# EXHIBIT

# B

State Court of Fulton County
**E-FILED**
24EV008822
10/5/2024 4:12 PM
Donald Talley, Clerk
Civil Division

## General Civil and Domestic Relations Case Filing Information Form

☐ Superior or ■ State Court of Fulton County

**For Clerk Use Only**

Date Filed ____________ Case Number ____________
MM-DD-YYYY

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| FINNERUD | ERIC | | | | NCHAIN HOLDING AG | | | | |
| SOUND ALIVE | ENTERPRISE, LLC | | | | NCHAIN UK LTD | | | | |
| DISTROMINT, LLC | | | | | | | | | |
| | | | | | | | | | |

Plaintiff's Attorney Mark W. Nonni State Bar Number 240319 Self-Represented ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

____________ Case Number ____________ Case Number

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

____________ Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

State Court of Fulton County
**E-FILED**
24EV008822
10/5/2024 4:12 PM
Donald Talley, Clerk
Civil Division

**GEORGIA, FULTON COUNTY** **DO NOT WRITE IN THIS SPACE**

**STATE COURT OF FULTON COUNTY**
**Civil Division**

**CIVIL ACTION FILE #:** ______________________

ERIC FINNERUD, 370 Paper Mill Dr., Lawrenceville, GA 30046

SOUND ALIVE ENTERPRISE LLC, 8735 Dunwoody Place, Ste N, Atlanta, GA 30350

DISTROMINT, LLC, 300 Colonial Center Pkwy, Ste 100N, Roswell, GA 30076

Plaintiff's Name, Address, City, State, Zip Code

vs.

NCHAIN HOLDING AG, 28-30 Market Place, London, England, W1W 8AP

NCHAIN UK LTD, 28-30 Market Place, London, England, W1W 8AP

Defendant's Name, Address, City, State, Zip Code

| **TYPE OF SUIT** | **AMOUNT OF SUIT** |
|---|---|
| [ ] ACCOUNT | PRINCIPAL $____________ |
| [ ] CONTRACT | |
| [ ] NOTE | INTEREST $____________ |
| [ ] TORT | |
| [ ] PERSONAL INJURY | ATTY. FEES $____________ |
| [ ] FOREIGN JUDGMENT | |
| [ ] TROVER | COURT COST $ ___________ |
| [ ] SPECIAL LIEN | |

************

[ ] NEW FILING
[ ] RE-FILING: PREVIOUS CASE NO. ________________

## SUMMONS

TO THE ABOVE NAMED-DEFENDANT:

You are hereby required to file with the Clerk of said court and to serve a copy on the Plaintiff's Attorney, or on Plaintiff if no Attorney, to-wit:

Name: Mark W Nonni

Address: Nonni Homola, 410 N Gadsden St.

City, State, Zip Code: Tallahassee, FL 32301 Phone No.: 850-601-1111

An answer to this complaint, which is herewith served upon you, must be filed within thirty (30) days after service, not counting the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint, plus cost of this action. **DEFENSES MAY BE MADE & JURY TRIAL DEMANDED**, via electronic filing or, if desired, at the e-filing public access terminal in the Self-Help Center at 185 Central Ave., S.W., Ground Floor, Room TG300, Atlanta, GA 30303.

Donald Talley, Chief Clerk (electronic signature)

***SERVICE INFORMATION:***

Served, this _______ day of ___________________, 20______.

_________________________________
DEPUTY MARSHAL, STATE COURT OF FULTON COUNTY

WRITE VERDICT HERE:
We, the jury, find for ________________________________________________

________________________________________________________________

This _________ day of _____________________, 20_____. ____________________________ Foreperson

**(STAPLE TO FRONT OF COMPLAINT)**

State Court of Fulton County
**E-FILED**
24EV008822
10/5/2024 4:12 PM
Donald Talley, Clerk
Civil Division

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| ERIC FINNERUD,<br>SOUND ALIVE ENTERPRISE, LLC, and<br>DISTROMINT, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>NCHAIN HOLDING AG and<br>NCHAIN UK LTD,<br><br>Defendants. | ) | Civil Action File No.:_______________<br><br>Jury Trial Demanded |

**COMPLAINT**

COME NOW, Eric Finnerud, Sound Alive Enterprise, LLC ("Sound Alive"), and DistroMint, LLC ("DistroMint"), as Plaintiffs in the above-styled action, and hereby file this Complaint against Defendants nChain Holding AG and nChain UK Ltd (collectively "nChain"), and in support thereof, show the Court as follows.

**INTRODUCTION**

1.

This case stems from the purposeful failures of Defendants nChain to adhere to its obligations to Plaintiffs Eric Finnerud, Sound Alive Enterprise, LLC, and DistroMint, LLC to assist Plaintiffs in developing the revolutionary music distribution platform—DistroMint—created by Plaintiffs. Despite initially working with and compensating Plaintiffs for their development efforts, the Defendants abruptly and intentionally ceased performance of its responsibilities and have converted the DistroMint platform as its own, causing immense damage to Plaintiffs.

2.

One primary reason that DistroMint is a game changer for the music industry is that it operates using blockchain technology. Blockchain technology is most often associated with the digital asset/cryptocurrency known as Bitcoin, although Bitcoin is just one of many different types of such assets. Cryptocurrencies are digital assets that employ cryptographic mechanisms to secure transactions, control the creation of additional units, and verify transactions. The underlying framework that permits this process to function is the “blockchain.”

3.

Before blockchain technology, the primary obstacle preventing the creation of cryptocurrencies was the “double-spend” problem. Previously, digital files were transmitted by duplication of the file itself. If one were to email or text a photo to another, the transaction resulted in the photo being duplicated—the sender and recipient both had an exact copy. This problem stopped the ability of a digital asset to have value as there was no mechanism to prevent infinite duplication.

4.

