# Exhibit 2

U.S. DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

-----------------------------------------

ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC, and DISTROMINT, LLC,

Plaintiffs and

Counterclaim Defendants,

v. 1:24-CV-05280-SDG

NCHAIN UK LTD,

Defendants and

Counterclaim Plaintiff.

-----------------------------------------

VIDEOTAPED DEPOSITION OF

DOROTHY HARAMINAC

8:30 a.m. CDT

September 11, 2026

Via Remote Zoom Videoconference

REPORTED BY: MARIE FOLEY, RMR CRR

-----------------------------------------

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

VIDEOTAPED DEPOSITION of

DOROTHY HARAMINAC, conducted remotely via Zoom video conference, commencing at 8:30 a.m. CDT, on the above date, before Marie Foley, a Registered Merit Reporter, Certified Realtime Reporter and Notary Public.

\- - -

APPEARANCES:

ON BEHALF OF PLAINTIFF:

MORGAN & MORGAN FRED RISPOLI
BY: FREDERICK A. RISPOLI, ESQUIRE
18100 Von Karman Avenue
Suite 200
Irvine, California 92612
PHONE: 949.898.6587
EMAIL: frederick.rispoli@forthepeople.com

ON BEHALF OF DEFENDANT:

ELSBERG BAKER & MARURI
BY: JARED RUOCCO, ESQUIRE
ELLIE BAINES, ESQUIRE
Empire State Building
350 Fifth Avenue
New York, New York 10118
PHONE: 212.597.2600
EMAIL: jruocco@elsberglaw.com

ALSO PRESENT:

Mickey Ferri, Analysis Group

VIDEOGRAPHER:

Jonathan Juarez

\- - -

TRANSCRIPT INDEX

PAGE
APPEARANCES...................... 3 - 4
INDEX OF EXHIBITS................ 7 - 9
EXAMINATION OF DOROTHY HARAMINAC:
BY: MR. RUOCCO................... 13
AFTERNOON SESSION................ 250
EVENING SESSION.................. 367

\- - -

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the parties hereto, through their respective counsel, that the certification, sealing and filing of the within examination will be and the same are hereby waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, will be reserved to the time of the trial;

IT IS FURTHER STIPULATED AND AGREED that the within examination may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.

All parties shall bear their own costs in the conduct of this deposition by video conference.

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Haraminac Exhibit 1 | Plaintiff's Expert Disclosure (First Supplement) | 31 |
| Haraminac Exhibit 2 | Email thread September 10, 2026 | 32 |
| Haraminac Exhibit 3 | National Association of Certified Valuators and Analysts website | 73 |
| Haraminac Exhibit 4 | Notice of Electronic Filing Newberry v. Talisman Energy, Southern District of Texas February 16, 2022 | 86 |
| Haraminac Exhibit 6 | International Glossary of Appraisal/Valuation Terms - U.S. Domestic Comparison Chart of Definitions | 111 |

\- - -

E X H I B I T S

\- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Haraminac Exhibit 7 | "Videotaped Deposition of Eric Finnerud Volume II August 5, 2026 | 145 |
| Haraminac Exhibit 8 | Excel worksheet and native file, Bates NCH0004508 | 269 |
| Haraminac Exhibit 9 | Excel worksheet and native file, Bates NCH0000257 | 274 |
| Haraminac Exhibit 10 | Email 01/03/2023 | 275 |
| Haraminac Exhibit 11 | DistroMint Empowering music creators around the globe, Bates NCH0000835-844 | 286 |
| Haraminac Exhibit 12 | DistroMint - provisional platform price options, Bates NCH0004459 | 291 |

- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Haraminac Exhibit 13 | Email 14/12/2023, Bates NCH0001867 and E.Smitty/NChain Restructure Proposal, Bates NCH0001868-170 | 386 |

(REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER
Page Line
- -none- -

REQUEST FOR PRODUCTION OF DOCUMENTS
Page Line
- -none- -

STIPULATIONS
Page Line
6 3

QUESTIONS MARKED
Page Line
- -none- -

- - -

8:34 a.m. CDT

- - -

THE VIDEOGRAPHER: We are now on the record. My name is Jonathan Juarez. I am a legal videographer for Digital Evidence Group.

Today's date is September 11th, 2026 and the time is 8:34 a.m.

This remote video deposition is being held in the matter of Finnerud, et al. versus nChain UK Ltd., et al.

The deponent is Dorothy Haraminac.

All parties to this deposition are appearing remotely and have agreed to the witness being sworn in remotely.

Counsel, please identify yourselves for the record.

MR. RUOCCO: Jared Ruocco from Elsberg Baker and Maruri on behalf of nChain UK Limited.

Also appearing with me is my colleague Ellie Baines with Elsberg

Baker and Maruri, and Mickey Ferri from the Analysis Group who is also on, I believe.

Noting for the record that nChain UK Limited is appearing and taking this deposition subject to and without prejudice to its objections to personal jurisdiction in this case.

MR. RISPOLI: Fred Rispoli on behalf of the plaintiffs.

THE VIDEOGRAPHER: The court reporter is Marie Foley and will now swear in the witness.

THE STENOGRAPHER: If I could ask you to raise your right hand, please, ma'am.

Do you swear or affirm the testimony you give will be the truth, the whole truth, and nothing but the truth today?

THE WITNESS: Yes, I do.

THE STENOGRAPHER: Thank you.

\- - -

DOROTHY HARAMINAC, the Witness herein,
having been first duly sworn by a
Notary Public in and of the State of
New York, was examined and testified
as follows:
EXAMINATION BY
MR. RUOCCO:
Q. Good morning, Ms. Haraminac.
Thank you for being here.
Do you understand that you are
under oath today?
A. Yes.
Q. And do you understand that the
oath you've taken is the same one that you
would take if you were testifying in
court?
A. Yes.
Q. And do you agree you will
test -- you will tell the truth and
testify accurately in your deposition here
today?
A. Yes.
Q. If at any time you don't
understand a question that I've asked,
will you please let me know?

A. Yes.
Q. Okay.
Now, do you understand that there is a court reporter and a videographer here today?
A. Yes.
Q. And do you understand that they will be transcribing and recording everything that is said today?
A. Yes.
Q. Okay.
Can you think of any reason why your deposition should not go forward today?
A. No.
Q. Have you had your deposition taken before?
A. Yes.
Q. Can you please list the matters in which you've had your deposition taken before?
A. Do you mean personally or as an expert?
Q. Sure. Let's -- let's start with just as an expert.

A. No, I have to open up my CV and review it to list them out. I don't have it memorized.

Do you mind if I open a copy of my CV?

Q. We can -- we can get to that.

You just don't recall offhand which ones you've testified in?

A. No, I don't have matters or the case styling memorized.

Q. Okay.

Do you -- have you given a deposition in your personal capacity?

A. I have.

Q. In what matters did you give a deposition in your personal capacity?

A. I don't remember the case styling, but one was an accusation against a coach at the school I attended, and one was related to a train derailment that decapitated a person I went to school with and paralyzed the other.

Q. Understood.

Before we get started, I just want to set some ground rules.

First, I would ask that you allow me to finish asking my questions before you start to respond, and I will wait for you to finish answering my questions before I ask my next question. That should make it easier for the -- the court reporter to take everything down.
Does that sound fair?
A. Yes.
Q. And for all my questions, I will need an audible response, so no head nods, head shakes, things like that.
Do you understand?
A. Yes.
Q. Now, we discussed this a moment ago, but if I ask you a question you don't understand, you'll -- you'll let me know, right?
A. Yes.
Q. Okay. And otherwise, if you answer my question, I'll assume that you understood it.
Is that fair?
A. Yes.
Q. Do you understand that this case

involves entities called Sound Alive Enterprise, LLC and nChain UK Limited?

A. Yes.

Q. If I refer to Sound Alive Enterprise as Sound Alive, you'll know what I mean?

A. Yes.

Q. And if I refer to nChain UK Limited as nChain, you'll know what I mean?

A. I think there are quite a few different nChain entities. So I'll remember that that's what you said, but I think it would be on you to specify when you're not referring to nChain UK Limited by using a shortened form of nChain.

Q. Okay.

But will you understand if I just use the term "nChain" I'm generally referring to nChain UK Limited, and I'll specify if I'm referring to a different entity?

A. Yes.

Q. Now, do you understand that this case also involves an individual named

Eric Finnerud and another entity called DistroMint, LLC?

A. Yes.

Q. And do you understand that Mr. Finnerud, DistroMint, LLC, and Sound Alive are the plaintiffs in this case?

A. Yes.

Q. And if I refer to Mr. Finnerud, DistroMint, LLC, and Sound Alive collectively as the plaintiffs, you'll know what I mean?

A. Yes.

MR. RUOCCO: Ellie, can we bring up tab 401, please?

MS. BAINES: 401 should be uploaded.

MR. RUOCCO: Okay.

Okay. I'm going to share my screen here with you.

BY MR. RUOCCO:

Q. I'm showing you a document entitled "Plaintiff's Expert Disclosure (First Supplement)".

Do you see that?

A. No.

Q. Okay.
And if we scroll down to Exhibit E, the first page, there's a document entitled "Expert Witness Report" and it states: Prepared by Dorothy Haraminac. And it's dated June 1, 2026.
Do you see that?
A. No.
Q. No, you don't?
A. No, I do not see your screen.
Q. Sorry. Okay.
Apologies.
(The above mentioned exhibit was published.)
BY MR. RUOCCO:
Q. Okay. Sorry.
Here we have a document entitled June 1 -- or, sorry, entitled "Expert Witness Report." It states: Prepared by Dorothy Haraminac. And it's dated June 1, 2026.
Do you see this?
A. Yes.
Q. Okay.
And are you seeking to offer

expert testimony on behalf of the plaintiffs in this case?
A. I'm offering expert testimony as to my opinion, and I was engaged by the plaintiffs.
Q. Okay.
And this is the report you submitted in this case summarizing the opinions you plan to offer as an expert witness. Is that right?
A. Yes.
I think rebuttal testimony and addressing anything that witnesses stated in depositions are reserved.
Q. Okay.
Have you created any updated versions of this report since June 1, 2026?
A. No.
Q. And you were retained by the plaintiffs to prepare this report.
Is that right?
A. That's correct.
Q. Okay.
And you were retained by the

plaintiffs to offer expert testimony in this case.

Is that true?

A. That's correct.

Q. This June 1, 2026 report, that's the most current version of your report.

Is that right?

A. Yes.

Q. Now, you've been compensated for the time you spent on this matter.

Is that right?

A. That's correct.

Q. And were you compensated for the time you spent drafting this report?

A. Yes.

Q. And are you being compensated for the time you're spending here at your deposition today?

A. I expect to be, yes.

Q. How much have you been paid for the time you spent on this matter to date, approximately?

A. About $42,000.

Q. Are there any amounts that you've billed for time spent on this

matter that you've not been paid to date?
A. No.
Q. About how much were you paid specifically for the time you spent writing this report?
A. Oh, I couldn't tell you specifically. I'd have to review the invoices.
MR. RUOCCO: Sorry, Fred. Can you still hear me?
MR. RISPOLI: Yes, I can.
MR. RUOCCO: Sorry.
MR. RUOCCO: Ms. Haraminac, I think we got disconnected for a minute. Okay. But I see your response.
BY MR. RUOCCO:
Q. Do you -- do you have a sense ballpark of how much time you spent writing this report?
A. I mean, the -- the research and analysis that we conducted and the tracing and all the other stuff we did was all in preparation for this report and for my testimony.

Q. Okay.
So, do you have a sense of how much time you spent on this matter total to date?
A. The number of hours? No, I don't have an idea of the number of hours.
Q. Okay.
More than a hundred hours?
A. I don't think so, no.
Q. More than 50 hours?
A. I don't think so. I'd have to review the invoice. The invoice would be detailed and have the number of hours on it.
Q. Okay.
More than 25 hours?
A. Probably somewhere around that number of hours.
Q. Okay.
So just sitting here today, you'd estimate that you spent approximately 25 to 50 hours in total on this matter to date.
Is that right?
A. No, that was not my testimony.

Q. Well, I asked you do you have a sense of how much time you spent on this matter to date, and when I -- after I asked you whether it was more than 50 hours, you said "I don't think so." But when I asked you whether it was more than 25 hours, you said, "Probably somewhere around this number of hours."
A. That's correct.
Q. Okay.
Now, who -- who pays your fees on this matter?
A. I sent my invoice to the -- to counsel and to -- it's my understanding he keeps the plaintiffs apprised of those fees.
Q. Okay.
Do you receive payment from plaintiffs' counsel or directly from plaintiff?
A. I would have to review the payment processing back end. I'm not sure.
I think counsel probably paid, like, the portion.

I have no idea.

Q. Okay. Let's look at page 22 of your report.

It says here, if you can see this: My -- My CV is attached as Appendix B and my time in this matter is billed on a task basis between $215 and $850 per hour.

Do you see that?

A. I do.

Q. Okay.

Can you explain how your task billing worked on this matter?

A. Yeah. Conventional billing methods for the attorneys and experts tend to be familiar with are person-based where a partner has a bill rate, an associate has a bill rate, and people in between have different bill rates. So even if somebody is doing the same task, it's billed at a different rate.

My billing is not that. If -- regardless of who is completing the task, it's billed at the same rate. So production review is billed at the lower

rate $215. Meetings, that kind of thing are billed at 215. There are a couple of tiers in between, like different kinds of analysis, different kinds of tracing, gathering records and preparation and schedules and summaries, and then report writing and testimony is billed at $850 an hour.

Q. Okay. And you mentioned there were a couple tiers in between 215 and 850 per hour.

What are those tiers?

A. I think they're 450 and 600.

Q. Okay.

And the time you spent actually writing the report and testifying here today, that's compensated at $850 an hour.

Is that right?

A. That's correct.

Q. Are any of your fees contingent on the outcome of this case?

A. No.

Q. Do you have any financial interest in the outcome of this case?

A. No.

Q. Did you prepare for your deposition today?
A. Yes.
Q. Can you please identify for me each day in which you did anything to prepare for your deposition?
A. Each day? No. I haven't prepared that.
I can tell you generally what I've done to prepare.
Q. Okay.
Well, how many -- how many -- how many days do you recall doing preparation for -- for this deposition?
A. Maybe four or five days this month, as far as preparation. The rest would be contained on my invoice.
Q. Okay.
You said there were four or five days this month you spent preparing for this deposition.
When were those days?
A. I don't remember. It would be this week and the previous week, like, days in September. I don't remember the

specific days. I'd have to go back through timesheets.

Q. How long did you spend preparing for this deposition in September in total?

A. Oh, I don't know. Probably -- probably another 20 hours or so.

Q. You said you spent four or five days this month preparing for your deposition.

About how many hours per day did you spend preparing?

A. About four or five.

Q. Did you meet with anyone to prepare for your deposition?

A. No.

Q. You didn't meet with plaintiffs' counsel to prepare for your deposition?

A. No. I had a call with him about, like, records and whether I felt prepared and that kind of thing, but I didn't meet with him for the specific purpose of preparation.

Q. Did any of the opinions in your report change after you began preparing for your deposition this month?

A. No.
Q. Now, you said you spent four or five days this month preparing for your deposition.
Did you dedicate any time before this month specifically to deposition preparation?
A. No.
Q. Did you review any documents in preparation for your deposition?
A. Yes.
Q. Which ones?
A. I reviewed my report. I reviewed the report of opposing expert. I reviewed depositions that were taken, and I reviewed the new production that came in, and I reviewed some of the other -- the older documents, like a re-review.
Q. Let's look at your Appendix A in your report.
Is Appendix A a list of the documents you reviewed in connection with preparing your report?
A. Yeah, can you scroll down some?
Q. Sure.

(Pause.)
Q. Do need me to scroll any further?
A. Yeah, I just want to see all the way down.
Q. Okay.
(Pause.)
A. Oh, it's 200 pages.
Q. Yeah.
A. You don't need to scroll through all that.
Q. You want to just go to the end, okay.
A. Yeah, of Appendix A.
Q. Okay.
(Pause.)
A. Okay.
Yeah, so you asked if this was a list of documents. I would say this is a list of files.
Q. Okay.
But is this -- is this a list of files that you reviewed in connection with drafting your report?
A. Yes.

Q. Okay.
In preparation for your deposition, did you review any documents that were not included among the documents in this Appendix A?
A. Yes. I've reviewed documents that were produced after -- after this report, or that I received after this report was prepared.
Q. Understood.
MR. RUOCCO: Ellie, can we bring up tab 359, please?
THE STENOGRAPHER: Counsel, are we marking the document as an exhibit?
MS. BAINES: 359 is uploaded.
MR. RUOCCO: Yes, please. Sorry if I didn't say that. This should be marked as Haraminac Exhibit 1 and the next document will be Haraminac Exhibit 2.
THE STENOGRAPHER: Thank you.
(Haraminac Exhibit 1, Plaintiff's Expert Disclosure (First Supplement), was marked for identification, as of this date.)

(Haraminac Exhibit 2, email thread September 10, 2026, was marked for identification, as of this date.)

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. Ms. Haraminac, this is an email from Mark Nonni to myself, copying Mr. Rispoli and some others. The subject is: Finnerud versus nChain UK Limited, Case No. 24-CV-0528 - Deposition of D. Haraminac.

Do you see this here?

A. I see the top portion, yes.

Q. Okay.

Do you understand Mr. Nonni is one of plaintiffs' attorneys in this case?

A. Yes.

Q. Okay.

And Mr. Nonni writes: I'm sending this email simply to go ahead and let you guys know, prior to tomorrow's deposition of Ms. Haraminac, that we've provided Ms. Haraminac with copies of all the discovery listed below, which has obviously occurred since Plaintiff's

Expert Disclosure (First Supplement) June 1st, 2026.
Do you see that?
A. I do.
Q. Okay.
Could you please just review the -- the bullets here in his email, and can you tell me whether you reviewed any -- well, let me ask this question.
Is this a complete list of the documents you reviewed since June 1st, 2026 that are not listed on Appendix A of your report?
A. Yeah, it -- it appears to be that. There were a couple of, like, topics that I researched afterwards, and so this is -- this would be a list of the production that was provided, yeah.
Q. Okay.
So, in preparation for your deposition, have you reviewed any documents that are not listed either in Appendix A to your report or in Mr. Nonni's email here?
A. Yeah, there were -- there were,

I think, one or two articles. I think it's just one article about something that Dale Evans mentioned in his deposition.

Q. And what did that article concern?

A. The SEC letter regarding the NBA Top Shot NFT project.

Q. Understood. Okay.

Okay. So, the documents listed in Appendix A to your report, the documents listed here in Mr. Nonni's email, and then that -- that article that you looked up regarding the SEC letter regarding the NBA Top Shot NFT, that's a complete list of all the documents you reviewed in connection with preparing for your deposition?

A. I also looked at the company's house documents related to Teranode. There's also -- that Dale Evans mentioned in his deposition.

Q. Okay.

Anything else?

A. I don't think so.

Q. Okay.

So, just so we're clear, so -- so, the documents you reviewed in preparation for your deposition include everything that's on schedule -- or, Appendix A in your report, everything in Mr. Nonni's email, an article about the SEC relate -- letter regarding the NBA Top Shot NFT, and the company's house documents related to Teranode.

Is that right?

A. That's right, but this list doesn't seem to contain the opposing expert's report.

Is that in -- in one of these categories?

Q. Well, I see it states nChain's Rule 26(e) Disclosure of Expert Testimony in the final.

A. Yeah, down there at the bottom.

Q. Okay.

So, did the -- did you review any other documents in preparation for your deposition other than what's on Appendix A in your report, what's in Mr. Nonni's email here, the NBA -- or, the

SEC letter regarding the NBA Top Shot NFT, and that company house documents regarding Teranode?

A. Yeah.

I would clarify that you're specifying the SEC letter. I didn't go obtain a letter through -- I researched the comment that Dale Evans made about that.

Q. Okay.

So, in preparation for your deposition, the only documents that you reviewed are either on Appendix A to your report, in Mr. Nonni's email here, an article that you reviewed about the SEC letter regarding the NBA Top Shot NFT, and company house documents from nChain regarding Teranode?

A. They weren't from nChain in that sense, but they're company house documents related to Teranode that Dale Evans specified in his deposition.

Q. Okay.

Other -- are there any other categories of documents other than the

ones I just mentioned that you reviewed in connection with your deposition?
A. No, I don't think so.
Q. Did you review any outlines prepared by plaintiffs' attorneys in preparation for your deposition?
A. No.
Q. Did you review -- or, did plaintiffs' attorneys share with you any summaries or outlines of topics or questions that might come up during your deposition?
A. No.
Q. You reviewed the rebuttal expert report from Mickey Ferri in preparation for your deposition?
A. Yes.
Q. Did any of the opinions you plan to offer change as a result of you reviewing Mr. Ferri's rebuttal expert report?
A. No. I -- I would say this is a substantial -- like, you've only got a handful of bullets on your list you're showing here, but that's the number of

files. So, I received these documents a few days ago. Most of those are going to be under review.

Mr. Ferri's report I received, I think, around August, end of August maybe. So these other documents would still be under review.

So, when you say "review," I've received them. I've tried to review most of them in preparation for deposition. Some them are still under review.

So to answer your question, no, nothing in my report changes as a result of my review of Mr. Ferri's expert report.

Q. Okay.

Now, when you say you reviewed the documents referenced here in Mr. Nonni's email a few days ago, when did you receive them?

A. Some of them I received on September 10th and some of them I received on September 8th.

Q. Okay.

And you -- you haven't viewed every page of every document referenced

here. Is that right?
A. That's correct.
Q. Okay.
Did any of the opinions you plan to offer in this case change as a result of documents you reviewed in preparation for your deposition?
A. No.
Q. After you submitted your report on June 1st, 2026, did anyone suggest that you change the opinions you planned to offer in this case?
A. No.
Q. After you submitted your report on June 1st, 2026, did anyone suggest that you change the conclusions or analysis in your report?
A. No.
Q. Just to get some professional background, where did you go to college, Ms. Haraminac?
A. I earned a bachelor's degree at McNeese State University, and I earned a master's degree from the University of Houston.

Q. And what was your major at McNeese State University?
A. My major there was liberal arts with minors in computer science and psychology.
Q. And you say that you got a master's degree from the University of Houston.
What was your course of study at the University of Houston?
A. Decision and information science.
Q. Okay.
After you graduated from the University of Houston, did you pursue any other formal education?
A. Not from university. I earned a -- different professional credentials, and those require education to pursue, ongoing -- continuing education to maintain.
Q. And what other professional credentials are you referring to in that response?
A. The licensed private

investigators, a license to conduct investigations, the master analyst in financial forensics is a credential offered by the National Association of Certified Valuators and Analysts, the certified fraud examiner is a credential offered by the Association of Certified Fraud Examiners, and CCI is certified cryptocurrency investigator, I think, offered by the Blockchain Intelligence Group.

Q. After you graduated from the University of Houston, did you enter the workforce?

A. Yes.

Q. And what was your first job after graduating from the University of Houston?

A. Jesus. I graduated in 2008.

My first job was probably in oil and gas data analysis. I've been a part of the workforce since I was 16 years old, so that wouldn't have been my first job. I don't even know what company that was. Had to be Global Industries after my

master's. Possibly M-I Swaco.
Q. Were you a litigation associate in a firm called Hill Schwartz Spilker and Keller?
A. Yeah, that firm changed its name to HSSK and then it was acquired by Weaver.
Q. Okay.
And what years did you work at that firm?
A. That was I think 2014 to 2017, if I recall. 2015 to 2017.
Yeah, I think 2015 to 2017.
Q. And I know you say that the -- the firm changed its name, but if I refer to it as Hill Schwartz Spilker Keller, you'll know what I'm talking about, right?
A. Yes, of course, but if it's easier, just HSSK.
Q. Okay.
What is HSSK?
A. It was a litigation support firm.
Q. While you worked at HSSK, did you perform valuations of any business

enterprises?
A. I worked for the litigation group and for the valuation group. So I didn't sign reports because I was a -- an entry level employee, but I did work to support valuation reports and litigation expert testimony.
Q. Okay.
Did you perform work to support expert valuations of business enterprises?
A. Yes.
Q. And what were your job responsibilities at HSSK?
A. It was to support the litigation support work, so the -- the partners and directors that were going to eventually provide expert testimony, and to support the work of the valuation group who performed business valuations.
Q. And you didn't act as a -- an expert witness while you worked at HSSK, did you?
A. No.
Q. And after you left HSSK, where did you go to work?

A. McCann Investigations.
Q. And what is McCann Investigations?
A. It's a private investigations firm that had a digital forensics arm and wanted to build out a financial forensics arm. So I was brought on to head the financial forensics arm.
Q. And what years did you work at McCann Investigations?
A. It was 2017 to 2018.
Q. And what were your job responsibilities at McCann Investigations?
A. They were about the same as HSSK except that it was in a director position. So I began performing as an expert.
Q. And you were a director of forensics at McCann Investigations. Is that right?
A. That's correct.
Q. Okay.
And I believe you said that you were brought in to help build out the financial forensics arm of that firm. Is that right?

A. That's correct.
Q. And -- and what are financial forensics?
A. That's a broad term. A synonym would be forensic accounting. Really forensic accounting is kind of a subset of financial forensics. Financial forensics is the work you perform on financial-related matters for the purpose of presenting in a forum. So forensics, right, that's the meaning of that. Financial forensics encompasses val -- valuation, digital forensics, open source intelligence, a lot of other different skill sets.
Q. And what -- what is the connection between financial forensics and valuation?
A. Valuation is a component of financial forensics.
Q. When you're performing the valuation work, are you -- sorry. When you're performing the financial forensic work, are you -- are you valuing business enterprises as going concerns?
A. Sometimes, yeah.

Q. And did you value business enterprises as going concerns when you worked at McCann Investigations?
A. I think that the work at McCann was largely focused on forensics and earlier. So, like, before pleadings are filed, so investigations in forensics.
We did some valuation work, building economic models.
I don't recall a specific enterprise valuation at that time.
Q. Did you serve as an expert witness while you worked at McCann Investigations?
A. Yes.
Q. And what types of matters did you serve as an expert witness?
A. Cases where cryptocurrency was in dispute.
Q. How many matter -- how many expert engagements did you have while you were at McCann Investigations?
A. Oh, I don't -- I don't remember a number of engagements.
Q. Did you testify as an expert

witness while you worked at McCann Investigations?

A. Yes.

Q. Okay.

Do you remember how many times you testified as an expert witness while you were at McCann Investigations?

A. I think twice. I remember DeSouza versus DeSouza. I may have also testified on another case, but I don't remember if that was 2017 or 2018 or if it was -- or if that wasn't testimony. It's so long ago.

The 2018 case was in California, California Superior Court, and that would be DeSouza versus DeSouza.

Q. Okay.

So the DeSouza versus DeSouza case is the only one you can specifically remember having testified as an expert while you were working at McCann Investigations?

A. That's correct.

Q. And -- and what was the subject of the DeSouza case?

A. That was a marital dissolution.
Q. Okay.
Did you value a business enterprise in the DeSouza case?
A. No.
Q. Okay.
After you left McCann Investigations, where did you go to work?
A. After I left McCann, I went to work for GreenVets. The -- the -- Snap Diligence is probably on there somewhere. That overlapped with McCann Investigations. That company was owned by the same partners as McCann.
Q. Okay. So let's just focus on Snap Diligence then for -- for a minute.
So, you worked at Snap Diligence while you were also at McCann. Is that right?
A. Yeah, it was a -- same office, dual roles, two different companies pursuing two vastly different object -- objectives.
Q. And -- and what was Snap Diligence's business?

A. Snap Diligence was built to consolidate public records from -- at the county or parish level across the United States and then match those against records for business registration and then produce a searchable database for the purposes of when I was brought on it was the fraud information basically, to identify whether, you know, cases had been brought against officers of a company, civil cases, that kind of thing.

By the time it wound down, I think they had already pivoted into marketing.

Q. Did you do any business valuation while you were at Snap Diligence?

A. Yeah, we did -- we did quite a few. That was a -- that was a start-up and then wound-down. So we did several.

Q. What -- what types of businesses were you valuing at Snap Diligence?

A. It would be preparing investor prospectus, it would be forward-looking statements and valuations for either Snap

Diligence or any of the partnerships that they were pursuing at the time.

Q. So you were preparing valuations that would be used by Snap Diligence itself. Is that right?

A. That's correct.

Q. Okay.

Did you serve as an expert witness while you were at Snap Diligence?

A. No, that's not the role for that --

Q. Right. Okay.

You mentioned a moment ago that you -- you worked at a company called GreenVets.

Is that right?

A. That's where I went after 2018.

Q. And what was GreenVets?

A. GreenVets was also a private investigations company. They were based out of Plano, Texas. Similar to McCann. They were building out their financial forensics arm. They were bigger. They had, like, a license from the state department to sell arms and expert weapons

and had more inter -- international operations, like executive extraction, that kind of thing.

Q. And did you perform any business valuations while you were at GreenVets?

A. Yeah. I know we -- we did a few as a component of lost profits calculations, we would have done something for valuation.

There weren't any, like, valuations for the purpose of testimony, I think, while I was there. It would be as a component of a forensic engagement or fraud investigation engagements.

Q. So you didn't -- you didn't conduct any valuations for purposes of offering expert testimony while you worked at GreenVets.

Is that right?

A. I think that would be too broad of a statement. Where they were a component of forensics or the forensics engagement we would have performed various valuations.

And then you're talking about

enterprise valuations, so there are some where we'd either review them or assess them or prepare our own -- I don't know about any cases that would make it all the way to testimony for there.

Q. Okay.

While you worked at GreenVets, were you specifically retained to offer expert testimony on a business enterprise valuation?

A. That would be a component of my forensic engagement. I don't usually have a narrow -- such a narrow scope as only valuation. I don't typically work as only a valuation expert in that limited regard.

Q. Okay.

You don't typically work only as a valuation expert?

A. That's correct.

Q. Were you also a member of the adjunct faculty at Houston Christian University?

A. Yes. That university has since -- yes. Sorry, that's its new name. It was formerly known as Houston Baptist

University.
Q. Okay.
And what years were you on the adjunct faculty at Houston Christian University?
A. I think 2021 to 2024.
Q. What courses did you teach at Houston Christian University?
A. I taught software engineering and I taught cybersecurity and digital forensics.
Q. How often did you teach while you were on the adjunct faculty there?
A. What do you mean?
Q. Did you -- would you teach every semester, every other semester? Did you teach every year that you were on the faculty there?
A. I think it was -- it was almost every semester. The -- COVID happened -- no, COVID was 2020. So they were still, like, preparing for different, like, sort of that virtual stuff, and so I'm trying to remember what was virtual and what ended up being in person.

I think it was -- it wasn't every semester 'cause I know there was at least one semester in there that I didn't teach, but it was almost every semester.

Q. Were you a formal title at Houston Christian University, quote, cyber engineering professor?

A. I don't -- I don't think so. I don't think they have formal titles that have the subject matter in there.

The cyber engineering piece is derived from what I taught and the fact that it's under the cyber engineering department. I was part of the board at HBU that developed the -- the programs for that department as the -- the industry advisor.

Q. While you were on the adjunct faculty at Houston Christian University, did you teach any courses on the valuation of business enterprises?

A. None of the courses had that title, no.

Q. While you were an adjunct faculty member at Houston Christian

University, did you teach any courses the primary subject of which were the valuation of business enterprises?
A. No.
Q. Did you -- or do you work at a company called Kiribrex Incorporated?
A. It's pronounced Kiribex (different pronunciation).
Q. Okay.
A. Yeah, I guess in the sense that we founded that company to -- to pursue applications of patents.
That's -- I wouldn't characterize it as work in the sense that it -- I'm an advisor to that at this point. It's in a different stage now than it was years ago.
Q. As part of its -- you said -- just to clarify, the name of the company is Kiribex?
A. That's correct.
Q. Okay.
Is -- is part of Kiribex's business offering expert or consulting work on -- to perform valuation of

business enterprises?
A. No.
Q. Did you conduct any valuations of business enterprises in connection with your work at Kiribex?
A. That would be similar to what we did for Snap Diligence.
Q. Okay.
So -- so you might have valued businesses for Kiribex in the course of considering deals for Kiribex itself?
A. That's correct.
Q. You're also a founding partner at YBR Consulting. Is that right?
A. That's correct.
Q. Are there any other founding partners at YBR aside from you?
A. No.
Q. Okay.
And when did you found YBR Consulting?
A. I founded it in 2018, and then it became a primary vehicle for conducting litigation support work in 2023.
Q. And -- and what is YBR

Consulting?
A. It's a litigation support firm.
Q. How many employees does YBR Consulting have?
A. Fewer than ten. I have a handful of contractors that I keep on. I have a handful of regular people that keep employed. It's, like, three and then expanded to maybe seven if needed.
Q. Aside from you, does anyone else at YBR Consulting provide consulting services to clients?
A. No.
Q. Aside from you, does anyone at YBR Consulting provide expert witness services?
A. No.
Q. Does YBR Consulting perform valuations of business enterprises as part of its regular business?
A. Would be as a component of forensic work.
Q. Okay.
You keep referencing forensic work. I mean, can you just help me

understand how the enterprise valuation fits into the forensic work that you're describing?

A. Yeah. Most of my work is in disputes where -- that are matrimonial disputes. Probably 85 percent. And so where businesses are being divided in divorce, we may be asked to perform valuations for that purpose, and so that's what I mean by that.

Sometimes I am the person that does that. Sometimes they bifurcate the case where I handle the cryptocurrency portion, someone else handles some other portions. There are multiple experts on a case.

That's why I keep referencing it back to as a component of my forensic work, because it's typically -- I don't do valuations for other purposes outside of litigation, so 409A valuations or for tax purposes or those kinds of things.

Q. You mentioned 85 percent of -- of your business at YBR Consulting is focused on matrimonial matters. Is that

right?
A. That's right.
Q. Okay.
A. At this point.
Q. And by "matrimonial matters," you mean, like, divorce cases?
A. That's right.
Q. And what -- what percentage of your business at YBR Consulting is focused on valuing cryptocurrency, the currency itself?
A. 99 percent.
Q. So in 99 percent of your cases at YBR Consulting, you're -- you're assessing the value of a cryptocurrency.
Is that right?
A. Yeah, I wouldn't -- I wouldn't limit it to a cryptocurrency. There -- there are typically more than one in the cases that I work.
Q. Okay. Fair enough.
But 99 percent of your regular work at YBR is focused on valuing cryptocurrency -- cryptocurrencies, right?
A. Do you want to define that term

maybe? Because it sounds like you're using a pretty limited term.

Q. Well, I wanted -- so, when I say "cryptocurrency," what I have in my mind is things like -- like bitcoin, like Ethereum, the actual currencies.

Is that what you understand "cryptocurrency" to mean when you're using that term?

A. No. I'm using that to be any asset traded on a blockchain.

Q. Okay. Okay.

So -- and -- and what are assets that -- that are traded on a blockchain?

A. So, it would include the fungible tokens that you're talking about, also the non-fungible tokens. It would also include blockchain like decentralized changes. It would be a decentralized version of an enterprise that there would be no corporate structure. So that's the difference between, like, an enterprise valuation and valuing a blockchain-based business or a blockchain-based service provider or, you know, set of

smart-contracts as some of them end up being.

Q. Okay.

So -- so, 99 percent of the business at YBR is focused on valuing assets that are traded on blockchain.

Is that right?

A. No.

So, 99 percent is -- are cases that involve cryptocurrency and -- and with my much broader definition than yours. So you could say 99 percent involve a blockchain component. Whether that's a fungible token as you described, like bitcoin or -- or Ether, or whether it's non-fungible tokens, whether it's a combination of services that also run on a blockchain where there's no corporate structure, like different projects that use blockchain as a vehicle by which those projects are, like, implemented and that kind of thing.

So, it -- it sounds like you're taking a very narrow meaning of "cryptocurrency," and I'm meaning that

much broader.

Q. I guess my question is 99 percent of your work at YBR is -- is -- is focused on valuing the assets that have actually exchanged on -- on -- on blockchain or based on blockchain technology, right?

A. No, you're -- so, you're -- you're narrowing it by saying "valuing the asset on -- traded on the blockchain."

So, I said 99 percent of my -- my cases have a cryptocurrency component. Some of them don't. The cryptocurrency would be tokens traded on a blockchain, whether I'm tracing them or valuing them, and services that run on a blockchain. So where somebody could -- could value a company where there's a structure and there's directors and officers and, so, you know, that kind of thing, there are now decentralized autonomous organizations where there are no people, but there are interactions, and so figuring out how you would value that. Or where there are -- where there are new token projects, those

are all blockchain components. That may require value, that may require assessments or tracing or analysis or all those things.

So when you say valuing just the asset portion of it, no, that's not an accurate statement.

Q. Okay.

So, 99 percent of YBR's work is focused on valuing or tracing assets or services that run on a blockchain.

Is that right?

A. There -- you're -- you're still, kind of, conflating the language.

99 percent of my cases have a cryptocurrency component, and then I broaden that term to be 99 percent of my cases have a blockchain component, because you had a narrow understanding of the term "cryptocurrency" and I meant it as something else. So we clarified that.

So, it's not 99 percent of my cases are valuing a single asset or valuing a group of assets or tracing a single group or single or group of assets.

99 percent of my cases have a blockchain component. Whether that is tracing and valuing assets, fungible or non-fungible, or enterprises that run on a blockchain which are different than those that have a more traditional corporate structure.

Q. Okay.

So, 99 percent of your cases at YBR focus on tracing or valuing assets, fungible or non-fungible, or enterprises that run on a blockchain.

Is that correct?

A. It -- that's a repetition of some of what I said, yes.

Q. Okay.

And that's -- that's an accurate description of YBR's business, right?

A. I mean, it's -- it's a partial description of my business. I wouldn't say, like, the way that you're taking out some of the words. I described it in a much, like, broader term, and it sounds like you're trying to narrow it down. But I'm trying to describe this the best I can that the -- the issue I think we're having

is some kind of difference on enterprise valuation, like the traditional methods, versus valuing projects that run on a blockchain where there are no people and there are no corporate structures. That's, kind of, the difference. So, those things are still digital assets in the same way a company would be, or shares in a company would be. So you have governance tokens that may be a close approximation of that analogy.

So that -- that's what I'm trying to, kind of, make sure that we're on the same page here.

Q. Does the term "digital assets" encompass everything that you trace and value in the course of -- of your work at YBR?

A. I mean, it would depend on your definition of that term, but it -- it -- the broadest definition of that term would encompass everything that's an asset that can be, like, transferred around using a computer. So that's -- I don't know if that's the meaning you're going for.

Q. So, you referenced several times the valuations you do when they concern enterprises do not involve typical corporate structures that involve actual people.
Is that right?
A. That's not what I said, no.
I said --
Q. Okay. Go ahead.
A. 99 percent of my cases involve a blockchain component.
I did not say and they don't involve traditional corporations. That's not an accurate repetition of my testimony.
Q. Okay.
What percentage of your work at YBR is focused on valuing traditional corporate entities?
A. I don't know. Maybe 45, 50 percent of my cases have traditional corporate entities.
Q. But that's not my question.
My question is what percentage of your work, the work that you do at YBR,

is focusing on valuing traditional corporate entities?

A. Oh, I see.

So, the -- the focus part is your differentiator in that question.

I would say 45 to 50 percent of my cases have that as its focus as a part of the forensic work in that case. So where I'm engaged as an expert who's going to offer expert testimony and there are traditional valuations there, like traditional corporate structures that you're talking about, then that would also be part of my focus.

So my answer, whether you include the word "focus" or not, is still about 45, 50 percent.

Q. Okay.

So, are you saying that you yourself in 45 percent of your cases are actually valuing a traditional corporate enterprise?

A. Yeah, I would either be valuing that enterprise or assessing the valuation, the -- like, on a rebuttal

side. Either way. Like preparing a rebuttal valuation would.

Q. Okay.

So -- so -- and what percentage of your -- of your work at YBR is focused on valuing corporations, LLCs, partnerships?

A. The traditional corporate enterprises, is that what you mean?

Like, again, 45 to 50 percent.

Q. Okay.

Now, you also founded an entity called the Forensic Board Association.

Is that right?

A. That's correct.

Q. Okay.

And what is the Forensics Board Association?

A. That's a 501(c)(6) non-profit trade association.

Q. Does the Forensics Board Association have any founding members other than you?

A. Yes.

Q. Okay.

Who are they?
A. I think the initial ones are the -- they may be directors. Sean Womack and Nicholas Womack would be the other two that are either directors or also founding members.
Q. And how many members does the Forensic Board Association have today?
A. What do you mean?
Q. So, does the Forensic Board Association offer membership to people who want to apply?
A. It -- it will. So, it's relatively new, so it doesn't have members. It's still in the -- the setting up the education component, setting up the standards, and maintaining those standards. So it does not have paying members at this point.
It has some, like, under -- I think under 15 or 20 test members, like, that their subscription fees have been waived because it's so new.
Q. Okay.
So the -- so the Forensic Board

Association is still in a developmental stage. Is that right?

A. No, the Forensics Board Association was set up to develop, maintain -- and maintain standards related to blockchain forensics, and the first portion of that was to get standards in place so that it could develop and issue a credential and then -- train people on that credential and then maintain their maintenance of that credential, right, in the same way that the ACFE does for the CFE or that NACVA does for the NBA.

Q. What was the -- sorry.

What is the credential that the Forensics Board Association offers, or will offer?

A. It's called the Certified Practical Forensic.

Q. And has the Forensics Board Association given the Certified Practical Forensic to anyone to date?

A. No, that's, like, the first -- the standards itself and then the development of that credential against

those standards.

Q. You have a master analyst in financial credential from the NACVA?

A. That's correct.

Q. What is the NACVA?

A. That's the National Association of Certified Valuators and Analysts.

Q. And to the best of your understanding, what is the purpose of the NACVA?

A. That's to -- it's a industry trade association that has memberships, and its goal is to develop -- or to support its members in their work either as litigation or valuation specialists.

Q. The NACVA is a private trade association. Is that right?

A. I -- I don't know.

I'm feeling it would be publicly traded, if that's your question.

Q. What I mean is the NACVA is not a government licensing authority, is it?

A. No, not that I know of.

Q. Okay.

It's a -- it's a private

membership group. Is that right?
A. It's -- it's a global trade association.
Private membership group sounds like, you know, guys meeting in a garage. It's not quite that.
Q. Okay.
It -- it's a trade association though, yes?
A. Yeah.
Q. Okay.
And -- and what is the Master Analyst in Financial Forensics Credential?
A. It's the credential they have that is designed for litigation support.
Q. And how did you obtain your Master Analyst in Financial Forensics Credential from the NACVA?
A. That required providing a list of all the matter hours that related to the credential work and training and exam, and it also requires ongoing continuing education and fees to maintain.
Did I say the exam part, I think? There's a proctored exam.

MR. RUOCCO: Okay.
Ellie, can we bring up tab 346, please?
MR. RISPOLI: Jared, before you get into anything, I just -- if you want to take a break soon. We've been going a little bit over an hour.
MR. RUOCCO: Sure. I think after this next little bit I think will be a good time.
MR. RISPOLI: All right. That's fine.
MS. BAINES: File should be uploaded, Jared.
MR. RUOCCO: Okay. Ms. Haraminac, I'm going to share my screen and I'm showing you what's been marked as Haraminac Exhibit 3.
(Haraminac Exhibit 3, National Association of Certified Valuators and Analysts website, was marked for identification, as of this date.)
(The above mentioned exhibit was published.)
BY MR. RUOCCO:

Q. And this is a document that we accessed from the National Association of Certified Valuators and Analysts' website and it's -- states: Qualifications for the MAFF.

Do you see this?

A. Yeah.

Q. Okay.

And here, if we just scroll down, so, it says: MAFF Credential Criteria. Number 1: Basic Education Prerequisite. Applicants must possess a bachelor degree, or higher, with a concentration or focus in a business field (i.e. management, economics, finance, marketing, accounting, or other business field) from an accredited college or university.

When -- when you applied for your MAFF, was it based on having a bachelor's degree?

A. That's part of the -- the requirement there. So, you like, check the box that says, Yes, I have a bachelor's degree. Yes, I have a master's

degree. Then here's the -- the hours of matter hours that you have related to that.

Q. Okay.

It just --

A. Sorry, go ahead.

Q. It also says: Military or federal law enforcement training in the below listed occupational specialty satisfies the requirements of the degree.

When you applied for your MAFF, did you rely on any military or federal law enforcement training?

A. When I applied for my MAFF, there was no NASBA-credited credential that accepted military experience in lieu of a degree. I was part of the board that advocated for this addition to its qualifications and made the MAFF the first NASBA-credited credential to do -- to do so.

So, no is the short answer.

Q. Okay.

A. But the reason why is a little bit more detailed.

Q. Okay.

Then number 2 is Basic Experience Prerequisite, and there are two options: A states: Having obtained substantial knowledge, 2,000 hours or more, of financial forensics theory, methodology, and practices, through one or a combination of: education, publishing, research, teaching, and/or working in activities related to, or a subset within, the field of financial forensics. See 1 or through 9 above.

Or B: Holding one or more of the following credentials that is still active, meaning you are current with all fees and requirements.

And it lists a number of credentials.

Were these the criteria for Basic Experience Prerequisite, more or less, when you applied for your MAFF?

A. More or less, yeah.

Q. Okay.

A. Can you -- can you scroll back up to see what the 1 through 9 are?

Q. Sure.
A. Field are.
(Pause.)
A. Okay.
Q. Okay.
Which -- which of these options did you apply for your MA -- MAFF under, the substantial knowledge one or the professional credential one?
A. The substantial knowledge one.
Q. And you asked to see that list 1 through 9.
Which -- which of these areas did you rely on having substantial knowledge in?
A. It would be areas 2, 3, 4, 5, 6, and 7.
8 is odd 'cause it's, kind of, embedded in those that I just listed.
At that time, I don't think I performed any fraud investigations. My matter hours were concentrated in business valuation litigation and in commercial damages and lost profits with subsets in business interruption and lost profits and

matrimonial litigation and a small bit in bankruptcy, insolvency, and restructure.

Then I also had a small bit in the personal injury piece.

Q. Okay.

And then in the -- if we look at number 3 here: Advanced Training and/or Experience Prerequisite it says: Candidates can meet this requirement by showing proof of having taken 50 hours or more of training areas covering NACVA's FFBOC [sic] found here, or attend the optional NACVA training program entitled: Foundations of Financial Forensics Training Center teaching to the FFBOK (five days online or -- five days live or online.)

States: Alternatively, applicants may show proof of participating in 20 Matters in a financial forensics capacity, or 2,000 hours in business valuation services, of which 500 hours are in one or more of the specialty areas, as defined in 1 through 9 above.

Do you see that here?

A. I do.

Q. And were these more or less the criteria when you applied for your MAFF?

A. I don't remember the term the foundations of forensic body of knowledge. That may have been new when we redid the qualifications, but it more or less it seems like the hours are about the same.

Q. Okay.

And which of these two alternatives did you rely on to apply for your MAFF?

A. What do you mean which of these?

Q. Did you rely on showing proof that you had taken 50 or more hours in training -- of trainings in areas covered by NACVA's FFBOC [sic], attending optional NACVA training program called Foundations of Financial Forensics Training Center, or -- or did you rely on showing proof that you had participated in 20 matters in a financial forensics capacity or 2,000 hours of business valuation services?

A. I had a combination of the hours. Just remember putting together

pages and pages of hours at that time for this application.

I know took loss courses through NACVA and through groups that the application itself was the hours component.

Q. Okay.

And when did you first receive your MAFF credential from NACVA?

A. I think 2015, maybe 2016.

Q. Is your MAFF credential current as of today?

A. Yes.

Q. A few moments ago you mentioned taking courses or trainings from MAFF.

Do you remember that?

A. No. From NACVA. MAFF is the credential itself.

Q. Correct, sorry. My mistake.

What -- what courses have you taken from NACVA?

A. I don't know. Like, hundreds of courses. I attend a couple of different conferences, the global conference for fraud and the super conferences for NACVA.

I have no idea what the titles of all of those would be. In addition to different state bar association conferences and the -- all of those.

MR. RUOCCO: Okay. I think now is a good time for our first break.

MR. RISPOLI: All right. You want to come back in ten?

MR. RUOCCO: Yeah, sounds good. We can go off the record.

THE VIDEOGRAPHER: The time right now is 9:46 a.m., and we're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 10:00 a.m., and we're back on the record.

MR. RUOCCO: Welcome back, Ms. Haraminac.

BY MR. RUOCCO:

Q. I want to go back to your report from June 1st.

A. Okay.

Q. If we pull that up here. And if we go to the back, there is a, here, a

copy of your CV.
Is that right?
A. Yes.
Q. And is this CV attached to your June 1 report an accurate and current version of your CV?
A. Can you scroll down to the thing -- the page so you see the testimony?
Q. Yeah.
A. No, there -- there's been additional testimony since then.
Q. There -- you've testified in additional cases since June 1st?
A. Yes.
Q. On --
A. Wait. Since June 1st?
Let me -- let me look at my updated copy.
Yeah, yeah, yeah. That was a -- that was a report.
Yeah, testified in two cases since June 1st, 2026.
Q. Okay.
What -- what are those cases?

A. One is the Candy June Bugg, B-U-G-G, versus Christopher Bugg, and that's a court -- court appointed joint expert case out of Payne County, Oklahoma.

And then the other one was Cassidy Windes versus Tyler Windes, W-I-N-D-E-S. That was also court appointed joint expert case out of Denver County, Colorado.

Q. Are -- are either of those matrimonial cases?

A. Both of those are matrimonial cases.

Q. Okay.

How many of the cases shown here in your disclosure -- in your CV are matrimonial cases?

A. Seventeen of them are matrimonial cases. Some of those had a civil component or were post-judgment actions but still related to, like, a family law case.

Q. Have you ever been disqualified as an expert witness?

A. I -- I don't think I've been

disqualified.
I've had portions of my testimony excluded, if that's what you mean.
Q. Okay. You've had testimony -- portions of your testimony as an expert witness excluded.
Is that right?
A. That's correct.
Q. Okay.
Did you have your testimony excluded in a case called Newberry versus Talisman Energy?
A. In -- yeah, in that case, the judge excluded all of the expert testimony for, like, both experts. That order was appealed and then the case settled on the basis of my work before the order -- the appeal was heard.
Q. Okay.
But the -- the trial court judge in the Newberry versus Talisman Energy case disqualified all of your expert testimony?
Let me ask you a different

question.

The trial judge in the Newberry versus Talisman Energy excluded all of your expert testimony. Is that right?

A. I -- I think he excluded both experts in that case.

The -- the Newberry versus Talisman case is one of, like, 25 other oil and gas cases, and the judge in that case felt he had enough background knowledge that he didn't need to hear testimony from either of the experts.

The -- like I said, the order in that case was appealed and then the case settled before that appeal was heard.

Q. Well, the judge in the Newberry versus Talisman Energy case excluded your testimony because he found that you lacked the necessary qualifications and failed to base your conclusions and methodology on the relevant documents in the case.

Isn't that right?

A. I think that the statement he made was that my cryptocurrency expertise he felt would not assist him in that case.

The review of relevant documents was a component of the attorneys withheld documents in that matter.

MR. RUOCCO: Ellie, can we do tab 212?

MS. BAINES: 212 is uploaded.

MR. RUOCCO: And I'm showing you what's being marked as Haraminac Exhibit 4, is it?

THE STENOGRAPHER: Yes.

MR. RUOCCO: Yes.

(Haraminac Exhibit 4, Notice of Electronic Filing Newberry v. Talisman Energy, Southern District of Texas February 16, 2022, was marked for identification, as of this date.)

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. And this is a document entitled "Minute entry from the Newberry et al. versus Talisman Energy" case from the Southern District of Texas. It is dated February 16th, 2022.

Correct?

A. Yeah, over four years ago. Yeah, I see that.
Q. Okay.
And in the middle of the paragraph here in the blue text do you see: The Court granted the motion to exclude with respect to Dorothy Haraminac because she lacks the necessary qualifications and failed to base her conclusions and methodology on the relevant documents in this case.
Do you see that?
A. I see that text in the -- the docket text.
I think what I was referring to was either the -- the hearing itself or one of the orders.
I haven't seen a copy of this minute entry.
Q. Okay.
But this was the basis of the Court's decision in the -- to exclude your testimony in the Talisman Energy case?
A. I think this is the decision. I don't know if the -- what all the judge

based it -- the decision on. I mean, it says, like, he has that there, but I think there was also an order, and then that order was appealed and then the case settled.

Q. Okay.

You -- you've mentioned the appeal. The judge's decision to exclude your testimony wasn't overturned, right?

A. The case settled on the basis of my work before that appeal was heard.

Q. Right.

Aside from the Talisman Energy case, have you been excluded from any other cases?

A. The -- can you put my CV back up?

Q. Sure.

A. There's -- let's see.

Q. Sorry.

(The above mentioned exhibit was published.)

A. There's a set of cases in here that are the Denker-Ricchio cases. There are several civil cases and matrimonial

cases, like, involving the same parties.

In one of those, a portion of my report, like, a segment of it was excluded from -- from testimony, but the rest of it wasn't, and it was specific to that case, not specific to the other cases.

Q. And do you recall which of the Denker cases a portion of your testimony was excluded in? Was it a state court case, federal court case?

A. I -- I don't remember which one. There were -- that -- that was a family case where it was a divorce paired with a civil case where the mother-in-law and the -- and the husband also had some issues, and I don't remember which one. It was a small section of my report that had to do with proceeds earned from staking that the -- the court didn't -- didn't think was relevant to the issue at hand.

And so I think that was -- I don't remember which one that was, but it was in the Denker-Ricchio, like, series of related cases.

Q. Okay.

Let's see. There's a case on here, the -- this is in French so excuse me, but Autorit Des March s Financiers v. Alexandre Gagnon and 9452-7538 Quebec Incorporated.

Do you see that this?

A. Yes.

Sorry, it's the Autorit Des March s Financiers versus Alexandre Gagnon and Quebec (different pronunciation).

Q. Yes.

Were any portions of your expert testimony excluded from this case?

A. That -- that order in that case was strangely worded, and the way Canada works is a little bit different.

So, the report itself was excluded, but the attorneys were still allowed to rely on my expertise and continued to engage me for their work in that case. So the -- that order was odd.

Q. But your -- your expert report in that Gagnon case was excluded by the Canadian tribunal?

A. I think the -- the report itself, but not the expertise, like the use of the expertise. So it was -- I can't say it was excluded.

Like an exclusion means it's excluded and cannot then be used in the case. That's not what happened in that case.

Q. Do you plan to testify as an expert in the Gagnon case?

A. That case is, I think the last time I checked, still ongoing because the AMF filed an appeal. So I don't know.

Q. But the Canadian tribunal in the Gagnon case issued an order excluding your written expert report in that case.

Is that right?

A. It's Gagnon (different pronunciation).

The order itself that you're referring to has that component in it where the report is segmented and separate from the attorney's use and reliance on expertise.

Q. Okay.

Aside from the Talisman Energy case, the Gagnon case, the Denker case, has any portion of your reports or testimony from other cases been excluded?

A. Not that I recall, no.

Q. Okay. Let's -- let's turn to your report in -- in this case.

So, we discussed this exhibit -- or, sorry, this Appendix A to your report earlier this morning.

Do you remember that?

A. Yes.

Q. Okay.

And this is a list of the documents that you stated that you reviewed in connection with drafting your report.

Is that right?

A. It's -- yeah, it's documents that were provided to me.

Q. Okay.

Now, did you review -- well, let me ask you this question.

If we -- if we look here, do you see here there is a "Production Category"

column?
A. Yeah.
Q. Okay.
And here starting in line 119 and going through line 129, the "Production Category" is listed as: DistroMint production.
Correct?
A. Yes.
Q. Okay.
And what does "DistroMint production" mean, as used here?
A. That's the folder name for the folder containing those documents. That's what was produced to me that was not produced by nChain.
Q. Do you -- do you have an understanding of which party in the lawsuit produced the documents that you labeled "DistroMint production"?
A. The plaintiffs.
Q. And there were only ten documents from the plaintiffs that you reviewed in connection with drafting your report.

Is that right?
A. Those are the documents that were produced to me, yeah.
Q. Okay.
Now, let's look at lines 130, okay, and we're going to go all the way to 1 -- or 13,188 at the bottom here.
Sorry, excuse me. The -- the production category listed here is "nChain Production."
Is that right?
A. That's right.
Q. Okay.
And are those documents taken from the production that nChain has made in discovery in this case?
A. Taken from the document that -- what -- what was your question?
Q. When -- when you label the -- the documents here in Schedule A with "NChain Production," does that mean that you got those documents from nChain's document production in this lawsuit?
A. Yeah, the attorneys provided that to me in a folder named, you know,

"nChain Production" and produced on whatever that date was. You can see the -- the -- when they produced it and then the date I obtained it.

Q. Okay.

Okay. So, there's two sets of dates here next to "nChain Production." So those -- those dates refer to the date that nChain produced the document.

Is that right?

A. Yeah, that's my understanding.

Q. Okay.

So, we see some -- some documents produced on May 15th, 2026, correct?

A. That's correct.

Q. Okay. And then we go up to here, there's also some documents that were produced on April 24th, 2026.

Is that right?

A. That's correct.

Q. Okay. And I think you mentioned this a moment ago, but this column here to the far right that lists the date in which you personally obtained the documents.

Is that right?
A. That's correct.
Q. Okay. And the date that you obtained each of the documents from the nChain production was May 29th, 2026.
Is that correct?
A. That's correct.
Q. There are -- well, the date of your report is June 1st, 2026, right?
A. That's correct.
Q. There are more than 13,000 documents listed here on schedule -- or Appendix A from -- from nChain's production, aren't there?
A. I think the -- no, that's not a correct statement.
The total list is 13,000, but I think one starts at not nChain's production.
Q. Well, okay. Let's just -- so, we have the documents listing -- or, from nChain's production start here on line 130.
You see that here?
A. Yeah.

Q. Okay. And they go all the way to line 13,188.
A. So, yeah. Very close. To almost exactly 13,000.
Q. Okay.
So, there are about 13,000 documents from nChain's production referenced here on your Appendix A.
Is that right?
A. Again, I would -- I wouldn't characterize all of these as documents. These are files and file names, but, yeah, there's that count. A lot of these are duplicates based on the format of that production.
Q. Okay.
Did you personally put eyes on each one of these files from nChain's production between the time you received them on May 29th, 2026 and the time you submitted your report on June 1st, 2026?
A. I -- we did a lot of searches and OCR recognition using a different OCR tool to get at what would be important information. A substantial amount of

these are just a single page containing, like, an icon in it, so like a fragment. So with those things, no, we -- we identified those segment amount and tried to put eyes on things that contained actual substantial information.

It's a very short timeframe. So we tried to review, like, by priority and relevance.

Q. Okay.

Can you identify any part of your report that describes the search protocol that you used to review the 13,000 files from the nChain's production?

A. The search protocol? What do you mean?

Q. Well, you're saying that you didn't personally put eyes on every one of these 13,000 files, right?

A. I think I personally I had analysts also looking at these. So we did review them.

The -- put eyes on each document, like, there's duplicates of a document where there's an image that says,

you know, native produced. So I wouldn't have reviewed the native produced placeholder document in detail. I would have just looked at the native, right.

So if I was to look at -- so that's what I mean by priority. So if I'm looking at the natives, I don't need to see the other versions where the metadata's been stripped out and there's no other information related to it. That's -- that's not a useful document, right. I'm just looking at the ones that have substance.

Does that make sense?

Q. Yeah, but my question's a little different.

So, did you -- a few minutes ago I said: Did you personally put eyes on each one of the files from nChain's production from the time you received them on May 29th, 2026 and the time you submitted your report on June 1st, 2026?

And your response was: I -- we did a lot of searches and OCR recognition using a different OCR tool to get at what

would be important information.

And my -- my question is what part of your report describes the searches and OCR recognition that you did when you look at documents from the nChain production --

A. That's standard practice under the word "review." So we would do that for all documents.

Q. My -- my question is --

(Stenographer instruction on cross talk.)

BY MR. RUOCCO:

Q. Your report doesn't disclose the search process for OCR process that you used to actually look at documents from nChain's production, right?

A. I -- I think you're confusing what OCR means with the word "look."

Like, eyeballs are open and I'm looking at the results of what is contained in that document. I can do that faster using Tesseract OCR engines versus opening each one individually. And it's unnecessary to open each one individually.

If the native file has been produced, I don't need to open the jpeg that says produced as native, right.

So that would be in a preview section. So I wouldn't -- I wouldn't physically open that document because it's just in the preview I can see it doesn't contain any substantial information. I would go open the native document.

Q. Okay. But I'm just saying you don't -- you didn't write any narrative in your report describing that part of your methodology for preparing the report was to run searches and OCR tools on the documents you received from nChain's production.

Is that right?

A. That would be contained in the word "review." The standard practice for review. You search through the documents using a wide variety of tools.

Q. Okay.

But we're not going to see any part of your report that says, I searched or did OCR tools on the nChain's

production.
Right?
A. I think you do see a part of my report under the procedures that say what I did, and reviewed those records would be one of those things, obtained and reviewed, analyzed, constructed models, identified things, reviewed documents, included all of those things, like.
That -- that's like -- your question is weird. It's like saying you're not going to tell us which browser in your report you used to open up a link, but that's a -- that's a weird thing to have in a report. No, of course you wouldn't, like, specify which browser you're using unless it's, like, pertinent to that discussion. But this is I opened them, I reviewed them using the tools that open and review things.
Q. Okay.
But I'm just saying, so you -- the procedures in your report, we're looking now at that part of our report page 5, it says: Reviewed documents

listed in Appendix A and those cited herein.

Right?

A. That's right.

Q. Okay.

And -- and what -- what you're saying is when you said "reviewed those documents," what you really meant was ran searches in OCR tools.

Is that right?

A. What -- what do you think "review" means? Like, it seems like you're taking some weird reading of it to mean didn't look at, but that's what "review" means is to look at the files, to understand what's the -- what is in the content of those files.

Q. Okay.

Did someone from YBR put eyes on each one of the 13,000 files that you -- you got from the nChain's production?

A. Yes.

Q. And who -- who was that person, if it wasn't you?

A. That would be one of the

analysts, but the person that signs the report and the -- the support that goes into it, it's me.

Q. Okay.

So it's your testimony under oath that a human being from YBR did a linear review between May 29th, 2026 and June 1st, 2026 of all 13,000 files that you got from the nChain's production?

A. What do you mean by "a linear review"?

Q. I mean --

A. Do you mean --

Q. I mean a human being up --

(Stenographer instruction on cross talk.)

BY MR. RUOCCO:

Q. I mean a human being -- are you testifying under oath that a human being from YBR opened up each one of those files, all 13,000 of them, from the first file to the last file between May 29th, 2026 and June 1st, 2026?

A. Okay. I think there's some distinction here with your word "open."

I just testified earlier that we did not do that. I have a tool that previews the content of a document. So where that -- that document is selected and the preview shows no substantial information in that document where it's just a picture of a logo or the text that says "produced as native," then that particular document would not be double clicked to be opened.

Do you understand what I'm saying?

We would just go to the native production and review the native production for that document. The image that says "produced as native" would not have been double clicked and opened in the sense that you're describing.

Q. Are -- are you -- are you testifying under oath that the only files someone from YBR did not personally put eyes on are documents that said "document produced in native" or some non-substantive jpeg file?

A. I -- I'm -- I think you're --

you're using some kind of narrow definition for the word "review" or "put eyes on."

Like, we did not print these out physically. That's not something that we did. And so you're asking if someone put eyes on them. We reviewed the documents to understand the content of the documents in the -- using efficient and effective methods to do that. That includes OCR. That includes using searches to -- to locate certain information or phrases that were referenced.

Those -- those processes are standard parts of review. And then you're now taking my answer and saying well, you didn't open everything. And I think that your use of the term "open" is a little bit odd because you're -- you're meaning it to double click and open the file, and I'm saying we use a tool that previews the content of that file. And those are two different things.

Q. Do you have a ballpark idea of the number of documents you personally

looked at when you were writing this report?
A. No.
What do you mean by "personally looked at"?
Are you still using the narrow definition "open" to mean double clicked and opened in some kind of certain software, or do you mean determined the content of the file?
Q. I mean do you know ballpark how many documents you, Dorothy Haraminac, personally used your eyes to look at while you were drafting this report?
A. I -- thousands of documents.
I don't know what -- what you're --
Q. Is it your -- your testimony is then that between May 29th, 2026 and June 1st, 2026, you personally using your own eyes reviewed thousands of documents.
Is that right?
A. Yeah, that's -- it was over a weekend. I mean, so we spent quite a few hours going through all of those

documents.

Q. How many hours did you spend reviewing the documents?

A. I don't know. I'd have to look at the -- at the invoices to see how many hours.

Q. Now, let's take a look at page 3 of your report.

So, here under Conclusions you write: The fair market value of DistroMint as of October 2nd, 2023, is $44,452,361 on a going-concern premise, corroborated by a probability-weighted analysis of $46,244,482, shown in the table below.

Do you see that?

A. You read that out loud, yeah.

Q. Okay.

And then there's a footnote and then in the footnote it says: DistroMint, LLC is the enterprise, and DistroMint is the software platform under development. The two are referenced herein collectively as DistroMint.

Do you see that?

A. I do.

Q. What is the thing that you're attempting to value in your report?

A. What do you mean "the thing I intend to value"?

It would be the -- the projects that is DistroMint and the implementation of that project, so the marketplace and the platform, the fees that were going to be earned by that entity.

Q. Are you attempting to value the enterprise value of DistroMint, LLC as a business entity?

A. What is your distinction between those two things?

Q. Are -- are you attempting to value the enterprise value of the business entity called DistroMint, LLC, or are you attempting to value the asset that is the software platform called DistroMint?

A. So, like it says in the footnote, the two are referenced collectively because you have the software itself and then you have the fees earned from running that software, which would

not be part of the software.

Q. But is the valuation of the business entity, or is it of the asset that is the software platform?

A. What -- what is your distinction between the two?

Like, as the footnote -- I'm saying very clearly the two are referenced collectively. This is the thing that they were building, the whole thing. So you have the -- the platform, the fees that they were going to earn, how they were going to do all of that. Like, all of that is described in the report.

I'm not -- I don't think I understand your question in that I don't understand what -- how you're trying to distinguish between the two.

MR. RUOCCO: Okay. Let's take a look at tab 338, please.

MS. BAINES: 338 is uploaded.

MR. RUOCCO: I'm showing you what's being marked as Haraminac Exhibit 6.

(Haraminac Exhibit 6,

International Glossary of
Appraisal/Valuation Terms - U.S.
Domestic Comparison Chart of
Definitions, was marked for
identification, as of this date.)
(The above mentioned exhibit was
published.)
BY MR. RUOCCO:
Q. And this is a document entitled "International Glossary of Appraisal/Valuation Terms - U.S. Domestic Comparison Chart of Definitions."
Do you see that?
A. I see the document.
Q. Okay.
And -- is this a document published by the NACVA?
A. It looks like it's a comparison of international terms to U.S. domestic terms.
Q. Okay.
Was your report prepared in accordance with the professional standards of the NACVA?
A. Yeah, it was prepare -- prepared

in accordance with the standards to which I am subject.

Q. Okay.

And so, the -- the definitions here provided by the NACVA, those would be the definitions that -- that governed your -- your valuation in this case?

A. This is -- this is a comparison of different terms. So this is an international glossary, and it pulls all the different terms from a wide variety of different sources, you see across the top the different sources there.

Q. Yes.

A. And so, to say that I would use a definition contained in this document, it would not be entirely accurate. This document contains a comparison of a wide variety of different terms from a bunch of different sources.

Q. Okay.

Did you apply the terms in the NACVA column?

A. Yeah. I mean, here you're looking at a comparison of these terms.

If you scroll down and see, like, it's -- it's got very specific things for some things and then there's blanks for everything else, right. And so there's no terms in the NACVA column. The terms are only in the left side, and NACVA is showing you their interpretation of that term and comparing it to the other organizations.

Q. Okay.

Let's look at fair market value, okay. I don't -- disregard all the other columns that are not the NACVA, okay?

A. Mm-hm.

Q. Now, it states the fair market value, and this is the nChain definition: Price expressed in terms of cash equivalents at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller acting at arm's length in an open an unrestricted market when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.

Do you see that?
A. I do.
Q. Is that the definition of fair market value you applied in your report?
A. Yeah, that's -- that's a common definition.
Q. Okay.
So, my -- my question is in your analysis, what is the property that a willing buyer would be purchasing?
A. You would be purchasing the thing that was built by nChain and the plaintiffs. So, the thing that was built would be the -- the platform along with the revenue that that platform can generate and all of the intellectual property that is required to run that platform and to have built that platform.
So all of those things together are individual software components and the implementation of that software and in the -- the things that that software's intended to generate or perform.
Q. So -- so -- so you did a -- a valuation of the soft -- software platform

as an asset.
Is that right?
A. I think you just misstated my testimony.
Q. Okay.
Your -- your testimony was that you would be purchasing the thing that was built by nChain and the plaintiffs so the thing that was built would be the platform, along with the revenue that platform could generate and all of the intellectual property that is required to run that platform and to have built that platform. So all those things together are individual software components and the implementation of that software and the thing that the software is intended to generate and/or perform.
That's what you stated, right?
A. Yeah.
Q. Okay.
A. It sounds like you just read that back.
Q. Okay.
And I guess what I'm asking is

in a -- the hypothetical sale that your valuation is assuming, okay, is someone buying all of DistroMint, LLC, or they just buying the software platform called DistroMint?

A. I -- I don't -- I still -- again, I don't understand your distinction.

Those terms are -- are referenced collectively, right. So you're talking about a single component, the software platform, and it sounds like you're limiting that to, like, the code itself, which is not what I'm talking about.

Like, this is the -- the implementation of this project, right. That -- this is, kind of, gets into the difference between traditional business valuation and blockchain-based business valuation where what you're talking about is the thing itself and the enterprise itself and all of those things are software-based.

And so for you to say well,

you're just talking about the software, that kind of minimizes what I'm talking about, what's being valued here. It's not that. It's everything that goes into that, the building of it and the implementation of it going forward.

So it sounds like you're trying to distinguish between the enterprise and all the things the enterprise owned or built or was trying to build or, you know, was going to generate -- use to generate revenue.

Q. When you use the phrase "enterprise" in your response, are you referring to DistroMint, LLC?

A. I'm -- I'm talking about the, like, in my response, I think I was talking generically. Like the enterprises traditionally. And so in your distinction, yeah, you're trying to draw a distinction between the enterprise DistroMint comma LLC and the platform that was later referred to as DistroMint, and I'm trying to get you to clarify what you intend as the -- as the distinction.

Like, do you intend that the platform, all the intellectual property that goes into it, or do you intend those things as separate assets under the enterprise? Do you intend by your distinction just code, or do you intend by your distinction the marketing and the revenue generated by that code?

That's what I'm trying to understand between -- in your question because you're drawing a distinction, and I don't understand what your distinction is.

Q. Well, I -- I'm trying to understand the thing that you were valuing in your report, and I don't think anyone reading it can.

So I'm asking you -- I'm asking you, okay, do you understand that -- that business entities like an LLC own or can own assets? Do you understand that?

A. Yes.

Q. Okay.

Do you understand that you can sell an asset of a business entity without

selling the business entity itself?

A. Yes.

Q. Okay.

Do you understand that you can sell a business entity and spin off an asset from it from that transaction?

A. Yes.

Q. Do you see how the business entity and the asset are not the same thing?

A. Yes.

As in your questions, it sounds like you're clarifying your distinction to mean asset is platform and everything else is the LLC.

Is that what you mean by your distinction?

Q. I -- I'm just asking you in your report, if we go back there, define DistroMint to mean the software platform under development.

Right?

A. You've taken a segment of a sentence, and the complete sentence is: DistroMint comma LLC is the enterprise and

DistroMint is the software platform under development - semicolon - the two are referenced herein collectively as DistroMint - period.

That's the complete sentence.

Q. Correct. Okay.

So, I -- I'm asking just the thing that is the subject of your valuation in this report, is it the DistroMint, LLC, the business entity, or is it the -- the -- the DistroMint software platform?

A. So --

MR. RISPOLI: Objection; asked and answered; calls for legal conclusion as to ownership structure of DistroMint, LLC.

But you can answer.

THE WITNESS: Okay.

A. What was your question? Sorry.

Q. My -- my question is just simply what is the subject of your valuation? Is it DistroMint, LLC, or is it the DistroMint software platform?

A. So, again, I think we kept going

around and around about this. The footnote that you're referencing says these are referenced collectively. I'm talking about all of these things together. Has segmented some portion of one asset off, right. You have some discussion in here about the provisional patent application. That would be one portion of an asset. You have some discussion by Dale about the code and whether it works for hire or owned by the worker or not. Those things are all -- all components of assets.

This is not that. And -- and I make that very clear here. The -- it's clear in the footnote and it's clear in my report what's being valued.

Q. Okay.

So, in your valuation, who is the seller?

A. A hypothetical -- wait. Oh, you said seller, not buyer. Sorry.

Who's the seller here?

The seller would be the -- I guess the owners of this collective

enterprise.
Q. Are they the owners of DistroMint, LLC, or are they the owners of a software platform?
A. I -- it would be whoever the holders of these things are. Like, I don't have an opinion on who the specific owners of this entity or the assets are.
The -- the point is, like, the valuation isn't dependent on who the owners are other than, like, a discount for closely held businesses, that kind of stuff. But that's, like, the point of this is a hypothetical willing buyer and seller. That's who this -- the sellers and buyers would be in this valuation. And it sounds like you're asking me for, like, a specific owner.
Q. I --
A. I'm not understanding your question.
Q. Does your valuation assume that DistroMint, LLC owns the software platform called DistroMint?
A. My valuation does not have a --

a presumption about which specific individuals are owners of -- of any of this.

Q. So how can you identify who the seller would be in this transaction?

A. I don't identify a seller in this transaction other than it's a hypothetical and willing buyer and seller with the knowledge that you -- we just looked at in that definition.

Q. Now, you would admit, right, that whether you're valuing the business entity or the asset might affect the outcome of the valuation, right?

A. How do you mean?

Q. Well, there would be inputs that would be different to your valuation depending on whether you're valuing the business entity or -- or the asset.

For example, right, the business entity would be required to pay taxes that the asset, that is the software platform, would not be required to pay taxes.

Isn't that right?

A. I don't think that's correct.

What taxes are you talking about?

The software itself is used to engage in purchases and sales and enable purchases and sales among piers. And so as such, that transaction enabling may also be subject to taxes.

That's part of the difference between a blockchain-based software that functions and an enterprise that would perform the same function.

Do you understand the difference, like, in my answer?

Q. No.

A. Okay.

Q. So -- so --

A. So let me explain a little bit more of my answer.

You asked -- you said that an entity would be subject to taxes and software would not be subject to taxes, right? The gist of your question.

Is that correct?

Q. Correct.

A. Okay.

So, in my answer, what I'm saying is that software itself can -- can automatically engage in transactions or enable transactions that may be subject to taxes. The controller of that software may not be an entity or an identified individual. That's kind of the point of a blockchain. And so you're mixing these capabilities from, like, a traditional perspective and kind of ignoring the -- the actual functionality of blockchains and blockchain-based companies.

Q. What -- what does the functionality of the blockchain have anything to do with -- with the valuation?

You're trying to assess, right, how much you could sell either DistroMint, LLC or the software platform for, aren't you?

A. The functionality of a blockchain is critical to the functionality of the software that you're talking about. The fact that it can be autonomously or automatically triggered by actions from other unidentifiable entities

or parties, that's the question that I was trying to answer.

You're -- in your question you, kind of, have a -- a premise that's not accurate that only entities are subject to taxes and software could never be subject to taxes. I'm giving you hypothetical example where actually transactions that are triggered as a result of software that runs in a blockchain may be subject to taxes. That is the whole point of, like, U.S.-based IRS guidance on blockchain stuff in general, like NFTs and transactions and those types of things. That those transactions may be taxable events. Those types of transactions may not be triggered by an individual. They may be triggered by the software itself as a function of how that blockchain component works.

Q. Okay. So let me ask another question.

So, who would have employees in your valuation? Would DistroMint, LLC have employees, or would the software

platform have employees?

A. So, that's a -- that's a weird question and it seems like it's driven by a misunderstanding of how blockchains work.

So, blockchains are not just, like, simple ledgers of to/from and assets. Those -- the things on blockchains can also be executable code. And so in the sense of an employee, like a worker that performs functions, those could be humans. Those could also be software in the form of smart-contracts that are triggered by other events.

Q. Okay.

You did a income approach analysis in -- in your report, right?

A. I did.

Q. Okay.

And that was based on a discounted cash flow analysis, right?

A. Yeah.

Q. Okay.

And in your discounted cash flow analysis, you -- you make assumptions

about revenues that would be generated from the operation of the DistroMint software platform. Is that right?

A. I -- I think you have to be careful with the characterization of an assumption 'cause in -- like, there's a thing that presumed to be true and there's, like, an input into a model and those things ca get a little bit hairy. So the model has inputs, and, like, I discussed the inputs and what those are.

If that's what you mean by "assumption," then yes, it has inputs, but I would, like, bristle at the use of the word "assumption" basically.

Q. We'll get to that later.

An input of your DCF analysis is that there would be revenues generated from the distribution of a software platform, right?

A. I think that's the premise of an income approach in general is a, you know, assessment of the revenue.

Q. Okay.

In your valuation, who is

receiving those revenues?

A. So again, that goes back to this -- this distinction that you're trying to draw between, like -- like, the example before that I used of a -- of a digital autonomous organization, right. That -- that's a thing that exists on the blockchain that has actions and triggers events and enables the transfer of different things. And then there's an equivalent, a traditional corporate structure equivalent, and those two things are -- are, kind of, hybridized in this model.

And so when you say who would have earned the revenue, it depends on that implementation. The software itself may earn the revenue and store it on a blockchain address and then distribute it to other blockchain addresses. Whether or not those other blockchain addresses are -- have identities and those identities are part of a traditional corporate structure is a strategy question that, kind of, doesn't have any effect on

the income itself.

Q. So, in your response you referenced "digital autonomous organizations."

Is that right?

A. That's right.

Q. Is -- is DistroMint, LLC a digital autonomous organization?

A. I -- I don't offer an opinion as to the -- the particular structure of DistroMint comma LLC, and that particular structure doesn't have an effect on the valuation. Like, the underlying corporate structure for the income approach is separate from the lay -- like, who's -- who that income is later distributed to. The income is just what is being earned by an implementation of this thing.

Q. Your testimony under oath is that -- is that the particular structure of the property being sold does not have an impact on the outcome of the valuation?

A. You're misstating my testimony.

Q. Okay.

Your analysis, you were directed

to assume that the plaintiff in this case owns 50 percent of something, right?
A. The 50 percent share is listed on, like, page 3 there.
Q. Mm-hm.
A. That's where that's illustrated.
So it's not an assumption into -- like an input into a model anywhere. The 50 percent is applied after those.
Q. What is the 50 percent of?
A. That would be the -- like, as I discussed before, this combination of what nChain and the plaintiffs were building and the implementation of that along with the licensing that goes into that.
Like, we're going in circles here.
Q. How does 50 percent of the proceeds of, quote/unquote, DistroMint get to any one of the plaintiffs?
A. That depends on the implementation.
Q. What do you mean by "the implementation"?

A. I -- I think I described this, kind of, ad nauseam.

The -- the -- you can set up, like, an -- in its most simplest form, some software that says if $50 is deposited, then transfer 25 to A, 25 to B. Or transfer 20 to A and 20 to B and 10 to C, right. That would be software. And the execution of that software would be.

How one thing got to another thing, another mechanism for how that would occur would be, you know, a transfer of dollars using Swift or something like that. You can mail something in -- in, like, mail.

How as far as how proceeds are distributed would depend on the implementation, but that doesn't have an impact on the income stream itself. The later downstream distribution of it is not, like, an input into the income that's being generated.

Q. Is there any evidence in the case that --

MR. RUOCCO: Strike that.

Q. I mean, is it -- is it -- do you understand that it is the plaintiffs' allegation in this case that they went and had a 50/50 share with nChain in the entity that is called DistroMint, LLC?

A. I -- I think the entity that's called DistroMint, LLC is a reference to the entirety of the DistroMint project, and they're referenced collectively. Like, the -- in so much as DistroMint comma LLC would be the, the entity that is the thing that is implementing what nChain and the plaintiffs built, right, this software, the licensing that goes into it, the revenue generation and all of those things, then, yes, right. The claim here is a 50 percent share in DistroMint, LLC which is the implementation vehicle of all of the things that -- that we're discussing.

Q. Okay.

So -- so, you're trying to value 50 percent --

MR. RUOCCO: Or, strike that.

Q. You're trying to value

DistroMint, LLC.
Is that what you're trying to do?
A. I -- I -- I don't understand your distinction. I think I've explained it, kind of, over and over again that you've got the segmentation between the asset itself as though that's somehow separate from the thing implementing all of those assets. And -- and so I'm trying to get clarification on your distinction, and you're just repeating the question.
Q. So, you just said the claim here is a 50 percent share of DistroMint, LLC which is the implementation vehicle of all the things that we're discussing, correct?
A. I mean, that comes from both parties' pleadings, right. Finnerud claims a 50 percent share in DistroMint comma LLC. That claim's corroborated with nChain's production in this matter. They're talking about 50/50 interest in the thing that they are building, which is either going to be implemented in an LLC structure or is the software that they are

building, a combination of the software and the licensing and the revenue generation and the interactions with the other ecosystem components. All of those things together are the implementation of that. One is a subset of the other, and you're trying to draw a distinction between them.

Q. Which one is the subset of the other?

A. What?

Q. You -- you just said one thing is a subset of the other. You're trying to draw a distinction between them.

In your response, which one is the subset of the other?

A. Are you -- are you asking me whether an enterprise can be a subset of an asset?

Q. No. I'm asking you whether you are doing a valuation of the enterprise and that owns the asset.

Is that what your valuation is in this case?

A. It's the -- the implementation

of it. So, the ownership piece is a different question because the -- the implementation of this that -- that the both parties were building is -- requires licensing. Licensing is not a transfer of ownership. And so when you're asking who owned it, who owned it, that depends on the licensing agreement and how that software got implemented and which specific IP was going into that implementation.

And so the -- your question seems like you're asking either something different or you're not willing to clarify what I'm asking you to clarify.

Q. Okay. Let's assume we get to a trial in this case. You're called as an expert witness. Plaintiffs' lawyers get up and they ask you: Ms. Haraminac, what did you value in this case?

Your response would be what?

MR. RISPOLI: Hold on.

Objection; asked and answered.

Jared --

MR. RUOCCO: No. No speaking

objection.

BY MR. RUOCCO:

Q. Please answer the question.

MR. RISPOLI: No, no, no. This is getting argumentative now. She's answered the question ten different times.

You know that this whole case is about who owns DistroMint, LLC. She's told you ten times she's talking about the platform and how you value it.

Her report is replete with every single way that she valued it.

Let's ask some questions about the report.

MR. RUOCCO: I am. I -- I'm trying to ascertain what the report is valuing, and it doesn't seem like the witness wants to respond.

So I'm going to ask my question one more time. You can direct her not to answer if you want, Fred, and then we can take that up with the Court.

BY MR. RUOCCO:

Q. If -- Ms. Haraminac, this is the last question I'll ask you about this right now.

Let's assume get to trial, okay. Plaintiffs' lawyer stands up, says: Ms. Haraminac, what did you value here in your report?

What's your response?

A. My response would be --

MR. RISPOLI: Objection; asked and answered.

But you may answer.

A. My response would be the fair market value of DistroMint as of October 2nd, 2023 is $44,452,361 on a going-concern premise corroborated by a probability-weighted analysis $46,244,482 shown in the table contained in my report.

Q. Now, in a fair market value transaction, would the buyer want to confirm who owned the property that it was buying?

A. The -- the fair market value hypothetical is a willing buyer and seller with knowledge of relevant facts, right.

Q. Right.
A. Not in distress. Like, all of those things.
Q. And before a -- before a buyer agrees to buy the property, would it want to confirm that the seller actually owns that property?
A. That's -- I think that's inherent in the hypothetical willingness of the buyer and the seller, right. The ownership is implied in that consideration.
Q. Okay.
So -- so here, would a buyer want to confirm who owned the software platform that's called DistroMint?
A. It's -- it's a fair market value. It's the willingness -- a willing buyer and a willing seller, right.
The underlying presumption there is that one does not own the thing and wishes to acquire it and one does own the thing and wishes to unload it.
Q. My -- my question was just if -- if someone was going to buy DistroMint, as

you call it, would they want to know who owned DistroMint?

MR. RISPOLI: Objection; asked and answered.

You can answer, Ms. Haraminac.

THE WITNESS: Okay.

A. So, your question again was the would they want to know who owned it, right? Again.

So again, the premise of this valuation is a willing buyer and a willing seller. The underlying presumption is that the seller is the owner or is at least, you know, able to sell the thing. Otherwise that presumption would fall apart. Like, that's -- you have to have that -- that hypothetical premise.

Q. Okay.

Have you ever seen a financial statement where DistroMint, LLC lists the software platform called DistroMint as one of its assets?

A. I don't think I've seen a financial statement from DistroMint, LLC.

Q. You've never seen any financial

statement from DistroMint, LLC, right?
A. I don't think so. I've seen, like, the presentations and stuff for the -- the pitch and all that. I don't recall formal financial statements.
Q. All right.
Have you ever seen any DistroMint, LLC documents in which the software platform called DistroMint was listed as one of the company's assets?
A. I -- is that -- is that not the same question? Are you asking me about the financial statements and whether or not there were things listed on the financial statements?
Q. I'm saying have you ever seen any documents from DistroMint --
A. Oh, any.
Q. -- saying that there's a software platform called DistroMint was listed as one of the company's assets?
A. I don't think I've seen anything like that where you're specifying DistroMint, LLC in a formal document.
Q. Okay.

A. Right. And some listing of assets, is that what you mean?
Q. Okay.
Have you ever seen any documents in which the software platform called DistroMint was assigned to DistroMint, LLC?
A. What do you mean?
Q. Did you -- have you ever seen, for example, a contract that was for the assignment of the software platform called DistroMint to DistroMint, LLC?
A. To -- the assignment of software? Do you mean, like, a licensing agreement or assignment of intellectual property?
Q. Sure. Let's do that.
A. What do you mean?
Q. Have you ever seen a document in which there was an assignment of intellectual property to the DistroMint platform to DistroMint, LLC?
A. I -- again, your question's a little convoluted.
You said an assignment to the

software to the platform -- I mean, to the platform to the LLC.

Q. Have you ever seen a document in which the intellectual property to the DistroMint platform was assigned to DistroMint, LLC?

A. No.

Q. Okay.

Have you ever seen a document in which DistroMint, LLC purchased the intellectual property to the DistroMint platform?

A. What -- what do you mean "purchased"?

Again, you're segmenting DistroMint comma LLC and DistroMint which are referred to collectively in here. So you're -- you're segmenting out specific code, right.

And so which code are you talking about?

Q. I -- I'm -- my question is have you ever seen anything like a purchase and sale agreement, an asset sale agreement in which the subject of the agreement was the

intellectual property to the DistroMint code and the buyer on that agreement was DistroMint, LLC?

A. I see.

So, no, I haven't seen formal agreements the way you described them.

Q. Okay.

Do you know who wrote the source code for the software platform called DistroMint?

A. I think it was Dale Evans' testimony that nChain d.o.o. in Slovenia wrote the code.

Q. Are you aware that Eric Finnerud did not write any of the source code for the software platform called DistroMint?

A. It's my understanding he had AWS and that to implement things on the AWS, you may have to use some kind of code.

So you're talking about portions of implementation for the code; is that correct? 'Cause all --

Q. I --

A. Is -- go ahead.

Q. Sorry. Were you done with your

answer?
A. Yeah. Go ahead.
MR. RUOCCO: Okay.
Ellie, can we bring up tab 356?
MS. BAINES: 356 is uploaded.
MR. RUOCCO: Okay. This is a document entitled "Videotaped Deposition of Eric Finnerud Volume II."
(Haraminac Exhibit 7, "Videotaped Deposition of Eric Finnerud Volume II August 5, 2026, was marked for identification, as of this date.)
(The above mentioned exhibit was published.)
BY MR. RUOCCO:
Q. Do you see this?
A. Yes.
Q. And you -- you received a copy of this deposition transcript from plaintiffs' lawyers, right?
A. Yes. I received a copy a couple days ago.
Q. All right. Let's turn to page

356, if we could.

Or, sorry, 354. And starting at line 3.

The question was: And to your understanding, it was Luca in Slovenia who he's -- and my question was writing the code for the DistroMint platform.

Response: Yeah. He's the code guy.

QUESTION: Okay. Now, you did not write any of the code for the DistroMint platform yourself, did you?

ANSWER: No.

Okay.

So, are you aware now that it's Mr. Finnerud's testimony that he did not write any of the source code for the software platform called DistroMint?

A. My earlier testimony clarified between the code for the DistroMint platform and things that would have been required to write for use of the AWS implementation of that code. Those are two different things.

This answer does not reflect anything related to AWS. It just refers to the one portion of the code for -- for the -- the segmentation that I asked you to clarify earlier.

Q. Well, the question here was:

You did not write any of the code for the DistroMint platform yourself, did you?

The answer was: No.

Right?

A. The -- that's what the question and the answer is, yeah.

Q. Okay.

Are you aware of any personnel from DistroMint, LLC writing any code for the DistroMint platform?

A. No. And I -- I think -- are you limiting your definition of the code to, like, the GitHub repository for the platform itself or other code on other services, therefore implementation of that platform?

Q. What's the distinction between those two things for you?

A. Well, the distinction is AWS is an implementation of the compiled code that would be stored in the GitHub repository, and so those -- those two things are different. One refers to the other.

Q. Well, would there be any code in the implementation through AWS that would not be included in the GitHub repository?

A. It depends on how that server is set up, right. Like you would have some -- some credentialing, you might have some code there to automatically call things or automatically trigger other things, pull from more than one repository. That -- it really depends on implementation.

In his testimony he's saying he didn't write any code. His understanding of this is not something that I could testify to.

Q. Okay.

Have you ever gotten access to the GitHub repository for the DistroMint platform?

A. No.
Q. Okay.
Have you ever seen any of the code for the DistroMint platform yourself?
A. Yes. I was able to access the -- some of the development servers that are mentioned in the -- nChain's proposal. I mean nChain's production.
Q. And -- and to -- to be clear, what was it that you were looking at?
A. There were links in there that were, like, dev.distromint.com or something like that that were still accessible. So we were looking at those things, whatever that implementation was, that it might be -- might not be the correct link. Might have been like Vercel or something, I don't remember exactly. You're not going to be able to see those things. And so as -- as a result of that view, using a browser of that view, you can see the underlying code that enables that view.
Q. Okay.
And you looked at the code

itself, not a finished version of the website?

A. What do you -- what do you think is the distinction there?

Q. Well, there could be lines of computer code, right, which are the number and letter sequences of the code, and then there's the finished -- the finished website, right?

A. Okay.

So, the -- the way that websites work is that what you view as a finished website, as you call it, is code, and so you just click a button in your browser and you could view both side-by-side.

Q. Okay.

I -- my question is did you look at the computer code itself?

A. Yeah, that's a standard view in the browser that's developed -- like, that's on when I access the website. I'm always looking at the code that operates that website to see what's running on the back end.

Q. Okay.

Did you do any analysis in connection with your report in determining who wrote the code for the DistroMint website?

A. That's -- that's not -- it's not the DistroMint website. It's just the view of it. And so how it's viewed, how it's displayed, all that stuff is what's on the website. It may call other things that you can't view.

So the code itself, like, as to the author of it, there's -- there's not, like -- unless there's a comment on there which would be strange because it's the functionality of the website itself, that's not something that would be in that kind of code.

Q. Okay.

But you -- you yourself did not do any analysis or investigation to determine who had authored the code, the source code for the DistroMint platform, did you?

A. I mean, it's not that I don't have an opinion as to who the author is in

my report. I think we would have analyzed the source of it, what we could tell from whatever we could -- whatever we reviewed. We would have looked at, like, if it said so-and-so wrote this, we probably would have reviewed that.

Q. Okay.

Are you aware that Eric Finnerud did not have access to the GitHub repository for the software platform called GitHub?

A. I think that's in their testimony.

Q. His testimony.

A. I don't remember if it's Dale's or Eric's testimony. And I think one of them testified he didn't have access to that repository.

Q. Okay. Let's just go -- we're still in Exhibit 7. This is Mr. Finnerud's testimony.

And the question was: But in 2023, you didn't have access to the GitHub repository --

A. I'm sorry, where -- where are

you in there?
Q. Sure. I'm right here, page -- line 15 on page 355.
A. Okay.
Q. Okay.
QUESTION: Okay. But in 2023, you didn't have access to the GitHub repository for the DistroMint platform, did you?
ANSWER: Or the DistroMint platform?
QUESTION: No. In 2023, you didn't have access to the GitHub repository for the DistroMint platform, did you?
I didn't know it existed, honestly, because I thought the source code was stored in AWS containers.
QUESTION: And in 2023, you never went into the GitHub repository for the DistroMint platform, did you?
Yes. We conducted a search for HandCash.
QUESTION: Sorry. I'm confused by your answer.

So what I'm asking is, in 2023, did you, Eric Finnerud, go into the GitHub repository for the DistroMint platform?

ANSWER: No. I was unable to access it, but we did go to the -- to GitHub with HandCash. We tried to search and find the DistroMint repository. It would have labeled DistroMint, but, obviously, nChain, they gave it another name. They hid it.

So Mr. Finnerud testified he did not have access to the GitHub repository in 2023, right?

A. I think that -- that understates his testimony there.

He characterized quite a bit of different things, but he does reference the AWS server and the use of containers on that server.

Q. Okay.

You are, though, aware of evidence that Mr. Finnerud did not have access to the GitHub repository for the

software platform called DistroMint, right?

A. So, you're -- you're talking about the GitHub repository for a portion of the code. Another portion of the implementation is the AWS and the -- the container servers. And so he didn't have access to the underlying code that those containers referenced, is what his testimony sounds like.

So I -- I understand that to -- for your -- when you're -- when you broaden your question to be all of the DistroMint platform that's separate from the specific code contained in the GitHub repository.

Q. Is it your understanding there would be any code in the AWS containers that wasn't in the GitHub repository?

A. Containers are code. That's what that is. Like, to implement those things, whether you push buttons in a GUI or you type code in a old-school, like, terminal window, those, like, implementation of an AWS server requires

code.

Q. Okay.

My question is -- I'm just trying to understand. When you say "AWS containers," that would just contain code that would be in the GitHub repository.

Is that right?

A. No, not exactly.

When you write code, you have the raw source code, and then you have a thing called a compiler that, kind of, runs all of that and -- I mean, it's an oversimplification. So it kind of wraps it up into an executable file. That's, kind of, the best oversimplification.

And then that executable file is what gets into the container referenced by the container and displaced. The reason you do that is to, kind of, protect that underlying information, unless you're trying make it open source.

Q. In connection with preparing your report, did you review any evidence suggesting that DistroMint, LLC had access to the GitHub repository for the code for

the software platform called DistroMint?
A. Who -- who do you mean by DistroMint, LLC?
Q. The legal entity DistroMint, LLC.
A. Okay.
So which -- which individuals are you referring to?
Q. I -- my question is -- okay.
In connection with preparing your report, did you review any evidence suggesting that anyone from DistroMint, LLC had access to the GitHub repository for the code for the software platform called DistroMint?
A. The -- so, your question is weird 'cause, like, the -- the overall implementation is this -- I guess you could -- a partnership or collaboration, whatever Dale calls it, through nChain and the plaintiffs, and one portion of those had access to the GitHub repository. But now you're, kind of, separating out again to be specifically DistroMint comma LLC, the corporation, and specific individuals

within that corporation and not using those terms collectively.

Q. There are -- you understand the difference of different corporate entities, right?

A. Yes.

Q. Okay.

Do you understand who the officers of DistroMint, LLC are?

A. I -- I -- you're -- you're, again, you're talking about the, like, the current status of DistroMint comma LLC. And in my valuation report, I refer to both of those things collectively, right.

And so when you ask did anybody at DistroMint comma LLC have access to the code, well, if you're talking about collectively, the thing that the parties were building together, yes, of course they had access to the code. They wrote the code. That's the whole point.

But you're segmenting that off to -- to get at, like, specific owners in a specific enterprise, and that's not the use of this term when it's collective.

Q. No one used the phrase "owners."
Do you have --
A. I guess you said officers or directors, is that what you said?
Q. Have you -- have you seen any evidence, okay, in connection with this matter where an officer, director, employee from DistroMint, LLC had access to the GitHub repository for the code for the software platform called DistroMint?
A. Okay.
So, when you use the term "employee" are you limiting that -- that definition to only W-2 employees and based in the United States, or are you expanding that to contractors?
Q. I am using that term to refer to any employees of the legal deriticle entity DistroMint, LLC.
A. Okay.
So then you are using that term differently than how it's used in my report.
Is that correct?
Q. I don't know.

How -- how do you use it in your report?

A. We've gone around and around about how DistroMint is a collective term.

So, when you say that the code for DistroMint platform and did anybody have access to the GitHub repository for the DistroMint platform, of course people had access to it to create it and write code to it.

Did anybody at DistroMint comma LLC have access to it? That depends what you mean by DistroMint comma LLC. Are you talking about the entity or are you talking about the overall project, those are two different things because the specific enterprise that you're referencing is -- is, like, a registered enterprise. The way that's used is what's in dispute where -- where each party had a 50 percent interest in -- in this thing they were building.

Q. When I --

A. So, yes, as each party had an interest in the thing that they were

building, that thing is referred to as DistroMint, and the developers had access to that GitHub repository for the code.

Some of the other parties within that -- the hundred percent did not.

Q. When I use the phrase -- the term "DistroMint, LLC," I am only referring to the legal entity organized in the State of Georgia called DistroMint, LLC.

Do you understand that?

A. Yeah, I understand that.

Q. Okay.

And you understand the concept of organizing a -- a legal entity, right?

A. Yes.

Q. Okay. Okay.

So, with that understanding, in connection with preparing your report, did you review any evidence suggesting that any officer, director, or employee of DistroMint, LLC had access to the GitHub repository for the code for the software platform called DistroMint?

A. Okay.

So --

MR. RISPOLI: Objection, incomplete hypothetical; calls for legal conclusion.

You can answer.

A. So, my -- the issue I have with your -- with your question, like the reason I -- I'm trying to give a more, like, detailed answer, is that you're using the term "employee" and I asked you to clarify what you meant by employee, whether you were limiting that definition to a W-2 employee under, you know, the United States or if you were expanding it to also mean contractors.

And I need that clarification in your hypothetical.

Q. Okay.

In connection with preparing your report, did you review any evidence suggesting that any director, officer, W-2 employee from DistroMint, LLC had access to the GitHub repository for the code for the software platform called DistroMint?

A. I -- I did not --

MR. RISPOLI: Objection, in -- hold on. Incomplete hypothetical; asked and answered; calls for legal conclusion.

You can answer.

A. I didn't see a document in -- that contained what you described in your question.

Q. Okay.

Now, you don't express any -- any opinion in this case about who the owners of DistroMint, LLC are, right?

A. So, are you still referring to the specific legal entity, or are you now referring to the -- the thing that's in dispute?

Q. Well, let's take them in turn.

You don't express any -- any opinion about who the owner of just the legal entity DistroMint, LLC is, right?

A. Yeah, I don't have an opinion about that.

Q. Okay.

You don't also have an opinion about who the owners of the broader

concept of DistroMint, the DistroMint project are, do you?
A. I -- I don't think I have an expert opinion as to who the owners are of that broader concept, but I do describe what each party represents.
Q. Okay.
You don't have an opinion about whether nChain and any of the plaintiffs had a contract in this case, right?
A. No. That would be a legal conclusion, I think, as far as, like, whether or not a contract existed.
Q. Okay.
A. Are you asking about, like, a specific piece of paper?
Q. I'm asking you have no -- you have no opinion about whether there was a legal contract between any of the plaintiffs and nChain in this matter, right?
A. Right. I don't have an opinion as to that.
Q. Okay.
And so you don't have an opinion

about whether anyone from any nChain entity was a contractor of DistroMint, LLC, correct?

A. That's a different question as to a legal conclusion of a contract in my use of the word "contractor." Right.

The contractor part is the employee piece, right. I was asking whether you meant, like, a W-2 employee where, you know, like, federal earnings are -- federal taxes are withheld or whatever, you know, however that goes, or, like, a 1099 contractor, like somebody engaged for services that is not a formal employee of the -- the organization.

You limited your question and the definition of DistroMint, LLC to the legal entity, and though as such, you're talking about Eric Finnerud, right, and the overall development agreement, there were people working on DistroMint code that were part of this overall hundred percent thing that were contractors. So that's part of Dale Evans' testimony. I think there were services agreement all

over nChain for different entities and whatnot.

And so that's -- that's two different things, whether there's a legal contract and whether people who were working for hire were categorized as employees in the way that I asked you to clarify or not.

Q. In the course of your work on this matter, did you ever see any evidence that DistroMint, LLC had any 1099 contractors?

A. So, in its -- DistroMint, LLC in your limited definition of the legal entity, right?

Okay. So you're talking about just the legal entity. No.

With the overall thing that was built, there were contractors that worked on that.

Q. You never saw any evidence that a 1099 contractor working for DistroMint, LLC had access to the GitHub repository for the code for the software platform called DistroMint, did you?

A. No, that's -- that's going -- that's not what I said.

Like, the 1099 piece was an example of what I meant and as a distinction between a person who's working as contractor and the legal conclusion of a contract.

And so, I didn't see anything where DistroMint comma LLC issued 1099s, but what I'm saying is that the overall thing that was being built by the parties in this matter did use -- use contractors. They were based in Slovenia. So a 1099 would not be a thing that got issued there and, you know, it would be -- 1099 is specific to U.S. tax code. And so as workers for hire, those people existed. They were not -- I didn't see 1099s issued by the legal entity DistroMint comma LLC.

Q. Are you offering an opinion on whether DistroMint, LLC engaged anyone in nChain Slovenia or any other nChain entity as a contractor?

A. So, the parties in this matter, part of their claim is that they each own

50 percent of this thing DistroMint comma LLC and DistroMint platform, who I referred to as DistroMint. And so in that regard, there are contractors who worked on that. That was Dale Evans' testimony, I think.

When you limit your question to the legal entity DistroMint comma LLC, didn't see any 1099s issued by that entity.

Q. In a fair market value transaction, would a buyer be willing to buy software code from DistroMint, LLC if DistroMint, LLC did not own that code?

A. That's a -- that's a weird presumption.

The -- the hypothetical -- the required hypothetical for fair market value is a willing buyer and a willing seller, and the underlying presumption there is ownership or at least authorization to sell the things that are being sold.

Q. Okay.

In a fair market value

transaction, would a buyer be willing to buy software code --

MR. RUOCCO: Strike that.

Q. In your valuation analysis, do you make any allowances or discounts for the possibility that DistroMint, LLC does not own the software code called DistroMint?

A. You're talking about the -- the legal entity DistroMint comma LLC. Is that -- that's right? That -- does that get -- let me just -- like, we could probably say it going forward this is true for all of your questions with DistroMint, right?

Q. That -- that's right.

A. Okay.

So, what -- what was your question as far as?

Q. My question is in your valuation analysis, do you make any adjustments or discounts for the possibility that DistroMint, LLC does not own the software code called -- for the DistroMint platform?

A. Okay.

No, that would be a strange thing to do because you're talking about the legal entity, and what is being valued here is the overall thing that was being built and the thing that's in dispute, right. So you're -- you're talking about something different than this overall thing.

The underlying presumption for what this valuation is is hypothetical willing buyer and willing seller. And the underlying presumption of that is that they either have ownership of the thing that's being sold or have authorization to sell it, which would be licensing, and I think that's what you mean by buy or sell. I think you also mean, like, license for use or something like that. But that's -- like, I don't make any discounts here because that would -- like, that would -- this is the hundred percent level. I'm not looking at one particular entity's share of that other than the 50 percent that's in dispute, right. Like, the

overall ownership part, you didn't discount one of the assets without some kind of corroborating evidence to do that.

Q. Do you know whether DistroMint, LLC has any assets other than the software platform called DistroMint, LLC?

A. What? Can you --

Q. Do you -- like, is it your understanding that DistroMint, LLC claims the DistroMint software platform as one of its assets?

A. I see what you're saying.

So, you're still referring to the legal entity, right? And so, my -- my report is not about the legal entity or the -- these particular ownership structure -- structure of each legal entity, of each party in this dispute.

The -- the valuation is based on the hundred percent, not the structure of any one percentage owner within that hundred percent, other than the 50 percent share per counsel. Like, that's just the calculation.

Q. Okay.

In your valuation, is DistroMint, LLC one of the things that would be bought and sold in -- in a hypothetical transaction?

A. So, again you're referring to a separate legal entity. And my valuation is about the collect difficult group, right. So the thing that was being built, the hundred percent thing, not one particular owner of any one of those things. Of the ownership piece of it is not part of this.

Q. Right, but -- okay.

My -- my question is just whether because it owns the software asset or exists alongside the software asset, does your valuation -- is it premised on DistroMint, LLC itself, the legal entity, being sold?

A. No. It's premised on the entire project being sold. It's not premised on one portion of, other than the 50 percent share of that overall concluded value.

Q. In -- in your valuation, is one of the things being sold the legal entity

called DistroMint, LLC?

A. The legal entity called DistroMint, LLC that you're referring to is not what is part of this valuation in the sense that you're -- you're drawing a distinction between the thing that owns the share, the thing that is an owner of a portion, and the entire thing.

This valuation is for the entire thing. Your -- your question was does it include a -- one of the owners selling a piece of it. I mean, inasmuch as one of the owners would be a portion of the hundred percent, sure. But, that's -- like, this is the hundred percent value. That's what the conclusion value is.

Q. Just in your valuation, are you assuming that some or all of the equity of DistroMint, LLC would be sold in a transaction?

A. I -- I don't have an opinion of the equity structure of DistroMint comma LLC, the legal entity, with your limited definition of it.

Like, we keep going, kind of,

around and around about this because in my report, this is the collective reference, and so the premise is a hypothetical willing buyer and a hypothetical willing seller with all relevant facts, right. The underlying presumption in that premise is the seller either owns outright or has the authorization to sell the thing that is being sold and the buyer has a desire to buy it. That's the underlying premise of it.

So this -- the question as to whether, like, one of the underlying owners has a certain structure or one of the underlying owners would sell their piece versus one of the underlying owners not selling their piece, it doesn't have an impact on the -- the overall hundred percent level valuation.

MR. RUOCCO: Why don't we go off the record?

MR. RISPOLI: No objection. That's fine.

THE VIDEOGRAPHER: The time right now is 11:30 a.m.

We're off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time right now is 11:44 a.m., and we're back on the record.
MR. RUOCCO: Welcome back, Ms. Haraminac.
BY MR. RUOCCO:
Q. Just quickly, I'm going to show your report again.
We discussed this already some this morning, but your -- your valuation conclusion was that the fair market value of DistroMint as of October 2nd, 2023 is 44,450 --
MR. RUOCCO: Sorry. Let me start again.
Q. Your conclusion was that the fair market value of DistroMint as of October 2, 2023 is $44,452,361 on a going-concern premise corroborated by a probability-weighted analysis of $46,244 -- $46,244,482 shown in the table below?
Do -- do you stand by that

valuation?

A. Yeah. I mean, that -- the -- this sentence is, you know, supported by all of the rest of this report.

Q. All right.

You haven't changed your valuation since you submitted this report, have you?

A. No. No. I mean, it did get, like, a lot of documents in the last couple of days. So those are still under review.

I did search them for, like, things that would change something in my valuation and considered some of the -- comments that Ferri made, but nothing rose to the level of requirement change to this.

Q. Do -- do you expect your valuation will change between now and the time of trial?

A. I don't expect it to. I haven't been asked to issue, like, a -- a supplement, you know, to discuss all of the other records. I might be asked to do

that. So of course, if I'm asked to rebut Ferri's report or something like that or --

Q. Okay.

A. -- issue a supplement with all the other records that came in, then maybe. But I don't -- I don't see anything at this point as we sit here today that would drive, like, a substantial change to that.

Q. Understood.

Okay. Let's turn to page 16 of your report. And I just want to focus on -- on the valuation date.

So, you say: The date is as of October 2nd, 2023, which is the date of alleged dispossession with nChain's December 14, 2023 figures treated as near-contemporaneous admissions.

Do you see that?

A. Yeah.

Q. Okay.

What is the allege dispossession that you're referencing there?

A. That's where the plaintiffs were

informed that either work had stopped or that their -- their main points of contact were terminated and they weren't continuing this. Like, where they were, like, not going to continue this ongoing development.

I think -- I think somewhere else there's some details as to that date somewhere in the rest of this report.

Q. Let's look at paragraph -- or, page 13 here.

Let's see. Here in the second paragraph this last clause -- we can look at the whole sentence, but I'm just saying: The source code and development credentials that nChain team built and administered, and to which it altered Mr. Finnerud's access on October 2, 2023.

Do you see that?

A. Yeah.

Q. Is the dispossession that you reference at page 16 a reference to the alleged alteration of Mr. Finnerud's access to the source code and development correctly credentials?

A. If you -- can you scroll down so I can see the source of that?

Q. Yeah.

(Pause.)

A. Yeah, so, that's the allegation, I think. That statement's not, like, my determination of that date. That's just the -- the date that's been provided.

Q. Okay.

Did -- did you select the October 2nd, 2023 date because that is when the plaintiffs allege that Mr. Finnerud lost access to the development site for the DistroMint platform?

A. So, again, I don't think I selected October 2nd, 2023. I think that's just the as-of date provided, you know, in this matter.

Q. Okay.

So you were -- you were directed by plaintiffs' counsel to use October 2nd, 2023 as the valuation date?

A. I think so. That's -- 'cause, like, usually that would be stated somewhere in here. That's what I was

looking for, but the -- the footnote there references the Complaint. Right, paragraphs 56 to 57. And so that's where that date would come from.

So, whether -- whether counsel said use that date in the Complaint or I read the Complaint and used the date in the Complaint, either -- either way it's the same.

MR. RUOCCO: Okay.

Let's -- let's take a look at tab 313.

THE WITNESS: Page -- which --

MR. RUOCCO: I'm talking to my colleague.

MS. BAINES: 313 should be uploaded.

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. So, this is the Complaint that plaintiffs filed in this case, correct?

A. Yep.

Q. Okay.

And you reviewed this document?

A. Yeah. This should be paragraph 57 in there, unless I'm referencing some other, like, amended complaint or something, but I don't think that's the case.

Q. So, your selection of the October 2nd, 2023 valuation date is based on paragraph 56 and 57 of this Complaint?

A. I think that's -- so, again, your -- your question has the premise of my selection of the date. And so that's not a thing, right.

Like, again, it's the as-of date. If I was hired -- I could be engaged to do the date -- a valuation as of the current date. That would be different than this date. And so the typical date would be, you know, the allegation in this matter that October 2nd, 2023. That's -- that's just an instruction. That's not my selection of it.

Q. Okay.

If you change the date of the valuation, that would potentially change

the outcome of the valuation.
Is that right?
A. Yes.
Q. Okay.
So, for example, if the plaintiff was not, in fact, deprived of access to the -- to the DistroMint -- the development site for the DistroMint platform on October 2nd, 2023, the valuation date might be different, right?
A. So, the reasons to change the valuation date don't matter as far as the, like. When the valuation date changes, of course the valuation may change. If the valuation date changes to, like, three days before or three days after, right, like a very close in time one, then the effect is -- is likely to be nothing or, you know, something minimal.
If it's multiple years later or years earlier, then that might have substantial changes as far as, like, the stage of the company or, you know, their expectations or other comparables. Like all of that stuff would be different.

Q. Okay.
And so change in the valuation date might affect your conclusions as to the -- the value here.
Is that right?
A. Yeah, they might. Yeah, that's -- that's not specific to this case. That's just a general rule of valuations.
Q. Okay.
Let's look back at your report, and now to page 17.
And here you write: The risk exposure for DistroMint includes pre-launch execution risk, the decline of Bitcoin SV, key person dependent on Mr. Finnerud, competition, and the reputational overhang addressed later in this report.
Do you see that?
A. Yeah. I mean, let me make this a little bigger.
I have my own copy, but I want to -- somehow I made it smaller.
Let me just -- I'm just going to

look to the side so I can see --
Q. Sure, no problem.
A. -- the -- my copy.
Okay. So, you're at?
Q. Page 17 right at the bottom.
A. Okay.
The risk exposure piece?
Q. Yeah.
A. I see that.
Q. Okay.
A. Okay.
What was your question about that?
Q. So, I'm just saying you see and you also state: These pillars provide context that informs the valuation approaches and weighting thereof.
Right?
A. Yes. This four pillar method is listed in detail in my book that's listed on my CV.
Q. So, I just want to talk through each of these -- these elements of risk exposure that you identified here, okay.
A. Okay.

Q. So, you identified pre-launch excuse risk is one of the risks that would affect the value of the DistroMint interest you were valuing in your report, right?

A. So, yeah. This is just the -- the risk exposure at that time, right. So your -- when you -- you can do a lot of stuff in staging and in development and in all the different stages of software engineering, and nothing prepares you for anything -- it's either Sun Tzu or General Patton, nothing prepares you for interacting with the enemy, whatever, with your customer base. And so when you launch, there's always some -- some risk there as far as will it work once customers start engaging with it. And so that's -- that's what that's referring to there, that pre-launch execution risk. You're not yet in -- you're not yet out of beta mode where you're interacting with actual users.

Q. So, pre-launch execution risk as defined here refers to the risk that the

DistroMint platform would not successfully launch commercially or would not launch commercially in the way that they had hoped.

Is that right?

A. No.

Q. It's not right?

A. No. Like you're talking about launching commercially, like as a -- as a product out there, no.

This is, like, pre-launch execution risk is, like, where you have new bugs identified or some error handling that, you know, you didn't catch or something like that because you can do a lot of testing, but once you're interacting with actual users there's still some -- a few more things to work out. It's not that the product isn't viable in, like, as a commercial product. That's already answered by the -- the MVP stage.

Q. Okay.

Did you do any analysis of the number of employees who would be needed to

run the DistroMint platform?
A. Like on a going-forward basis?
Q. Yes.
A. I think the development of the platform and the -- the costs going into that -- I didn't do, like, a specific analysis as to the -- a count of employees, but that's -- that would be a weird thing to do for this kind of company. Like the -- the -- it would be inherent in the models that are considered.
Does that make sense? Like the -- it's already inherent in the -- the market approach and the income approach. The cost approach is a different premise.
Q. But wouldn't the number of employees needed to run the -- the DistroMint platform be relevant to the costs of operating that platform in the future?
A. Well, it's a component of the costs. So in that sense, yeah, it's relevant.
But as far as whether a

breakdown of though components is necessary, not necessarily, right. Like you're -- if I'm using a market approach, I'm comparing against other companies who have built similar things, and that's inherent in that approach.

Same with the -- the revenue generation piece. Like, those things are inherent. You wouldn't break down a component of the number of employees for either of those.

Q. Would a -- would the number of employees needed to run the platform on a go-forward basis be relevant to its EBITDA or profit margin?

A. Yeah, that's the -- I mean, that's what I'm talking about. In those valuation approaches, expenses and costs are a component, but, like, having an explicit breakdown of those components is unnecessary by the approach itself.

Q. Okay.

Did you do any analysis or study of the countries in which the DistroMint platform would operate?

A. That's -- there was some discussion as to where it should be based, like, as a headquarters, but as far as operations, I -- I presumed as blockchain-based companies are, like, that's a -- there's not a restriction on the buyers and the sellers of the -- the customer base of that operation.

Q. Did you do any study or analysis into the regulatory regimes that the DistroMint platform might be subject to?

A. Which regulatory regimes do you think it's subject to?

Q. Did you do any analysis to undertake whether the platform would be subject to regulation, and if so, by which governmental entities?

A. Oh, I see.

I would look at that from a risk perspective, regulatory risk perspective.

At that time in 2023, there -- there wasn't a lot of guidance as far as how what they were building would be regulated.

Dale mentioned one that they

were concerned about that drove their decision, made a comparable company that drove their decision to move the jurisdiction suggestion to the British Virgin Islands. That company at that time had engaged in, like, hundred million dollars worth of sales in prior months and was at, like, tens of millions in sale -- in volume per month. So the regulatory consideration there, while it exists, didn't seem to have much of an impact on the operation of that company, right. That's the -- the NBA Top Shot.

And so of course we looked at what the regulatory issues would be, and you base that on, you know, what's going on in different countries at the time. Trying to keep apprised of those different things that at this time, October of 2023, the risks were there. That -- that's pre-Trump, and so you still had a Gensler SEC within the United States. And so there, they were doing some kind of -- they were targeting different blockchain-based companies but of much

higher market volumes at the time, and their targeting didn't seem to have much of an impact on the operations themselves. And so that's -- there is some regulatory risk there as far as a target and defense and that kind of thing and shift in jurisdiction could resolve that. It wasn't substantial enough to include as part of the valuation outside of the other comparables or outside of the other income streams.

Q. Okay.

So you didn't -- you didn't apply any discount or adjustment for regulatory risk associated with the DistroMint platform.

Is that right?

A. I think there's -- there are applications of discounts in there, and I don't remember if I break down the -- the buildup method for that discount rate or not or if it's just a comparable one for other companies that would have also made those considerations.

You can look at -- I mean, I'd

have to look at the -- the work papers for underlying schedules for -- for those discount rates. It would be inherent in those.

Q. Okay.

So there's not -- there's not a specific deduction or adjustment that you took for a regulatory risk associated with -- with the DistroMint platform.

Is that right?

A. If you don't mind, I want to look at my schedules just to refresh because I don't remember if there's a specific line item in there or not, or if I discuss, you know, whether or not it's a component.

It would be inherent if it's not broken out into the -- if it's not broken out in detail, it would still be inherent in the discount rate that gets applied because I discuss their regulatory characterization, risk exposure in my report.

Q. Okay.

Did you do any study or analysis

of the plans for marketing and sales for the DistroMint platform immediately before launch and after?

A. What do you mean, like?

Q. Did you -- did you do any study or analysis of the -- of the sort of promotional activities, marketing activities that would be needed to attract subscribers to the platform?

A. So, the valuation methods here are market approach and income approach and a cost approach. And the underlying premise for those, or the hypothetical premise is the willing buyer and seller.

In each one of those, you have components of if it's a comparable company situation, then those considerations are inherent in that approach.

If it's the cost approach, that's something different. That's the cost of rebuild, and that would have been considered there as far as the development, implementation. That's where that would be considered.

Q. Okay.

Did you do any study or analysis of the plans for the operations, distribution, sales, customer support for the DistroMint platform on a go-forward basis?

A. I mean, that's -- that's all a component of each of these approaches, right. Like, it sounds like you're asking me if I rebuilt hypothetical financials at -- at a granular level of detail. That's not something that would be part of a valuation.

Like, this is a market approach, income approach and costs approach, and each one of those has considerations for the things you're asking. The granular level of detail that you're asking about would be contained in, inherently, in the approach itself, right. So the discount rate that gets applied or the revenue multiples that are derived or the, you know, estimates for the revenue multiples, the extrapolated multiples for ones where revenue wasn't available.

The same with the -- the income

approach, right. Those considerations are inherent in that approach. If you then applied some additional discount, you'd be double-counting that risk.

Q. Okay.

Did you -- did you do any narrative analysis of the plans for operations, marketing, sales, distribution, customer support for the DistroMint platform after launch?

A. What do you mean by "narrative analysis"? Like do I talk about it in my report?

Q. Do you talk about it in your report?

A. Yeah, I do. I think, like, as far as the future considerations, if you look on page 3 in that footnote, there's a second phase for this operation that was considered, and I don't tie that second phase to this valuation because that -- that's a future point, and a valuation that considered that would need a different valuation date, right.

That's the -- the rest of what

they're talking about, like additional marketing, additional implementation, a second version or a second application under the initial provisional patent application. There's a lot of additional things that went into what would happen next, but what would happen next after the date of valuation doesn't impact the as-of date for that valuation.

Q. Well, you're referring here to footnote 1 on page 3 and I think the sentence you're referring to says: A second phase Distrofy is mentioned in NCH0001596 and NCH0001689 and tied to the second provisional patent application. This Phase 2 operation is not included in this valuation consideration.

Is that what you're referring to?

A. Yeah. Yeah, 'cause you're asking me about the future marketing of the -- the product after it was implemented and how you would mark that after you implemented it. And what I'm saying is that would -- those are all

things that are part of this other consideration, the second phase or after the date of value.

Q. But the Phase 2 that you're -- you're describing here is related to -- to Distrofy which was based on a second and different provisional patent application, one Mr. Finnerud had filed with the DistroMint platform, right?

A. I don't remember who filed it. I think the preparation of it was on -- may have been on his behalf, but it was -- like, involved nChain as well. That whole thing, though, it's not -- like, what I'm saying is that whole thing is not part of the consideration of value. Those are all future things that are not part of the -- the as of October 2nd, 2023 value.

Q. Yeah, I -- my -- my question is just when you say "Phase 2 operation" in this footnote, you're referring to Distrofy, not the cost to operate the -- the DistroMint platform, you know, from launch into the future, right?

A. Oh, I see.

Yeah, yeah, yeah. Okay. I see what you mean. That -- I took your question somewhere totally different.

So, the income approach takes that forward-looking revenue stream and accounts for expenses in the way that -- that you're talking about.

Q. Okay.

A. I mean, the others do in an inherent way as well. The comparables, they obviously have those -- those kind of components. That's -- that's part of your discount rate and the growth rate that gets into the year 2, 3, 4 and 5, right. Those are all part of that.

Q. All right.

Now, let's look back at page 17 of your report.

Right at the top it says: The value is developed presuming that commercialization would have proceeded but for the events at issue, which is a presumption directed for the analysis and not an opinion on liability.

Do you see that?

A. Yeah.
Q. Okay.
And so, you were directed by plaintiffs' lawyers to make that assumption.
Is that right?
A. I don't think I was direct -- that's just a part of the fair market value, right. If it's not a going-concern, then that would be a different premise of value.
So, would -- I think what you're getting at -- I mean, have the phrase "but for" in here, but I think it's just grammatical. It's not like a but-for calculation for lost profits in that sense, and that might be what you're -- like, what's throwing you off as far as the meaning of the words here.
It's -- it's really just the presumption that this was a going-concern that it was going to continue to be developed or implemented or, you know, the things that they were doing were going to continue to be done.

There's no consideration here that, like, everything caught on fire and was destroyed or something. That would be, like, a distress sale.

Q. Okay.

But in -- in concluding that the DistroMint interest that you valued was worth more than $44 million, you assumed that the DistroMint software platform would launch successfully and be commercially successful. Is that right?

A. It -- that's the product of the going-concern, right. So this successful nature is not -- like, that's what I'm taking issue with 'cause there are -- there are rates for that, right. There's a lot of -- there's discount rates. There's growth rates. There's probability rates and viability rate. There's a lot of things that go into that -- the adjustment before you get to the conclusion of value that -- that makes that -- that, kind of, accounts for those considerations.

Q. Okay.

A. Of course, like, if you're -- if you're building a thing and then you stop building the thing, to value the thing while you're building it is -- doesn't consider that you just stop. That's not -- that would not be part of the premise for fair market value, which requires that going-concern.

Q. Right.

A. That it continue to operate.

Q. But apart from whether or not the parties just stopped building the platform, there are any number of factors that could have adversely affected the commercial success of the platform, correct?

A. I mean, generally, sure, right. A meteor could drop out of the sky and that would commercially -- that would affect the commercial application of it.

There's lots of factors that could affect it. But that's true of the -- on the positive side either also, right. You have the adverse factors. There's also the opposite of that,

whatever the opposite of adverse is, but those -- those components would be controlled for in the rates that are applied in that valuation method.

Q. Okay.

But I'm -- on the valuation date, the DistroMint platform didn't have any subscribers, did it?

A. No, not to my knowledge. They -- they were post-MVP. There were public statements that said it was launched, ready. No, the public statement was, like, ready for launch, or something like that. And so that there -- there were just -- just at the cusp of pre-launch, which is not early stage development, right. That's a very late stage.

Q. And -- and on the valuation date, October 2nd, 2023, the DistroMint platform had never generated any revenue, had it?

A. Not to my knowledge. That's -- so, late stage, when I say that, that's late stage development, right. There's

some -- there -- those terms are also used for the -- characterizing a business, like in a business life cycle. I'm not talking about that. I'm talking about the development life cycle.

Q. Okay.

And here on page 10 of your report, you say here near the end of the page over to the next page: nChain's records reflect a minimum viable product still under active development, with integration and payment components incomplete as of the valuation date.

Do you see that?

A. Yeah. I think that's been confirmed by Dale Evans' testimony where the only thing left to do is to, like, set up a HandCash wallet and that kind of thing. Like, he described accounts in his testimony, and, like, described later that that's what -- what he was talking about.

The minimum vial -- viable product was done and the -- the platform itself was under active development. So it was a thing that they were building and

continuing to -- to work on towards launch.

Q. Okay.

And so -- so, on the valuation date, the DistroMint MVP site wasn't even technologically finished yet, was it?

A. I think that -- that's the opposite of what the records and the testimony were. I'm pretty sure -- I think I remember something that said it's done or the MVP, it looks cool or something like that. There's some discussion about it, so it was finished and reviewed.

Q. Well, your statement here in your report, though, is that as of the valuation date, it was in a minimum viable product that was still under active development with integration and payment components incomplete, right?

A. I -- I see how you're reading this.

So, minimum viable product is a stage that was complete, and DistroMint was under active development. But that's

the -- that's what that sentence means.
I mean, I guess I could have phrased it better. But I'm not saying that they were still developing an MVP. I'm saying that DistroMint was still under active development and an MVP had happened.
Q. Okay.
But there were components to that MVP that were still incomplete as of the valuation date, right?
A. Okay.
So, there are components of the overall platform that are incomplete. The MVP I think is what they were referencing when they were talking about looks cool or is done, something. I don't remember exactly.
Q. Okay.
So, as of the valuation date, there were still components that weren't finished, right?
A. Yeah, I think that's fair. To differentiate between the MVP and the overall platform itself. The components

there were confirmed, I think, in Dale's testimony to be minimum, right. There -- it was just a -- a decision point and a couple of button presses basically, the way he was describing it.

Q. Okay.

So, I mean, it -- it is possible that after launching the -- the DistroMint platform, the platform never attracted enough subscribers to keep it in business, right?

A. Sure. There's a potential for failure, absolutely.

Q. And it's -- it's possible that after it launched, the DistroMint platform never generated any revenue or never Jen -- generated enough revenue to keep it in business, right?

A. Yeah, both of -- both of the things in your question, both questions are within the realm of possibility. Just like it's possible that this concept takes off and makes a billion dollars in the first year and becomes what's known as a unicorn, right. Those -- those are all

within realm of possibility.

Q. Okay.

Did you do any study or analysis, though, to assess the relative probability of those -- those outcomes?

A. Yeah. I mean, that's -- that's what those -- the comparable approach is really for. You've got open season over there with, like, a billion dollar valuation. You've got a couple of others that did something very similar, but you don't include all of those in the -- the comparable approach because they're -- one, they don't disclose revenue in the same way. Some of them use government and that kind of thing and as a product of that exclusion, you're also accounting for the rate of failure, right, by excluding these outlier companies that turn out to be unicorns. You could -- you could do a, like, an unobjective market approach where you just select the billion dollar unicorns as comparables and then you end up with, like, a $300 million valuation or something like that, but that wouldn't be

a conservative or appropriate approach. That's why you reconcile the comparable companies. That's why you make selections of those.

The same is true of the -- the income approach. You're looking at discount rate, terminal growth rate. You're not presuming that it's -- you know, the term within blockchain is "to the moon," right. You're not presuming hundred percent market share, hundred percent right out the gate. You're presuming slow buildup to that. The presumption that it will fail would be not a going-concern. That wouldn't be your -- your value. You control for the probability of failure in those valuation approaches with your selection of the different comparables, with your application of the growth rates, with the application of the discount rate. All of those things are components in those -- in those different approaches. That's the -- the point of that reconciliation and the point of the sensitivity analysis and all

of that to show, like, whether -- whether this is representative of what was going on at the time or not, whether it's some kind of limited selection.

Q. Now, we'll get to this more later, but in your market approach, you didn't include any companies that had failed, right?

A. How would you -- what do you mean "include a company that had failed in the market approach"?

Q. You didn't -- you didn't include as a comparable a company that had not successfully launched, right?

A. So, is your question when you applied the underlying premise of going-concern, you ignored the fact that it should be a going-concern?

Is that what you're asking me?

Q. Well, you -- you seem to be -- you -- you seem to be conflating the idea that you're going to value a -- a asset or a business as a going-concern with a presumption that it will continue as a going-concern. Those are not the same

thing, are they?

A. The -- like, the premise of the going-concern, right, is that is a company in operation that will continue to be in operation. Of course there is a chance that it can fail and you control for that in the different valuation approaches, or you control for that with the stabilization. You control for that with the size and stage adjustments. You control for that with all the other discounts that go into that market approach, right.

And then the same is true for the income and the cost. You're -- you're looking at other -- other things that were either -- that were comparable at the time with the facts that were knowable at the time, and if you -- like, the -- the presumption that it would fail would be the opposite of the presumption that it's a going-concern.

So, like -- like --

Q. So, but it is -- it is a -- I'm saying in your analysis then, what you're

saying is when you value the DistroMint interest as a going-concern, you are presuming that it will be a going-concern in the future, right?
A. I mean, I'm not presuming a meteor drops and destroys the business, if that's what you're asking.
And the -- the rates are all controlled in here. Like, the different discounts that you apply control for that -- for the industry that they're in, for the size that they're in. That's the -- that's the point of it. If you presume that it would fail, then the value drops to zero and it's no longer a going-concern.
Q. I'm not saying --
A. That's what a failure is.
Q. No, but I'm not saying that you would presume that it would fail.
My -- my question is in any of your valuation approaches, did you take a specific discount or adjustment for the possibility that the DistroMint platform would fail?

A. Yeah. I mean, that's -- that's in the discount rates that get applied, right. I think it's a 27 percent discount rate which is for an institutionally backed early-stage company, that's -- that's what's in there, right. You would have a much lower discount rate if it was a later-stage company, a much lower discount rate if it was a post-money and it had, like, actual revenue streams and was functioning after, you know, contact with their customer base.

All of those things go into that. And so that -- that -- that concept is inherent in the approach itself, right.

For instance, if you -- if you took this and -- and added on another discount for this presumption of failure that you're talking about, that would be double-counting the risk of failure that you've already controlled for based on those other factors.

Q. Okay.

So, let's -- let's jump then to Schedule 5 of -- of your report.

A. Okay.
Q. Now, you've mentioned the discount rate a few times, right?
A. Yeah.
Q. Okay.
This is the discount rate you were referring to?
A. Yeah.
Q. Okay.
And, so, is it your testimony that the discount rate you applied in the -- in -- in the income approach is meant to account for the possibility that the DistroMint platform would fail?
A. So, the -- there's a -- a sensitivity analysis in here that shows the -- the low and the high and the base presumptions. That's where that 27 percent is coming from.
The discount rate for that institutionally backed early-stage component is -- like, I'm not saying that it has in it some, like, a person is the risk of failure or something like that. That discount rate itself is a product

of -- of its stage and its stage is a contributing factor to whether or not it will fail, right. If it's a -- if it's a much more mature company, then that risk of failure is lower, that discount rate would also be lower.

Q. Okay. Right. Okay.

So, but I'm saying the -- the discount rate that you used here, that's the part of your analysis where you tried to account for the possibility that the DistroMint platform would fail. Is that right?

A. I -- I don't think that's the only portion of it, right. You also have the -- the terminal growth. You also have the other approaches and the reconciliation across those approaches.

Q. Okay.

Let's -- let's just focus here -- can you just actually -- before we do that, can you describe all the parts for me of your valuation that account for the possibility that the DistroMint platform would fail?

A. Sure.

That would be in the market approach and in the income approach. Cost approach not so much other than in the reconciliation component of the valuation.

Q. Okay.

But what -- what parts of the income approach analysis and the market approach analysis account for the possibility that the DistroMint platform would fail?

A. I mean, that's -- it -- so, what you're -- what you're talking about is an application of a risk of failure, and what I'm telling you is that if you add on a calculation for the risk of failure to these approaches as they are, then you double count that risk. And so there's not a specific component that says oh, here's where it's accounted for. It's accounted for inherent in the -- the applications of each of these components where I talked about the early stage and how the reason for that much higher discount rate is this or that. The risk

of failure is inherent in there and so that -- that's what I'm trying to explain.

It sounds like you're kind of ignoring the word "inherent" and saying where exactly is it. It's inherent.

Q. But in what parts of the valuation, what parts of the valuation are where the risk of failure are accounted for?

A. So, in the -- the blockchain-based companies here, the risk of failure is inherent in the consideration of the -- the going-concern basis, right. So you have it's a thing. It's going to keep existing as a thing. You don't negate that underlying concern to then put inputs into the -- into that presumption that would negate it.

What you do is look at other things in the industry, like I'm describing, kind of like, the comparable things. The other things in that industry, other things with similar components. Other things that are making similar things or selling similar things

so that you can account for that risk across the board. And you do that by not selecting only very large ones. You do that by controlling for the -- the -- I mean, applying the discount rate and the income approach by applying discount for lack of marketability for the size and stage adjustments and the market approach. That's where those things are inherent in here.

If you then tack on another risk of failure, you'd be double-counting that. I mean, I think this is, like, a primary concern of almost every valuation expert out there, Damodaran and Pratt and even, like, some of the lesser known ones, like Mercer. Like, that risk of double-counting components of risk when you -- when you tack on these additional pieces like you're talking about exists and you have to -- I mean, that's a thing to be weary of when you're doing these kinds of valuations.

Q. Right.

So, I understand you didn't take

any specific discount or adjustment for -- for the risk of failure, right?
A. No. There's not a line item in here that case risk of failure equals some number.
Q. All right.
Now, let's just look at Schedule 5, right. Start here.
So, what are the parts here on this page of Schedule 5 that account for the risk that the DistroMint platform would fail?
A. I -- I think I just described all of that in detail.
Q. Well --
A. Do you have Schedule 5 -- it's at the top, you have the comparables. It's inherent in the selection and the normalization of those comparables and it's inherent in the selection of that multiple right there, and then in the second section where it starts with step value, it's inherent in each of those discount percentages. You've got the return. You've got the size and stage

adjustment --

(Stenographer instruction to witness.)

A. Return, size and stage. Discount for lack of marketability. Those are all components in there where that consideration would be inherent and then in that bottom section, it's also inherent in those portions that were not considered as a comparable.

Q. Okay. I'm -- I'm asking you about Schedule 5, which is about the income approach. It sounds like --

A. Am I looking at Schedule 4? I'm sorry.

(Stenographer instruction on cross talk.)

A. Okay. Well I guess I described where it is in Schedule 4.

Q. We'll come back to that.

A. Sorry. I guess I was looking at Schedule 5.

So, Schedule 5, you've got the pricing input and assumption.

Is there a second page to

Schedule 5?

Q. There is.

So let's just start on page 1 of Schedule 5, okay.

A. Okay.

Q. What parts of the valuation of the income approach here on Schedule 5 account for the risk that the DistroMint platform would fail?

A. All right. So, this is the income approach.

Q. Correct.

A. So your -- your risk of failure is inherent in your growth rate and in your discount rate and, you know, every other of these assumptions that are built in right there. That's where that is.

So, if you wanted to drop this to zero, right, and say it will fail, then you would just change everything, and the valuation would be zero because that's what failure is.

If you want to account for a risk of failure, like the potential that it's going to fail, then you would lower

your growth rate or reduce it to a negative or something like that. But you would have to do that with the comparison of everything that's going on at the time and the -- the things that were in nChain's production, like -- like their forward-looking statements, their investment prospectus, their conversations. All -- all of that are the components in there.

Those things are what your inputs are into this model, and that's where that -- that assessment would be.

Q. Okay.

So, I think, I mean, you reference in your response the -- the discount rate, correct?

A. Yeah.

Q. Okay.

And you use a 27 percent discount rate, right?

A. Yeah.

Q. Can you just explain for us what that means in the context of the income approach analysis?

A. Yeah.
If you look -- if you look down at the present value calculation in that second page, that's what it means, right. You have the discount factor. That's that rate raised to the exponent for each year and it basically brings that revenue to a present value. That's what that's for.
Q. Okay.
So, is it the case then that if you're saying -- we'll get into the revenue assumptions and everything else here, but you apply a discount rate of 27 percent, right?
A. That's right.
Q. Are you saying basically that there is a 73 percent chance that you're going to realize the revenues in that period?
A. That's -- I mean, that's not exactly -- I guess you could characterize that in, like, an extreme oversimplification of what a discount rate is.
It's to bring what -- expected

future value to a -- to a present day number, right. Like, because a hundred dollars today is worth something different than a hundred dollars five years from now. And so what is that hundred dollars worth? Well, to figure out what that hundred dollars five years from now is worth, I need to know what's the chance of me actually getting it. And so, in, like this extreme oversimplification of what a discount rate is, it's something like that. But that's the effect of it, that is to bring those future numbers into a today value.

Q. The -- the discount rate that you use in the income approach, it assumes that it's more likely than not that the DistroMint platform would be successful.

Is that right?

A. It's -- I mean, it's a discount rate that's appropriate for an institutionally backed early-stage companies, and so that "more than likely than not" consideration, I don't think that's -- like, that's some kind of weird

reading of it within this premise of going-concern, right. Like, you're not -- you're not valuing something under the presumption that it will fail. You're calculating the probability that it will continue with whatever -- whatever forward-looking statements that nChain, like, talked about, right. Like, if they had in their documents, Hey, this isn't going anywhere. We're going to lose a lot of money on this. We don't expect it to have any growth whatsoever. Like, that -- those kinds of things would be a component in here.

What their fees are, what they're going to charge for customers, those are all your expectations of -- of revenue, right. If your -- if your expectation of revenue is zero because it's going to fail, then the value would just be zero.

Q. Okay. But I'm not saying anyone is presuming failure.

I'm -- I'm asking you, right, if you use a discount rate of 20 -- 27

percent, are you assuming that the probability of success is greater than the probability of failure?

A. That's inherent in the going-concern issue, right, is that the thing will continue, right. That that's -- that's what that means.

Q. No, but if -- so, assume that you were to value a company the day before it went bankrupt, right. I mean, you -- would you not assume that the company would definitely continue in the future, would you?

A. So, when you say "the day before it went bankrupt," do you mean the day before it became insolvent? Because, like, a company that -- that is in a later stage where it has, like, actual financials would show insolvency and you would consider that. That's not what this is.

Q. Right.

A. That's not what Schedule 5 is.

Q. No, they're -- this isn't based on any actual financials, right?

A. It can't be. It -- because of the stage of the company.
Q. Right.
So Schedule 5 is not based on any actual financials, right?
A. Of course not. I mean, you -- you see the inputs that are going in there.
I did compare these against the financials of -- of nChain that were available, and looked at, like, what their inputs were and all of that, but of course it's a pre-money valuation.
Q. Okay.
You -- you don't provide any citation to the 27 percent discount rate, do you?
A. What do you mean "a citation"?
Q. Well, there's no -- there's no, like, citation to a source, a study that you read that said a valuation -- a discount rate in this range would be appropriate here, right?
A. I have the sensitivity analysis in here and I have the citation off to the

side institutionally backed and early-stage, and then -- so I thought somewhere else I had that in there.

Maybe I talk about it in my report, but, yeah, that's -- I mean, it's -- there's a description of why that rate is what it is.

Q. How -- how did -- how did you come up with 27 percent?

A. I mean, I -- it's listed in the schedule. It's an institutionally backed early-stage company, and then there's a sensitivity analysts there to what the impact of changing that would be.

Q. But how did you pick 27 as opposed to 26 or 28 or 2?

A. Would -- I wouldn't -- why would I pick 2?

Like, that's -- that would not be appropriate for the -- the stage of the company or the -- the institutional backing. Like all -- all of those, that's what those rates are for.

Q. Okay.

But why -- why would you pick 27

and not 26?
A. You can see that in the sensitivity analysis, right. Like the 22, 25, 27 -- wait, I think that's by discount rate and there's a typo in there, it looks like.
But the -- the one-way sensitivity analysis and the two-way, the third section in there, are -- are all, like, an analysis of how sensitive this model is to that discount rate.
Q. What -- what -- what page of the report are you looking at?
A. I was looking at the -- the next schedule, the 5a, which is the sensitivity analysis.
Q. Okay.
Well, isn't -- I mean, this is showing, right, this two-way grid. Is that what you're referring to here?
A. Yeah, there's the -- the one-way how sensitive it is and then the two-way down there.
Q. Yeah.
So, I mean, it -- it's highly

sensitive to the -- to the discount rate that you choose, isn't it?

A. I mean, I would describe "highly sensitive" as a -- as a much larger ratio. This is going from 50 to 80. Like, it could be going zero-100. That would be highly sensitive.

The -- that's the subscriber one. If you look up at the top, the -- the discount rate at 27 is 55.5, and then the at 30 is 47 and then at 22, 76. Those are the ranges.

The -- the one at the bottom is a two-way grid both by subscribers and discount rate.

Q. But you -- you assumed that there would be 15,000 subscribers in year one in your DCF, right?

A. So, with the -- that's the -- the term "assume." That's the input into the model.

Q. Okay.

And so, I mean, in here if you dropped the discount rate from 27 to 25, it would add another $7 million to the

valuation, right?
A. Yeah.
Q. All right.
So that would be more than 10 percent?
A. Yeah.
Q. Okay.
And if -- and if you increased it by 3 percentage points by -- from 27 percent to -- to 30 percent, it would have dropped the valuation to $47.1 million, roughly, right?
A. Yeah, that's how the math works.
Q. Okay.
And -- and again, that would be more than -- than 10 percent -- more than a 10 percent swing, right?
A. Yeah.
Q. Okay.
And there's nothing here, though, in -- in Schedule 5a that tells me where you were selecting between discount rates between 22 and 30 percent at all, right?
A. I mean, that's contained in the

note in the -- in the Schedule 5 where it's institutionally backed and early-stage.

Q. But where did you get that from?

A. Like, that -- would -- what do you mean where did I get it from?

Q. Like where -- where did you -- where did you come up with the idea that a 27 percent discount rate was appropriate for an institutionally backed early-stage company?

A. That's -- that's just -- that's just what it is.

What do you mean, like? Are you asking me to point you to, like, an article that says 27 percent is appropriate or something? I'm not sure.

Q. Yeah. If I -- if I just wanted to know, if I was doing some research myself, where would I go to find out that a 27 percent discount rate is appropriate for an institutionally backed early-stage company, as you described it?

A. So, I don't -- the 27 percent here is applied in the income approach is

reduced further in the market approach.
The -- like, there's a couple of different ways to get to that. Your required rate of return, whether it's the buildup method, like, I don't remember which one is used. There would be a work paper somewhere that would show that, but that's -- I mean, that's why it's in here, institutionally backed early-stage, the components of that company -- I mean, the characteristics of that company are considered to drive them.
Q. Okay.
But if I just wanted to check that a 27 percent discount rate was appropriate for an institutionally backed early-stage company, as you've described it, you can't, sitting here today, point me to a source that would tell me that, can you?
A. There's not a footnote on that schedule other -- other than that.
Q. Now, the 3 percent terminal growth rate, does that mean that -- let's took -- look to the second page of the

schedule.
Does the 3 percent terminal growth rate mean that after year 5, you assumed the DistroMint platform's revenues would continue to grow by 3 percent every year, year after year, forever?
A. Let me look at the underlying calculation.
(Pause.)
Yeah, at year 5, that's reduced. Terminal growth rate's discounted.
Q. Okay.
So -- so, is the -- is the 3 percent terminal growth rate that you used here, does that mean that after year 5 in your model you're assuming that the DistroMint platform continues to grow at a rate of 3 percent every year until forever?
A. It's -- it's a function of the calculation, right. So you're -- you make that presumption. You also apply the discount rate to that, right.
So it's not just plus 3 percent year-over-year in the way that you're

describing.

Q. Sure. But just -- just focus on the -- on the 3 percent terminal growth rate.

Is -- does what the 3 percent terminal growth rate represent is that after year 5 the DistroMint platform would continue to grow at 3 percent every year year after year until forever?

A. I mean, that's just a product of the terminal growth rate. That's what that is. It's, you know, lower than inflation at this point, but it's future earnings at that growth rate that are then discounted.

Q. Okay.

A. And so it -- it, like -- you're -- the way that you're asking it makes it sounds like it's year-over-year plus 3 percent, and that's not what it is.

Q. Okay.

How did you come up with the 3 percent terminal growth rate?

A. Oh, geez. I don't know. I think I -- do I talk about that in my

report?

It's the same input to the model. It's probably the risk free rate of something.

No, that's the wrong thing.

Let me see. I don't remember off the top of my head.

Q. Okay.

A. So, if you look at page 20 of my report.

Q. Yep.

A. And footnote 59, right. There's some details as to what is in that discount rate. The discount rate reflects that institutionally backed venture in an unsaturated growing market.

(Stenographer instruction to witness.)

A. I'm just -- I'm was just reading it off footnote 359: The discount rate reflects an institutionally backed venture in an unsaturated growing market and demand for release linked music NFTS more durable than purely art-based NFT's, the adoption, mix, growth and value inputs are

reserved for finalization once the plaintiffs' projections and operating data are produced.

So the person that has control over that information. Here it's plaintiffs' projections and operating data, but I think it just meant parties' projections an operating data, whoever had that control.

Q. Well, footnote 59 is talking about the discount rate, right?

A. Yeah. Well, no, footnote 59 is a footnote to that entire sentence. That's the 27 percent discount rate and the 3 percent terminal rate.

Q. Okay.

But -- but what footnote 59 says is the discount rate reflects an institutionally backed venture in an unsaturated growing market and demand for release linked music NFTS more durable than purely art-based NFT's, the adoption, mix, growth and volume inputs are reserved for finalization once the plaintiffs' projections and operating data are

produced.
Correct?
A. Yeah.
Q. What --
A. And where it says plaintiffs it would probably be parties there.
Q. There's no part of footnote 59 that's talking about the growth rate there, is there?
A. The word "growth" is literally in the footnote.
Q. So -- so you're saying that the -- you are reserving the -- the terminal growth rate used in your DCF analysis for further confirmation?
A. The adoption, the mix, the growth, the volume inputs are all reserved for finalization.
If there's something in the most recent production that could change this, right. It's -- it's the similar holding of the -- like I reserve the right to update this report. If they have some additional information that shows that this projection should be some other

number that they thought it was going to grow at a different rate or something like that, then we could adjust the model. There's no math error, like, in the model itself. And so whatever that input is is easily adjusted. The 3 percent is a terminal growth rate that's -- that's in there, but this footnote, like, explains where those numbers come from, both the discount rate and the -- the terminal growth rate.

Q. Footnote 59 doesn't cite any source for the use of the 3 percent terminal growth rate, does it?

A. No, there's not a -- a source other than the review production in this matter.

Q. Okay.

A. And that's -- go ahead.

Q. If I wanted to do some research and just confirm for myself whether it would be appropriate to use a 3 percent terminal growth rate here, I mean, where would I look?

A. You would use the components of

that company that are detailed either in the report or in that footnote, right. Like, that's -- that's -- you asked me what it is and where it came from. That's those things that are used and derived those numbers.

Q. What company are you talking about?

A. What are you talking about?

Q. What --

A. What are you --

Q. You said you would use the components of the company that I detailed in the report and in that footnote, right.

And I'm asking you what company are you talking about in that response?

A. The one that's being valued here, the -- the overall thing that -- that the parties were building, right. I mean, that's -- that's, like, the whole point of the dispute is this thing that they're building, DistroMint.

Q. Right. But what documents from DistroMint, LLC exist to -- to give us any indication of what the terminal growth

rate should be?

A. So, the bulk of the -- of the documents are produced by nChain, right. Their projections, their projections on the -- the -- how subscribers are going to grow, what they were going to charge, what the fees were going to be. All of those -- those things are work papers that they produced in this matter.

You in your question you specified again that DistroMint comma LLC legal entity, and that's not what we're talking about here. We're talking about the overall thing, the platform that was being built by both parties that's in dispute.

Q. Is there a document that you're aware of where nChain was projecting what it expected the revenues for DistroMint -- the DistroMint platform to be?

A. There's -- there's a couple of presentations that, I think, Eric started and nChain finalized. There's some work papers about the subscription pricing. There -- which are the inputs into that

model. That's -- that's what all of those things are.

Q. Have you ever seen a document from nChain that used a 27 percent discount rate in the cash flow analysis for the DistroMint platform?

A. It was Dale Evans' testimony that nChain never engaged in any valuation mechanism whatsoever related to DistroMint.

Q. Okay.

So you've never seen a document in which nChain attempted to value the DistroMint platform?

A. Are you representing to me that a document exists contradictory to Dale Evans' testimony?

Q. I'm asking you whether you've seen a document showing a valuation done by nChain of the DistroMint platform.

A. I have not seen such a document. And such a document would directly contradict Dale Evans' testimony in this matter.

Q. Okay.

Have you seen any documents from nChain's production suggesting that there should be a 3 percent terminal growth rate used in a DCF analysis for the DistroMint platform?

A. So again, they never engaged in a valuation of DistroMint. And so as such, any components of a valuation would also not be contained, other than the inputs into that model. And so, like, there's some extensive discussion in my report about their communications about this, about their pricing inputs, about their expectations, about their market share, of all of -- all of those things are contained in here and cited.

And so when you're asking if there was a valuation, Dale Evans testified there was not. If I ever saw a document with a valuation on it, that would be surprising because it would directly contradict Dale Evans' testimony.

Q. Okay.

Can you point me to any source, a book, an article, anything that would

support your use of the 3 percent terminal growth rate in your DCF analysis?

A. Yeah, I have to -- I probably have to review the work papers to see where that's coming from because it looks like there would be, like, a secondary -- another, like, 5b or something like that that would tell you, like the buildup method that I used the buildup method or something like that.

Q. But sitting here today, you can't point me to a source, a book, an article, anything, that would support the use of the 3 percent terminal growth rate?

A. So you're asking me to point to you a thing that is not likely to exist, right. So this is a blockchain-based company issuing two different kind of blockchain-based assets. The documentation or the research or the standards on valuing those kinds of things didn't exist. That's why I founded the Forensics Board Association and why I published the book called "Comprehensive Forensics: Tracing and Valuation of

Digital Assets," to start that discussion and, like, identify the methods and the considerations of where you have to look for the kinds of inputs into that model, what kinds of considerations this to be made.

And so you're like oh, you didn't point to an article. That's correct. There's probably some work papers in here that can explain further where those numbers come from, but, like, the -- the idea that this company and what they were building is somehow, you know, only a traditional type company is -- is not true. That --

Q. So there's not a source you could point me to that would support the user of the 3 percent terminal growth rate?

A. That's not my question.

Q. I believe in your response you said you didn't think a source like that was likely to exist.

A. I -- I said that there's probably work papers that can explain that

further. That was my testimony.
And then I expounded in -- in my explanation of what you were asking and what kind of, like, documentation or analysis or research that would be.
Q. All right.
And -- and can you sitting here today point me to any other source, an outside source, that would support using a 3 percent terminal growth rate for that DCF?
A. Like I said, I would have to look at the work papers that go into it.
Q. Okay.
If you used a higher discount rate, your valuation would be lower, correct?
A. I mean, that's -- yeah, that's a function of how math works, right. So absolutely.
And it's easy to determine, right. If the parties or the court orders a different discount rate be applied, it's very easy to type that in and see what that value would be.

Q. Okay.
A. Or look at the sensitivity analysis, if it happens to be one of those.
Q. And if your use of a 3 percent terminal growth rate is unfounded, that would make your valuation wrong, wouldn't it?
A. No. Wrong would be, like, a math error, like the math isn't working correctly or something.
What you're talking about is just an adjustment to the model. And so if -- if you determine some other growth rate is appropriate, you have some other document that shows a different growth rate, then you could just update the model.
Q. Okay.
So if you -- if you used a -- a different terminal growth rate, the output of your valuation would be different, right?
A. Yeah, that's a function of how the math works, yeah.

Q. If you use a lower terminal growth rate, the output of your valuation would be lower.
Is that right?
A. Yeah.
Q. Okay.
A. Like, for instance, if you dropped the terminal growth rate to zero, right, then the value, the terminal value in your 5 would go from about a hundred million, 103 million to 90 million.
Q. Right.
And -- and just to -- let's go book to Schedule 5. The -- the terminal valuation -- the terminal value that you used here, that's -- that's more than 55 percent of your valuation, right?
A. What do you -- what do you mean?
Q. So, you -- the DCF analysis you came up with essentially consists of -- of two parts, right? It's the present value of -- of the five years, correct? Plus the terminal value, right?
A. Yeah.
Q. Okay.

A. Well, yeah. Yes, the present value of each of the five years, so not -- but, yeah.

Q. And what I'm saying is approximately 31.3 million of your $55.5 million valuation in the DCF is the terminal value, right?

A. Yeah. The -- I mean, that's obvious, right. So the other half -- the other portion of that is 24 million.

So, yeah, 33 is more than 24.

Q. More than half of it -- more than half of your DCF analysis is the -- is the terminal value, right?

A. Yeah.

Q. Okay.

And so --

A. That's been -- so, like I said, if you dropped that terminal value right to zero, right, the terminal growth rate to zero, you still have a present value of the terminal value.

Q. Okay.

But adjusting -- what -- what's the output if you -- if you adjust it to

zero?

A. If you drop the terminal growth rate to zero, then the terminal value of year 5, 90 million, the present value of the terminal value stays 27 million, and the indicated value is 51. So then your -- your present value of the terminal value is then not more than half of the overall.

Q. Okay.

MR. RUOCCO: Okay.

Why don't we take a break? We'll go off the record.

MR. RISPOLI: No objections.

THE VIDEOGRAPHER: The time right now -- I'm sorry. Go ahead, counsel.

MR. RISPOLI: No objections.

THE VIDEOGRAPHER: The time right now is 12:58 p.m., and we're off the record.

(Luncheon recess taken.)

\- - -

A F T E R N O O N S E S S I O N

\- - -

THE VIDEOGRAPHER: The time right now is 1:51 p.m.

We're back on the record.

MR. RUOCCO: Welcome back, Ms. Haraminac.

BY MR. RUOCCO:

Q. Before the break, we were discussing your income approach to valuation.

Do you remember that?

A. Yes. Yeah.

Q. Okay. And we're here in Schedule 5 of your report.

Let me share my screen with you again.

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. And this shows the DCF analysis that you conducted as part of your income approach, right?

A. Yes.

Q. Okay.
And in your income approach, you projected revenues for the first five years for the DistroMint platform, correct?
A. Yeah. If you -- like, if you don't mind, you had asked me some questions before the break about the rates. If we can go back to that. I have some information on those.
Q. We'll -- we'll get back to that, but I just want to focus my question here.
So, the -- the -- the revenues here in your DCF analysis, they -- they consist of two pieces, right? There's a subscription -- subscription revenue piece and a market and transaction revenue piece. Is that right?
A. That's right.
Q. Okay.
And if I scroll up here to this part of Schedule 5, you made an assumption, it's called an assumption here, that in year 1 there would be 15,000 subscribers to the DistroMint platform,

correct?
A. Yeah.
Q. Okay.
A. And where an assumption is an input, right. Those are in the same column.
Q. Okay.
And that assumption that there would be 15,000 subscribers in year 1, that affects both your projections of subscription revenue and marketplace and transaction revenue in the DCF model, right?
A. Yeah. I -- I think they're both built off of that.
Q. Okay.
And what was your assumption that the DistroMint platform would have 15,000 paying subscribers in year 1 based on?
A. Well, so, nChain's own comparison, right. Their revenue engines are what they identified, that's why there are those two streams. And its comparison against the -- or I guess not comparison,

but its benchmark against OpenSea as a marketplace. I mean, that had, like, 200 million revenue, I think, monthly at its peak. I mean, it's in my footnote there. But it's -- that was nChain's own benchmark, and there are some documents cited there for where that 15,000 number comes from.

That document has nChain's discussion over how their profitable at very low transaction number -- at a very low transaction volume and that the numbers in their little tables in there are low and not what they actually expect to happen, and then their expectation was then, like, a reference against the -- the OpenSea marketplace and so I looked at, you know, how many users OpenSea had, how many users other comparable companies had, like DistroKid has 2 million and then what -- what was asking that they may have actually been expecting are, not their -- I think they describe it as painfully low or not painfully low in there. Low, but not painfully low expectation. So use

something like that as the basis and that's how you get to the 15,000.

Q. Did you see any projection from nChain that used -- that assumed that there would be 15,000 paying subscribers in year 1 for the DistroMint platform?

A. I think I just described what -- how nChain discussed that and what their own benchmarks were, how many subscribers they felt they would have.

The document that had numbers of subscribers in it I think was the max in their table was 5,000 and they referred to that as low.

Q. Is that for purposes of a pricing analysis that you're saying?

A. Yeah, that's what they were talking about. Their -- their paying subscribers and the number of -- of subscribers there.

I think this is also, like, a combination of the artist base, right. Like the -- the user base, the subscribing artists where their -- their market share was something like 10 percent and the

overall share of subscribers is lower, like 10 percent of 2 million is not -- still not 15,000. So if you're making a presumption you're going to get 10 percent of a market and that share is much, much higher than 15,000, then this use of 15,000 would be conservative, even when -- and its corroborated by nChain's own document where they talk about how 5,000 is their -- their low analysis in their pricing discussions.

Q. Did you see, though, any -- any market analysis where nChain said it expected to have 15,000 paying subscribers for the DistroMint platform in the first year?

A. I don't -- I don't recall a detail where they said they expected any number of subscribers.

They used some inputs to see where there were minimum break-down amounts, and they used some benchmarks against OpenSea. That's where they described that. I don't think they had something where they had an expectation of

subscribers, like a detail to that detail.
Q. And all of the -- the paying subscriber figures here in Schedule 5 are based on the assumption that there would be 15,000 subscribers this year 1.
Is that right?
A. What do you mean? Like the each one is a growth from that number? Is that what you mean?
Q. Correct.
So -- so, you basically -- you assumed there would be 15,000 users in year 1 and then 24,000 users in year 2.
And so what you did to arrive at 15,000 was increase the 15,000 by 160 percent, correct?
A. No. I mean, yes, I increased it by the -- the growth of 60 percent. So that's one plus 60 percent.
Q. Right.
A. So yes -- yes, it's -- I didn't increase it by 160 percent in the sense that the rate is not 160. The rate is 60.
Q. Right. Okay.
So, basically every -- every

number of paying subscribers for years 1 through 5, it -- it's 1.6 times the number of paying subscribers in the prior year, correct?

A. I mean, that's the growth rate in the assumption in the model at the top, right. That's the subscriber growth.

Q. Okay.

And so if you -- if you were to change the assumption that there were 15,000 paying subscribers in year 1, all the other numbers for paying subscribers in the model would change too, right?

A. Yeah. I mean, that shows in the sensitivity analysis again, right. Again where -- how that change affects it.

Q. And so if you -- if you lowered the assumption from 15,000 paying subscribers, the number of paying subscribers in the rest of the model would -- would decrease proportionately, right?

A. Yeah, 'cause it's -- it's a growth rate.

Q. And --

A. Applied.
Q. And if you lowered the number of assumes paying subscribers in year 1, all the -- the -- the valuation and the income approach would -- would decrease, right?
A. If I -- if I lowered the number, you mean?
Q. Yes.
A. The number of subscribers?
Yeah, I mean, that's just a product of the math, right. The subscription revenue is based on subscribers.
Q. Okay.
How did you decide to use the 60 percent year-over-year growth rate? What was that based on?
A. Well, that goes back to what these rates are based on, right. The subscriber growth I think -- I think that might be from their tables that cited in there. I'd have to look.
Those other rates in there, the 27 percent and the -- the 3 percent that we were talking about earlier -- let me

see on the annual growth.

60 percent.

Yeah, that's probably a product of the -- the review of each of those sectors where you're looking at the comparables, you're looking at what nChain benchmarked itself against.

Q. I mean, did you conduct any analysis of other companies you considered similar to the DistroMint platform that had a 60 percent growth in the number of their subscribers every single year?

A. Well, you're -- you've -- your question has two parts.

So, I looked at OpenSea's growth rate prior to this and looked at some of the other marketplaces and try to look at some of the more specific NFT marketplaces that were limited to real world assets, but this -- October 2023, like, right before this was some skyrocketing user bases. There was a lot of, like, recovery in the market that followed some earlier declines, but when I say "decline," it's, like, down to $10 billion worth of

revenue, something crazy.

So, I looked at all of those -- those benchmarks and then tried to -- to reduce those for the DistroMint itself because DistroMint was a very specific type -- two different types of NFTs and not -- not just a marketplace or any kind of NFTs. So like gaming NFTs and some of those others. It was more niche than that.

So benchmarking directly against OpenSea was not appropriate. Like, those growth rates are substantially higher. So, looking at that, just look at something that's much more conservative than the other things that they were benchmarking against.

Q. In your discounted cash flow analysis, did you make any adjustments or allowance for the possibility that the number of paying subscribers for the platform would stay flat or decrease one year to the next?

A. Where -- did I -- did I say that it would stay flat or decrease?

There was no -- there wasn't anything that would indicate that that kind of a application would be warranted in the first five years.

That discount rate that you're talking about, the -- the method here, I mentioned before or break that I would have to check, like, work papers to see if there was a buildup method or something like that. So I want to clarify, there are no other work papers. So the work file is complete.

The 27 percent is not from a buildup method. It's based on the -- what's known as the VC approach, and Ferri also cites these sources, like Damodaran and Pratt, where they talk about the stages of a company. This rate and the -- the range in my sensitivity analysis match the pre-money IPO stage of those companies, and that's a combination of a consideration of the -- the pre-money stage, but the reason that DistroMint was pre-money is because it was boot-strapped, not because it was -- it was, like, very

early in its development. You had both parties working towards the development of that product for, you know, an exchange in equity. And so it's pre-money, but it's also late-stage in the development, and that's why the VC approach is used. And that's where that 27 percent comes from. That's within the range of that pre-money IPO bracket.

Q. Have -- you keep referencing a pre-money valuation.

Before this case, have you ever valued a pre-money company?

A. Yes.

Q. What company was that?

A. So, I -- we talked about the Snap Diligence and Kiribex would have been companies that we were either interested in acquiring as part of that or if companies that we're looking to acquire a portion of either of those, all -- all of those were pre-money. Or some portions of the Snap Diligence were also post-money.

Q. Have you ever offered expert testimony on the value of a pre-money

company outside of this case?
A. I don't remember the subject of -- of all of the testimony.
I know there were some companies involved in some of those cases, but I don't remember -- I don't remember if that would have been a part of my testimony.
Q. Okay.
A. I mean -- I mean, it's not like the reference to the pre-money portion is the reference to the bracketed sections of the ranges, and my ranges are consistent with that. That's where this came from, which was your question before the break.
Q. So, let's -- let's then look at some of the pieces of -- of the DCF model.
So, the subscription revenue model, that's -- that's based on the assumed number of users.
Well, let's take it in steps.
So, you have here in Schedule 5 pricing inputs. Do you see these?
A. Yes.
Q. Okay. And there is a largest tier which is $1,999, a middle tier was

$199, and a trial tier which is $9.99.
Right?
A. Yes.
Q. Okay.
And then down here in the assumptions you made some assumptions about how many -- or what percentage of the users in each year would select the -- one of those three pricing tiers, right?
A. Yes.
Q. Okay.
And so you assumed each year 25 percent of the users would select the largest tier, 65 percent would select the middle tier, and 10 percent would select the trial tier.
Is that right?
A. Yes.
Q. Now, what was your assumption that the users would select the subscription tiers in those percentages based on?
A. Oh, I mean, that's either the nChain documents that we reviewed that are cited down there in the footnote at the

bottom or up in the sources for those fees, together with the comparison against the benchmarks they mentioned, and then other research into those -- those companies. Like, this is just experience with blockchain-based companies.

Q. I want to be clear.

The purpose of the -- the nChain document you keep referring to, the purpose of that document was to determine what a break-even price would be for the platform, correct?

A. I don't remember if a purpose is explicitly stated in that document.

The -- I know it had references to other documents that I think weren't provided and it had quite a few different tables in it.

There was a section in it that said our break -- something like our break-even price is -- or, our break-even volume is something like thousand, 950 or something like that, and then the rest of that document was subscription pricing and numbers of subscribers and the overall

discussion of it was that those tables were not their expectation. Those tables were low but not painfully low, I think is the -- was the phrasing they used.

So, like the specific purpose, there might have been a purpose section in the document. I don't remember it off the top of my head.

Q. Did you see any documents that were market research by nChain showing what the appetite was for subscribers for one of these three subscription plans?

A. There -- there were some discussions in some of those documents about comparing against competitors and the rates -- like, the fees and transaction fees against competitors. I don't -- I don't know what their -- what the -- I don't remember off the top of my head if there was, like, something specific about their breakdown of which customers were going to fall into which tier other than those -- other than those other, like, low tables.

Q. And again you're talking about

the pricing analysis, right?
A. I mean, the pricing analysis is -- I think is what these are coming from, right. Like, that's what the 44, I think, 59 is what's down there. Like, those are part of their -- like, this is the revenue their revenues are based on their price and what they thought they could charge for it. Those were the records that nChain produced that contained components that could be put into here.
Q. Now, these -- these pricing inputs that you use, did you see any documentation in which any actual subscriber was offered pricing on these terms?
A. I don't think that there were any subscribers yet.
So, the -- I mean, the short answer would be no.
Q. Okay.
And are -- are you confident that the pricing shown here is -- was final for the DistroMint platform?

A. I -- that's not my testimony. I think I very clearly described where that came from.

Q. Okay.

So, I mean, is it -- is it your testimony that the -- the subscription tier pricing that you show here on Schedule 5 may have been subject to change?

A. I think that's the footnote we talked about earlier that, yes, of course it would be subject to change. They discuss a lot of those different changes as part of the determination for, like, their terms and conditions, as part of their benchmarking against OpenSea, and a part of what they could charge or what they could reasonably charge to either break even and to be competitive, and all -- well, I wouldn't say all of that. But some of that's contained in the production that -- that nChain provided.

MR. RUOCCO: Okay.

Can we take a look, Ellie, please, at tab 256?

MS. BAINES: 256 is uploaded.

MR. RUOCCO: I'm sorry, there's a native file too. Can you include that, please?

MS. BAINES: One second.

(Pause.)

MS. BAINES: I think you should have it now. I think it's tab 257.

MR. RUOCCO: Yeah.

Ms. Hash, I'm showing you what's being marked as Haraminac Exhibit 8?

Is that right?

(Pause.)

MR. RUOCCO: I'm showing you what's being marked as Haraminac Exhibit 8.

(Haraminac Exhibit 8, Excel worksheet and native file, Bates NCH0004508, was marked for identification, as of this date.)

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. And I'll represent to you that the metadata on this document shows that

it dates from March 29th, 2023.

And I want to show you this portion. This is -- this was a document under Bates number NCH0004508 from nChain's production, and here you can see at the top: We propose three subscription prices and a test price for one off NFT mix.

Do you see that?

A. Are you on -- you're on price?

Q. Price V2.

A. Okay. Let me -- okay.

Q. Okay.

So, do you see here it says: We propose 3 subscription prices, and a test price for one off NFT mints?

A. Yes.

Q. Okay.

And here there -- you can see here there are three subscription prices listed here, one at 19.99, one at $200, and one at a thousand.

Do you see that?

A. Yes.

Q. That's different than the

subscription pricing assumptions in your DCF model, right?

A. Yeah, those look different. Those are also different with nChain's records that were, I think, later than this document.

Q. You cite this document in your report.

Do you know that?

A. The 4508?

Q. The one that we're looking at now, this Excel file that's Exhibit 8, yeah.

A. Okay.

Q. It's cited footnote 36 of your report. You can check me on that, if you want.

What -- what did you do to reconcile the subscription prices shown here in this Excel file with subscription prices that you use for the basis of your DCF analysis?

A. So, there's -- if you look at the metadata of this file that you talked about, right.

Q. Yep.

A. The properties there are going to show that it's, I think, January and March, and then the other document that -- that we are referring to that's in the footnote of the schedule is a later date in March.

Q. Okay.

So, it's your testimony that the subscription pricing model inputs that you used for the DCF analysis are based on a document that dates from after March of 2023.

Is that correct?

A. That's not my testimony.

I said it was after the date that this particular file was modified. They're both modified in March.

Well, I don't know when the other version was modified. I know when it was created 'cause it's contained in the document. But this one was modified in March, I think.

I'm looking at it, like, right now.

So, the --

Q. Okay. Well, let's just -- I mean, no reason to guess.
We'll --
A. Are you looking at the properties now?
No, you're not.
Q. No, no. Let me ask the questions.
So, all -- you refer to the same document, which is NCH0000257, as the basis of your subscription pricing inputs for the DCF analysis, right?
A. Yeah, I think that's -- that's where those particular numbers came from.
Q. Okay. Let's take a look at that document.
MR. RUOCCO: Ellie, can you bring up 237? And I think that one might have an Excel with it too.
THE WITNESS: I think you might mean 257.
MR. RUOCCO: No, I mean 237.
THE WITNESS: I'm sorry.
MR. RUOCCO: That's where it is in my documents.

MS. BAINES: I believe it's tab 239.
And you want the native Excel, right?
MR. RUOCCO: Yes, please.
MS. BAINES: Okay.
MR. RUOCCO: With the slip sheet, please.
MS. BAINES: Okay.
(Pause.)
MS. BAINES: You should have the slip sheet and the native.
MR. RUOCCO: Okay.
So I'm showing you -- I'm showing what's being marked as Haraminac Exhibit 9, this is a -- a file under the Bates stamp NCH0000257.
(Haraminac Exhibit 9, Excel worksheet and native file, Bates NCH0000257, was marked for identification, as of this date.)
(The above mentioned exhibit was published.)
MR. RUOCCO: And this is the native Excel version of that.

BY MR. RUOCCO:

Q. And you can cross-reference in your Schedule 5 of your report, but this is the file that you claim the subscription pricing base is based on, right?

A. Yes, I think -- I mean, that's what -- that's the citation in there.

MR. RUOCCO: Okay.

Ellie, can you please give me the tab 237? It's the cover email.

MS. BAINES: 237 should be uploaded.

THE WITNESS: The tab, I see.

MR. RUOCCO: This is an email from Urban Bratina to Sound Alive Rep. Date is March 1st, 2023, DistroMint packages for final confirmation, and there's an attachment DistroMint packages.

(Haraminac Exhibit 10, email 01/03/2023, was marked for identification, as of this date.)

(The above mentioned exhibit was published.)

BY MR. RUOCCO:
Q. Do you see this?
A. I do.
Q. And this is a one-page document. I marked this one as Haraminac Exhibit 10.
If we go back to the one we were just looking at, this is the Excel file that was attached to it?
So, these prices shown here are from March 1st, 2026, right?
Sorry. Sorry. These are from March 1st, 2023, right?
A. Yeah. I mean, that's the -- I think that's the date in the email.
Q. Right.
A. So when this document was created and how often it was modified, that's -- that's what was attached there.
Q. Okay.
And then if we look back at the other document we were just discussing, the one with the different pricing, you were telling me that this is -- you were looking at the metadata. The metadata on this shows that it was -- it dates from

March 29th, 2023, right?
A. Yeah, I said March before. But the created date is January 2023, and then the modified date is -- is March 29th of 2023. It is modified by somebody else. So --
Q. Okay.
A. -- I would -- that's --
Q. What did you do to reconcile the differences in these subscription pricing models? Why did you choose one and not the other?
A. I probably -- how often it was discussed or who was on the meetings, where it was being discussed and how often. We probably looked at that.
The costs in here and the pricing version 2. I don't remember what we -- like, whether we selected something from here or if the other pricing models are reflected later somewhere else.
As I cite 257, I don't cite anything else in here. I cite 4508 as another place where they also discuss pricing, and I think the section of that

report is a discussion about how it's not consistent. There -- there wasn't, like, a finalized version in there.

Q. Okay.

So there was no finalized version of the subscription tier pricing for the DistroMint platform.

Is that right?

A. Not that I know of. I don't recall seeing something that said, like, absolute final version of pricing.

Q. Okay.

A. In the sense that there was probably a last one, sure. But that doesn't mean that it's also the final.

Q. Okay.

And if you change the subscription pricing, that would affect the outcome of your valuation, right?

A. Yeah, obviously.

This one -- the one that you're -- you're looking at has an additional pricing tier, and so it moves the -- it basically moves the trial tier into the enthusiast level and then has the

other two as, like, different descriptions. That trial, middle, and largest I think were different descriptions of what kinds of subscribers they would be.

These are -- this new -- the -- I can't say the new. But the more recent one with, like, the shaded cells and everything, that's -- that's got a different description of their customer base, a little bit more detailed, but it also introduces that additional single -- single NFT mint from one-offs.

So, yes, it would change. I don't know that it would change downward 'cause this is a -- a fourth tier and not three tiers. So you'd have to do some additional work to see what all would go into that.

Q. But the highest tier in this Excel is about a thousand dollars less than the highest tier in -- in your model.

Is that right?

A. Yeah, but it's -- it's got some other additional presumptions in here that

are the mints per month, and how many that would expect to be that would also drive the marketplace and transaction revenue. And so I think we probably went with the -- the earlier version even though the number is higher. I think that results in a lower overall valuation. So to be conservative, this -- this fourth tier and then the number of minting things per month paired with the transaction fees and the -- the perpetual -- like, the resale fees and all that, I think that ends up being higher, but I don't -- I don't remember off the top of my head. That would be a reason you wouldn't go with it.

Q. In this pricing model, though, there's an assumption that the price you're paying for the subscription buys you a certain number of mints per month, correct?

A. Yes. The -- so, that means you can mint a certain amount. The transaction fees would be the presumption on how many of those mints are then sold or transferred because every transaction

also has a -- an underlying transaction fee, not just the -- the minting fee. And so the minting fee is not the only driver. The mint there would be included, but the other driver would be the transaction fees.

Q. Let's take a look back at your report.

So, just waiting for that to load.

So, you -- you assumed talking about the marketplace and transaction fees, that each subscriber on average would conduct $2500 worth of transactions on the -- the DistroMint NFT marketplace each year.

Is that right?

A. I'm sorry. I was reading the section on the footnote. I missed your question.

Q. It's okay.

In your DCF analysis, you assumed for purposes of your marketplace and transaction revenue that each subscriber to the DistroMint platform

would do $2500 worth of NFT transactions on the marketplace each year.

Is that right?

A. Yeah, I think that's what that -- that row is saying.

Q. Okay.

How did you come up with that figure?

A. I think that's a, again, the OpenSea benchmark compared against the other industry, like, area stuff, how much subscriber volume or had -- who had subscribers who were either unique or said to be unique versus volume of transactions from all of the different industries at the time.

October 2023, this is -- with the OpenSea benchmark that nChain relies on -- nChain is -- I mean, OpenSea is so large, it's like the largest market participant, and so we tried to do something that was -- or I tried to do something that was much more conservative than what was going on at OpenSea because looking at OpenSea just alone as -- as

your benchmark is -- is not conservative, to say the least.

And so that -- that's really where that number comes from. The 2500 is, I think there's a couple of different presentations where they talk about what their marketplace rate is going to be and, like, what they expect that to be. I don't remember if that's cited in there or not.

Q. Now, but again, you're talking about the pricing analysis that -- that nChain did, right?

A. The pricing analysis is not the same as the -- the marketplace stuff. That's different.

Q. Okay.

Have you seen an analysis where nChain projected that subscribers on the DistroMint NFT platform would do an average $2500 in marketplace transactions each year?

A. No.

Q. Okay.

A. No. That's -- I don't think

they had something that was that granular level of a detail. I think that comes from, again, an assessment of their documents overall and what they said their benchmarks were as far as their expectations.

I'm looking at those and then drawing a conservative assumption.

Q. Okay.

And, now, you -- you assume that of the $2500 in marketplace transactions the subscribers did each year, nChain -- or, DistroMint would take a fee of 5 percent per platform transaction fees and a separate fee of 2-and-a-half percent for DistroMint perpetual marketplace fees.

Is that right?

A. Yeah. Those -- those two percentage fees are, like, different revenue streams. The platform transaction fees are, like, what it costs to mint, what it costs to transfer, you know, a percentage of sale, like the initial one.

The perpetual marketplace fee is kind of like a -- a royalty, and if

DistroMint is the one creating the things, then the creators can set -- like, if they're enabling the creation of NFTs, then you can set something that's like a perpetual royalty for that particular NFT. And so you said, like, not just on this mint and not just on this transaction, but perpetual transactions, future transactions will also incur some additional small fee, and that's -- that's what those two are.

Q. Okay. Let's just take a look at -- I'm going to show you what's being marked as Haraminac Exhibit 11.

Before we turn over to that, though, the -- the DistroMint perpetual marketplace fee is based on the document shown here in the table NCH0000841.

Is that right?

A. Yeah. I mean, that's the -- that's the citation there. That's one of -- there were -- there were a lot of duplicates in there. I think in my report I talk about how there's a lot of different pricing communications and other

communications, and this is the one with that particular number in it.

Q. Okay.

A. Or one of the ones with that number in it.

(Haraminac Exhibit 11, DistroMint Empowering music creators around the globe, Bates NCH0000835-844, was marked for identification, as of this date.)

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. Okay. So, I'm showing you this is what's been marked as Haraminac Exhibit 11. It's a presentation entitled "DistroMint Empowering music creators around the globe."

And I believe the document that you cited in your Schedule 5 is this slide, I think it's slide 7 of the -- the presentation.

Is that right?

You can see the Bates number up here on the top.

A. Yeah.
Q. Okay.
Here this says in the bottom left-hand corner: 2.5 percent fixed platform fee.
Correct?
A. Yeah, that's what it says.
Q. Okay.
I think you just described the perpetual marketplace fee as, like, a royalty-based fee, but this document is describing it as the platform fee, right?
A. Well, it -- it's using that term. There's plat -- you can call it fee or platform fee or transaction fee or royalty rate or additional fee or whatever that is. This -- this had the 2-and-a-half percent in it. There were some other documents that had 5 percent or 5.3 percent. Some that were including the Stripe percentage, some that didn't. Some that included some -- some other payment mechanism. There were also discussions for how this fee was going to be conveyed to subscribers and discussions for how

that payment fee was going to be moved away from Stripe and just on to BSV. And so that's -- that's where that's coming in.

Q. Okay.

Now, you just -- you just mentioned Stripe. Now, that's the fiat currency payment processor for the -- for the DistroMint platform.

Is that right?

A. Yeah. It's a -- it's one of the components in their pricing discussions.

Q. When we see fiat currency too, that just means, like, traditional money, right?

A. No. It -- it specifically means money that's backed by a government.

Q. Okay. Yeah, right.

Not NFTs, not cryptocurrencies, right?

A. Right. Cryptocurrency would be one that's backed by math. Like, the cryptography.

Q. Okay.

And each time there was going to

be a marketplace transaction on the DistroMint NFT marketplace, the DistroMint platform would have to pay Stripe a fee for that transaction, correct?

A. No. It depends on the transaction. The -- the marketplace, if you're -- if you're buying something for dollars or you're trying deposit dollars in somewhere, convert dollars, then that would incur a -- you know, something to do with Stripe. But if you're engaging in just blockchain transactions, that would not involve Stripe.

Q. Okay. But it was a part of nChain's internal pricing analysis that when there were marketplace transactions happening on the NFT marketplace in the DistroMint platform, they would have to pay fees to Stripe.

Isn't that right?

A. That -- I think you're overstating how often Stripe would be involved.

So, this is a blockchain-based company. What they're selling are

subscriptions, and those subscriptions could be paid for in dollars. They could be paid for in other types of cryptocurrency. And those dollar transactions, or whatever fiat currency transaction that Stripe supports, those would have gone through Stripe.

But when you say "any transaction on the platform," I can't say yes to that because not all transactions on the platform would involve a transfer -- or a transaction with dollars, with a fiat currency.

Q. Did you just say that it's your understanding that the DistroMint software platform would accept payment for subscriptions in cryptocurrency?

A. The -- in documents that nChain produced talked about switching to BSV for payments. So that -- that's what I was referencing. So it's not my testimony that the DistroMint platform as of October 2nd, 2023 was accepting payments in a wide variety of forms. That's not what my testimony was.

Q. Okay. Right.
I mean, the NCP cite as it existed on October 2nd, 2023 did not accept payments of cryptocurrency, right?
A. So, I think if you're referring to a specific website, then I think you should reference that one.
I don't remember which one was the MVP site. If you have a screen shot of it, we could do that. I know there was a couple that I was able to look at, but I don't know which ones were in existence as of October 2023.
(Haraminac Exhibit 12, DistroMint - provisional platform price options, Bates NCH0004459, was marked for identification, as of this date.)
(The above mentioned exhibit was published.)
BY MR. RUOCCO:
Q. Let's take a look at what's being marked at Haraminac Exhibit 12, and this is a document Bates stamped NCH004459. The title is "DistroMint -

provisional platform price options"
created March 16th, 2023.
Do you see that?
A. Yeah. There's like, I don't know, 20 versions of this document and there are duplicates of this document in their production.
Q. You've been referring to an analysis from nChain a few times in your testimony.
This is the document you're thinking of, right?
A. I think your word was "analysis." I think I used the words "tables" and -- or maybe I used "analysis" too, but there's some calculations in here.
Q. Okay.
But when -- when you've been talking about assumptions about users, assumptions about pricing, this is the document that you're thinking of, right?
A. Where it's cited, that's the document I'm referring to, yeah.
Otherwise I'm talking about the rest of

the nChain production.
Q. Okay.
So, there's a problem statement at the top. It says: As part of the MVP, how might we provisionally price the marketplace platform fees?
That's what it says, right?
A. Yeah. You've read that accurately.
Q. Okay.
That's all this document was trying to do, right? Provisionally price the marketplace fees for the DistroMint platform, correct?
A. What do you mean that's all it was trying to do?
The rest of this is -- is work that supports that. And you can see that there was additional work referenced by it. So it seems like this is not just an answer to that question. It's also a reference to other work for other purposes.
Q. This document is not a projection of a number of anticipated

users for the DistroMint platform, is it?

A. I don't recall any projections of an anticipated users.

And again, like, that would be part of a valuation, right, that I think it was Dale that testified they never did. When looking for inputs into this model, the contemporaneous, like, expectations or what they were considering, how they were going to price it, what they thought might happen, all of those things are -- are, like, reviewed, compared, and then determined as to whether or not they should be inputs into that model. This is one of those inputs.

Q. This -- this document is not any sort of projection of the revenues anyone expected the DistroMint platform to generate, is it?

A. What do you mean it's not an expectation of the revenues?

I mean, I think it has a -- a comment in there that says something like they break even somewhere. Like, there is some discussion about what they would

earn.

Q. This document is not saying, We expect to generate X-amount in revenues in year 1, Y-amount of revenues in year 2, Z-amount of revenues in year 3. That's not the point of the document.

A. The language -- that language that you're describing doesn't appear in here, like, as a quote, no. But the purpose of the document, how nChain used that document, I wouldn't be able to testify to.

Q. Okay.

Now, let's look at the analysis. It states: We know that Stripe fees and fiat payments are a core element of the MVP.

Do you see that?

A. I see that.

Q. Do you agree with that statement?

A. I -- I don't have an opinion as to that statement. I didn't have access to their MVP to test that statement.

Q. Okay.

This implies -- sorry, the document continues: This implies that there is an avoidable cost to us of 2.9 percent plus 30 cent per fiat transaction.

Do you see that?

A. I do.

Q. And did you understand for purposes of your report that for every fiat transaction on the DistroMint NFT marketplace, the marketplace would incur a 2.9 percent Stripe fee, plus a 30 cent fee?

A. So, you -- I think you've conflated the per fiat transaction with all platform transactions. Those are -- I think those are two different things.

So, the -- the -- if the question is that fee is anticipated for all the fiat transactions, sure. That's -- that's what's contained in this document.

Q. By the way, there's a -- here on page 2, there are some tables showing a usage model.

Is this -- is this what you're

basing your assumptions of users on?

A. I -- I think there's somewhere in here that says this is low, not painfully low or something is the language. But, yeah, this is what I'm referring to when I say their volume is in the thousands, and then this is also document that they benchmark themselves against OpenSea.

Q. Okay.

And if we look here on the third page it states: From a pricing perspective, if we are committed to a percentage platform fee, the logical price anchor would be optional royalty plus 5 percent plus 30 cent fee. This would imply the platform fee would be 2.1 percent. We would explain the pricing as in order to cover our payment processing costs.

Do you see that?

A. I do.

Q. Okay.

So, the fee that's discussed in this document is a gross fee of 5 percent.

Is that correct?

A. No. I think the gross fee is optional royalty plus 5 percent plus 30 cents.

Q. Okay.

A. It would be the sum of those things.

Q. Okay.

So, the -- the platform fee reference here, though, right, is that the 5 percent?

A. I think this "platform fee" language is probably using -- referencing one component, whereas my platform fee is the -- the overall fee they need to charge.

Q. Okay.

The -- the 5 percent fee, 2.9 percent of that goes to Stripe. Is that correct?

A. That would be a cost, yeah.

Q. Okay.

So of this 5 percent fee described in this document, the DistroMint platform is only netting 2.1 percent.

Is that right?
A. For the -- the times that they're using the Stripe for those transactions, right. So those are -- like, when you engage in a blockchain transaction, you're -- oh, I guess there's also the break-even statement I was mentioning earlier. But when you're using blockchain transactions, you've got the dollar conversions and the fiat conversions, and they talk about using BSV for payments later. And so when they're using Stripe, that would be a cost related to their use of it. And then it would not be a cost if they didn't use Stripe.
Q. Now, you referenced an optional royalty fee.
Have you seen any documents indicating that there would be an optional royalty fee on every NFT transaction done in that DistroMint marketplace?
A. I don't think that granular level of detail is there. This -- I mean, this is just a royalty across each one of the options, so the word "royalty" appears

in every one of those. But I don't think that's what you're asking.

Q. Now, up here it -- it states here in this -- in these bullets: 2-and-a-half percent is a reasonable platform fee from DistroMint's perspective, e.g. 2.5 percent platform fee plus royalty plus 2.9 percent plus 30 percent equals royalty plus 5.4 percent plus 30 percent fee.

Next bullet point: This does not imply it is a commercially correct fee if competitors are at zero.

Do you see that?

A. Yeah.

Q. Did you do any analysis in connection with your report to determine whether the marketplace and platform fees that you assumed were consistent with what other competitors in the marketplace were charging as of the valuation date?

A. I compared those -- those percentages against the transaction fees on other blockchains where NFTs were present, other similar blockchains where

NFTs are present. It's two different things.

Whether, like, competitors were charging a zero percent fee, I didn't find anywhere where that would be the case because all of the competitors would have a blockchain transaction fee and to -- to interact with their marketplace, you -- they all had fees. There might have been some tiers that waived fees, but that -- that wasn't a component here.

Q. How does the marketplace and transaction fees that you assumed for purposes of your DCF model compare to the marketplace and transaction fees that were being charged by other competitors in the market on the valuation date?

A. The fees in my model I think are lower than the transaction fees for the other blockchains on which NFTs existed at the time.

Q. And which other -- which other marketplaces are you referring to in that answer?

A. Oh, I don't know which

marketplaces I would refer to the different blockchains on which NFTs exists, not marketplaces themselves. The marketplaces would be stuff like Rarible, Nifty, the one with -- Magic Eden, OpenSea, those are all NFT marketplaces. I was referring to the blockchain transaction fees alone. So the transaction fees alone are higher than what those fees are contained in the model.

Q. Did you do any study or analysis of what other NFT marketplaces similar to what the DistroMint platform intended to provide, what they were charging in terms of marketplace and platform fees on the valuation date?

A. It sounds like you're asking that with respect to the income approach. And so that kind of consideration would have occurred on the market approach to see, like, what -- what were the comparables and what was going on as far as that -- that goes, that's where that would be a component.

Q. I -- I'm just trying to assess -- I mean, did you do any analysis to determine whether or not the -- the marketplace and transaction fees used for purposes of your DCF analysis were higher or lower than the marketplace and transaction fees being charged by NFT marketplaces with which DistroMint would have competed?

A. Yeah. I mean, we looked at a couple of different places, and I mentioned the NFT marketplaces. I also try to look at overall third-party service providers on blockchains in general and what was being accepted by the market, mainly because those tend to drive the NFT marketplace fees a little bit more than just the NFT marketplace fees. And so we looked at whether or not there were any trends going downward, whether or not there were fee -- like, whether or not these would be supportable by what was going on in blockchain-based, like, companies and projects at the time.

Q. What were some of the other

companies and marketplaces that you looked at?

A. I -- I think I listed all those other NFT marketplaces that were in existence. Pretty sure those were the ones in existence.

I don't remember what other third-party service providers. I know we probably compared against a traditional exchange just to get some kind of comparison against whether this incorporation of a fiat conversion would be appropriate and those are -- those are I think the lower -- down at the lower end. They're, like, 3 or so percent, which was already at the -- at what nChain was considering for a portion of their fee.

Q. Did you do any research or analysis into how the subscription tier pricing you use in your DCF analysis compared to the subscription tier pricing offered by other NFT marketplaces or companies similar to DistroMint on the valuation date?

A. So, it looks like you're mixing up what you would do for assumptions versus the pricing inputs at the top, right.
So, those tier pricing inputs are straight from nChain. Those are direct from nChain. And we talked about why we would use the more conservative pricing inputs over their fourth tier and the higher, like, per-transaction cost. Those are different from assumption inputs.
Q. No, I'm -- I'm just asking you, though, I mean, did you do any study or analysis of how the subscription tier pricing you assumed for the purposes of the DCF analysis compared to the subscription tier pricing being offered by other NFT marketplaces or other companies similar to the DistroMint platform on the valuation date?
A. Okay.
So, can you point where the assumption is that you're referring to?
Q. I -- we're -- we're looking here

at Schedule 5. You have your three pricing tiers, right?

A. Mm-hm.

Q. Did you do any analysis or study to compare how those subscription tier prices compare to the subscription pricing for other NFT marketplaces or companies similar to the DistroMint platform on the valuation date?

A. Yeah, we did that with a general research.

These, however, are not assumptions, as you referred to them in your -- your earlier question. When you restated it, you didn't use that word. And so my -- my issue with your reference to these as assumptions is that that's not what they are. These are inputs from nChain's production.

Q. You're not responding to my question.

The -- my -- my question is did you do an analysis or a study to compare the subscription tier pricing used for purposes of your DCF analysis to the

subscription tier pricing used for other NFT marketplaces or companies similar to the DistroMint platform on the valuation date?

A. Okay. So, I've answered your question a couple of different ways.

The comparison question would be answered in a different approach. This is the income approach, not the market approach.

The comparison question against, like, a sanity check is, like, what you're asking for nChain's own production? Yes, we did that, and I answered that already with the general research. That's in my procedures in our report. We research all these things to see, like, okay, is this something that they had a million dollars being paid for each thing and they're not -- you know, that's not what they're offering and that didn't match up, that would be considered unreliable.

This they repeat over and over, it's the more conservative version of their pricing. There's a -- a lot of

reasons to use that.

But you keep asking me about, like, whether I, like, tried to support their numbers. It's just their number, and so I cite it and that's the input. We compared it against the other numbers that they also had. We compared it against general knowledge against the NFT marketplaces at the time, against other third-party service providers at the time. That's -- that's where we're at.

Most of the other exchanges at the time were doing something like discounts based on your volume. So you didn't subscribe. You would just get a discounts on fees based on the volume of your transactions. It's a little bit different model than what they were anticipating here.

The NFT marketplaces that we looked at, I don't have, like, a detailed, like, formal analysis work paper here because it's just a research on the sanity check to make sure that this is what they had in their documentation. It doesn't

change that much over time. This is their input into that model.

Q. Do you remember my question?

A. Your -- your question was did I perform any analysis to check their numbers.

Q. And you did.

A. You had a complicated -- you had a couple of other complex parts, and so I broke your question apart into the three parts that it was and I answered each one.

Q. Okay.

You did not --

A. And the answer was not that I did not. That was a misstatement of my testimony.

Q. Okay.

True or false, you did no market research into the pricing that you used for purposes of your DCF analysis?

A. False.

Q. Okay.

Where in your report do you describe the pricing -- the market research you did?

A. And this is a basic practice of the valuation to test these assumptions, and it's in the -- the -- probably, I guess, page 3 where it lists the procedures.

Q. Okay.

A. That's the research and analysis for the things that are at issue.

Q. Thank you.

All right. Here you also use EBITDA after maturity 30 percent.

Do you see that?

A. Yeah.

Q. Okay.

So you're -- you're assuming that 30 percent of all the revenues in your DCF model are converted to EBITDA. Is that right?

A. Yeah, the -- I mean, that's a oversimplification, but, sure.

Q. Okay.

What is that 30 percent EBITDA margin based on?

A. Again that goes back, I think, to the VC approach that we were talking

about earlier.

Q. Can you point me to a source that would support using a 30 percent EBITDA margin for your DCF analysis here?

A. Yeah, I talked about the sources for all of these rates, right, the -- the Damodaran on the stages of the company itself versus the VC approach for the stages of the development. That's where these numbers are coming from.

Q. Did you do any analysis of the EBITDA margins for companies or software platforms similar to this -- to DistroMint as of the valuation date?

A. The -- a comparable approach in the way that you're describing would be in the market approach.

Q. Okay.

If you used a lower EBITDA margin, the valuation would go down, right?

A. Yeah.

Q. Okay.

A. That's just a function of how the math works.

Q. Okay.
Let's -- let's go to your -- your cost approach. Sorry, not cost approach. Your market approach analysis. That's shown here in Schedule 4, right?
A. Yeah.
Q. Okay.
So, you picked three companies that you considered comparable to the DistroMint platform, right?
A. Yeah. I think the OpenSea in particular is nChain's selection.
Q. Okay.
Can I just ask, I mean, these -- were these all, like, legal entities, these companies?
A. OpenSea is a -- is a decentralized marketplace. I don't recall if it's an actual -- no, I think it would be 'cause it has some series of funding.
Some of the ones we looked at were not. Like the Audius used a governance token for -- to make its determinations. Those -- I think the others maybe are. The Believe one is.

DistroKid, I don't remember the structure of that one.

Q. Okay.

Now, according to your Schedule 4 here, each of these three companies, Believe SA, OpenSea, Distrofy kid, had annual revenues of a hundred million dollars or -- or more on valuation date.

Is that right?

A. Well, Believe SA had the enterprise value and annual revenue. So it had some numbers that we could use to get to the -- the ratio that you see there, the EB divided by revenue. When I put this schedule together that started with believe. OpenSea, it's not exactly the revenue. DistroKid with the same, that's not like a -- direct reported revenue. It's an extrapolation to get to that multiple.

The others didn't have any kind of revenue to get there.

Q. Okay.

So -- sorry, I didn't mean to interrupt.

I mean, you didn't get financial statements for OpenSea to confirm that was its annual revenue as of the valuation date?

A. No. I don't have financial statements for those companies. I think the -- the citations are in the schedule or in my re -- in my Appendix A for where these numbers are coming from.

Q. Okay.

And you didn't get any financial statements from OpenSea to confirm that that was its annual revenue?

A. This -- I mean, this kind of -- like, the blockchain-based company portion, right. So, no, I don't have the -- the financial statements for that.

For determining market volume and that kind of thing, that stuff wouldn't -- like, some of that stuff is public, which is a little bit different from your traditional records. Some of the claims that are made can be compared against public volume and public market volume.

Q. Each of the three companies you chose as comparable, though, had not been in operation for several years as of the valuation date, right?

A. I think so. I think they all -- I don't remember when DistroKid was first founded, but, yeah, those were -- those were all later-stage companies.

Q. Each of them had a significant number of customers or subscribers.

Is that right?

A. Yeah.

Q. None of them had -- were -- were pre-revenue like the DistroMint platform, were they?

A. They wouldn't -- if they were pre-revenue, I wouldn't be able to use them at -- to get to a revenue multiple. I think that's -- that's straight forward from the approach itself.

So, the -- the way this works is that you look for comparable companies and then adjust for the differences in that comparison. And so the first step is is this doing something similar; is it

selling something similar; does it have a similar customer base; is it -- you know, those are the considerations you make. And then you control for the differences in that next step.

Q. Okay.

A. Or the data -- the availability of data is a consideration. That would be the third one.

Q. So, but none of them were -- none of the companies you chose as -- as pre -- as comparables were pre-revenue, right?

A. How -- how would you choose a pre-revenue company to use for a revenue assessment?

Like, I -- I don't think I understand your question. The -- the comparable selections here are specifically to determine that multiple, right. The ratio there.

Q. Well, if it's difficult to find a company that's comparable to DistroMint, LLC, doesn't that suggest that the market approach is an unreliable method to value

it?

A. I think it does not go so far as to say it's unreliable. I think you can adjust that with the weight.

And I discuss that in my report also and in the reconciliation in Schedule 6.

Q. Okay.

But the fact that -- that you are having a hard time finding companies that are comparable to the DistroMint platform, that -- that does suggest that there shouldn't be that much weight put on the market approach, right?

A. Yeah. That's why I weighted it 25 percent.

Q. Now, the way that you -- the way that this valuation works is you -- you took the enterprise value and you divide it by the annual revenue for each company and came up with an enterprise to revenue multiple.

Is that right?

A. Yeah. I mean, we -- I -- the -- the column title there for annual revenue

really just refers to Believe SA. The other two are extrapolations.
Q. Okay.
And -- and then --
A. But, yes, to answer your question, sorry, that's just a simple division.
Q. Sure.
And then what you did is you took each of them -- if I call them revenue multiples, you'll know what I mean?
A. Yeah, that's fine.
Q. Okay.
You took each of the revenue multiples and then you averaged them together into your selected multiple, right?
A. Well, I did a couple of different things. I have the minimum there, the median, the mean, and then the maximum. So each one of those is there, and then the selected one is the mean.
Q. Which is the average, right?
A. Yeah, yeah, that's the average.

Sorry. But I -- like, you were asking if I only did that. So I was answering no, I didn't only do that. The -- there are other things that happened before that.

Q. Okay.

But the outcome of your market approach is -- is highly sensitive to how you -- how you calculated -- or how you combined the --

MR. RUOCCO: Let me ask a better question.

Q. The outcome of your market approach is highly sensitive to how you chose the selected multiple for the valuation, isn't it?

A. No. How I chose it is the selection itself. The -- the -- each individual one, like, that would change it, but the method for, like, pushing the button is not the thing that drives it.

Q. Okay. Okay.

The outcome of your market approach is highly sensitive to the selected multiple that you chose.

Isn't that right?

A. Yes. Yeah, I mean, multiples -- the multiples here and in general, that's a -- it's a super sensitive thing.
Q. Just for example, if you had chosen the median of the three revenue multiples, that would be less than half the multiple that you -- you used, right?
A. Yeah. Yeah. I mean, it -- yeah, it's highly sensitive to that.
Q. I mean, if you had used the median instead of the average, the output of your market approach would be less than half of what it was, all else being equal, right?
A. Yeah. It's -- I mean, it -- I mean, it's not linear, but, yeah. It's -- or, I think it might be.
But the -- the multiple is super sensitive. And so that's why you have to take a lot of care in making sure your -- your comparables are actually comparable, that you're making adjustments to reduce that, and that you're excluding things that would result in something much higher, like the funding rounds for some

of those others and the revenue for some of those others, like the -- the multiples for companies that were similar here are in the higher double digits, which -- which just seemed hopeful, I guess would the best use of it and the best way to -- to say that.

And so that selected 4.6 is low as far as the overall industry is going, but that incorporate -- like, the reason we did the average because that incorporates those comparables and applied those adjustments.

Q. Okay.

And then if we look down to the next part of the -- of the schedule. So, you apply your selected 4.6772 multiple to the year 3 revenue from your DCF analysis, right?

A. Yeah.

Q. Okay.

So, if there's any problem with the way that you calculated the revenues for your DCF analysis, that would also affect the output of your market approach,

correct?
A. Did you -- there's no problem here. Like, all of that math works.
Do you mean, like, if there's disagreement on one of the inputs?
Q. Sure.
Let me ask -- so -- so, if the inputs you used to calculate the revenues in your DCF analysis are incorrect, that would affect the output of your market approach too, right?
A. Are -- are you saying that the sources that I cite have a different number in them? Like -- like, I'm struggling with the use of the term, like, problem or incorrect.
Q. Okay.
A. Because the -- these are inputs.
Q. I'll --
A. They're -- an error here would be a mathematical error. Like, there is a problem in how the calculation works, and that's not true. Like, there's not a calculation error here.
And so, if there's some other

input, like if you think that there should be 5,000 paying subscribers, then that would change year 3 and that year 3 number would also affect the market approach.

Q. Right. Okay.

So, right. So if there's any change to the inputs in your DCF analysis, that would change the output of your market approach too, right?

A. Yeah, higher or lower.

Q. Okay.

A. Yeah.

Q. And also if -- if someone determined that your DCF analysis was unreliable, that would make your market approach analysis unreliable, right?

A. How -- how would you determine that it's unreliable? Like, the numbers are cited. The rates come from the same places.

That are also cited. Those -- like, those are all that I described, like.

Q. I --

A. Determination of an

unreliability there would still have to result from a disagreement in -- on the input, which is not a reliability consideration. A reliability consideration would be, like, the mathematical errors there or, like, the numbers are wrong or -- and so the numbers aren't wrong. There may be a disagreement as to what they, like, what they should be, but to say that they are wrong means that there's some document out there that disproves them, and that's not what this is. Like, these are assumptions with a lot of basis based on subjection descriptions on knowledge and experience of this industry of what was going on at the time. Like, there's a lot of different moving parts to that.

And so, I -- I understand your -- your question, but it -- it, kind of, understates or overstates the severity of a change to this.

Q. I guess what I'm saying is if -- if the whole of your DCF analysis is, let's say, excluded because it's unduly

speculative, your market approach analysis would also have to be excluded, right? It doesn't stand on its own.

A. I don't think that's true. Like, if you excluded the income approach, then you would have to have a different basis for what goes into the market approach, right. Because I'm looking at the stabilized revenue there. And so the math there still would work. You would just have a different input.

Q. You -- you would have to have a different revenue input, right?

A. Yeah, you have -- you would have a different revenue number, sure.

Q. And if -- if -- if you couldn't get a revenue input from your DCF analysis, where would you get it from?

A. I mean, where -- in your hypothetical, it's someone else who is determining a revenue input. So that someone else would be the one that should say what they think it should be.

Q. Okay.

Now, if you also -- the -- the

return required per Schedule 5 is 27 percent here.

Do you see that?

A. You -- you cut out. The return what?

Q. This line here required return per Schedule 5 is 27 percent?

A. Yeah.

Q. -- that -- the required return per Schedule 5 that references the 27 percent discount rate from the DCF?

A. Yeah. Again, that's the -- the pre-money IPO table for the VC approach.

Q. Okay.

Any change to the discount rate for purposes of the DCF would also affect the market approach, right?

A. So, any change to the required rate of return, any change to the stabilized revenue, whether or not it comes from the income approach would change the market approach, right. Regardless of where the number comes from, if you change the number, then the calculation is going to change.

Q. And here in your market approach, you took a 25 percent discount for size and stage adjustment.
Do you see that?
A. I do.
Q. And -- and where did you draw that 25 percent discounts for size and stage?
A. That's the same source I was talking about earlier. That size and stage consideration that's described in the footnote of my report is a -- consistent with the treatises that are like Damodaran and Pratt, and I think there's one more I mentioned earlier. Those are the VC approach for the range. That range is between, like, 25, 30 percent, 25, 35 percent, something like that, and that's where this numbers -- where these numbers are coming from. That early stage size -- let me go back to the market.
So that size and stage adjustment, that's the -- the comparison of DistroMint against those comparables.

So is it substantially smaller? Yes.
Is it earlier stage than these? Yes.
Then it should command a higher discount ratio -- I mean, not a ratio. A higher size an stage adjustment there.
Q. But here all else being equal you're -- you're saying with the size and stage adjustment that the DistroMint platform should be treated as if it's 75 percent of these other more mature companies, right?
A. No, that's not how you should read that.
Q. Okay. Well, how should we read it?
A. Sorry.
That's a weird thing to -- to say.
The -- like, that adjustment is saying it's different than the comparable and, like, this is the consideration for how it's different. Like, it may be smaller, but it's doing the same things. And so I'm not saying it's got 75 percent

of the revenue or something like that. That's not what that means.

Q. Okay.

You also took a 30 percent discount for lack of marketability, right?

A. Yeah.

Q. Okay.

And what was the 30 percent discount for lack of marketability drawn from?

A. That -- that's the restricted stocks. That is the range there is from 25 to 40 percent. There's a lot of restricted stocks studies out there.

The discount for lack of marketability is really, like, can you sell this and can you sell a hundred percent of the shares of it.

Usually you apply a DeLong where the company's closely held, and in this case, they're two 50 percent owners, right. In dispute, but that's -- that's where they are. So you've just got two owners there. This discounts for lack of marketability is that where what portion

could you possibly sell? Is this a sellable thing at all? And is it something that is easily rebuilt without buying this company? Like on a different platform or with a different -- not on a different platform. A different platform on a different blockchain.

And so, that's kind of all rolled into here, like how -- how sellable is it in that sense.

Q. Okay.

You -- you mentioned some treatises that you say are the basis for the 25 percent -- or, sorry, the 30 percent delong, but you don't cite any of those here in your report, do you?

A. No, I don't cite them 'cause they're not really standards in that sense. They're overall guidance, right. This comes from Damodaran. It comes from Pratt. It also comes from me now. I don't cite myself in my own report. That seems self-serving, but the -- the rates here, like the stage assessment, the -- the company development assessment, the

fact that it's blockchain-based, whether or not its IP has been publicized in versions of smart-contracts, like whether or not those smart-contracts are copy/pastable to transfer to a different blockchain or if they require some additional development to transfer to a different blockchain, all of those considerations are, kind of wrapped into this.

Q. You don't take any discount for lack of control in any of your valuation approaches, do you?

A. A -- a discount for lack of control would usually apply to when you're selling a portion of a company. So you're -- you're valuing a -- a certain fraction of the -- the overall entity, and this is a hundred percent valuation. So there's no discount for lack of control when it's a hundred percent of the entity that's lack of control.

Q. But you didn't take any discount or adjustment to reflect for the fact that in this enterprise it's allegedly split

50/50, one owner could not sell the enterprise without the consent of the other, did you?

A. No, because that, again, that, kind of, goes into my answer where you're talking about selling a fraction of the overall enterprise and not the whole of it.

Q. No, I want to clarify my question.

What I'm saying is assume you're going to sell the entirety of the enterprise, you didn't take a discount or adjustment to account for the possibility that the -- the enterprise could not be sold without the consent of both owners, correct?

A. I -- I think that gets back to that un -- the overall premise of value, right. That's your hypothetical willing seller and your hypothetical willing buyer. To add the component of a discount for lack of control because the -- there's a disputed structure of the sellers is another component. That's -- that's not

considered here 'cause it's, again, a hundred percent. I'm not -- I'm not -- like in your -- in your question you're saying that there's not actually a hypothetical seller. There's only a piece of a hypothetical seller and that the hypothetical sellers require some consent and what I'm saying is that that, premise of value is willing seller, not half of one.

Q. I mean, to understand that though, don't we have to know who the sellers are?

A. The -- why would I need to know who the sellers are if the hypothetical is willing seller and willing buyer?

Q. You -- you don't -- I mean, to assume whether or not you you're actually correctly applying the fair market value valuation, right? Whether one seller is being compelled to sell or not, you'd have to know who they are?

A. The -- the compulsion there is still part of the fair market value definition, right. The fact that there is

no compulsion, the -- the willingness piece is there. Knowledge of relevant facts is there. And neither is in distress, right. It's the -- the willingness.

And, so, I can -- I -- I think I understand what you're asking. Like, it's an additional hypothetical on top of this market approach. You could apply a discount for lack of control, but that's usually applied to a portion that can't be sold because it requires consent or something like that, but in this case, the premise of value is a hundred percent is being sold. That's -- that's the -- the overarching presumption.

Q. Is it your testimony that you can never have a discount for lack of control when what is being sold is 100 percent of the enterprise?

A. No, that's not my testimony.

Q. So -- so you can have a discount for lack of control when you're selling the entire enterprise?

A. Yeah. People apply discounts

for lack of control for a wide variety of reasons.

The question that you asked is did I apply one in this case, and I said no.

Q. Okay.

Now, you only applied the discount for lack of marketability in the market approach, right?

A. Yes.

Q. Okay.

So you did not apply it in the income approach or the cost approach, right?

A. So, the discounts of lack of marketability is in the -- in -- like, specified in the market approach.

The income approach is based on a revenue stream.

The discounts for lack of marketability applied to a revenue stream would -- would be weird, but it would be, kind of, inherent in that -- in the discount rate that you used to determine that stream. And in the cost approach, a

discount for lack of marketability is -- I am not -- the cost approach itself is the cost to recreate. It's not -- it's not the same thing.

Q. Okay, but reasonable all three of your value approaches trying to value the same thing?

A. Yeah, that's -- you take three different approaches and then try to reconcile those approaches with the, you know, relevant facts and circumstances at hand.

Here, the market approach and the discount there, as I explained is, like, part of the restricted stock study piece, part of the comparison back against those comparables.

Q. So --

A. The overall -- the overall value is a combination of those.

Q. Right.

So in each of our your valuing approaches, you are a trying to estimate what a willing knowledgeable buyer would have paid for the DistroMint platform on

the valuation date, right?
A. Yeah.
Q. Okay.
So the discount for lack of marketability should apply to each your valuation approaches, shouldn't it?
A. I don't -- I don't think that's the appropriate use of that discount, right. That you're double-counting the different things that are already inherent to the other two approaches, or that's not the appropriate thing. Like, you don't discount a cost approach when you're recreating costs. That's -- I mean, there's some ways to -- that you would do some of that depending on currencies and whatnot. But, like, that's a cost to recreate.
And so, that's different from what someone will pay for a thing, right. And so, what someone will pay for a thing is not each of these individual numbers. What someone will pay for the thing is the conclusion of value and these are each components that build into that. Cost

approach is one. Market approach is one. The income approach is one.

Q. If you had applied the discount for lack of marketability to the income approach, the valuation would be lower, right?

A. Yeah, if I lowered one of the components, sure, then the overall reconciliation would be lower.

Q. And if you applied the discounts for lack of marketability to the cost approach, the valuation would be lower too, right?

A. If you -- if you reduced each component, like, just by a function of how the math works, yes. In the same way if you increased each component, yes, those would -- those would increase or decrease with the increases or decreases of the components. Unless you then weighted any one of those components that you discounted to zero.

MR. RUOCCO: Okay.

Why don't we take a break? Go off the record.

MR. RISPOLI: Yeah.
THE VIDEOGRAPHER: The time right now is 3:18 p.m.
We're off the record.
(Recess taken.)
THE VIDEOGRAPHER: The time right now is 3:30 p.m.
We are back on the record.
MR. RUOCCO: Welcome back.
BY MR. RUOCCO:
Q. Let's take a look at your cost approach analysis, okay?
A. Sure.
Q. So, that's in Schedule 3 here, right?
A. Yep.
Q. And actually, before we look at Schedule 3, can we turn to page 20 in your report?
A. Are -- are you sharing your screen right now?
Q. Sorry. I thought I was.
Here we go.
(The above mentioned exhibit was published.)

BY MR. RUOCCO:
Q. So, cost approach you state: The cost approach estimates replacement cost new less obsolescence and indicates a floor rather than a going-concern value.
Do you see that?
A. Yes.
Q. And that -- that's an accurate statement of your view of what the cost approach is supposed to value?
A. I mean, it's -- it's a recreation cost. So I don't -- like, that's what that schedule is doing.
Q. All right. Let's look at the schedule then, please. Schedule 3.
Okay. So, here at the top you have several costs in the "Development" category.
Right?
A. Yes.
Q. Okay.
And essentially what this part of your schedule here is showing is the -- the person hours that it would take to recreate the DistroMint platform.

Is that right?
A. Yeah, the FTE, if there's full-time employee.
Q. Right.
And so, for purposes of your cost approach analysis, you assume that there would be 27 people working full-time for eleven straight months to build a recreation of the DistroMint MVP site.
Is that right?
A. Yeah, you -- yeah, that -- that's pretty much it.
I think there's no -- this is just straight multiplication for each one of those rows.
Q. What is your assumption that there would be 27 people working full-time based on?
A. Well, it was looking at everything nChain said about this project, looking at how many people were involved in the different communications for it, and then what their public statements were about it. So, there were -- I don't remember -- I don't remember the exact

number of people all in the communications, and I remember it was substantially fewer than what their public statement -- there -- was. Their public statement was that 200 people worked on this. So we tried to use that for what it was as a public statement and looked at how many people were in the communications they had turned over versus what it would likely take to rebuild something of this scale.

Q. Did -- did you actually find files from the nChain production showing that there had been 27 people working full-time on the project at any given time?

A. No, that's not what this is.

Like, this is -- this is not a document that -- that says here's what nChain -- here's the number of people that nChain said worked on this. nChain said 200 people worked on this. That's not what's here.

In their documents, they have -- I don't think they have an employee count

like that for this date.
There's a wide variety of communications with different people on them and, like, different developers on and off and different roles and stuff. But they don't have, like, a count equals 27, and that's not what this is.
Q. And so if it wasn't based on files showing what nChain or one of its affiliated entities did in connection with the development of the DistroMint MVP site, what was it based on?
A. I -- I think I -- you're misstating my testimony in your question.
Q. Okay.
Well, I mean, you're saying that you reviewed files from nChain's production and you didn't see any documents showing that nChain ever had 27 people working full-time on the development of the DistroMint MVP site, right?
A. That's right.
And I also stated that nChain said 200 people worked on it.

Q. Were you referring to a -- a marketing article that they put out that they referenced a 200-person development team, right?

A. Your characterization of it is one thing. The fact of that matter is it's a public statement made by nChain. That's -- that's what it is.

A characterization of it is not something I offer.

Q. Did you try to reconcile the number of full-time employees used for purposes of your cost approach model with the number of full-time employees who worked on the development of the DistroMint MVP site at nChain or one of its affiliated entities?

A. So, your question has a couple of parts there.

There -- the -- the at nChain answer is zero. There were no employees. I think it was Dale Evans testified something like the creators owned the code or something, but the creators are not nChain UK Limited. The creators in that

regard are nChain d.o.o., the Slovenian coding team.

We looked at how many different names there were, what those roles were over time.

We didn't have records produced by the Slovenian team specifically. There were records produced by nChain UK Limited that contained communications with that team. We don't have, like, records that show how many employees that group had or how many people worked on it over time. I know we looked at that. Like, it certainly wasn't 200, and it wasn't, like, what was limited to just the production because it was an account of employees over time.

And you also had to consider this isn't a recreation of what nChain did to develop this. This is a recreation of what it would take to rebuild this without nChain, if you had to -- to start over from scratch, what would you have to do to do that.

Q. Right.

But you wouldn't assume that it would take someone else a lot more man hours to recreate the DistroMint MVP site than what nChain actually spent on it, right?

A. nChain said that 200 people worked on it. So even if what each one worked a handful of hours, that's a substantial amount of man hours.

Their contemporaneous hours and stuff like that would be something different that don't really -- it's not consistent with the 200.

The -- here, the 27 amount, if you're going to build something different on a different blockchain using different asset mechanisms and everything, that code is not copy/paste transferable, which would be a consideration if this was on some other kind of blockchain that was a fork of another one. BSV is that, but the other NFT marketplaces are not built on the same fork sources, basically.

And so, if you were going to recreate this, you would have to rebuild

it without using that original code 'cause the original code was designed to work only on the BSV blockchain, and that's not copy/pastable to the other marketplaces. So you would have to redesign that.

This is what that would entail. Like, what are -- what's the work that would need to be done to redesign that and -- and build it out.

Q. No, you -- but your cost approach is supposed to value what someone would pay for the DistroMint platform as it existed on the valuation date, correct?

A. The -- the cost approach, it sounds like you're giving the definition of the fair market value and then using the cost approach as the answer to that fair market value question.

The cost approach is one component of that.

Q. What I'm -- what I'm saying --

A. It's a -- this -- this is a recreation, basically a buildup model. It's the cost it would take to recreate that.

Q. Right.

But what I'm asking you is in the cost approach, what you were supposed to recreate is the DistroMint platform exactly as it existed on the valuation date. Isn't that right?

A. Why -- why do you think that's a presumption for exactly?

So, and -- and I have a footnote here, right: nChain is the end associated with Bitcoin SV following the exit and distancing of its key personnel. That would be Craig Wright, science officer. He was ruled in 2024, I think, to -- to have made, like, I think the language was deliberately provided false evidence or something.

You have to consider whether what you're building is going to be viable. And so this recreation approach is also a viability assessment. You have to recreate a functioning platform, and that re-platforming and launching layer to a different chain is a component of that cost.

As of October 2nd, 2023, the controversies around one of their key personnel, those things were knowable facts, and so that was something that was part of this consideration.

Q. Right.

But in your report, right, you -- you have a long narrative about the obsolescence of the Bitcoin SV blockchain, correct?

A. I don't think it's that long. There is some description of it.

Q. Right.

Let's take a look at your report.

(Pause.)

Q. So, you said here -- bear with me a moment.

(Pause.)

Q. So, in the cost approach, you said that you're supposed to estimate the replacement costs new less obsolescence.

Correct?

A. Yeah. I -- I don't think that's what you're supposed to do. I say that's

what it does.
Q. Okay.
A. That's what I'm doing in the cost approach.
And even if you were going to rebuild this thing on the BSV blockchain, you'd have to hire other people to do that that weren't nChain, right? nChain is one -- or, their chief scientist is the person who created the BSV blockchain. So there are some synergies there that you have to account for if you're going to recreate this independently.
Q. Let -- let's back up a second.
So, in -- in the cost approach, what you were valuing is the cost to the buyer in a prospective transaction to recreate the thing that they are buying, correct?
A. That's one way to characterize it. I don't know that it matters in the -- whether the transaction piece is there or not. It's really just the cost to recreate.
And that's -- that's what I'm

talking about there. It's just a replacement cost. You can talk about the new -- building it new less the obsolescence. That's there, but I don't know that it really matters. That's just the cost to recreate.

Q. It does matter, though, right? Because a buyer, right, is going to pay less money for a software product based on an obsolete blockchain than a product that's not based on an obsolete blockchain.

Isn't that right?

A. I see. If you -- if you're going to rebuild it on the Bitcoin SV blockchain, then you would expect some discount as a result of its obsolescence. Whereas if you just rebuilt it on any blockchain, then you wouldn't have a discount for that obsolescence.

Is that what you mean?

Q. I guess here's my question.

Your cost approach is not -- is trying to estimate the cost to recreate the DistroMint MVP site exactly as it

existed on the valuation date, correct?
A. That's not correct. You've replaced the whole platform with just the MVP. Those are two different things.
Q. But -- but in -- this gets back to defining what it is that is the subject of your valuation.
What you are valuing in your report, right, is this DistroMint enterprise that existed on the valuation date, correct?
A. Yes.
Q. Okay.
So your cost approach would need to estimate the cost to recreate the DistroMint enterprise on the valuation date, correct?
A. Sure. What you're -- what you're talking about there is the -- like, embedded in your question is the presumption that the MVP is the -- is what was in existence as of October 2nd, 2023, and I already explained that's not what that means.
The MVP had been built and

was -- like, the overall DistroMint was under active development. So it had -- it had gone beyond just an MVP. There were discussions in that -- in their production about ready to launch, right. The -- the public statement consistent with their contemporaneous communications. That's -- that's all referencing to that development.

And you -- you said something about it only being in MVP. I don't think that's the case. I think the references to the MVP happened much earlier in 2023, not October, if I remember right.

Q. The DistroMint software platform that was coded by nChain Slovenia was only ever based on the BSV blockchain, correct?

A. I don't -- I think that, yeah, that's true, as far as I know. The nChain itself only builds things as -- like, on the -- on the BSV blockchain, or at least did. That was, like -- that was, like, the purpose of their existence was to promote the use of the BSV blockchain because their chief science officer was

the one that forked it from Bitcoin Cash.
Q. So, if you were going to replace the DistroMint software platform on the valuation date, you would be replacing it with the same software platform also based on the BSV blockchain, correct?
A. So, I -- I don't think so. This cost approach is not to recreate it being built on the BSV blockchain. It's just the functionality, to recreate the functionality. You could recreate that functionality. Whether or not it's on the Bitcoin SV blockchain, you have to incur these cost to do it.
The fact that it's on the Bitcoin SV blockchain offers some synergies as to why nChain's costs would not be these cost because, again, the chief science officer, like, forked BSV from BCH, and their purpose as a company is to build things on this blockchain. That's -- that's different, and that's the purpose of the cost approach is to show what that difference is.
If somebody else recreated it,

whether or not it's on the Bitcoin SV blockchain, they would incur these costs to do so. So the obsolescence portion is a little bit separated from -- from this cost approach. If you did a cost approach for -- I mean, for if you added up all the costs that nChain spent on development, you would then have to add in what it would take someone to learn about the Bitcoin SV blockchain itself, like all the knowledge that they're bringing to the table that make their work more efficient, or cheaper basically. And so that's what this cost approach is doing, an independent recreation of that functionality, whether or not it's on the -- the Bitcoin SV blockchain.

Q. Your cost approach analysis proposes to build a product that is different than the one that existed on the valuation date, correct?

A. I don't see where you -- where you're getting a difference. There's no -- nothing in here that says it absolutely will not be built on the

Bitcoin SV blockchain. There's some commentary in here about how it's not likely that somebody would recreate it on the BSV blockchain, that the entity itself is distancing from key personnel, that there's a lot of other things going on there.

This is -- this is a recreation cost, and that recreation cost would be incurred whether or not you built it on the BSV blockchain. If you built it on some other blockchain, yes. If you had to hire other people who did not build the BSV blockchain to build on the BSV blockchain, they would also incur these costs.

And, so, like, that's --

Q. Looking --

A. It's not -- it's not what did you spend to build this. It's what would some independent person have to spend to build this.

Q. No, it's -- it's what would somebody pay you for the thing that you built, correct?

A. Okay.
So, it -- yes, the -- this is a component into the fair market value for what would somebody pay you to build, and a component of that is this cost approach for the recreation -- the recreation of it. That's -- that's still what this is.
Q. You -- you would agree with me the fact that the DistroMint platform was built on the BSV blockchain was an impairment to its value on the valuation date, correct?
A. I think there were some indications about the key personnel and there were some concerns about the decline. The BSV token value itself had dropped by, I don't remember, I think it's like 90 percent or 70 percent, something. It's in my report.
But the -- so, there was a severe reduction in the use and a community reaction to the controversies that were going on at the time.
Whether or not that impairs the -- the underlying functionality, I

don't think it impairs the underlying functionality because you could recreate this on a blockchain that it was forked from or you could recreate that functionality on any other blockchain, but the recreation costs of it is -- was contained in this schedule. The fact that DistroMint was on the Bitcoin SV blockchain was -- and the Bitcoin SV blockchain nChain itself were part of this, like -- embroiled in controversy, that's all stuff that -- that nChain, you know, would have expected them to, like, mention if they expected it to affect the -- the operation of this project. I didn't see anything like that in their production where they say hey, you know, Craig Wright is, you know -- had to admit this or that about making false statements, or, you know, the use of the BSV blockchain has declined substantially and that's going to impact your code or the code we built. I didn't see anything like that in their production.

Q. I'm just going off what you

wrote here in Note 2 to Schedule 3, okay.
A. Yeah.
Q. You said: nChain is the entity associated with Bitcoin SV following the exit and distancing of its key personnel Craig Wright ruled in 2024 not to be Satohi Nakamoto. The network ceased to be a available platform. Recreating a functioning platform therefore requires re-platforming on the on-chain layer to a viable platform.
Do you see that?
A. Yeah. Whether -- whether -- recreating a functioning platform therefore requires re-platforming. Yeah, if you're going to have it functioning at that point and you're going to recreate it after that date of value, sure. Like, that's -- that's kind of a footnote as -- as to the specific facts and circumstances of what was going on at Bitcoin SV at the time.
Q. Right.
And so here in your -- in your cost approach model, you have $1.87

million in costs associated with re-platforming the DistroMint platform from the BSV blockchain to a different blockchain.

Is that correct?

A. That's correct. I mean, the rest of that -- that sentence is specifying that additional cost, not a depreciation of the existing build and whether or not that -- that shutdown is attributable to nChain. Like, all of that is -- is part of that -- that component.

Q. Right.

So, rather than deduct the obsolescence from your cost approach, you added it on top.

A. If you -- if you were going to rebuild this on the Bitcoin SV blockchain and presume that the Bitcoin SV blockchain was also go -- a going-concern, which would be a stretch at this point, then you would deduct that cost.

Here, I've already considered it and I'm showing what that consideration is. So it's like -- it's like half a

dozen one way and six of the other. You're approaching that from two different directions. You would either rebuild it and presume that BSV was an ongoing concern recognizing that it wasn't discount that recognition or recognize already at the start that it's not viable and consider the recreation costs in that way.

Q. Your -- your -- your cost approach assumes that the buyer is recreating this DistroMint platform from scratch, correct?

A. Yeah.

Q. And then essentially what you're assuming is that they're going to build it on the BSV blockchain which you determine to be obsolete and then re-platform it to a different blockchain, correct?

A. So, you have to build the thing and you still have to do the code and security audits. You still have to -- yeah, I guess if you already had assets on the Bitcoin SV, then you would have that component of the asset migration. They

had some talks about art being uploaded and then that on-chain layer, moving that from one to the other.

Those components are part of moving from one blockchain to the other. That's what that is. And so if you were recreating this on the Bitcoin SV blockchain, you would have to re-platform it. You would -- you would recreate it on the Bitcoin SV plat -- blockchain and then you would have to re-platform that -- that cost and that was all something that you would have to do. That's something that was happening at the time.

Q. Right. But a buyer would not pay the owners of the DistroMint platform for its own costs to re -- re-platform that platform to a new blockchain, would it?

A. The -- if the buyers are buying a Bitcoin SV-built thing, then they would incur the re-platforming costs after they bought it.

Q. Correct.

So, the $1.87 million shown here

in your -- in your cost approach valuation should be subtracted from your valuation, not added?

A. Would it -- you mean it should be subtracted to the total after it's added, or are you talking about it's to be subtracted from the subtotal of it?

Q. I'm saying if you think everything here is -- is correct, and that's the cost it would take if you think that the development costs and the software costs represent the cost to rep -- to recreate the DistroMint software platform as it existed on the valuation date, a buyer would then subtract the re-platforming costs from -- from those other costs to recreate the thing that existed, right?

A. That's -- I think that's what's contained in footnote 2, right. So to define this separate re-platforming cost because that's the specific facts and circumstances of this case where it's on Bitcoin SV, it was built on Bitcoin SV, whether or not someone would incur those

costs or whether or not nChain disclosed the fact that this was being deprecated and that it affected or impacted that code, whether or not re-platforming was ongoing. Like, all of -- all of those considerations are part of it.

And so, since you couldn't determine whether or not that was happening, I didn't see anything in there, but maybe they used different language or something. If that had happened, then the re-platforming would already be a consideration of those costs incurred. If somebody was going to go rebuild this from scratch on the Bitcoin SV platform, then they would have to re-platform it because Bitcoin SV was later deprecated, and that's -- that's just a function of this. That's what the point of that -- that footnote 2 is in there.

Q. Right.

I guess my -- my question is is this: The fact that the nChain platform as it existed on the valuation date was built on the BSV blockchain should make

the valuation lower than what's reflected in your cost approach, correct?

A. The -- so the fact -- I see what you're saying.

So, the recreation of it would not also incur re-platforming because someone wouldn't buy the Bitcoin SV version. They would just go recreate it. But then that, kind of, gets at the un -- the overarching premise of value for what's being recreated here.

Q. Right.

And what they would be recreating is the thing that existed on the valuation date, right?

A. It depends. Like, the -- the costs to recreate this are in those first two sections. The costs of re-platform are what's in that third section, and those are each costs that were -- would be incurred depending on how it was going to be recreated. That's why I segmented them out and didn't embed them in the other two categories.

Q. But if -- if a buyer was going

to buy the DistroMint software platform as existed on the valuation date, it would expect to take a deduction to the price to account for the fact that it would have to re-platform the software that existed, correct?

A. I -- I guess that would depend on whether or not nChain was in the process of re-platforming off the Bitcoin SV blockchain at -- you know, as a result of its impending deprecation.

Q. And have you seen any evidence that nChain wasn't in the process of re-platforming the DistroMint platform on the valuation date?

A. No, I testified earlier I didn't see anything where nChain had communicated that concern to the plaintiffs in this matter.

Q. Okay.

Now, going back up to the development costs. The monthly costs per category here, how did you calculate those?

- - -

E V E N I N G   S E S S I O N

- - -

A. The -- the dollars per month in there?

Q. Yes.

A. I think that's just knowledge of software engineering in general. Basically salaries of what those -- those costs would be.

Q. Okay.

A. What those positions would be.

Q. How did you come up with the monthly costs for each of the roles shown in this part of Schedule 3?

A. Those are -- that's just basic, like, salary positions for those types of individuals, those types of workers.

Q. Did you do any market research to determine what people in the market were paying for people working in roles like this on the valuation date?

A. Yeah, I'm sure we did some research as to, like, what was any of -- these are all round numbers, right. So

they're not, like, calculations from something. These are -- these are just based on soft -- basic software engineering costs at the time.

Q. Which were drawn from what?

A. Well, I mean, I taught software engineering and have built software in the past. But also this is -- it's just research, right. Like, what these things are, what they cost over time. I mean, for their positions. I keep saying over time.

Q. Research from what sources?

A. I think I provided a lot of those sources, but it's really just, like, basic knowledge about how much this kind of development costs. Like what it -- not -- not the overall cost, but each one of these positions, like, this.

Q. Okay.

Now, if -- if you -- you also assumed here that all the -- the people working on recreating the platform would work for full-time for eleven straight months, right?

A. Yeah. Like I said before, these are -- these are straightforward. I mean, straight multiplication.

Q. Are you aware of any development activity on the DistroMint platform having happened before 2023?

A. This -- this isn't something that is specific to the DistroMint activities engaged in by nChain. I think I've explained that before.

Like, this is not a reflection of nChain's development costs. This is the cost to recreate it.

Q. Is it your understanding that it took nChain less than eleven months to create the version of the DistroMint platform that existed on the valuation date?

A. Yeah, I think the -- the beginning of that was somewhere around December 2022, if I remember right, and then through October of 2023. So you're getting close to eleven months from the beginning of those communications to the -- the date in the Complaint.

The eleven-month portion of that, though, again, is -- is not a reflection of nChain's own development because they don't have that granular level of detail in their production. There's some communications about it, but you don't know how many hours people were working. I think when I was looking for that, there was -- there weren't any, like, that granular level of detail which developer and how many hours on which days.

And then Dale Evans also testified later that I think when he was asked what the support was for the development costs, his answer was privileged because stocks being privileged.

Q. Okay.

Now, the developer incentive at 15 percent, what is that?

A. Developer incentive, that's an additional cost paid to developers. Like, finish fast, finish early or piece -- sometimes you do this as equity, but

that's what that is.

It -- it should be discernible from the meaning of the words.

Q. Okay.

That represents just under 10 percent of your whole cost approach valuation, right?

A. Under 10 percent of the whole -- 600,000 over 7.2 million? I mean, it's -- it's specifically 15 percent of that subtotal.

Q. Right.

I'm just -- you haven't seen any evidence that nChain Slovenia paid the developers there a 15 percent incentive for their work on the DistroMint platform, right?

A. There -- there might be something as far as what -- what companies were paid in the most recent production that, like I said, hasn't -- I haven't been able to view in detail.

I know Dale testified to a lot of different service agreements and on a wide variety of entities. So I don't know

what the content of those service agreements were. I suspect some of those service agreement might be in the most recent production.

Q. But you just haven't seen files from the nChain production indicating that the nChain Slovenia developers were paid a 15 percent incentive for their work on the DistroMint platform, have you?

A. I -- yeah, again, this is -- this isn't a reflection of what nChain spent to develop a thing. It's a cost to recreate this independently.

Q. Okay.

If we took out the developer incentive, that would bring your cost approach valuation down, right?

A. It would bring it down by exactly $613,800 because, I mean, that's how the math works.

Q. All right.

If we reduced the number of FTEs that you used for purposes of this calculation, that would also reduce the -- the cost approach valuation you came up

with?

A. Yeah. Yeah, I mean, it's basic multiplication. So if you reduce the cost to recreate it, then of course the total sum of those cost would also reduce.

Q. Okay.

And the same is true if you reduced the number of months, right?

A. Yeah. I mean, un -- yes. I guess with the exception that unless you then increased the dollars per month to make up the difference, but that would be moot. I don't think that's what you're asking.

Q. The software licenses part, what are the third party integrations and licensing costs reflected here?

A. Just what -- what do you mean what are they? They're $200,000 for integrations and licensing that you may need to use to use other parties. Like integrate with some, like -- I guess a good example would be accounting software integrates with your time entry software, right. Those are integration costs. Or

your payment software integrates with your website software, right. Those are your third party integrations.

Q. Okay.

The $200,000 amount that you assumed for third party integrations and licensing is not based on anything from the document productions in this lawsuit, is it?

A. I mean, other than -- no, and I would so caveat that with the recent production contains service agreements, and I haven't been able to review the terms of those service agreements. So to the extent I've been able to review the things that were provided for this report, no, they're not -- they're not there. If they were, there would be a citation.

But, again, this isn't a -- a recreation of what nChain spent or what -- what the plaintiffs spent. This is an -- what it would cost to recreate that independently.

Q. Okay.

What -- what -- what are the

security and smart-contract audit costs referenced in the next line?

A. When you -- when you write code and you put that code on your personal computer, then it will run on your personal computer. But when you write code and you put it on a blockchain, everybody can see that code and attempt to attack it. And so you -- to make sure that that code is secure, doesn't have any loopholes that you missed or doesn't have the ability for someone, to, like, drain all the wallets that's connected to that smart-contract to that -- to that code, you have third party audit review that code to make sure that it's secure and -- and that the interactions among a variety of smart-contracts are also secured.

That's true for software code in general, whether or not it's based on a blockchain. That's just, kind of, the example I gave because of the public nature of it.

Q. Okay.

That's not based on any of the

files you've reviewed from discovery in this case, right?

A. In -- in -- in so much as these were things that were components of building out the software, yeah, it is that. Like, there are third party integrations. There are third party licensing.

I don't remember if they actually did a security audit. They should have. I don't remember if I specifically remember that part, but these are -- these are components that are in there, right. The cloud -- the different cloud infrastructures that you need. They talk about how they didn't own the domain for AWS. I mean, they didn't own the domain for DistroMint.com. They used end servers to do it and a bunch of cloud infrastructure stuff and then also the patent prosecution. Like, these aren't just components that I made up out of thin air. These are components that are specific to rebuilding the -- the DistroMint platform.

Q. Okay.
But did you see any files in the course of reviewing the discovery record in this case that suggests that nChain and the plaintiffs incurred $150,000 in security and smart-contract audits in connection with developing the DistroMint platform?
A. Even -- even if there had been a complete disclosure in this matter from all of the different subsidiaries, that kind of cost wouldn't be contained in those documents because I think Dale Evans called them re-charges or chargebacks, or maybe that was in the production, where the interactions among all the subsidiaries were measured, but the costs to do that are not the same as the independent recreation costs. And so I wouldn't have used, like, their internal payment to their own internal developers or their developers of a subsidiary or their licensing fees to something that they had a majority interest in. Those are -- those are all not an independent

recreation cost.

Q. So, does the third party integrations and licensing costs you put at $200,000, the security and smart-contract audits you put at $150,000, both round numbers, are -- are -- are these numbers just based on your general understanding of the way costs like these work in the industry?

A. Some of this is general understanding, but, again, the component itself is a product of how this was built and the communications around how it was built.

Q. But you don't cite any of those communications here in Schedule 3, do you?

A. Yeah, there are -- there are things that are cited down in the footnotes, but I think I also described quite a lot of how this was built in my report.

Q. The citations in the footnote are not -- are not for the -- the costs shown here in the software license part of this schedule, are they?

A. What -- your question was that the things here were not part of the costs? No, that's not true. The -- note at the bottom is the -- about the team members and how many hours had been spent and -- and in that single month.

Q. We're talking about the software licensing costs, right?

A. You're specifying that particular category, not the overall costs.

(Cross-talk.)

Q. You understood my question when I asked it.

A. You asked me about the -- the overall costs and that the footnote wasn't -- that the footnotes didn't reference anything about the costs.

Q. Okay.

Do the footnotes relate in any way to the software license costs shown here in Schedule 3?

A. So, footnote 1 is talking about the third party integrations and the lysing -- licensing. Those are the parts

of those components that I was talking about.

Q. Okay.

And what's -- what's the relevance of footnote 1 to -- to the assumptions you made about the software licensing costs?

A. That those reliances on the third party integrations were part of it, that they weren't planning to not use a fiat -- a third party fiat conversion. They weren't planning to use, like, their own bank, for instance. They weren't planning to use their own wallet software as much as HandCash is, you know, debatable as to who controlled it when that they were integrating with third party systems, and the -- the majority interest in asset layer, also those are all components that are part of this. If they hadn't had those third party integrations and didn't have software licensing and didn't discuss, like, the IP licensing from the plaintiffs, then that wouldn't be a component in here.

Q. Okay.
The Cloud Infrastructure During Build $176,000.
$176,000 is kind of a specific number, isn't it?
A. Yeah, it's $16,000 per month, basically. That's -- I guess if you had the -- the spreadsheet version in there, then you would see that number. That's -- 176 is not as round as 16,000. I try to round these to, like, the nearest thousand.
Q. Is the $176,000 referenced here meant to relate to the $176,000 worth of cloud credits Mr. Finnerud claims he -- he secured in connection with the development of DistroMint?
A. Yeah, it seems like it was a credit that with that kind of reference that would put it there, but that's a value for the cloud infrastructure that you could use to recreate. But that's -- I mean, it's -- the -- the formula behind here is 16,000 times 11. So I don't think so.

Q. Okay.
Is it -- is it your testimony that "Cloud Infrastructure During Build" line item has nothing to do with Mr. Finnerud's allegation that he secured $176,000 worth of crowd -- cloud credits?
A. No. I mean, that's -- it's exactly the same number. So I can't sit here and say that no, they're nothing to do -- it's just a coincidence they're exactly the same.
If I had to guess, I think that I was trying to figure out how much per month that would be and whether or not a software at this scale is supportable for that kind of monthly spend.
Q. Are you aware that no one ever paid for those cloud credits in connection with the development of the DistroMint platform?
A. It -- it wouldn't matter if somebody had paid $2 million for those -- for that platform.
The purpose of this is an independent cost to recreate.

Q. Okay.
"Development, Tooling, and Saas," just what do those costs represent?
A. Saas is software as a service, and so that's taking all the things that you built and then rolling it up so that they can be, like, the term is, like, white labeled so that you've got these -- these back-end components that are now rolled up, and each one of those components interact with each other. You can then combine those into a single product and then resell that -- that service itself. That's really what that is. It's kind of like the next level in a development stack.
Q. Okay.
And again, that's not -- that's not based on costs that were actually incurred in connection about the development of the DistroMint platform by nChain and its affiliates, is it?
A. I mean, I think I've answered whether or not this -- this independent recreation is a regurgitation of nChain's

specific development costs, and it isn't that.

Q. And then the patent prosecution and IP legal costs, what -- what does that refer to?

A. That's -- that's patent prosecution, like that's the filing of a patent, filing of a provisional, filing of various applications, like, to convert that provisional into an actual patent application or, you know, multiple applications afterwards, and the defense of that pat -- those patents.

Q. And how --

A. Like, I guess the defense, it goes both ways. Like defending if somebody's using it, but also pursuing if somebody's -- defending yourself against a claim that you have infringed, but also pursuing people if you think they have infringed.

Q. Why would those costs be incurred in connection with recreating the platform?

A. DistroMint itself was reliant on

intellectual property, and so there were software licensing lines among all the different entities in the -- in the little different charts that they were showing. And so recreating that relied on software licensing, and if you were going to recreate this, you may also have those -- those things 'cause you're presuming that you're recreating it but not that you're recreating it and a copy also exists. And so when you create that thing, if you are trying to protect it in the same way, that's -- that's a cost you would incur for that protection.

Q. But -- but whether the idea underlying the platform is patentable is -- is separate from the cost it would take to create the platform itself, right?

A. Yeah, the -- so, that's why this doesn't -- this doesn't just say "patent prosecution." It says "patent prosecution and IP legal costs," so intellectual property as a whole.

When you build software that runs on a blockchain, the underlying code

is inherently public. Somewhat depending on how you build it. And you would incur costs to protect that -- that property. Whether it's the combination of the code that you wrote or the use of it or those other pieces, you still, like, trademark things and copyright things and try to protect the thing that you built.

MR. RUOCCO: Okay.

I'm going to show you what's being marked as Haraminac Exhibit 13.

Is that right?

I'm asking the court reporter.

THE STENOGRAPHER: Yes.

MR. RUOCCO: Okay.

(Haraminac Exhibit 13, email 14/12/2023, Bates NCH0001867 and E.Smitty/NChain Restructure Proposal, Bates NCH0001868-170, was marked for identification, as of this date.)

(The above mentioned exhibit was published.)

BY MR. RUOCCO:

Q. And this is a December 14th, 2023 email from Dale Evans to Eric

Finnerud and James Marchant. The subject is: E. Smitty nChain restructure proposal.

Correct?

A. That's what the document says, yeah.

Q. And if we turn -- apologies, it seems that the attachment is in a different file.

MS. BAINES: Jared, I think the attachment is 310, if you want me to upload that.

MR. RUOCCO: Okay.

Please. Yeah, please.

MS. BAINES: Okay. It should be uploaded.

MR. RUOCCO: I'm going to include this as part of Exhibit 13, okay.

BY MR. RUOCCO:

Q. Have you reviewed this document before?

A. Yeah.

Q. Okay.

A. Well, I mean -- so, I don't know

which -- there's several copies of this with the Bates stamps that are in the production. So I don't know if this specific Bates stamp one is one I cite or not. But, yeah, I've reviewed their restructure proposal.

Q. Okay.

I want to focus here on this part. Column 3 it says: nChain would provide the software and website development services to develop the platform and additional blockchain support and expertise to further the growth and expansion of the platform, time recorded at nChain internal rates is US 514,000.

Do you see that?

A. Which -- which part are you on? Did you highlight?

Oh, yeah, yeah. Okay.

Yeah. Well, it says internal rates is c.USD 514.

Yeah.

Q. Okay.

And so in this document, nChain stated that its internal costs on

development to build the DistroMint platform was $514,000, right?

A. This is short -- this is a statement in about prior actions, that this -- that can't be verified by anything. And I think it was Dale Evans' testimony that he couldn't provide any document to support the numbers that were in this.

The -- the issue here is that it's not a contemporaneous measure of the time, and so you would want to see the contemporaneous measure of the time itself to know that.

In as much as this is what the words are in the document, yeah, that's what the words are in the document.

Q. Okay.

Just -- the cost approach valuation that you came up with is more than nine times the number that nChain stated it incurred to develop the DistroMint platform itself, correct?

A. Well, that depends if you're going to go with this statement by nChain

or if you're going to go with the public statement by nChain where they said 200 people worked on it.

Q. Well, they didn't say that they had spent a different amount of money on it in public, did they?

A. There was no amount of money in that -- that article that I'm referencing.

Q. Okay.

Just here you say that the cost approach would lead to a valuation of over $7 million, right?

A. I think the cost approach is a component in the valuation, and the cost approach value is about 7 million, yeah.

Q. All right.

And that's more than nine times $514,000, right?

A. This is -- so, this 514,000 is time recorded at nChain and that seems to be a different entity than nChain UK 'cause that's what's up there at the top.

Internal rates is c.USD 514. So, like, again it goes back to, like, the synergy piece that I was talking about.

This number is not a number that you would use to base an independent recreation on it. This is -- this is something that the people who developed the blockchain are spending to build. And this is just something that they said they spent. It's not -- it's not what they actually spent 'cause that would be shown in, like, actual time records.

Q. Okay.

A. Just a reference to an amount.

Q. I want to -- I want to turn to the next page in here.

Do you see this part where it says: nChain will agree to provide convertible debt finance to Project Company (100 percent owner E. Smitty) on the following terms.

And it says: Facility limit is initially fully drawn to reflect the USD $675,000 nChain investment to date, (development time, E. Smitty consultancy services and patent assistance). Any further provision of credit will be agreed from time to time.

And then it continues: The debt finance will have the following conversion terms: Automatic conversion of the loan into shares in Project Company upon Qualified Financing at the lower of (a) 20 percent discount to the Qualified Financing price and (b) Agreed Valuation Cap USD $10 million.

Do you see this?

A. Yeah, I see all of that.

Q. Okay.

So, here nChain is stating that the $675,000 that it had spent to date included the 514,000 of development time we saw in the prior page, right?

A. That's what their document says, right. That's -- as much -- like, I can't -- I can't testify to this is what they sent. All I can -- like, you're showing me the document and you're asking me whether the document says that. That's all I can answer.

Q. Okay.

A. I can say that number is not consistent with other statements they made

and it's not -- well, and that Dale testified that the -- he had no non-privileged support for that 675, like, time entry sheets and all that kind of thing, and that the $10 million number was arbitrary. And so those -- like, I can talk about what's in the document and what nChain has said about those numbers since then, but as far as, like, whether or not this is what they actually spent, they're -- didn't produce any records and I think asserted a privilege as to the support for those numbers.

Q. But the -- the way that this proposal works is is nChain would divide, right -- nChain would convert its equity into the lower of a 20 percent discount to a qualified financing price or $10 million, right?

A. That's what their -- that's kind of a simplification of what their terms say in their document.

Q. Okay.

If -- if nChain had actually spent more money developing the DistroMint

site, wouldn't it advantage nChain to --

MR. RUOCCO: Strike that.

Q. If nChain had actually spent more money developing the DistroMint platform than stated in this document, it would receive more equity through these conversion terms if it just stated its actual costs, wouldn't it?

A. If -- if the number 675,000 was increased further, then sure, right. In the way that you're asking, that would increase what they're claiming to be debt -- what they're proposing becomes debt. So if they increased their proposed debt, sure, that would increase that propose -- like, the -- the later conversion of it.

Q. Okay.

So, do you have any reason to believe that nChain would have shortchanged itself on these conversion terms by understating the amount it spent on developing the DistroMint platform?

A. Whether -- so, that kind of gets at the reliability of the number itself,

right. And so the -- there are records that would show that number to be reliable were produced. And the other number in the same section is -- was testified to as arbitrary.

There -- there were some agreements in the most recent production. It's some servicing agreement, but I don't think -- I think the parties in those agreements are all redacted. So there wouldn't be something in there that would also contribute to this. I mean, there may be, but I haven't, like -- that's the recent production stuff that we covered at the beginning of my deposition.

Q. Okay.

Now, you, I believe, in your report referred to this agreed valuation cap of $10 million as a floor. Is that right?

A. I don't think I referred to it as an agreed valuation cap. I think I referred to it as a -- as content in this document.

And I don't -- I don't -- I

don't think I say it is a floor. I think the language I use is that it's best characterized as a floor, and that comment is further corroborated and confirmed by Dale Evans who said it was arbitrary.

Q. Can you just explain to me why you think it's best characterized as a floor?

A. When you -- when you do that kind of convertible debt financing, you're usually offering, like, a -- a lower value. It's -- it's a mechanism for incentive -- to incentivize that -- that kind of financing, right. Like, you'd put a -- you don't -- you don't put a high value there because you're trying to incentivize that investment.

That's not usually the point of that kind of initial round of convertible debt financing. There would be some kind of valuation to go behind it or some sort of measurement, like maybe they at least Google'd something, but I think the testimony used the exact word "arbitrary."

Q. Now, do you have an

understanding of convertible debt generally?

A. Yeah, I would -- I would say I have an understanding of convertible debt generally. I wouldn't say that I, like, have a detailed understanding of -- of each nuanced component of it.

Q. Do you have a -- an understanding of whether an investor offering to invest on convertible debt as opposed to equity --

MR. RUOCCO: Strike that.

Q. Do you have an understanding of what an investor offering to invest as convertible debt instead of equity reflects what the investor thinks about the company?

A. I -- can you repeat your question?

Q. Sure.

I mean, do you have an understanding, basically, that convertible debt is -- is used primarily in investments that are more distressed?

A. Is it your representation to me

that --
Q. Well, I'm asking you do you understand that?
A. I don't -- like, I understand the words that you're saying.
I don't know that I would characterize the use of convertible debt in that way. I think there's probably some article somewhere that would say it is used in this way. There's probably articles out there that say it's not.
In -- in my experience, a convertible debt mechanism has a wide variety of uses.
Q. All right. Let's go back to your report. I'll bring it up.
I want to go to Schedule 6. That is your reconciliation of value.
Do you see this?
A. Yeah.
Q. Okay.
And so to arrive at your valuation of $44,452,361, you applied weights to the outcome of your cost approach, market approach, and income

approach valuations.
Is that right?
A. That's right.
Q. Okay.
Now, you don't cite any authority for what the weights you used in your report are based on, do you?
A. The -- the reconciliation itself is a component of valuation that's consistent with the professional standards I put this together under.
Q. Okay.
Can you point me to a -- an authority, an article, a book, a treatise that supports using weights in a valuation the way you have here in Schedule 6?
A. Yeah, I -- I just said that's the net of professional standards where you reconcile these values.
Q. Okay.
And how did you come up with these weights specifically?
A. That's what the -- the "Notes" column is, kind of, there to summarize. Like on the -- the reliability weights, 10

percent on the cost, the replacement and the re-platforming. The -- the reason that that weight is 10 percent is that the -- the product is there already. You could -- you could purchase that overall platform while BSV in the future ended up being deprecated at October 2nd, 2023, I think it was, like, in the process of that. So you had some decline. You had a bunch of altercations there. So it didn't give that a lot of weight because of the platform itself, you may be able to just rebuild the, kind of, back-end portion of it without incurring all of those costs to completely recreate it. So that's why I applied a 10 percent weight.

The same with a market approach. That's a 35 percent weight. The comparables and -- and why the -- the discount for lack of marketability is applied to that market approach and not to the income approach goes into the -- the method for determining the discount rate for the income approach. If you -- if you apply a DeLong to the income approach in

this case, then you're double-counting that illiquidity measure because the whole point of a -- of a VC method for the discount rate is that you're pre-money, right. That's the illiquidity nature of it.

The income approach here, that's the DCF as a going-concern, it's just a reference to the approach itself. I think I talk in my report about more details behind those specific weights, but the Notes, kind of, give you that summary -- summary reference to it.

Q. Okay.

But does anything in Schedule 6 explain why you chose to set any of the weights at the specific percentages you did as compared to a different percentage?

A. I mean, Schedule 6 is part of my overall report. And so I -- I think I explained these weights in my report. And that's the Notes are there 'cause -- as a sort of summary, but the details of that explanation should be in my report, or are in my report.

Q. So, here in -- and the weights, by the way, you -- you -- in this top schedule is a concluded value, reliability weighted, right? So you're saying these are reliability weights?

A. I'm saying that the -- it's like looking at the cost approach and looking at how reflective that is of the specific facts and circumstances in this matter. Like, how reflective is it overall. How -- that's -- that's what that is.

Q. Okay.

I mean, here in the notes to the schedule you say: Reliability here is a measure how closely each approach represents the subject's economic reality under the fair market value standard, reflecting the quality of the underlying data and the suitability of the method to this particular asset.

A. Yeah.

Q. (Reading) The weight assigned to an approach expresses that representational closeness.

Do you see that?

A. Yeah. I mean, that's -- that's a fancier language for what I just described, I think.
Q. Okay.
I mean, how did you determine how closely each of your valuation approach -- approaches represents the subject's economic reality?
A. That's a -- that's the substance of the entire report. What this is, what it's matched against, what the differences are, what was going on at the time, that's -- that's what contributes to each one of those.
Q. But, I mean, the point, right, of your valuation is to assess the fair market value of this DistroMint enterprise.
Is that right?
A. That's right.
Q. Okay.
So, how can you determine which of the income approach, the market approach, or the cost approach most closely matches the fair market value of

the DistroMint enterprise? That's the very thing that you're trying to determine through those valuation approaches, isn't it?

A. So, I'm not trying to match this against its actual fair market value. I'm trying to match the economic reality to each of the components in each one of those models. And so you're taking the cost approach and you say okay, how -- how reflective is this approach to DistroMint? How reflective is this market approach to DistroMint? How reflective of the income approach is -- you know, is DistroMint? And I talk in my report about why the income approach is weighted the most helpful.

Q. But, I mean, to -- to make the assessment that you just described though, wouldn't you need to know the value of DistroMint in advance?

A. I -- I just said you're not trying to match the -- to a value. You're trying to match the economic reality to the components of each approach. So

you're taking -- you're taking DistroMint, you're breaking it down and looking at, okay, if I just look at how to recreate this, that's my cost approach. If I just look at market comparable, that's my market approach. If I just look at DCF on the income stream, then -- or the revenue stream, then that's my income approach.

How -- how did each one of those now match the overall DistroMint operation? And that's -- that's what this is. That's a reconciliation of those values.

Q. No, I -- I guess. But what I'm saying is to understand how closely the -- the valuation derived through any one of your valuation approaches matches the value of DistroMint, you would need to know the value of DistroMint in advance, wouldn't you?

A. Again, I -- you -- you keep asking me if I'm matching a value to a value, and you're matching the components in the cost approach to the overall DistroMint after you break it down. So

taking the overall thing and ask specific questions about it for the cost approach. Take the overall thing and ask specific questions about it for the market approach. Take the overall thing and ask specific questions about it for the income approach. And then to reconcile the differences in value across those approaches, you look at how close the economic reality is of the overall thing, of DistroMint, to -- is to each one of the components of that approach.

Q. What -- what do you mean by the overall economic -- sorry.

What do you mean by "the economic reality of the overall thing that is DistroMint"?

A. That's -- that's what I describe in my report of why you apply these weights to reconcile that value. I'm talking about the thing that is being valued when I talk about that. What is it, how does it work, how does it function, and how -- like, what is its relationship to each one those.

So the other methods for reconciling value are selection, right. You could just pick one, the cost approach or the market approach or the income approach, but picking one doesn't appropriately reflect what was going on with DistroMint at the time.

There were a lot of things going on in October 2nd, 2023 that make a single selection not the most reflective of the economic reality. And that's all of those different, like, components that go into those weights are what's the sub -- that's the substance of the report, so.

Q. What were those things that were going on in October 2nd, 2023 that you just referenced?

A. That -- that gets into the -- the issues with the controversies around Bitcoin SV chain. That gets into the fact that there's not a substantial amount of revenue data for comparable companies, and that the income approach is based on some inputs that are nChain's own product and assumptions that are based on the overall

industry the general knowledge about the industry and the communications in nChain's production. Each one of those alone does not more accurately reflect the economic reality. And so you need to reconcile which pieces of each one of those, like how much it is a reflection of the economic reality. That's what those weights are for. There are some components of the cost that are a reflection of the economic reality. There's components of the market that are a reflection of that. The -- the other comparable companies and some of the other growth rates and stuff like that are -- are huge and so weighting that appropriately, given the differences between the subject company, and the -- the comparables are contained in the market approach, but the overall economic reality of what all was going on means that that -- the market approach alone is not the only appropriate measure of value. The reconciliation is a more appropriate measure of how each one of those

components contribute -- contributes to the conclusion of value.

Q. Now, can you just describe for me, like, what the economic reality is, as you understand it?

A. I -- I mean, I think I just described that quite -- quite a lot of detail.

That's the substance of the report itself, right.

The fact that DistroMint was in this late stage of development, it had been boot-strapped by two people who were in dispute about who owns what, but -- but the contemporaneous documents say 50/50 in all of the documentation, on all of their contemporaneous records show a 50/50 agreement for this thing that was being built.

That's the thing that we're talking about, the economic reality of that thing. Where it was built, what it cost to build or what it would cost to recreate it, the income that it was expected to -- to generate and whether or

not the thing that was actually built could generate that income, right. It turns out there was some issues with the economic reality at the time that make that a little less of a contributing factor to the overall value.

Q. And I'm just -- so, it just so happens, right, the weights that you assign, you assign the highest weight to the -- indicate the approach that came up with the highest valuation, the second highest weight to the -- to the approach that came up with the second highest indication, and the lowest weight to the approach that came up with the lowest indication, right?

A. I -- yeah, I see that, now that you've said it, it -- they're both in -- in order in that way, low to high. Yeah, I see that.

Q. And, I mean, and your valuations have a -- and -- instead of expressing this as -- as a weight -- or, sorry.

Instead of expressing your valuation on a weighted basis, you could

have just expressed it as a range, right?
A. If the range would reflect the economic reality, then a range would be appropriate. So, I think the range would probably be more reflected in the sensitivity analysis, right. Like, that -- that would be a range of, like, how things change with the changes in different components.
If you did a range here, you would -- you would probably do a different kind of mechanism to reconcile those three values and then assign, like, a plus or minus percentage to it.
Q. Okay.
I mean, the -- your valuation approaches result in a wide range of valuations here, don't they?
A. The -- you mean the -- just the indications here, the 7, 37, and 55?
Q. Right.
A. Yes, in the sense that they're different numbers.
Q. Okay.
And each of the approaches

produces a very different valuation for the DistroMint enterprise, correct?

A. I mean, they're all under $15 million, I guess. So I guess "very different" would depend on your range, but, yeah, the difference between 55 million and 7.2 million seems to be not small.

Q. And they're not all under 50 million. One of them is over 50 million, right?

A. Sorry, yeah. They're under, like, 56 million.

Q. I mean, the fact that your three different approaches produced such a wide range of valuations, doesn't that call the reliability of your evaluation approaches into question?

A. The fact that the three numbers are different from the three different approaches?

Q. No.

The fact -- the fact that your three approaches produced a wide range of valuations, doesn't that suggest that your

valuation approaches are -- are unreliable?

A. No. And the reason why is because recreation costs for a company that's largely software-based where the software relatively is straightforward is you would expect that kind of recreation cost to be substantially lower than the revenue that that software can generate, right.

It's kind of like the cost for me to mint an NFT, like, maybe -- let's say I, like -- I don't know, let's say it's a thousand dollars for the time it takes for me to sketch something out and upload it and mint that in NFT, right. But there are NFTs that have sold for $69 million or $50 million. So the cost to recreate is substantially different from the market value that it was later sold for.

And then -- and that's not a -- not an entirely hypothetical example. That's -- I'm referencing some of the users that have done such a thing, like

Beeple is one of the NFT creators, right.

So, those kinds of extremes are actually relatively common in blockchains -- blockchain-based companies where the cost is in no way reflective of the expected income and -- or the revenue generation and market comparables are all over the place in one sense. And in this case in particular, NFT marketplaces they're extremely high which, like, you can get very hopeful and you can weight that much higher, but it's just not, like -- it's not a reflection of the reliability inasmuch as it's a reflection of the underlying data and the functions of how this corporation -- I mean, how this platform was built, right. These -- these kinds of companies, the blockchain-based and the -- the NFT marketplace style companies are different from your, like, you know, the old-school traditional valuation approaches where you -- you expect something relatively similar from marketing company, and sometimes a cost approach not so much, but

here you wouldn't -- it would not be normal to expect those three values to converge. That's why you have to reconcile the values.

Q. Okay. But even your -- put the cost approach aside. I mean, even your income approach and market approach valuations differ significantly on the value of the same subject.

Isn't that right?

A. I mean, no, I couldn't say that. If you're -- you're going to say that the cost approach differs significantly than the market and the income -- income approach relatively do not differ significantly. I mean, the difference between those two, one's close to 40, one's close to 50. Like, there's some -- there are differences, but relatively compared to the cost approach, I wouldn't -- I wouldn't be able to characterize that as significant.

Q. You're --

MR. RISPOLI: Jared, sorry to interrupt you, but did you want to

reserve any time for recross?

MR. RUOCCO: Let me finish my questions and I'll -- I'll see.

MR. RISPOLI: Sure. We can take a break, too, after you finish to decide.

MR. RUOCCO: All right.

BY MR. RUOCCO:

Q. Just -- just quickly looking down, reconciliation value. I mean -- sorry, in the -- the next line down. The concluded value. These are probability weights.

How did you come up with the weights here in this part of the schedule?

A. So, I think I discussed the probability weights and the reliability weights in detail in my report. I have to look how these are, but it's a similar thing that the probability is this is the most reflective, right. Like, one is considering the underlying data, the economic reality. The other is, kind of, a probability of a similar assessment, and that's where you would expect to see

conversions.
Q. Okay.
Is there --
A. The difference between 44.4 and 46.2 is -- is the smallest of all of those differences.
Q. Is there -- is there any authority supporting the -- the weights you use in this probability analysis?
A. Yeah, again, this -- this is a product of reconciling values, and that is consistent with the NACVA standards under which this was prepared.
Q. Okay.
And, now, in the notes for each one, are you suggesting that each of the approaches corresponds to a scenario described in the notes?
A. Cost, wind-down, as cost floor. I have floor at the top and replacement and re-platforming, the market is partial or delayed, go to market, and then income is -- is the presumption that commercialization succeeds.
So, I think those are the

probabilities and -- and, like, a summary of what's in the report for what those probabilities are.

Q. Okay.

And why -- what -- what's the relationship between the income approach, for example, and a scenario where it's commercialization succeeds?

A. What do you mean?

Q. Like, why -- why -- why did the income approach relate connected to a situation which the commercialization of the platform would have been successive?

A. You're -- this is a measure of the probability for each one of those, and so that note is kind of a description of what that probability weight is trying to measure.

And so each -- each one of those is that. And then you would want this -- this weight -- this -- this probability weight to rec -- or, to, corroborate your reliability weight. That's where you'd want to see the convergence. 'Cause you're asking about the differences in

values. You really want the reconciliations of value in those two different weights to -- to get close.

Q. Okay.

How did you determine that it was the probability that commercialization would be successful was 65 percent?

A. What do you mean that how did I determine that? Like the -- like how did I type the number in for 65 percent? Like -- like, why is that one 65 and the other two are 25 and 10? Is that what you're asking?

Q. Yes, that's my question.

A. Okay.

I mean, that's the same consideration that's in the footnote for the reliability measure. Like how closely each one of those reflects the economic reality, and then in the notes that that probability section, that's -- that's kind of a secondary measure for what those are. Like, if you make these presumptions about the cost approach, the market approach, and income approach, if those are the

things that are happening, how close that a reflection -- or that's -- how probable are those things to happen, that's what those weights are.

Q. Okay. You're not --

A. We talked about, like, failure rates and that kind of thing before. It's kind of that idea there.

Q. Are -- are you -- if you changed the weights in the reliability portion of this schedule, that would alter the outcome of your valuation, yes?

A. Yeah, my -- my conclusion of value is the one in the top section, that 44.452361 measure.

Q. Right. But if --

A. If -- if you change those weights, then, yeah, absolutely.

Like, if you -- if you removed the -- the cost approach all together, then you'd have to rebound once the market income.

Yeah, the same -- the same is true for if you change the mechanism for reconciliation at all.

Q. Okay.
And the probability weights, you changed those, it would -- it would change the outcome of that analysis too, right?
A. No. If you -- the -- the outcome of the reliability weights are not dependent on the probability weights. The probability weight is just a -- a secondary measure for those. They're not dependent on each other.
Q. Right.
I'm saying the -- the result of your probability weighted analysis depends on the weights you use in that analysis, right?
A. Oh, you're not connecting that back to the reliability one. You're just asking if I changed the numbers in the probability one, will the -- the conclusion net probability wouldn't change.
Q. Yes.
A. Yeah, that's true. But that -- like, a change in that probability wouldn't affect the overall conclusion of

value because it's a secondary measure.

Q. Okay.

Are you -- Ms. Haraminac, your report only addresses your estimate of the DistroMint enterprise's fair market value as of October 2nd, 2023.

Is that right?

A. No, in the sense that there's a valuation and the valuation is of DistroMint as of October 2nd, 2023. Yes, that's contained in my report, but that's not the sole substance of the report. There -- there are some other portions of my report in there.

Q. You're not -- you're not offering an opinion about the value of the DistroMint enterprise any other point in time other than October 2nd, 2023, are you?

A. I -- I haven't been asked to prepare some other valuation as of a different point in time. And that's not contained in my report.

Q. Okay.

And you're not offering an

opinion about whether the value of the DistroMint enterprise changed from one point in time to another, are you?
A. I'm not -- no, I'm not -- so, I don't offer more than one conclusion of value in here.
But I do have to caveat that with I might be asked to issue a supplemental or address Ferri's report or something like that, but I haven't been asked to do that at this point. And I don't offer a second value or that one changed over time in here.
Q. Right.
You're not offering an opinion about whether the value of the DistroMint enterprise changed based on any of the conduct alleged in this action, are you?
A. I think that question gets at a legal conclusion. Like, the -- who's responsible for the change in a value. I don't offer an opinion about -- about that, no.
Q. And you're not offering an opinion about whether the value of the

DistroMint enterprise changed based on anything nChain is alleged to have done in this case, are you?

A. I don't -- I don't ascribe culpability for changes in value in -- in this report, no.

As to -- to what I'm asked at trial, that's -- that's not something contained in my report. If I'm asked to do a supplemental or something like that to address the production that came in after this report was done or the expert report, then that -- that may be a component of it.

Q. And you're not offering an opinion on plaintiffs' damages in this action, are you?

A. I -- I think it was Eric's testimony when he asked what your damages were, I think he might have referred to -- to these calculations.

Q. Okay.

But you're not doing a damages calculation yourself, are you?

A. In -- in the sense of the -- if

the value of -- if, like, somebody took a thing, the value of the thing they took, right. Like, so in that sense, yes. But I don't have, like, a -- like, a lost profits calculation in here. This is a -- a valuation with some additional research and analysis components in the report.

Q. Right.

You're not -- you're not -- you're not offering any opinion on how plaintiffs' interest in the enterprise may have changed --

MR. RUOCCO: Strike that.

Q. You're not -- you're not offering any opinion about how plaintiffs' interest in the DistroMint platform may have been affected by anything nChain did, right?

A. How plaintiffs' interest in DistroMint, so not the legal entity this time. Is that -- is that what your question is?

Q. Right.

You're not offering an opinion about how the plaintiffs' interest in

DistroMint was affected by anything nChain did, are you?

A. I don't -- no, I don't think I'm offering an opinion as -- as to that.

There are some details in my report about what changed in nChain's representations, right. So, like, the restructure proposal. And so to the extent that would have an effect, that -- that might be part of it.

But, no, I don't have, like, a culpability opinion in here or the results of an action in -- as that -- as an opinion in my report.

Q. Okay.

And then I just want to direct you to Schedule 2 of your report, which references pillar assessment organizing framework.

A. That's correct.

Q. Can you just explain briefly how this -- these pillars affected your evaluation analysis?

A. Yeah, I mean, the -- the impact is they're in the column.

Right, so, when you assess the -- and each of these pillars is discussed in more detail in the report. But you assess these four pillars for the inputs into a valuation and for your later reconciliation, and that's a big part of what goes into valuing digital assets in general, right. The economic function, the technical implementation, the regulatory characterization, your risk exposure, and in each one of those is a component of the specific facts in this matter and then the implication of that.

So you have the income approach, what's primary; what's not; what's going on in the technical implementation. There's platform dependency. That's an input. There's a migration scenario. The regulatory characterization, what was going on. There's not a restriction at all in what they were building at this time.

The testimony of Dale Evans mentions a thing. That -- that thing was not an actual enforcement action. It was

more of like a notice that there's concern the way that that works. And so there was not, like, a -- a specific restriction at the time. The environment is something that we talk about, a regulatory environment is something that we talked about.

And then the risk exposure here also, the second column is the specific, like, summary of what was going on at DistroMint, and then the implication there is -- is how that -- how that assessment is inserted into those different valuation approaches.

Q. Okay.

Is there a source from which -- that supports the use of these four pillars?

A. Yeah, the source would be comprehensive blockchain forensics, tracing and valuing digital cryptocurrency and digital assets, which is the -- the book I wrote in May 2026. This -- this is also part of the -- the four pillars itself, not so much but the NACVA advisory

brief on cryptocurrency and the application of NACVA's professional standards for valuation in the way that this was prepared. The framework itself, the four pillar approach is -- and the -- the consideration of each of these individual components. The consideration of the components are part of the overall valuation standards. The framework of the four pillars to break those apart and identify the impacts, that method is part of what's contained in the book for -- specific to -- to cryptocurrency and digital assets.

Q. And did you speak with Mr. Finnerud in connection with preparing your report?

A. No.

Q. Did you speak to Destiny Perry in connection with preparing your report?

A. No.

MR. RUOCCO: Okay. I'll pass the witness.

MR. RISPOLI: All right. Let's go off the record for about 15

minutes.

(Pause.)

THE VIDEOGRAPHER: The time 5:01 p.m.

We're off the record.

(Recess taken.)

THE VIDEOGRAPHER: The time right now is 5:03 p.m.

We're back on the record.

MR. RISPOLI: Yes. Given the court reporter's time sensitivity and unavailability, plaintiffs have stated their intention to finish redirect from defense counsel's questioning, and hopefully we'll work in good faith with defense counsel to schedule that. I do not think I have more than 20 or 25 minutes of direct.

MR. RUOCCO: And defendant reserves all rights, including that plaintiff -- plaintiffs didn't cross-notice this deposition and we're now beyond the time limit and we'll take this under advisement.

MR. RISPOLI: We're -- we can go

off.

MR. RUOCCO: Okay.

THE VIDEOGRAPHER: The time right now is 5:03 p.m.

We're off the record.

(Deposition adjourned at approximately 5:03 p.m. CDT)

C E R T I F I C A T E

I, MARIE FOLEY, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the State of New York, do hereby certify that prior to the commencement of the examination, DOROTHY HARAMINAC, was duly remotely sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.




COURT REPORTER
Registered Merit Reporter
Certified Realtime Reporter
Notary Public
Dated: September 18, 2026

Case: Finnerud, et al. vs NCHAIN UK LTD.
Witness Name: Dorothy Haraminac Vol. I
Deposition Date: 09/11/2026

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2026 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Finnerud, et al. vs NCHAIN UK LTD.
Witness Name: Dorothy Haraminac Vol. I
Deposition Date: 09/11/2026

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

______________ __________________________
DATE WITNESS SIGNATURE

______________ __________________________
DATE NOTARY

Errata Sheet

NAME OF CASE: Finnerud, et al. vs NCHAIN UK LTD.

DATE OF DEPOSITION: 09/11/2026

NAME OF WITNESS: Dorothy Haraminac Vol. I

Reason Codes: 1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

Page _____ Line ______ Reason ______

From _________________________ to _________________________

____________________________

DOROTHY HARAMINAC VOL. I

**$**

**$1,999** 263:25

**$1.87** 359:25 362:25

**$10** 259:25 392:8 393:5,18 395:19

**$15** 412:4

**$150,000** 377:5 378:5

**$16,000** 381:6

**$176,000** 381:3,4, 13,14 382:6

**$199** 264:1

**$2** 382:22

**$200** 270:21

**$200,000** 373:19 374:5 378:4

**$215** 25:7 26:1

**$2500** 281:14 282:1 283:21 284:11

**$300** 207:24

**$42,000** 21:23

**$44** 200:8

**$44,452,361** 108:12 138:15 175:20 398:23

**$46,244** 175:23

**$46,244,482** 108:14 138:17 175:23

**$47.1** 230:11

**$50** 132:5 413:18

**$514,000** 389:2 390:18

**$55.5** 248:5

**$613,800** 372:19

**$675,000** 391:21 392:13

**$69** 413:17

**$7** 229:25 390:12

**$850** 25:7 26:7,17

**$9.99** 264:1

**(**

**(a)** 392:5

**(b)** 392:7

**0**

**01/03/2023** 275:22

**1**

**1** 19:6,18, 20 20:17 21:5 31:18,22 74:11 76:11,25 77:11 78:24 82:5 94:7 196:11 220:3 251:24 252:9,19 254:6 256:5,13 257:1,11 258:3 295:4 379:23 380:5

**1.6** 257:2

**10** 32:2 132:7 203:7 230:4,16, 17 254:25 255:2,4 264:15 275:21 276:5 371:5,8 399:25 400:3,16 419:12

**100** 334:19 391:17

**103** 247:11

**1099** 165:13 166:11,22 167:3,13, 15

**1099s** 167:9, 18 168:9

**10:00** 81:16

**10th** 38:21

**11** 285:14 286:6,16 381:24

**119** 93:4

**11:30** 174:25

**11:44** 175:4

**11th** 11:8

**12** 291:14, 23

**129** 93:5

**12:58** 249:20

**13** 178:11 386:11,16 387:18

**13,000** 96:11,17 97:4,6 98:14,19 103:20 104:8,21

**13,188** 94:7 97:2

**130** 94:5 96:23

**14** 177:18

**14/12/2023** 386:17

**14th** 386:24

**15** 69:21 153:3 370:21 371:10,15 372:8 429:25

**15,000** 229:17 251:24 252:9,19 253:7 254:2,5 255:3,6,7, 14 256:5, 12,15 257:11,18

**15th** 95:14

**16** 41:22 86:15 177:12 178:22

**16,000** 381:10,24

**160** 256:15, 22,23

**16th** 86:24 292:2

**17** 183:12 184:5 198:17

**176** 381:10

**19.99** 270:21

**1:51** 250:5

**1st** 33:2,11 39:10,15 81:22 82:14,17, 23 96:9 97:21 99:22 104:8,23 107:20 275:17 276:10,12

**2**

**2** 31:20 32:1 76:2 77:16 175:20 178:18 196:16 197:4,20 198:14 227:16,18 253:20 255:2 256:13 277:18 295:4 296:23 359:1 363:20 364:20 426:17

**2,000** 76:5 78:21 79:22

**2-and-a-half** 284:15 287:18 300:5

**2.1** 297:17 298:25

**2.5** 287:4 300:7

**2.9** 296:3, 11 298:18 300:8

**20** 28:6 69:21 78:20 79:21 132:7 224:25 235:9 292:5 339:18 392:5 393:17 430:17

**200** 30:8 253:2 342:5,22 343:25 345:14 346:6,13 390:2

**200-person** 344:3

**2008** 41:19

**2014** 42:11

**2015** 42:12, 13 80:10

**2016** 80:10

**2017** 42:11, 12,13 44:11 47:11

**2018** 44:11 47:11,14 50:17 56:22

**2020** 53:21

**2021** 53:6

**2022** 86:15, 24 369:21

**2023** 56:24 108:11 138:15 152:23

153:6,12, 19 154:1, 15 175:14, 20 177:16, 18 178:18 179:11,16, 22 181:7, 20 182:9 189:21 190:19 197:18 202:20 259:20 270:1 272:12 275:17 276:12 277:1,3,5 282:17 290:23 291:3,13 292:2 349:1 352:22 353:13 369:6,22 386:25 400:7 407:9,16 422:6,10, 18

**2024** 53:6 348:14 359:6

**2026** 11:9 19:6,21 20:18 21:5 32:2 33:2, 12 39:10, 15 82:23 95:14,19 96:5,9 97:20,21 99:21,22 104:7,8,23 107:19,20 145:12 276:10 428:23

**212** 86:5,6

**215** 26:2,10

**22** 25:2 228:3 229:11 230:23

**237** 273:18, 22 275:11, 12

**239** 274:2

**24** 248:10, 11

**24,000** 256:13

**24-CV-0528** 32:11

**24th** 95:19

**25** 23:16,22 24:7 85:8 132:6 228:4 229:24 264:12 317:16 327:2,7, 17,18 329:13 330:14 419:12 430:18

**2500** 283:4

**256** 268:25 269:1

**257** 269:8 273:21 277:22

**26** 227:16 228:1

**26(e)** 35:17

**27** 212:3 213:18 221:20 222:13 224:25 226:16 227:9,15, 25 228:4 229:10,24 230:9 231:9,16, 21,24 232:15 236:14 241:4 249:5 258:24 261:13 262:7 326:1,7,10 341:7,17 342:14 343:7,19 346:14

**28** 227:16

**29th** 96:5 97:20 99:21 104:7,22 107:19 270:1 277:1,4

**2nd** 108:11 138:15 175:14 177:16 179:11,16, 21 181:7, 20 182:9 197:18 202:20 290:23 291:3 349:1 352:22 400:7 407:9,16 422:6,10, 18

**3**

**3** 73:18,19 77:16 78:7 108:7 131:4

146:3 195:18 196:11 198:14 230:9 232:23 233:2,5, 13,18,24 234:3,5,8, 20,22 236:15 238:6,13, 22 242:3 243:1,14 244:18 245:10 246:5 258:24 270:15 295:5 304:15 310:4 321:18 323:3 339:14,18 340:15 359:1 367:15 378:16 379:22 388:9

**30** 229:11 230:10,23 296:4,11 297:16 298:3 300:8,10 310:11,16, 22 311:3 327:17 329:4,8 330:14

**31.3** 248:5

**310** 387:11

**313** 180:12, 16

**33** 248:11

**338** 110:20, 21

**346** 73:2

**35** 327:18 400:18

**354** 146:2

**355** 153:3

**356** 145:4,5 146:1

**359** 31:12, 15 235:20

**36** 271:15

**37** 411:20

**3:18** 339:3

**3:30** 339:7

**4**

**4** 77:16 86:9,12 198:14 219:14,19 312:5 313:5

**4.6** 321:8

**4.6772** 321:17

**40** 329:13 415:17

**401** 18:14, 15

**409A** 58:21

**44** 267:4

**44,450** 175:15

**44.4** 417:4

**44.452361** 420:15

**45** 66:20 67:6,17,20 68:10

**450** 26:13

**4508** 271:10 277:23

**46.2** 417:5

**47** 229:11

**5**

**5** 77:16 102:25 145:12 198:14 212:25 218:8,10, 16 219:12, 22,23 220:1,4,7 225:23 226:4 231:1 233:3,10, 15 234:7 247:10,14 249:4 250:16 251:22 256:3 257:2 263:21 268:8 275:3 284:13 286:20 287:19 297:15,25 298:3,11, 18,23 306:1 326:1,7,10

**5,000** 254:13 255:9 323:2

**5.3** 287:20

**5.4** 300:9

**50** 23:10,22 24:4 66:20 67:6,17 68:10 78:10 79:15 131:2,3,9, 11,19 133:17,23

134:14,19 160:21 168:1 170:24 171:22 172:22 229:5 329:21 412:9,10 415:18

**50/50** 133:4 134:22 332:1 409:15,17

**500** 78:22

**501(c)(6)** 68:19

**51** 249:6

**514** 388:21 390:23

**514,000** 388:15 390:19 392:14

**55** 247:16 411:20 412:6

**55.5** 229:10

**56** 180:3 181:8 412:13

**57** 180:3 181:2,8

**59** 235:12

236:10,12, 17 237:7 238:12 267:5

**5:01** 430:3

**5:03** 430:8 431:4,7

**5a** 228:15 230:21

**5b** 243:7

**6**

**6** 77:16 110:24,25 317:7 398:17 399:16 401:15,19

**60** 256:18, 19,23 258:15 259:2,11

**600** 26:13

**600,000** 371:9

**65** 264:14 419:7,10, 11

**675** 393:3

**675,000** 394:9

**7**

**7** 77:17 145:10 152:20 286:21 390:15 411:20

**7.2** 371:9 412:7

**70** 357:18

**73** 222:17

**75** 328:10, 25

**76** 229:11

**8**

**8** 77:18 269:11,16, 17 271:12

**80** 229:5

**85** 58:6,23

**850** 26:10

**8:34** 11:9

**8th** 38:22

**9**

**9** 76:12,25 77:12 78:24 274:16,18

**90** 247:11 249:4 357:18

**9452-7538** 90:5

**950** 265:22

**99** 59:12, 13,22 61:4,9,12 62:2,11 63:9,15, 17,22 64:1,8 66:10

**9:46** 81:12

**A**

**a.m.** 11:9 81:12,16 174:25 175:4

**ability** 375:12

**absolute** 278:11

**absolutely** 206:13 245:20 355:25 420:18

**accept** 290:16 291:4

**accepted**

75:16 303:15

**accepting** 290:23

**access** 148:23 149:5 150:21 152:9,17, 23 153:7, 13 154:6, 14,25 155:8 156:24 157:13,22 158:16,20 159:8 160:7,9,12 161:2,22 162:22 166:23 178:18,24 179:13 182:7 295:23

**accessed** 74:2

**accessible** 149:14

**accordance** 111:23 112:1

**account** 213:13 214:11,23 215:9 217:1 218:10 220:8,23 332:14 345:16 350:12 366:4

**accounted** 215:20,21 216:8

**accounting** 45:5,6 74:16 207:17 373:23

**accounts** 198:6 200:23 203:19

**accredited** 74:17

**accurate** 63:7 64:16 66:14 82:5 112:17 126:5 340:8

**accurately** 13:20 293:9 408:4

**accusation** 15:18

**ACFE** 70:12

**acquire** 139:22 262:20

**acquired** 42:6

**acquiring** 262:19

**act** 43:20

**acting** 113:21

**action** 423:18 424:17 426:13 427:25

**actions** 83:21 125:25 129:8 389:4

**active** 76:15 203:11,24 204:18,25 205:6 353:2

**activities** 76:10 193:7,8 369:9

**activity** 369:5

**actual** 60:6 66:4 98:6 125:11 185:23 186:17 212:10 225:18,25 226:5 267:15 312:19 384:10 391:9 394:8 404:6 427:25

**ad** 132:2

**add** 215:15 229:25 332:22 355:8

**added** 212:17 355:6 360:16 363:3,6

**addition** 75:18 81:2

**additional** 82:12,14 195:3 196:1,2,5 217:19 237:24 278:23 279:12,18, 25 285:10 287:16 293:19 331:7 334:8 360:8

370:23
388:12
425:6

**address** 129:19 423:9 424:11

**addressed** 183:18

**addresses** 129:20,21 422:4

**addressing** 20:13

**adjourned** 431:6

**adjunct** 52:21 53:4,13 54:18,24

**adjust** 238:3 248:25 315:23 317:4

**adjusted** 238:6

**adjusting** 248:24

**adjustment** 191:14 192:7 200:21 211:23 218:1 219:1 246:13 327:3,24 328:6,9,20 331:24 332:14

**adjustments** 169:21 210:10 217:8 260:19 320:22 321:13

**administered** 178:17

**admissions** 177:19

**admit** 123:11 358:18

**adoption** 235:25 236:22 237:16

**advance** 404:21 405:19

**Advanced** 78:7

**advantage** 394:1

**adverse** 201:24 202:1

**adversely** 201:14

**advisement** 430:24

**advisor** 54:17 55:15

**advisory** 428:25

**advocated** 75:18

**affect** 123:13 183:3 185:3 201:20,22 278:18 321:25 322:10 323:4 326:16 358:14 421:25

**affected** 201:14 364:3 425:17 426:1,22

**affects** 252:10 257:16

**affiliated** 343:10 344:17

**affiliates** 383:22

**affirm** 12:17

**agree** 13:18 295:20 357:8 391:15

**agreed** 11:16 391:24 392:7 395:18,22

**agreement** 136:8 142:15 143:24,25 144:2 165:20,25 372:3 395:8 409:18

**agreements** 144:6 371:24 372:2 374:12,14 395:7,10

**agrees** 139:5

**ahead** 32:20 66:9 75:6 144:24 145:2 238:19 249:16

**air** 376:23

**Alexandre** 90:5,10

**Alive** 17:1,

4,5 18:5,9 275:16

**allegation** 133:3 179:5 181:19 382:5

**allege** 177:23 179:12

**alleged** 177:17 178:23 423:18 424:2

**allegedly** 331:25

**allowance** 260:20

**allowances** 169:5

**allowed** 90:20

**alongside** 172:16

**alter** 420:11

**alteration** 178:23

**altercations** 400:10

**altered** 178:17

**Alternatively** 78:18

**alternatives** 79:11

**amended** 181:3

**AMF** 91:13

**amount** 97:25 98:4 280:22 346:9,14 374:5 390:5,7 391:11 394:22 407:21

**amounts** 21:24 255:22

**analogy** 65:11

**analysis** 12:2 22:22 26:4 39:16 41:21 63:3 108:14 114:9 127:17,21, 25 128:17 130:25 138:17 151:1,20 169:4,21 175:22 186:24 187:7 188:23 189:9,14 192:25 193:6 194:1 195:7,12 198:23 207:4 208:25 210:25 213:16 214:10 215:8,9 221:25 226:24 228:3,8, 10,16 237:15 241:5 242:4 243:2 245:5 246:3 247:19 248:13 250:22 251:14 254:16 255:10,13 257:15 259:9 260:19 261:19 267:1,2 271:22 272:11 273:12 281:22 283:12,14, 18 289:15 292:9,14, 15 295:14 300:16 302:12 303:2,5 304:20,21 305:15,17 306:4,23, 25 308:22 309:5,20 310:7 311:4,11 312:4 321:18,24 322:9 323:7,14, 16 324:24 325:1,18 339:12 341:6 355:18 411:6 417:9 421:4,13, 14 425:7 426:23

**analyst** 41:2 71:2 72:13,17

**analysts** 41:5 71:7 73:21 98:21 104:1 227:13

**Analysts'** 74:3

**analyzed** 102:7 152:1

**anchor** 297:15

**and/or** 76:9 78:7 115:18

**annual** 259:1 313:7,11 314:3,13 317:20,25

**answering** 16:4 319:2

**anticipated** 293:25 294:3 296:18

**anticipating** 308:19

**apologies** 19:12 387:7

**appeal** 84:19 85:15 88:8,11 91:13

**appealed** 84:17 85:14 88:4

**appearing** 11:16,24 12:5

**appears** 33:14 299:25

**Appendix** 25:5 29:19,21 30:14 31:5 33:12,23 34:10 35:5,24 36:13 92:9 96:13 97:8 103:1 314:8

**appetite** 266:11

**applicants** 74:12 78:19

**application** 80:2,5 121:8 196:3,5,15 197:7 201:20 208:20,21 215:14 261:3 384:11 429:2

**applications** 55:12 191:19 215:22 384:9,12

**applied** 74:19 75:11,14 76:21 79:3 114:4 131:9 192:20 194:20 195:3 202:4 209:16 212:2 213:11 231:25 245:23 258:1 321:12 334:11 335:7,21 338:3,10 398:23 400:16,21

**apply** 69:12 77:7 79:11 112:22 191:14 211:10 222:13 233:22 321:17 329:19 331:15 334:9,25 335:4,12 337:5 400:25 406:19

**applying** 217:5,6 333:19

**appointed** 83:3,8

**Appraisal/ valuation** 111:2,11

**apprised** 24:15 190:18

**approach** 127:16 128:22 130:14 187:15,16 188:3,6,21 193:11,12, 18,19 194:13,14, 19 195:1,2 198:4 207:7,13, 21 208:1,6 209:6,11 210:13 212:15 213:12 215:3,4,8, 9 217:6,8 219:13 220:7,11 221:25 223:16 231:25 232:1 250:11,24

251:2
258:5
261:15
262:6
302:19,21
307:8,9,10
310:25
311:8,15,
17 312:3,4
315:20
316:25
317:14
319:7,13,
23 320:12
321:25
322:11
323:4,9,16
325:1,5,8
326:13,17,
21,22
327:2,16
334:9
335:9,13,
17,18,25
336:2,13
337:13
338:1,2,5,
12 339:12
340:2,3,10
341:6
344:13
347:11,14,
17,19
348:3,20
349:20
350:4,15
351:23
352:14
354:8,23
355:5,14,
18 357:5
359:25
360:15
361:11
363:1
365:2
371:6
372:17,25
389:19
390:11,13,
15 398:25
399:1
400:17,21,
22,24,25
401:7,9
402:7,15,
23 403:7,
23,24
404:10,11,
12,14,16,
25 405:4,
6,8,24
406:2,5,7,
12 407:3,
4,5,23
408:20,22
410:10,12,
15 414:25
415:6,7,
13,15,20
418:6,11
419:24,25
420:20
427:14
429:5

**approaches** 184:17 188:18 194:7 208:18,23 210:7 211:22 214:17,18 215:17 331:13 336:6,9, 10,23 337:6,11 403:7 404:3 405:17 406:9 411:17,25 412:15,17, 21,24 413:1 414:22 417:17 428:14

**approaching** 361:2

**appropriately** 407:6 408:17

**approximately** 21:22 23:22 248:5 431:7

**approximation** 65:11

**April** 95:19

**arbitrary** 393:6 395:5 396:5,24

**area** 282:11

**areas** 77:13, 16 78:11, 23 79:16

**argumentative** 137:5

**arm** 44:5,7, 8,24 50:23

**arm's** 113:21

**arms** 50:25

**arrive** 256:14 398:22

**art** 362:1

**art-based** 235:24 236:22

**article** 34:2,4,12 35:6 36:15 231:16 242:25 243:13 244:8 344:2 390:8 398:9 399:14

**articles** 34:1 398:11

**artist** 254:22

**artists** 254:24

**arts** 40:3

**as-of** 179:17 181:13 196:8

**ascertain** 137:17

**ascribe** 424:4

**asserted** 393:12

**assess** 52:2 125:16 207:4 303:2 403:16 427:1,4

**assessing** 59:15 67:24

**assessment** 128:23 221:13 284:3 316:16 330:24,25 348:21 404:19 416:24 426:18 428:12

**assessments** 63:3

**asset** 60:11 62:10 63:6,23 65:22 109:19 110:3 115:1 118:25 119:6,9,14 121:6,9 123:13,19, 22 134:8 135:19,22 143:24 172:15,16 209:22 346:17 361:25 380:19 402:20

**assets** 60:13 61:6 62:4 63:10,24, 25 64:3,9 65:7,15 118:4,21 121:13 122:8 127:8 134:10 140:22 141:10,21 142:2 171:2,5,11 243:19 244:1 259:19 361:23 427:7 428:22 429:14

**assign** 410:9 411:13

**assigned** 142:6 143:5 402:22

**assignment** 142:11,13, 15,20,25

**assist** 85:25

**assistance** 391:23

**associate** 25:17 42:2

**association** 41:4,7 68:13,18, 20,22 69:8,11 70:1,4,16, 21 71:6, 12,17 72:3,8 73:20 74:2 81:3 243:23

**assume** 16:21 122:22 131:1 136:16 138:4 225:8,11 229:20 284:10 332:11 333:18 341:6 346:1

**assumed** 200:8 229:16 233:4 254:4 256:12 263:19 264:12 281:11,23 300:19 301:13 305:16 368:22 374:6

**assumes** 223:16 258:3 361:11

**assuming** 116:2 173:18 225:1 233:16 310:15 361:16

**assumption** 128:6,13, 15 131:7 199:5 219:24 251:23 252:4,8,17 256:4 257:6,10, 18 264:19 280:17 284:8 305:11,24 341:16

**assumptions** 127:25 220:16 222:12 264:6 271:1 292:20,21 297:1 305:2 306:13,17 310:2 324:13 380:6 407:25

**attached** 25:5 82:4 276:8,18

**attachment** 275:19 387:8,11

**attack** 375:9

**attempt** 375:8

**attempted** 241:13

**attempting** 109:3,11, 16,19

**attend** 78:12 80:23

**attended** 15:19

**attending** 79:17

**attorney's** 91:23

**attorneys** 25:15 32:16 37:5,9 86:2 90:19 94:24

**attract** 193:8

**attracted** 206:9

**attributable** 360:11

**audible** 16:11

**audit** 375:1, 15 376:10

**audits** 361:22 377:6

**average** 378:5

**Audius** 312:22

**August** 38:5 145:12

**author** 151:12,25

**authored** 151:21

**authority** 71:22 399:6,14 417:8

**authorization** 168:22 170:15 174:8

**Automatic** 392:3

**automatically** 125:3,24 148:13,14

**autonomous** 62:21 129:6 130:3,8

**autonomously** 125:24

**Autorit** 90:4,9

**availability** 316:7

**average** 281:13 283:21 318:24,25 320:11 321:11

**averaged** 318:16

**avoidable** 296:3

**aware** 144:14 146:16 147:15 152:8 154:23 240:18 369:4 382:17

**AWS** 144:17, 18 146:23 147:2 148:1,8 153:18 154:20 155:6,18, 25 156:4 376:17

**B**

**B-U-G-G** 83:2

**bachelor** 74:13

**bachelor's** 39:22 74:21,25

**back** 24:22 28:1 58:18 76:24 81:8,17, 18,21,25 88:16 115:23 119:19 129:2 150:24 175:5,6 183:11 198:17 219:20 250:6,7 251:9,11 258:18 276:6,20 281:7 310:24 327:21 332:18 336:16 339:8,9 350:14 352:5 366:21 390:24 398:15 421:17 430:9

**back-end** 383:9 400:13

**backed** 212:5 213:21 223:22 227:1,11 231:2,10, 22 232:9, 16 235:15, 21 236:19 288:17,22

**background** 39:20 85:10

**backing** 227:22

**Baines** 11:25 18:15 31:15 73:13 86:6 110:21 145:5 180:16 269:1,5,7 274:1,6,9, 11 275:12 387:10,15

**Baker** 11:22 12:1

**ballpark** 22:19 106:24 107:11

**bank** 380:13

**bankrupt** 225:10,15

**bankruptcy** 78:2

**Baptist** 52:25

**bar** 81:3

**base** 85:20 87:9 185:15 189:8 190:16 212:12 213:17 254:22,23 275:5 279:11 316:2 391:2

**based** 50:20 62:6 74:20 88:1 97:14 127:20 159:14 167:13 171:19 181:7 189:2 197:6 212:21 225:24 226:4 252:19 256:4 258:12,17, 19 261:14 263:18 264:22 267:7 272:11 275:5 285:17 308:14,16 310:23 324:14 335:18 341:18 343:8,12 351:9,11 353:17 354:5 368:3 374:7 375:20,25 378:7 383:19 399:7 407:23,25 423:17 424:1

**bases** 259:22

**basic** 74:11 76:2,20 310:1 367:16 368:3,16 373:2

**basically** 49:8 128:15 206:4 222:7,16 256:11,25 278:24 346:23 347:23 355:13 367:9 381:7 397:22

**basing** 297:1

**basis** 25:7 84:18 87:21 88:10 187:2 188:14 194:5 216:14 254:1 271:21 273:11 324:14 325:7 330:13 410:25

**Bates** 269:18 270:4 274:17,19 286:8,24 291:16,24 386:17,19 388:2,4

**BCH** 354:20

**bear** 349:17

**Beeple** 414:1

**began** 28:24 44:16

**beginning** 369:20,24 395:15

**behalf** 11:22 12:10 20:1 197:12

**benchmark** 253:1,6 282:10,18 283:1 297:8

**benchmarked** 259:7

**benchmarking** 260:11,17 268:16

**benchmarks** 254:9 255:22 260:3 265:3 284:5

**beta** 185:22

**bifurcate** 58:12

**big** 427:6

**bigger** 50:23 183:22

**bill** 25:17, 18,19

**billed** 21:25 25:6,21, 24,25 26:2,7

**billing** 25:13,14, 22

**billion** 206:23 207:9,22 259:25

**bit** 73:7,9 75:25 78:1,3 90:17 106:19 124:17 128:9 154:18 279:11 303:17 308:17 314:21 355:4

**bitcoin** 60:5 61:15 183:16 348:11 349:9 351:15 354:1,13, 16 355:1, 10,17 356:1 358:8,9 359:4,21 360:18,19 361:24 362:7,10, 21 363:24 364:15,17 365:7 366:9 407:20

**blanks** 113:4

**blockchain** 41:10 60:11,14, 18 61:6, 13,18,20 62:6,10, 14,16 63:1,11,18 64:1,4,11 65:4 66:11 70:6 125:8,14, 21 126:10, 12,19 129:8,19, 20,21 208:9 289:12 299:5,9 301:7 302:7 330:7 331:6,8 346:16,20 347:3 349:9 350:6,10 351:10,12, 16,19 353:17,21, 24 354:6, 9,13,16,21 355:2,10, 17 356:1, 4,11,12, 14,15 357:10 358:3,5,9, 10,21 360:3,4, 18,19

361:17,19 362:5,8, 10,18 364:25 366:10 375:7,21 385:25 388:12 391:4 428:20

**blockchain-based** 60:23, 24 116:20 124:9 125:12 189:5 190:25 216:11 243:17,19 265:6 289:24 303:23 314:15 331:1 414:4,19

**blockchains** 125:11 127:4,6,9 300:24,25 301:20 302:2 303:14 414:4

**blue** 87:5

**board** 54:14 68:13,17, 21 69:8, 10,25 70:3,16,20 75:17 217:2 243:23

**body** 79:5

**book** 184:20 242:25 243:12,24 247:14 399:14 428:23 429:12

**boot-strapped** 261:24 409:13

**bottom** 35:19 94:7 184:5 219:8 229:13 265:1 287:3 379:4

**bought** 172:3 362:23

**box** 74:24

**bracket** 262:9

**bracketed** 263:11

**Bratina** 275:16

**break** 73:6 81:6 188:9 191:20 249:12 250:10 251:8 261:7 263:14 265:20 268:19 294:24 338:24 405:25 416:5 429:10

**break-down** 255:21

**break-even** 265:11,21 299:7

**breakdown** 188:1,20 266:21

**breaking** 405:2

**briefly** 426:21

**bring** 18:13 31:11 73:2 145:4 222:25 223:13 273:18 372:16,18 398:16

**bringing** 355:11

**brings** 222:7

**bristle** 128:14

**British** 190:4

**broad** 45:4 51:20

**broaden** 63:17 155:13

**broader** 61:11 62:1 64:22 163:25 164:5

**broadest** 65:21

**broke** 309:10

**broken** 192:18

**brought** 44:7,23 49:7,10

**browser** 102:12,16 149:21 150:14,20

**BSV** 288:2 290:19 299:11 346:21 347:3 350:6,10 353:17,21,

24 354:6, 9,19 356:4,11, 14 357:10, 16 358:21 360:3 361:4,17 364:25 400:6

**Bugg** 83:1,2

**bugs** 186:13

**build** 44:6, 23 117:10 337:25 341:8 346:15 347:9 354:21 355:19 356:13,14, 20,22 357:4 360:9 361:16,20 381:3 382:3 385:24 386:2 389:1 391:5 409:23

**building** 46:9 50:22 110:10 117:5 131:14 134:23 135:1 136:4 158:19 160:22 161:1 189:23 201:2,3,4, 12 203:25 239:19,22 244:13 348:19 351:3 376:5 427:21

**builds** 353:20

**buildup** 191:21 208:13 232:5 243:8,9 261:9,14 347:23

**built** 49:1 114:12,13, 18 115:8, 9,13 117:10 133:13 166:19 167:11 170:6 172:8 178:16 188:5 220:16 240:15 252:15 346:22 352:25 354:9 355:25 356:10,11, 25 357:10 358:23 363:24 364:25 368:7 378:12,14, 20 383:6 386:8 409:19,22 410:1 414:17

**bulk** 240:2

**bullet** 300:11

**bullets** 33:7 37:24 300:4

**bunch** 112:19 376:19 400:10

**business** 42:25 43:10,19 45:23 46:1 48:3,25 49:5,15 51:4 52:9 54:21 55:3,24 56:1,4 57:19,20 58:24 59:9 60:24 61:5 64:17,19 74:14,16 77:22,25 78:21 79:23 109:13,17 110:3 116:19,20 118:20,25 119:1,5,8 120:10 123:12,19, 20 203:2,3 206:10,18 209:23 211:6

**businesses** 49:21 56:10 58:7 122:12

**but-for** 199:15

**button** 150:14 206:4 319:20

**buttons** 155:22

**buy** 113:23 139:5,25 168:13 169:2 170:17

174:10
365:7
366:1

**buyer** 113:20
114:10
121:22
122:14
123:8
138:20,24
139:4,10,
14,19
140:11
144:2
168:12,19
169:1
170:12
174:4,9
193:14
332:22
333:16
336:24
350:17
351:8
361:11
362:15
363:15
365:25

**buyers**
122:16
189:7
362:20

**buying**
116:3,4
138:22
289:7
330:4
350:18
362:20

**buys** 280:18

**C**

**c.usd** 388:21
390:23

**ca** 128:9

**calculate**
322:8
366:23

**calculated**
319:8
321:23

**calculating**
224:5

**calculation**
171:24
199:16
215:16
222:3
233:8,21
322:22,24
326:25
372:24
424:24
425:5

**calculations**
51:8
292:16
368:1
424:21

**California**
47:14,15

**call** 28:18
140:1
148:13
150:13
151:9
287:14
318:10
412:16

**called** 17:1
18:1 42:3
50:14 55:6
68:13
70:18
79:18
84:12
109:18,20
116:4
122:24
133:5,7
136:17
139:16
140:21
141:9,20
142:5,11
144:9,16
146:19
152:11
155:1
156:11
157:1,15
159:10
161:9,24
162:24
166:25
169:7,24
171:6
173:1,2
243:24
251:23
377:14

**calls** 120:15
157:20
162:3
163:3

**Canada** 90:16

**Canadian**
90:25
91:14

**Candidates**
78:9

**Candy** 83:1

**cap** 392:8
395:19,22

**capabilities**
125:9

**capacity**
15:13,16
78:21
79:22

**care** 320:20

**careful**
128:5

**case** 12:8
15:10,17
16:25
17:25 18:6
20:2,8
21:2
26:21,24
32:10,16
39:5,12
47:10,14,
19,25 48:4

58:13,16 67:8 83:4, 8,22 84:12,14, 17,23 85:6,8,10, 14,17,21, 25 86:22 87:11,23 88:4,10,14 89:5,10, 13,14 90:2,14, 15,22,24 91:7,8,10, 11,15,16 92:2,7 94:16 112:7 131:1 132:24 133:3 135:24 136:17,20 137:8 163:11 164:10 180:22 181:5 183:8 218:4 222:10 262:12 263:1 301:5 329:21 334:13 335:4 353:12 363:23 376:2 377:4 401:1 414:9 424:3

**cases** 46:18 49:9,11 52:4 59:6, 13,20 61:9 62:12 63:15,18, 23 64:1,8 66:10,21 67:7,20 82:14,22, 25 83:11, 13,15,17, 19 85:9 88:15,23, 24,25 89:1,6,8, 25 92:4 263:5

**cash** 113:17 127:21,24 241:5 260:18 354:1

**Cassidy** 83:6

**catch** 186:14

**categories** 35:15 36:25 365:24

**categorized** 166:6

**category** 92:25 93:6 94:9 340:18 366:23 379:10

**caught** 200:2

**caveat** 374:11 423:7

**CCI** 41:8

**CDT** 431:7

**ceased** 359:7

**cells** 279:8

**cent** 296:4, 11 297:16

**Center** 78:15 79:19

**cents** 298:4

**certified** 41:5,6,7,8 70:18,21 71:7 73:20 74:3

**CFE** 70:13

**chain** 348:24 407:20

**chance** 210:5 222:17 223:8

**change** 28:24 37:19 39:5,11,16 113:18 176:14,17, 20 177:10 181:24,25 182:11,14 183:2 220:20 237:20 257:10,13, 16 268:9, 12 278:17 279:14,15 309:1 319:18 323:3,7,8 324:22 326:15,18, 19,22,24, 25 411:8 420:17,24 421:3,21, 24 423:21

**changed** 42:5,15 176:6 420:9 421:3,18 423:2,13, 17 424:1 425:12 426:6

**changing** 227:14

**characteristics** 232:11

**characterization** 128:5 192:22 344:5,9 427:10,19

**characterize** 55:14 97:11 222:21 350:20 398:7 415:22

**characterized** 154:18 396:3,7

**characterizing** 203:2

**charge** 224:16 240:6 267:9 268:17,18 298:16

**chargebacks** 377:14

**charged** 301:16 303:7

**charging** 300:21 301:4 302:15

**Chart** 111:3, 12

**charts** 385:4

**cheaper** 355:13

**check** 74:23 232:14 261:8 271:16 307:12 308:24 309:5

**checked** 91:12

**chief** 350:9 353:25 354:19

**choose** 229:2 277:11 316:14

**chose** 315:2 316:11 319:14,16, 24 401:16

**chosen** 320:5

**Christian** 52:21 53:4,8 54:6,19,25

**Christopher** 83:2

**circles** 131:17

**circumstances** 336:11 359:20 363:23 402:9

**citation** 226:16,18, 20,25 275:8 285:21 374:18

**citations** 314:7 378:22

**cite** 238:12 271:7 277:22,23 291:2 308:5 322:13 330:15,17, 22 378:15 388:4 399:5

**cited** 103:1 242:16 253:7 258:21 264:25 271:15 283:9 286:20 292:23 323:19,21 378:18

**cites** 261:16

**civil** 49:11 83:20 88:25 89:14

**claim** 133:16 134:13 167:25 275:4 384:19

**claim's** 134:20

**claiming** 394:12

**claims** 134:19 171:9 314:23 381:15

**clarification** 134:11 162:16

**clarified** 63:21 146:20

**clarify** 36:5 55:19 117:24 136:14,15 147:5 162:11 166:8 261:10 332:9

**clarifying** 119:13

**clause** 178:13

**clear** 35:1 121:15,16 149:9 265:7

**click** 106:20 150:14

**clicked** 105:10,17 107:7

**clients** 57:12

**close** 65:10 97:3 182:17 369:23 406:9 415:17,18 419:3 420:1

**closely** 122:12 329:20 402:15 403:6,25 405:15 419:18

**closeness** 402:24

**cloud** 376:14,15, 19 381:2, 15,21 382:3,6,18

**coach** 15:19

**code** 116:13 118:5,8 121:10 127:9 143:19,20 144:2,9, 13,15,19, 21 146:7, 9,12,18, 21,24 147:3,8, 16,19,21 148:2,7, 13,19 149:4,22, 25 150:6, 7,13,18,22 151:3,11, 17,21,22 153:18 155:5,8, 15,18,20, 23 156:1, 5,9,10,25 157:14 158:17,20, 21 159:9 160:5,10 161:3,23 162:23 165:21 166:24 167:16 168:13,14 169:2,7,24 178:15,24 344:23 346:17 347:1,2 358:22,23 361:21 364:4 375:3,4,7, 8,10,14, 16,19 385:25 386:4

**coded** 353:16

**coding** 345:2

**coincidence** 382:10

**collaboration** 157:19

**colleague** 11:25 180:15

**collect** 172:7

**collective** 121:25 158:25 160:4 174:2

**collectively** 18:10 108:23 109:23 110:9 116:10 120:3 121:3 133:9 143:17 158:2,14, 18

**college** 39:20 74:17

**Colorado** 83:9

**column** 93:1 95:23 112:23 113:5 252:6 317:25 388:9 399:24 426:25 428:9

**columns** 113:13

**combination** 61:17 76:8 79:24 131:13 135:1 254:22 261:21 336:20 386:4

**combine** 383:12

**combined** 319:9

**comma** 117:22 119:25 130:11 133:11

134:20
143:16
157:24
158:12,16
160:11,13
167:9,19
168:1,8
169:10
173:22
240:11

**command**
328:4

**comment** 36:8
151:13
294:23
396:3

**commentary**
356:2

**comments**
176:16

**commercial**
77:23
186:20
201:15,20

**commercialization** 198:21
417:24
418:8,12
419:6

**commercially**
186:2,3,9
200:11
201:19
300:12

**committed**
297:13

**common** 114:5
414:3

**communicated**
366:17

**communications**
242:12
285:25
286:1
341:22
342:2,8
343:3
345:9
353:7
369:24
370:6
378:13,16
408:2

**community**
357:22

**companies**
48:21
125:12
188:4
189:5
190:25
191:23
207:19
208:3
209:7
216:11
223:23
253:19
259:9
261:21
262:18,20
263:4
265:5,6
303:24
304:1,24
305:19
306:7
307:2
311:12
312:8,16
313:5
314:6
315:1,8,22
316:11
317:10
321:3
328:12
371:19
407:22
408:14
414:4,18,20

**company**
36:2,17,20
41:24
48:13
49:10
50:14,20
55:6,11,19
62:18
65:8,9
182:23
187:10
190:2,5,12
193:16
209:10,13
210:3
212:5,8
214:4
225:9,11,17 226:2
227:12,21
231:11,23
232:10,11,17 239:1,7,13,15
243:18
244:12,14
261:18
262:13,15
263:1
289:25
311:7
314:15
316:15,23
317:20
330:4,25
331:16
354:20
391:17
392:4
397:17
408:18
413:4
414:24

**company's**
34:18 35:8
141:10,21
329:20

**comparable**
190:2
191:22
193:16
207:7,13
208:2
209:13

210:17
216:21
219:10
253:19
311:15
312:9
315:2,22
316:19,23
317:11
320:21
328:21
405:5
407:22
408:14

**comparables**
182:24
191:10
198:10
207:23
208:19
218:17,19
259:6
302:23
316:12
320:21
321:12
327:25
336:17
400:19
408:19
414:7

**compare**
226:9
301:14
306:5,6,23

**compared**
282:10
294:12
300:22
304:9,22
305:17
308:6,7
314:23
401:18
415:20

**comparing**
113:8
188:4
266:15

**comparison**
111:3,12, 18 112:8, 18,25
221:3
252:22,24, 25 265:2
304:11
307:7,11
315:24
327:24
336:16

**compelled**
333:21

**compensated**
21:9,13,16
26:17

**competed**
303:9

**competition**
183:17

**competitive**
268:19

**competitors**
266:15,17
300:13,20
301:3,6,16

**compiled**
148:2

**compiler**
156:11

**complaint**
180:2,6,7, 8,21
181:3,8
369:25

**complete**
33:10
34:15
119:24
120:5
204:24
261:12
377:10

**completely**
400:15

**completing**
25:23

**complex**
309:9

**complicated**
309:8

**component**
45:18
51:7,13,22
52:11
57:21
58:18
61:13
62:12
63:16,18
64:2 66:11
69:16 80:6
83:20 86:2
91:21
116:11
126:20
187:22
188:10,19
192:16
194:7
213:22
215:5,19
224:13
298:14
301:11
302:25
332:22,25
338:15,17
347:20
348:24
357:3,5
360:12
361:25
378:11
380:25
390:14
397:7
399:9
424:14
427:12

**components**
63:1
114:20
115:15
121:13

135:4
188:1,20
193:16
198:12
202:2
203:12
204:20
205:9,13,
21,25
208:22
215:22
216:24
217:18
219:6
221:10
232:10
238:25
239:13
242:8
267:11
288:12
337:25
338:8,20,
21 362:4
376:4,13,
22,23
380:1,20
383:9,11
404:8,25
405:23
406:12
407:12
408:10,12
409:1
411:9
425:7
429:7,8

**comprehensive**
243:24
428:20

**compulsion**
113:23
333:23
334:1

**computer**
40:4 65:24
150:6,18
375:5,6

**concentrated**
77:22

**concentration**
74:14

**concept**
161:14
164:1,5
206:22
212:14

**concern** 34:5
66:2
216:16
217:14
361:5
366:18
428:1

**concerned**
190:1

**concerns**
45:24 46:2
357:15

**concluded**
172:23
402:3

416:12

**concluding**
200:6

**conclusion**
120:16
162:4
163:4
164:12
165:5
167:6
173:16
175:13,18
200:22
337:24
409:2
420:13
421:20,25
423:5,20

**conclusions**
39:16
85:20
87:10
108:9
183:3

**conditions**
268:15

**conduct** 41:1
51:16 56:3
259:8
281:14
423:18

**conducted**
22:22
153:22
250:23

**conducting**
56:23

**conference**
80:24

**conferences**
80:24,25
81:4

**confident**
267:23

**confirm**
138:21
139:6,15
238:21
314:2,12

**confirmation**
237:15
275:18

**confirmed**
203:16
206:1
396:4

**conflated**
296:14

**conflating**
63:14
209:21

**confused**
153:24

**confusing**
100:18

**connected**
375:13
418:11

**connecting**
421:16

**connection**
29:22
30:23
34:16 37:2
45:16 56:4
92:16
93:24
151:2
156:22
157:10
159:6
161:19
162:19
300:17
343:10
377:7
381:16
382:18
383:20
384:23
429:16,20

**consent**
332:2,16
333:7
334:12

**conservative**
208:1
255:7
260:15
280:8
282:23
283:1
284:8
305:8
307:24

**consideration**
139:12
190:10
196:17
197:2,16
200:1
216:13
219:7
223:24
261:22
302:20
316:8
324:4,5
327:11
328:22
346:19
349:5
360:24
364:13
419:17
429:6,7

**considerations**
191:24
193:17
194:15
195:1,17
200:24
244:3,5
316:3
331:9
364:6

**considered**
176:15
187:12
193:22,24
195:20,23
219:9
232:12
259:9
307:22
312:9
333:1
360:23

**consist**
251:15

**consistent**
263:12
278:2
300:19
327:13
346:13
353:6
392:25
399:10
417:12

**consists**
247:20

**consolidate**
49:2

**constructed**
102:7

**consultancy**
391:22

**consulting**
55:24
56:14,21
57:1,4,11,
15,18
58:24
59:9,14

**contact**
178:2
212:11

**contained**
27:17 98:5
100:22
101:18
112:16
138:18
155:15
163:7
194:18
230:25
242:9,16
267:11
268:21
272:20
296:20
302:10
345:9
358:7
363:20
377:12
408:19
422:11,23
424:9
429:12

**container**
155:7
156:17,18

**containers**
153:18
154:20
155:9,18,
20 156:5

**contemporaneous**
294:8
346:10
353:7

389:11,13 409:15,17

**content** 103:17 105:3 106:8,22 107:10 372:1 395:23

**context** 184:16 221:24

**contingent** 26:20

**continue** 178:5 199:22,25 201:10 209:24 210:4 224:6 225:6,12 233:5 234:8

**continued** 90:21

**continues** 233:17 296:2 392:1

**continuing** 40:20 72:22 178:4 204:1

**contract** 142:10 164:10,13, 19 165:5 166:5 167:7

**contractor** 165:2,6,7, 13 166:22 167:6,23

**contractors** 57:6 159:16 162:15 165:23 166:12,19 167:12 168:4

**contradict** 241:23 242:22

**contradictory** 241:16

**contribute** 395:12 409:1

**contributes** 403:13 409:1

**contributing** 214:2 410:5

**control** 208:16 210:6,8,9, 11 211:10 236:4,9 316:4 331:12,15, 20,22 332:23 334:10,19, 23 335:1

**controlled** 202:3 211:9 212:21 380:16

**controller** 125:5

**controlling** 217:4

**controversies** 349:2 357:22 407:19

**controversy** 358:11

**Conventional** 25:14

**converge** 415:3

**convergence** 418:24

**conversations** 221:9

**conversion** 304:12 380:11 392:2,3 394:7,17, 21

**conversions** 299:10,11 417:1

**convert** 289:9 384:9 393:16

**converted** 310:17

**convertible** 391:16 396:10,19 397:1,4, 10,15,22 398:7,13

**conveyed** 287:24

**convoluted** 142:24

**cool** 204:11 205:16

**copies** 32:23 388:1

**copy** 15:4 82:1,19 87:18 145:20,23 183:23 184:3 385:10

**copy/pastable**

331:5 347:4

**copy/paste** 346:18

**copying** 32:8

**copyright** 386:7

**core** 295:16

**corner** 287:4

**corporate** 60:21 61:18 64:6 65:5 66:4, 19,22 67:2,12,21 68:8 129:11,24 130:13 158:4

**corporation** 157:25 158:1 414:16

**corporations** 66:13 68:6

**correct** 20:23 21:4,12 24:9 26:19 39:2 44:20 45:1 47:23 50:6 52:19 55:21 56:12,15 64:12 68:15 71:4 80:19 84:9 86:25 93:8 95:15,16, 21 96:2,6, 7,10,16 120:6 123:25 124:23,24 134:16 144:22 149:17 159:24 165:3 180:22 201:16 220:12 221:17 237:2 244:9 245:17 247:22 251:5 252:1 256:10,16 257:4 265:12 272:13 280:20 287:6 289:4 293:14 298:1,20 300:12 322:1 332:17 347:13 349:10,23 350:19 352:1,2, 11,17 353:17 354:6 355:21 356:25 357:12 360:5,6 361:13,19 362:24 363:9 365:2 366:6 387:4 389:23 412:2 426:20

**correctly** 178:25 246:11 333:19

**corresponds** 417:17

**corroborate** 418:22

**corroborated** 108:13 134:20 138:16 175:21 255:8 396:4

**corroborating** 171:3

**cost** 187:16 193:12,19, 21 197:22 210:15 215:3 296:3 298:21 299:13,15 305:10 312:3 335:13,25 336:2,3 337:13,17, 25 338:11 339:11 340:2,3,4, 9,12 341:6 344:13 347:10,14, 17,19,24 348:3,25 349:20 350:4,15, 16,23 351:2,6, 23,24 352:14,15 354:8,14, 18,23 355:5,14, 18 356:9 357:5 359:25 360:8,15, 22 361:10 362:12 363:1,10, 12,21 365:2

368:10,18 369:13 370:23 371:6 372:12,16, 25 373:3,5 374:22 377:12 378:1 382:25 385:13,17 389:19 390:10,13, 14 398:24 400:1 402:7 403:24 404:10 405:4,24 406:2 407:3 408:10 409:23 413:8,11, 18 414:5, 25 415:6, 13,20 417:19 419:24 420:20

**costs** 187:5, 20,23 188:18 194:14 277:17 284:21,22 297:20 337:14 340:17 349:22 354:17 355:2,7 356:16 358:6 360:1 361:8 362:17,22 363:11,12, 16,17 364:1,13 365:17,18, 20 366:22 367:10,14 368:4,17 369:12 370:16 373:17,25 375:1 377:17,19 378:3,8,23 379:3,8, 11,16,18, 21 380:7 383:3,19 384:1,4,22 385:22 386:3 388:25 394:8 400:14 413:4

**counsel** 11:19 24:14,19, 24 28:17 31:13 171:23 179:21 180:5 249:17 430:16

**counsel's** 430:14

**count** 97:13 187:7 215:18 342:25 343:6

**countries** 188:24 190:17

**county** 49:3 83:4,9

**couple** 26:2, 10 33:15 80:23 145:23 176:11 206:4 207:10 232:2 240:21 283:5 291:11 303:11 307:6 309:9 318:19 344:18

**courses** 53:7 54:20,22 55:1 80:3, 15,20,23

**court** 12:11 13:16 14:4 16:7 47:15 83:3,7 84:21 87:6 89:9,10,19 137:23 245:22 386:13 430:11

**Court's** 87:22

**cover** 275:11 297:19

**covered** 79:16 395:14

**covering** 78:11

**COVID** 53:20, 21

**Craig** 348:13 358:18 359:6

**crazy** 260:1

**create** 160:9 369:16 385:11,18

**created** 20:16 272:20 276:17 277:3

292:2 350:10

**creating** 285:1

**creation** 285:3

**creators** 285:2 286:7,17 344:23,24, 25 414:1

**credential** 41:3,6 70:9,10, 11,15,25 71:3 72:13,14, 18,21 74:10 75:15,20 77:9 80:9, 11,18

**credentialing** 148:12

**credentials** 40:18,23 76:14,18 178:16,25

**credit** 381:19 391:24

**credits** 381:15 382:6,18

**criteria** 74:11 76:19 79:3

**critical** 125:21

**cross** 100:12 104:16 219:17

**cross-notice** 430:22

**cross-reference** 275:2

**Cross-talk** 379:12

**crowd** 382:6

**cryptocurrencies** 59:24 288:19

**cryptocurrency** 41:9 46:18 58:13 59:10,15, 18,24 60:4,8 61:10,25 62:12,13 63:16,20 85:24 288:21 290:4,17 291:4 428:21 429:1,13

**cryptography** 288:23

**culpability** 424:5 426:12

**currencies** 60:6 337:16

**currency** 59:10 288:8,13 290:5,13

**current** 21:6 76:15 80:11 82:5 158:12 181:16

**cusp** 202:15

**customer** 185:15 189:8 194:3 195:9 212:12 279:10 316:2

**customers** 185:18 224:16 266:22 315:10

**cut** 326:4

**CV** 15:1,5 25:5 82:1, 4,6 83:16 88:16 184:21

**cyber** 54:6, 11,13

**cybersecurity** 53:10

**cycle** 203:3, 5

**D**

**d.o.o.** 144:12 345:1

**Dale** 34:3, 20 36:8,21 121:10 144:11 157:20 165:24 168:5 189:25 203:16 241:7,16, 23 242:18, 22 294:6 344:22 370:13 371:23 377:13 386:25 389:6 393:1 396:5 427:23

**Dale's** 152:15 206:1

**damages** 77:24 424:16,19, 23

**Damodaran** 217:15 261:16 311:7 327:14 330:20

**data** 41:21 236:2,7,8, 25 316:7,8 402:19 407:22 414:15 416:22

**database** 49:6

**date** 11:8 21:21 22:1 23:4,23 24:3 31:25 32:3 70:22 73:22 86:16 95:2,4,8, 24 96:3,8 111:5 145:14 177:14,15, 16 178:8 179:7,8, 11,17,22 180:4,6,7 181:7,11, 14,15,16, 17,18,24 182:10,12, 13,15 183:3 195:24 196:8,9 197:3 202:7,20 203:13 204:5,17 205:11,20 269:20 272:6,15 274:21 275:17,23 276:14 277:3,4 286:10 291:18 300:21 301:17 302:17 304:25 305:21 306:9 307:4 311:14 313:8 314:4 315:4 337:1 343:1 347:13 348:6 352:1,11, 17 354:4 355:21 357:12 359:18 363:15 364:24 365:15 366:2,15 367:22 369:18,25 386:20 391:21 392:13

**dated** 19:6, 20 86:23

**dates** 95:7,8 270:1 272:12 276:25

**day** 27:5,7 28:10 223:1 225:9,14, 15

**days** 27:13, 15,20,22, 25 28:1,8 29:3 38:2, 18 78:16 145:24 176:11 182:16 370:12

**DCF** 128:17 229:18 237:14 242:4 243:2 245:11 247:19 248:6,13 250:22 251:14 252:12 263:16 271:2,22 272:11 273:12 281:22 301:14 303:5 304:21 305:17 306:25 309:20 310:17 311:4 321:18,24 322:9 323:7,14 324:24 325:17 326:11,16 401:8 405:6

**deals** 56:11

**debatable** 380:16

**debt** 391:16 392:1 394:13,14, 15 396:10, 20 397:1, 4,10,15,23 398:7,13

**decapitated** 15:21

**December** 177:18 369:21 386:24

**decentralized** 60:18,19 62:21 312:18

**decide** 258:15 416:6

**decision** 40:11 87:22,24 88:1,8 190:2,3 206:3

**decline** 183:15 259:24 357:16 400:9

**declined** 358:21

**declines** 259:24

**decrease** 257:21 258:5 260:22,25 338:18

**decreases** 338:19

**dedicate** 29:5

**deduct** 360:14,22

**deduction** 192:7 366:3

**defendant** 430:19

**defending** 384:16,18

**defense** 191:5 384:12,15 430:14,16

**define** 59:25 119:19 363:21

**defined** 78:24 185:25

**defining** 352:6

**definition** 61:11 65:20,21 106:2 107:7 112:16 113:16 114:3,6 123:10 147:19 159:14 162:12 165:17 166:14 173:24 333:25 347:15

**definitions** 111:4,12 112:4,6

**degree** 39:22,24 40:7 74:13,21, 25 75:1, 10,17

**delayed** 417:22

**deliberately** 348:16

**delong** 329:19 330:15 400:25

**demand** 235:23 236:20

**Denker** 89:8 92:2

**Denker-ricchio** 88:24 89:24

**Denver** 83:8

**department** 50:25 54:14,16

**depend** 65:19 132:17 366:7 412:5

**dependency** 427:17

**dependent** 122:10 183:16 421:7,10

**depending** 123:18 337:16 365:21 386:1

**depends** 129:16 131:22 136:7 148:10,16 160:12 289:5 365:16 389:24 421:13

**deponent** 11:13

**deposit** 289:8

**deposited** 132:6

**deposition** 11:10,15 12:6 13:20 14:13,16,

20 15:13, 16 21:18 27:2,6,14, 21 28:4,9, 14,17,25 29:4,6,10 31:3 32:11,22 33:21 34:3,17,21 35:3,23 36:12,22 37:2,6,12, 16 38:10 39:7 145:8,11, 21 395:15 430:22 431:6

**depositions** 20:14 29:15

**deprecated** 364:2,17 400:7

**deprecation** 366:11

**depreciation** 360:9

**deprived** 182:6

**derailment** 15:20

**deriticle** 159:18

**derived** 54:12 194:21 239:5 405:16

**Des** 90:4,9

**describe** 64:24 164:5 214:22 229:3 253:23 309:24 406:18 409:3

**describes** 98:12 100:3

**describing** 58:3 101:12 105:18 197:5 206:5 216:21 234:1 287:12 295:8 311:16

**description** 64:17,19 227:6 279:10 349:12 418:16

**descriptions** 279:2,4 324:15

**designed** 72:15 347:2

**desire** 174:9

**Desouza** 47:9,16, 18,25 48:4

**Destiny** 429:19

**destroyed** 200:3

**destroys** 211:6

**detail** 99:3 184:20 192:19 194:10,17 218:14 255:18 256:1 284:2 299:23 370:5,10 371:22 409:8 416:18 427:3

**detailed** 23:13 75:25 162:9 239:1,13 279:11 308:21 397:6

**details** 178:8 235:13 401:10,23 426:5

**determination** 179:7 268:14 323:25

**determinations** 312:24

**determine** 151:21 245:21 246:14 265:10 300:17 303:3 316:20 323:17 335:24 361:17 364:8 367:20 403:5,22 404:2 419:5,9

**determined** 107:9 294:13 323:14

**determining** 151:2 314:18

325:21
400:23

**dev. distromint.com**
149:12

**develop**
70:4,8
71:13
345:20
372:12
388:11
389:22

**developed**
54:15
150:20
198:20
199:23
391:4

**developer**
370:11,20,
22 372:15

**developers**
161:2
343:4
370:23
371:15
372:7
377:21,22

**developing**
205:4
377:7
393:25
394:4,23

**development**
70:25
108:22
119:21
120:2
149:6
165:20
178:6,15,
24 179:13
182:8
185:9
187:4
193:23
202:17,25
203:5,11,
24 204:19,
25 205:6
262:1,2,5
311:9
330:25
331:7
340:17
343:11,21
344:3,15
353:2,9
355:7
363:11
366:22
368:17
369:4,12
370:3,16
381:16
382:19
383:2,16,
21 384:1
388:11
389:1
391:22
392:14
409:12

**developmental**
70:1

**differ**
415:8,15

**difference**
60:22
65:1,6
116:19
124:8,13
158:4
354:24
355:23
373:12
412:6
415:16
417:4

**differences**
277:10
315:23
316:4
403:11
406:8
408:17
415:19
417:6
418:25

**differentiate**
205:24

**differentiator**
67:5

**differently**
159:22

**differs**
415:13

**difficult**
172:7
316:22

**digital** 11:7
44:5 45:12
53:10
65:7,15
129:6
130:3,8
244:1
427:7
428:21,22
429:14

**digits** 321:4

**Diligence**
48:11,16,
17 49:1,
17,22
50:1,4,9
56:7
262:17,23

**Diligence's**
48:25

**direct**
137:21
199:7
305:7
313:18
426:16
430:18

**directed**
130:25
179:20
198:23
199:3

**directions**

361:3

**directly**
24:19
241:22
242:22
260:11

**director**
44:15,17
159:7
161:21
162:21

**directors**
43:16
62:19
69:3,5
159:4

**disagreement**
322:5
324:2,8

**discernible**
371:2

**disclose**
100:14
207:14

**disclosed**
364:1

**disclosure**
18:22
31:23 33:1
35:17
83:16
377:10

**disconnected**
22:14

**discount**
122:11
171:2
191:14,21
192:3,20
194:19
195:3
198:13
200:17
208:7,21
211:23
212:2,3,7,
9,18
213:3,6,
11,20,25
214:5,9
215:25
217:5,6
218:1,24
219:5
220:15
221:17,21
222:5,13,
23 223:11,
15,20
224:25
226:16,22
228:4,11
229:1,10,
15,24
230:22
231:9,21
232:15
233:23
235:14,20
236:11,14,
18 238:10
241:5
245:15,23
261:5
326:11,15
327:2
328:5
329:5,9,15
331:11,14,
20,23
332:13,22
334:10,18,
22 335:8,
24 336:1,
14 337:4,
8,13 338:3
351:17,20
361:6
392:6
393:17
400:20,23
401:4

**discounted**
127:21,24
233:11
234:15
260:18
338:22

**discounts**
169:5,22
170:20
191:19
210:12
211:10
308:14,16
327:7
329:24
334:25
335:15,20
338:10

**discovery**
32:24
94:16
376:1
377:3

**discuss**
176:24
192:15,21
268:13
277:24
317:5
380:23

**discussed**
16:15 92:8
128:11
131:13
175:11
254:8
277:14,15
297:24
416:16
427:3

**discussing**
133:20
134:16
250:11
276:21

**discussion**
102:18
121:7,10
189:2
204:13
242:11
244:1
253:10

266:1
278:1
294:25

**discussions**
255:11
266:14
287:23,25
288:12
353:4

**displaced**
156:18

**displayed**
151:8

**dispossession**
177:17,23
178:21

**disproves**
324:12

**dispute**
46:19
160:20
163:16
170:6,25
171:18
239:21
240:16
329:22
409:14

**disputed**
332:24

**disputes**
58:5,6

**disqualified**
83:23
84:1,23

**disregard**
113:12

**dissolution**
48:1

**distancing**
348:12
356:5
359:5

**distinction**
104:25
109:14
110:5
116:8
117:20,21,
25 118:5,
6,11,12
119:13,17
129:3
134:5,11
135:7,14
147:24
148:1
150:4
167:5
173:6

**distinguish**
110:18
117:8

**distress**
139:2
200:4
334:4

**distressed**
397:24

**distribute**
129:19

**distributed**
130:16
132:17

**distribution**
128:19
132:20
194:3
195:9

**District**
86:14,23

**Distrofy**
196:13
197:6,22
313:6

**Distrokid**
253:20
313:1,17
315:6

**Distromint**
18:2,5,9
93:7,11,20
108:11,20,
21,24
109:7,12,
18,20
116:3,5
117:15,22,
23 119:20,
25 120:1,
4,10,11,
17,23,24
122:3,23,
24 125:17
126:24
128:2
130:7,11
131:20
133:5,7,8,
10,17
134:1,14,
19 137:9
138:14
139:16,25
140:2,20,
21,24
141:1,8,9,
17,20,24
142:6,12,
21,22
143:5,6,
10,11,16
144:1,3,
10,16
146:7,13,
19,21
147:8,16,
17 148:24
149:4
151:3,6,22
153:8,10,
14,21
154:3,8,10
155:1,14
156:24
157:1,3,4,
12,15,24
158:9,12,
16 159:8,
10,19
160:4,6,8,
11,13
161:2,7,9,
22,24
162:22,24

163:12,20
164:1
165:2,17,
21 166:11,
13,22,25
167:9,19,
21 168:1,
2,3,8,13,
14 169:6,
8,10,14,
23,24
171:4,6,9,
10 172:2,
18 173:1,
3,19,22
175:14,19
179:14
182:7,8
183:14
185:3
186:1
187:1,19
188:24
189:11
191:16
192:9
193:2
194:4
195:10
197:9,23
200:7,9
202:7,20
204:5,24
205:5
206:8,15
211:1,24
213:14
214:12,24
215:10
218:11
220:8
223:18
233:4,17
234:7
239:22,24
240:11,19,
20 241:6,
10,14,20
242:4,7
251:4,25
252:18
254:6
255:15
259:10
260:4,5
261:23
267:25
275:17,19
278:7
281:15,25
283:20
284:13,16
285:1,16
286:7,17
288:9
289:2,18
290:15,22
291:15,25
293:13
294:1,18
296:9
298:24
299:21
302:14
303:8
304:24
305:20
306:8
307:3
311:13
312:10
315:14
316:23
317:11
327:25
328:9
336:25
340:25
341:9
343:11,21
344:16
346:3
347:12
348:4
351:25
352:9,16
353:1,15
354:3
357:9
358:8
360:2
361:12
362:16
363:13
366:1,14
369:5,8,16
371:16
372:9
376:25
377:7
381:17
382:19
383:21
384:25
389:1,23
393:25
394:4,23
403:17
404:1,11,
13,14,21
405:1,10,
18,19,25
406:11,17
407:7
409:11
412:2
422:5,10,
17 423:2,
16 424:1
425:16,20
426:1
428:11

**Distromint's** 300:6

**Distromint. com.** 376:18

**divide** 317:19 393:15

**divided** 58:7 313:14

**division** 318:7

**divorce** 58:8 59:6 89:13

**docket** 87:14

**document** 18:21 19:4,17

31:14,19 38:25 74:1 86:20 94:17,23 95:9 98:24,25 99:3,11 100:22 101:6,9 105:3,4,6, 9,15,22 111:9,14, 16 112:16, 18 141:24 142:19 143:3,9 145:7 163:6 180:25 240:17 241:3,12, 16,19,21, 22 242:20 246:16 253:9 254:11 255:9 265:9,10, 14,24 266:7 269:25 270:3 271:6,7 272:4,12, 21 273:10, 16 276:4, 16,21 285:17 286:19 287:11 291:24 292:5,6, 11,22,24 293:11,24 294:16 295:2,6, 10,11 296:2,21 297:8,25 298:24 324:11 342:19 374:8 387:5,21 388:24 389:8,16, 17 392:16, 20,21 393:7,22 394:5 395:24

**documentation**
243:20 245:4 267:15 308:25 409:16

**documents**
29:9,18,22 30:19 31:3,4,6 33:11,22 34:9,11, 15,19 35:2,9,22 36:2,12, 17,20,25 38:1,6,17 39:6 85:21 86:1,3 87:11 92:15,19 93:14,19, 23 94:2, 14,20,22 95:14,18, 25 96:4, 12,21 97:7,11 100:5,9,16 101:15,20 102:8,25 103:8 105:22 106:7,8,25 107:12,15, 21 108:1,3 141:8,17 142:4 176:10 224:9 239:23 240:3 242:1 253:6 264:24 265:16 266:9,14 273:25 284:4 287:19 290:18 299:18 342:24 343:19 377:13 409:15

**dollar**
207:9,22 290:4 299:10

**dollars**
132:13 190:7 206:23 223:3,4,5, 7 279:21 289:8,9 290:2,12 307:18 313:8 367:4 373:11 413:14

**domain**
376:16,18

**domestic**
111:3,11, 19

**Dorothy**
11:13 13:1 19:5,20 87:7 107:12

**double**
105:9,17 106:20 107:7 215:18

321:4

**double-counting** 195:4 212:20 217:12,18 337:9 401:1

**downstream** 132:20

**downward** 279:15 303:20

**dozen** 361:1

**drafting** 21:14 30:24 92:16 93:24 107:14

**drain** 375:12

**draw** 117:20 129:4 135:7,14 327:6

**drawing** 118:11 173:5 284:8

**drawn** 329:9 368:5 391:20

**drive** 177:9 232:12 280:2

303:16

**driven** 127:3

**driver** 281:3,5

**drives** 319:20

**drop** 201:18 220:18 249:2

**dropped** 229:24 230:11 247:8 248:19 357:17

**drops** 211:6, 15

**drove** 190:1, 3

**dual** 48:21

**duly** 13:2

**duplicates** 97:14 98:24 285:23 292:6

**durable** 235:24 236:21

**E**

**e.g.** 300:7

**E.smitty/nchain** 386:18

**earlier** 46:6 92:10 105:1 146:20 147:5 182:21 258:25 259:23 268:11 280:5 299:8 306:14 311:1 327:10,15 328:2 353:13 366:16

**early** 202:16 215:23 262:1 327:21 370:24

**early-stage** 212:5 213:21 223:22 227:2,12 231:3,10, 22 232:9, 17

**earn** 110:12 129:18 295:1

**earned** 39:22,23 40:17 89:18 109:10,24 129:16 130:17

**earnings** 165:10 234:14

**easier** 16:6 42:19

**easily** 238:6 330:3

**easy** 245:21,24

**EB** 313:14

**EBITDA** 188:14 310:11,17, 22 311:4, 12,19

**economic** 46:9 402:16 403:8 404:7,24 406:10,14, 16 407:11 408:5,8, 11,20 409:4,21 410:4 411:3 416:23

419:19 427:8

**economics** 74:15

**ecosystem** 135:4

**Eden** 302:5

**education** 40:16,19, 20 69:16 72:23 74:11 76:8

**effect** 129:25 130:12 182:18 223:12 426:9

**effective** 106:9

**efficient** 106:9 355:12

**Electronic** 86:13

**element** 295:16

**elements** 184:23

**eleven** 341:8 368:24 369:15,23

**eleven-month** 370:1

**Ellie** 11:25 18:13 31:11 73:2 86:4 145:4 268:24 273:17 275:10

**Elsberg** 11:22,25

**email** 32:1, 7,20 33:7, 24 34:12 35:6,25 36:14 38:18 275:11,15, 21 276:14 386:16,25

**embed** 365:23

**embedded** 77:19 352:20

**embroiled** 358:11

**employed** 57:8

**employee** 43:5 127:10 159:8,13 161:21 162:10,11, 13,22 165:8,9,15 341:3

342:25

**employees** 57:3 126:23,25 127:1 159:14,18 166:7 186:25 187:8,18 188:10,13 344:12,14, 21 345:11, 16

**Empowering** 286:7,17

**enable** 124:4 125:4

**enables** 129:9 149:22

**enabling** 124:6 285:3

**encompass** 65:16,22

**encompasses** 45:12

**end** 24:22 30:12 38:5 61:1 150:24 203:8 207:23 304:15 348:10

376:18

**ended** 53:25 400:6

**ends** 280:12

**enemy** 185:14

**Energy** 84:13,22 85:3,17 86:14,22 87:23 88:13 92:1

**enforcement** 75:8,13 427:25

**engage** 90:21 124:4 125:3 299:5

**engaged** 20:4 67:9 165:14 167:21 181:15 190:6 241:8 242:6 369:9

**engagement** 51:13,23 52:12

**engagements** 46:21,24 51:14

**engaging**

185:18 289:11

**engineering** 53:9 54:7, 11,13 185:11 367:8 368:4,7

**engines** 100:23 252:22

**entail** 347:6

**enter** 41:13

**enterprise** 17:2,5 46:11 48:4 52:1,9 58:1 60:20,22 65:1 67:22,24 108:21 109:12,17 116:22 117:8,9, 14,21 118:4 119:25 122:1 124:10 135:18,21 158:24 160:17,19 313:11 317:19,21 331:25 332:2,7, 13,15 334:20,24 352:10,16 403:18 404:1 412:2 422:17 423:2,17 424:1 425:11

**enterprise's** 422:5

**enterprises** 43:1,10 45:24 46:2 54:21 55:3 56:1,4 57:19 64:4,10 66:3 68:9 117:18

**enthusiast** 278:25

**entire** 172:20 173:8,9 236:13 334:24 403:10

**entirety** 133:8 332:12

**entities** 17:1,12 66:19,22 67:2 118:20 125:25 126:5 158:5 166:1 189:17 312:15 343:10 344:17 371:25 385:3

**entitled** 18:22 19:4,17,18 78:13 86:20 111:9 145:7 286:16

**entity** 17:22 18:1 68:12 109:10,13, 18 110:3 118:25 119:1,5,9 120:10 122:8 123:13,19, 21 124:20 125:6 133:5,6,11 157:4 159:19 160:14 161:8,15 163:14,20 165:2,18 166:15,17 167:19,22 168:8,10 169:10 170:4 171:14,15, 18 172:6, 18,25 173:2,23 240:12 331:18,21 356:4 359:3 390:21 425:20

**entity's** 170:23

**entry** 43:5 86:21 87:19 373:24 393:4

**environment** 428:4,6

**equal** 320:13 328:7

**equals** 218:4 300:9 343:6

**equity** 173:18,22 262:4 370:25 393:16 394:6

397:11,15

**equivalent** 129:11,12

**equivalents** 113:18

**Eric** 18:1 144:14 145:8,11 152:8 154:2 165:19 240:22 386:25

**Eric's** 152:16 424:18

**error** 186:13 238:4 246:10 322:20,21, 24

**errors** 324:6

**essentially** 247:20 340:22 361:15

**estimate** 23:21 336:23 349:21 351:24 352:15 422:4

**estimates** 194:22 340:3

**et al** 11:12 86:21

**Ether** 61:15

**Ethereum** 60:6

**evaluation** 412:17 426:23

**Evans** 34:3, 20 36:8,21 242:18 344:22 370:13 377:13 386:25 396:5 427:23

**Evans'** 144:11 165:24 168:5 203:16 241:7,17, 23 242:22 389:6

**events** 126:16 127:14 129:9 198:22

**eventually** 43:16

**evidence** 11:7 132:23 154:24 156:23 157:11 159:6 161:20 162:20 166:10,21 171:3 348:16 366:12 371:14

**exact** 341:25 396:24

**exam** 72:21, 24,25

**EXAMINATION** 13:6

**examined** 13:4

**examiner** 41:6

**Examiners** 41:8

**Excel** 269:17 271:12,20 273:19 274:3,18, 25 276:7 279:21

**exception** 373:10

**exchange** 262:3 304:10

**exchanged** 62:5

**exchanges** 308:12

**exclude** 87:7,22 88:8

**excluded** 84:3,7,12, 15 85:3,5, 17 88:14 89:3,9 90:14,19, 24 91:4,6 92:4 324:25 325:2,5

**excluding** 91:15 207:18 320:23

**exclusion** 91:5 207:17

**excuse** 90:3 94:8 185:2

**executable** 127:9 156:14,16

**execution** 132:9 183:15 185:20,24 186:12

**executive**

51:2

**exhibit**
19:3,13 31:14,18, 20,22 32:1,4 73:18,19, 23 86:9, 12,17 88:21 92:8 110:24,25 111:6 145:10,15 152:20 180:18 250:19 269:11,16, 17,21 271:12 274:16,18, 22 275:21, 24 276:5 285:14 286:6,11, 16 291:14, 19,23 339:24 386:11,16, 21 387:18

**exist** 239:24 243:16,22 244:23

**existed**
153:16 164:13 167:17 291:3 301:20 347:13 348:5 352:1,10 355:20 363:14,18 364:24 365:14 366:2,5 369:17

**existence**
291:12 304:5,6 352:22 353:23

**existing**
216:15 360:9

**exists** 129:7 172:16 190:10 217:20 241:16 302:3 385:10

**exit** 348:11 359:5

**expanded**
57:9

**expanding**
159:15 162:14

**expansion**
388:14

**expect** 21:19 176:19,22 224:11 253:14 280:2 283:8 295:3 351:16 366:3 413:7 414:23 415:2 416:25

**expectation**
224:19 253:15,25 255:25 266:2 294:21

**expectations**
182:24 224:17 242:14 284:6 294:8

**expected**
222:25 240:19 255:14,18 294:18 358:13,14 409:25 414:6

**expecting**
253:22

**expenses**
188:18 198:6

**experience**
75:16 76:3,20 78:8 265:5 324:15 398:12

**expert**
14:23,25 18:22 19:4,18 20:1,3,9 21:1 29:14 31:23 33:1 35:17 37:14,20 38:14 43:7,10, 17,21 44:16 46:12,17, 21,25 47:6,20 50:8,25 51:17 52:9,15,18 55:24 57:15 67:9,10 83:4,8,24 84:6,15,23 85:4 90:13,23 91:10,16 136:18 164:4 217:14

262:24 424:12

**expert's** 35:13

**expertise** 85:24 90:20 91:2,3,24 388:13

**experts** 25:15 58:15 84:16 85:6,12

**explain** 25:12 124:17 216:2 221:23 244:10,25 297:18 396:6 401:16 426:21

**explained** 134:5 336:14 352:23 369:10 401:21

**explains** 238:8

**explanation** 245:3 401:24

**explicit** 188:20

**explicitly** 265:14

**exponent** 222:6

**exposure** 183:14 184:7,24 185:7 192:22 427:11 428:8

**expounded** 245:2

**express** 163:10,18

**expressed** 113:17 411:1

**expresses** 402:23

**expressing** 410:22,24

**extensive** 242:11

**extent** 374:15 426:9

**extraction** 51:2

**extrapolated** 194:23

**extrapolation** 313:19

**extrapolations** 318:2

**extreme** 222:22 223:10

**extremely** 414:10

**extremes** 414:2

**eyeballs** 100:20

**eyes** 97:17 98:5,18,23 99:18 103:19 105:22 106:3,7 107:13,21

**F**

**Facility** 391:19

**fact** 54:12 125:23 182:6 209:17 317:9 331:1,24 333:25 344:6 354:15 357:9 358:7 364:2,23 365:3 366:4 407:20 409:11 412:14,19, 23

**factor** 214:2 222:5 410:6

**factors** 201:13,21, 24 212:22

**facts** 113:25 138:25 174:5 210:18 334:3 336:11 349:4 359:20 363:22 402:9 427:12

**faculty** 52:21 53:4,13,18 54:19,25

**fail** 208:14 210:6,20 211:14,20, 25 213:14 214:3,12, 25 215:11 218:12 220:9,19,

25 224:4, 20

**failed** 85:19 87:9 209:8,10

**failure** 206:13 207:18 208:17 211:18 212:18,20 213:24 214:5 215:14,16 216:1,8,12 217:12 218:2,4 220:13,22, 24 224:23 225:3 420:6

**fair** 16:8, 23 59:21 108:10 113:11,15 114:3 138:13,19, 23 139:17 168:11,18, 25 175:13, 19 199:8 201:7 205:23 333:19,24 347:16,18 357:3 402:17 403:16,25 404:6 422:5

**faith** 430:15

**fall** 140:15 266:22

**false** 309:18,21 348:16 358:19

**familiar** 25:16

**family** 83:22 89:12

**fancier** 403:2

**fast** 370:24

**faster** 100:23

**February** 86:15,24

**federal** 75:8,12 89:10 165:10,11

**fee** 281:2,3 284:13,15, 24 285:10, 17 287:5, 10,11,12, 14,15,16, 24 288:1 289:3 296:11,12, 18 297:14, 16,17,24, 25 298:2, 9,12,14, 15,18,23 299:17,20 300:6,7, 10,12 301:4,7 303:21 304:18

**feeling** 71:19

**fees** 24:11, 16 26:20 69:22 72:23 76:16 109:9,24 110:11 224:15 240:7 265:2 266:16,17 280:10,12, 23 281:6, 13 284:14, 16,19,21 289:19 293:6,13 295:15 300:18,23 301:9,10, 13,15,18, 19 302:8, 9,10,16 303:4,7, 17,18 308:16 377:23

**felt** 28:19 85:10,25 254:10

**Ferri** 12:1 37:15 176:16 261:15

**Ferri's** 37:20 38:4,14 177:2 423:9

**fewer** 57:5 342:3

**FFBOC** 78:12 79:17

**FFBOK** 78:15

**fiat** 288:7, 13 290:5, 13 295:16 296:4,9, 14,19 299:10 304:12 380:11

**field** 74:14, 17 76:11 77:2

**figure** 223:6 282:8 382:13

**figures** 177:18 256:3

**figuring** 62:23

**file** 73:13 97:12 101:1 104:22 105:24 106:20,22 107:10 156:14,16 261:12 269:3,18 271:12,20, 24 272:16 274:17,19 275:4 276:7 387:9

**filed** 46:7 91:13 180:22 197:8,10

**files** 30:20, 23 38:1 97:12,18 98:14,19 99:19 103:15,17, 20 104:8, 21 105:20 342:13 343:9,17 372:5 376:1 377:2

**filing** 86:13 384:7,8

**final** 35:18 267:25 275:18 278:11,15

**finalization** 236:1,24 237:18

**finalized** 240:23 278:3,5

**finance** 74:15 391:16 392:2

**financial** 26:23 41:3 44:6,8,24 45:2,7,11, 16,19,22 50:22 71:3 72:13,17 76:6,11 78:14,20 79:19,22 140:19,24, 25 141:5, 13,15 314:1,5, 11,17

**financial-related** 45:8

**financials** 194:9 225:19,25 226:5,10

**Financiers** 90:4,10

**financing** 392:5,7 393:18 396:10,14, 20

**find** 154:8 231:20 301:4 316:22 342:12

**finding** 317:10

**fine** 73:12 174:23 318:13

**finish** 16:2, 4 370:24 416:2,5 430:13

**finished** 150:1,8,12 204:6,13 205:22

**Finnerud** 11:11 18:1,5,8 32:10 134:18 144:14 145:8,12 152:8 154:2,13, 24 165:19 179:13 183:17 197:8 381:15 387:1 429:16

**Finnerud's** 146:17 152:21 178:18,23 382:5

**fire** 200:2

**firm** 42:3, 5,10,15,23 44:5,24 57:2

**fits** 58:2

**fixed** 287:4

**flat** 260:22,25

**floor** 340:5 395:19 396:1,3,8 417:19,20

**flow** 127:21,24 241:5 260:18

**focus** 48:15 64:9 67:4, 7,14,16 74:14

177:13 214:20 234:2 251:12 388:8

**focused** 46:5 58:25 59:9,23 61:5 62:4 63:10 66:18 68:5

**focusing** 67:1

**folder** 93:13,14 94:25

**Foley** 12:12

**footnote** 108:19,20 109:22 110:7 121:2,16 180:1 195:18 196:11 197:21 232:21 235:12,20 236:10,12, 13,17 237:7,11 238:8,12 239:2,14 253:4 264:25 268:10 271:15 272:6 281:19 327:12 348:9 359:19 363:20 364:20 378:22 379:16,23 380:5 419:17

**footnotes** 378:19 379:17,20

**forensic** 45:5,6,22 51:13 52:12 57:22,24 58:2,18 67:8 68:13 69:8,10,25 70:19,22 79:5

**forensics** 41:3 44:5, 6,8,18,24 45:3,7,10, 11,13,16, 19 46:5,7 50:23 51:22 53:11 68:17,21 70:3,6,16, 20 72:13, 17 76:6,11 78:14,20 79:19,22 243:23,25 428:20

**forever** 233:6,19 234:9

**fork** 346:21,23

**forked** 354:1,19 358:3

**form** 17:16 127:13 132:4

**formal** 40:16 54:5,9 141:5,24 144:5 165:14 308:22

**format** 97:14

**forms** 290:24

**formula** 381:23

**forum** 45:10

**forward** 14:13 117:6 169:13 315:19

**forward-looking** 49:24 198:5 221:7 224:7

**found** 56:20 78:12 85:18

**foundations** 78:14 79:5,18

**founded** 55:11 56:22 68:12 243:22 315:7

**founding** 56:13,16 68:22 69:5

**fourth** 279:16 280:8 305:9

**fraction** 331:18 332:6

**fragment** 98:2

**framework** 426:19 429:4,9

**fraud** 41:6,8 49:8 51:14 77:21 80:25

**Fred** 12:9 22:9 137:22

**free** 235:3

**French** 90:3

**FTE** 341:2

**FTES** 372:22

**full-time** 341:3,7,17 342:15 343:20 344:12,14 368:24

**fully** 391:20

**function** 124:11 126:19 233:20 245:19 246:24 311:24 338:15 364:18 406:24 427:8

**functionality** 125:11,14, 20,22 151:15 354:10,11, 12 355:16 357:25 358:2,5

**functioning** 212:11 348:22 359:9,14, 16

**functions** 124:10 127:11 414:15

**funding** 312:20 320:25

**fungible** 60:16 61:14 64:3,10

**future** 187:21 195:17,22 196:21 197:17,24 211:4 223:1,13 225:12 234:13 285:8 400:6

**G**

**Gagnon** 90:5, 10,24 91:10,15, 18 92:2

**gaming** 260:8

**garage** 72:5

**gas** 41:21 85:9

**gate** 208:12

**gathering** 26:5

**gave** 154:11 375:22

**geez** 234:24

**general** 126:13 128:22 183:8 185:12 303:14 306:10 307:15 308:8 320:2 367:8 375:20 378:7,10 408:1 427:8

**generally** 17:19 27:9 201:17 397:2,5

**generate** 114:16,23 115:11,18 117:11 294:19 295:3 409:25 410:2 413:9

**generated** 118:7 128:1,18 132:22 202:21 206:16,17

**generation** 133:15 135:3 188:8 414:7

**generically** 117:18

**Gensler** 190:21

**Georgia** 161:9

**gist** 124:22

**Github** 147:20 148:3,9,24 152:9,11, 24 153:7, 13,20 154:3,7, 14,25 155:4,15, 19 156:6, 25 157:13, 22 159:9 160:7 161:3,22 162:23 166:23

**give** 12:18 15:15 162:8

239:24
275:10
400:11
401:12

**giving** 126:7
347:15

**global** 41:25
72:2 80:24

**globe** 286:8,
18

**glossary**
111:1,10
112:10

**go-forward**
188:14
194:4

**goal** 71:13

**going-concern**
108:12
138:16
175:21
199:10,21
200:13
201:8
208:15
209:17,18,
23,25
210:3,22
211:2,3,16
216:13
224:2
225:5
340:5
360:20
401:8

**going-forward**
187:2

**good** 13:8
73:10
81:6,9
373:23
430:15

**Google'd**
396:23

**governance**
65:10
312:23

**governed**
112:6

**government**
71:22
207:15
288:17

**governmental**
189:17

**graduated**
40:14
41:12,19

**graduating**
41:17

**grammatical**
199:15

**granted** 87:6

**granular**
194:10,16
284:1
299:22
370:4,10

**greater**
225:2

**Greenvets**
48:10
50:15,18,
19 51:5,18
52:7

**grid** 228:19
229:14

**gross** 297:25
298:2

**ground** 15:25

**group** 11:7
12:2 41:11
43:3,18
63:24,25
72:1,4
172:7
345:11

**groups** 80:4

**grow** 233:5,
17 234:8
238:2
240:6

**growing**
235:16,22
236:20

**growth**
198:13
200:18
208:7,20
214:16
220:14
221:1
224:12
232:24
233:3,11,
14 234:3,
6,11,14,23
235:25
236:23
237:8,10,
14,17
238:7,11,
14,23
239:25
242:3
243:2,14
244:18
245:10
246:6,14,
16,21
247:2,8
248:20
249:2
256:8,18
257:5,7,24
258:16,20
259:1,11,
15 260:13
388:13
408:15

**guess** 55:10
62:2
115:25
121:25
157:18
159:3
205:2
219:18,21
222:21
252:25
273:2

299:6
310:4
321:5
324:23
351:22
361:23
364:22
366:7
373:10,22
381:7
382:12
384:15
405:14
412:4

**GUI** 155:22

**guidance** 126:12 189:22 330:19

**guy** 146:10

**guys** 32:21 72:5

**H**

**hairy** 128:9

**half** 248:9, 12,13 249:8 320:6,13 333:9 360:25

**hand** 12:15 89:21 336:12

**Handcash** 153:23 154:7 203:18 380:15

**handful** 37:24 57:6,7 346:8

**handle** 58:13

**handles** 58:14

**handling** 186:13

**hands** 113:19

**happen** 196:6,7 253:15 294:11 420:3

**happened** 53:20 91:7 205:7 319:4 353:13 364:11 369:6

**happening** 289:17 362:14 364:9 420:1

**haraminac** 11:14 13:1,8 19:6,20 22:13 31:18,19, 22 32:1,7, 11,22,23 39:21 73:16,18, 19 81:19 86:8,12 87:7 107:12 110:23,25 136:19 138:1,6 140:5 145:10 175:7 250:8 269:11,15, 17 274:16, 18 275:21 276:5 285:14 286:6,15 291:14,23 386:11,16 422:3

**hard** 317:10

**Hash** 269:10

**HBU** 54:15

**head** 16:11, 12 44:7 235:7 266:8,20 280:14

**headquarters** 189:3

**hear** 22:10 85:11

**heard** 84:19 85:15 88:11

**hearing** 87:16

**held** 11:11 122:12 329:20

**helpful** 404:17

**hey** 224:9 358:17

**hid** 154:11

**high** 213:17 396:15 410:19 414:10

**higher** 74:13 191:1 215:24 245:15 255:6 260:13 280:6,13 302:9 303:5 305:10 320:25 321:4 323:10 328:4,6 414:12

**highest** 279:20,22 410:9,11, 12,13

**highlight** 388:18

**highly** 228:25 229:3,7 319:7,13, 23 320:9

**Hill** 42:3, 16

**hire** 121:11 166:6 167:17 350:7 356:13

**hired** 181:14

**hold** 136:22 163:2

**holders** 122:6

**holding** 76:13 237:21

**honestly** 153:17

**hoped** 186:4

**hopeful** 321:5 414:11

**hour** 25:8 26:8,11,17 73:7

**hours** 23:5, 6,8,10,13, 16,18,22 24:5,7,8 28:6,10 72:20 75:1,2 76:5 77:22 78:10,21, 22 79:8, 15,23,25 80:1,5 107:25 108:2,6 340:24 346:3,8,9, 10 370:7, 11 379:5

**house** 34:19 35:8 36:2, 17,20

**Houston** 39:25 40:8,10,15 41:13,18 52:21,25 53:4,8 54:6,19,25

**HSSK** 42:6, 19,21,24 43:13,21, 24 44:14

**huge** 408:16

**human** 104:6, 14,18,19

**humans** 127:12

**hundred** 23:8 161:5 165:22 170:22 171:20,22 172:9 173:14,15 174:18 190:6 208:11 223:2,4,5, 7 247:10 313:7 329:17 331:19,21 333:2 334:14

**hundreds** 80:22

**husband** 89:15

**hybridized** 129:13

**hypothetical** 113:19,20 116:1 121:21 122:14 123:8 126:7 138:24 139:9 140:17 162:3,17 163:2 168:17,18 170:11 172:4 174:3,4 193:13 194:9 325:20 332:20,21 333:5,6,7, 15 334:8 413:23

**I**

**i.e** 74:15

**icon** 98:2

**idea** 23:6 25:1 81:1 106:24 209:21 231:8 244:12 385:15 420:8

**identification** 31:25 32:3 73:22 86:16 111:5 145:13 269:20 274:21 275:23 286:10 291:17 386:20

**identified** 98:4 102:8 125:6 184:24 185:1 186:13 252:23
**identify** 11:19 27:4 49:9 98:11 123:4,6 244:2 429:11
**identities** 129:22,23
**ignoring** 125:10 216:4
**II** 145:9,12
**illiquidity** 401:2,5
**illustrated** 131:6
**image** 98:25 105:15
**immediately** 193:2
**impact** 130:22 132:19 174:18 190:11 191:3 196:8 227:14 358:22 426:24
**impacted** 364:3
**impacts** 429:11
**impairment** 357:11
**impairs** 357:24 358:1
**impending** 366:11
**implement** 144:18 155:21
**implementation** 109:7 114:21 115:16 116:17 117:6 129:17 130:18 131:15,23, 25 132:18 133:18 134:15 135:5,25 136:3,11 144:21 146:24 147:22 148:2,8,17 149:15 155:6,25 157:18 193:23 196:2 427:9,16
**implemented** 61:21 134:24 136:9 196:23,24 199:23
**implementing** 133:12 134:9
**implication** 427:13 428:11
**implied** 139:11
**implies** 296:1,2
**imply** 297:17 300:12
**important** 97:24 100:1
**incentive** 370:20,22 371:15 372:8,16 396:13
**incentivize** 396:13,17
**include** 35:3 60:15,18 67:16 173:11 191:8 207:12 209:7,10, 12 269:3 387:18
**included** 31:4 102:9 148:9 196:16 281:4 287:22 392:14
**includes** 106:10,11 183:14
**including** 287:20 430:20
**income** 127:16 128:22 130:1,14, 16,17 132:19,21 187:15 191:10 193:11 194:14,25 198:4 208:6 210:15 213:12 215:3,8 217:6

219:13 220:7,11 221:24 223:16 231:25 250:11,23 251:2 258:4 302:19 307:9 325:5 326:21 335:13,18 338:2,4 398:25 400:22,24, 25 401:7 403:23 404:13,16 405:7,8 406:6 407:4,23 409:24 410:2 414:6 415:7,14 417:22 418:6,11 419:25 420:22 427:14

**incomplete** 162:3 163:2 203:13 204:20 205:10,14

**incorporate** 321:10

**Incorporated** 55:6 90:6

**incorporates** 321:12

**incorporation** 304:12

**incorrect** 322:9,16

**increase** 256:15,22 338:18 394:12,15

**increased** 230:8 256:17 338:17 373:11 394:10,14

**increases** 338:19

**incur** 285:9 289:10 296:10 354:13 355:2 356:15 362:22 363:25 365:6 385:13 386:2

**incurred** 356:10 364:13 365:21 377:5 383:20 384:23 389:22

**incurring** 400:14

**independent** 355:15 356:21 377:19,25 382:25 383:24 391:2

**independently** 350:13 372:13 374:23

**indicating** 299:19 372:6

**indication** 239:25 410:14,16

**indications** 357:14 411:20

**individual** 17:25 114:20 115:15 125:7 126:17 319:18 337:22 429:7

**individually** 100:24,25

**individuals** 123:2 157:7,25 367:18

**industries** 41:25 282:15

**industry** 54:16 71:11 211:11 216:20,23 282:11 321:9 324:16 378:9 408:1,2

**inflation** 234:13

**information** 40:11 49:8 97:25 98:6 99:10 100:1 101:8 105:6 106:12 156:20 236:5 237:24 251:10

**informed** 178:1

**informs** 184:16

**infrastructure** 376:20 381:2,21 382:3

**infrastructures** 376:15

**infringed** 384:19,21

**inherent** 139:9 187:11,14 188:6,9 192:3,17, 19 193:18 195:2 198:10 212:15 215:21 216:1,4,5, 12 217:9 218:18,20, 23 219:7,8 220:14 225:4 335:23 337:10

**inherently** 194:18 386:1

**initial** 69:2 196:4 284:23 396:19

**initially** 391:20

**injury** 78:4

**input** 128:8, 17 131:8 132:21 219:24 229:20 235:2 238:5 252:5 308:5 309:2 323:1 324:3 325:11,13, 17,21 427:18

**inputs** 123:16 128:10,11, 13 216:17 221:12 226:7,12 235:25 236:23 237:17 240:25 242:10,13 244:4 255:20 263:22 267:14 272:10 273:11 294:7,14, 15 305:3, 5,9,12 306:18 322:5,8,18 323:7 407:24 427:5

**inserted** 428:13

**insolvency** 78:2 225:19

**insolvent** 225:16

**instance** 212:16 247:7 380:13

**institutional** 227:21

**institutionally** 212:4 213:21 223:22 227:1,11 231:2,10, 22 232:9, 16 235:15, 21 236:19

**instruction** 100:11 104:15 181:21 219:2,16 235:17

**integrate** 373:22

**integrates** 373:24 374:1

**integrating** 380:17

**integration** 203:12 204:19 373:25

**integrations** 373:16,20 374:3,6 376:7 378:3 379:24 380:9,22

**intellectual** 114:16 115:12 118:2 142:15,21 143:4,11 144:1 385:1,22

**intelligence** 41:10 45:13

**intend** 109:5 117:25 118:1,3,5, 6

**intended** 114:23

115:17 302:14

**intention** 430:13

**inter** 51:1

**interact** 301:8 383:11

**interacting** 185:14,22 186:17

**interactions** 62:23 135:3 375:17 377:16

**interest** 26:24 134:22 160:21,25 185:4 200:7 211:2 377:24 380:19 425:11,16, 19,25

**interested** 262:18

**internal** 289:15 377:20,21 388:15,20, 25 390:23

**international** 51:1 111:1,10, 19 112:10

**interpretation** 113:7

**interrupt** 313:25 415:25

**interruption** 77:25

**introduces** 279:12

**invest** 397:10,14

**investigation** 51:14 151:20

**investigations** 41:2 44:1, 3,4,10,13, 18 46:3,7, 14,22 47:2,7,22 48:8,12 50:20 77:21

**investigator** 41:9

**investigators** 41:1

**investment** 221:8 391:21 396:17

**investments** 397:24

**investor** 49:23 397:9,14, 16

**invoice** 23:12 24:13 27:17

**invoices** 22:8 108:5

**involve** 61:10,13 66:3,4,10, 13 289:13 290:11

**involved** 197:13 263:5 289:23 341:21

**involves** 17:1,25

**involving** 89:1

**IP** 136:10 331:2 380:23 384:4 385:22

**IPO** 261:20 262:9 326:13

**IRS** 126:12

**Islands** 190:5

**issue** 64:25 70:8 89:20 162:6 176:23 177:5 198:22 200:15 225:5 306:16 310:8 389:10 423:8

**issued** 91:15 167:9,14, 18 168:9

**issues** 89:16 190:15 407:19 410:3

**issuing** 243:18

**item** 192:14 218:3 382:4

**J**

**James** 387:1

**January** 272:3 277:3

**Jared** 11:21

73:4,14 136:24 387:10 415:24

**Jen** 206:17

**Jesus** 41:19

**job** 41:16, 20,23 43:12 44:12

**joint** 83:3,8

**Jonathan** 11:5

**jpeg** 101:2 105:24

**Juarez** 11:6

**judge** 84:15, 21 85:2,9, 16 87:25

**judge's** 88:8

**jump** 212:24

**June** 19:6, 18,20 20:17 21:5 33:1,11 39:10,15 81:22 82:5,14, 17,23 83:1 96:9 97:21 99:22 104:8,23 107:19

**jurisdiction** 12:8 190:4 191:7

**K**

**Keller** 42:4, 16

**key** 183:16 348:12 349:2 356:5 357:14 359:5

**kid** 313:6

**kind** 26:1 28:20 45:6 49:11 51:3 61:22 62:20 63:14 65:1,6,13 77:18 106:1 107:8 116:18 117:2 122:12 125:7,10 126:4 129:13,25 132:2 134:6 144:19 151:17 156:11,13, 15,19 157:23 171:3 173:25 187:9 190:23 191:6 198:11 200:23 203:18 207:16 209:4 216:3,21 223:25 243:18 245:4 260:7 261:3 284:25 302:20 304:10 313:21 314:14,19 324:20 330:8 331:9 332:5 335:23 346:20 359:19 365:9 368:16 375:21 377:12 381:4,19 382:16 383:15 393:4,20 394:24 396:10,14, 19,20 399:24 400:13 401:12 411:12 413:7,11 416:23 418:16 419:21 420:7,8

**kinds** 26:3,4 58:22 217:23 224:13 243:21 244:4,5 279:4 414:2,18

**Kiribex** 55:7,20 56:5,10,11 262:17

**Kiribex's** 55:23

**Kiribrex** 55:6

**knowable** 210:18 349:3

**knowledge** 76:5 77:8, 10,15 79:5 85:11 113:24 123:9

138:25 202:9,23 308:8 324:15 334:2 355:11 367:7 368:16 408:1

**knowledgeable** 336:24

**L**

**label** 94:19

**labeled** 93:20 154:9 383:8

**lack** 217:7 219:5 329:5,9, 15,24 331:12,14, 20,22 332:23 334:10,18, 23 335:1, 8,15,20 336:1 337:4 338:4,11 400:20

**lacked** 85:18

**lacks** 87:8

**language** 63:14 295:7 297:5 298:13 348:15 364:10 396:2 403:2

**large** 217:3 282:20

**largely** 46:5 413:5

**larger** 229:4

**largest** 263:24 264:14 279:3 282:20

**late** 202:17,24, 25 409:12

**late-stage** 262:5

**later-stage** 212:8 315:8

**launch** 185:16 186:2 193:3 195:10 197:24 200:10 202:13 204:2 353:5

**launched** 202:12 206:15 209:14

**launching** 186:9 206:8 348:23

**law** 75:8,13 83:22

**lawsuit** 93:19 94:23 374:8

**lawyer** 138:5

**lawyers** 136:18 145:22 199:4

**lay** 130:15

**layer** 348:23 359:10 362:2 380:19

**lead** 390:11

**learn** 355:9

**ledgers** 127:7

**left** 43:24 48:7,9 113:6 203:17

**left-hand** 287:4

**legal** 11:6 120:15 157:4 159:18 161:8,15 162:4 163:3,14, 20 164:11, 19 165:5, 18 166:4, 14,17 167:6,19 168:8 169:10 170:4 171:14,15, 17 172:6, 18,25 173:2,23 240:12 312:15 384:4 385:22 423:20 425:20

**length** 113:21

**lesser** 217:16

**letter** 34:6, 13 35:7 36:1,6,7, 16 150:7

**level** 43:5

49:3 170:22 174:19 176:17 194:10,17 278:25 284:2 299:23 370:5,10 383:15

**liability** 198:24

**liberal** 40:3

**license** 41:1 50:24 170:18 378:24 379:21

**licensed** 40:25

**licenses** 373:15

**licensing** 71:22 131:16 133:14 135:2 136:5,8 142:14 170:16 373:17,20 374:7 376:8 377:23 378:3 379:8,25

380:7,23, 24 385:2,6

**lieu** 75:16

**life** 203:3, 5

**limit** 59:18 168:7 391:19 430:23

**limited** 11:23 12:5 17:2,9,15, 20 32:10 52:15 60:2 165:16 166:14 173:23 209:4 259:19 344:25 345:8,15

**limiting** 116:13 147:19 159:13 162:12

**linear** 104:7,10 320:16

**lines** 94:5 150:5 385:2

**link** 102:13 149:17

**linked** 235:23 236:21

**links** 149:11

**list** 14:19 15:2 29:21 30:19,20, 22 33:10, 17 34:15 35:11 37:24 72:19 77:11 92:14 96:17

**listed** 32:24 33:12,22 34:9,11 75:9 77:19 93:6 94:9 96:12 103:1 131:3 141:10,14, 21 184:20 227:10 270:21 304:3

**listing** 96:21 142:1

**lists** 76:17 95:24 140:20 310:4

**literally** 237:10

**litigation** 42:2,22 43:2,6,14 56:24 57:2 58:21 71:15 72:15 77:23 78:1

**live** 78:16

**LLC** 17:2 18:2,5,9 108:21 109:12,18 116:3 117:15,22 118:20 119:15,25 120:10,17, 23 122:3, 23 125:18 126:24 130:7,11 133:5,7, 11,17 134:1,14, 20,24 137:9 140:20,24 141:1,8,24 142:7,12, 22 143:2, 6,10,16 144:3 147:16 156:24 157:3,5, 13,24

158:9,12, 16 159:8, 19 160:12, 13 161:7, 10,22 162:22 163:12,20 165:3,17 166:11,13, 23 167:9, 19,21 168:2,8, 13,14 169:6,10, 23 171:5, 6,9 172:2, 18 173:1, 3,19,23 239:24 240:11 316:24

**LLCS** 68:6

**load** 281:10

**loan** 392:3

**locate** 106:12

**logical** 297:14

**logo** 105:7

**long** 28:3 47:13 349:8,11

**longer** 211:15

**looked** 34:13,18 99:4 107:1,5 123:10 149:25 152:4 190:14 226:11 253:17 259:15,16 260:2 277:16 303:10,19 304:1 308:21 312:21 342:7 345:3,13

**loopholes** 375:11

**lose** 224:10

**loss** 80:3

**lost** 51:7 77:24,25 179:13 199:16 425:4

**lot** 45:13 97:13,22 99:24 176:10 185:8 186:16 189:22 196:5 200:17,19 224:10 259:22 268:13 285:22,24 307:25 320:20 324:14,17 329:13 346:2 356:6 368:14 371:23 378:20 400:11 407:8 409:7

**lots** 201:21

**loud** 108:17

**low** 213:17 253:11,12, 14,23,24, 25 254:14 255:10 266:3,24 297:3,4 321:8 410:19

**lower** 25:25 212:7,8 214:5,6 220:25 234:12 245:16 247:1,3 255:1 280:7 301:19 303:6 304:14 311:19 323:10 338:5,9,12 365:1 392:5 393:17 396:11 413:8

**lowered** 257:17 258:2,6 338:7

**lowest** 410:14,15

**Luca** 146:5

**luncheon** 249:22

**lysing** 379:25

**M**

**M-I** 42:1

**MA** 77:7

**made** 36:8 75:19 85:24 94:15 176:16 183:24 190:2 191:23 244:6 251:22

264:6 314:23 344:7 348:15 376:22 380:6 392:25

**MAFF** 74:5, 10,20 75:11,14, 19 76:21 77:7 79:3, 12 80:9, 11,15,17

**Magic** 302:5

**mail** 132:14,15

**main** 178:2

**maintain** 40:21 70:5,10 72:23

**maintaining** 69:17

**maintenance** 70:11

**major** 40:1,3

**majority** 377:24 380:18

**make** 16:6 52:4 65:13 99:14 121:15 127:25 156:21 169:5,21 170:20 183:21 187:13 199:4 208:3 233:21 246:7 260:19 308:24 312:23 316:3 323:15 355:12 364:25 373:12 375:9,16 404:18 407:9 410:4 419:23

**makes** 200:22 206:23 234:19

**making** 216:24 255:3 320:20,22 358:19

**man** 346:2,9

**management** 74:15

**March** 90:4, 10 270:1 272:4,7, 12,17,22 275:17 276:10,12 277:1,2,4 292:2

**Marchant** 387:1

**margin** 188:15 310:23 311:4,20

**margins** 311:12

**Marie** 12:12

**marital** 48:1

**mark** 32:8 196:23

**marked** 31:18,24 32:2 73:18,21 86:8,15 110:23 111:4 145:13 269:11,15, 19 274:15, 20 275:22 276:5 285:14 286:9,15 291:17,23 386:11,19

**market** 108:10 113:11,15, 22 114:4 138:14,19, 23 139:17 168:11,18, 25 175:13, 19 187:15 188:3 191:1 193:11 194:13 199:8 201:7 207:21 208:11 209:6,11 210:12 215:2,8 217:8 232:1 235:16,22 236:20 242:14 251:17 254:24 255:5,13 259:23 266:10 282:20 301:17 302:21 303:15 307:9 309:18,24 311:17 312:4 314:18,24

316:24 317:14 319:6,12, 22 320:12 321:25 322:10 323:4,9,15 325:1,7 326:17,22 327:1,22 333:19,24 334:9 335:9,17 336:13 338:1 347:16,18 357:3 367:19,20 398:25 400:17,21 402:17 403:17,23, 25 404:6, 12 405:5,6 406:4 407:4 408:12,20, 22 413:20 414:7 415:7,14 417:21,22 419:24 420:21 422:5

**marketability** 217:7 219:5 329:5,9, 16,25 335:8,16, 21 336:1 337:5 338:4,11 400:20

**marketing** 49:14 74:16 118:7 193:1,7 195:8 196:2,21 344:2 414:24

**marketplace** 109:8 252:11 253:2,17 260:7 280:3 281:12,15, 23 282:2 283:7,15, 21 284:11, 16,24 285:17 287:10 289:1,2,6, 16,17 293:6,13 296:10 299:21 300:18,20 301:8,12, 15 302:16 303:4,6, 17,18 312:18 414:20

**marketplaces** 259:17,18 301:23 302:1,3,4, 6,13 303:8,12 304:1,4,23 305:19 306:7 307:2 308:9,20 346:22 347:4 414:9

**marking** 31:14

**Maruri** 11:22 12:1

**master** 41:2 71:2 72:12,17

**master's** 39:24 40:7 42:1 74:25

**match** 49:4 261:19 307:21 404:5,7, 23,24 405:10

**matched** 403:11

**matches** 403:25 405:17

**matching** 405:22,23

**math** 230:13 238:4 245:19 246:10,25 258:11 288:22 311:25 322:3 325:10 338:16 372:20

**mathematical** 322:21 324:6

**matrimonial** 58:5,25 59:5 78:1 83:11,12, 17,19 88:25

**matter** 11:11 21:10,21 22:1 23:3, 23 24:3,12 25:6,13 46:20 54:10 72:20 75:2 77:22 86:3 134:21 159:7

164:20
166:10
167:12,24
179:18
181:19
182:12
238:17
240:9
241:24
344:6
351:7
366:19
377:10
382:21
402:9
427:13

**matters**
14:19
15:9,15
45:9 46:16
58:25 59:5
78:20
79:21
350:21
351:5

**mature** 214:4
328:11

**maturity**
310:11

**max** 254:12

**maximum**
318:22

**Mccann** 44:1,
2,10,13,18
46:3,4,13,
22 47:1,7,
21 48:7,9,
12,14,18
50:21

**Mcneese**
39:23 40:2

**meaning**
45:11
61:24,25
65:25
76:15
106:19
199:19
371:3

**means** 91:5
100:19
103:12,15
205:1
221:24
222:4
225:7
280:21
288:14,16
324:10
329:2
352:24
408:21

**meant** 63:20
103:8
162:11
165:9
167:4
213:13
236:7
381:14

**measure**
389:11,13
401:2
402:15
408:23,25
418:14,18
419:18,22
420:15
421:9
422:1

**measured**
377:17

**measurement**
396:22

**mechanism**
132:11
241:9
287:23
396:12
398:13
411:12
420:24

**mechanisms**
346:17

**median**
318:21
320:5,11

**meet** 28:13,
16,21 78:9

**meeting** 72:5

**meetings**
26:1
277:14

**member** 52:20
54:25

**members**
68:22
69:6,7,15,
19,21
71:14
379:5

**membership**
69:11
72:1,4

**memberships**
71:12

**memorized**
15:3,10

**mention**
358:14

**mentioned**
19:13 26:9
32:4 34:3,
20 37:1
50:13
58:23
73:23
80:14
86:17
88:7,21
95:22
111:6
145:15
149:7
180:18
189:25
196:13
213:2
250:19
261:7
265:3
269:21

274:22
275:24
286:11
288:7
291:19
303:12
327:15
330:12
339:24
386:21

**mentioning** 299:8

**mentions** 427:24

**Mercer** 217:17

**metadata** 269:25 271:24 276:24

**metadata's** 99:9

**meteor** 201:18 211:6

**method** 184:19 191:21 202:4 232:5 243:9 261:6,9,14 316:25 319:19 400:23 401:3 402:19 429:11

**methodology** 76:7 85:20 87:10 101:13

**methods** 25:15 65:2 106:10 193:10 244:2 407:1

**Mickey** 12:1 37:15

**middle** 87:4 263:25 264:15 279:2

**migration** 361:25 427:18

**military** 75:7,12,16

**million** 190:6 200:8 207:24 229:25 230:11 247:11 248:5,6,10 249:4,5 253:3,20 255:2 307:18 313:7 360:1 362:25 371:9 382:22 390:12,15 392:8 393:5,19 395:19 412:4,7,10,13 413:18

**millions** 190:8

**mind** 15:4 60:4 192:11 251:7

**minimal** 182:19

**minimizes** 117:2

**minimum** 203:10,22 204:17,23 206:2 255:21 318:20

**minors** 40:4

**mint** 279:13 280:22 281:4 284:21 285:7 413:12,16

**minting** 280:9 281:2,3

**mints** 270:16 280:1,19,24

**minus** 411:14

**minute** 22:15 48:16 86:21 87:19

**minutes** 99:17 430:1,18

**missed** 281:19 375:11

**misstated** 115:3

**misstatement** 309:15

**misstating** 130:23 343:14

**mistake** 80:19

**misunderstanding** 127:4

**mix** 235:25 236:23 237:16 270:8

**mixing** 125:8 305:1

**Mm-hm** 113:14 131:5 306:3

**mode** 185:22

**model** 128:8, 10 129:14 131:8 221:12 228:11 229:21 233:16 235:3 238:3,4 241:1 242:10 244:4 246:13,18 252:12 257:6,13, 20 263:16, 18 271:2 272:10 279:22 280:16 294:7,14 296:24 301:14,18 302:11 308:18 309:2 310:17 344:13 347:23 359:25

**models** 46:9 102:7 187:11 277:11,20 404:9

**modified** 272:16,17, 19,21 276:17 277:4,5

**moment** 16:15 50:13 95:23 349:18

**moments** 80:14

**money** 224:11 288:14,17 351:9 390:5,7 393:25 394:4

**month** 27:16, 20 28:8,25 29:3,6 190:9 280:1,10, 19 367:4 373:11 379:6 381:6 382:14

**monthly** 253:3 366:22 367:14 382:16

**months** 190:7 341:8 368:25 369:15,23 373:8

**moon** 208:10

**moot** 373:13

**morning** 13:8 92:10 175:12

**mother-in-law** 89:14

**motion** 87:6

**move** 190:3

**moved** 288:1

**moves** 278:23,24

**moving** 324:18 362:2,5

**multiple** 58:15 182:20 218:21 313:20 315:18 316:20 317:22 318:17 319:14,24 320:7,18 321:17 384:11

**multiples** 194:21,22, 23 318:11, 16 320:1, 2,6 321:2

**multiplication** 341:14 369:3 373:3

**music** 235:23 236:21 286:7,17

**MVP** 186:21 204:5,11 205:4,6, 10,15,24 291:9 293:4 295:17,24 341:9 343:11,21 344:16 346:3 351:25 352:4,21, 25 353:3, 11,13

**N**

**NACVA** 70:13 71:3,5,10, 16,21 72:18 78:13 79:18 80:4,9,17,

21,25 111:17,24 112:5,23 113:5,6,13 417:12 428:25

**NACVA's** 78:11 79:17 429:2

**Nakamoto** 359:7

**named** 17:25 94:25

**names** 97:12 345:4

**narrative** 101:11 195:7,11 349:8

**narrow** 52:13 61:24 63:19 64:23 106:1 107:6

**narrowing** 62:9

**NASBA-CREDITED** 75:15,20

**National** 41:4 71:6 73:19 74:2

**native** 99:1, 2,4 101:1, 3,9 105:8, 13,14,16, 23 269:3, 18 274:3, 12,19,25

**natives** 99:7

**nature** 200:14 375:23 401:5

**nauseam** 132:2

**NBA** 34:6,14 35:7,25 36:1,16 70:13 190:13

**NCH0000257** 273:10 274:17,20

**NCH0000835-844** 286:9

**NCH0000841** 285:18

**NCH0001596** 196:14

**NCH0001689** 196:14

**NCH0001867** 386:17

**NCH0001868-170** 386:19

**NCH0004459** 291:16

**NCH0004508** 269:19 270:4

**NCH004459** 291:25

**nchain** 11:12,23 12:5 17:2, 8,9,12,15, 16,19,20 32:10 36:17,19 93:16 94:9,15,21 95:1,7,9 96:5 100:5 113:16 114:12 115:8 131:14 133:4,12 144:12 154:10 157:20 164:9,20 165:1 166:1 167:22 178:16 197:13 224:7 226:10 240:3,18, 23 241:4, 8,13,20 254:4,8 255:13 259:6 264:24 265:8 266:10 267:10 268:22 282:18,19 283:13,19 284:12 290:18 292:9 293:1 295:10 304:16 305:6,7 341:20 342:13,20, 21 343:9, 19,24 344:7,16, 20,25 345:1,8, 19,22 346:4,6 348:10 350:8 353:16,19 355:7 358:10,12 359:3 360:11 364:1,23 366:8,13, 17 369:9, 15 371:14 372:6,7,11

374:20
377:4
383:22
387:2
388:9,15,
24 389:21,
25 390:2,
20,21
391:15,21
392:12
393:8,15,
16,24
394:1,3,20
424:2
425:17
426:1

**nchain's**
35:16
94:22
96:13,18,
22 97:7,18
98:14
99:19
100:17
101:15,25
103:21
104:9
134:21
149:7,8
177:17
203:9
221:6
242:2
252:21
253:5,9
255:8
270:5
271:4
289:15
306:19
307:13
312:12
343:17
354:17
369:12
370:3
383:25
407:24
408:3
426:6

**NCP** 291:2

**near-contemporaneous** 177:19

**nearest**
381:11

**necessarily**
188:2

**needed** 57:9
186:25
187:18
188:13
193:8

**negate**
216:16,18

**negative**
221:2

**net** 399:18
421:20

**netting**
298:25

**network**
359:7

**Newberry**
84:12,22
85:2,7,16
86:13,21

**NFT** 34:7,14
35:8 36:1,
16 259:18
270:7,16
279:13
281:15
282:1
283:20
285:5
289:2,17
296:9
299:20
302:6,13
303:7,12,
16,18
304:4,23
305:19
306:7
307:2
308:8,20
346:22
413:12,16
414:1,9,19

**NFT's** 235:24
236:22

**NFTS** 126:13
235:23
236:21
260:6,8
285:3
288:19
300:24
301:1,20
302:2
413:17

**niche** 260:9

**Nicholas**
69:4

**Nifty** 302:5

**nods** 16:11

**non-fungible**
60:17
61:16
64:3,10

**non-privileged**
393:3

**non-profit**
68:19

**non-substantive**
105:24

**Nonni** 32:8,
15,19

**Nonni's**
33:24
34:11
35:6,25
36:14
38:18

**normal** 415:2

**normalization**
218:19

**Notary** 13:3

**note** 231:1
359:1
379:3

418:16
**notes** 399:23 401:12,22 402:13 417:15,18 419:20
**notice** 86:12 428:1
**Noting** 12:4
**nuanced** 397:7
**number** 23:5, 6,13,18 24:8 37:25 46:24 74:11 76:2,17 78:7 106:25 150:6 186:25 187:17 188:10,12 201:13 218:5 223:2 238:1 253:7,11 254:19 255:19 256:8 257:1,2,19 258:2,6,9 259:11 260:21 263:19 270:4 280:6,9,19 283:4 286:2,5,24 293:25 308:4 315:10 322:14 323:3 325:15 326:23,24 342:1,20 344:12,14 372:22 373:8 381:5,9 382:8 389:21 391:1 392:24 393:5 394:9,25 395:2,3 419:10
**numbers** 223:13 238:9 239:6 244:11 253:13 254:11 257:12 265:25 273:14 308:4,6 309:6 311:10 313:12 314:9 323:18 324:7 327:19,20 337:22 367:25 378:6,7 389:8 393:8,13 411:23 412:19 421:18

**O**

**oath** 13:11, 14 104:6, 19 105:20 130:19
**object** 48:22
**objection** 120:14 136:23 137:1 138:10 140:3 162:2 163:1 174:22
**objections** 12:7 249:14,18
**objectives** 48:23
**obsolescence** 340:4 349:9,22 351:4,17, 20 355:3 360:15
**obsolete** 351:10,11 361:18
**obtain** 36:7 72:16
**obtained** 76:4 95:4, 25 96:4 102:6
**obvious** 248:9
**occupational** 75:9
**occur** 132:12
**occurred** 32:25 302:21
**OCR** 97:23 99:24,25 100:4,15, 19,23 101:14,25 103:9 106:10
**October** 108:11 138:14 175:14,20 177:16 178:18 179:11,16,

21 181:7, 19 182:9 190:19 197:18 202:20 259:20 282:17 290:22 291:3,13 349:1 352:22 353:14 369:22 400:7 407:9,16 422:6,10, 18

**odd** 77:18 90:22 106:19

**offer** 19:25 20:9 21:1 37:19 39:5,12 52:8 67:10 69:11 70:17 130:9 344:10 423:5,12, 22

**offered** 41:4,7,10 262:24 267:16 304:23 305:18

**offering** 20:3 51:17 55:24 167:20 307:21 396:11 397:10,14 422:16,25 423:15,24 424:15 425:10,15, 24 426:4

**offers** 70:16 354:16

**offhand** 15:7

**office** 48:20

**officer** 159:7 161:21 162:21 348:13 353:25 354:19

**officers** 49:10 62:19 158:9 159:3

**oil** 41:20 85:9

**Oklahoma** 83:4

**old-school** 155:23 414:21

**older** 29:18

**on-chain** 359:10 362:2

**one's** 415:17,18

**one-offs** 279:13

**one-page** 276:4

**one-way** 228:7,21

**ongoing** 40:20 72:22 91:12 178:5 361:4 364:5

**online** 78:16,17

**open** 15:1,4 45:13 100:20,25 101:2,6,9 102:13,20 104:25 106:17,18, 20 107:7 113:22 156:21 207:8

**opened** 102:18 104:20 105:10,17 107:8

**opening** 100:24

**Opensea** 253:1,17, 18 255:23 260:12 268:16 282:10,18, 19,24,25 297:9 302:6 312:11,17 313:6,16 314:2,12

**Opensea's** 259:15

**operate** 188:25 197:22 201:10

**operates** 150:22

**operating** 187:20 236:2,6,8, 25

**operation** 128:2 189:8 190:12 195:19 196:16 197:20 210:4,5

315:3
358:15
405:11

**operations** 51:2 189:4 191:3 194:2 195:8

**opinion** 20:4 122:7 130:9 151:25 163:11,19, 21,24 164:4,8, 18,22,25 167:20 173:21 198:24 295:22 422:16 423:1,15, 22,25 424:16 425:10,15, 24 426:4, 12,14

**opinions** 20:9 28:23 37:18 39:4,11

**opposed** 227:16 397:11

**opposing** 29:14

35:12

**opposite** 201:25 202:1 204:8 210:21

**optional** 78:13 79:17 297:15 298:3 299:16,19

**options** 76:4 77:6 291:16 292:1 299:25

**order** 84:16, 18 85:13 88:3,4 90:15,22 91:15,20 297:19 410:19

**orders** 87:17 245:22

**organization** 129:6 130:8 165:15

**organizations** 62:21 113:9 130:4

**organized**

161:8

**organizing** 161:15 426:18

**original** 347:1,2

**outcome** 26:21,24 123:14 130:22 182:1 278:19 319:6,12, 22 398:24 420:12 421:4,6

**outcomes** 207:5

**outlier** 207:19

**outlines** 37:4,10

**output** 246:21 247:2 248:25 320:11 321:25 322:10 323:8

**outright** 174:7

**overarching** 334:16 365:10

**overhang** 183:18

**overlapped** 48:12

**oversimplification** 156:13,15 222:23 223:10 310:20

**overstates** 324:21

**overstating** 289:22

**overturned** 88:9

**owned** 48:13 117:9 121:11 136:7 138:21 139:15 140:2,8 344:23

**owner** 122:18 140:13 163:19 171:21 172:10 173:7 332:1 391:17

**owners** 121:25 122:2,3,8,

11 123:2 158:23 159:1 163:12,25 164:4 173:11,13 174:14,15, 16 329:21, 24 332:16 362:16

**ownership** 120:16 136:1,6 139:11 168:21 170:14 171:1,16 172:11

**owns** 122:23 131:2 135:22 137:9 139:6 172:15 173:6 174:7 409:14

P

**p.m.** 249:20 250:5 339:3,7 430:4,8 431:4,7

**packages** 275:18,20

**pages** 30:8 80:1

**paid** 21:20 22:1,3 24:24 290:2,3 307:19 336:25 370:23 371:14,20 372:7 382:18,22

**painfully** 253:23,24, 25 266:3 297:4

**paired** 89:13 280:10

**paper** 164:16 232:7 308:22

**papers** 192:1 240:8,24 243:4 244:10,25 245:13 261:8,11

**paragraph** 87:5 178:10,13 181:1,8

**paragraphs** 180:3

**paralyzed** 15:22

**parish** 49:3

**part** 41:21 54:14 55:18,23 57:19 67:4,7,14 72:24 74:22 75:17 98:11 100:3 101:12,24 102:3,24 110:1 124:8 129:23 165:7,22, 24 167:25 171:1 172:12 173:4 191:9 194:11 197:1,15, 17 198:12, 15 199:8 201:6 214:10 237:7 250:23 251:22 262:19 263:7 267:6 268:14,15, 17 289:14 293:4 294:5 321:16 333:24 336:15,16 340:22 349:5 358:10 360:12 362:4 364:6 367:15 373:15 376:12 378:24 379:2 380:9,20 387:18 388:9,17 391:14 401:19 416:15 426:10 427:6 428:24 429:8,11

**partial** 64:18 417:21

**participant** 282:21

**participated** 79:21

**participating** 78:19

**parties** 11:15 89:1 126:1

136:4 158:18 161:4 167:11,24 201:12 237:6 239:19 240:15 245:22 262:2 373:21 395:9

**parties'** 134:18 236:7

**partner** 25:17 56:13

**partners** 43:15 48:14 56:17

**partnership** 157:19

**partnerships** 50:1 68:7

**parts** 106:15 214:22 215:7 216:6,7 218:9 220:6 247:21 259:14 309:9,11 324:18 344:19 379:25

**party** 93:18 160:20,24 164:6 171:18 373:16 374:3,6 375:15 376:6,7 378:2 379:24 380:9,11, 18,21

**pass** 429:22

**past** 368:8

**pat** 384:13

**patent** 121:8 196:4,15 197:7 376:21 384:3,6,8, 10 385:20, 21 391:23

**patentable** 385:16

**patents** 55:12 384:13

**Patton** 185:13

**Pause** 30:1, 7,16 77:3 179:4 233:9 269:6,13 274:10 349:16,19 430:2

**pay** 123:21, 23 289:3, 19 337:20, 21,23 347:12 351:8 356:24 357:4 362:16

**paying** 69:18 252:19 254:5,18 255:14 256:2 257:1,3, 11,12,18, 19 258:3 260:21 280:18 323:2 367:21

**payment** 24:18,22 203:12 204:19 287:22 288:1,8 290:16 297:19 374:1 377:21

**payments** 290:20,23 291:4 295:16 299:12

**Payne** 83:4

**pays** 24:11

**peak** 253:4

**people** 25:18 57:7 62:22 65:4 66:5 69:11 70:9 160:8 165:21 166:5 167:17 334:25 341:7,17, 21 342:1, 5,8,14,20, 22 343:3, 20,25 345:12 346:6 350:7 356:13 367:20,21 368:22 370:7 384:20 390:3 391:4 409:13

**per-transaction** 305:10

**percent** 58:6,23

59:12,13, 22 61:4,9, 12 62:3,11 63:9,15, 17,22 64:1,8 66:10,21 67:6,17,20 68:10 131:2,3,9, 11,19 133:17,23 134:14,19 160:21 161:5 165:23 168:1 170:22,24 171:20,22 172:9,22 173:14,15 174:19 208:11,12 212:3 213:19 221:20 222:14,17 225:1 226:16 227:9 230:5,10, 16,17,23 231:9,16, 21,24 232:15,23 233:2,5, 14,18,24 234:3,5,8, 20,23 236:14,15 238:6,13, 22 241:4 242:3 243:1,14 244:18 245:10 246:5 247:17 254:25 255:2,4 256:16,18, 19,22 258:16,24 259:2,11 261:13 262:7 264:13,14, 15 284:14, 15 287:4, 18,19,20 296:4,11 297:16,18, 25 298:3, 11,18,19, 23,25 300:5,7,8, 9,10 301:4 304:15 310:11,16, 22 311:3 317:16 326:2,7,11 327:2,7,18 328:11,25 329:4,8, 13,18,21 330:14,15 331:19,21 333:2 334:14,20 357:18 370:21 371:6,8, 10,15 372:8 391:17 392:6 393:17 400:1,3, 16,18 419:7,10

**percentage** 59:8 66:17,24 68:4 171:21 230:9 264:7 284:19,23 287:21 297:14 401:18 411:14

**percentages** 218:24 264:21 300:23 401:17

**perform** 42:25 43:9 45:8 51:4 55:25 57:18 58:8 114:23 115:18 124:11 309:5

**performed** 43:19 51:23 77:21

**performing** 44:16 45:20,22

**performs** 127:11

**period** 120:4 222:19

**perpetual** 280:11 284:16,24 285:5,8,16 287:10

**Perry** 429:19

**person** 15:21 53:25 58:11 103:23 104:1 167:5 183:16 213:23 236:4 340:24 350:10 356:21

**person-based** 25:16

**personal** 12:8 15:13,16 78:4 375:4,6

**personally** 14:22 95:25 97:17 98:18,20 99:18 105:21 106:25 107:4,13, 20

**personnel** 147:15 348:12 349:3 356:5 357:14 359:5

**perspective** 125:10 189:20 297:13 300:7

**pertinent** 102:17

**phase** 195:19,21 196:13,16 197:2,4,20

**phrase** 117:13 159:1 161:6 199:13

**phrased** 205:3

**phrases** 106:12

**phrasing** 266:4

**physically** 101:6 106:5

**pick** 227:15,18, 25 407:3

**picked** 312:8

**picking** 407:5

**picture** 105:7

**piece** 54:11 78:4 136:1 164:16 165:8 167:3 172:11 173:12 174:16,17 184:7 188:8 251:16,18 333:5 334:2 336:16 350:22 370:24 390:25

**pieces** 217:20 251:15 263:16 386:6 408:6

**piers** 124:5

**pillar** 184:19 426:18 429:5

**pillars** 184:15 426:22 427:2,4 428:18,24 429:10

**pitch** 141:4

**pivoted** 49:13

**place** 70:8 277:24 414:8

**placeholder** 99:3

**places** 303:11 323:20

**plaintiff** 24:20 131:1 182:6 430:21

**Plaintiff's** 18:22 31:23 32:25

**plaintiffs** 12:10 18:6,10 20:2,5,21 21:1 24:15 93:21,23 114:13 115:8 131:14,21 133:13 157:21 164:9,20 177:25 179:12 180:22 237:5 366:18 374:21 377:5 380:24 430:12,21

**plaintiffs'** 24:19 28:16 32:16 37:5,9 133:2 136:18 138:5 145:22 179:21 199:4 236:2,6,24

424:16 425:11,15, 19,25

**plan** 20:9 37:18 39:4 91:9

**planned** 39:11

**planning** 380:10,12, 14

**Plano** 50:21

**plans** 193:1 194:2 195:7 266:12

**plat** 287:14 362:10

**platform** 108:22 109:9,20 110:4,11 114:14,15, 18,25 115:10,11, 13,14 116:4,12 117:22 118:1 119:14,20 120:1,12, 24 122:4, 23 123:22 125:18 127:1 128:3,20 137:11 139:16 140:21 141:9,20 142:5,11, 22 143:1, 2,5,12 144:9,16 146:8,13, 19,22 147:8,17, 21,23 148:25 149:4 151:22 152:10 153:9,11, 15,21 154:4 155:1,14 157:1,14 159:10 160:6,8 161:24 162:24 166:24 168:2 169:25 171:6,10 179:14 182:9 186:1 187:1,5, 19,20 188:13,25 189:11,15 191:16 192:9 193:2,9 194:4 195:10 197:9,23 200:9 201:13,15 202:7,21 203:23 205:14,25 206:9,15 211:24 213:14 214:12,25 215:10 218:11 220:9 223:18 233:17 234:7 240:14,20 241:6,14, 20 242:5 251:4,25 252:18 254:6 255:15 259:10 260:22 265:12 267:25 278:7 281:25 283:20 284:14,20 287:5,12, 15 288:9 289:3,18 290:9,11, 16,22 291:15 292:1 293:6,14 294:1,18 296:15 297:14,17 298:9,12, 14,25 300:6,7,18 302:14,16 305:20 306:8 307:3 312:10 315:14 317:12 328:10 330:5,6 336:25 340:25 347:12 348:4,22 352:3 353:15 354:3,5 357:9 359:8,9, 11,14 360:2 361:12 362:16,18 363:14 364:15,23 366:1,14 368:23 369:5,17

371:16
372:9
376:25
377:8
382:20,23
383:21
384:24
385:16,18
388:12,14
389:2,23
394:5,23
400:6,12
414:17
418:13
425:16
427:17

**platform's** 233:4

**platforms** 311:13

**pleadings** 46:6 134:18

**point** 55:16 59:4 69:19 122:9,13 125:7 126:11 158:21 177:8 195:22 206:3 208:24,25 211:13 231:15 232:18 234:13 239:21 242:24 243:12,15 244:8,17 245:8 295:6 300:11 305:23 311:2 359:17 360:21 364:19 396:18 399:13 401:3 403:15 422:17,22 423:3,11

**points** 178:2 230:9

**portion** 24:25 32:13 58:14 63:6 70:7 89:2, 8 92:3 121:5,9 147:3 155:4,5 157:21 172:22 173:8,13 214:15 248:10 262:21 263:10 270:3 304:17 314:16 329:25 331:16 334:11 355:3 370:1 400:13 420:10

**portions** 58:15 84:2,6 90:13 144:20 219:9 262:22 422:13

**position** 44:15

**positions** 367:12,17 368:11,19

**positive** 201:23

**possess** 74:12

**possibility** 169:6,22 206:21 207:1 211:24 213:13 214:11,24 215:10 260:20 332:14

**possibly** 42:1 330:1

**post-judgment** 83:20

**post-money** 212:9 262:23

**post-mvp** 202:10

**potential** 206:12 220:24

**potentially** 181:25

**Practical** 70:19,21

**practice** 100:7 101:19 310:1

**practices** 76:7

**Pratt** 217:15 261:17 327:14 330:21

**pre** 316:12

**pre-launch** 183:15 185:1,20, 24 186:11 202:16

**pre-money** 226:13

261:20,22, 24 262:4, 8,11,13, 22,25 263:10 326:13 401:4

**pre-revenue** 315:14,17 316:12,15

**pre-trump** 190:21

**prejudice** 12:7

**premise** 108:12 126:4 128:21 138:16 140:10,17 174:3,6,10 175:21 181:10 187:16 193:13,14 199:11 201:7 209:16 210:2 224:1 332:19 333:8 334:14 365:10

**premised** 172:17,20, 21

**preparation** 22:24 26:5 27:14,16 28:22 29:7,10 31:2 33:20 35:3,22 36:11 37:6,15 38:10 39:6 197:11

**prepare** 20:21 27:1,6,10 28:14,17 52:3 111:25 422:21

**prepared** 19:5,19 27:8 28:20 31:9 37:5 111:22,25 417:13 429:4

**prepares** 185:11,13

**preparing** 27:20 28:3,8,11, 24 29:3,23 34:16 49:23 50:3 53:22 68:1 101:13 156:22 157:10 161:19 162:19 429:16,20

**Prerequisite** 74:12 76:3,20 78:8

**present** 222:3,8 223:1 247:21 248:1,21 249:4,7 300:25 301:1

**presentation** 286:16,22

**presentations** 141:3 240:22 283:6

**presenting** 45:9

**presses** 206:4

**presume** 211:14,20 360:19 361:4

**presumed** 128:7 189:4

**presuming** 198:20 208:8,10, 13 211:3,5 224:23 385:8

**presumption** 123:1 139:20 140:12,15 168:16,20 170:10,13 174:6 198:23 199:21 208:14 209:24 210:20,21 212:18 216:18 224:4 233:22 255:4 280:23 334:16 348:8 352:21 417:23

**presumptions** 213:18 279:25 419:23

**pretty** 60:2 204:9 304:5 341:12

**preview** 101:4,7

105:5

**previews** 105:3 106:21

**previous** 27:24

**price** 113:17 265:11,21 267:8 270:7,10, 11,16 280:17 291:16 292:1 293:5,12 294:10 297:14 366:3 392:7 393:18

**prices** 270:7,15, 20 271:19, 21 276:9 306:6

**pricing** 219:24 240:24 242:13 254:16 255:11 263:22 264:9 265:24 267:1,2, 13,16,24 268:7 271:1 272:10 273:11 275:5 276:22 277:10,18, 20,25 278:6,11, 18,23 280:16 283:12,14 285:25 288:12 289:15 292:21 297:12,18 304:21,22 305:3,5,9, 16,18 306:2,6,24 307:1,25 309:19,24

**primarily** 397:23

**primary** 55:2 56:23 217:13 427:15

**print** 106:4

**prior** 32:21 190:7 257:3 259:16 389:4 392:15

**priority** 98:8 99:6

**private** 40:25 44:4 50:19 71:16,25 72:4

**privilege** 393:12

**privileged** 370:17,18

**probabilities** 418:1,3

**probability** 200:18 207:5 208:17 224:5 225:2,3 416:12,17, 20,24 417:9 418:15,17, 21 419:6, 21 421:2, 7,8,13,19, 20,24

**probability-weighted** 108:13 138:17 175:22

**probable** 420:2

**problem** 184:2 293:3 321:22 322:2,16, 22

**procedures** 102:4,23 307:16 310:5

**proceeded** 198:21

**proceeds** 89:18 131:20 132:16

**process** 100:15 366:9,13 400:8

**processes** 106:14

**processing** 24:22 297:19

**processor** 288:8

**proctored** 72:25

**produce** 49:6 393:11

**produced** 31:7 93:15,16, 19 94:3

95:1,3,9, 14,19 99:1,2 101:1,3 105:8,16, 23 236:3 237:1 240:3,9 267:10 290:19 345:6,8 395:3 412:15,24

**produces** 412:1

**product** 186:10,19, 20 196:22 200:12 203:10,23 204:18,23 207:16 213:25 234:10 258:11 259:3 262:3 351:9,10 355:19 378:12 383:13 400:4 407:24 417:11

**production** 25:25 29:16 33:18 92:25 93:6,7,12, 20 94:9, 10,15,21, 23 95:1,7 96:5,14, 19,22 97:7,15,19 98:14 99:20 100:6,17 101:16 102:1 103:21 104:9 105:14,15 134:21 149:8 221:6 237:20 238:16 242:2 268:22 270:5 292:7 293:1 306:19 307:13 342:13 343:18 345:15 353:4 358:17,24 370:5 371:20 372:4,6 374:12 377:15 388:3 395:7,14 408:3 424:11

**productions** 374:8

**professional** 39:19 40:18,22 77:9 111:23 399:10,18 429:2

**professor** 54:7

**profit** 188:15

**profitable** 253:10

**profits** 51:7 77:24,25 199:16 425:5

**program** 78:13 79:18

**programs** 54:15

**project** 34:7 109:8 116:17 133:8 160:15 164:2 172:21 341:20 342:15 358:15 391:16 392:4

**projected** 251:3 283:19

**projecting** 240:18

**projection** 237:25 254:3 293:25 294:17

**projections** 236:2,6,8, 25 240:4 252:10 294:2

**projects** 61:19,21 62:25 65:3 109:6 303:24

**promote** 353:24

**promotional** 193:7

**pronounced** 55:7

**pronunciation** 55:8 90:11 91:19

**proof** 78:10, 19 79:14, 20
**properties** 272:2 273:5
**property** 113:18 114:9,17 115:12 118:2 130:21 138:21 139:5,7 142:16,21 143:4,11 144:1 385:1,23 386:3
**proportionately** 257:21
**proposal** 149:8 386:18 387:3 388:6 393:15 426:8
**propose** 270:6,15 394:16
**proposed** 394:14
**proposes** 355:19
**proposing** 394:13
**prosecution** 376:21 384:3,7 385:21
**prospective** 350:17
**prospectus** 49:24 221:8
**protect** 156:19 385:12 386:3,8
**protection** 385:14
**protocol** 98:13,15
**provide** 43:17 57:11,15 184:15 226:15 302:15 388:10 389:7 391:15
**provided** 32:23 33:18 92:20 94:24 112:5 179:8,17 265:17 268:22 348:16 368:14 374:16
**provider** 60:25
**providers** 303:14 304:8 308:10
**providing** 72:19
**provision** 391:24
**provisional** 121:7 196:4,15 197:7 291:15 292:1 384:8,10
**provisionally** 293:5,12
**psychology** 40:5
**public** 13:3 49:2 202:11,12 314:21,24 341:23 342:3,4,7 344:7 353:6 375:22 386:1 390:1,6
**publicized** 331:2
**publicly** 71:19
**published** 19:14 32:5 73:24 86:18 88:22 111:7,17 145:16 180:19 243:24 250:20 269:22 274:23 275:25 286:12 291:20 339:25 386:22
**publishing** 76:8
**pull** 81:24 148:15
**pulls** 112:10
**purchase** 143:23 400:5
**purchased** 143:10,14
**purchases** 124:4,5

**purchasing** 114:10,11 115:7

**purely** 235:24 236:22

**purpose** 28:22 45:9 51:11 58:9 71:9 265:8,10, 13 266:5,6 295:10 353:23 354:20,23 382:24

**purposes** 49:7 51:16 58:20,22 254:15 281:23 293:23 296:8 301:14 303:5 305:16 306:25 309:20 326:16 341:5 344:13 372:23

**pursue** 40:15,19 55:11

**pursuing** 48:22 50:2 384:17,20

**push** 155:22

**pushing** 319:19

**put** 88:16 97:17 98:5,18,23 99:18 103:19 105:21 106:2,6 216:17 267:11 313:15 317:13 344:2 375:4,7 378:3,5 381:20 396:14,15 399:11 415:5

**putting** 79:25

**Q**

**qualifications** 74:4 75:19 79:7 85:19 87:9

**qualified** 392:5,6 393:18

**quality** 402:18

**Quebec** 90:5, 11

**question** 13:24 16:5,16,21 33:9 38:12 62:2 66:23,24 67:5 71:20 85:1 92:23 94:18 100:2,10 102:11 110:16 114:8 118:10 120:20,21 122:21 124:22 126:1,3,22 127:3 129:24 134:12 136:2,12 137:3,6,20 138:2 139:24 140:7 141:12 143:22 146:4,6,11 147:6,12 150:17 152:22 153:6,12, 19,24 155:13 156:3 157:9,16 162:7 163:8 165:4,16 168:7 169:19,20 172:14 173:10 174:12 181:10 184:12 197:19 198:3 206:20 209:15 211:21 240:10 244:20 251:12 259:14 263:14 281:20 293:21 296:18 306:14,21, 22 307:6, 7,11 309:3,4,10 316:18 318:6 319:11 324:20 332:10 333:3 335:3 343:14

344:18 347:18 351:22 352:20 364:22 379:1,13 397:19 412:18 419:14 423:19 425:22

**question's** 99:15 142:23

**questioning** 430:14

**questions** 16:2,5,10 37:11 119:12 137:14 169:14 206:20 251:8 273:8 406:2,4,6 416:3

**quickly** 175:9 416:9

**quote** 54:6 295:9

**quote/unquote** 131:20

**R**

**raise** 12:15

**raised** 222:6

**ran** 103:8

**range** 226:22 261:19 262:8 327:16,17 329:12 411:1,2,3,4,7,10,17 412:5,16,24

**ranges** 229:12 263:12

**Rarible** 302:4

**rate** 25:17,18,21,24 26:1 191:21 192:20 194:20 198:13 200:19 207:18 208:7,21 212:4,7,9 213:3,6,11,20,25 214:5,9 215:25 217:5 220:14,15 221:1,17,21 222:6,13,23 223:11,15,21 224:25 226:16,22 227:7 228:5,11 229:1,10,15,24 231:9,21 232:4,15,24 233:3,14,18,23 234:4,6,11,14,23 235:3,14,20 236:11,14,15,18 237:8,14 238:2,7,10,11,14,23 240:1 241:5 242:3 243:2,14 244:19 245:10,16,23 246:6,15,17,21 247:2,8 248:20 249:3 256:23 257:5,24 258:16 259:16 261:5,18 283:7 287:16 326:11,15,19 335:24 400:23 401:4

**rate's** 233:11

**rates** 25:19 192:3 200:16,17,18,19 202:3 208:20 211:8 212:2 227:23 230:23 251:9 258:19,23 260:13 266:16 311:6 323:19 330:23 388:15,21 390:23 408:15 420:7

**ratio** 229:4 313:13 316:21 328:5

**raw** 156:10

**re-charges**

377:14

**re-platform** 361:18 362:8,11, 17 364:16 365:18 366:5

**re-platforming** 348:23 359:10,15 360:2 362:22 363:16,21 364:4,12 365:6 366:9,14 400:2 417:21

**re-review** 29:18

**reaction** 357:22

**read** 108:17 115:22 180:7 226:21 293:8 328:14,15

**reading** 103:13 118:17 204:21 224:1 235:19 281:18 402:22

**ready** 202:12,13 353:5

**real** 259:19

**reality** 402:16 403:8 404:7,24 406:10,16 407:11 408:5,8, 11,21 409:4,21 410:4 411:3 416:23 419:20

**realize** 222:18

**realm** 206:21 207:1

**reason** 14:12 75:24 156:18 162:8 215:24 261:23 273:2 280:15 321:10 394:19 400:2 413:3

**reasonable** 113:24 300:5

336:5

**reasons** 182:11 308:1 335:2

**rebound** 420:21

**rebuild** 193:21 342:10 345:21 346:25 350:6 351:15 360:18 361:3 364:14 400:13

**rebuilding** 376:24

**rebuilt** 194:9 330:3 351:18

**rebut** 177:1

**rebuttal** 20:12 37:14,20 67:25 68:2

**rec** 418:22

**recall** 15:7 27:13 42:12 46:10 89:7 92:5 141:5

255:17 278:10 294:2 312:18

**receive** 24:18 38:19 80:8 394:6

**received** 31:8 38:1, 4,9,20,21 97:19 99:20 101:15 145:20,23

**receiving** 129:1

**recent** 237:20 279:7 371:20 372:4 374:11 395:7,14

**recess** 81:14 175:2 249:22 339:5 430:6

**recognition** 97:23 99:24 100:4 361:6

**recognize** 361:6

**recognizing** 361:5

**reconcile** 208:2 271:19 277:9 336:10 344:11 399:19 406:7,20 408:6 411:12 415:4

**reconciliation** 208:24 214:18 215:5 317:6 338:9 398:18 399:8 405:12 408:24 416:10 420:25 427:6

**reconciliations** 419:2

**reconciling** 407:2 417:11

**record** 11:5,20 12:4 81:10,13,17 174:21 175:1,5 249:13,21 250:6 338:25 339:4,8 377:3 429:25 430:5,9 431:5

**recorded** 388:14 390:20

**recording** 14:8

**records** 26:5 28:19 49:2,5 102:5 176:25 177:6 203:10 204:8 267:10 271:5 314:22 345:6,8,10 391:9 393:11 395:1 409:17

**recovery** 259:22

**recreate** 336:3 337:18 340:25 346:3,25 347:24 348:4,22 350:13,18,24 351:6,24 352:15 354:8,10,11 356:3 358:2,4 359:17 362:9 363:13,17 365:8,17 369:13 372:13 373:4 374:22 381:22 382:25 385:7 400:15 405:3 409:24 413:19

**recreated** 354:25 365:11,22

**recreating** 337:14 359:8,14 361:12 362:7 365:14 368:23 384:23 385:5,9,10

**recreation** 340:12 341:9 345:19,20 347:23 348:20 355:15 356:8,9 357:6 358:6 361:8 365:5 374:20 377:19 378:1 383:25 391:2 413:4,7

**recross** 416:1

**redacted** 395:10

**redesign** 347:5,8

**redid** 79:6

**redirect** 430:13

**reduce** 221:1 260:4 320:22 372:24 373:3,5

**reduced** 232:1 233:10 338:14 372:22

373:8

**reduction** 357:21

**refer** 17:4,8 18:8 42:15 95:8 158:13 159:17 273:9 302:1 384:5

**reference** 133:7 154:19 174:2 178:22 221:16 253:16 263:10,11 291:7 293:22 298:10 306:16 379:18 381:19 391:11 401:9,13

**referenced** 38:17,25 66:1 97:8 106:13 108:23 109:22 110:8 116:10 120:3 121:3 130:3 133:9 155:9 156:17 293:19 299:16 344:3 375:2 381:13 407:17

**references** 180:2 265:15 326:10 353:12 426:18

**referencing** 57:24 58:17 121:2 160:18 177:24 181:2 205:15 262:10 290:21 298:13 353:8 390:8 413:24

**referred** 117:23 143:17 161:1 168:3 254:13 306:13 395:18,21, 23 424:20

**referring** 17:15,20, 21 40:23 87:15 91:21 117:15 157:8 161:8 163:13,15 171:13 172:5 173:3 185:19 196:10,12, 18 197:21 213:7 228:20 265:9 272:5 291:5 292:8,24 297:6 301:23 302:7 305:24 344:1

**refers** 147:2 148:5 185:25 318:1

**reflect** 147:1 203:10 331:24 391:20 407:6 408:4 411:2

**reflected** 277:21 365:1 373:17 411:5

**reflecting** 402:18

**reflection** 369:11 370:3 372:11 408:7,11, 13 414:13, 14 420:2

**reflective** 402:8,10 404:11,12, 13 407:10 414:5 416:21

**reflects** 235:14,21 236:18 397:16 419:19

**refresh** 192:12

**regard** 52:15 168:4 345:1

**regimes** 189:10,12

**registered** 160:18

**registration** 49:5

**regular** 57:7,20 59:22

**regulated** 189:24

**regulation** 189:16

**regulatory** 189:10,12, 20 190:9, 15 191:4, 15 192:8, 21 427:10, 19 428:5

**regurgitation** 383:25

**relate** 35:7 379:20 381:14 418:11

**related** 15:20 34:19 35:9 36:21 70:5 72:20 75:2 76:10 83:21 89:25 99:10 147:2 197:5 241:9 299:13

**relationship** 406:25 418:6

**relative** 207:4

**release** 235:23 236:21

**relevance** 98:9 380:5

**relevant** 85:21 86:1 87:11 89:20 113:25 138:25 174:5 187:19,24 188:14 334:2 336:11

**reliability** 324:3,4 394:25 399:25 402:3,5,14 412:17 414:14 416:17 418:23 419:18 420:10 421:6,17

**reliable** 395:2

**reliance** 91:23

**reliances** 380:8

**reliant** 384:25

**relied** 385:5

**relies** 282:18

**rely** 75:12 77:14 79:11,14, 20 90:20

**remember** 15:17 17:13 27:23,25 46:23 47:5,8,11, 20 53:24 79:4,25 80:16 89:11,16, 23 92:11 149:18 152:15 191:20 192:13 197:10 204:10 205:17 232:5 235:6 250:13 263:2,6 265:13 266:7,19 277:18 280:14 283:9 291:8 304:7 309:3 313:1 315:6 341:25 342:2 353:14 357:17 369:21 376:9,11, 12

**remote** 11:10

**remotely** 11:16,18

**removed** 420:19

**rep** 275:16 363:13

**repeat** 307:23 397:18

**repeating** 134:12

**repetition** 64:13 66:14

**replace**

354:2

**replaced** 352:3

**replacement** 340:3 349:22 351:2 400:1 417:20

**replacing** 354:4

**replete** 137:12

**report** 19:4, 19 20:7, 17,21 21:5,6,14 22:5,20,24 25:3 26:6, 16 28:24 29:13,14, 20,23 30:24 31:8,9 33:13,23 34:10 35:5,13,24 36:14 37:15,21 38:4,13,14 39:9,14,17 81:21 82:5,21 89:3,17 90:18,23 91:1,16,22 92:7,9,17 93:25 96:9 97:21 98:12 99:22 100:3,14 101:12,13, 24 102:4, 13,15,23, 24 104:2 107:2,14 108:8 109:3 110:14 111:22 114:4 118:16 119:19 120:9 121:17 127:17 137:12,15, 17 138:7, 18 151:2 152:1 156:23 157:11 158:13 159:23 160:2 161:19 162:20 171:15 174:2 175:10 176:4,7 177:2,13 178:9 183:11,19 185:4 192:23 195:13,15 198:18 203:8 204:16 212:25 227:5 228:13 235:1,10 237:23 239:2,14 242:12 250:16 271:8,16 275:3 278:1 281:8 285:23 296:8 300:17 307:16 309:23 317:5 327:12 330:16,22 339:19 349:7,15 352:9 357:19 374:16 378:21 395:18 398:16 399:7 401:10,20, 21,24,25 403:10 404:15 406:19 407:14 409:10 416:18 418:2 422:4,11, 12,14,23 423:9 424:6,9, 12,13 425:7 426:6,14, 17 427:3 429:17,20

**reported** 313:18

**reporter** 12:12 14:4 16:7 386:13

**reporter's** 430:11

**reports** 43:4,6 92:3

**repository** 147:20 148:4,9, 16,24 152:10,18, 24 153:8, 14,20 154:3,9, 15,25

155:4,16, 19 156:6, 25 157:13, 22 159:9 160:7 161:3,23 162:23 166:23

**represent** 234:6 269:24 363:12 383:3

**representation** 397:25

**representational** 402:23

**representations** 426:7

**representative** 209:2

**representing** 241:15

**represents** 164:6 371:5 402:16 403:7

**reputational** 183:18

**require** 40:19 63:2 331:6 333:7

**required** 72:19 114:17 115:12 123:21,23 146:23 168:18 232:4 326:1,6,9, 18

**requirement** 74:23 78:9 176:17

**requirements** 75:10 76:16

**requires** 72:22 136:4 155:25 201:8 334:12 359:9,15

**resale** 280:11

**research** 22:21 76:9 231:19 238:20 243:20 245:5 265:4 266:10 304:19 306:11 307:15,16 308:23 309:19,25 310:7 367:19,24 368:9,13 425:6

**researched** 33:16 36:7

**resell** 383:13

**reserve** 237:22 416:1

**reserved** 20:14 236:1,23 237:17

**reserves** 430:20

**reserving** 237:13

**resolve** 191:7

**respect** 87:7 302:19

**respond** 16:3 137:19

**responding** 306:20

**response** 16:11 22:16 40:24 99:23 117:14,17 130:2 135:15 136:21 138:8,9,13 146:9 221:16 239:16 244:21

**responsibilities** 43:13 44:13

**responsible** 423:21

**rest** 27:16 89:4 176:4 178:9 195:25 257:20 265:23 292:25 293:17 360:7

**restated** 306:15

**restricted** 329:11,14 336:15

**restriction** 189:6 427:20 428:3

**restructure** 78:2 386:18 387:2

388:6
426:8

**result** 37:19
38:13 39:5
126:9
149:20
320:24
324:2
351:17
366:10
411:17
421:12

**results**
100:21
280:6
426:12

**retained**
20:20,25
52:8

**return**
218:25
219:4
232:4
326:1,4,6,
9,19

**revenue**
114:15
115:10
117:12
118:7
128:23
129:16,18
133:15
135:2
188:7
194:20,22,
24 198:5
202:21
206:16,17
207:14
212:10
222:7,12
224:18,19
251:16,17
252:11,12,
22 253:3
258:12
260:1
263:17
267:7
280:3
281:24
284:20
313:11,14,
17,19,22
314:3,13
315:18
316:15
317:20,21,
25 318:11,
15 320:5
321:1,18
325:9,13,
15,17,21
326:20
329:1
335:19,21
405:7
407:22
413:9
414:6

**revenues**
128:1,18
129:1
222:18
233:4
240:19
251:3,13
267:7
294:17,21
295:3,4,5
310:16
313:7
321:23
322:8

**review** 15:2
22:7 23:12
24:21
25:25 29:9
31:3 33:6
35:21
37:4,8
38:3,7,8,
9,11,14
52:2 86:1
92:22
98:8,13,22
100:8
101:19,20
102:20
103:12,15
104:7,11
105:14
106:2,15
156:23
157:11
161:20
162:20
176:12
238:16
243:4
259:4
374:13,15
375:15

**reviewed**
29:13,14,
15,16,17,
22 30:23
31:6 33:8,
11,21
34:16 35:2
36:13,15
37:1,14
38:16 39:6
92:16
93:24 99:2
102:5,7,8,
19,25
103:7
106:7
107:21
152:3,6
180:25
204:14
264:24
294:12
343:17
376:1
387:21
388:5

**reviewing**
37:20
108:3
377:3

**rights**
430:20

**risk**
183:13,15
184:7,23

185:2,7, 16,20,24, 25 186:12 189:19,20 191:5,15 192:8,22 195:4 212:20 213:24 214:4 215:14,16, 18,25 216:8,11 217:1,11, 17,18 218:2,4,11 220:8,13, 24 235:3 427:10 428:8

**risks** 185:2 190:20

**Rispoli** 12:9 22:11 32:9 73:4,11 81:7 120:14 136:22 137:4 138:10 140:3 162:2 163:1 174:22 249:14,18 339:1 415:24 416:4 429:24 430:10,25

**role** 50:10

**roles** 48:21 343:5 345:4 367:14,21

**rolled** 330:9 383:10

**rolling** 383:6

**rose** 176:16

**roughly** 230:12

**round** 367:25 378:6 381:10,11 396:19

**rounds** 320:25

**row** 282:5

**rows** 341:15

**royalty** 284:25 285:5 287:16 297:15 298:3 299:17,20, 24,25 300:8,9

**royalty-based** 287:11

**rule** 35:17 183:8

**ruled** 348:14 359:6

**rules** 15:25

**run** 61:17 62:16 63:11 64:4,11 65:3 101:14 114:17 115:13 187:1,18 188:13 375:5

**running** 109:25 150:23

**runs** 126:10 156:12 385:25

**Ruocco** 11:21 13:7 18:13,17, 20 19:15 22:9,12, 13,17 31:11,16 32:6 73:1, 8,15,25 81:5,9,18, 20 86:4,7, 11,19 100:13 104:17 110:19,22 111:8 132:25 133:24 136:25 137:2,16, 25 145:3, 6,17 169:3 174:20 175:6,8,16 180:10,14, 20 249:11 250:7,9,21 268:23 269:2,9, 14,23 273:17,22, 24 274:5, 7,13,24 275:1,9,15 276:1 286:13 291:21 319:10 338:23 339:9,10 340:1 386:9,15, 23 387:13, 17,20 394:2 397:12 416:2,7,8 425:13 429:22 430:19 431:2

## S


**SA** 313:6,10 318:1

**Saas** 383:3, 4

**salaries** 367:9

**salary** 367:17

**sale** 116:1 143:24 190:8 200:4 284:23

**sales** 124:4, 5 190:7 193:1 194:3 195:8

**sanity** 307:12 308:23

**satisfies** 75:10

**Satohi** 359:7

**scale** 342:11 382:15

**scenario** 417:17 418:7 427:18

**schedule** 35:4 94:20 96:12 212:25 218:7,10, 16 219:12, 14,19,22, 23 220:1, 4,7 225:23 226:4 227:11 228:15 230:21 231:1 232:22 233:1 247:14 250:16 251:22 256:3 263:21 268:8 272:6 275:3 286:20 306:1 312:5 313:4,15 314:7 317:6 321:16 326:1,7,10 339:14,18 340:13,15, 23 358:7 359:1 367:15 378:16,25 379:22 398:17 399:16 401:15,19 402:3,14 416:15 420:11 426:17 430:16

**schedules** 26:6 192:2,12

**school** 15:19,21

**Schwartz** 42:3,16

**science** 40:4,12 348:13 353:25 354:19

**scientist** 350:9

**scope** 52:13

**scratch** 345:23 361:13 364:15

**screen** 18:19 19:10 73:17 250:17 291:9 339:21

**scroll** 19:2 29:24 30:2,10 74:9 76:24 82:7 113:1 179:1 251:21

**Sean** 69:3

**search** 98:12,15 100:15 101:20 153:22 154:8 176:13

**searchable** 49:6

**searched** 101:24

**searches** 97:22 99:24 100:3 101:14 103:9 106:11

**season** 207:8

**SEC** 34:6,13 35:7 36:1, 6,15 190:22

**secondary** 243:6 419:22 421:9 422:1

**section** 89:17

101:5 218:22 219:8 228:9 265:19 266:6 277:25 281:19 365:19 395:4 419:21 420:14

**sections** 263:11 365:18

**sectors** 259:5

**secure** 375:10,16

**secured** 375:18 381:16 382:5

**security** 361:22 375:1 376:10 377:6 378:4

**seeking** 19:25

**segment** 89:3 98:4 119:23

**segmentation** 134:7 147:4

**segmented** 91:22 121:5 365:22

**segmenting** 143:15,18 158:22

**select** 179:10 207:22 264:8,13, 14,15,20

**selected** 105:4 179:16 277:19 318:17,23 319:14,24 321:8,17

**selecting** 217:3 230:22

**selection** 181:6,11, 21 208:18 209:4 218:18,20 312:12 319:17 407:2,10

**selections** 208:3 316:19

**self-serving** 330:23

**sell** 50:25 113:23 118:25 119:5 125:17 140:14 168:22 170:16,17 174:8,15 329:17 330:1 332:1,12 333:21

**sellable** 330:2,9

**seller** 113:21 121:20,22, 23,24 122:15 123:5,6,8 138:24 139:6,10, 19 140:12, 13 168:20 170:12 174:5,7 193:14 332:21 333:5,6,9, 16,20

**sellers** 122:15 189:7 332:24 333:7,13, 15

**selling** 119:1 173:11 174:17 216:25 289:25 316:1 331:16 332:6 334:23

**semester** 53:16,20 54:2,3,4

**semicolon** 120:2

**sending** 32:20

**sense** 22:18 23:2 24:2 36:20 55:10,14 99:14 105:18 127:10 173:5 187:13,23 199:17 256:22 278:13 330:10,19 411:22 414:8 422:8 424:25

425:3

**sensitive** 228:10,22 229:1,4,7 319:7,13, 23 320:3, 9,19

**sensitivity** 208:25 213:16 226:24 227:13 228:3,8,15 246:2 257:15 261:19 411:6 430:11

**sentence** 119:24 120:5 176:3 178:14 196:12 205:1 236:13 360:7

**separate** 91:22 118:4 130:15 134:9 155:14 172:6 284:15 363:21 385:17

**separated** 355:4

**separating** 157:23

**September** 11:8 27:25 28:4 32:2 38:21,22

**sequences** 150:7

**series** 89:24 312:20

**serve** 46:12, 17 50:8

**server** 148:10 154:20,21 155:25

**servers** 149:6 155:7 376:19

**service** 60:24 303:13 304:8 308:10 371:24 372:1,3 374:12,14 383:4,14

**services** 57:12,16 61:17 62:16 63:11 78:22 79:23 147:22 165:14,25 388:11 391:23

**servicing** 395:8

**set** 15:25 60:25 70:4 88:23 132:3 148:11 203:17 285:2,4 401:16

**sets** 45:14 95:6

**setting** 69:15,16

**settled** 84:17 85:15 88:5,10

**Seventeen** 83:18

**severe** 357:21

**severity** 324:21

**shaded** 279:8

**shakes** 16:12

**share** 18:18 37:9 73:16 131:3 133:4,17 134:14,19 170:24 171:23 172:23 173:7 208:11 242:15 250:17 254:24 255:1,5

**shares** 65:8 329:18 392:4

**sharing** 339:20

**sheet** 274:8, 12

**sheets** 393:4

**shift** 191:6

**short** 75:22 98:7 267:20 389:3

**shortchanged** 394:21

**shortened** 17:16

**shot** 34:7, 14 35:8 36:1,16 190:13 291:9

**show** 78:19 175:9 209:1 225:19 232:7 268:7 270:2 272:3 285:13 345:11 354:23 386:10 395:2 409:17

**showing** 18:21 37:25 73:17 78:10 79:14,20 86:7 110:22 113:7 228:19 241:19 266:10 269:10,14 274:14,15 286:14 296:23 340:23 342:13 343:9,19 360:24 385:4 392:20

**shown** 83:15 108:14 138:18 175:23 267:24 271:19 276:9 285:18 312:5 362:25 367:14 378:24 379:21 391:8

**shows** 105:5 213:16 237:24 246:16 250:22 257:14 269:25 276:25

**shutdown** 360:10

**sic** 78:12 79:17

**side** 68:1 113:6 184:1 201:23 227:1

**side-by-side** 150:15

**sign** 43:4

**significant** 315:9 415:22

**significantly** 415:8,13, 16

**signs** 104:1

**similar** 50:21 56:6 188:5 207:11 216:23,25 237:21 259:10 300:25 302:13 304:24 305:20 306:8 307:2 311:13 315:25 316:1,2 321:3 414:24 416:19,24

**simple** 127:7 318:6

**simplest** 132:4

**simplification** 393:21

**simply** 32:20 120:21

**single** 63:23,25 98:1 116:11 137:13 259:12 279:12,13 379:6 383:12 407:9

**sit** 177:8 382:8

**site** 179:14 182:8 204:5 291:9 341:9 343:12,21 344:16 346:3 351:25 394:1

**sitting** 23:20 232:18 243:11 245:7

**situation** 193:17 418:12

**size** 210:10 211:12 217:7 218:25 219:4 327:3,7, 10,21,23 328:6,8

**sketch** 413:15

**skill** 45:14

**sky** 201:18

**skyrocketing** 259:21

**slide** 286:21

**slip** 274:7, 12

**Slovenia** 144:12 146:5 167:13,22 353:16 371:14 372:7

**Slovenian** 345:1,7

**slow** 208:13

**small** 78:1,3 89:17 285:10 412:8

**smaller** 183:24 328:1,24

**smallest** 417:5

**smart-contract** 375:1,14 377:6 378:5

**smart-contracts** 61:1 127:13 331:3,4 375:18

**Smitty** 387:2 391:17,22

**Snap** 48:10, 16,17,24 49:1,16, 22,25 50:4,9 56:7 262:17,23

**so-and-so** 152:5

**soft** 114:25 368:3

**software** 53:9 107:9 108:22 109:20,23, 25 110:1,4 114:20,21, 25 115:15, 16,17 116:4,12 117:1 119:20 120:1,12, 24 122:4, 23 123:22 124:3,9,21 125:2,5, 18,22 126:6,9, 18,25 127:13 128:3,19 129:17 132:5,8,9 133:14 134:25 135:1 136:9 139:15 140:21 141:9,20 142:5,11, 14 143:1 144:9,16 146:19 152:10 155:1 157:1,14 159:10 161:23 162:24 166:24 168:13 169:2,7,23 171:5,10 172:15,16 185:10 200:9 290:15 311:12 351:9 353:15 354:3,5 363:12,13 366:1,5 367:8 368:3,6,7 373:15,23, 24 374:1,2 375:19 376:5 378:24 379:7,21 380:6,14, 22 382:15 383:4 385:2,5,24 388:10 413:6,9

**software's** 114:22

**software-based** 116:24 413:5

**sold** 130:21 168:23 170:15 172:3,19, 21,25 173:19 174:9 280:24 332:16 334:12,15, 19 413:17, 20

**sole** 422:12

**somebody's** 384:17,18

**sort** 53:22 193:6 294:17 396:21 401:23

**sound** 16:8 17:1,4,5

18:5,9 275:16

**sounds** 60:1 61:23 64:22 72:4 81:9 115:22 116:12 117:7 119:12 122:17 155:10 194:8 216:3 219:13 234:19 302:18 347:15

**source** 45:13 144:8,15 146:18 151:22 152:2 153:17 156:10,21 178:15,24 179:2 226:20 232:19 238:13,15 242:24 243:12 244:16,22 245:8,9 311:2 327:9 428:16,19

**sources** 112:12,13, 20 261:16 265:1 311:5 322:13 346:23 368:13,15

**Southern** 86:14,23

**speak** 429:15,19

**speaking** 136:25

**specialists** 71:15

**specialty** 75:9 78:23

**specific** 28:1,21 46:10 89:5,6 113:2 122:7,18 123:1 136:10 143:18 155:15 157:25 158:23,24 160:17 163:14 164:16 167:16 183:7 187:6 192:7,14 211:23 215:19 218:1 259:18 260:5 266:5,21 291:6 359:20 363:22 369:8 376:24 381:4 384:1 388:4 401:11,17 402:8 406:1,3,6 427:12 428:3,9 429:13

**specifically** 22:4,7 29:6 47:19 52:8 157:24 288:16 316:20 345:7 371:10 376:12 399:22

**speculative** 325:1

**spend** 28:3, 11 108:2 356:20,21 382:16

**spending** 21:17 391:5

**spent** 21:10, 14,21,25 22:4,19 23:3,21 24:2 26:15 27:20 28:7 29:2 107:24 346:4 355:7 372:12 374:20,21 379:5 390:5 391:6,7 392:13 393:10,25 394:3,22

**Spilker** 42:3,16

**spin** 119:5

**split** 331:25

**spreadsheet** 381:8

**stabilization** 210:9

**stabilized** 325:9 326:20

**stack** 383:16

**stage** 55:16 70:2 182:23 186:22 202:16,18, 24,25 204:24 210:10 214:1 215:23 217:8 218:25 219:4 225:18 226:2 227:20 261:20,23 327:3,8, 11,21,23 328:2,6,9 330:24 409:12

**stages** 185:10 261:18 311:7,9

**staging** 185:9

**staking** 89:19

**stamp** 274:17 388:4

**stamped** 291:24

**stamps** 388:2

**stand** 175:25 325:3

**standard** 100:7 101:19 106:15 150:19 402:17

**standards** 69:17,18 70:5,7,24 71:1 111:23 112:1 243:21 330:18 399:10,18 417:12 429:3,9

**stands** 138:5

**start** 14:24 16:3 96:22 175:17 185:18 218:8 220:3 244:1 345:22 361:7

**start-up** 49:19

**started** 15:24 240:22 313:15

**starting** 93:4 146:2

**starts** 96:18 218:22

**state** 13:3 39:23 40:2 50:24 81:3 89:9 161:9 184:15 340:2

**stated** 20:13 92:15 115:19 179:24 265:14 343:24 388:25 389:22 394:5,7 430:12

**statement** 51:21 63:7 85:23 96:16 140:20,24 141:1 202:12 204:15 293:3 295:21,23, 24 299:7 340:9 342:4,5,7 344:7 353:6 389:4,25 390:2

**statement's** 179:6

**statements** 49:25 141:5,13, 15 202:11 221:7 224:7 314:2,6, 12,17 341:23 358:20 392:25

**states** 19:5, 19 35:16 49:4 74:4 76:4 78:18 113:15 159:15 162:14 190:22 295:15 297:12 300:3

**stating** 392:12

**status** 158:12

**stay** 260:22,25

**stays** 249:5

**stenographer** 12:14,22 31:13,21 86:10 100:11

104:15 219:2,16 235:17 386:14

**step** 218:22 315:24 316:5

**steps** 263:20

**stock** 336:15

**stocks** 329:12,14 370:17

**stop** 201:2, 5

**stopped** 178:1 201:12

**store** 129:18

**stored** 148:3 153:18

**straight** 305:6 315:19 341:8,14 368:24 369:3

**straightforward** 369:2 413:6

**strange** 151:14 170:2

**strangely** 90:16

**strategy** 129:24

**stream** 132:19 198:5 335:19,21, 25 405:7,8

**streams** 191:11 212:10 252:24 284:20

**stretch** 360:21

**strike** 132:25 133:24 169:3 394:2 397:12 425:13

**Stripe** 287:21 288:2,7 289:3,11, 13,19,22 290:6,7 295:15 296:11 298:19 299:3,13, 15

**stripped** 99:9

**structure** 60:21 61:19 62:18 64:6 120:16 129:12,24 130:10,12, 14,20 134:25 171:17,20 173:22 174:14 313:1 332:24

**structures** 65:5 66:4 67:12

**struggling** 322:15

**studies** 329:14

**study** 40:9 188:23 189:9 192:25 193:5 194:1 207:3 226:20 302:12 305:14 306:4,23 336:15

**stuff** 22:23 53:23 122:13 126:13 141:3 151:8 182:25 185:9 282:11 283:15 302:4 314:19,20 343:5 346:11 358:12 376:20 395:14 408:15

**style** 414:20

**styling** 15:10,18

**subject** 12:6 32:9 47:24 54:10 55:2 112:2 120:8,22 124:7,20, 21 125:4 126:5,6,10 143:25 189:11,13, 16 263:2 268:8,12 352:6 387:1 408:18 415:9

**subject's** 402:16 403:8

**subjection** 324:14

**submitted** 20:8 39:9, 14 97:21 99:22 176:7

**subscribe** 308:15

**subscriber** 229:8 256:3 257:7 258:20 267:16 281:13,25 282:12

**subscribers** 193:9 202:8 206:10 229:14,17 240:5 251:25 252:9,19 254:5,9, 12,19,20 255:1,14, 19 256:1,5 257:1,3, 11,12,19, 20 258:3, 9,13 259:12 260:21 265:25 266:11 267:19 279:4 282:13 283:19 284:12 287:25 315:10 323:2

**subscribing** 254:23

**subscription** 69:22 240:24 251:16 252:11 258:12 263:17 264:21 265:24 266:12 268:6 270:6,15, 20 271:1, 19,20 272:10 273:11 275:5 277:10 278:6,18 280:18 304:20,22 305:15,18 306:5,6,24 307:1

**subscriptions** 290:1,17

**subset** 45:6 76:10 135:6,9, 13,16,18

**subsets** 77:24

**subsidiaries** 377:11,17

**subsidiary** 377:22

**substance** 99:13 403:9 407:14 409:9 422:12

**substantial** 37:23 76:5 77:8,10,14 97:25 98:6 101:8 105:5 177:10 182:22 191:8 346:9 407:21

**substantially** 260:13 328:1 342:3 358:21 413:8,19

**subtotal** 363:7 371:11

**subtract** 363:15

**subtracted** 363:2,5,7

**succeeds** 417:24 418:8

**success** 201:15 225:2

**successful** 200:11,13 223:18 419:7

**successfully** 186:1 200:10 209:14

**successive** 418:13

**suggest** 39:10,15 316:24 317:12 412:25

**suggesting** 156:24 157:12 161:20 162:21 242:2 417:16

**suggestion** 190:4

**suggests** 377:4

**suitability** 402:19

**sum** 298:6 373:5

**summaries** 26:6 37:10

**summarize** 399:24

**summarizing** 20:8

**summary** 401:12,13, 23 418:1 428:10

**Sun** 185:12

**super** 80:25 320:3,18

**Superior** 47:15

**supplement** 18:23 31:24 33:1 176:24 177:5

**supplemental** 423:9 424:10

**support** 42:22 43:6,9,14, 15,17 56:24 57:2 71:14 72:15 104:2 194:3 195:9 243:1,13 244:17 245:9 308:3 311:3 370:15 388:12 389:8 393:3,13

**supportable** 303:22 382:15

**supported** 176:3

**supporting** 417:8

**supports** 290:6 293:18 399:15 428:17

**supposed** 340:10 347:11 348:3 349:21,25

**surprising** 242:21

**suspect** 372:2

**SV** 183:16 348:11 349:9 351:15 354:13,16 355:1,10, 17 356:1 358:8,9 359:4,21 360:18,19 361:24 362:7,10 363:24 364:15,17 365:7 366:10 407:20

**SV-BUILT** 362:21

**Swaco** 42:1

**swear** 12:13, 17

**Swift** 132:13

**swing** 230:17

**switching** 290:19

**sworn** 11:17 13:2

**synergies** 350:11 354:17

**synergy** 390:25

**synonym** 45:4

**systems** 380:18

**T**

**tab** 18:14 31:12 73:2 86:5 110:20 145:4 180:12 268:25 269:8 274:1 275:11,14

**table** 108:15 138:18 175:23 254:13 285:18 326:13 355:12

**tables** 253:13 258:21 265:18 266:1,2,24 292:15 296:23

**tack** 217:11,19

**takes** 198:4 206:22 413:15

**taking** 12:6 61:24

64:20
80:15
103:13
106:16
200:15
383:5
404:9
405:1
406:1

**Talisman**
84:13,22
85:3,8,17
86:13,22
87:23
88:13 92:1

**talk** 100:12
104:16
184:22
195:12,14
219:17
227:4
234:25
255:9
261:17
283:6
285:24
299:11
351:2
376:16
393:7
401:10
404:15
406:22
428:5

**talked**
215:23
224:8
262:16
268:11
271:24
290:19
305:7
311:5
420:6
428:6

**talking**
42:17
51:25
60:16
67:13
116:11,14,
21 117:1,
2,16,18
121:4
124:1
125:23
134:22
137:10
143:21
144:20
155:3
158:11,17
160:14,15
165:19
166:16
169:9
170:3,7
180:14
186:8
188:17
196:1
198:7
203:3,4,21
205:16
212:19
215:13
217:20
236:10
237:8
239:7,9,16
240:13
246:12
254:18
258:25
261:6
266:25
281:11
283:11
292:20,25
310:25
327:10
332:6
351:1
352:19
363:6
379:7,23
380:1
390:25
406:21
409:21

**talks** 362:1

**target** 191:5

**targeting**
190:24
191:2

**task** 25:7,
12,20,23

**taught** 53:9,
10 54:12
368:6

**tax** 58:21
167:16

**taxable**
126:15

**taxes**
123:21,23
124:1,7,
20,21
125:5
126:6,7,11
165:11

**teach** 53:7,
12,15,17
54:4,20
55:1

**teaching**
76:9 78:15

**team** 178:16
344:4
345:2,7,10
379:4

**technical**
427:9,16

**technologically** 204:6

**technology**
62:7

**telling**
215:15
276:23

**tells** 230:21

**ten** 57:5
81:8 93:22
137:6,10

**tend** 25:15

303:16

**tens** 190:8

**Teranode** 34:19 35:9 36:3,18,21

**term** 17:19 45:4 59:25 60:2,9 63:17,19 64:22 65:15,20, 21 79:4 106:18 113:8 158:25 159:12,17, 21 160:4 161:7 162:10 208:9 229:20 287:14 322:15 383:7

**terminal** 155:24 208:7 214:16 232:23 233:2,11, 14 234:3, 6,11,23 236:15 237:14 238:7,10, 14,23 239:25 242:3 243:1,14 244:18 245:10 246:6,21 247:1,8,9, 14,15,23 248:7,14, 19,20,22 249:2,3,5, 7

**terminated** 178:3

**terms** 111:2, 11,19,20 112:9,11, 19,22,25 113:5,6,17 116:9 158:2 203:1 267:17 268:15 302:15 374:14 391:18 392:3 393:21 394:7,22

**Tesseract** 100:23

**test** 13:19 69:21 270:7,15 295:24 310:2

**testified** 13:4 15:8 47:6,10,20 82:13,22 105:1 152:17 154:13 242:19 294:6 344:22 366:16 370:14 371:23 393:2 395:4

**testify** 13:20 46:25 91:9 148:21 295:12 392:18

**testifying** 13:15 26:16 104:19 105:20

**testimony** 12:18 20:1,3,12 21:1 22:25 23:25 26:7 35:17 43:7,17 47:12 51:11,17 52:5,9 66:15 67:10 82:9,12 84:3,5,6, 11,15,24 85:4,12,18 87:23 88:9 89:4,8 90:14 92:4 104:5 107:18 115:4,6 130:19,23 144:12 146:17,20 148:18 152:13,14, 16,21 154:17 155:10 165:24 168:5 203:16,20 204:9 206:2 213:10 241:7,17, 23 242:22 245:1 262:25 263:3,7 268:1,6 272:9,14 290:21,25 292:10 309:16 334:17,21 343:14 382:2

389:7
396:24
424:19
427:23

**testing** 186:16

**Texas** 50:21 86:14,23

**text** 87:5, 13,14 105:7

**theory** 76:6

**thereof** 184:17

**thin** 376:22

**thing** 26:1 28:20 49:11 51:3 61:22 62:20 82:8 102:14 109:2,4 110:9,10 114:12,13 115:7,9,17 116:22 118:15 119:10 120:8 128:7 129:7 130:18 132:10,11 133:12 134:9,23 135:12 139:21,23 140:14 156:11 158:18 160:21,25 161:1 163:15 165:23 166:18 167:11,14 168:1 170:3,5,6, 9,14 172:8,9 173:6,7,8, 10 174:8 181:12 187:9 191:6 197:14,15 201:2,3 203:17,19, 25 207:16 210:1 216:14,15 217:21 225:6 235:5 239:18,21 240:14 243:16 307:19 314:19 319:20 320:3 328:18 330:2 336:4,7 337:12,20, 21,23 344:6 350:6,18 356:24 361:20 362:21 363:17 365:14 372:12 385:11 386:8 393:5 404:2 406:1,3,5, 10,16,21 409:18,20, 22 410:1 413:25 416:20 420:7 425:2 427:24

**things** 16:12 58:22 60:5 63:4 65:7 98:3,5 102:6,8,9, 20 106:23 109:15 113:3 114:19,22 115:14 116:23 117:9 118:3 121:4,12 122:6 126:14 127:8 128:9 129:10,12 133:16,19 134:16 135:5 139:3 141:14 144:18 146:22,25 147:25 148:5,14, 15 149:15, 20 151:9 154:19 155:22 158:14 160:16 166:4 168:22 172:2,11, 25 176:14 186:18 188:5,8 190:19 194:16 196:6 197:1,17 199:24 200:20 206:20 208:22 210:16 212:13 216:20,22, 23,24,25

217:9 221:5,11 224:13 239:5 240:8 241:2 242:15 243:21 260:16 280:9 285:1 294:11 296:16 298:7 301:2 307:17 310:8 318:20 319:4 320:23 328:24 337:10 349:3 352:4 353:20 354:21 356:6 368:9 374:16 376:4 378:18 379:2 383:5 385:8 386:7 407:8,15 411:8 420:1,3

**thinking** 292:12,22

**thinks** 397:16

**third-party** 303:13 304:8 308:10

**thought** 153:17 227:2 238:1 267:8 294:10 339:22

**thousand** 265:22 270:22 279:21 381:12 413:14

**thousands** 107:15,21 297:7

**thread** 32:2

**throwing** 199:18

**tie** 195:20

**tied** 196:14

**tier** 263:25 264:1,14, 15,16 266:23 268:7 278:6,23, 24 279:16, 20,22 280:8 304:20,22 305:5,9, 15,18 306:5,24 307:1

**tiers** 26:3, 10,12 264:9,21 279:17 301:10 306:2

**time** 11:9 13:23 21:10,14, 17,21,25 22:4,19 23:3 24:2 25:6 26:15 29:5 46:11 49:12 50:2 73:10 77:20 80:1 81:6,11,15 91:12 97:19,20 99:20,21 137:21 174:24 175:3 176:21 182:17 185:7 189:21 190:5,17, 19 191:1 209:3 210:17,19 221:4 249:15,19 250:4 282:16 288:25 301:21 303:24 308:9,10, 13 309:1 317:10 324:17 339:2,6 342:16 345:5,12, 17 357:23 359:22 362:14 368:4,10, 12 373:24 388:14 389:12,13 390:20 391:9,22, 25 392:14 393:4 403:12 407:7 410:4 413:14 416:1 422:18,22 423:3,13 425:21 427:22

428:4
430:3,7,
11,23
431:3

**timeframe** 98:7

**times** 47:5
66:1
137:7,10
213:3
257:2
292:9
299:2
381:24
389:21
390:17

**timesheets** 28:2

**title** 54:5,
23 291:25
317:25

**titles** 54:9
81:1

**to/from** 127:7

**today** 12:20
13:11,21
14:5,9,14
21:18
23:20
26:17 27:2
69:8 80:12
177:9
223:3,14
232:18

243:11
245:8

**Today's** 11:8

**token** 61:14
62:25
312:23
357:16

**tokens** 60:16,17
61:16
62:14
65:10

**told** 137:10

**tomorrow's** 32:21

**tool** 97:24
99:25
105:2
106:21

**Tooling** 383:2

**tools** 101:14,21,
25 102:19
103:9

**top** 32:13
34:7,14
35:7 36:1,
16 112:12
190:13
198:19
218:17
229:9
235:7
257:6

266:8,19
270:6
280:14
286:25
293:4
305:3
334:8
340:16
360:16
390:22
402:2
417:20
420:14

**topics** 33:16
37:10

**total** 23:3,
22 28:4
96:17
363:5
373:4

**totally** 198:3

**trace** 65:16

**tracing** 22:22 26:4
62:15
63:3,10,24
64:2,9
243:25
428:21

**trade** 68:20
71:12,16
72:2,8

**traded** 60:11,14

61:6
62:10,14
71:20

**trademark** 386:6

**traditional** 64:6 65:2
66:13,18,
21 67:1,
11,12,21
68:8
116:19
125:9
129:11,23
244:14
288:14
304:9
314:22
414:22

**traditionally** 117:19

**train** 15:20
70:9

**training** 72:21
75:8,13
78:7,11,
13,15
79:16,18,
19

**trainings** 79:16
80:15

**transaction** 119:6
123:5,7

124:6
138:20
168:12
169:1
172:4
173:20
251:17
252:12
253:11,12
266:17
280:3,10,
23,25
281:1,5,
12,24
284:14,20
285:7
287:15
289:1,4,6
290:6,9,12
296:4,9,14
299:6,20
300:23
301:7,13,
15,19
302:8,9
303:4,7
350:17,22

**transactions**
125:3,4
126:8,14,
15,16
281:14
282:1,14
283:21
284:11
285:8,9
289:12,16
290:5,10
296:15,19
299:4,9
308:17

**transcribing**
14:8

**transcript**
145:21

**transfer**
129:9
132:6,7,12
136:5
284:22
290:12
331:5,7

**transferable**
346:18

**transferred**
65:23
280:25

**treated**
177:18
328:10

**treatise**
399:14

**treatises**
327:13
330:13

**trends**
303:20

**trial** 84:21
85:2
136:17
138:4
176:21
264:1,16
278:24
279:2
424:8

**tribunal**
90:25
91:14

**trigger**
148:14

**triggered**
125:24
126:9,17,
18 127:14

**triggers**
129:8

**true** 21:3
128:7
169:13
201:22
208:5
210:14
244:15
309:18
322:23
325:4
353:19
373:7
375:19
379:3
420:24
421:23

**truth** 12:18,
19,20
13:19

**turn** 92:6
145:25
163:17
177:12
207:19
285:15
339:18
387:7
391:12

**turned** 342:9

**turns** 410:3

**two-way**
228:8,19,
22 229:14

**Tyler** 83:6

**type** 155:23
244:14
245:24
260:6
419:10

**types** 46:16
49:21
126:14,16
260:6
290:3
367:17,18

**typical** 66:3
181:18

**typically**
52:14,17
58:19
59:19

**typo** 228:5

**Tzu** 185:12

**U**

**U.S.** 111:2, 11,19 167:16

**U.s.-based** 126:12

**UK** 11:12,23 12:5 17:2, 8,15,20 32:10 344:25 345:8 390:21

**un** 332:19 365:9 373:9

**unable** 154:5

**unavailability** 430:12

**underlying** 130:13 139:20 140:12 149:22 155:8 156:20 168:20 170:10,13 174:6,10, 13,15,16 192:2 193:12 209:16 216:16 233:7 281:1 357:25 358:1 385:16,25 402:18 414:15 416:22

**understand** 13:10,13, 24 14:3,7 16:13,17, 25 17:18, 24 18:4 32:15 58:1 60:7 103:16 105:11 106:8 110:16,17 116:7 118:10,12, 15,19,21, 24 119:4 124:12 133:2 134:4 155:11 156:4 158:3,8 161:11,12, 14 217:25 296:7 316:18 324:19 333:11 334:7 398:3,4 405:15 409:5

**understanding** 24:14 63:19 71:9 93:18 95:11 122:20 144:17 146:5 148:19 155:17 161:18 171:9 290:15 369:14 378:8,11 397:1,4,6, 9,13,22

**understates** 154:16 324:21

**understating** 394:22

**understood** 15:23 16:22 31:10 34:8 177:11 379:13

**undertake** 189:15

**unduly** 324:25

**unfounded** 246:6

**unicorn** 206:25

**unicorns** 207:20,23

**unidentifiable** 125:25

**unique** 282:13,14

**United** 49:3 159:15 162:14 190:22

**university** 39:23,24 40:2,7,10, 15,17 41:13,17 52:22,23 53:1,5,8 54:6,19 55:1 74:18

**unload** 139:23

**unnecessary** 100:25 188:21

**unobjective** 207:21

**unreliability** 324:1

**unreliable** 307:22 316:25

317:3 323:15,16, 18 413:2

**unrestricted** 113:22

**unsaturated** 235:16,22 236:20

**update** 237:23 246:17

**updated** 20:16 82:19

**upload** 387:12 413:16

**uploaded** 18:16 31:15 73:14 86:6 110:21 145:5 180:17 269:1 275:13 362:1 387:16

**Urban** 275:16

**usage** 296:24

**USD** 391:20 392:8

**user** 244:18 254:23 259:21

**users** 185:23 186:17 253:18,19 256:12,13 263:19 264:8,13, 20 292:20 294:1,3 297:1 413:25

**V**

**V2** 270:11

**val** 45:12

**valuation** 43:3,6,18 45:12,17, 18,21 46:8,11 49:16 51:9 52:10,14, 15,18 54:20 55:3,25 58:1 60:23 65:2 67:25 68:2 71:15 77:23 78:22 79:23 110:2 112:7 114:25 116:2,20, 21 120:9, 22 121:19 122:10,16, 22,25 123:14,17 125:15 126:24 128:25 130:13,22 135:21,23 140:11 158:13 169:4,20 170:11 171:19 172:1,6, 17,24 173:4,9,17 174:19 175:12 176:1,7, 15,20 177:14 179:22 181:7,15, 25 182:1, 10,12,13, 14,15 183:2 184:16 188:18 191:9 193:10 194:12 195:21,22, 24 196:8, 9,17 202:4,6,19 203:13 204:4,17 205:11,20 207:10,24 208:17 210:7 211:22 214:23 215:5 216:7 217:14 220:6,21 226:13,21 230:1,11 241:8,19 242:7,8, 18,20 243:25 245:16 246:7,22 247:2,15, 17 248:6 250:12 258:4 262:11 278:19 280:7 294:5 300:21 301:17 302:17 304:25 305:21 306:9 307:3 310:2 311:14,20 313:8 314:3

315:4
317:18
319:15
331:12,19
333:20
337:1,6
338:5,12
347:13
348:5
352:1,7,
10,16
354:4
355:21
357:11
363:1,2,14
364:24
365:1,15
366:2,15
367:22
369:17
371:7
372:17,25
389:20
390:11,14
392:7
395:18,22
396:21
398:23
399:9,15
403:6,16
404:3
405:16,17
410:11,25
411:16
412:1
413:1
414:22
420:12
422:9,21
425:6
427:5
428:13
429:3,9

**valuations**
42:25
43:10,19
49:25 50:3
51:5,11,
16,24 52:1
56:3 57:19
58:9,20,21
66:2 67:11
183:9
217:23
399:1
410:21
411:18
412:16,25
415:8

**Valuators**
41:5 71:7
73:20 74:3

**valued** 56:9
117:3
121:17
137:13
170:4
200:7
239:17
262:13
406:22

**values**
399:19
405:13
411:13
415:2,4
417:11
419:1

**valuing**
45:23
49:22
59:10,23
60:23 61:5
62:4,9,15
63:5,10,
23,24
64:3,9
65:3 66:18
67:1,21,23
68:6
118:15
123:12,18
137:18
185:4
224:3
243:21
331:17
336:22
350:16
352:8
427:7
428:21

**variety**
101:21
112:11,19
290:24
335:1
343:2
371:25
375:17
398:14

**vastly** 48:22

**VC** 261:15
262:6
310:25
311:8
326:13
327:16
401:3

**vehicle**
56:23
61:20
133:18
134:15

**venture**
235:15,21
236:19

**Vercel**
149:17

**verified**
389:5

**version** 21:6
60:20 82:6
150:1
196:3
272:19
274:25
277:18
278:3,6,11
280:5
307:24
365:8
369:16
381:8

**versions**
20:17 99:8
292:5
331:3

**versus** 11:12 32:10 47:9,16,18 65:3 83:2, 6 84:12,22 85:3,7,17 86:22 90:10 100:23 174:16 282:14 305:3 311:8 342:9

**viability** 200:19 348:21

**viable** 186:20 203:10,22 204:17,23 348:20 359:11 361:7

**vial** 203:22

**video** 11:10

**view** 149:21,23 150:12,15, 19 151:7, 10 340:9 371:22

**viewed** 38:24 151:7

**Virgin** 190:5

**virtual** 53:23,24

**volume** 145:8,12 190:9 236:23 237:17 253:12 265:22 282:12,14 297:6 308:14,16 314:18,24, 25

**volumes** 191:1

**W**

**W-2** 159:14 162:13,21 165:9

**W-I-N-D-E-S** 83:7

**wait** 16:4 82:17 121:21 228:4

**waiting** 281:9

**waived** 69:23 301:10

**wallet** 203:18 380:14

**wallets** 375:13

**wanted** 44:6 60:3 220:18 231:18 232:14 238:20

**warranted** 261:3

**ways** 232:3 307:6 337:15 384:16

**weapons** 50:25

**weary** 217:22

**Weaver** 42:7

**website** 73:21 74:3 150:2,9, 13,21,23 151:4,6,9, 15 291:6 374:2 388:10

**websites** 150:11

**week** 27:24

**weekend** 107:24

**weight** 317:4,13 400:3,11, 16,18 402:22 410:9,12, 14,23 414:11 418:17,21, 22,23 421:8

**weighted** 317:15 338:20 402:4 404:16 410:25 421:13

**weighting** 184:17 408:16

**weights** 398:24 399:6,15, 22,25 401:11,17, 21 402:1,5 406:20 407:13 408:9 410:8 416:13,15, 17,18 417:8 419:3 420:4,10, 18 421:2, 6,7,14

**weird** 102:11,14

103:13
127:2
157:17
168:15
187:9
223:25
328:18
335:22

**whatnot** 166:2
337:17

**whatsoever** 224:12
241:9

**white** 383:8

**wide** 101:21
112:11,18
290:23
335:1
343:2
371:25
398:13
411:17
412:15,24

**willingness** 139:9,18
334:1,5

**wind-down** 417:19

**Windes** 83:6

**window** 155:24

**wishes** 139:22,23

**withheld** 86:2
165:11

**witnesses** 20:13

**Womack** 69:3,
4

**word** 67:16
100:8,19
101:19
104:25
106:2
128:15
165:6
216:4
237:10
292:13
299:25
306:15
396:24

**worded** 90:16

**words** 64:21
199:19
292:14
371:3
389:16,17
398:5

**work** 42:9
43:5,9,15,
18,25 44:9
45:8,21,23
46:4,8
48:8,10
52:14,17
55:5,14,25
56:5,24
57:22,25
58:2,4,19
59:20,23
62:3 63:9
65:17
66:17,25
67:8 68:5
71:14
72:21
84:18
88:11
90:21
127:5
150:12
166:9
178:1
185:17
186:18
192:1
204:1
232:6
240:8,23
243:4
244:9,25
245:13
261:8,11
279:18
293:17,19,
22 308:22
325:10
347:2,7
355:12
368:24
371:16
372:8
378:9
406:23
430:15

**worked** 25:13
42:24
43:2,21
46:3,13
47:1 48:17
50:14
51:17 52:7
166:19
168:4
342:5,21,
22 343:25
344:15
345:12
346:7,8
390:3

**worker** 121:12
127:11

**workers** 167:17
367:18

**workforce** 41:14,22

**working** 47:21 76:9
165:21
166:6,22
167:5
246:10
262:2
341:7,17
342:14
343:20
367:21
368:23
370:8

**works** 90:17 121:11 126:20 230:13 245:19 246:25 311:25 315:21 317:18 322:3,22 338:16 372:20 393:15 428:2

**worksheet** 269:18 274:19

**world** 259:19

**worth** 190:7 200:8 223:3,6,8 259:25 281:14 282:1 381:14 382:6

**wound** 49:12

**wound-down** 49:20

**wrapped** 331:9

**wraps** 156:13

**Wright** 348:13 358:18 359:6

**write** 101:11 108:10 144:15 146:12,18, 23 147:7 148:19 156:9 160:9 183:13 375:3,6

**writes** 32:19

**writing** 22:5,20 26:7,16 107:1 146:7 147:16

**written** 91:16

**wrong** 235:5 246:7,9 324:7,8,10

**wrote** 144:8, 13 151:3 152:5 158:20 359:1 386:5 428:23

**X**

**X-AMOUNT** 295:3

**Y**

**Y-AMOUNT** 295:4

**YBR** 56:14, 17,20,25 57:3,11, 15,18 58:24 59:9,14,23 61:5 62:3 64:9 65:18 66:18,25 68:5 103:19 104:6,20 105:21

**YBR's** 63:9 64:17

**year** 53:17 198:14 206:24 222:6 229:17 233:3,6, 10,15,18 234:7,8,9 249:4 251:24 252:9,19 254:6 255:16 256:5,13 257:3,11 258:3 259:12 260:23 264:8,12 281:16 282:2 283:22 284:12 295:4,5 321:18 323:3

**year-over-year** 233:25 234:19 258:16

**years** 41:22 42:9 44:9 53:3 55:17 87:1 182:20,21 223:4,7 247:22 248:2 251:4 257:1 261:4 315:3

**York** 13:4

**Z**

**Z-AMOUNT** 295:5

**zero-100** 229:6