The creation of the blockchain solved this problem in an elegant manner. The blockchain is a digital ledger that tracks the ownership and transactional history of its native cryptocurrency. The first blockchain termed its native cryptocurrency Bitcoin. The Bitcoin blockchain (aka Bitcoin Network) thus tracks every transaction of every Bitcoin in existence. Every Bitcoin owner receives a digital address in order to take ownership of Bitcoin. The Bitcoin blockchain publicly lists every digital address and the amount of Bitcoin tied to that address. Digital addresses are commonly

referred to as "digital wallets." Every transaction from every address is publicly available and, for practical purposes, immutable.

5.

Defendants nChain are English companies that hold themselves out as companies operating at the forefront of blockchain technology, developing software, offering intellectual property ("IP") licensing, and providing consulting services.

6.

Defendants and Plaintiffs were to be joint and equal owners of the DistroMint platform, working together on its development and publication. Yet, as Plaintiffs poured their time, energy, and resources into the project, the Defendants began to misappropriate DistroMint as its own, willfully violating the terms of the agreement between it and Plaintiffs.

**PARTIES, JURISDICTION, AND VENUE**

7.

At all times material hereto, Plaintiff Eric Finnerud was a citizen and resident of Lawrenceville, Gwinnett County, Georgia.

8.

At all times material hereto, Plaintiff Sound Alive Enterprise, LLC was a Georgia limited liability company with its principal office in Atlanta, Fulton County, Georgia. Sound Alive is owned and operated by Eric Finnerud.

9.

At all times material hereto, Plaintiff DistroMint, LLC was a Georgia limited liability company with its principal office in Atlanta, Fulton County, Georgia. DistroMint is owned and operated by Eric Finnerud.

10.

At all times material hereto, Defendant nChain Holding AG was a foreign for-profit company registered in Liechtenstein, operating in the United Kingdom, and transacting business in Fulton County, Georgia.

11.

At all times material hereto, Defendant nChain UK Ltd was a foreign for-profit company registered in Liechtenstein, operating in the United Kingdom, and transacting business in Fulton County, Georgia. nChain UK Ltd, upon information and belief, is a wholly-owned subsidiary of nChain Holding AG.

12.

nChain is a leading blockchain technology, IP licensing, and consulting services company engaged in the business of contracting, developing, marketing, licensing, distributing, and selling blockchain-based IP in the United States and in Fulton County, Georgia, including Mr. Finnerud's blockchain IP which is the subject of this action.

13.

As described below, a substantial part of the Parties' business was transacted in, and a substantial part of the tortious acts, omissions, and injuries alleged herein occurred in, Fulton County, Georgia by virtue of Sound Alive and DistroMint's presence and business activities

therein. As such, jurisdiction and venue are proper as to nChain pursuant to O.C.G.A. §§ 9-10-91(1) – (3) and 9-10-93.

14.

nChain are companies which have no registered agent in Georgia, and as a result, pursuant to O.C.G.A. §§ 9-10-91 and 14-2-504(b), the Hague Service Convention, as well as other statutes, they may be served with process by mail at their registered office address: 28-30 Market Place, London, England, W1W 8AP. The United Kingdom is a party to the Hague Service Convention, and it permits service by mail under Article 10 for the registered offices of companies. These Defendants have been properly served with process in this action.

**FACTUAL ALLEGATIONS**

**Sound Alive**

15.

Sound Alive, founded by E. Smitty (i.e., Eric Finnerud's stage name), represents a multifaceted venture in the music industry, focusing primarily on production, engineering, and distribution. Eric started what was initially known as "Smitty Productions" in 2001, later rebranding it to Sound Alive Studios. Over the years, this evolved into not just a studio but an internationally recognized brand in music production.

16.

Sound Alive provides professional mixing, mastering, and production services. The company aims not just to create but also to enhance the quality of sound for artists, ensuring their music reaches the highest standards for distribution worldwide.

17.

Beyond production, Sound Alive also provides music distribution. This arm of the business focuses on getting music out to platforms like Spotify, Apple Music, and others, ensuring that artists have a platform to reach broader audiences.

18.

The label has also released compilations like "Sound Alive Records The Compilation Vol. 1," showcasing various artists.

19.

Sound Alive has a well-established reputation in the music industry, with notable projects that include high-profile artists, representing a versatility in handling different genres within hip-hop and beyond.

**DistroMint**

20.

DistroMint is a pioneering venture in the music industry that leverages Web3 and blockchain technology. It was created by and is owned by Eric Finnerud.

21.

Eric, who also goes by his stage name E. Smitty, has decades of experience in the music industry as a record producer and audio engineer.

22.

He became an innovator in the blockchain technology industry after realizing the beneficial effects the technology could have in bridging the artistic and technological realms.

23.

DistroMint seeks to stand at the forefront of music industry innovation, promising artists not just distribution but also new avenues for monetization and engagement through blockchain and AI technologies. Eric’s venture aims to reshape how artists interact with their music's lifecycle, from creation to consumption, in a digital, decentralized economy.

24.

The vision and purpose of DistroMint is to revolutionize music distribution and discovery by providing artists with a more equitable platform that enables artists to distribute their music across major platforms like Spotify, Apple Music, and Tidal while allowing them to generate revenue from multiple sources, including through Non-Fungible Tokens (“NFTs”) and token-based systems.

25.

Utilizing blockchain technology, DistroMint facilitates the minting and trading of music-related NFTs. This integration not only provides authenticity and ownership rights but also allows for new forms of interaction between artists and fans, like collecting and investing in music assets.

26.

The promise of DistroMint allowed Eric and Sound Alive to receive significant recognition and funding from major tech players. It was awarded grants from AWS (Amazon Web Services) Startups and Microsoft for Startups, indicating strong potential and industry backing. These grants were provided to facilitate further development, scalability, and integration of cloud and AI technologies into DistroMint's ecosystem.

27.

Beyond blockchain, DistroMint incorporates AI to combat harmful content, enhancing the platform's safety and user experience.

28.

By focusing on Web3 technologies, DistroMint redefines how music is valued, distributed, and monetized. The project's approach aligns with broader trends in decentralizing content distribution, giving more control back to creators.

**nChain**

29.

nChain advertises itself as a leading provider of blockchain technology, IP licensing, and consulting services.

30.

At all relevant times until approximately September 2023, Christen Ager-Hanssen ("Ager-Hanssen") was the CEO of nChain.

31.

The current CEO of nChain is Stefan Matthews.

32.

At one point, the Chief Scientist Officer of nChain was Craig Wright.

33.

Mr. Wright claimed for several years that he was the inventor of Bitcoin, often using his high net worth to file defamation lawsuits against anyone disputing his claim.

34.

In 2021, an alliance was formed to sue Mr. Wright in the United Kingdom ("UK") to definitively determine that he was not the inventor of Bitcoin, the pseudonymous Satoshi Nakamoto.

35.

At the conclusion of that case in May 2024, in its Approved Judgment the UK judge in the matter determined Mr. Wright to be a serial liar, holding "it would either be impossible to pin down every lie and/or it would take weeks to do so."

36.

In that same UK case, current nChain CEO Mr. Matthews testified on behalf of Mr. Wright. The judge also concluded that Mr. Matthews testified untruthfully, determining that "Mr. Matthews was considerably more careful in his lies than Dr. Wright, only lying where he had to do so to sustain Dr. Wright's position."

37.

Prior to being terminated, Ager-Hanssen compiled a dossier alleged to contain information demonstrating several of nChain's directors were engaged in an attempt to defraud the company.

**Business Relationship Between Eric Finnerud, Sound Alive, and nChain**

38.

Eric, through his company, Sound Alive, sought a joint venture with nChain for blockchain development as nChain's resources would serve to better showcase DistroMint's commitment to

leveraging cutting-edge technology for transparency, security, and efficiency in music distribution.

39.

On December 12, 2022, Ager-Hanssen and Eric entered into an agreement (“Development Agreement”) whereby nChain UK LTD agreed to commit its resources towards the development, support, and launch of Sound Alive’s platform and patent: "Blockchain Distribution W/NFT Minting" and "DistroMint, LLC." Sound Alive and nChain agreed to a split ownership of fifty percent. nChain also agreed to compensate Eric through Sound Alive at a rate of $12,500.00 per month for consulting services nChain required as part of its development and support of DistroMint.

40.

Recognizing the importance it placed on the efforts and creation of Eric and Sound Alive, nChain dedicated an entire team to focus on (i) supporting Sound Alive and (ii) advancing DistroMint in the United States (“US”) generally and the Atlanta area specifically.

41.

Specifically, Sound Alive, through Eric, engaged in the following US activities on behalf of nChain:

a. Leverage Sound Alive’s industry knowledge and experience to engage with multiple US record labels, executives, and music distributors.

b. Leverage Sound Alive’s musician network to engage with various artists to secure commitments to utilize DistroMint services.

c. Leverage Sound Alive's reputation and network to amplify social media posts for nChain (such as @nchainglobal on X).

d. Provide support and assistance to nChain's subsidiaries, executives, and employees.

e. Planning for "roadshow" engagements publicizing DistroMint through speaking engagements and presentations (for example at music schools).

f. Secure grants from Amazon Web Services and Microsoft Azure (approximately $176,000.00) for hosting and development of DistroMint.

g. Build and develop the US social media following for DistroMint.

h. Negotiate with advertising firms regarding US billboard advertising and other advertising media, including Times Square.

i. Engage firms for DistroMint social media management, marketing, funnel building, and fund-raising.

42.

After the December 12, 2022 meeting, nChain began to set recurrent meetings with Eric and Sound Alive through its Microsoft Teams account. During these meetings, nChain would reach out to Eric while he was physically present in Fulton County, Georgia working on behalf of nChain.

43.

On December 19, 2022, nChain dedicated at least four of its employees and/or agents to meet with Eric and Sound Alive and discuss Eric and Sound Alive's efforts to advance nChain's US goals with DistroMint.

44.

In January 2023, nChain increased its activity in the United States, engaging in at least thirteen meetings with Eric and Sound Alive to discuss DistroMint and its continued development as well as its promotion in the US.

45.

In February 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another thirteen meetings. These meetings included participation by legal counsel for nChain.

46.

On February 20, 2023, Eric and Sound Alive reduced their Development Agreement to writing. Eric, through Sound Alive, and Ager-Hanssen, on behalf of nChain, affirmed in writing the terms that were verbally agreed to in December 2022.

47.

In March 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another fourteen meetings between its staff and Eric and Sound Alive.

48.

In April 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another twelve meetings between its staff and Eric and Sound Alive.

49.

In May 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another nine meetings between its staff and Eric and Sound Alive.

50.

On May 30, 2023, nChain paid for Eric and Sound Alive to visit London and host a panel discussion during the London Blockchain Conference.

51.

Beginning in June 2023, nChain featured Eric and Sound Alive in a commercial advertising campaign.

52.

Also, in June 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another eleven meetings between its staff and Eric and Sound Alive.

53.

On July 28, 2023, an nChain employee, Dale Evans, nChain's in-house counsel, met with Eric and Sound Alive to discuss nChain's continued obligations under the Development Agreement.

54.

In August 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another five meetings between its staff and Eric and Sound Alive.

55.

In September 2023, nChain continued its US efforts to develop and promote DistroMint with Eric and Sound Alive, engaging in at least another five meetings between its staff and Eric and Sound Alive.

**Wrongful Conduct and Damages By nChain**

56.

On October 2, 2023, the nChain Project Manager working with Eric and Sound Alive, Urban Bratina, informed Eric that Ager-Hanssen had been terminated from nChain. During this same meeting, Bratina informed Eric that the termination would not affect the ongoing research, development, and promotion of DistroMint.

57.

Yet, on that same day, nChain altered Eric's login credentials to the DistroMint development site maintained by nChain with the effect of denying him access.

58.

When Eric raised his concern with losing access to DistroMint, nChain employee Christine Leong told Eric not to worry and that the company desired to continue working with Eric and Sound Alive.

59.

Eric and Sound Alive believed and relied upon Ms. Leong's representations, as well as the representations of other nChain employees as they scheduled Eric and Sound Alive for at least seven meetings for the month of October 2023. Although Eric and Sound Alive attended each of the scheduled meetings, all were "no-shows" by nChain staff.

60.

In November 2023, nChain scheduled Eric and Sound Alive for at least five meetings. Although Eric and Sound Alive attended each of the scheduled meetings, all were "no-shows" by nChain staff.

61.

On November 1, 2023, Eric met with Dale Evans, nChain's in-house legal counsel, to discuss the "no-shows" and nChain's failure to abide by its continuing obligations under the Development Agreement. These failures included the failure to provide Eric and Sound Alive with continued access to nChain's resources for continued development of DistroMint and the failure to pay Sound Alive's timely submitted invoices for October and November 2023.

62.

Mr. Evans, nChain's in-house attorney, continued to state the company desired to work with Sound Alive to develop and promote DistroMint. Eric relied on these statements by nChain's legal staff.

63.

On December 14, 2023, Mr. Evans and James Marchant, nChain's Deputy CEO and Chief Commercial Officer, met with Eric to discuss nChain's failures to meet its obligations under the Development Agreement.

64.

During this meeting, these two nChain employees presented Eric and Sound Alive with the "E.Smitty / nChain Transaction Restructure Proposal" (hereinafter "DistroMint Restructure

Proposal"), which altered the terms of the Development Agreement to the substantial detriment of Eric and Sound Alive.

65.

The DistroMint Restructure Proposal did, in the very first sentence of the document, recognize and affirm nChain's obligations under the original Development Agreement. Specifically, the first sentence stated: "The objective of this Proposal is to achieve a restructure of the arrangements entered into pursuant to an oral agreement between Eric Finnerud (professionally known as **E.Smitty**) and Christen Ager-Hanssen (**CAH**) on behalf of nChain UK Ltd (**nChain UK**). The agreement is recorded in an email from E.Smitty to CAH of 21 February 2023, in respect of the development and ownership of the Distromint platform." [emphasis in the original]

66.

Realizing the value of DistroMint and the efforts of Eric and Sound Alive, nChain valued DistroMint at a minimum of $10,000,000.00 USD in the DistroMint Restructure Proposal.

67.

Also recognizing that it had maintained substantial meaningful contacts with Eric and Sound Alive through the Development Agreement terms, nChain sought concessions from Eric and Sound Alive to alter the pre-existing US venue and choice-of-law understanding such that any legal disputes would be resolved in the United Kingdom under English law. Eric and Sound Alive declined to concede jurisdiction outside of the US.

68.

Given the obvious, oppressive and unconscionable terms of the DistroMint Restructure Proposal, Eric and Sound Alive did not agree to the proposed restructure agreement and did not execute the document. Consequently, no alterations, modifications, or amendments were made to the original terms of the Development Agreement.

69.

nChain and its employees purposefully engaged in conduct to deceive Eric and Sound Alive because it believed it could unfairly leverage its substantial resources against a small-business owner. In proposing the restructuring agreement without any consideration and recognizing that Sound Alive had committed a vast amount of time and resources to the Development Agreement, nChain engaged in willful and/or wanton misconduct by seeking to unilaterally change the terms to the detriment of Sound Alive.

70.

Unhappy that Eric and Sound Alive refused to bend to nChain's strong-arm tactics to restructure the Development Agreement, Mr. Evans met with Eric and Sound Alive on December 18, 2023 to browbeat him into accepting the one-sided DistroMint Restructure Proposal. During this meeting, Mr. Evans attempted to coerce Eric and Sound Alive by stating that if the DistroMint Restructure Proposal was not signed, nChain would refuse to pay Eric and Sound Alive the owed monthly fee.

71.

When Eric and Sound Alive let nChain know in no uncertain terms that such behavior was not only unprofessional, but clearly violative of the terms of the Development Agreement, nChain did pay the outstanding October and November 2023 invoices.

72.

In December 2023, nChain scheduled Eric and Sound Alive for at least six meetings. Although Eric and Sound Alive attended each of the scheduled meetings, all were "no-shows" by nChain staff.

73.

In January 2024, nChain scheduled Eric and Sound Alive for at least five meetings. Although Eric and Sound Alive attended each of the scheduled meetings, all were "no-shows" by nChain staff.

74.

In February 2024, nChain scheduled Eric and Sound Alive for at least four meetings. Although Eric and Sound Alive attended each of the scheduled meetings, all were "no-shows" by nChain staff.

75.

Currently, nChain owes Sound Alive in excess of $150,000.00 for its agreed-upon monthly consulting fees from December 2023 through the present as well as related expenses that were previously reimbursed by nChain when it was still honoring the Development Agreement. This amount will continue to increase with each successive month.

76.

Currently, nChain refuses to allow Eric and Sound Alive access to the cloud storage site that houses the DistroMint source code.

77.

Currently, nChain refuses to transfer the DistroMint source code to Sound Alive.

78.

Without the source code for DistroMint, Sound Alive cannot complete the platform such that it is fully operational and functional.

79.

Without a fully operational and functional platform, the numerous musicians, record labels, producers, distributors, *etc.* cannot fully commit to putting their content on DistroMint.

80.

Without a fully operational and functional platform, continued efforts by Eric and Sound Alive to recruit additional musicians, record labels, producers, distributors, *etc.* are hampered to such an extent as to make any further attempts meaningless.

81.

In the blockchain industry time is especially of the essence, and the past and present delays caused by nChain have significantly damaged the business opportunities of DistroMint such that a recovery may no longer be possible.

82.

Further, in reliance on the promises made by nChain—and its repeated affirmations of those promises—Eric devoted the vast majority of this time to Sound Alive's development of

DistroMint. The losses he has suffered due to the misbehavior of nChain has caused him substantial distress, anguish, and pain and suffering.

83.

As a result, the continued breaches by nChain have caused damages to Sound Alive in excess of $10,000,000.00 that continue to accrue with each passing day.

84.

Further, as stated previously, Sound Alive was granted approximately $176,000.00 in credits by Amazon Web Services and Microsoft Azure for cloud hosting and storage purposes for DistroMint. Sound Alive is unable to use these credits as nChain holds the DistroMint code hostage. The credits will expire in November 2024 if unused, contributing to Sound Alive's damages.

## CAUSES OF ACTION

### Count One
### Equitable (Injunctive and/or Declaratory) Relief

85.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

86.

Plaintiffs entered into written or oral contracts with Defendants, as alleged herein and as conceded by nChain when it submitted the DistroMint Restructure Proposal. Plaintiffs were induced to enter into such contracts by Defendants' representations, which emphasized and assured that Defendants would assist in the development of the DistroMint platform while Sound Alive continued to promote and develop the DistroMint brand, and omitted any information

regarding its intent to unlawfully convert DistroMint and its source code into nChain's sole possession and control. Plaintiffs were the natural and intended beneficiaries of those written or oral contracts.

87.

Plaintiffs performed all promises, covenants, and conditions required to be performed on their part pursuant to the contracts, and Plaintiffs have done and performed all those matters and things properly required under the contracts, or alternatively, they have been excused from such performance because of the acts, representations, omissions, breaches, and/or conduct of Defendants. Similarly, all conditions precedent to Plaintiffs' right to recover have been performed or have been waived by Defendants.

88.

Defendants breached these contracts by improperly performing their obligations promised in the Development Agreement, and by employing, authorizing, and/or allowing the employment of processes and practices resulting in such nonperformance, as alleged herein.

89.

No adequate remedy at law exists to address Defendants's breaches, and, due to Defendants's actions, there may be no way to undo the injustices that have been done.

90.

Accordingly, Plaintiffs request the following equitable relief:

a. A judicial determination and declaration of the rights of Plaintiffs and the responsibilities of Defendants with respect to the Development Agreement that is the subject of this action;

b. That Defendants be enjoined to return to Plaintiffs the DistroMint code and all assets, tangible and intangible, belonging to DistroMint;

c. That Defendants be enjoined to cease and desist from any involvement in DistroMint; and

d. That Defendants be determined and declared to be financially responsible for the costs and expenses of returning all DistroMint assets to Plaintiffs.

**Count Two**
**Breach of Contract**

91.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

92.

Plaintiffs entered into written or oral contracts with Defendants to commit its resources towards the development, support, and launch of Sound Alive's platform, DistroMint, LLC, and patent "Blockchain Distribution W/NFT Minting," as alleged herein. The expectations of Plaintiffs, as a reasonable person, was that these contracts, expressly or by reasonable implication, assured the proper performance of all aspects of the terms and obligations contained in the Development Agreement. However, these contracts uniformly omitted material information regarding Defendants' actual practices and Defendants' failure to properly train, inspect, monitor, or supervise its employees, agents, servants, representatives, associates, and/or independent contractors. Plaintiffs were the natural and intended beneficiaries of the contracts with Defendants.

93.

Plaintiffs performed all promises, covenants, and conditions required to be performed on their part pursuant to the contracts. Furthermore, Plaintiffs have done and performed all those matters and things properly required under the contracts, or alternatively, they have been excused from such performance because of the acts, representations, omissions, breaches, and/or conduct of Defendants. Similarly, all conditions precedent to Plaintiffs' right to recover have been performed or have been waived by Defendants.

94.

Defendants breached their express written or oral contracts as well as their implied contracts with, and promises to, Plaintiffs by improperly performing the terms and obligations contained in the Development Agreement and by failing to disclose the true nature of Defendants' practices and procedures, as alleged herein.

95.

As a direct and proximate result of Defendants' breaches of contract, Plaintiffs have suffered, and will continue to suffer, monetary losses in an amount in excess of $10,000,000.00.

96.

Moreover, Defendants did not breach the contracts unintentionally, or negligently, or while acting in good faith. Instead, in breaching the contracts, Defendants acted intentionally, with knowledge, and for the purpose of bringing about an injury by depriving Plaintiffs of certain contemplated benefits, namely the DistroMint code and platform. As a result, pursuant to O.C.G.A. § 51-12-10, Defendants may be held liable for the mental distress damages traceable to their acts, even though such damages would not otherwise naturally be foreseeable or in the

contemplation of the parties at the time of making the contracts. Thus, as a further direct and proximate result of Defendants' breaches of contract, Plaintiffs has suffered, and will continue to suffer, severe mental distress.

**Count Three**
**Breach of Covenant of Good Faith and Fair Dealing**

97.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

98.

At all times material hereto, Defendants held itself out to be a reputable, experienced, and trustworthy entity engaged in the business of contracting, developing, marketing, licensing, distributing, and selling blockchain-based IP in the United States and other countries.

99.

Defendants represented to the public at large and, in particular, to Plaintiffs that it would properly, carefully, and professionally perform or accomplish all aspects of the terms and obligations contained in the Development Agreement.

100.

In conducting the activities and making the representations described herein, Defendants breached the covenants of good faith and fair dealing, implicit in its contracts and imposed upon it by law, by failing to abide by its agreements and promises to Plaintiffs, by abusing the trust that Plaintiffs placed in it, by improperly performing the terms and obligations contained in the Development Agreement, and by falsely stating to Plaintiffs, or inducing Plaintiffs to reasonably believe, otherwise.

101.

As a direct and proximate result of Defendants' breaches of the covenants of good faith and fair dealing, and upon their discovery of Defendants' conduct, Plaintiffs have suffered, and will continue to suffer, monetary losses in an amount in excess of $10,000,000.00.

102.

In performing its acts, omissions, false representations, and concealments herein alleged, Defendants acted intentionally, knowingly, wantonly, willfully, with oppression, fraud, or malice, or in reckless and conscious disregard of the rights of Plaintiffs. Plaintiffs are, therefore, entitled to punitive and exemplary damages from Defendants in such amount as shall be necessary and appropriate to punish Defendants and to deter it and anyone else from ever committing, enabling, aiding and abetting, or recklessly allowing similar conduct. Alternatively, Plaintiffs are entitled to mental pain, suffering, and anguish damages based upon the injuries to the peace, happiness, or feelings of Plaintiffs.

**Count Four**
**Breach of Fiduciary Duty/Special Duty**

103.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

104.

By entering into the Development Agreement, which Plaintiffs reasonably expected would be performed or accomplished in a proper manner, Defendants knowingly and intentionally entered into a special relationship of trust and confidence with Plaintiffs. And, in entering into agreements to effectuate and complete the Development Agreement, Defendants

undertook to lawfully discharge those duties, including specifically the duty to commit its resources towards the development, support, and launch of Sound Alive's platform, DistroMint, LLC, and patent "Blockchain Distribution W/NFT Minting," within the bounds of industry practice, and in accordance with all applicable laws and regulations.

105.

Defendants were, therefore, charged with a fiduciary, or special, duty to Plaintiffs to fully and faithfully perform its obligations under the Development Agreement.

106.

By violating the terms of the Development Agreement as described herein, and by negligently or recklessly entrusting its employees, agents, servants, representatives, associates, and/or independent contractors with performing its obligations under the Development Agreement, and by failing to properly perform or accomplish the obligations that Defendants had expressly or implicitly agreed to perform, Defendants breached the fiduciary, or special, duties owed by it to Plaintiffs.

107.

As a direct and proximate result of Defendants' breaches of its fiduciary, or special, duties, Plaintiffs have suffered, and will continue to suffer, the following damages: monetary losses in an amount in excess of $10,000,000.00.

108.

Defendants' conduct in breach of its fiduciary, or special, obligations was intentional, knowing, wanton, willful, done with oppression, fraud, or malice, or done in reckless and conscious disregard of the rights of Plaintiffs. Plaintiffs are, therefore, entitled to punitive and

exemplary damages from Defendants in such amount as shall be necessary and appropriate to punish Defendants and to deter it and anyone else from ever committing, enabling, aiding and abetting, or recklessly allowing similar conduct.

**Count Five**
**Fraudulent Conduct**

109.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

110.

The conduct of Defendants' practices and performance under the Development Agreement, as described herein, operated as a fraud upon Plaintiffs in that the actual conduct of Defendants was knowingly, uniformly, and actively concealed from Plaintiffs.

111.

Such conduct constituted false representations on material facts made to Plaintiffs, which Defendants knew were false at the time they were made. Defendants intended to deceive Plaintiffs and to induce Plaintiffs to act in reliance on the false representations. Plaintiffs did not know that the representations were false and justifiably relied on them to their detriment.

112.

Plaintiffs' reliance upon Defendants' proper conduct at every stage of Development Agreement was justified and reasonable in that Defendants held itself out to be a reputable, experienced, and trustworthy entity in the business of contracting, developing, marketing, licensing, distributing, and selling blockchain-based IP.

113.

As a direct and proximate result of Defendants' fraudulent conduct, fraud, and deceit, Plaintiffs have suffered, and will continue to suffer, the following damages: monetary losses in an amount in excess of $10,000,000.00.

114.

Defendants' fraud and deceit, consisting of its improper performance under the Development Agreement, combined with its uniform concealment and nondisclosure of such misconduct as well as its implicit representation, through repeated reassurances, that the terms of the Development Agreement would be properly performed, thereby concealing the misconduct from Plaintiffs in such a manner that it was difficult for Plaintiffs to discover that Defendants had no intention of complying with such terms, was intentional, knowing, wanton, willful, done with oppression, fraud, or malice, or done in reckless and conscious disregard of the rights of Plaintiffs. Plaintiffs are, therefore, entitled to punitive and exemplary damages from Defendants in such amount as shall be necessary and appropriate to punish Defendants and to deter it and anyone else from ever committing, enabling, aiding and abetting, or recklessly allowing similar conduct.

**Count Six**
**Negligence**

115.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

116.

At all times material hereto, Defendants owed a duty to Plaintiffs to act with the ordinary care of a reasonable person/company with respect to all aspects of the services and obligations promised in the Development Agreement, including but not limited to: all phases of the Development Agreement; the hiring, training, retention, and supervision of all employees, agents, servants, representatives, associates, and/or independent contractors in connection with such services and obligations; the management and administration of such services and obligations; the association with other persons or entities to accomplish the performance of such services and obligations; and the ascertainment that all such services and obligations were being fully and properly undertaken and performed.

117.

However, Defendants negligently, recklessly, wantonly and/or carelessly failed to discharge such duties.

118.

Defendants' conduct was accomplished through a common course and practice of the improper performance of its obligations promised in the Development Agreement, as alleged herein, resulting from Defendants' own negligence and the negligent entrustment of such services and obligations to persons and entities who lacked the qualifications, training, and experience required to execute them properly, and by Defendants' negligent failure to control, supervise, and investigate the actions of such persons and entities.

119.

As a direct and proximate result of such negligence, recklessness, wantonness, and/or carelessness, Plaintiffs have suffered, and will continue to suffer, the following damages: monetary losses in an amount in excess of $10,000,000.00 and/or injuries to the peace, happiness, or feelings of Plaintiff Eric Finnerud causing him mental pain, suffering, and anguish.

**Count Seven**
**Unjust Enrichment**

120.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

121.

Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiffs by improperly performing the terms and obligations contained in the Development Agreement and by refusing to return the DistroMint code and platform to Plaintiffs.

122.

It would be inequitable to permit Defendants to retain the benefits it has wrongfully gained through the actions alleged herein, which it accordingly holds in constructive trust for, and must be ordered to restore to, Plaintiffs.

**Count Eight**
**Conversion**

123.

Plaintiffs reallege and incorporate by reference the allegations of Paragraphs 1 through 84 as if fully set forth herein, and further allege as follows.

124.

Plaintiffs had title to the DistroMint platform at all relevant times and a right to immediate possession at the moment Defendants ceased performing all its obligations under the Development Agreement. Defendants continue to have possession of the DistroMint source code. Despite Plaintiffs' repeated requests for the return of all DistroMint source code and assets, Defendants have refused to return said property.

125.

The value of the DistroMint platform is an amount in excess of $10,000,000.00.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully demand judgment against Defendants and request the following relief:

a. A trial before a fair and impartial jury as to all issues;

b. Equitable, injunctive, and declaratory relief, as described herein, including judicial supervision of Defendants' property and a judicial determination of the rights and responsibilities of the Parties regarding the Development Agreement that is the subject of this action;

c. Compensatory damages, as described herein, and mental distress damages pursuant to O.C.G.A. § 51-12-10 in an amount to be proven at trial and deemed appropriate by the trier of fact;

d. Punitive damages in an amount to be proven at trial and deemed appropriate by the trier of fact;

e. Damages for mental pain, suffering, and anguish pursuant to O.C.G.A. § 51-12-6 in an amount to be proven at trial and deemed appropriate by the trier of fact;

f. Any and all other damages including but not limited to economic, special, non-economic, general, pain and suffering, incidental, nominal, consequential, and all other damages permitted under Georgia law in an amount to be proven at trial and deemed appropriate by the trier of fact;

g. The establishment of a constructive trust upon Defendants' property, revenues, and/or profits for the benefit of Plaintiffs, and the disgorgement and restitution of the past revenues and/or profits to Plaintiffs;

h. Prejudgment and post-judgment interest;

i. Taxable costs of litigation, including but not limited to discretionary costs, attorneys' fees, and expenses incurred in pursuing this action;

j. Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense, and as a result, pursuant to O.C.G.A. § 13-6-11, Plaintiffs request that they be awarded expenses of this litigation, including reasonable attorneys' fees;

k. Any other and further relief to which Plaintiffs may be entitled at law or in equity; and

l. Any other and further relief this Honorable Court deems just and proper.

TRIAL BY JURY IS HEREBY DEMANDED.

[DATE & SIGNATURE ON FOLLOWING PAGE]

This 2nd day of October, 2024.

Respectfully submitted,

/s/ Mark W. Nonni

Mark W. Nonni
Georgia Bar No.: 240319
Co-Counsel for Plaintiffs

NONNI HOMOLA
410 N Gadsden Street
Tallahassee, FL 32301
Phone: 850-601-1111
Fax: 850-765-2074
Email: Mark@noho.law
LeighAnna@noho.law

HODL LAW CALI, APC
Frederick A. Rispoli
Cal. Bar No. 321794
Co-Counsel for Plaintiffs
(Pro Hac Vice Application Pending)
27762 Antonio Parkway, Suite L-1 No. 232
Ladera Ranch, CA 92694
Phone: 213-292-5200
Email: Filing@HodlLaw.org

State Court of Fulton County
**E-FILED**
24EV008822
11/5/2024 2:20 PM
Donald Talley, Clerk
Civil Division

# IN THE STATE COURT OF FULTON COUNTY
# STATE OF GEORGIA
**Civil Division**

ERIC FINNERUD
SOUND ALIVE ENTERPRISE, LLC, and
DISTROMINT, LLC,

Plaintiffs, Civil Action No.: 24EV008822

vs.

NCHAIN HOLDING AG and
NCHAIN UK LIMITED

Defendants.

---

**Witness Statement of Service in accordance with sub paragraph (b) of article 10, Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents In Civil or Commercial Matters**

---

I, **PAUL COTTEE**, Process Server, acting under the instructions of Across The Pond Process Service of Moorside, Moor Lane, Menston, LS29 6AS, England, say as follows:

1. In the matters detailed below I was acting as agent for Graham Henry Bridgman ("Mr Bridgman"), a Solicitor of the Senior Courts of England and Wales and thus a competent person within the meaning of article 10(b) of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("the Convention").

2. Mr Bridgman was in turn acting upon the instructions of Aaron Dean Lukken of Viking Advocates, LLC, of Kansas City, Missouri, USA, an attorney, and thus a competent person of the State of origin within the meaning of article 10(b) of the Convention).

3. In this witness statement I refer to the following documents as "the Service Documents":

   - Hague Service Convention Warning and Summary of the Document to be Served ("the Hague Summary");
   - Summons; and
   - Complaint.

4. Exhibited hereto marked 'A' is a copy of the Hague Summary.

5. On Thursday the 17th day of October 2024 at 3:23 p.m., I served NCHAIN UK LIMITED, one of the Defendants herein, with the Service Documents, by delivering them to and leaving them at the Registered Office of nChain Limited, namely 28-30 Market Place, London, W1W 8AP, England, hereafter "the Service Address", which is a method of service in accordance with English Court rules. Under those rules, the deemed date of service is Monday the 21st day of October 2024.

6. On arrival at the Service Address I was directed to the fifth floor, where I met with an adult male who identified himself as 'Harme', an employee of nChain UK Limited. Nobody else was present but he accepted the documents on behalf of nChain UK Limited, confirming that he was authorised to do so.

7. Service has thus been effected in accordance with a method prescribed by the internal law of England and Wales and also in accordance with article 10(b) of the Convention.

## STATEMENT OF TRUTH

I believe, and declare under penalty of perjury, that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**Dated:** 18 October 2024

**Signed:** ______________________________

**PAUL COTTEE**

# IN THE STATE COURT OF FULTON COUNTY
# STATE OF GEORGIA
**Civil Division**

ERIC FINNERUD
SOUND ALIVE ENTERPRISE, LLC, and
DISTROMINT, LLC,

Plaintiffs, Civil Action No.: 24EV008822

vs.

NCHAIN HOLDING AG and
NCHAIN UK LIMITED

Defendants.

---

**Exhibit A to the Witness Statement of PAUL COTTEE**

---

This is the exhibit marked "A" to my witness statement dated today.

Dated: 18th October 2024

Signed: ______________________

**PAUL COTTEE**

'A'

# SUMMARY OF THE DOCUMENT TO BE SERVED
ÉLÉMENTS ESSENTIELS DE L'ACTE

**Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, signed at The Hague, the 15th of November 1965 (Article 5, fourth paragraph).**
Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye le 15 novembre 1965 (article 5, alinéa 4).

| | |
|---|---|
| **Name and address of the requesting authority:**<br>Nom et adresse de l'autorité requérante : | Aaron D. Lukken, Attorney<br>Viking Advocates, LLC<br>6525 Charlotte Street<br>Kansas City, Missouri 64131 USA<br>E.: lukken@vikinglaw.us<br>Tel.: +1.816.683.7900 |
| **Particulars of the parties*:**<br>Identité des parties* : | **Plaintiffs:** Eric Finnerud; Sound Alive Enterprise, LLC; Distromint, LLC<br>**Defendants:** nChain Holding AG; nChain UK Ltd |

* If appropriate, identity and address of the person interested in the transmission of the document
S'il y a lieu, identité et adresse de la personne intéressée à la transmission de l'acte

☒ **JUDICIAL DOCUMENT****
ACTE JUDICIAIRE**

| | |
|---|---|
| **Nature and purpose of the document:**<br>Nature et objet de l'acte : | To notify the defendants of a lawsuit against them, and to demand their answer at court. |
| **Nature and purpose of the proceedings and, when appropriate, the amount in dispute:**<br>Nature et objet de l'instance, le cas échéant, le montant du litige : | Plaintiffs accuse the defendants of, *inter alia*, breach of contract. They seek injunctive and declaratory relief, damages, costs, fees, expenses, and interest. |
| **Date and Place for entering appearance**:**<br>Date et lieu de la comparution** : | Within 30 days after service the addressee must enter an appearance in the State Court of Fulton County, Civil Division, 185 Central Avenue, SW Atlanta, Georgia 30303. |
| **Court which has given judgment**:**<br>Juridiction qui a rendu la décision** : | No court has issued a judgment. |
| **Date of judgment**:**<br>Date de la décision** : | No court has issued a judgment. |
| **Time limits stated in the document**:**<br>Indication des délais figurant dans l'acte** : | 30 days |

** if appropriate / s'il y a lieu

# WARNING
AVERTISSEMENT

**Identity and address of the addressee** / Identité et adresse du destinataire

**nChain UK Limited**
28-30 Market Place
London W1W 8AP

**IMPORTANT**

**THE ENCLOSED DOCUMENT IS OF A LEGAL NATURE AND MAY AFFECT YOUR RIGHTS AND OBLIGATIONS. THE 'SUMMARY OF THE DOCUMENT TO BE SERVED' WILL GIVE YOU SOME INFORMATION ABOUT ITS NATURE AND PURPOSE. YOU SHOULD HOWEVER READ THE DOCUMENT ITSELF CAREFULLY. IT MAY BE NECESSARY TO SEEK LEGAL ADVICE.**

**IF YOUR FINANCIAL RESOURCES ARE INSUFFICIENT YOU SHOULD SEEK INFORMATION ON THE POSSIBILITY OF OBTAINING LEGAL AID OR ADVICE EITHER IN THE COUNTRY WHERE YOU LIVE OR IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED.**

**ENQUIRIES ABOUT THE AVAILABILITY OF LEGAL AID OR ADVICE IN THE COUNTRY WHERE THE DOCUMENT WAS ISSUED MAY BE DIRECTED TO:**

TRÈS IMPORTANT

LE DOCUMENT CI-JOINT EST DE NATURE JURIDIQUE ET PEUT AFFECTER VOS DROITS ET OBLIGATIONS. LES « ÉLÉMENTS ESSENTIELS DE L'ACTE » VOUS DONNENT QUELQUES INFORMATIONS SUR SA NATURE ET SON OBJET. IL EST TOUTEFOIS INDISPENSABLE DE LIRE ATTENTIVEMENT LE TEXTE MÊME DU DOCUMENT. IL PEUT ÊTRE NÉCESSAIRE DE DEMANDER UN AVIS JURIDIQUE.

SI VOS RESSOURCES SONT INSUFFISANTES, RENSEIGNEZ-VOUS SUR LA POSSIBILITÉ D'OBTENIR L'ASSISTANCE JUDICIAIRE ET LA CONSULTATION JURIDIQUE, SOIT DANS VOTRE PAYS, SOIT DANS LE PAYS D'ORIGINE DU DOCUMENT.

LES DEMANDES DE RENSEIGNEMENTS SUR LES POSSIBILITÉS D'OBTENIR L'ASSISTANCE JUDICIAIRE OU LA CONSULTATION JURIDIQUE DANS LE PAYS D'ORIGINE DU DOCUMENT PEUVENT ÊTRE ADRESSÉES À :

Atlanta Legal Aid Society
54 Ellis Street NE, Atlanta, Georgia 30303
Tel.: +1.404.524.5811

**It is recommended that the standard terms in the notice be written in English and French and where appropriate also in the official language, or in one of the official languages of the State in which the document originated. The blanks could be completed either in the language of the State to which the document is to be sent, or in English or French.**

Il est recommandé que les mentions imprimées dans cette note soient rédigées en langue française et en langue anglaise et le cas échéant, en outre, dans la langue ou l'une des langues officielles de l'État d'origine de l'acte. Les blancs pourraient être remplis, soit dans la langue de l'État où le document doit être adressé, soit en langue française, soit en langue anglaise.