# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION**

| | |
|---|---|
| ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC, and DISTROMINT, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>NCHAIN UK LTD,<br><br>Defendant. | Civil Action<br>File No. 1:24-CV-05280-SDG |

# REBUTTAL EXPERT REPORT OF MICKEY A. FERRI, PH.D.

**July 24, 2026**

**CONFIDENTIAL**

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1
A. Qualifications ..... 1
B. Summary of Allegations and Assignment ..... 2
C. Evidence Considered ..... 3
D. Compensation ..... 3
E. Summary of Opinions ..... 3
II. Parties and Case Background ..... 12
III. Valuation of Young Companies and Idea Companies ..... 14
A. Overview ..... 14
B. Valuing Early-Stage Companies Can Be Especially Challenging ..... 15
C. Startups, Especially Pre-Revenue Companies, Have a Low Probability of Generating Significant Revenues and Profits ..... 16
D. Importance of Having Reliable Inputs and Assumptions ..... 19
E. Valuation Approaches ..... 20
1. Market Approach ..... 20
2. Income Approach ..... 23
3. Cost Approach ..... 25
F. Two-Step Valuation Method For Early-Stage Startup Businesses ..... 27
IV. Analysis of the DistroMint Platform Idea ..... 28
A. DistroMint Did Not Have Proven Market Demand ..... 28
B. DistroMint Had a Limited Total Addressable Market ..... 31
C. DistroMint Faced Substantial Competition from Existing Platforms ..... 31
D. DistroMint's Patent Rejections Demonstrate It Had Not Established That It Had Novel Technology ..... 35
E. DistroMint Faced Additional Risks Because It Relied on Uncertain Technologies ..... 36
F. DistroMint Faced Additional Risks Because of the Significant Uncertainty Around Early-Stage Crypto- and NFT-Based Companies in 2023 ..... 37
G. Conclusions ..... 42
1. DistroMint's Probability of Generating Any Meaningful Revenues and Profits Was Very Low as of October 2023 ..... 42

2. There is Not a Sufficient Basis to Establish a Reliable Valuation of DistroMint or DistroMint, LLC Based on an Income or Market Approach ... 42
3. The Approximate Costs of $675,000 Invested by nChain Would At Most Represent an Upper Bound for a Valuation Based on a Cost Approach ... 43

V. Rebuttal To The Haraminac Report ... 44

A. Fails to Distinguish Between the Proposed DistroMint Platform and DistroMint, LLC ... 48

B. Lacks Specificity Regarding Key Operational Details That Investors Typically Consider When Evaluating Early-Stage Companies ... 48

C. Improperly Assumes DistroMint Would Become a Viable and Operating Platform With Certainty ... 49

D. Improperly Assumes DistroMint Would Achieve Revenue and Profit Projections With Certainty ... 51
1. Overview ... 51
2. Fails To Apply the Two-Step Valuation Method For Early-Stage Startup Businesses ... 53

E. Uses Speculative, Arbitrary, and Unsupported Assumptions and Inputs ... 53
1. Income Approach ... 55
2. Market Approach ... 68
3. Cost Approach ... 79

F. Improperly Applies a DLOM Discount to only the Market Approach ... 83

G. Uses Arbitrary and Unsupported Weights to Combine the Three Valuation Approaches ... 84

H. Does Not State an Opinion on Damages ... 85

VI. CONCLUSION ... 86

# I. INTRODUCTION

## A. Qualifications

1. I am a Vice President at Analysis Group, Inc. ("AG"). AG is an economic, financial, health care, and strategy consulting firm with offices in Boston, MA; Chicago, IL; Dallas, TX; Denver, CO; Los Angeles, CA; Menlo Park, CA; New York, NY; San Francisco, CA; Washington, D.C.; Beijing, China; Brussels, Belgium; London, United Kingdom; Montreal and Toronto, Canada; and Paris, France. AG provides research and analysis in a variety of business, litigation, and regulatory settings.

2. I earned my Ph.D. in economics from the University of Chicago, where I was awarded the Presidential Fellowship, the highest award the university grants to Ph.D. students. In addition, I earned the Margaret G. Reid Fellowship for excellence in research relating to consumer behavior. I have conducted extensive economic research in consumer behavior and market dynamics in entertainment and other areas. For example, I analyzed changes in movie consumption and spending in response to the growth of Netflix, Redbox, and the Internet. I taught numerous courses at the University of Chicago's Department of Economics and the Booth School of Business, including industrial organization, microeconomics, public finance, and the economics of sports. I graduated summa cum laude with degrees in quantitative economics, mathematics, and computer science from Tufts University.

3. I am an expert in applied business economics with extensive experience in economic analysis, business strategy, consulting, and data analysis. I apply my expertise in a variety of areas, including economic damages, lost profits, reasonable royalty, unjust enrichment, intellectual property, commercial success, licensing, negotiation, breach of contract, labor

economics, lost wages, technology adoption, financial analysis, market analysis, strategy, and valuation. My work spans a variety of industries, including consumer products, entertainment, pharmaceuticals, medical devices, education, finance, real estate, software, hardware, and cybersecurity.

4. My curriculum vitae contains more details on my education, experience, publications, and expert testimony and is provided as Exhibit 1.

### B. Summary of Allegations and Assignment

5. In this matter, Eric Finnerud ("Finnerud"), Sound Alive Enterprise, LLC, and DistroMint, LLC (collectively "Plaintiffs") have asserted the following causes of action against nChain UK Ltd ("nChain" or "Defendant"): (1) equitable (injunctive and/or declaratory) relief, (2) breach of contract, (3) breach of covenant of good faith and fair dealing, (4) breach of fiduciary duty / special duty, (5) fraudulent conduct, (6) negligence, (7) unjust enrichment, and (8) conversion (collectively the "Alleged Conduct").[1]

6. I have been retained by Elsberg, Baker & Maruri PLLC on behalf of nChain to provide expert economic analysis and, if necessary, testimony as a rebuttal expert witness to Ms. Dorothy Haraminac, an expert witness retained by Plaintiffs, related to the fair market value of the proposed DistroMint platform ("DistroMint") and DistroMint, LLC as of October 2, 2023.

---

[1] Notice of Removal, *Eric Finnerud, Sound Alive Entertainment, LLC and DistroMint, LLC v. nChain Holding AG and nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, November 18, 2024, Exhibit B ("Complaint"), at pp. 1, 20-31. I understand that the Complaint initially asserted claims against both nChain Holding AG and nChain UK Ltd as defendants, however, I further understand from nChain's Answer to Complaint and the Court's Order dated September 30, 2025, that nChain Holding AG has been dismissed as a defendant. nChain UK Ltd's Answer, Affirmative Defenses, and Counterclaims, *Eric Finnerud, Sound Alive Entertainment, LLC and DistroMint, LLC v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, October 14, 2025 ("nChain's Answer to Complaint"), at p. 1; Opinion and Order, *Eric Finnerud, et al. v. nChain UK Ltd, United States District Court, Northern District of Georgia, Atlanta Division*, Case No. 1:24-cv-05280-SDG, September 30, 2025, at p. 1.

As part of my assignment, I have been asked to provide my opinions on the report submitted by Ms. Haraminac.[2]

### C. Evidence Considered

7. In forming my analysis and opinions in this case, I have considered information from a variety of sources, which are identified in Exhibit 2. I also have relied upon my professional judgment and expertise, which I formed over many years of evaluating economics, valuation, damages, and related issues.

### D. Compensation

8. AG has billed Defendant on a time-and-materials basis for my work and that of my colleagues. My hourly billing rate for the time spent consulting and developing analysis, which includes my study of issues and materials, and any testimony I may give, is $935. I also have directed the efforts of other staff members of AG, whose hourly billing rates range from $500 to $895. My compensation is not, in any way, dependent on the outcome of this proceeding or on the substance of my opinion.

### E. Summary of Opinions

9. Here is a summary of my opinions based on the facts and data I have seen in this matter.

---

[2] Expert Witness Report Prepared by Dorothy Haraminac, *Eric Finnerud, Sound Alive, and DistroMint v. nChain Holding AG and nChain UK*, United States District Court for the Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280, June 1, 2026 ("Haraminac Report").

10. Performing a valuation of an early-stage company or platform can be especially challenging, because early-stage companies and platforms often have non-existent or low revenue, negative operating income, little-to-no operating history, no sufficiently comparable companies or assets, and the source of value almost entirely depends on future growth.[3] Further, startups, especially pre-revenue companies, have a low probability of generating significant revenues and profits. See Section III.

11. As discussed in Section IV, the facts and data in this case regarding DistroMint and DistroMint, LLC[4] indicate that:

a. DistroMint did not have proven market demand;

b. DistroMint had a limited total addressable market;

c. DistroMint faced substantial competition from existing platforms;

d. DistroMint's patent rejections demonstrate it had not established that it had novel technology;

e. DistroMint faced additional risks because it relied on uncertain technologies, including the Bitcoin Satoshi Vision ("BSV")[5] chain, and on providers that were themselves early stage; and

---

3 Damodaran, Aswath, *The Dark Side of Valuation: Valuing Young, Distressed, and Complex Businesses*, 2nd Ed. (2010), Pearson Education ("Damodaran (2010)"), at p. 8, Figure 1.3. Dr. Aswath Damodaran is a professor of finance at the Stern School of Business at New York University, who is widely regarded as a leading authority on valuation. Damodaran (2010), at p. ix. These same issues would generally apply to the valuation of proposed platforms that have not yet been released.

4 The valuation in the Haraminac Report includes both DistroMint and DistroMint, LLC. Haraminac Report, at p. 1. The Haraminac Report does not cite, nor have I reviewed, documents demonstrating any specific development activities performed by DistroMint, LLC.

5 BSV is a cryptocurrency that emerged as a hard fork from Bitcoin Cash in late 2018. OKX Learn, "What Is Bitcoin SV (BSV)?" OKX, June 2, 2026, available at https://www.okx.com/en-us/learn/what-is-bitcoin-sv-bsv (accessed July 21, 2026).

f. DistroMint faced additional risks because of the significant uncertainty around early-stage crypto- and non-fungible token ("NFT")[6]-based companies in 2023.

12. For the reasons discussed throughout this report, including the above reasons, DistroMint's probability of generating any meaningful revenues and profits was very low as of October 2, 2023.

13. There is not a sufficient basis to establish a reliable valuation of DistroMint or DistroMint, LLC as of October 2, 2023, or at any time, based on an Income Approach, because, among other reasons, there are no available data on revenues, profits, or market demand that could form a reliable basis for a discounted cashflow ("DCF") model.

14. There is not a sufficient basis to establish a reliable valuation of DistroMint or DistroMint, LLC as of October 2, 2023, or at any time, based on a Market Approach, because, among other reasons, DistroMint had not received funding from any investors with a specified valuation, and, based on my review of the evidence, I have not identified—nor did the Haraminac Report identify—any platforms that are comparable to DistroMint or companies that are comparable to DistroMint, LLC that could be used as the basis for a Market Approach, as discussed in Section V.E.2.

15. While nChain's approximate investments of $675,000[7] toward development of the proposed DistroMint platform could be used as the starting point for a valuation of DistroMint

[6] NFTs are tokens that are individually unique. Each NFT has different properties (non-fungible) and is provably scarce. "Non-fungible Tokens (NFT)," Ethereum, available at https://ethereum.org/nft/ (accessed July 21, 2026).

[7] nChain documents indicate that it had invested approximately $675,000 toward developing DistroMint, including consulting payments to Finnerud, as of December 2023. NCH0001867-870, at 867, 869. *See also* Section II.

based on a Cost Approach, it would at most represent an upper bound for at least the following reasons. First, the portion of the $675,000 that was directed toward BSV and integration with the early-stage providers operating in the BSV space would have lost significant value due to the challenges faced by BSV discussed in Section IV.E. Second, the Haraminac Report does not identify, and I am not aware of, any demonstrated value derived from these costs, let alone value greater than or equal to $675,000. Third, the Haraminac Report does not identify, and I am not aware of, a potential buyer or investor being willing to pay for DistroMint or being willing to continue funding the development, launch, and/or operation of DistroMint. nChain's decision to discontinue funding the development of DistroMint and the lack of interest from other potential investors are signals that investors did not view DistroMint as worth investing in, so these factors would indicate a downward adjustment on any valuation of DistroMint. See Section IV.G.3.

16. As discussed in Section V, the Haraminac Report is flawed, speculative, and unreliable for multiple reasons including, but not limited to, the following. The Haraminac Report:

a. Fails to distinguish between the proposed DistroMint platform and DistroMint, LLC, resulting in a purported valuation that is ambiguous and not specific to either the proposed DistroMint platform or the LLC;

b. Lacks specificity regarding key operational details that investors typically consider when evaluating early-stage companies;

c. Improperly assumes DistroMint would become a viable and operating platform with certainty, rather than analyzing the viability of the proposed platform and whether it could actually be developed and launched;

d. Improperly assumes DistroMint would achieve its revenue and profit projections with certainty, despite data and factors discussed in Sections III and IV of this report showing that DistroMint had a very low probability of generating any meaningful revenues and profits, and fails to apply the "two-step" framework used in valuation literature to adjust for the probability of failure;

e. Uses speculative, arbitrary, and unsupported assumptions and inputs in its Income Approach that result in a flawed and overstated valuation, including but not limited to the following:

   i. The assumption that DistroMint would be commercialized is speculative, unsupported, and inconsistent with the available data and factors;

   ii. The Haraminac Report assumes DistroMint's potential revenue would have come from two sources: (1) subscription fees, and (2) marketplace and transaction revenues.[8] Each of these revenue sources was calculated based on an assumed number of paying subscribers.[9] The assumption of 15,000 paying subscribers in Year 1 is speculative, arbitrary, and not based on any actual DistroMint or market data;

[8] Haraminac Report, at p. 20, Schedule 5.

[9] Haraminac Report, at p. 20, Schedule 5.

iii. The three annual subscription tiers and allocations to each tier are speculative and not based on *any* actual DistroMint or market data. Further, the Haraminac Report does not justify why 90 percent of DistroMint's hypothetical subscribers would pay for a DistroMint subscription at a substantially higher price than the prices of other established platforms, and cites no evidence to suggest that subscribers would do so;

iv. The assumption that each artist would generate, on average, $2,500 in gross NFT sales per year, is speculative and not supported by any data;

v. The assumption that DistroMint would earn 7.5 percent of NFT sales is speculative and overstated compared to documents showing potential fee ranges at lower percentages, resulting in speculative and overstated projections;

vi. The assumed 30 percent margin for earnings before interest, taxes, depreciation, and amortization ("EBITDA") for DistroMint each year, starting in Year 1, is speculative, arbitrary, unsupported, and inconsistent with data on profit margins for technology companies;

vii. The valuation in the Haraminac Report is unreliable and overstated because it uses EBITDA in its DCF analysis without separately identifying taxes, capital expenditures, or changes in working capital, or explaining whether and how those items are embedded in the assumed EBITDA margin;

viii. The assumption that DistroMint's number of paying subscribers would grow by 60 percent annually from Years 2 through 5 is speculative and unreliable because it is not supported by any analysis or supporting data;

ix. The discount rate of 27 percent is arbitrary and not supported by any data relevant to DistroMint. Further, it is very low relative to published sources that provide discount rates for companies at the seed or idea stage, which often range from 50 percent to 85 percent; and

x. The use of a terminal value (*i.e.*, the value of cash flows assumed to occur from year five to perpetuity with an assumed growth rate) that comprises 56 percent of the total value is speculative, unreliable, and results in a substantially overstated valuation because it does not account for the high probability that DistroMint would not be commercialized and survive for at least five years, let alone indefinitely into the future.

f. Uses flawed and improper assumptions and inputs in its Market Approach that result in an unreliable and overstated valuation, including:

i. Improperly uses companies that are not comparable to DistroMint; they are, among other things, much more established than and different from DistroMint, resulting in an unreliable, arbitrary, and overstated valuation;

ii. Uses incorrect and inconsistent data to calculate its valuation multiples, resulting in an unreliable valuation;

iii. Provides a wide range of results for multiples, indicating that none of them may be reliable for DistroMint;

iv. Relies on flawed, overstated, and unreliable results from its own Income Approach, resulting in a flawed, overstated, and unreliable valuation; and

v. Uses arbitrary and unsupported adjustments of 25 percent and 30 percent, resulting in a flawed and unreliable valuation;

g. Uses a flawed Cost Approach, with at least the following errors:

i. Improperly disregards nChain's actual reported costs and instead uses arbitrary, speculative, and overstated numbers without sources;

ii. Inappropriately includes costs to develop functionality that had not been implemented, resulting in a speculative and overstated valuation;

iii. Does not identify how value is created from the purported development costs; and

iv. Fails to account for the lack of interest from potential investors or buyers, resulting in an overstated valuation;

h. Improperly applies a discount for lack of marketability ("DLOM") to only the Market Approach, resulting in a flawed and overstated valuation; and

i. Uses arbitrary and unsupported weights to combine the three valuation approaches, resulting in an unreliable and flawed valuation.

17. For the above reasons, the Haraminac Report does not provide a reliable valuation of the proposed DistroMint platform or DistroMint, LLC as of October 2, 2023—or at any time. Further, while the Haraminac Report provides a purported valuation of DistroMint and DistroMint, LLC collectively,[10] it does not state an opinion on damages associated with the Alleged Conduct.

18. This report is based on the information that was available to me as of the date of this report and summarizes the opinions I have formed to date. I may revise, supplement, or expand my opinions, if necessary and allowed, based on my review and analysis of information provided to me subsequent to the filing of this report.

---

10 In the Haraminac Report, DistroMint, LLC and DistroMint, the software platform under development, are referenced collectively as DistroMint. Haraminac Report, at p. 3.

## II. PARTIES AND CASE BACKGROUND

19. Plaintiffs are Finnerud, Sound Alive Enterprise, LLC ("Sound Alive"), and DistroMint, LLC.[11] Finnerud, who goes by his stage name "E. Smitty," describes himself as a music producer, engineer, and consultant.[12] Finnerud founded Sound Alive in 2021.[13] Sound Alive owns Sound Alive Records, which describes itself as an independent label and music distributor […] blending traditional music distribution with […] cryptocurrency."[14] DistroMint, LLC is a Georgia limited liability company founded on February 20, 2023 by Finnerud and Destiny Perry ("Perry").[15] I understand that Plaintiffs allege that DistroMint, LLC is owned by Sound Alive and nChain, while nChain disputes that it has any ownership stake in DistroMint, LLC.

20. Defendant and Counterclaim-Plaintiff is nChain, a private limited company founded in 2015, with a registered office in London.[16] nChain advances "the potential of blockchain technology through ongoing research and development of… inventions."[17]

[11] Complaint, at p. 1; nChain's Answer to Complaint, at p. 1.

[12] NCH0005018-021, at 020; "E. Smitty," LinkedIn, available at https://www.linkedin.com/in/therealesmitty (accessed June 25, 2026).

[13] "Sound Alive Enterprise, LLC," Georgia Company Directory, available at https://www.georgiacompanyregistry.com/companies/sound-alive-enterprise-llc/ (accessed July 22, 2026); NCH0000079-081, at 080.

[14] "How Sound Alive Records is 'Revolutionizing the Music Industry,'" Sound Alive Records, available at https://www.soundaliverecords.com/post/how-sound-alive-records-is-revolutionizing-the-music-industry (accessed June 18, 2026).

[15] NCH0004473-474, at 474; "DistroMint LLC," Georgia Company Directory, available at https://www.georgiacompanyregistry.com/companies/distromint-llc/ (accessed July 22, 2026).

[16] "nChain UK Limited," Companies House, available at https://find-and-update.company-information.service.gov.uk/company/09823112 (accessed June 25, 2026); nChain's Answer to Complaint, at pp. 1, 87.

[17] nChain UK Limited, Annual Report and Financial Statements for the year ended December 31, 2024, available at https://find-and-update.company-information.service.gov.uk/company/09823112/filing-history, at p. 1.

21. I understand that in or around December 2022, Finnerud approached Christen Ager-Hanssen ("Ager-Hanssen"), the CEO of the nChain group at the time, with a proposal seeking nChain's support to develop the project that was unnamed at the time and later named DistroMint, and he met virtually with some of the nChain group's developers to kick it off.[18] I understand nChain paid Finnerud, through Sound Alive, a monthly fee of $12,500 in exchange for consulting services concerning music-related matters for twelve months.[19] In February 2023, Finnerud sent an email to Ager-Hanssen stating that he "agree[s] to the terms of 50/50 Partnership of Distromint, LLC."[20] Ager-Hanssen replied on the same day, writing that he "will arrange an agreement as soon as possible."[21]

22. I understand Finnerud continued to correspond with nChain over the DistroMint project's development and to discuss a potential broader agreement for a joint investment in a potential project throughout the summer of 2023.[22] Following Ager-Hanssen's termination as the CEO of nChain,[23] Finnerud was notified that the project had been temporarily halted in early October 2023 through an email stating that there was no "legal ground (contract)" for the project and that "negotiations for contractual relationship to continue to develop Distromint" would be

---

18 nChain's Answer to Complaint, at pp. 74-76.

19 NCH0001867-870, at 868. $12,500 calculated as $150,000 / 12. Ager-Hanssen arranged for these invoices to be paid out beginning in February 2023. NCH0004237-39, at 38.

20 NCH0004237-39, at 38.

21 NCH0004237-39, at 38.

22 nChain's Answer to Complaint, at p. 76. *See also* NCH0001596-597, at 596. In or around May 2023, a pitch deck DistroMint, LLC shared with nChain (the "May 2023 DistroMint Pitch Deck") was created to describe the proposed business model of DistroMint, LLC. NCH0000834-844, at 834, 841. I understand that in June 2023, Finnerud met with Ager-Hanssen to discuss the project future and possibilities for additional functionalities. NCH0003125-126, at 125-126. I understand that on or around July 28, 2023, Finnerud and nChain discussed a potential investment structure in which nChain would take a 49 percent stake in the potential project company, but this proposal was not agreed upon in the discussion. *See* nChain's Answer to Complaint, at p. 76.

23 "nChain Company Statement," nChain, Archived Web Version dated September 30, 2023, available at https://web.archive.org/web/20240203233231/https://nchain.com/nchain-company-statement/ (accessed June 25, 2026).

necessary to move forward.[24] nChain sent Finnerud a restructuring proposal in December 2023, which noted $675,000 in total expenses that it had incurred related to DistroMint.[25]

## III. VALUATION OF YOUNG COMPANIES AND IDEA COMPANIES

### A. Overview

23. Fair market value ("FMV") is defined as "[t]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."[26] FMV is the most commonly used business valuation standard.[27]

24. Valuation literature explains that "[t]he intrinsic value of a cash flow-generation asset is a function of how long you expect it to generate cash flows, as well as how large and predictable these cash flows are."[28] Valuing a company involves valuing "both the investments already made (assets in place) and growth assets (investments that are expected in the future) while factoring in the mix of debt and equity used to fund the investments."[29]

---

24 NCH0003974-976, at 975.

25 The sum of the underlying expenses is $679,000 ($514,000 + $15,000 + $150,000 = $679,000), however, the restructuring proposal itself stated that nChain's investment to date was $675,000. NCH0001867-870, at 868-869.

26 Weil, Roman L., et al., *Litigation Services Handbook: The Role of the Financial Expert*, 6th Ed. (2017), Wiley ("Weil et al. (2017)"), at PDF pp. 562-563.

27 Weil et al. (2017), at PDF p. 563.

28 Damodaran (2010), at p. 1.

29 Damodaran (2010), at p. 2.

### B. Valuing Early-Stage Companies Can Be Especially Challenging

25. The valuation literature notes that for "Start-Up or Idea Companies," defined as companies with "Nonexistent or Low Revenues/Negative Operating Income," no operating history, and no comparable firms, or companies for which the source of value entirely depends on future growth,[30] valuation creates the most daunting challenges, because:[31]

> There are few or no existing assets; almost all the value comes from expectations of future growth. The firm's current financial statements provide no clues about the potential margins and returns that will be generated in the future, and little historical data can be used to develop risk measures. To cap the estimation problem, many young firms will not make it to stable growth, and estimating when that will happen for firms that survive is difficult to do.

26. The valuation literature explains that attributes of young companies include: (1) no history, (2) small or no revenues, operating losses, (3) dependent on private equity, (4) many do not survive, and (5) multiple claims on equity.[32] It explains that "[t]he fact that young companies have limited histories, are dependent on equity from private sources, and are particularly susceptible to failure all contribute to making them more difficult to value."[33]

27. When evaluating early-stage startup companies, investors often consider several factors, including information and documents in the following categories:

a. Corporate records and charter documents;

b. Leadership, management, and employees;

c. Business plan and financials;

30 Damodaran (2010), at p. 8, Figure 1.3.

31 Damodaran (2010), at pp. 8-9.

32 Damodaran (2010), at pp. 214-215.

33 Damodaran (2010), at pp. 216.

d. Customers, suppliers, and strategic partnerships;

e. Products;

f. Company ownership, security issuances, and related agreements;

g. Intellectual property;

h. Material agreements; and

i. Information regarding disputes and potential litigation.[34]

28. See Exhibit 3 for additional details on the documents and information investors typically consider that are included within these categories.

### C. Startups, Especially Pre-Revenue Companies, Have a Low Probability of Generating Significant Revenues and Profits

29. A pre-revenue company is sometimes referred to as an "idea compan[y]," or a company in its earliest stages of development (*see* Figure 1).[35] Valuation literature notes that "[m]ost ideas go nowhere."[36]

---

[34] *See* "Series A Diligence Checklist," Y Combinator, available at https://www.ycombinator.com/library/3h-series-a-diligence-checklist#corporate-records-and-charter-documents (accessed June 29, 2026). *See also* "What Startups Should Know About Due Diligence," DealRoom Technologies, Inc., available at https://dealroom.net/blog/startup-due-diligence (accessed June 29, 2026).

[35] Damodaran (2010), at pp. 7-8. *See also* "PwC Deals Insights: How to Value a Start-Up Business," PwC, available at https://www.pwc.com/ee/en/services/transaction-services/pwc-deals-insights--how-to-value-a-start-up-business.html (accessed June 26, 2026).

[36] Damodaran (2010), at p. 8.

**Figure 1: Excerpt of Damodaran (2010) Showing the Business Life Cycle[37]**




30. Industry commentary acknowledges that even for startup companies that get past the idea stage, the majority fail. According to a 2021 Harvard Business Review article, "more than two-thirds of [startup companies] never deliver a positive return to investors."[38] That "two thirds" ratio likely understates the true failure rate, because it reflects only startups that received venture-capital funding,[39] which are companies that had overcome one of the most significant early-stage hurdles.[40]

---

37 Damodaran (2010), at p. 8.

38 Eisenmann, Tom, "Why Start-ups Fail," Harvard Business Review, May-June 2021, available at https://hbr.org/2021/05/why-start-ups-fail (accessed June 23, 2026).

39 "Webinar: Why Startups Fail with Tom Eisenmann," YouTube, April 8, 2021, available at https://www.youtube.com/watch?v=IHPrQXjkBQQ, at 2:25 (accessed July 24, 2026).

40 Kotashev, Kyril, "Startup Failure Rate: How Many Startups Fail and Why in 2026?" Failory, January 12, 2026, available at https://www.failory.com/blog/startup-failure-rate (accessed June 26, 2026) ("However, venture funds invest mainly in growth-stage startups, AKA scale-ups. They are true startups, but most have gotten past one of the most significant risks for startups: the search for product-market fit. They have tangible proof that people want what they are offering (this proof is how they attract venture capital).") (Emphasis excluded.).

31. Across all industries, the Bureau of Labor Statistics ("BLS") consistently estimates that the six-year survival rate of private sector establishments[41] is less than 50 percent, indicating a high probability of failure in a company's early years.[42] The six-year survival rates of establishments that opened in 2019, 2018, and 2017 are 46.8 percent, 47.4 percent, and 47.0 percent, respectively.[43] Among the companies that do survive, data indicate that few companies generate annual revenues of more than $10 million. A 2024 market analysis conducted by NAICS Association[44] found that only about 1.3 percent of businesses in the U.S. achieved more than $10 million in annual sales that year.[45]

32. Further, published academic research has cited specific challenges for crypto and blockchain-related companies. For example, an academic study of "Success and Failure of Blockchain Technology Providers" based largely on data collected from 2019 through 2023 explains that "[d]espite a growing focus on blockchain adoption within operations and supply

41 The BLS defines a private sector establishment as "an economic unit, such as a farm, mine, factory, or store, which produces goods or provides services. It is typically at a single physical location and engaged in one, or predominantly one, type of economic activity for which a single industrial classification may be applied." An establishment is considered as open in the first year it reports positive employment, and companies with no employment may not be captured by BLS data. "Business Employment Dynamics - Field Definitions," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/help/def/bd.htm (accessed June 26, 2026); "Business Employment Dynamics: Frequently Asked Questions," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/bdm/bdagefaq.htm (accessed June 26, 2026) ("Openings are establishments with positive employment in the current year and no employment in the march of the previous year." "The age of an establishment is determined by its date of first positive employment.").

42 "Table 7. Survival of private sector establishments by opening year: Total Private," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/bdm/us_age_naics_00_table7.txt (accessed June 26, 2026).

43 "Table 7. Survival of private sector establishments by opening year: Total Private," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/bdm/us_age_naics_00_table7.txt (accessed June 26, 2026).

44 The 2024 market analysis report uses data from Dun & Bradstreet, which has been a major publisher of business information from its earliest iteration back in 1841. "Market Analysis Reports," NAICS Association, available at https://www.naics.com/market-analysis-reports/ (accessed June 26, 2026); Terrell, Ellen, "Dun and Bradstreet Publications at the Library of Congress: Business Identification Service," Library of Congress, available at https://guides.loc.gov/dun-and-bradstreet/business-identification-service (accessed July 23, 2026).

45 "Detailed Business Counts," NAICS Association, available at https://www.naics.com/business-lists/counts-by-company-size/ (accessed June 26, 2026) (The sum of all businesses with more than $10 million in sales: 176,000 + 23,670 + 4,070 + 5,161 = 208,901. Total businesses with coded records: 17,769,699 – 1,935,963 = 15,833,736. Proportion of businesses with over $10 million in sales: 208,901 / 15,833,736 = 1.32 percent.).

chains, these initiatives exhibit an exceedingly high failure rate, with many failing to achieve sustainable success."[46] This study notes that "high-performing cases actively seek inspiration beyond the blockchain ecosystem for service designs and adopt a centralized decision-making approach where key strategic decisions are made internally. In contrast, low-performing cases struggle due to within-blockchain exploration and decentralized decision-making, leading to slower implementation and limited scalability."[47]

### D. Importance of Having Reliable Inputs and Assumptions

33. Valuation literature and industry sources note the importance of verifying the reliability of key inputs and assumptions underlying valuation models. For example, the American Institute of Certified Public Accountants ("AICPA") has recommended guidelines to be applied to attain reasonable certainty in economic damages calculations.[48] According to the AICPA, when relying on secondary data, experts "must conduct some sort of independent investigation or verification" to ensure that the data are "both accurate and helpful to the court."[49] The investigation "should be sufficiently thorough such that the expert … can demonstrate the data's reliability."[50] As noted by Weil et al. (2017), a financial expert should

---

[46] Zhan, Yuanzhu, et al., "Success and Failure of Blockchain Technology Providers: Founders' Power, Beyond-Blockchain Exploration and Centralized Decision-Making," *Journal of Operations Management*, Vol. 71 (2025), 893-916, at pp. 893-894.

[47] Zhan, Yuanzhu, et al., "Success and Failure of Blockchain Technology Providers: Founders' Power, Beyond-Blockchain Exploration and Centralized Decision-Making," *Journal of Operations Management*, Vol. 71 (2025), 893-916, at p. 893.

[48] Duffus, David, et al., *Forensic & Valuation Services Practice Aid, Attaining Reasonable Certainty in Economic Damages Calculations, Revenues, Costs and Best Evidence* (2020), Association of International Certified Professional Accountants ("AICPA FVS-ARC"), at p. 9.

[49] AICPA FVS-ARC, at p. 16.

[50] AICPA FVS-ARC, at p. 16.

consider the company's industry and operating circumstances, challenge the reasonableness of its cash flow projections, and test the projections' sensitivity to variations in key assumptions.[51]

## E. Valuation Approaches

34. The Haraminac Report uses three approaches to value DistroMint. I discuss each of these approaches below.

### *1. Market Approach*

35. The Market Approach values an asset using an analysis of market data on transactions or other relative value indicators of comparable assets.[52] When applying the Market Approach to value businesses, valuation multiples, such as enterprise value-to-sales ratios, observed from publicly traded firms that are comparable to the target company are applied to the corresponding financial metric of the target company (*e.g.*, sales).[53] The valuation can be based on multiples across companies or based on comparing the multiple of a company to the multiples it used to trade at in the past.[54] Valuation literature notes that "[t]here are two components to relative valuation," (1) standardizing prices of publicly traded companies by converting prices "into multiples of earnings, book values or sales;" and (2) "find[ing] similar firms… in the same business" with similar "risk, growth potential and cash flows."[55]

---

51 Weil et al. (2017), at PDF p. 1248.

52 Weil et al. (2017), at PDF p. 586.

53 Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 4th Ed. (2025), Wiley ("Damodaran (2025)"), at PDF p. 69. *See also* Weil et al. (2017), at PDF p. 586.

54 Damodaran (2025), at PDF p. 70.

55 Damodaran, Aswath, "Relative Valuation," available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/multiples.pdf, at p. 1. Dr. Damodaran describes "Valuation Multiples: First Principles" as follows: "This paper (which is a chapter from my investment valuation book) looks at the first principles that we need to follow when using multiples." Damodaran, Aswath, "Damodaran Online," available at https://pages.stern.nyu.edu/~adamodar/New_Home_Page/papers.html#mult (accessed July 22, 2026).

36. Valuation literature identifies four steps to avoid potential misuses of the multiple approach, including (1) "ensur[ing] that the multiple is defined consistently and … measured uniformly"; (2) checking "the cross sectional distribution of the multiple" (*i.e.*, how much variation there is between different estimates of the multiple); (3) "analyz[ing] the multiple and understand[ing] not only what fundamentals determine the multiple but also how changes in these fundamentals translate into changes in the multiple"; and (4) "finding the right firms to use for comparison, and controlling for differences that may persist across these firms."[56] Valuation literature notes that "the lack of transparency regarding the underlying assumptions in relative valuations make them particularly vulnerable to manipulation," and that a "biased analyst who is allowed to choose the multiple on which the valuation is based and to pick the comparable firms can essentially ensure that *almost any value* can be justified" (emphasis added).[57]

37. Valuation literature notes that the fourth step (*i.e.*, identifying comparable firms) is often considered as the "key" question in the multiples approach.[58] The selection of the peer group has been described as a judgment-intensive process that requires more than identifying companies in a generally similar industry.[59] In selecting peer companies, one should consider the "comparability of the driving underlying investment risk and expected rate of return

---

56 Damodaran, Aswath, "Relative Valuation," available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/multiples.pdf, at p. 5.

57 Damodaran, Aswath, "Relative Valuation," available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/multiples.pdf, at p. 2. Similarly, a research article shows that analysts often select a peer group that leads to the desired answer. *See* Eaton, Gregory W., et al., "Peer Selection and Valuation in Mergers and Acquisitions," *Journal of Financial Economics*, Vol. 146, No. 1 (2022), 230-255, at p. 230.

58 Koller, Tim, et al., *Valuation: Measuring and Managing the Value of Companies*, 8th Ed. (2025), Wiley ("McKinsey (2025)"), at p. 378. *See also* Damodaran, Aswath, "Relative Valuation," available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/multiples.pdf, at pp. 1, 15.

59 Pratt, Shannon P., and Alina V. Niculita, *Valuing A Business: The Analysis and Appraisal of Closely Held Companies*, 5th Ed. (2008), McGraw-Hill ("Pratt (2008)"), at p. 272. "The comparable companies not only should be in the same industry but also should have similar economic performance, as measured by ROIC [return on invested capital] and growth." *See* McKinsey (2025), at p. 199.

characteristics of the guideline companies and the subject company."[60] According to valuation literature, "[a] comparable firm is one with cash flows, growth potential, and risk similar to the firm being valued."[61] Further, the literature notes that "finding similar and comparable firms is often a challenge, and frequently we have to accept firms that are different from the firm being valued on one dimension or the other. When this is the case, we have to either explicitly or implicitly control differences across firms on growth, risk, and cash flow measures. In practice, controlling for these variables can range from the naive (using industry averages) to the sophisticated (multivariate regression models where the relevant variables are identified and controlled for)."[62] The use of valuation multiples is "more difficult to use to price unique firms with no obvious comparables, with little or no revenues, and with negative earnings. By the same token, multiples are also easy to misuse and manipulate, especially when comparable firms are used. … [A] biased analyst can choose a group of comparable firms to confirm his or her biases about a firm's pricing. … The other problem with using multiples based on comparable firms is that it builds in errors (overvaluation or undervaluation) that the market might be making in valuing these firms. … [F]or instance, if the market has overvalued all computer software firms, using the average [price-to-earnings] ratio of these firms to value an initial public offering will lead to an overvaluation of the IPO." [63]

---

60 Pratt (2008), at p. 272.

61 Damodaran, Aswath, "Relative Valuation," available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/multiples.pdf, at p. 15.

62 Damodaran (2025), at PDF p. 71.

63 Damodaran (2025), at PDF p. 72.

*2. Income Approach*

38. The Income Approach values an asset based on the present value of expected future cash flows of the asset.[64] A DCF methodology is often used in the Income Approach.[65] A DCF analysis relies on the following inputs: cash flows, growth in operating income, a discount rate, and a terminal value.[66] Instead of projecting an infinite stream of periodic cash flows, a DCF model attempts to project the operating results of a business over a limited and explicit forecast period, estimate a terminal value that reflects the value of all subsequent cash flows, and then discount those future cash flows to present value at a discount rate that reflects the timing and risk associated with those cash flows.[67]

39. Valuation literature recognizes that "discounted economic income methods are extremely sensitive to changes in the input variables."[68] Key assumptions underlying a DCF model must be verified and tested, including factors that affect the projected cash flows during the explicit forecast period and the terminal period; the perpetuity growth rate for calculating the terminal value; and the discount rate.[69] Valuation literature further notes that "[t]he most difficult task in valuing a company is forecasting future revenues, earnings, and reinvestment."[70] When valuing a firm, information about that firm is often utilized, including its current financial statements and its past history.[71] For young and startup firms, the absence of historical data and

64 Damodaran (2025), at PDF p. 58; Weil et al. (2017), at PDF p. 568.

65 Pratt (2008), at pp. 62, 950; Weil et al. (2017), at PDF p. 568.

66 Damodaran (2010), at pp. 24-25.

67 Damodaran (2025), at PDF pp. 429-430.

68 Pratt (2008), at pp. 224-225. *See also* Damodaran (2010), at pp. 19-20.

69 Koller, Tim, Marc Goedhart, and David Wessels, Valuation: Measuring and Managing the Value of Companies, 7th Ed. (2020), Wiley ("McKinsey (2020)"), at pp. 360-365; Pratt (2008), at pp. 177, 225.

70 Damodaran (2010), at p. 19.

71 Damodaran (2025), at PDF p. 845.

the dependence on growth assets make estimating future cash flows and risk particularly difficult.[72]

40. A discount rate is a rate of return used to convert a future monetary amount (or stream of future amounts) into a present value.[73] Mathematically, a higher discount rate in a DCF analysis results in a lower present value. Valuation literature explains that "[n]either the cash flows from existing assets nor the cash flows from growth investments are guaranteed. When valuing these cash flows, we have to consider risk somewhere, and the discount rate is usually the vehicle that we use to convey the concerns that we may have about uncertainty in the future. In practical terms, we use higher discount rates to discount riskier cash flows and thus give them a lower value than more predictable cash flows."[74]

41. Table 1, below, demonstrates the significant impact the choice of discount rate will have on the present value of a future indicated value.

**Table 1: Illustrative Example of Income Approach With Different Discount Rates[75]**

| Discount Rate | Indicated Value | Percentage Reduction |
|---|---|---|
| 25.0% | $45,454,545 | *n/a* |
| 50.0% | $21,276,596 | 53.2% |
| 85.0% | $12,195,122 | 73.2% |

42. Valuation experts "generally impose closure in valuation models by stopping [the] estimation of cash flows sometime in the future and then computing a terminal value that reflects

72 Damodaran (2010), at p. 21.

73 Weil et al. (2017), at PDF p. 515.

74 Damodaran (2010), at p. 4.

75 Assumes $10 million of free cash flow ("FCF") in Year 1 with an annual growth rate of 3.0 percent until Year 5, and a terminal growth rate of 3.0 percent. Exhibit 4.

all cash flows beyond that point."[76] The terminal value is typically calculated by estimating a constant average growth rate at which the cash flows are projected to grow in perpetuity.[77] Valuation literature cautions that "[t]he perpetual growth model is a powerful one, but it can be easily misused. In fact, analysts often use it as a piggy bank that they go to whenever they feel that the value they have derived for an asset is too low or high. Small changes in the inputs can alter the terminal value dramatically."[78]

43. For young companies, it is often the case that "[t]here are few or no existing assets; almost all the value comes from expectations of future growth. The firm's current financial statements provide no clues about the potential margins and returns that will be generated in the future, and little historical data can be used to develop risk measures. To cap the estimation problem, many young firms will not make it to stable growth, and estimating when that will happen for firms that survive is difficult to do. In addition, these firms are often dependent on one or a few key people for their success, so losing them can have significant effects on value."[79]

*3. Cost Approach*

44. The Cost (or Asset-Based) Approach values an asset based on the "current replacement or reproduction cost of an asset."[80] This approach assumes that "no one would pay more for an asset than the price required to obtain (by purchase or by construction) a substitute

---

76 Damodaran (2010), at p. 45.

77 Damodaran (2025), at PDF pp. 430-431.

78 Damodaran (2010), at p. 46.

79 Damodaran (2010), at pp. 8-9.

80 International Valuation Standards Council, *International Valuation Standards*, effective January 31, 2025, IVS 103, ¶ 40.01.

asset of *comparable utility*" and thus the cost of such substitute should reflect the value of the asset being valued.[81]

45. Practitioners typically implement the Cost Approach using one of three methods: liquidation value, replacement cost, and adjusted book value. Under the liquidation value method, the analyst estimates value by aggregating the proceeds that would be received from selling the company's assets after paying off liabilities.[82] Under the replacement cost method, the analyst estimates value based on the cost to replace the company's assets.[83] Under the adjusted book value method, the analyst uses accounting book value as the measure of asset value, with adjustments to book value where necessary.[84] More generally, applying the Cost Approach requires identifying the company's assets and liabilities, assessing the value of each item, and using those asset and liability values to arrive at an indicated value.[85]

46. The International Valuation Standards Council states that the Cost Approach "should be applied and afforded significant weight" in circumstances such as where participants "would be able to recreate an asset with substantially the same utility," where "the asset is not directly income-generating and the unique nature of the asset makes using an income approach or market approach unfeasible," where "the basis of value being used is fundamentally based on replacement cost," or "the asset was recently created or issued and sold to market participants, such that there is a high degree of reliability in the assumptions used in the cost approach."[86] The

---

81 Pratt (2008), at p. 358.

82 Damodaran (2025), at PDF p. 74; McKinsey (2020), at p. 302.

83 Damodaran (2025), at PDF p. 74; McKinsey (2020), at p. 302.

84 Damodaran (2025), at PDF p. 74.

85 Weil et al. (2017), at PDF pp. 589-590.

86 International Valuation Standards Council, *International Valuation Standards*, effective January 31, 2025, IVS 103, ¶ 40.02.

Cost Approach is typically used to value assets that can be easily replaced, such as property, plant, and equipment.[87]

47. Valuation literature notes that "[a]n advantage of the cost approach is the easy possibility of collecting and processing the required data. Furthermore the approach is also applicable with partially completed IP, which normally is not bought or sold and does not generate any revenues…. But the approach has the crucial conceptual weakness that it does not really appraise the future benefits arising from the asset…. The underlying assumption that costs create value is very problematic in this context."[88]

### F. Two-Step Valuation Method For Early-Stage Startup Businesses

48. Research and literature recognize that when "reasonable profit/cash flow forecasts cannot be generated, which is often the case for young startups," valuation methods including DCF models "struggle to generate a useful valuation result."[89] To mitigate these challenges, valuation literature suggests a "two-step" approach when valuing a young startup. In the first step, the company is valued based on the assumption that it "survives and makes it to financial hea[l]th."[90] In the second step, the probability of the company's failure is accounted for by finding the company's distress value under a failure scenario. The probability of failure can be

---

87 "Fair Value Measurements," PwC, June 2026, at PDF p. 41 (citing to § 4.4.2 ("Cost Approach"), ASC 820-10-55-3D), available at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/fair_value_measureme/assets/pwcfairvalueguide072026.pdf.

88 Wirtz, Harald, "Valuation of Intellectual Property: A Review of Approaches and Methods," *International Journal of Business and Management*, Vol. 7, No. 9 (2012), 40-48, at pp. 41-42.

89 Orcutt, John L., "Valuing Young Startups is Unavoidably Difficult: Using (and Misusing) Deferred-Equity Instruments for Seed Investing," University of New Hampshire Franklin Pierce School of Law, June 25, 2020, available at https://scholars.unh.edu/cgi/viewcontent.cgi?article=1445&context=law_facpub (accessed June 26, 2026), at PDF p. 14.

90 Damodaran, Aswath, "Valuing Young, Start-up and Growth Companies: Estimation Issues and Valuation Challenges," *Stern School of Business, New York University*, May 2009, available at https://pages.stern.nyu.edu/~adamodar/pdffiles/papers/younggrowth.pdf ("Damodaran (2009)"), at p. 41.

assessed by using sector average survival rates, probit models, or simulations.[91] Regardless of how the probability of failure is assessed, the final valuation of the company should be the expected value of both the success and failure scenarios. In other words, the startup company's value is calculated as:[92]

**Expected Value = Value of going concern (1 – Probability of failure) + Distress Sale value (Probability of failure)**

## IV. ANALYSIS OF THE DISTROMINT PLATFORM IDEA

### A. DistroMint Did Not Have Proven Market Demand

49. Based on the documents I reviewed in this case, I understand that the idea for the DistroMint platform proposed two key components: (1) a single-chain marketplace for music-related NFTs based on BSV; and (2) a music distribution function.

50. I understand the idea for the NFT marketplace relied on three third-party services: (1) Asset Layer for core NFT functionality (minting, transferring, and storing music-related NFTs); (2) HandCash for login, registration, and wallets; and (3) Stripe for fiat payment processing.[93]

51. I understand the idea for the music distribution component contemplated an admin portal through which artists, authenticated via HandCash, could upload albums, tracks, and album cover images for distribution; and I understand that in this component, uploaded files

[91] Damodaran (2009), at pp. 41-42.
[92] Damodaran (2009), at p. 42.
[93] NCH0005483-499, at 494, 497; NCH0004139-147, at 142, 146.

would be screened using ClamAV and Amazon Rekognition for potentially harmful, inappropriate, or illegal content.[94]

52. As of October 2, 2023, DistroMint, LLC had the characteristics of an "idea company."[95] DistroMint, LLC was still in the very early stages. As far as I am aware, it did not have any identified employees other than Finnerud as its CEO and his wife Destiny Perry.[96] Documents show that the source code for the proposed DistroMint platform was developed by nChain—not DistroMint, LLC or other Plaintiffs.[97] Based on the documents in this case, DistroMint did not have a developed business plan or go-to-market strategy.[98]

53. The business documents the Haraminac Report relies upon with hypothetical assumptions about DistroMint's proposed business model include:[99] (1) the May 2023 DistroMint Pitch Deck,[100] (2) a provisional analysis of DistroMint's pricing and platform fees dated March 16, 2023 (the "March 2023 DistroMint Provisional Platform Price Analysis"),[101] and (3) spreadsheets containing pricing assumptions prepared in or around March 2023.[102] The assumptions in these documents do not appear to be supported by actual data or research, such as

---

94 NCH0005483-499, at 494, 497.

95 *See* Section III.C. *See also* Damodaran (2010), at pp. 7-8.

96 *See, e.g.,* NCH0004398.

97 *See*, *e.g.*, NCH0004170-171, at 170; NCH0004172-175, at 174; NCH0004444-447, at 446; NCH0003125-126, at 125; NCH0000059-060, at 060; NCH0000067-069, at 068; NCH0000071-073, at 071; NCH0000075-076, at 075; NCH0000113-115, at 114; NCH0000138-142, at 138-139; NCH0000147-148, at 147-148; NCH0000160-161, at 160; NCH0000209-211, at 209-211; NCH0000411, at 411; NCH0000522-524, at 522; NCH0000534, at 534; NCH0000770-772, at 771.

98 While "idea" companies may have an established idea and be in the stage of building a minimum viable product, the main characteristics of startup companies include a go-to-market strategy, definite business model, initial revenues, and hiring process in place. *See* "PwC Deals Insights: How to Value a Start-Up Business," PwC, available at https://www.pwc.com/ee/en/services/transaction-services/pwc-deals-insights--how-to-value-a-start-up-business.html (accessed June 26, 2026).

99 Haraminac Report, at p. 19, Schedule 5.

100 NCH0000834-844.

101 NCH0004459-462.

102 NCH0000257; NCH0000586; NCH0000589; NCH0002509.

historical revenues, usage data from either side of the market DistroMint proposed to serve (*i.e.*, the artists who might pay to use it or the collectors who might purchase NFTs on it), interview or survey data, or anything else indicating actual demand from artists or collectors. I discuss the assumptions in the Haraminac Report in further detail in Section V.E.1.

54. After reviewing the facts and data produced in this case and referenced in the Haraminac Report, I am not aware of any positive measures of demand from actual or prospective artists or collectors (collectively, the "users"), or of any investment commitments for DistroMint as of October 2023 or at any point. By contrast, documents produced in this case show that even after October 2023, Finnerud acknowledged a need to raise funds but had not secured funding from investors. For example, Finnerud emailed SSBCI.Manager@dca.ga.gov on November 28, 2023, indicating "I need funding for the continued development and launch of the [proposed DistroMint] platform and also working capital to hire staff and expand the operation."[103] As another example, Finnerud emailed rnurse@planitvirtual.com on November 28, 2023, indicating "It'd be awesome to bring you aboard as founding investor [for DistroMint]."[104] On July 25, 2024, a representative from the National Science Foundation's Small Business Innovation Research ("SBIR") and Small Business Technology Transfer ("STTR") Program emailed Finnerud, indicating "the information you have submitted is incomplete or requires further clarification" because "[t]he pitch describes in general terms what needs to be done but does not adequately clarify what the innovation is, what is technically very challenging (and why), and how this solution is differentiated from and preferable over existing solutions."[105]

[103] SA0003183-194, at 183.

[104] SA0003197-207, at 197.

[105] SA0003763-769, at 763.

### B. DistroMint Had a Limited Total Addressable Market

55. As discussed above, I understand the idea for the DistroMint platform proposed two features: a marketplace for music-related NFTs and a music distribution function. The NFT component of the proposed DistroMint platform would have had a limited total addressable market. I understand DistroMint's proposed business model was focused on artists interested in minting and selling NFTs, as well as fans and collectors interested in purchasing those NFTs. Thus, DistroMint's addressable audience was only the subset of music artists and listeners interested in buying and selling NFTs, rather than the entire music industry. A limited total addressable market would limit DistroMint's potential opportunities for users, revenue, and profits.

56. Similarly, based on the documents I have seen in this matter, DistroMint's idea for a music distribution function would not have offered any meaningful advantage over other music distribution platforms, as discussed in further detail in Section IV.C. Because DistroMint's music distribution function was connected to a music-related NFT marketplace, the addressable market interested in the platform with both features would be narrower than the addressable market for a music distribution platform without the NFT marketplace.

### C. DistroMint Faced Substantial Competition from Existing Platforms

57. DistroMint's proposed business model included functionalities that were already provided by established competitors as of October 2023. Artists could already distribute their music, as well as mint and sell music-related NFTs, through platforms that had operated for years and established audiences. Music collectors and fans could already listen to music, as well as buy music NFTs, on existing platforms and established channels.

58. The Haraminac Report and the documents I reviewed identified several existing music distribution platforms as of around October 2023 (the "Existing Distribution Platforms").[106] As shown in Table 2, DistroMint's proposed subscription pricing for artists (*e.g.*, $199 and $1,999 per year for the middle and top tiers, respectively),[107] was well above the price range charged by the Existing Distribution Platforms, which ranged between $9.99 and $59.99 per year as of 2023, including some platforms that offered free options.[108] In addition, some of the Existing Distribution Platforms had already gained market traction as of 2023, including hosting an estimated 1 to 2 million artists and distributing between 500,000 and 45 million tracks.[109] These Existing Distribution Platforms provided artists a range of options for placing their music on major streaming platforms such as Spotify, Apple Music, and YouTube Music.[110] In addition to the platforms included in Table 2, there were many other established music distribution platforms as of October 2023, which resulted in additional competition for DistroMint. For example, Spotify's 'Preferred Distributor' List included 23 companies as of February 2023,[111] Apple Music's Preferred Distributor's list included 26 distributors as of

---

106 NCH0000834-844, at 843; Haraminac Report, at p. 19.

107 NCH0000257.

108 Table 2.

109 Figures reference available public sources as close to October 2023 as possible. The estimated number of distributed tracks for TuneCore was unavailable.

110 "YouTube Music Directory," YouTube Music, Archived Web Version dated October 2, 2023, available at https://web.archive.org/web/20231002230858mp_/https://servicesdirectory.withyoutube.com/directory/#?services=preferred-music-distributor&page=2 (accessed June 23, 2026); King, Ashley, "Spotify's 'Preferred Distributor' List Now Includes 23 Companies," Digital Music News, February 2, 2023, available at https://www.digitalmusicnews.com/2023/02/02/spotifys-preferred-distributor-list-now-includes-23-companies/ (accessed June 26, 2026); "Apple Music Preferred Distributors," iTunes Connect Resources and Help, Archived Web version dated October 2, 2023, available at https://web.archive.org/web/20231002142456/https://itunespartner.apple.com/music/partners (accessed June 26, 2026).

111 King, Ashley, "Spotify's 'Preferred Distributor' List Now Includes 23 Companies," Digital Music News, February 2, 2023, available at https://www.digitalmusicnews.com/2023/02/02/spotifys-preferred-distributor-list-now-includes-23-companies/ (accessed June 26, 2026).

October 2023,[112] and YouTube's list of Preferred Music Distributors included 63 results as of October 2023.[113]

**Table 2: Summary of Select Music Distribution Platforms as of Around October 2023[114]**

| Platform | Subscription Fee Options for Artist | Year Founded | Market Traction as of 2023 |
|---|---|---|---|
| CD Baby | Pay per release:<br>• $9.99 per single or album | 1998 | Over 2 million artists and nearly 20 million tracks (November 2023) |
| TuneCore | Unlimited plans:<br>• New artist: Free<br>• Rising artist: $14.99 per year<br>• Breakout artist: $29.99 per year<br>• Professional: $49.99 per year<br>Pay per release:<br>• Free to release a single or an album to social platforms only<br>• $29.99 per album/year or $9.99 per single/year to release to all digital stores | 2006 | Over 1 million artists used to date (October 2020) |
| DistroKid | Unlimited plan:<br>• $22.99 per year | 2013 | 2 million artists and 45 million tracks (September 2023) |
| UnitedMasters | Unlimited plans:<br>• Debut: Free<br>• Select: $59.99 per year<br>• Partner: Invite only | 2017 | Over 1.9 million artists (November 2023) and over 500,000 tracks (July 2020) |

59. In addition, as of October 2023, artists could already mint and sell music NFTs on numerous existing platforms. These included but were not limited to Sound.xyz[115] and

---

112 "Apple Music Preferred Distributors," iTunes Connect Resources and Help, Archived Web version dated October 2, 2023, available at https://web.archive.org/web/20231002142456/https://itunespartner.apple.com/music/partners (accessed June 26, 2026).

113 "YouTube Music Directory," YouTube Music, Archived Web Version dated October 2, 2023, available at https://web.archive.org/web/20231002230858mp_/https://servicesdirectory.withyoutube.com/directory/#?services=preferred-music-distributor&page=2 (accessed June 23, 2026).

114 Exhibit 5.

115 In July 2023, Sound.xyz publicly launched its artist-first NFT platform and announced a $20 million Series A round. Shutler, Ali, "Sound Raises $20 Million, Opens Music-NFT Platform to All Artists," Decrypt, July 12,

Catalog,[116] both dedicated music NFT platforms serving artists through either limited-edition or single-edition releases; Onlymusix[117] and TokenTraxx,[118] music NFT marketplaces providing artists with tools to tokenize and sell their music; and OpenSea, which supported music NFTs alongside other digital assets.[119] Further, DistroKid had a program in November to December 2021 called Sellouts, which was a collaboration with 10,000 independent music creators to design and mint 10,000 individualized, collectible, carbon-negative NFTs that commemorate the music of each artist.[120] Thus, even if DistroMint had been able to commercialize its platform, it would have faced competition from these other platforms that launched earlier and already enabled music artists to mint and sell music NFTs. DistroKid, an established music distribution platform, had already offered music NFTs through its Sellouts program nearly two years before the valuation date in the Haraminac Report (*i.e.*, October 2, 2023).[121] I have not been able to identify any further launches of DistroKid NFTs since that initial launch, suggesting DistroKid did not view NFTs as a product worth continuing to offer.

60. From the consumer perspective, as of October 2023, music fans and collectors already had several existing options to listen to music and support artists, including a small

---

2023, available at https://decrypt.co/148246/sound-raises-20-million-opens-music-nft-platform-all-artists (accessed July 16, 2026). *See also* Chew, Zoe, "Startup Ideas: Web3 Music, Creator Economy & Metaverse," Medium, October 31, 2022, available at https://medium.com/@whizzoe/web3-music-roles-of-nfts-creator-economy-metaverse-d43c53951695 (accessed July 16, 2026) ("Sound.xyz allows artists to host a listening party for new song releases with a series of limited edition NFTs.").

116 "Catalog is a mix between a streaming service and an NFT marketplace... The platform is exclusively a 1/1 marketplace." Thomas, Langston, "The Music NFT Bible: A Guide to the Future of Sound," NFT Now, September 28, 2022, available at https://nftnow.com/guides/complete-guide-to-the-nft-music-ecosystem/ (accessed July 16, 2026).

117 "Onlymusix," Onlymusix, available at https://www.onlymusix.com/ (accessed July 16, 2026).

118 "TokenTraxx," Archived Web Version dated January 22, 2026, available at https://web.archive.org/web/20260122201024/https://www.tokentraxx.com/ (accessed July 16, 2026).

119 I discuss OpenSea in more details in Sections V.E.2.a-b.

120 "Sellouts," DistroKid Support Center, available at https://support.distrokid.com/hc/en-us/articles/4410721731347-Sellouts (accessed July 16, 2026).

121 Haraminac Report, at p. 16.

number of well-established music streaming platforms that represented most of the market (*e.g.*, Spotify, Apple Music, Tencent Music, YouTube Music, and Amazon Music).[122] While I understand DistroMint did not plan to offer music streaming as of October 2023, the fact that a small number of well-established music streaming platforms represented most of the market created additional barriers to entry because DistroMint would have had to operate within the existing music ecosystem, where fans could listen to music and support artists without purchasing NFTs on DistroMint.

61. Considering there were several well-established platforms as of October 2023, while DistroMint had no users, revenue, or artists on its proposed platform and it had not yet launched, and based on my review of the documents cited by the Haraminac Report and the documents I reviewed in this case, I have not seen information suggesting that DistroMint had a likelihood of generating any meaningful revenue or profit.

### D. DistroMint's Patent Rejections Demonstrate It Had Not Established That It Had Novel Technology

62. As discussed above, technology and intellectual property, including patents, are factors that can be considered by investors when evaluating early-stage startup technologies. DistroMint's patent rejections demonstrate that it had not established that it had novel technology. I understand the technology underlying DistroMint's platform was the subject of nonprovisional patent applications filed both in the U.S. (Application No. 18/222,772)[123] and

---

[122] "Who Are the Biggest Players in Music Streaming?" Voronoi, available at https://www.voronoiapp.com/business/Who-Are-the-Biggest-Players-in-Music-Streaming-2223 (accessed July 13, 2026). *See also* Curry, David, "Music App Report 2026," May 7, 2026, available at https://www.businessofapps.com/data/music-app-report/ (accessed July 13, 2026).

[123] "Office Action Summary," United States Patent and Trademark Office, February 3, 2026. Finnerud filed a provisional patent application No. 63/389,715 on July 15, 2022, and later filed this non-provisional patent. *See also* Haraminac Report, at p. 6; NCH0005529-547, at 538.

internationally (PCT Application No. PCT/IB2023/057275).[124] Both applications were rejected by the respective patent authorities. The U.S. Patent and Trademark Office rejected the U.S. application because it found that the claimed invention was an "abstract idea" and "not an improvement to functioning of a computer, technology, or technical field."[125] The International Searching Authority similarly concluded that the application lacked both "novelty" and an "inventive step."[126] Based on my review of the documents cited by the Haraminac Report and the documents I reviewed in this case, I have not seen information on any intellectual property rights associated with DistroMint or DistroMint, LLC with demonstrated value.

### E. DistroMint Faced Additional Risks Because It Relied on Uncertain Technologies

63. I understand DistroMint's proposed NFT marketplace was being built on BSV, meaning that all NFTs were proposed to be issued on one chain: BSV.[127] Further, as discussed above in Section II, I understand DistroMint's proposed NFT marketplace relied on Asset Layer and HandCash.[128]

64. As of October 2023, there was uncertainty around these technologies. As noted in the Haraminac Report, the decline of BSV contributed to the risk exposure for DistroMint.[129] Since its inception in 2018, BSV has suffered significant setbacks. In April 2019, BSV was

---

124 "International Preliminary Report on Patentability," International Searching Authority, December 1, 2024.

125 "Office Action Summary," United States Patent and Trademark Office, February 3, 2026.

126 "International Preliminary Report on Patentability," International Searching Authority, December 1, 2024.

127 NCH0000834-844, at 841.

128 NCH0005483-499, at 494, 497; NCH0004139-147, at 142, 146.

129 Haraminac Report, at p. 17.

delisted from Binance,[130] the world's largest cryptocurrency exchange by daily volume.[131] In 2023, BSV was dropped by two more cryptocurrency platforms, Circle[132] and Robinhood.[133] As of October 2023, the volume of BSV traded on a daily basis had fallen significantly compared to its levels in 2020 and 2021.[134]

65. Therefore, as of October 2023, DistroMint faced additional risks because it relied on BSV, an asset that had suffered significant setbacks, and these risks were compounded by integrating the services of Asset Layer and HandCash, other early-stage providers operating in that space.[135]

### F. DistroMint Faced Additional Risks Because of the Significant Uncertainty Around Early-Stage Crypto- and NFT-Based Companies in 2023

66. As of October 2023, DistroMint faced additional risks because of the significant uncertainty around early-stage crypto- and NFT-based companies. Multiple types of data demonstrate this uncertainty.

---

130 "Binance Will Delist BCHSV," Binance, available at https://web.archive.org/web/20190417102243/https://support.binance.com/hc/en-us/articles/360026666152 (accessed June 16, 2026).

131 "Top Cryptocurrency Exchanges Ranked By Volume," CoinMarketCap, available at https://coinmarketcap.com/rankings/exchanges/ (accessed June 16, 2026).

132 Henslee, Joshua, "HandCash on Circle Termination: It May Have Happened for the Best," Coingeek, February 7, 2023, available at https://coingeek.com/handcash-on-circle-termination-it-may-have-happened-for-the-best/ (accessed June 16, 2026).

133 Beganski, André, "Robinhood to Delist Bitcoin SV, Market Sell Remaining User Balances," Decrypt, January 11, 2023, available at https://decrypt.co/118951/robinhood-delist-bitcoin-sv-market-sell (accessed June 16, 2026).

134 *See* "Bitcoin SV USD Price (BSV-USD)," Yahoo Finance, available at https://finance.yahoo.com/quote/BSV-USD/history/ (accessed June 26, 2026).

135 *See*, *e.g.*, Campino, Jose, and Shiwen Yang, "Decoding the Cryptocurrency User: An Analysis of Demographics and Sentiments," *Heliyon*, Vol. 10 (2024), at pp. 7-8 ("Popularity is the most important factor for the user when they select a cryptocurrency […]. The second most important feature […] is stability and thirdly is network. Good stability implies less risk in price and a trustworthy network guarantees the user experience.").

67. First, venture capital funding in crypto-based companies declined significantly in 2023, as shown in Figure 2. Venture capital investment and deal count in crypto declined sharply in comparison to 2021 and early 2022, reaching their lowest point in Q3 2024. According to data from *Messari*, "Q3 2023 marked new lows in both overall funding amounts and deal counts" with quarterly totals "down 36% in both [funding amounts and deal counts]."[136] The research platform *Galaxy Insights* attributed this trend to "[t]he macro environment and turmoil in the crypto market."[137] Industry analysts in 2025 noted that with investors' interests shifted to AI-related companies, achieving a rebound in financing of crypto-based companies to pre-2022 levels would be increasingly challenging.[138]

---

136 Devens, Chase, "State of Crypto Fundraising – Q3 2023," Messari, October 5, 2023, available at https://messari.io/report/state-of-crypto-fundraising-q3-2023 (accessed June 26, 2026).

137 Thorn, Alex, and Gabe Parker, "Crypto & Blockchain Venture Capital – Q4 2024," Galaxy Insights, January 15, 2025, available at https://www.galaxy.com/insights/research/crypto-blockchain-venture-capital-q4-2024 (accessed June 26, 2026). For example, in May 2022, stablecoin Terra collapsed creating a "domino-effect" of consecutive market failures, including the collapse of, amongst others, the fourth largest crypto-asset trading firm FTX. As a result, the industry lost $1.7 trillion in market value by June 2022 with the total loss estimated at $2 trillion. OECD, "Lessons from the Crypto Winter," *OECD Business and Finance Policy Papers*, No. 18 (2022), at pp. 4, 5 (identifying "Celsius, Three Arrows Capital and [...] FTX" as the most notable crypto-asset service provider failures), 26-28 (identifying "Hong Kong China-based Babel crypto-lender and crypto-exchange Hoo […]; Voyager Digital; Vauld," among market participants that have failed as a result of the "[c]rypto-asset market instability [in 2022]").

138 Robbins, Jacob, "AI startups grabbed a third of global VC dollars in 2024," PitchBook, January 9, 2025, available at https://pitchbook.com/news/articles/ai-startups-grabbed-a-third-of-global-vc-dollars-in-2024 (accessed July 23, 2026); Khatri, Yogita, "The Funding: Why the bar for crypto VC is higher than ever," The Block, April 19, 2026, available at https://www.theblock.co/post/398015/the-funding-why-the-bar-for-crypto-vc-is-higher-than-ever (accessed June 18, 2026) (citing conversations with investors stating that "the era of easy fundraising in crypto is over and unlikely to come back.").

**Figure 2: Cryptocurrency Venture Capital Invested and Deal Count (2016 – 2024)**[139]




68. Second, the crypto industry has historically had high volatility, especially in 2022 and 2023. A 2023 research paper from the International Monetary Fund noted that "[r]ecent episodes of high volatility after the failures of Terra, FTX and SVB quickly propagated within the crypto industry and across traditional financial institutions, particularly those with relevant linkages to high tech sectors."[140] Researchers also noted that investor anxiety grew after these failures, which further exacerbated the industry's instability.[141] In early 2024, BTCS Inc. (a blockchain technology company that offers services allowing crypto holders to utilize proof-of-stake blockchain infrastructure)[142] noted that "[t]he prices of crypto assets have experienced

---

139 Thorn, Alex, and Gabe Parker, "Crypto & Blockchain Venture Capital – Q4 2024," Galaxy Insights, January 15, 2025, available at https://www.galaxy.com/insights/research/crypto-blockchain-venture-capital-q4-2024 (accessed June 26, 2026).

140 Hacibedel, Burcu, and Hector Perez-Saiz, "Assessing Macrofinancial Risks from Crypto Assets," International Monetary Fund, September 2023, available at https://www.imf.org/-/media/files/publications/wp/2023/english/wpiea2023214-print-pdf.pdf.

141 Sakariyahu, Rilwan et al., "One Crash, Too Many: Global Uncertainty, Sentiment Factors and Cryptocurrency Market," *Journal of International Financial Markets, Institutions & Money*, Vol. 94 (2024), 1-17, at p. 2.

142 BTCS Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, filed March 21, 2024, available at https://www.sec.gov/Archives/edgar/data/1436229/000149315224010797/form10-k.htm (accessed July 18, 2026), at p. 3.

substantial volatility, which may reflect 'bubble' type volatility, meaning that high or low prices may have little or no merit."[143]

69. Likewise, the market for NFTs experienced a substantial decline in 2023. As shown in Figure 3 below, worldwide NFT revenue fell from nearly $1.6 billion in 2022 to just $611 million in 2023, a 61 percent decline.[144]

**Figure 3: Worldwide NFT Revenue (2018 – 2026) ($ Millions)[145]**




70. Further, music NFT and Web3[146] platforms that had shown signs of traction in 2021-2022 such as raising venture capital funding, sales, and onboarding artists appear to have been discontinued or lost substantial value. For example, Royal.io, a music NFT platform that

143 BTCS Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, filed March 21, 2024, available at https://www.sec.gov/Archives/edgar/data/1436229/000149315224010797/form10-k.htm (accessed July 18, 2026), at p. 6.

144 1 – ($611.1 / $1,581.3) = 61.4 percent.

145 Downloaded from "NFT," Statista, available at https://www.statista.com/outlook/fmo/digital-assets/nft/worldwide/ (accessed June 25, 2026). Figure is updated as of March 2026, and 2026 values are projected for the full year.

146 Web3 uses blockchains, cryptocurrencies, and NFTs to give power back to the users in the form of ownership. Web3's core principles include that it is decentralized, permissionless, has native payments, and is trustless. "Introduction to Web3," Ethereum.org, available at https://ethereum.org/web3/ (accessed July 21, 2026).

raised a total of $71 million in funding in 2021[147] and generated over $500,000 in sales in one release,[148] stopped operating its original platform and announced in April 2024 that it was rebuilding its backend infrastructure and revamping its product-development approach.[149] As another example, OneOf, a music NFT platform that raised $63M in funding in 2021,[150] stopped releasing new NFTs two years ago.[151] Audius reported raising $9 million across a seed round and a strategic round by October 2020,[152] and its AUDIO token now trades approximately 99.6 percent below its 2021 peak.[153] Sound.xyz, which raised a $5 million seed round in 2021 and a $20 million Series A in 2023[154] and "onboarded more than 500 artists [as of 2023],"[155] announced that the platform would go offline in January 2026.[156]

---

147 Matney, Lucas, "NFT Music Rights Startup Royal Banks $55M Investment Led by a16z Crypto," TechCrunch, November 22, 2021, available at https://techcrunch.com/2021/11/22/nft-music-rights-startup-royal-banks-55m-investment-from-a16z-crypto/ (accessed July 20, 2026).

148 Stassen, Murray, "Diplo Is the Latest Artist to Let Fans Buy Shares in His Streaming Royalties on $55M-Backed NFT Platform Royal," Music Business Worldwide, March 25, 2022, available at https://www.musicbusinessworldwide.com/diplo-is-the-latest-artist-to-let-fans-buy-shares-in-his-streaming-royalties-on-55m-backed-nft-platform-royal123/ (accessed July 24, 2026).

149 Royal, "Royal 2.0: Rebuilding for Web3," Paragraph, April 10, 2024, available at https://paragraph.com/@royal-3/royal-2-0-rebuilding-for-web3 (accessed July 20, 2026).

150 "OneOf NFT Platform Adds American Express as Backer in $8.4M Round," OneOf, August 2022, available at https://about.oneof.com/press-aug-2022-oneof-nft-platform-adds-american-express-as-backer/ (accessed July 23, 2026).

151 "Drops," OneOf, available at https://www.oneof.com/app/drops (accessed July 23, 2026).

152 Audius, "Welcome $AUDIO to Mainnet," Audius Blog, October 22, 2020, available at https://blog.audius.co/posts/welcome-audio-to-mainnet (accessed July 20, 2026).

153 AUDIO's price declined from $3.167 on March 31, 2021 to $0.013 on July 20, 2026, a decrease of approximately 99.6 percent. *See* CoinMarketCap, "Audius price today, AUDIO to USD live price, marketcap and chart," CoinMarketCap, available at https://coinmarketcap.com/currencies/audius/ (accessed July 20, 2026).

154 Sound.xyz, "Sound.xyz Opens to All, Raises $20m to Help Artists Make a Living from Their Music," Paragraph, July 12, 2023, available at https://paragraph.com/%40soundxyz/sound-xyz-opens-to-all-raises-20m-to-help-artists-make-a-living-from-their-music (accessed July 20, 2026).

155 Yahya, Ali, and Jane Lippencott, "Investing in Sound.xyz," a16z crypto, July 12, 2023, available at https://a16zcrypto.com/posts/article/investing-in-sound-xyz/ (accessed July 21, 2026).

156 "Thank you for building Sound with us," sound.xyz, available at https://www.sound.xyz (accessed July 20, 2026).

### G. Conclusions

#### *1. DistroMint's Probability of Generating Any Meaningful Revenues and Profits Was Very Low as of October 2023*

71. Based on the facts and data I have seen, DistroMint had zero revenues, users, and profits, and it did not have any positive indications of demand from actual or prospective users, artists, investors, or otherwise as of October 2, 2023, or at any time. Further, I am not aware of any reliable data or projections on DistroMint's potential revenues, users, operating expenses, profitability, business plan, comparables, benchmarks, or positive measures of demand from actual or prospective users, investors, or otherwise as of October 2023, or at any time. For the reasons discussed above and throughout this report, DistroMint's probability of generating any meaningful revenues and profits was very low as of October 2023.

#### *2. There is Not a Sufficient Basis to Establish a Reliable Valuation of DistroMint or DistroMint, LLC Based on an Income or Market Approach*

72. There is not a sufficient basis to establish a reliable valuation of DistroMint or DistroMint, LLC as of October 2, 2023, or at any time, based on an Income Approach, because, among other reasons, there are no available data on revenues, profits, or market demand that could form a reliable basis for a DCF model. As discussed below in Section V.E.1, the inputs and assumptions in the Income Approach in the Haraminac Report are speculative, arbitrary, unsupported, and not based on actual data.[157] DistroMint did not have any revenue, it had not completed any transactions, and it did not have any funding or investment from investors in

[157] Asset Layer demonstrates a contrasting example of a company that nChain evaluated along several dimensions and determined its valuation to be $12 million as of June 2023. nChain Ventures prepared a 35-page Preliminary Investment Report with details and analysis along several categories that investors typically consider when evaluating startup companies, including an Executive Summary, a Product and Sector Analysis, a Commercial Analysis, and a Valuation Analysis. NCH0005448-482, at 449.

exchange for company equity. In fact, nChain's decision to stop funding the development of DistroMint is a negative indication of value of the proposed platform because it shows that nChain did not believe it was worth continuing to invest. Further, as discussed in Section IV.A above, documents produced in this case show that even after October 2023, Finnerud acknowledged a need to raise funds but was unable to secure funding from investors.

73. There is not a sufficient basis to perform a valuation of DistroMint or DistroMint, LLC based on a Market Approach, because, among other reasons, DistroMint had not received funding from any investors with a specified valuation, and, based on my review of the evidence, I have not identified – nor did the Haraminac Report identify – any platforms that are comparable to DistroMint or companies that are comparable to DistroMint, LLC that could be used as the basis for a Market Approach.

*3. The Approximate Costs of $675,000 Invested by nChain Would At Most Represent an Upper Bound for a Valuation Based on a Cost Approach*

74. While nChain's approximate investments of $675,000[158] toward development of the proposed DistroMint platform could be used as the starting point for a valuation of DistroMint based on a Cost Approach, it would at most represent an upper bound for at least the following reasons. First, the portion of the $675,000 that was directed toward BSV and integration with the early-stage providers operating in the BSV space would have lost significant value due to the challenges faced by BSV discussed in Section IV.E. Second, the Haraminac

[158] nChain documents indicate that it had invested approximately $675,000 toward developing DistroMint, including consulting payments to Finnerud, as of December 2023. NCH0001867-870, at 867, 869. *See also* Section II.

Report does not identify, and I am not aware of, any demonstrated value derived from these costs, let alone value greater than or equal to $675,000.

75. Third, the Haraminac Report does not identify, and I am not aware of, a potential buyer or investor being willing to pay for DistroMint or being willing to continue funding the development, launch, and/or operation of DistroMint. nChain's decision to discontinue funding the development of DistroMint and the lack of interest from other potential investors[159] are signals that investors did not view DistroMint as worth investing in, so these factors would indicate a downward adjustment on any valuation of DistroMint.

## V. REBUTTAL TO THE HARAMINAC REPORT

76. The Haraminac Report states that it performs a valuation of "the DistroMint enterprise as a whole" using a standard of "fair market value, the price at which the platform would change hands between a hypothetical willing buyer and willing seller, neither compelled and both reasonably informed."[160] The Haraminac Report claims to use a "premise" of "going concern at highest and best use."[161] The Haraminac Report uses a valuation date of October 2, 2023,[162] and it presumes that "commercialization would have proceeded but for the events at issue, which is a presumption directed for the analysis and not an opinion on liability."[163]

[159] *See* Sections II, IV.A.
[160] Haraminac Report, at p. 16.
[161] Haraminac Report, at p. 16.
[162] Haraminac Report, at p. 16.
[163] Haraminac Report, at p. 17.

CONFIDENTIAL

77. The Haraminac Report uses three approaches to perform a valuation of DistroMint, and it reports results of $55,557,335 from the Income Approach, $37,636,134 from the Market Approach, and $7,231,800 from the Cost Approach.[164]

78. The Haraminac Report then calculates the weighted average of these three results, applying two weightings to arrive at its valuation of DistroMint.[165] The "Reliability Weighted" weights are 10 percent for the Cost Approach, 35 percent for the Market Approach, and 55 percent for the Income Approach, and these result in a valuation of $44,452,361.[166] The "Probability Weighted" weights are 10 percent for the Cost Approach, 25 percent for the Market Approach, and 65 percent for the Income Approach, and these result in a valuation of $46,244,482.[167] The Haraminac Report opines that "[t]he fair market value of DistroMint as of October 2, 2023, is $44,452,361, on a going-concern premise, corroborated by a probability-weighted analysis of $46,244,482."[168]

79. The Haraminac Report states that the weights were informed by four "pillars,"[169] including "economic function, technical implementation, regulatory characterization, and risk

[164] Haraminac Report, at p. 3. The Haraminac Report acknowledges that nChain's restructuring proposal includes a "convertible debt subject to a $10,000,000 cap," but claims that "Defendants' own $10,000,000 figure is the floor, the least nChain itself was prepared to state." *See* Haraminac Report, at p. 16, Schedules 6 and 8. That claim mischaracterizes the $10 million figure and how valuation caps function in venture financing. As MicroVentures, a venture investment platform, explains, a valuation cap within a convertible note "sets a maximum company valuation for an investment's conversion to equity," and "[i]t's important to note that a valuation cap is not an official valuation of the company, but rather a maximum valuation that can give early investors more favorable conversion terms in a future funding round." *See* Clark, Bill, "Understanding Valuation Caps," MicroVentures Blog, November 14, 2025, available at https://microventures.com/understanding-valuation-caps (accessed July 23, 2026). Accordingly, in this case, the $10 million valuation cap does not establish a valuation or a valuation "floor" as stated in the Haraminac Report.

[165] Haraminac Report, at p. 21, Schedule 6.

[166] Haraminac Report, at pp. 3, 21.

[167] Haraminac Report, at pp. 3, 21.

[168] Haraminac Report, at p. 3.

[169] Haraminac Report, at p. 17, Schedule 2. While the Haraminac Report claims that "[a] commercialized product, Soundbase" was "similar to DistroMint," the discussion in the Haraminac Report related to Soundbase does not

exposure."[170] The weights in the "Probability Weighted" method are assigned to reflect a 65 percent probability to the possibility that "[c]ommercialization succeeds," a 25 percent probability to a "[p]artial or [d]elayed go-to market," and a 10 percent probability to a "[w]ind-[d]own" outcome.[171]

80. Using the result from its "Reliability Weighted" approach, the Haraminac Report provides a figure of "50% Share per Counsel" and multiplies its valuation by 50 percent to arrive at a figure of $22,226,181.[172]

81. As discussed below, the Haraminac Report is flawed, unreliable, speculative, and it results in an unreliable and overstated value of DistroMint because, among other things, it:

a. Fails to distinguish between the proposed DistroMint platform and DistroMint, LLC, resulting in a purported valuation that is ambiguous and not specific to either the proposed DistroMint platform or the LLC;

b. Lacks specificity regarding key operational details that investors typically consider when evaluating early-stage companies;

---

appear to impact the valuation in the Haraminac Report. The Haraminac Report does not cite any source showing any actual connection between nChain, DistroMint, or Soundbase, and I am not aware of any such connection. Further, the Haraminac Report appears to ignore notable differences between DistroMint's proposed product offerings and Soundbase. For example, it appears that Soundbase does not distribute music. Rather it allows fans to discover and support artists by "preview[ing] tracks for free and unlock[ing] full songs instantly" within its own ecosystem. *See* Haraminac Report, at p. 12; "Soundbase," available at https://bsvradar.com/apps/soundbase (accessed July 22, 2026).

While the Haraminac Report refers to HandCash and Asset Layer as being controlled by nChain several times (*see, e.g.*, Haraminac Report, at pp. 4, 12, 13, 14, 15, 17, 20), it does not provide documents or information indicating such control existed and even acknowledges that "nChain's control over each is not explicitly disclosed in its communications with Finnerud or easily ascertained." Haraminac Report, at p. 12. Further, I have been informed that nChain did not control HandCash or Asset Layer at any time after December 2022.

170 Haraminac Report, at p. 17, Schedule 2.

171 Haraminac Report, Schedule 6.

172 Haraminac Report, at p. 3.

c. Improperly assumes DistroMint would become a viable and operating platform with certainty, rather than analyzing the viability of the proposed platform and whether it could actually be developed and launched;

d. Improperly assumes DistroMint would achieve its revenue and profit projections with certainty, despite data and factors discussed in Sections III and IV of this report showing that DistroMint had a very low probability of generating any meaningful revenues and profits, and fails to apply the "two-step" framework used in valuation literature to adjust for the probability of failure;

e. Uses speculative, arbitrary, and unsupported assumptions and inputs in its Income Approach, Market Approach, and Cost Approach, which result in a flawed and overstated valuation;

f. Improperly applies a discount for lack of marketability ("DLOM") to only the Market Approach, resulting in a flawed and overstated valuation; and

g. Uses arbitrary and unsupported weights to combine the three valuation approaches, resulting in an unreliable and flawed valuation.

82. For the above reasons, the Haraminac Report does not provide a reliable valuation of the proposed DistroMint platform or DistroMint, LLC as of October 2, 2023—or at any time. Further, while the Haraminac Report provides a purported valuation of DistroMint and

DistroMint, LLC collectively,[173] it does not state an opinion on damages associated with the Alleged Conduct.

### A. Fails to Distinguish Between the Proposed DistroMint Platform and DistroMint, LLC

83. The Haraminac Report claims to "assess the value of the DistroMint platform and assess related activities," but it fails to distinguish between DistroMint, LLC, the company, and the proposed DistroMint platform.[174] To the extent DistroMint, LLC and the proposed DistroMint platform have different values, it is unclear which valuation is represented in the Haraminac Report. As a company, DistroMint, LLC would have taxes, regulations, costs, employees, contracts, investors, and other issues that may not be relevant to the valuation of the proposed DistroMint platform. As of October 2023, the company DistroMint, LLC had not yet launched a product, and the proposed DistroMint platform had not yet launched. At the time of the valuation, DistroMint was not an established platform or a revenue-generating product. The Haraminac Report does not specify the value of DistroMint, LLC versus the value of the proposed DistroMint platform, resulting in a purported valuation that is ambiguous and not specific to either DistroMint, LLC or the proposed DistroMint platform.

### B. Lacks Specificity Regarding Key Operational Details That Investors Typically Consider When Evaluating Early-Stage Companies

84. As discussed above in Section III.B, when evaluating early-stage startup companies, investors often consider several factors, including the information and documents

[173] In the Haraminac Report, DistroMint, LLC and DistroMint, the software platform under development, are referenced collectively as DistroMint. Haraminac Report, at p. 3.

[174] Haraminac Report, at p. 3.

listed in Exhibit 3. However, the Haraminac Report lacks specificity regarding key operational details. As a few examples, the Haraminac Report does not identify the employees who would be operating the LLC and the proposed platform, how many employees would be needed to operate the proposed platform, which countries the platform would operate in, who would provide funding, or the company's plans for operations, marketing, sales, distribution, or customer support. The lack of specificity regarding key operational details, along with the overall lack of data and other flaws in the Haraminac Report, result in the valuation being speculative and unreliable.

### C. Improperly Assumes DistroMint Would Become a Viable and Operating Platform With Certainty

85. The Haraminac Report does not specify any assumptions on product development to support the valuation of DistroMint as a viable and operating platform. It instead acknowledges that "nChain's records reflect a minimum viable product still under active development, with integration and payment components incomplete as of the valuation date."[175] And, while DistroMint was not actually launched, the Haraminac Report assumes that it would have been able to launch and gain traction starting in its first year.[176] In other words, the Haraminac Report simply assumes success, rather than evaluating the viability of developing the proposed DistroMint platform, *i.e.*, whether it could be completed and launched.

86. For example, if DistroMint were to function as a music distribution platform, it would need to have the ability to engage in business activities such as:

---

175 Haraminac Report, at p. 10.

176 Haraminac Report, at p. 20.

a. Manage and track information of artists and their artwork, including copyright information, payment information, metadata of the artwork;

b. Develop and maintain distribution relationships with existing platforms, such as Apple Music, Spotify, and others, including negotiating and agreeing to contract terms;

c. Market to artists and generate artist interest in the product; and

d. Address IP-related issues (*e.g.*, copyright and patent problems) associated with the sale or distribution of music.

87. Similarly, if DistroMint were to sell or facilitate NFTs, the valuation would need to include assumptions on how the platform could create and manage NFTs tied to music content, track ownership and transfers, and market to users. However, the Haraminac Report does not discuss or address the feasibility or viability of these product development assumptions.

88. The Haraminac Report also does not appear to address how the proposed DistroMint platform would overcome the practical requirements of launching a two-sided music and NFT marketplace, including the channels for recruiting artists, what level of promotional support and incentives the platform would offer, how DistroMint would verify that artists controlled the relevant copyrights, among other things. On the user and collector side, the Haraminac Report does not specify the assumptions on how DistroMint could attract users, what marketing channels it would use, or how it would stand out from competitors. By failing to identify support for these assumptions, the Haraminac Report effectively assumes that DistroMint would work as intended, rather than analyzing the viability of the proposed platform

and whether it could actually be developed, launched, attract users, process transactions, or generate the revenues and profits projected in the Haraminac Report.

### D. Improperly Assumes DistroMint Would Achieve Revenue and Profit Projections With Certainty

#### *1. Overview*

89. The Haraminac Report improperly assumes that DistroMint would have been commercialized with certainty but for the Alleged Conduct.[177] This assumption is arbitrary and unsupported by any facts or data. In fact, the Haraminac Report acknowledges that "[t]he going-concern premise rests on the directed presumption that commercialization would have proceeded."[178]

90. According to valuation literature, "not only is estimating when a firm will become mature difficult to do, but considering whether a firm will make it as a going concern for a valuation is just as important."[179] As discussed in Section III above, early-stage prelaunch companies without users, revenue, and indications of interest from investors and potential users have a very low probability of generating substantial revenues and profits, and crypto and NFT companies were facing additional challenges in 2023.[180] Further, as discussed in Section IV, DistroMint's probability of generating any meaningful revenues and profits as of October 2023 was very low for multiple reasons, including but not limited to the following: (1) DistroMint did not have proven market demand, (2) DistroMint had a limited total addressable market, (3)

---

177 Haraminac Report, at pp. 3, 17, Schedule 1.

178 Haraminac Report, at pp. 10-11, Schedule 1.

179 Damodaran (2010), at p. 5.

180 Damodaran (2010), at pp. 8-9, 257; Zhan, Yuanzhu, et al., "Success and Failure of Blockchain Technology Providers: Founders' Power, Beyond-Blockchain Exploration and Centralized Decision-Making," *Journal of Operations Management*, Vol. 71 (2025), 893-916, at pp. 893-894.

DistroMint faced substantial competition from existing platforms, (4) DistroMint's patent rejections demonstrate that it had not established that it had novel technology, and (5) DistroMint faced additional risks discussed in Sections IV.E and IV.F, including the decline of the BSV blockchain it relied on.

91. After assuming that DistroMint would have been commercialized with certainty, the Haraminac Report assumes DistroMint would have generated substantial revenues – including over $12 million in its first year and over $80 million in Year 5, and it does not account for the scenario where DistroMint does not achieve these revenues.[181]

92. Even if the proposed DistroMint platform had launched, it is highly unlikely it would have achieved the projections in the Haraminac Report. As discussed in Section III.C, data show that only 1.3 percent of U.S. businesses achieved $10 million or more in annual revenue as of 2024.[182] These 1.3 percent of businesses represent a broad set of all businesses in the U.S., including both new and established businesses.[183] Due to the factors discussed in Section IV, DistroMint faced additional challenges and risks, so DistroMint's probability of generating $10 million or more in Year 1 was likely far less than 1.3 percent. Said another way, DistroMint's probability of generating less than $10 million in Year 1 and not meeting the projections in the Haraminac Report was very high – likely greater than 98.7 percent.[184]

---

181 Haraminac Report, Schedule 5.

182 "Detailed Business Counts," NAICS Association, available at https://www.naics.com/business-lists/counts-by-company-size/ (accessed June 26, 2026) (The sum of all businesses with more than $10 million in sales: 176,000 + 23,670 + 4,070 + 5,161 = 208,901. Total businesses with coded records: 17,769,699 – 1,935,963 = 15,833,736. Proportion of businesses with over $10 million in sales: 208,901 / 15,833,736 = 1.32 percent.).

183 "NAICS Code Identification Tools," NAICS Association, available at https://www.naics.com/search/ (accessed July 22, 2026).

184 Similarly, the Haraminac Report improperly assumes an EBITDA profit margin of 30 percent without any citation. Haraminac Report, at p. 20, Schedule 5. I incorporate my analysis of profitability from Sections V.E.1.c and V.E.1.d into this section.

93. By assuming that DistroMint would meet the revenue projections in its report with certainty, the Haraminac Report essentially assumes a high valuation and fails to account for the scenario in which DistroMint would not be commercialized and the very high probability (likely greater than 98.7 percent) that DistroMint's revenues in Year 1 and each of the subsequent years would be less than $10 million.

### 2. *Fails To Apply the Two-Step Valuation Method For Early-Stage Startup Businesses*

94. As discussed above in Section III.F, the valuation literature suggests a "two-step" approach when valuing a young startup. If one were to use the approach of starting with the valuation of a later stage company and applying a percentage reduction to its value to account for the probability of realizing that valuation, the adjustment in this case would need to capture the extremely low probability of success for the proposed DistroMint platform. While the assumptions and inputs in the Haraminac Report are flawed, speculative, and unreliable, applying an illustrative adjustment factor of 99 percent to the valuation in the Income Approach from the Haraminac Report to account for the approximate percentage of businesses that have less than $10 million in revenue results in a figure of $555,573.[185]

## E. Uses Speculative, Arbitrary, and Unsupported Assumptions and Inputs

95. The valuation models in the Haraminac Report are flawed and unreliable because, among other reasons, they use speculative and arbitrary assumptions and inputs that are not supported by facts and data. The majority of the assumptions and inputs in the Haraminac Report are not based on actual DistroMint data. In fact, the Haraminac Report acknowledges that many

[185] $55,557,335 × (1 – 0.99) = $555,573.

of its key assumptions are not based on data from an identified source. For example, it acknowledges that "the adoption, mix, growth, and volume inputs are *reserved for finalization* once the plaintiffs' projections and operating data are produced" and "[t]he 15,000 figure is my Year 1 adoption assumption, a small fraction of the addressable market; it is *reserved for confirmation* against nChain's projections and any additional operating data produced" (emphasis added).[186] Further, the Haraminac Report does not address the extent to which DistroMint was actually developed and ready to be launched as of October 2, 2023.

96. In fact, any assumptions about DistroMint's potential revenues, costs, users, or profits would be speculative in this case because the proposed DistroMint platform had not yet been developed, launched, tested, or validated by data on actual users in the marketplace, and it had a very low probability of generating any meaningful revenues or profits, as discussed in Section IV. As discussed above in Section III.D, according to the valuation literature and commonly accepted principles and methods, valuation experts must conduct independent investigation or verification to ensure that the data and assumptions in their valuation models are accurate, reliable, and reasonable. However, the Haraminac Report does not do this, and it would be especially challenging in this case because data on DistroMint's revenues, costs, users, and profits do not exist because the platform never launched and Finnerud was not able to find investors.

97. I discuss the inputs and assumptions for each of the Income Approach, Market Approach, and Cost Approach below.

---

[186] Haraminac Report, at p. 20.

### *1. Income Approach*

98. The Income Approach in the Haraminac Report is based on a DCF model over five years, with a terminal value for years 6 and beyond.[187] The Haraminac Report uses speculative, arbitrary, and unsupported assumptions and inputs in its Income Approach that result in a flawed and overstated valuation, including but not limited to the following:

a. The assumption that DistroMint would be commercialized is speculative, unsupported, and inconsistent with the available data and factors;

b. The Haraminac Report assumes DistroMint's potential revenue would have come from two sources: (1) subscription fees, and (2) marketplace and transaction revenues.[188] Each of these revenue sources was calculated based on an assumed number of paying subscribers.[189] The assumption of 15,000 paying subscribers in Year 1 is speculative, arbitrary, and not based on any actual DistroMint or market data;

c. The three annual subscription tiers and allocations to each tier are speculative and not based on *any* actual DistroMint or market data. Further, the Haraminac Report does not justify why 90 percent of DistroMint's hypothetical subscribers would pay for a DistroMint subscription at a substantially higher price than the prices of other established platforms, and cites no evidence to suggest that subscribers would do so;

---

187 Haraminac Report, at p. 20, Schedule 5.

188 Haraminac Report, at p. 20, Schedule 5.

189 Haraminac Report, at p. 20, Schedule 5.

d. The assumption that each artist would generate, on average, $2,500 in gross NFT sales per year, is speculative and not supported by any data;

e. The assumption that DistroMint would earn 7.5 percent of NFT sales is speculative and overstated compared to documents showing potential fee ranges at lower percentages, resulting in speculative and overstated projections;

f. The assumed 30 percent margin for EBITDA for DistroMint each year, starting in Year 1, is speculative, arbitrary, unsupported, and inconsistent with data on profit margins for technology companies;

g. The valuation in the Haraminac Report is unreliable and overstated because it uses EBITDA in its DCF analysis without separately identifying taxes, capital expenditures, or changes in working capital, or explaining whether and how those items are embedded in the assumed EBITDA margin;

h. The assumption that DistroMint's number of paying subscribers would grow by 60 percent annually from Years 2 through 5 is speculative and unreliable because it is not supported by any analysis or supporting data;

i. The discount rate of 27 percent is arbitrary and not supported by any data relevant to DistroMint. Further, it is very low relative to published sources that provide discount rates for companies at the seed or idea stage, which often range from 50 percent to 85 percent; and

j. The use of a terminal value (*i.e.*, the value of cash flows assumed to occur from year five to perpetuity with an assumed growth rate) that comprises 56

percent of the total value is speculative, unreliable, and results in a substantially overstated valuation because it does not account for the high probability that DistroMint would not be commercialized and survive for at least five years, let alone indefinitely into the future.

99. I address each assumption in further detail in the sections below.

*a. Commercialization Assumption*

100. As discussed in Section V.D, the assumption in the Haraminac Report that DistroMint would have been commercialized with certainty and been a "going concern at highest and best use"[190] but for the Alleged Conduct is speculative and unsupported. The valuation literature describes a going concern as a firm assumed to continue operating and delivering cash flows in perpetuity,[191] and its "highest and best use" as the "reasonable, realistic, and objective possible uses for the [firm's assets] in the near future [that] control [its] valuation."[192]

101. The Haraminac Report does not specify any assumptions on product development to support the valuation of DistroMint as a viable and operating platform. While DistroMint was not actually launched, the Haraminac Report assumes that it would have been able to launch and gain traction starting in its first year.[193] However, the Haraminac Report does not evaluate the viability of developing DistroMint, *i.e.*, whether it could be completed and launched. By assuming that DistroMint would be commercialized and meet the revenue and profit projections in the Haraminac Report with certainty, the Haraminac Report essentially assumes a high

190 Haraminac Report, at p. 16.
191 Damodaran (2025), at PDF p. 429; Damodaran (2010), at p. 46.
192 Pratt (2008), at p. 755.
193 Haraminac Report, Schedule 5.

valuation based on speculative and arbitrary inputs and, on top of that, fails to account for the scenario in which DistroMint would not be commercialized and meet projections in the Haraminac Report. As discussed in Section IV above, DistroMint's probability of generating any meaningful revenues and profits was very low as of October 2023, so this commercialization assumption without supporting facts and data results in an unreliable and overstated valuation.

*b. Revenue Assumptions*

102. The Haraminac Report calculates revenue projections for DistroMint in the first year after launch based on three sets of assumptions:[194]

a. 15,000 total paying subscribers;

b. Three annual subscription tiers, \$9.99, \$199.00, and \$1,999.00, with 10 percent, 65 percent, and 25 percent of subscribers allocated to each tier, respectively; and

c. Each subscriber would generate, on average, \$2,500 in gross NFT sales per year, on which DistroMint would earn a 5 percent transaction fee and a 2.5 percent platform fee (for a total of 7.5 percent of NFT sales).

103. Each of the above assumptions is speculative and not supported by data on actual revenues, users, or customer demand.

---

[194] Haraminac Report, Schedule 5. In addition, the Haraminac Report states that the May 2023 DistroMint Pitch Deck was "prepared by nChain's team" and appears to rely on that document to indicate an "anticipated revenue [of DistroMint] in the \$1 to \$2 billion range." *See* Haraminac Report, at p. 19. However, documents in this case indicate that it was Finnerud and Sound Alive, rather than nChain, who developed the content of the May 2023 DistroMint Pitch Deck and sent it to nChain. *See* SA0001221-234, at 221; SA0001665, at 665.

104. First, the Haraminac Report does not explain how a proposed platform with no existing users could attract 15,000 paying subscribers in its first year. The Haraminac Report acknowledges that the 15,000 figure is "reserved for confirmation against nChain's projections and any additional operating data produced."[195] The Haraminac Report identifies no marketing efforts, acquisition channels, or conversion assumptions to describe how DistroMint would grow from zero subscribers to 15,000 paying subscribers in one year. The Haraminac Report does not provide data on any artists who have paid for, or expressed interest in using or paying for, the proposed DistroMint platform at subscription prices ranging from $9.99 to $1,999.00 per year.[196] While the Haraminac Report states that "[a]doption [is] derived from the Sony/Orchard channel and sector data, set by the expert pending the hard documents," it does not explain what the Sony/Orchard channel is or how the 15,000 figure was derived.[197] Thus, it appears the Haraminac Report does not have any basis supported by facts or data for the speculative and arbitrary figure of 15,000 paying subscribers in Year 1 – which is the starting point for the remainder of the calculations in the Income Approach.

105. Second, the assumed allocation of subscribers across pricing tiers is speculative and not based on any actual DistroMint or market data. Further, the Haraminac Report does not justify why 90 percent of DistroMint's hypothetical subscribers would pay for a DistroMint subscription at a substantially higher price than the prices of other established platforms.[198] As shown above in Table 2, the pricing for the middle and top tiers used in the Income Approach in the Haraminac Report have subscription pricing well above the pricing of the Existing

[195] Haraminac Report, at p. 20, Schedule 5.

[196] NCH0000257; Haraminac Report, Schedule 5.

[197] Haraminac Report, Schedule 5. *See also*, Haraminac Report, at p. 20.

[198] 90 percent calculated as 65 percent + 25 percent. Haraminac Report, Schedule 5.

Distribution Platforms. The Existing Distribution Platforms charge artists between $9.99 and $59.99 per year, with some offering free trials.[199] By contrast, the Haraminac Report assumes that approximately 1,500 subscribers (10 percent) would pay $9.99 per year, 9,750 (65 percent) would pay $199.00, and 3,750 (25 percent) would pay $1,999.00.[200] The Haraminac Report does not provide an explanation to support its assumption that 90 percent of the assumed paying subscribers on DistroMint would pay substantially more for a new platform with no established user base and no operating history than for the Existing Distribution Platforms with lower prices.

106. Third, the assumption that each subscriber would generate, on average, $2,500 in NFT sales per year is speculative and unsupported. The Haraminac Report provides no basis for this assumed number. It does not, for example, identify data on actual DistroMint users or users of other platforms who have generated similar dollar values in NFT sales that could even be used as a starting point for the model, let alone justify the projections in the Haraminac Report.

107. Fourth, the Haraminac Report mischaracterizes the fee arrangement reflected in produced documents, and, as a result, overstates the "Marketplace & Transaction Revenue" line item.[201] The Haraminac Report calculates DistroMint's "Marketplace & Transaction Revenue" as 7.5 percent of its assumed revenue.[202]

---

199 Table 2.

200 Haraminac Report, Schedule 5. 15,000 × 10 percent = 1,500; 15,000 × 65 percent = 9,750; 15,000 × 25 percent = 3,750.

201 Haraminac Report, Schedule 5.

202 Haraminac Report, Schedule 5. For example, as Figure 4 shows, for "Year 1," the Haraminac Report calculates the "Marketplace & Transaction Revenue" by multiplying the total assumed transactions ($37.5 million = $2,500 "Marketplace, per Subscriber per Year" × 15,000 "Year 1, Paying Subscribers") by 7.5 percent ($2,812,500 = $37.5 million × 7.5 percent).

**Figure 4: Excerpt of the Haraminac Report, Schedule 5**

| Revenue Stream | Year 1 |
|---|---|
| Paying Subscribers | 15,000 |
| Subscription Revenue | $ 9,451,485 |
| Marketplace & Transaction Revenue | $ 2,812,500 |
| **Total Revenue** | **$ 12,263,985** |

108. However, the March 2023 DistroMint Provisional Platform Price Analysis cited in the Haraminac Report[203] specifies a gross fee of 5 percent for DistroMint, with DistroMint retaining 2.1 percent and Stripe taking 2.9 percent.[204] Using a 5 percent gross fee instead of a 7.5 percent fee would result in "Marketplace & Transaction Revenue" decreasing each year by 33.3 percent.[205]

109. Further, even the March 2023 DistroMint Provisional Platform Price Analysis cited in the Haraminac Report cautioned that while "2.5% is a reasonable platform fee from DistroMint's perspective... [that] does not imply it is the commercially correct fee if competitors are at zero."[206] In other words, the March 2023 DistroMint Provisional Platform Price Analysis acknowledged there was uncertainty as to whether a 5 percent fee would be commercially viable, let alone the 7.5 percent fee assumed in the Haraminac Report.

203 Haraminac Report, Schedule 5.

204 NCH0004459-462, at 459, 461. See the "User view" column. For example, for the "Anchored" row, the document notes that a "[l]ogical price anchor would be optional royalty + 5% + 30c fee... [which] would imply that the platform fee would be 2.1%... in order to cover our payment processing costs [of 2.9%]."

205 For example, in Year 1, "Marketplace & Transaction Revenue" would be \$1.875 million rather than \$2.8125 million. \$2.8125 / 7.5 percent × 5.0 percent = \$1.8750 million. (\$2.8125 - \$1.8750 million) / \$2.8125 = 33.3 percent.

206 NCH0004459-462, at 461.

### c. *Profitability Assumptions*

110. EBITDA, an approximate measure of cash flows from operations, is a widely used metric in valuation.[207] The Haraminac Report assumes a 30 percent EBITDA margin for DistroMint each year, starting in Year 1, without providing any source.[208] This 30 percent EBITDA margin is speculative, unsupported, and inconsistent with data on profit margins for technology companies.

111. According to valuation literature, even "young companies in a very high growth phase may be expected to have negative cash flow *for years*" (emphasis added).[209] Data on company initial public offerings ("IPOs") compiled by Professor Jay Ritter show that, in recent years, the majority of technology companies that go public are not profitable at the time they go public, which is often after *several years of operating*.[210] This is because companies that reach the IPO stage generally must be able to present a developed business with audited financial statements and disclosures that satisfy applicable listing requirements.[211] Accordingly, these companies are at a substantially later stage than DistroMint was in October 2023. Among technology companies that *went public* in 2023, the median time from founding to IPO was six

---

[207] Damodaran (2025), at PDF p. 538.

[208] Haraminac Report, at p. 20, Schedule 5.

[209] Pratt (2008), at p. 276.

[210] Ritter, Jay R., "Initial Public Offerings: Updated Statistics," Warrington College of Business, University of Florida, June 18, 2026, at Table 4.a, available at https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf.

[211] "Going Public," U.S. Securities and Exchange Commission, September 3, 2024, available at https://www.sec.gov/resources-small-businesses/going-public (accessed July 24, 2026) ("If you decide to conduct a registered public offering, the Securities Act requires your company to file a registration statement with the SEC before it may offer its securities for sale."); "Staff Observations in the Review of Smaller Reporting Company IPOs," U.S. Securities and Exchange Commission, March 4, 2009, available at https://www.sec.gov/divisions/corpfin/guidance/cfsmallcompanyregistration.htm (accessed July 24, 2026) ("Item 101 of Regulation S-K requires a company to describe its business development during the last three years.").

years, and only 33 percent of those companies were profitable at the time of their IPOs.[212] Among technology companies that went public from 2018 through 2022, the median time from founding to IPO (measured for the companies that went public in each year) ranged from 11 to 15 years, and only 15 percent to 33 percent were profitable at the time of their IPOs.[213]

112. Believe SA, which the Haraminac Report claims was comparable to DistroMint in its Market Approach,[214] generated $801.4 million in revenue in FY 2022 and $952.2 million in revenue in FY 2023,[215] and had EBITDA margins of around 5 percent (4.6 percent in FY 2022 and 5.7 percent in FY 2023).[216] While Believe SA is not comparable to DistroMint for the reasons discussed in Section V.E.2, even as an illustrative calculation, reducing DistroMint's EBITDA margin to 5 percent rather than 30 percent would result in reducing the valuation in the Income Approach in the Haraminac Report by 83.3 percent.[217]

113. In addition to being speculative and unsupported, the assumption in the Haraminac Report of a 30 percent EBITDA margin in Year 1 for DistroMint, a platform that had not yet launched or earned any revenue, is very unlikely, considering only 15 to 33 percent of

---

212 Ritter, Jay R., "Initial Public Offerings: Updated Statistics," Warrington College of Business, University of Florida, June 18, 2026, at Table 4.a, available at https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf.

213 Ritter, Jay R., "Initial Public Offerings: Updated Statistics," Warrington College of Business, University of Florida, June 18, 2026, at Table 4.a, available at https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf.

214 Haraminac Report, at p. 19, Schedule 4.

215 Believe SA, "FY'23 Organic Growth of 14.4% with Growth Recovery in Q4, as Expected; Strong Profitability Improvement and Free Cash Flow Close to Breakeven; 2024 Outlook: Another Step Towards Long-Term Objective," March 13, 2024, available at https://www.believe.com/wp-content/uploads/2026/01/2024-03-13-Believe-FY-2023-earnings-US-3.pdf ("Believe SA 2023 Financials"), at p. 2. Believe SA's FY 2022 revenue was €760.8 million, or approximately $801.4 million, and its FY 2023 revenue was €880.3 million, or approximately $952.2 million. The amounts were converted to U.S. dollars using the respective average annual U.S.-dollar-per-euro spot exchange rates published by the Federal Reserve: €760.8 million × 1.05 = $801.4 million and €880.3 million × 1.08 = $952.2 million (figures may not tie due to rounding). *See* "U.S. Dollars to Euro Spot Exchange Rate," Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/AEXUSEU (accessed July 22, 2026).

216 Believe SA 2023 Financials, at p. 2.

217 The EBITDA margin is the same in each year, so a reduction in the EBITDA margin scales the valuation by the same amount. (30 percent – 5 percent) / 30 percent = 83.3 percent.

technology companies at the IPO stage are profitable.[218] Further, the Haraminac Report does not account for the scenario in which DistroMint fails to cover its platform costs and has negative cash flows. Even the March 2023 DistroMint Provisional Platform Price Analysis relied on by the Haraminac Report[219] acknowledges that "it is very expensive to absorb the fiat payment processing fees" and "[a]t low volumes the platform will burn the costs described above irrespective of the platform fee."[220]

#### d. *Use of EBITDA Without Separately Identifying Taxes, Capital Expenditures, and Changes in Working Capital*

114. The Haraminac Report uses EBITDA in its DCF analysis without separately identifying taxes, capital expenditures, and changes in working capital, or explaining whether and how those items are embedded in the assumed EBITDA margin.[221] This is contrary to a standard DCF analysis, in which FCF of the subject firm is calculated on an after-tax basis and is reduced by reinvestment needs, including capital expenditures and changes in working capital.[222] By not separately identifying taxes, capital expenditures, and changes in working capital, the Haraminac Report is missing key factors that would impact the valuation, such as the presumed taxes the proposed platform would pay on the profits presumed by the Haraminac Report and the presumed capital expenses required to build and maintain the proposed platform. The valuation

---

218 Ritter, Jay R., "Initial Public Offerings: Updated Statistics," Warrington College of Business, University of Florida, June 18, 2026, at Table 4.a, available at https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf.

219 Haraminac Report, Schedule 5.

220 NCH0004459-462, at 460-461.

221 Haraminac Report, at p. 20, Schedule 5.

222 FCF = EBITDA – EBIT(t) − Capital Expenditure – Change in Working Capital, where EBIT(t) represents Taxes on Operating Income, calculated as Earnings Before Interest and Tax ("EBIT"), multiplied by Tax Rate ("t"). *See* Damodaran (2025), at PDF pp. 359, 539, Table 15.1.

in the Haraminac Report is unreliable and overstated because it uses EBITDA in its DCF analysis without separately identifying taxes, capital expenditures, or changes in working capital.

*e. Growth Assumptions*

115. The Haraminac Report assumes that DistroMint's number of paying subscribers would grow at 60 percent annually from Years 2 through 5.[223] However, the Haraminac Report does not provide any historical data on user growth, artist adoption, or subscriber conversion against which such a growth rate could be tested and validated – from actual or potential users of DistroMint itself or any other companies or platforms. For the reasons discussed throughout this report, including those discussed in Section IV, assuming a 60 percent growth rate for four additional years after the assumed starting point of 15,000 users is speculative and inconsistent with contemporaneous market conditions. The projections in the Haraminac Report are based on an arbitrary and unsupported starting point and growth rate, rather than actual data, so they are speculative and unreliable.

*f. Discount Rate Assumptions*

116. The Haraminac Report uses a discount rate of 27 percent,[224] without citing any data or research to support this assumption. In describing its assumptions, the Haraminac Report notes that "[t]he discount rate reflects an institutionally backed venture in an unsaturated, growing market and demand for release-linked music NFTs more durable than purely art-based NFTs; the adoption, mix, growth, and volume inputs are reserved for finalization once the

---

[223] Haraminac Report, at p. 20, Schedule 5.

[224] Haraminac Report, at p. 20, Schedule 5.

plaintiffs' projections and operating data are produced."[225] However, the Haraminac Report does not provide any source indicating that 27 percent would be the appropriate discount rate, and it does not explain why a 27 percent discount rate is appropriate for DistroMint, despite its prelaunch status, lack of revenue, lack of users, and other factors discussed throughout this report.

117. The 27 percent discount rate is very low relative to published sources that provide discount rates for companies at the seed or idea stage. For example, PwC's startup valuation guidance states that discount rates for startups differ from traditional estimation and presents selected ranges for discount rates for seed/idea-stage companies from 50 percent to 85 percent, citing five different sources from valuation literature.[226]

118. Using a higher and more appropriate discount rate would result in a lower valuation, as discussed above in Section III.E.2. Thus, the use of a lower discount rate than those suggested by published sources results in an overstated valuation in the Haraminac Report.

*g. Terminal Value Assumptions*

119. The terminal value in the Haraminac Report assumes that DistroMint is commercialized, survives at least five years (growing at 60 percent each year), reaches a stabilized operating state in Year 5, and continues to grow at a 3 percent growth rate per year

[225] Haraminac Report, at p. 20, Schedule 5.

[226] "PwC Deals insights: How to value a start-up business," PwC Estonia, available at https://www.pwc.com/ee/en/services/transaction-services/pwc-deals-insights--how-to-value-a-start-up-business.html (accessed June 26, 2026).

indefinitely after that.[227] The terminal value accounts for 56 percent of the total value from the Income Approach.[228]

120. The terminal value in the Haraminac Report is speculative, unreliable, and results in a substantially overstated valuation because it does not account for the high probability that DistroMint would not be commercialized and survive for at least five years and indefinitely into the future. Rather, it assumes that DistroMint (which had not yet launched and had a very low probability of generating any meaningful revenues and profits even if it did launch, as discussed in Sections III and IV) would survive for at least five years, reach a normalized, sustainable level of operations by Year 5, and would continue growing at a 3 percent rate indefinitely into the future forever.[229]

121. The assumption in the Haraminac Report that DistroMint would reach this terminal state is highly unlikely. For example, as discussed above in Sections III and IV, the majority of companies across all industries do not survive beyond five years, data indicate that only about 1.3 percent of companies generate more than $10 million in annual revenues, and DistroMint faced additional challenges and risks. While the Income Approach in the Haraminac Report is flawed, unreliable, and overstated for the other reasons discussed throughout this report, removing the terminal value alone would reduce the valuation of the Income Approach by 44 percent.[230] The use of a terminal value that comprises 56 percent of the total value results in a substantially overstated valuation because it does not account for the high probability that

---

227 Haraminac Report, at p. 20, Schedule 5.

228 Calculated as present value of terminal value divided by total indicated value: $31.3 million / $55.6 million = 56.4 percent. *See* Haraminac Report, Schedule 5.

229 Haraminac Report, at p. 20, Schedule 5.

230 Calculated as 1 – 56.4 percent = 43.6 percent, where 56.4 percent is calculated as the present value of terminal value divided by total indicated value in the Haraminac Report ($31.3 million / $55.6 million = 56.4 percent). *See* Haraminac Report, Schedule 5.

DistroMint would not be commercialized and survive for at least five years and indefinitely into the future.

### 2. *Market Approach*

122. The Market Approach in the Haraminac Report uses data on the claimed "Enterprise Value" and "Annual Revenue" of three companies that the Haraminac Report deems comparable to DistroMint: Believe SA, OpenSea, and DistroKid.[231] It calculates an "EV/Revenue" multiple as the claimed enterprise value divided by the claimed annual revenue for each company, and it calculates the average from the three companies to be 4.68.[232] The Haraminac Report multiplies this figure of 4.68 by its own projections of DistroMint's revenue in Year 3 of $31,395,802 derived from the Income Approach in the Haraminac Report.[233] The Haraminac Report calculates an "[i]ndicated enterprise value (forward)" or "forward enterprise value" of $146,844,223.[234]

123. The Haraminac Report then applies three discounts to its forward enterprise value. First, the Haraminac Report discounts to present value over three years at the claimed "27% required return used in the income approach," yielding a result of $71,687,874.[235] Second, the Haraminac Report discounts the valuation by 25 percent "because DistroMint is materially smaller and earlier in its life than the mature comparables," yielding a result of $53,765,906.[236]

---

231 Haraminac Report, at p. 19, Schedule 4. The Haraminac Report includes additional information on four other companies it classifies as "Other Peers, not included in Comps" and Asset Layer, but it does not factor this information into its calculations in the Market Approach.

232 Haraminac Report, at p. 19, Schedule 4.

233 Haraminac Report, at p. 19, Schedule 4.

234 Haraminac Report, at p. 19, Schedule 4.

235 Haraminac Report, at p. 19, Schedule 4.

236 Haraminac Report, at p. 19, Schedule 4.

Third, the Haraminac Report reduces the valuation by 30 percent "for the marketability of a private, illiquid interest," resulting in a valuation of $37,636,134.[237]

124. The Haraminac Report uses flawed and improper assumptions and inputs in its Market Approach that result in an unreliable and overstated valuation, including:

a. Improperly uses companies that are not comparable to DistroMint; they are, among other things, much more established than and different from DistroMint, resulting in an unreliable, arbitrary, and overstated valuation;

b. Uses incorrect and inconsistent data to calculate its valuation multiples, resulting in an unreliable valuation;

c. Provides a wide range of results for multiples, indicating that none of them may be reliable for DistroMint;

d. Relies on flawed, overstated, and unreliable results from its own Income Approach, resulting in a flawed, overstated, and unreliable valuation; and

e. Uses arbitrary and unsupported adjustments of 25 percent and 30 percent, resulting in a flawed and unreliable valuation.

*a. Improperly Uses Companies that are Not Comparable to DistroMint*

125. As discussed above in Section III.E.1, valuation literature notes that comparables used in a Market Approach should be similar to the target company in characteristics such as the stage of development, operating history, financial profile, growth prospects, and risk. However,

[237] Haraminac Report, at p. 19, Schedule 4.

the three companies the Haraminac Report uses in its Market Approach are not comparable to DistroMint along these dimensions for at least two reasons.

126. First, the three companies used in the Market Approach in the Haraminac Report are not comparable to DistroMint because they were much more established as of the valuation date in the Haraminac Report[238] – they had established businesses with years of operating history and usage:

a. OpenSea was founded in 2017.[239] It was accepted into Y Combinator—one of the most selective and prestigious startup incubators in the world—in July 2018 and raised $2.1 million in venture capital funding in November 2019.[240] By March 2020, it had $1.1 million in monthly transactions and 4,000 active users.[241] Its peak monthly trade volume was over $5 billion in January 2022.[242]

b. TuneCore was founded in or around 2005 and acquired by Believe SA in 2015.[243] Prior to its acquisition, TuneCore had surpassed $500 million in

[238] In principle, an appropriate adjustment could be made to account for these factors; however, as discussed below, the adjustments in the Haraminac Report are arbitrary and do not appropriately account for the differences between DistroMint and the other companies.

[239] "OpenSea," Y Combinator, available at https://www.ycombinator.com/companies/opensea (accessed June 26, 2026).

[240] "How OpenSea Dominated the NFT Space — A Growth Case Study!," Medium, April 21, 2025, available at https://medium.com/thecapital/how-opensea-dominates-the-nft-space-case-study-0f723545e063 (accessed June 23, 2026).

[241] "How OpenSea Dominated the NFT Space — A Growth Case Study!," Medium, April 21, 2025, available at https://medium.com/thecapital/how-opensea-dominates-the-nft-space-case-study-0f723545e063 (accessed June 23, 2026).

[242] Park, Danny, "OpenSea hits highest monthly users since 2023 as OS2 exits beta; trading volume remains well below previous highs," The Block, June 9, 2025, available at https://www.theblock.co/post/357409/opensea-hits-highest-monthly-users-since-2023-as-os2-exits-beta-trading-volume-remains-well-below-previous-highs (accessed June 26, 2026).

[243] "TuneCore Overview," PitchBook, available at https://pitchbook.com/profiles/company/53438-41#funding (accessed June 26, 2026).

artist earnings from streaming,[244] and had started to develop its own publishing service for artists within its first seven years in business.[245]

c. DistroKid, founded in 2013, "publishes music in a range of stores and streaming applications […] enabling artists to earn royalties every time other people use their music"[246] As of 2023, it was "used by over two million artists and distribute[d] about 30-40% of all new music in the world," and it had acquired other companies.[247]

127. Second, these three companies are different from DistroMint because their revenues are derived from a broader set of products and services that target larger total addressable markets – they are not derived from combining the two features the proposed DistroMint platform planned to offer – a marketplace for music-related NFTs and a music distribution function.[248] By contrast, OpenSea offers NFTs for "digital art, collectibles, domain names, virtual worlds, and more,"[249] while DistroMint's target audience was music artists, collectors, and fans only. Further, while (according to the Haraminac Report)[250] the majority of DistroMint's potential revenues would have been in the form of subscription revenues with

244 "TuneCore Artists Earn over $134 Million in 2014 from 7.5 Billion in Downloads and Streams," PR Newswire, January 27, 2015, available at https://www.prnewswire.com/news-releases/tunecore-artists-earn-over-134-million-in-2014-from-75-billion-in-downloads-and-streams-300025839.html (accessed June 26, 2026).

245 "About TuneCore," TuneCore, available at https://www.tunecore.com/what-is-tunecore (accessed June 26, 2026).

246 "DistroKid Overview", PitchBook, available at https://pitchbook.com/profiles/company/229479-13#overview (accessed June 26, 2026).

247 Forristal, Lauren, "DistroKid acquires website builder Bandzoogle to expand its toolset for artists," TechCrunch, September 14, 2023, available at https://techcrunch.com/2023/09/14/distrokid-acquires-website-builder-bandzoogle-to-expand-its-toolset-for-artists/ (accessed June 26, 2026).

248 *See* Section IV.A.

249 "How OpenSea Dominated the NFT Space — A Growth Case Study!," Medium, April 21, 2025, available at https://medium.com/thecapital/how-opensea-dominates-the-nft-space-case-study-0f723545e063 (accessed June 23, 2026).

250 Haraminac Report, Schedule 5.

higher prices than other platforms, OpenSea generates revenue from a transaction-based commission (2.5 percent per transaction as of around October 2023).[251]

128. TuneCore and DistroKid were different from DistroMint because they targeted a broad set of users, rather than a narrower group of users interested in transacting through an NFT-enabled marketplace.[252] Thus, as discussed above in Sections IV.B and IV.C, the total addressable market for TuneCore and DistroKid includes all music artists, not just those interested in NFTs, which is larger than the total addressable market for DistroMint.

129. Even the Haraminac Report recognizes the lack of comparability by noting that "DistroKid's higher multiple reflects scale, margin, and maturity that DistroMint does not yet share."[253] The Haraminac Report improperly uses companies that are not comparable to DistroMint; they are, among other things, much more established than and different from DistroMint, resulting in an unreliable, arbitrary, and overstated valuation.

*b. Uses Incorrect and Inconsistent Data to Calculate its Valuation Multiples*

130. For each of the three companies used as comparables, the multiple that the Haraminac Report derives is based on inputs that are unsupported, internally inconsistent, or contradicted by the sources used in the Haraminac Report. The use of incorrect and inconsistent

[251] "How OpenSea Dominated the NFT Space — A Growth Case Study!," Medium, April 21, 2025, available at https://medium.com/thecapital/how-opensea-dominates-the-nft-space-case-study-0f723545e063 (accessed June 23, 2026); "OpenSea Fees," OpenSea Docs, September 25, 2023, available at https://docs.opensea.io/changelog/opensea-fees (accessed July 22, 2026).

[252] "About TuneCore," TuneCore, available at https://www.tunecore.com/what-is-tunecore (accessed June 26, 2026); DistroKid, "Share Your Music with the World," DistroKid, available at https://distrokid.com (accessed June 25, 2026).

[253] Haraminac Report, Schedule 4.

data to calculate its valuation multiples results in an unreliable valuation even if these were appropriate comparators, which they are not for the reasons stated above.

131. OpenSea: The valuation multiple for OpenSea in the Haraminac Report is flawed and unreliable for at least two reasons. First, the $1.5 billion revenue figure does not appear to represent OpenSea's actual revenues in any known year.[254] The Haraminac Report does not provide a citation showing this figure,[255] and I am not aware of any sources indicating that OpenSea's revenue was actually $1.5 billion in any year. Second, the method of using OpenSea's revenue and enterprise value is flawed and unreliable in this case because the volatility of OpenSea's enterprise value over time indicates that the approach of using multiples for OpenSea can produce a wide range of results depending on the sources used and when the data are measured. According to the source the Haraminac Report appears to use for OpenSea's enterprise value, OpenSea's valuation changed substantially in April 2023.[256] An April 2023 article from one of OpenSea's investors, Tiger Global, indicates that OpenSea's valuation had been $13 billion "at the height of NFT mania last year" but was reduced by 76 percent to $3 billion.[257] The Haraminac Report does not address whether or how its valuation multiple would have changed depending on when the enterprise value and revenue were measured, and how this would impact the purported valuation multiple. Without knowing when the alleged $1.5 billion revenues occurred, it is not clear whether the Haraminac Report uses the appropriate measure of

254 Haraminac Report, Schedule 4.

255 Haraminac Report, Schedule 4.

256 Haraminac Report, Schedule 4; Craig, Tim, "'OpenSea is in big trouble' as Tiger Global cuts valuation by 76%," DLNews, April 25, 2023, available at https://www.dlnews.com/articles/web3/opensea-valuation-slashed-76-by-tiger-global/ (accessed June 22, 2026).

257 Craig, Tim, "'OpenSea is in big trouble' as Tiger Global cuts valuation by 76%," DLNews, April 25, 2023, available at https://www.dlnews.com/articles/web3/opensea-valuation-slashed-76-by-tiger-global/ (accessed June 22, 2026).

revenues or valuation. Further, according to the data source cited by the March 2023 DistroMint Provisional Platform Price Analysis and the Haraminac Report,[258] OpenSea's monthly revenue ranged from $2 to $3 million as of around October 2023,[259] which would imply annual revenue of approximately $30 million ($2.5 million × 12) – substantially lower than $1.5 billion. Using a figure of only $30 million in revenue rather than $1.5 billion would result in a significantly different valuation multiple, thereby undermining the reliability of this method in this case.

132. TuneCore: The valuation multiple for TuneCore in the Haraminac Report is flawed and unreliable for at least two reasons. First, it does not actually use data from TuneCore, the music distribution platform. Rather, it uses valuation and revenue data from Believe SA, the parent company of TuneCore,[260] which generates over 94 percent of its revenue from businesses other than TuneCore.[261] Believe SA describes itself as "one of the world's leading digital music companies," noting that its "team of digital music experts around the world leverages the Group's global technology platform to advise artists and labels, distribute and promote their music. Its 1,919 employees in more than 50 countries aim to support independent artists and labels with a unique digital expertise, respect, fairness and transparency."[262] Because the valuation multiple is derived primarily from revenues that are not in the same business segment

---

258 "OpenSea," Dune, available at https://dune.com/rchen8/opensea (accessed June 26, 2026). This data source is cited by nChain in NCH0004459-462, at 459 and listed in the Haraminac Report, Appendix A.

259 "OpenSea," Dune, available at https://dune.com/rchen8/opensea (accessed June 26, 2026).

260 Haraminac Report, at p. 19, Schedule 4.

261 According to Believe SA's FY 2023 financial filings, the Automated Solutions segment, which includes TuneCore, accounted for only approximately six percent of Believe SA's revenue (6.3 percent = €55.2 million / €880.3 million). Believe SA 2023 Financials, at pp. 2, 4. The Automated Solutions segment reported revenues of €55.2 million, or approximately $59.7 million. Converted to U.S. dollars according to the annual U.S.-dollar-per-euro average spot exchange rate (annual frequency) in 2023 published by the Federal Reserve: €55.2 million × 1.08 = $59.7 million (figure may not tie due to rounding). *See* "U.S. Dollars to Euro Spot Exchange Rate," Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/AEXUSEU (accessed July 22, 2026).

262 Believe SA 2023 Financials, at p. 11.

as the purportedly comparable TuneCore music distribution platform, it is flawed and unreliable to use for DistroMint in this case.

133. Second, the valuation multiple for Believe SA in the Haraminac Report is flawed and unreliable because it uses two inputs that are measured at different points in time, so it is not internally consistent. The reported revenue appears to be from FY 2023. Believe SA's FY 2023 revenue was €880.3 million, which would convert to approximately $952.2 million.[263] The $1.93 billion enterprise value in the Haraminac Report appears to be based on Believe SA's market capitalization as of its 2021 IPO, which was reported as 1.9 billion euros.[264] Setting aside the fact that the Haraminac Report would be unreliable if it used inconsistent metrics in different currencies (a revenue figure in dollars and a valuation figure in euros), it appears to have used a valuation from over two years before October 2023 from a different fundraising environment when conditions were more favorable,[265] so, all else equal, its use results in an overstated valuation multiple.

134. DistroKid: The valuation multiple for DistroKid in the Haraminac Report is flawed and unreliable for at least two reasons. First, the figure of $130 million used as DistroKid's revenue does not actually represent revenue in the source cited by the Haraminac Report.[266] Rather, the $130 million figure pertains to a hypothetical scenario of investment,

---

[263] Haraminac Report, Schedule 4; Believe SA 2023 Financials, at p. 2. Believe SA's FY 2023 revenue was €880.3 million, or approximately $952.2 million. Converted to U.S. dollars according to the annual U.S.-dollar-per-euro average spot exchange rate (annual frequency) in 2023 published by the Federal Reserve: €880.3 million × 1.08 = $952.2 million. *See* "U.S. Dollars to Euro Spot Exchange Rate," Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/AEXUSEU (accessed July 22, 2026).

[264] Haraminac Report, Schedule 4; Believe, "Successful Initial Public Offering of Believe on Euronext Paris," Believe, June 9, 2021, available at https://www.believe.com/press-release/successful-initial-public-offering-of-believe-on-euronext-paris/ (accessed June 26, 2026).

[265] *See* Section IV.F; Figure 2.

[266] Haraminac Report, Schedule 4.

hypothesizing that "DistroKid would hit a $1.3 billion valuation if 10% of it was sold for $130 million."[267] Second, while DistroKid was valued at $1.3 billion,[268] this valuation was in August 2021, over two years before the valuation date of October 2023 in a different fundraising environment when conditions were more favorable,[269] so, all else equal, its use results in an overstated valuation multiple.

135. In summary, the multiples used in the Market Approach in the Haraminac Report are (1) 2.0316 for Believe SA (based on enterprise value and revenue from inconsistent time periods for a larger parent company which is only at most six percent related to the alleged comparable company, TuneCore), (2) 2.0 for OpenSea (based on an unverified revenue figure from an undisclosed year and an enterprise value that changed significantly in 2023), and (3) 10.0 for DistroKid (based on an incorrect $130 million revenue figure).[270]

*c. Provides a Wide Range of Results for Multiples, Indicating that None of Them May be Reliable for DistroMint*

136. The Haraminac Report averages the multiples from the three different companies to produce a multiple of 4.6772.[271]

137. The wide range of results from 2.0 to 10.0 indicates that the multiples are inconsistent across the three companies, which is a signal that none of them may be reliable as a

[267] "DistroKid Valued at $1.3 Billion After Funding from Twitter Investor Insight Partners," August 16, 2021, available at https://www.musicbusinessworldwide.com/distrokid-valued-at-1-3-billion-after-investment-from-insight-partners/ (accessed June 26, 2026).

[268] "DistroKid Valued at $1.3 Billion After Funding from Twitter Investor Insight Partners," August 16, 2021, available at https://www.musicbusinessworldwide.com/distrokid-valued-at-1-3-billion-after-investment-from-insight-partners/ (accessed June 26, 2026) (citing only $1.3 billion valuation by Insight Partners).

[269] *See* Section IV.F; Figure 2.

[270] Haraminac Report, Schedule 4.

[271] Haraminac Report, Schedule 4.

valuation multiple that could be applied to a different company. Even leaving aside all the other errors and flaws in the Market Approach in the Haraminac Report, the result is highly sensitive to the selected multiple. For example, if one were to use a multiple of 2.0 rather than 4.6772 as an illustrative example, the overall valuation in the Market Approach in the Haraminac Report would be reduced by more than 50%.[272]

#### d. *Relies on Flawed, Overstated, and Unreliable Results From its Own Income Approach*

138. The Market Approach in the Haraminac Report is flawed and unreliable because it relies on its own projected value of $31,395,802 for DistroMint's Year 3 revenue and its own discount rate of 27 percent from its Income Approach.[273] As discussed above in Section V.E.1, the Income Approach in the Haraminac Report is flawed, overstated, and unreliable. Because the Market Approach uses flawed, overstated, and unreliable results from the Income Approach, it produces flawed, overstated, and unreliable results.

139. In addition, by applying multiples from established companies to DistroMint's Year 3 revenue, the Haraminac Report implicitly assumes that DistroMint would grow from a pre-revenue company to an established company with significant revenues by its third year with certainty. As discussed above, the Haraminac Report offers no support for that assumption, and it is inconsistent with the data and analysis described above in Section IV that DistroMint's probability of being commercialized, much less generating any meaningful revenues and profits, was very low.

---

[272] $37,636,134 / 4.6772 × 2.0 = $16,093,447.

[273] Haraminac Report, at p. 19, Schedules 4-5.

#### *e. Uses Arbitrary and Unsupported Adjustments of 25 Percent and 30 Percent*

140. In its Market Approach, the Haraminac Report applies a discount factor of 25 percent for "size and stage adjustment" "because DistroMint is materially smaller and earlier in its life than the mature comparables" and assumes a 30 percent discount for lack of marketability ("DLOM"), both of which are arbitrary and unsupported.[274] The Haraminac Report does not provide a citation or an analysis supporting the arbitrary 25 percent adjustment or the 30 percent DLOM. The Haraminac Report does not explain how these adjustments are sufficient to account for the differences between DistroMint and the companies used in its Market Approach.

141. As discussed above, the later stage companies used in the Market Approach are not appropriate comparisons, so they do not represent meaningful starting points. An industry article discussing DLOM notes that "[a] discount for lack of marketability (DLOM) is applied when assets are being valued, specifically relating to private companies that aren't traded on public exchanges and are therefore difficult to sell."[275] It notes that "restricted stock studies suggest a discount of around 20-35%, while pre-IPO studies suggest a discount ranging from about 40-60%."[276] It further notes that "discounts can vary significantly… [and certain] studies have observed discounts as high as 90%. This emphasi[z]es the importance of considering company-specific factors when determining applicable discounts."[277] DistroMint is a pre-revenue

274 Haraminac Report, at p. 19, Schedule 4.

275 Arthur, Rob, and Yudmila Adaya, "When to apply a discount for lack of marketability," Grant Thornton, April 4, 2024, available at https://www.grantthornton.co.uk/insights/when-to-apply-a-discount-for-lack-of-marketability/ (accessed June 26, 2026).

276 Arthur, Rob, and Yudmila Adaya, "When to apply a discount for lack of marketability," Grant Thornton, April 4, 2024, available at https://www.grantthornton.co.uk/insights/when-to-apply-a-discount-for-lack-of-marketability/ (accessed June 26, 2026).

277 Arthur, Rob, and Yudmila Adaya, "When to apply a discount for lack of marketability," Grant Thornton, April 4, 2024, available at https://www.grantthornton.co.uk/insights/when-to-apply-a-discount-for-lack-of-marketability/ (accessed June 26, 2026).

company, even earlier than a pre-IPO company, so if one were to apply a DLOM, it would likely be higher than the range from pre-IPO companies of 40 to 60 percent – notably higher than the 30 percent discount used in the Haraminac Report. A higher DLOM would result in a lower valuation, so, due to the low DLOM of 30 percent, the valuation in the Market Approach in the Haraminac Report is overstated.

### *3. Cost Approach*

142. The Cost Approach in the Haraminac Report purports to estimate the replacement cost of building the full reproduction of DistroMint's functionality.[278] It assumes twenty-seven full-time employees working over the eleven-month build at costs ranging between $10,000 to $20,000 per month, as well as additional costs associated with software licenses, summing to a replacement cost of $5,361,800.[279] The Haraminac Report then adds a separate cost it refers to as a re-platforming component "[b]ecause Bitcoin SV ceased to be viable after its key personnel departed, recreating a functioning DistroMint platform require[d] an additional outlay on the order of $1,870,000 to re-platform the on-chain layer, replace the wallet and custody layer controlled by an nChain affiliate and the minting layer that is an nChain investment target, re-audit the rebuilt systems, and migrate the data."[280] The Haraminac Report adds this re-platforming cost to the $5,361,800 replacement cost, resulting in a total "Cost to Recreate" of $7,231,800.[281]

278 Haraminac Report, at p. 20.
279 Haraminac Report, at pp. 20-21, Schedule 3.
280 Haraminac Report, at p. 21, Schedule 3.
281 Haraminac Report, at p. 21, Schedule 3.

143. The Cost Approach used in the Haraminac Report is flawed for multiple reasons, including but not limited to the following. The Haraminac Report:

a. Improperly disregards nChain's actual reported costs and instead uses arbitrary, speculative, and overstated numbers without sources;

b. Inappropriately includes costs to develop functionality that had not been implemented, resulting in a speculative and overstated valuation;

c. Does not identify how value is created from the purported development costs; and

d. Fails to account for the lack of interest from potential investors or buyers, resulting in an overstated valuation.

*a. Improperly Disregards nChain's Actual Reported Costs and Instead Uses Arbitrary, Speculative, and Overstated Numbers Without Sources*

144. The Haraminac Report improperly disregards nChain's actual reported costs to develop the proposed DistroMint platform and instead uses arbitrary, speculative, and overstated numbers without sources. A document nChain sent to Finnerud in 2023 indicates that actual development costs associated with DistroMint were approximately $675,000, including: $514,000 for nChain's software and website development services, $15,000 in patent application fees on behalf of the project, and $150,000 for Finnerud's consulting services.[282] Additionally, some documents suggest that Finnerud paid the AWS hosting fees, which were estimated to be

[282] NCH0001867-870, at 868-869.

$650 per month.[283] These expenses suggest that the Cost Approach should amount to around $675,000, rather than the $7.2 million figure proposed in the Haraminac Report.[284]

145. However, the Haraminac Report improperly disregards the actual data and instead appears to assume that 27 people would have been required to work full-time for 11 months at monthly rates ranging from $10,000 to $20,000,[285] as well as additional expenses discussed above. All of the information included appears to be speculative and without any supporting data or analysis. For example, the Haraminac Report does not specify any development roadmap, technical requirements, staffing plan, or comparable development costs to support the assumptions of the number of employees, the types of employees, the types of expenses, or cost metrics for each expense in her Cost Approach.

146. In fact, the Haraminac Report acknowledges that "[l]abor headcount, duration, rates, and third-party amounts are stated inputs reserved for confirmation against nChain's build records."[286] While the Haraminac Report claims that the Cost Approach "indicates a floor,"[287] the total value in the Cost Approach of $7.2 million is over ten times greater than the actual expenses of approximately $675,000, indicating it is overstated and unreliable.[288]

283 NCH0000281-284, at 281.

284 Haraminac Report, at p. 21, Schedule 3.

285 Haraminac Report, at p. 21, Schedule 3.

286 Haraminac Report, at p. 21.

287 Haraminac Report, at p. 20.

288 Calculation: $7,231,800 / $675,000 = 10.7. Haraminac Report, Schedule 3.

*b. Inappropriately Includes Costs to Develop Functionality that Had Not Been Implemented*

147. The Haraminac Report claims that the Cost Approach "builds the full reproduction of the platform's functionality,"[289] but ignores the fact that the proposed DistroMint platform was not ready to launch as of October 2023. The assumed development costs by the Haraminac Report therefore reflect a hypothetical future product with additional functionality beyond what had been developed. Accordingly, the Cost Approach has flaws similar to the Income Approach in that it improperly assumes product development and commercialization, rather than measuring the value of the proposed DistroMint platform as it existed as of October 2023. As discussed in Section III.E.3, the Cost Approach is meant to develop technology that replicates or replaces the existing assets, not build new technology that serves a different purpose and has not yet been developed.

*c. Does Not Identify How Value is Created From the Purported Development Costs*

148. As discussed above in Section III.E.3, valuation literature notes that "the [Cost Approach] has the crucial conceptual weakness that it does not really appraise the future benefits arising from the asset…. The underlying assumption that costs create value is very problematic in this context."[290] The Haraminac Report itself claims that the Cost Approach "indicates a floor rather than a going-concern value,"[291] and it does not explain or justify how the purported development costs of $7.2 million would provide a reliable basis for a valuation of DistroMint or DistroMint, LLC. Because it does not identify how value is created from the purported

---

289 Haraminac Report, at p. 20.

290 Wirtz, Harald, "Valuation of Intellectual Property: A Review of Approaches and Methods," *International Journal of Business and Management*, Vol. 7, No. 9 (2012), 40-48, at p. 41.

291 Haraminac Report, at p. 20.

development costs, the Haraminac Report fails to establish that its purported development costs are an appropriate measure for the valuation of DistroMint or DistroMint, LLC.

#### d. *Fails to Account for the Lack of Interest from Potential Investors or Buyers, Resulting in an Overstated Valuation*

149. As discussed in Section IV.G.3, nChain's decision to discontinue funding the development of DistroMint and the lack of interest from other potential investors are signals that investors did not view DistroMint as worth investing in, so these factors would indicate a downward adjustment on any valuation of DistroMint. The Haraminac Report does not apply any downward adjustment for the lack of demonstrated value or interest from any investors, resulting in an overstated valuation.

### F. Improperly Applies a DLOM Discount to only the Market Approach

150. The Haraminac Report applies its DLOM of 30 percent to the Market Approach, but not the Income Approach or Cost Approach,[292] and the Haraminac Report does not provide an explanation for why it only applies to the Market Approach.

151. An industry article discussing DLOM notes that "A discount for lack of marketability (DLOM) is applied when assets are being valued, specifically relating to private companies that aren't traded on public exchanges and are therefore difficult to sell."[293] The

292 Haraminac Report, at p. 19, Schedules 3-5.

293 Arthur, Rob, and Yudmila Adaya, "When to apply a discount for lack of marketability," Grant Thornton, April 4, 2024, available at https://www.grantthornton.co.uk/insights/when-to-apply-a-discount-for-lack-of-marketability/ (accessed June 26, 2026).

DLOM is applied to the valuation regardless of how the valuation is calculated – whether it be from an Income Approach, a Market Approach, or a Cost Approach.[294]

152. While I disagree with the Haraminac Report's valuations under all three approaches for the reasons discussed throughout this report, applying the DLOM to the Income Approach and Cost Approach would reduce the valuations under these two Approaches, and thus the overall valuation from the Haraminac Report. By improperly applying the DLOM to only the Market Approach, the Haraminac Report overstates its valuation of DistroMint.

### G. Uses Arbitrary and Unsupported Weights to Combine the Three Valuation Approaches

153. As described above, the Haraminac Report uses two methodologies, which it calls "Reliability Weight[s]" and "Probability Weight[s]" to reconcile the different results from its Income Approach, Market Approach, and Cost Approach.[295] This approach is flawed for multiple reasons, including but not limited to the following.

154. First, this approach is not consistent with standard valuation practices. The Haraminac Report does not provide any citations endorsing this approach. Rather, standard valuation practices are to employ multiple approaches and provide a range of valuations. As

---

[294] An industry practitioner explains that "[a] DLOM is an adjustment considered after determining the fully marketable value of a business interest using primary valuation approach (income, market, or asset). While primary methodologies account for cash flows, risk, and growth, they don't explicitly adjust for non-marketability." Venette, Anthony, "DLOM Decoded: Busting Myths and Mastering Marketability Discounts," DeJoy & Co., available at https://www.teamdejoy.com/blog/dlom-decoded (accessed July 21, 2026). *See also* "Discount for Lack of Marketability, Job Aid for IRS Valuation Professionals," IRS, September 25, 2009, available at https://www.irs.gov/pub/irs-lbi/dlom.pdf, at p. 4 ("A Discount for Lack of Marketability (DLOM) is 'an amount or percentage deducted from the value of an ownership interest to reflect the relative absence of marketability.'").

[295] Haraminac Report, at pp. 3, 21.

described in Pratt (2008), while indications from different approaches may vary, they should represent the value of a common subject:[296]

> Ideally, the analyst will use two or more approaches in the subject valuation, and these approaches will yield virtually identical value indications. In practice, of course, this rarely happens. […] Sometimes several valuation approaches all conclude a reasonably narrow dispersion of value indications. These alternative indications, then, imply the reasonable range of values for the subject business. They also provide mutually supportive evidence as to the final value estimate.

155. Second, the Haraminac Report does not provide a quantitative basis for the weights it uses. The Haraminac Report is unclear as to why the Income Approach should receive 65 percent weight, 55 percent weight, or any other number.[297]

156. Third, the fact that the approaches provide very different results is an indication that each of them may be unreliable. For example, the result from the Income Approach ($55.6 million) is 7.7 times greater than the result from the Cost Approach ($7.2 million), indicating that one (or both) of them are a flawed measure of DistroMint's valuation.[298]

### H. Does Not State an Opinion on Damages

157. The Haraminac Report does not state an opinion on damages associated with the Alleged Conduct in this case.

158. For example, I understand that in a breach of contract matter, the goal of a damages analysis from an economic perspective is to make the injured party whole – that is, the damages amount will return the injured party to the financial position it would have occupied

---

[296] Pratt (2008), at pp. 475-476.

[297] Haraminac Report, at p. 3.

[298] Haraminac Report, at p. 3. $55,557,335 / $7,231,800 = 7.7.

had the alleged conduct not taken place (*i.e.*, in the but-for world).[299] In many cases related to an alleged breach of contract, courts seek to provide compensation by awarding the plaintiff "expectation" damages "sufficient to give the plaintiff the same economic value the plaintiff would have received if the defendant had fulfilled the promise or bargain."[300]

159. To the extent DistroMint or DistroMint, LLC had any non-zero value as of October 2023, the Haraminac Report does not establish how that value may have changed, if at all, due to the Alleged Conduct. Therefore, even if the Haraminac Report were able to provide a reliable valuation of DistroMint or DistroMint, LLC as of October 2023 (which it does not do), the Haraminac Report does not establish how the valuation would relate to damages in this case.

## VI. CONCLUSION

160. For the reasons discussed throughout this report, DistroMint's probability of generating any meaningful revenues and profits was very low as of October 2, 2023. There is not a sufficient basis to establish a reliable valuation of DistroMint or DistroMint, LLC as of October 2, 2023, or at any time, based on an Income Approach or a Market Approach. While nChain's approximate investments of $675,000 toward development of the proposed DistroMint platform could be used as the starting point for a valuation of DistroMint based on a Cost Approach, that amount would at most represent an upper bound. As discussed throughout this report, the Haraminac Report does not provide a reliable valuation of the proposed DistroMint platform or DistroMint, LLC as of October 2, 2023—or at any time. Further, while the Haraminac Report

[299] Allen, Mark A. et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, 3rd Ed., Federal Judicial Center, 2011, at pp. 429-430, 432-433. *See also* Weil et al. (2017), at PDF pp. 171, 239.

[300] Allen, Mark A. et al., "Reference Guide on Estimation of Economic Damages," in *Reference Manual on Scientific Evidence*, 3rd Ed., Federal Judicial Center, 2011, at p. 433. *See also* Weil et al. (2017), at PDF p. 171; Restatement (Second) of Contracts § 344, 347 (1981).

provides a purported valuation of DistroMint and DistroMint, LLC, collectively, it does not state an opinion on damages associated with the Alleged Conduct.

161. This report is based on the information that was available to me as of the date of this report and summarizes the opinions that I have formed to date. I may revise, supplement, or expand my opinions, if necessary and allowed, based on further review and analysis of information and opinions provided to me before trial.

Mickey A. Ferri, Ph.D.

July 24, 2026

**EXHIBIT 1**

**MICKEY FERRI, PH.D.**
**Vice President**

Phone: 202 530 2595
Mobile: 773 896 6828
mickey.ferri@analysisgroup.com

800 17th Street, NW
Suite 400
Washington, DC 20006

Dr. Ferri specializes in applied business economics and has extensive experience in economic analysis, business strategy, and data analysis. His litigation work includes economic consulting on damages, class certification, fraud, irreparable harm, and commercial success in a variety of areas, including intellectual property, antitrust and competition, commercial disputes, and labor and employment. Dr. Ferri has served as a damages expert or consultant in more than 60 cases in US federal and state courts, submitted over 30 expert reports and declarations, and testified at deposition and trial in federal courts, state courts, and arbitration hearings. He has consulted to clients in several industries, including pharmaceuticals, medical devices, education, finance, real estate, software and hardware, cybersecurity, automobiles, natural resources, consumer products, entertainment, and sports.

Dr. Ferri has authored articles in journals published by the California Law Association and the American Bar Association, among others. He has been recognized multiple times as a top patent expert by *Intellectual Asset Management* (*IAM*) in the *IAM Patent 1000*. His work has been featured in several media outlets, including TechCrunch, NewsNation, CBS, LinkedIn, *Financial Services Review*, Venture Beat, and Digital Trends. Dr. Ferri is a USA Track & Field (USATF) San Diego-Imperial board member and a USATF national panelist. Prior to joining Analysis Group, he worked at multiple other economics consulting companies. He also co-founded two companies: One, backed by Y Combinator, developed and sold motion capture clothing to measure and improve human movement; the other used economics, data, and science to improve the lives of athletes.

## EDUCATION

| | |
|---|---|
| 2013 | Ph.D., economics, The University of Chicago |
| 2010 | M.A., economics, The University of Chicago |
| 2007 | B.A., quantitative economics, mathematics, and computer science (*summa cum laude*), Tufts University |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2023–Present | Analysis Group, Inc.<br>*Vice President* |
| 2018–Present | Economics Athletes, LLC<br>*Founder and President* |
| 2018–2023 | Insight Economics, LLC<br>*Economist, Partner* |

2013–2019 Enflux, Inc.
*Co-founder, Board Member, and Advisor (2013–2019)*
*Chief Growth Officer (2015–2018)*

2013–2015 Intensity Corporation (Quant Economics)
*Economist*

**SELECTED EXPERT CASE WORK**

**Intellectual property**

- ***Bausch Health Ireland Limited and Bausch Health Americas Inc. v. Perrigo Israel Pharmaceuticals Limited and Perrigo Company PLC***
  *US District Court, District of New Jersey*
  Economic analysis of commercial success related to patents for treatments for plaque psoriasis. Expert report, deposition, and trial testimony.
- ***Open Sea Distribution Corp., et al. v. Artemis Distribution LLC, et al.; Artemis Distribution LLC v. Open Sea Distribution Corp., Pro Design Plus SAS, and Neil Porras***
  *US District Court, Middle District of Florida, Jacksonville Division*
  Expert economic analysis of damages due to alleged fraud, trademark infringement, defamation, and tortious interference. Analysis of revenues, profits, forecasted sales, comparisons to expectations, and R&D expenses. Analysis of impact of conduct, but-for revenues, and but-for profits. Expert report, expert rebuttal report, expert reply report, and deposition.
- ***24/7 Customer, Inc. v. LivePerson, Inc.***
  *US District Court, Northern District of California*
  Analysis of economic damages due to alleged patent infringement. Analysis of lost profits and reasonable royalty. Analysis of *Georgia-Pacific* factors. Expert report. and deposition.
- ***Irish Rover Entertainment, LLC v. Aaron Sims, Matt Duffer, Ross Duffer, Netflix, Inc., et al.***
  *US District Court, Central District of California, Western Division*
  Analysis of economic damages related to alleged copyright infringement. Expert report and deposition.
- ***Vitaform, Inc. d/b/a/ Body After Baby v. Aeroflow, Inc. and Motif Medical, Inc.***
  *Superior Court of North Carolina, County of Buncombe*
  Expert economic analysis of damages due to alleged violation of the North Carolina Trade Secret Protection Act (N.C.G.S. § 66-152 et seq.), breach of covenant of good faith and fair dealing, and unjust enrichment. Analysis of revenue, expenses, lost profits, and unjust enrichment. Expert report and deposition.
- ***American Medical Experts, LLC v. Ronny Nizar Hamad, Prime Medical Experts, LLC, et al.***
  *US District Court, Eastern District of Virginia, Alexandria Division*
  Analysis of economic damages related to copyright infringement, breach of contract, breach of fiduciary duty, conversion, misappropriation of trade secrets, violation of Virginia Computer Crimes Act 18.2-152.4 and 152.12, Common Law Conspiracy, and conspiracy in violation of Va. Code 18.2-499-500. Expert declaration and expert rebuttal report.

- ***Apalone, Inc v. Schutt Sports, LLC and Certor Sports, LLC***
  *US District Court, Central District of Illinois*
  Expert economic analysis of damages due to alleged patent infringement. Analysis of royalty, revenues, apportionment, license agreements, development costs, and economic damages. Expert report.

- ***Nuheara IP Pty Ltd. and Nuheara Limited v. Anker Innovations Limited, Fantasia Trading LLC d/b/a AnkerDirect, and Power Mobile Life, LLC***
  *US District Court, Western District of Washington*
  Expert economic analysis of damages due to alleged trademark infringement. Analysis of royalty, profits, revenues, apportionment, license agreements, and economic damages. Expert report.

- ***Harrow Health, Inc. f/k/a Imprimis Pharmaceuticals Inc. v. J. Scott Karolchyk***
  *US District Court, District of New Jersey*
  Uniform Trade Secret Act (N.J. Trade Secrets Act, N.J. Stat. Ann. § 56:15), breach of contract, and breach of covenant of good faith and fair dealing. Analysis of revenue, analysis of expenses, and analysis of unjust enrichment. Expert report.

- ***Doskocil Manufacturing Company, Inc. d/b/a Petmate v. Make Ideas, LLC and Keith Mullin***
  *US District Court, Northern District of Texas, Dallas Division*
  Economic analysis of damages due to alleged breach of contract, alleged patent infringement, and alleged copyright infringement. Expert report.

- ***Chung & Associates, LLC d/b/a Cashmere Agency v. Xavier Ruffin and Ricardo Mendoza***
  *Superior Court of California, County of Los Angeles*
  Expert economic analysis of lost profits and unjust enrichment due to alleged breach of contract and violation of California Uniform Trade Secrets Act. Expert declaration.

- ***A.E. Tribe, LLC Opposer v. Dave Dean, Applicant***
  *US Patent and Trademark Office before the Trademark Trial and Appeal Board*
  Analysis of economic aspects related to constructive use priority, economic aspects related to first use priority, and reasonableness of business records related to clothing, hotels, merchandise, and related products. Expert declaration.

- ***Laltitude, LLC v. Shenshen Jinnuo Precision Products Co., Ltd. and Shenzhen Wyn-World Technology Ltd.***
  *US District Court, Central District of California*
  Analysis of *Georgia-Pacific* factors. Analysis of reasonable royalty for the infringement of a design patent related to Bluetooth shower speakers. Expert report and supplemental expert report.

- ***Laltitude, LLC v. SoyeeGlobal***
  *US District Court, Central District of California*
  Analysis of *Georgia-Pacific* factors. Analysis of reasonable royalty for the infringement of a design patent and a copyright related to children's toys. Expert report and supplemental expert report.

- ***Gema USA, Inc. v. First In Finishing Inc.***
  *US District Court, Southern District of Indiana, Indianapolis Division*
  Analysis of damages for the infringement of design patents and trademarks related to powder coating products. Expert report.

- ***SES-imagotag SA, et al. v. Hanshow America Inc., et al.***

*US District Court, Eastern District of New York*
Analysis of bond. Analysis of lost profits and reasonable royalty for the infringement of multiple patents related to electronic shelf label software and hardware used in retail.

- ***Janssen Products, LP, and Pharma Mar, SA v. Evenus Pharmaceuticals Laboratories Inc., Jiangsu Hengrui Medicine Co. Ltd., Natco Pharma Ltd., Sun Pharmaceutical Industries Ltd., and Sun Pharmaceutical Industries Inc.***
  *US District Court, District of New Jersey*
  Economic analysis of commercial success related to patents for treatment of patients with unresectable or metastatic liposarcoma or leiomyosarcoma who received a prior anthracycline-containing regimen.

- ***Ebin New York, Inc. v. SIC Enterprise, Inc.***
  *US District Court, Eastern District of New York*
  Expert economic analysis of damages due to alleged trade dress infringement and unfair competition related to consumer products, including under the Lanham Act. Analysis of lost profits, unjust enrichment, and business harm.

- **Alleged patent infringement and irreparable harm**
  Economic analysis of irreparable harm, balance of hardships, and bond. Analysis of revenues, profits, marketplace, and expenses related to medical devices.

- **Alleged patent infringement and irreparable harm**
  Economic analysis of irreparable harm, balance of hardships, public interest, and bond. Analysis of revenues, profits, marketplace, and expenses related to injectable pharmaceutical products.

**Contract and commercial disputes**

- ***Zouki for America Corporation v. Prime Healthcare Centinela, LLC d/b/a Centinela Hospital Medical Center, Mohammad Abdelnaser, R.N., and Sodexo America, LLC***
  *Superior Court of California, County of Los Angeles, Southwest District*
  Expert economic analysis of damages due to alleged breach of contract, breach of implied covenant of good faith and fair dealing, breach of covenant of quiet enjoyment, trespass and intentional trespass, forcible entry and eviction, conversion, and civil conspiracy to trespass. Analysis of but-for revenues, but-for expenses, but-for profits, and lost profits. Expert report, updated expert report, second updated expert report, two depositions, and trial testimony.

- ***Pancho Villa No. 2, LLC v. F&R Real Estate, Inc., and Does 1 through 10, Inclusive; F&R Real Estate, Inc. v. Pancho Villa No. 2, LLC and Stephen W. Boney, and Roes 1 through 10***
  *Superior Court of California, County of San Diego, Central Division*
  Expert economic analysis of damages due to alleged breach of contract, breach of implied covenant of good faith and fair dealing, and additional claims. Analysis of revenues, expenses, customer count, profits, and lost profits associated with grocery stores and commercial real estate. Deposition and trial testimony.

- ***Learning Genie, Inc. v. Child Care Results, Inc. d/b/a CCR Analytics***
  *American Arbitration Association*
  Expert economic analysis of lost profits and unjust enrichment due to alleged fraud, breach of contract, and breach of covenant of good faith and fair dealing. Analysis of revenue, analysis of expenses, and market analysis. Expert report, expert rebuttal report, expert declaration, arbitration testimony, and supplemental expert report.

- ***Cole Bartiromo* v. PayPal, Inc.**
  *American Arbitration Association*
  Expert economic analysis of lost profits due to alleged breach of contract. Forecasted revenues, expenses, and profits. Expert analysis and arbitration testimony.

- ***Decision Sciences Research Associates, Inc.* v. The American Automobile Association, Inc.**
  *US District Court, Central District of California*
  Expert economic analysis of lost profits due to alleged breach of contract. Analysis of lost income and lost profits under multiple scenarios, past and projected income, and expenses. Expert report, supplemental expert report, and deposition.

- ***Terrace View Partners, LP, a California Limited Partnership v. Three State Investment Company, a California Corporation; and Does 1 through 25, inclusive***
  *Superior Court of California, County of San Diego*
  Analysis of economic value and opportunity cost associated with an alleged breach of contract related to real estate.

- ***Hamid Taeb, et al. v. Abbas Mash, et al.***
  *Superior Court of California, County of Alameda*
  Expert analysis of damages related to real estate.

**Economic value, valuation, market analysis, and statistical analysis**

- ***Workplace Technologies Research, Inc. v. Project Management Institute, Inc.***
  *US District Court, Southern District of California*
  Expert analysis of economic value, demand, market, costs, commercialization approach, business rationale, and marketability of software, technology, and project management products and services. Alleged breach of contract, alleged breach of obligation to act fairly and in good faith, alleged theft of trade secrets, and alleged misappropriation of trade secrets. Expert report and deposition.

- ***Duane Chapman, an Individual; Adrian Harris, an Individual; Sonya Harris, an Individual; David Clark, an Individual; Jennifer Andrews-Clark, an Individual; and Robert James, an Individual v. University Village Thousand Oaks, CCRC, LLC, a Delaware Limited Liability Company; Continuing Life, LLC, a Delaware Limited Liability Company; Life Care Services, LLC, an Iowa Limited Liability Company; Ryan Exline, an Individual; Warren Spieker, an Individual; Michael South, an Individual; and Does 1 through 100, Inclusive***
  *Superior Court of California, County of Ventura*
  Expert economic analysis of monthly fee increases, economic value, costs, profitability, and economic indicators in the context of Continuing Care Retirement Communities. Expert report.

- ***State of Arizona, ex rel. Mark Brnovich, Attorney General v. Arizona Board of Regents, et al.***
  *Superior Court of Arizona, Arizona Tax Court*
  Analysis of economic value of intangible assets related to Arizona State University. Analysis of income, cost, and market approaches for fair market value (FMV) related to branding, real estate, hotels, universities, and conference centers. Expert report and expert rebuttal report.

- ***Leslie Hammon v. David Schweikert, et al.***
  *Superior Court of Arizona, County of Maricopa*
  Statistical analysis of exposure, engagement, and interactions with political ads related to alleged defamation, false light, and invasion of privacy. Analysis of data on street signs, traffic, social media, and the internet. Expert report. Expert rebuttal report.

- ***John C. Depp, II* v. *Amber Laura Heard***
  *Nineteenth Judicial Circuit Court of Virginia, County of Fairfax*
  Economic analysis of impact of alleged defamation on earnings. Statistical analysis of impact of alleged defamation on earnings and consumer sentiment.

**Class action**

- ***Barry Earls, Thomas Fetsch, David Kiel, Trent Shores, Steve Schussler, Cassie Lietaert, and Chris Jesse, Individually and on Behalf of Classes of Similarly Situated Individuals* v. *Menard, Inc., a Delaware Corporation***
  *US District Court, Western District of Wisconsin*
  Analysis of class certification. Analysis of damages, restitution, and/or unjust enrichment related to customer purchases and rebates. Expert report.

- ***Richard A. Ross and Fieldstone Ventures, LLC, on Their Own Behalf and on Behalf of All Others Similarly Situated* v. *EQT Corporation, EQT Production Company, Rice Drilling B, LLC, Vantage Energy Appalachia LLC, and Vantage Energy Appalachia II LLC***
  *Court of Common Pleas, Pennsylvania, Allegheny County*
  Expert economic analysis of class action damages related to unpaid royalties for natural gas.

**Labor, employment, and damages**

- ***Matthew Melda* v. *Custom Pro Logistics, LLC***
  *Superior Court of California, County of San Diego, Central Division*
  Economic analysis of damages due to alleged failure to pay wages and alleged wrongful termination. Analysis of lost wages, salary, commissions, bonuses, and benefits. Expert report, deposition, and trial testimony.

- ***Sheila Gianelli* v. *Mark Schwartz, Eric Woolsey, and Don Dennis Jr.***
  *Superior Court of California, County of Santa Barbara*
  Expert economic analysis of damages due to alleged legal malpractice, breach of fiduciary duty, and fraud. Analysis of "but-for" wages and benefits, mitigation wages and benefits, and lost wages and benefits. Expert report, deposition, and trial testimony.

- ***Rebecca Holland New* v. *Thermo Fisher Scientific, Inc.***
  *US District Court, Middle District of North Carolina*
  Expert analysis of damages due to alleged discrimination, harassment, hostile and abusive working environment, retaliation, breach of contract, conversion, fraud, and failure to pay wages and benefits when due. Lost wages and benefits; mitigation wages and benefits. Expert report, deposition, supplemental expert report, and second supplemental expert report.

- ***Synthia Hernandez, Alicia Cabrera, and N.R., by and through His Parent Synthia Hernandez* v. *Los Angeles Unified School District***
  *US District Court, Central District of California*
  Expert economic analysis of damages due to alleged violations of Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 et seq.) and Section 504 of the Rehabilitation Act (29 U.S.C. §§ 794 et seq.). Analysis of loss in expected lifetime earnings, psychological expenses, lost wages, and other expenses. Analysis of the relationship between education, earnings, and economic outcomes. Expert report and deposition.

- ***Rene Mitchell* v. U.S. Bank National Association, et al.**
  *US District Court, District of Maryland*
  Expert economic analysis of damages due to alleged violations of the fair debt collection practices act (41 U.S.C. §§ 1692k and 41 U.S.C. §§ 1692 et seq.), alleged violations of the Maryland Consumer Debt Collections Act (Md. Code Ann., Com. Law §§ 14-201 to -204), and violations of the Maryland Consumer Protection Act (Md. Code Ann., Com. Law §§ 13-101 to -501d). Analysis of loss in life expectancy, lost quality of life, and psychological expenses associated with the alleged conduct. Analysis of business harm, revenues, expenses, and profits. Expert report, supplemental expert report, and deposition.

- ***Mia Kelman* vs. David Robert Gotham, Jr. D.O., an Individual; David R. Gotham, Jr., D.O., Inc., a California Corporation; and Does 1 through 20, Inclusive**
  *Superior Court of California, County of Placer*
  Economic analysis of damages due to alleged medical malpractice. Analysis of future medical expenses, inflation, and present value. Analysis of lost wages, expert report, and deposition.

- ***Gary Masiello* v. Adam Strandberg**
  *Superior Court of Massachusetts, County of Middlesex*
  Expert economic analysis of damages due to alleged negligence resulting in injury, permanent disability, medical expenses, psychological expenses, and noneconomic damages. Analysis of past and projected lost wages and mitigating compensation, as well as past and projected medical expenses. Expert declaration and supplemental expert declaration.

- ***Carl Martin v. Rowan-Salisbury Board of Education***
  *US District Court, Middle District of North Carolina*
  Expert economic analysis of damages due to alleged wage discrimination based on age and race, and alleged failure to promote. Lost wages, salary, and benefits. Expert report.

- ***Brett Gardner* v. Kenneth Braithwaite, Secretary, Department of the Navy**
  *US District Court, Southern District of California*
  Expert economic analysis of damages due to alleged discrimination and retaliation based on race. Lost wages, salary, benefits, and pension value. Expert report and supplemental expert report.

- ***United States of America v. Ronald Steven Schoenfeld***
  *US District Court, Eastern District of California*
  Expert economic analysis of victim restitution due to lost wages related to fraud conspiracy. Expert declaration.

- ***Rachel Horton v. National Commercial Services d/b/a NCS Legal Services and Experian Information Solutions, Inc.***
  *US District Court, Southern District of California*
  Expert analysis of damages due to alleged violations of the Fair Credit Reporting Act, the California Consumer Credit Reporting Agencies Act, the Fair Debt Collection Practices Act, the Rosenthal Fair Debt Collection Practices Act, and the California Identity Theft Act. Expert report.

- ***In the Matter of Deborah H. Andrews, Executor of the Estate of George H. Andrews (Deceased), Owner of a 2020 35' +/- Scout 355 LXF, HIN # SLPVT596G920, NC Registration # NC-4565EP, Her Engines, Tackle, Apparel, Appurtenances, etc. for Exoneration from or Limitation of Liability***
  *US District Court, Eastern District of North Carolina, Eastern Division*
  Analysis of economic damages permitted pursuant to the North Carolina Wrongful Death Statute (N.C. Gen. Stat. § 28A-18-2).

- ***Joshua N. Weisbord v. Posner & Rosen, Inc., et al.***
  *Superior Court of California, County of San Diego, Central Division*
  Expert economic analysis of damages due to alleged professional negligence and legal malpractice. Analysis of but-for wages and benefits, mitigation wages and benefits, and lost wages and benefits.

- ***Sherry Clark and Robert Clark v. United Rentals (North America) Inc. and Sumner Manufacturing Co., LLC***
  *Superior Court of California, County of Santa Clara*
  Expert economic analysis of damages due to alleged product liability and negligence. Analysis of but-for wages and benefits, mitigation wages and benefits, and lost wages and benefits.

- ***Jeffrey Van De Poel, an Individual v. Kevin Burton Merkes, M.D., an Individual; and Does 1 through 20, Inclusive***
  *Superior Court of California, County of San Diego*

- ***Salvador Luna v. Ware Disposal, Inc.***
  *Superior Court of California, County of Orange*
  Expert economic analysis of damages due to alleged age discrimination, wrongful termination, and retaliation. Analysis of lost earnings.

- ***John Does 1 to 5, et al. v. The New Hanover County Board of Education, et al.***
  *Superior Court of North Carolina, County of New Hanover*
  Expert analysis of damages related to harassment.

- ***Tiffany Cross, Shalonda Adams, Crystal Anthony, Arron Lee Mathews, Acadia McNeal, Tiana Reddic, and Darlene Francine Rouse v. City and County of San Francisco, et al.***
  *US District Court, Northern District of California, San Francisco Division*
  Expert economic analysis of damages due to alleged discriminatory enforcement of criminal law. Analysis of lost wages, expenses, and economic consequences for multiple individuals.

## SELECTED CONSULTING EXPERIENCE

### Intellectual property

- ***Maxell, Ltd. v. Samsung Electronics Co., Ltd. and Samsung Electronic America, Inc.***
  *US District Court, Eastern District of Texas, Texarkana Division*
  Economic analysis of alleged patent infringement related to smartphones and tablets. Analysis of reasonable royalty, revenues, costs, profits, *Georgia-Pacific* factors, license agreements, and economic damages. Expert report, deposition, and trial testimony.

- ***Certain Non-invasive Aesthetic Body-Contouring Devices, Components Thereof, and Methods of Using the Same***
  *International Trade Commission, Investigation No. 337-TA-1219*
  Economic analysis of domestic industry investment in the US related to non-invasive, FDA-approved devices, including investments in plant and equipment, as well as labor and capital. Economic analysis of commercial success in the US related to patents on non-invasive, FDA-approved devices. Analysis of revenues, profits, forecasted sales, comparisons to expectations, R&D expenses, license agreements, and nexus. Economic analysis of bond. Economic analysis of remedy. Expert report, deposition, and trial testimony.

- ***Orexo AB and Orexo US, Inc. v. Actavis Elizabeth LLC, Actavis Pharma, Inc., Teva Pharmaceuticals USA, Inc., and Teva Pharmaceutical Industries, Ltd.***
  *US District Court, District of Delaware*
  Economic analysis of alleged patent infringement related to pharmaceuticals for opioid treatment. Analysis of *Georgia-Pacific* factors, revenues, expenses, and reasonable royalty. Expert report, deposition, and trial testimony.

- ***BMG Rights Management (US) LLC v. Cox Communications, Inc. and Coxcom, LLC***
  *US District Court, Eastern District of Virginia, Alexandria Division*
  Economic analysis of alleged music copyright infringement, data analysis of file sharing data, and calculations of economic damages. Expert report, deposition, and trial testimony.

- ***Pharmacyclics LLC and Janssen Biotech, Inc. v. Zydus Worldwide DMCC, et al.; Pharmacyclics LLC and Janssen Biotech, Inc. v. Alvogen Pine Books LLC and Natco Pharma LTD.***
  *US District Court, District of Delaware*
  Evaluation of commercial success related to patents for Imbruvica (ibrutinib) to treat non-Hodgkin's lymphoma. Expert report, deposition, and trial testimony.

- ***Sanofi-Aventis US LLC, Sanofi-Aventis Deutschland GMBH, and Sanofi Winthrop Industrie, Biocon Limited, Biocon Research Ltd., Biocon S.A., Biocon Sdn. Bhd. v. Mylan GMBH, Mylan Inc., Mylan NV, And Mylan Pharmaceuticals Inc.***
  *US District Court, District of New Jersey*
  Evaluation of commercial success related to patents for Lantus Vial and Lantus SoloStar (insulin glargine) for the treatment of diabetes. Expert report, deposition, and trial testimony.

- ***Maxell, Ltd. v. TCL Electronics Holdings Ltd., et. al.***
  *US District Court, Eastern District of Texas, Texarkana Division*
  Economic analysis of alleged patent infringement related to smart TVs. Analysis of reasonable royalty, revenues, costs, profits, *Georgia-Pacific* factors, license agreements, and economic damages. Expert report and deposition.

- ***Maxell, Ltd. v. Coretronic Corp, Optoma Corp.***
  *US District Court, Eastern District of Texas, Texarkana Division*
  Economic analysis of alleged patent infringement related to projectors. Analysis of reasonable royalty, revenues, costs, profits, *Georgia-Pacific* factors, license agreements, and economic damages. Expert report and deposition.

- ***Certain Smart Televisions***
  *International Trade Commission, Investigation No. 337-TA-1420*
  Economic analysis of domestic industry investment in the US related to laptop computers, including investments in plant and equipment, as well as labor and capital. Economic analysis of bond. Economic analysis of remedy. Expert report and deposition.

- ***Powermat Technologies, Ltd. v. Anker Innovations, Ltd.***
  *US District Court, Eastern District of Texas, Texarkana Division*
  Economic analysis of alleged patent infringement related to wireless charging devices. Analysis of reasonable royalty, revenues, costs, profits, *Georgia-Pacific* factors, license agreements, and economic damages. Expert report and deposition.

- ***Gerald Hayden v. International Business Machines Corporation, Pablo Suarez and Shanker Ramamurthy***
  *US District Court, Southern District of New York*
  Economic analysis of alleged trade secret misappropriation, alleged breach of contract, and alleged retaliatory discharge. Expert report and deposition.

- ***Actelion Pharmaceuticals Ltd. and Actelion Pharmaceuticals US, Inc. v. Bristol-Myers Squibb Co., Celgene Corp., and Celgene International II Sarl***
  *US District Court, District of New Jersey*
  Economic analysis of alleged patent infringement related to pharmaceutical products used to treat multiple sclerosis and ulcerative colitis. Analysis of reasonable royalty, revenues, *Georgia-Pacific* factors, license agreements, and economic damages. Expert report and deposition.

- ***Charter Communications Holding Company, LLC, Charter Communications Operating, LLC, and Bright House Networks, LLC v. Sonus Networks, Inc. and Ribbon Communications Operating Company, Inc.***
  *Superior Court of Delaware, New Castle County*
  Economic analysis of effective fees associated with license and settlement agreements, analysis of expected value of litigation, analysis of value of settlement. Expert report and deposition.

- ***Charter Communications Operating, LLC v. Sonus Networks, Inc. and Ribbon Communications Operating Company, Inc.***
  *Supreme Court of New York*
  Economic analysis of effective fees associated with license and settlement agreements, analysis of expected value of litigation, analysis of value of settlement. Expert report, supplemental expert report, and depositions.

- ***Netlist, Inc v. Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc.***
  *US District Court, Eastern District of Texas*
  Economic analysis of alleged patent infringement related to DRAM technology. Analysis of reasonable royalty, revenues, *Georgia-Pacific* factors, license agreements, and economic damages. Expert report and deposition.

- ***Finjan, LLC* v. SonicWall, Inc.**
  *US District Court, Northern District of California*
  Economic analysis of alleged patent infringement related to cybersecurity hardware, software, and subscriptions, including firewalls, secure wireless, endpoint security, email security, and secure remote access. Analysis of reasonable royalty, revenues, *Georgia-Pacific* factors, license agreements, settlements, and economic damages. Expert report and deposition.

- ***CA, Inc. and Avago Technologies International Sales Pte. Limited* v. Netflix, Inc.**
  *US District Court, Northern District of California*
  Evaluation of reasonable royalty related to video streaming. Expert report and deposition.

- ***Bristol-Myers Squibb Company and Pfizer Inc. v. Aurobindo Pharma USA, Inc. and Aurobindo Pharma Ltd., Sigmapharm Laboratories, LLC, Unichem Laboratories, Ltd., and Zydus Pharmaceuticals (USA), Inc.***
  *US District Court, District of Delaware*
  Evaluation of secondary considerations related to patents for Eliquis (apixaban) for the treatment of deep vein thrombosis and pulmonary embolism, as well as stroke prevention, in nonvalvular atrial fibrillation. Analysis of alleged commercial success, blocking patents, revenues, profits, forecasted sales, comparisons to expectations, and R&D expenses. Expert report and deposition.

- ***Finjan, LLC* v. Qualys, Inc.**
  *US District Court, Northern District of California*
  Economic analysis of alleged patent infringement related to cybersecurity software and hardware. Analysis of reasonable royalty, revenues, *Georgia-Pacific* factors, license agreements, settlements, apportionment, and economic damages. Expert report and deposition.

- ***Vanda Pharmaceuticals Inc. v. Teva Pharmaceuticals USA, Inc., Apotex Inc., Apotex Corp., MSN Pharmaceuticals Inc., and MSN Laboratories Private Limited***
  *US District Court, District of Delaware*
  Evaluation of commercial success related to patents for Hetlioz (tasimelteon) for the treatment of non-24-hour sleep disorders. Analysis of blocking patents, revenues, profits, forecasted sales, comparisons to expectations, R&D expenses, and nexus. Expert report, supplemental expert report, and deposition.

- ***Align Technology, Inc.* v. Strauss Diamond Instruments, Inc.**
  *US District Court, Northern District of California, San Jose Division*
  Economic analysis of alleged trademark infringement of medical devices for orthodontics, restorative dentistry, and aesthetic dentistry. Expert report.

- ***DirectPacket Research, Inc.* v. Polycom, Inc.**
  *US District Court, Northern District of California, San Jose Division*
  Economic analysis of alleged patent infringement related to unified communications and collaboration products. Analysis of *Georgia-Pacific* factors, revenues, expenses, and reasonable royalty.

- **Domestic industry for International Trade Commission**
  Economic analysis of domestic industry investment in the US related to non-invasive FDA-approved devices, including investments in plant and equipment, as well as labor and capital. Analysis of revenues, profits, and R&D expenses.

- **Patent infringement**
  Economic analysis of alleged patent infringement related to technology used in video streaming, encoding, compression, and digital content distribution. Analysis of reasonable royalty, lost profits, *Georgia-Pacific* factors, and economic damages.
- **Patent infringement**
  Analysis of alleged patent infringement related to technology used in military helmets. Analysis of reasonable royalty, lost profits, *Georgia-Pacific* factors, license agreements, and economic damages.
- **Patent infringement**
  Economic analysis of alleged patent infringement related to pharmaceuticals for the treatment of infections.
- **Trade secret misappropriation, breach of contract, fraud, and false advertising**
  Economic analysis of damages related to trade secret misappropriation, breach of contract, fraud, and false advertising for 5G communications and microchip products and technologies.
- **Trademark infringement**
  Economic analysis of alleged trademark and trade dress infringement related to automobiles.
- **Patent infringement**
  Economic analysis of alleged patent infringement of smartphone technology.
- **Trade secrets**
  Economic analysis of alleged trade secret misuse related to technology used by smartphone companies.

**Antitrust**

- ***US Wholesale Outlet & Distribution, Inc., Trepco Imports & Distribution, Ltd., L.A. International Corporation, California Wholesale, YNY International Inc., Eashou, Inc. d/b/a San Diego Cash and Carry, and Sanoor, Inc. d/b/a L.A. Top Distributor v. Living Essentials, LLC and Innovation Ventures, LLC***
  *US District Court, Central District of California*
  Economic analysis of alleged unlawful price discrimination related to energy drinks under the Robinson-Patman Act. Analysis of price discrimination, competition, unfair practices, restitution damages, and antitrust damages. Expert report and deposition.
- ***Brian C. Williams, et al. v. The Estates LLC, et al.***
  *US District Court, Middle District of North Carolina*
  Economic analysis of damages due to alleged bid-rigging of real estate foreclosure auctions. Analysis of data on foreclosures. Analysis of class action damages. Expert report.
- **Antitrust, price discrimination, and unfair practices**
  Economic analysis of alleged unlawful price discrimination related to beverages under the Robinson-Patman Act. Analysis of price discrimination, competition, restitution damages, and antitrust damages.

**Fraud**

- **Valuation, negotiation, fraud, aiding and abetting fraud, conspiracy to commit fraud, and breach of purchase agreement**
  Economic analysis of damages and valuation due to alleged fraud related to a company acquisition. Analysis of financial data, company valuation, costs, revenues, profits, and economic damages.

**Real Estate Settlement Procedures Act (RESPA)**

- **RESPA (large lender)**
  Economic analysis of FMV of leads on behalf of a lender related to a partnership with a provider of home services for compliance with RESPA. Two RESPA reports to evaluate the FMV of two distinct aspects of the partnership.
- **RESPA (large lender)**
  Economic analysis of FMV of advertising services on behalf of a lender related to a partnership with a real estate building company for compliance with RESPA.
- **RESPA (large lender)**
  Economic analysis of FMV of services on behalf of a lender related to a partnership with a credit union for compliance with the RESPA. Two RESPA reports to evaluate the FMV of two distinct aspects of the partnership.
- **RESPA (large insurance broker)**
  Economic analysis of FMV of services provided by a variety of partners related to homeowners insurance on behalf of a real estate insurance broker related to compliance with RESPA.
- **RESPA (large real estate broker)**
  Economic analysis of FMV of 1,003 applications from a computer loan origination system on behalf of a real estate broker related to compliance with RESPA.
- **RESPA (mid-sized bank)**
  Economic analysis of FMV of broker agreements on behalf of a lender related to compliance with RESPA.
- **RESPA (manufactured home lender)**
  Economic analysis of FMV of digital data in a web portal related to borrowers for manufactured housing buyers. This analysis was completed on behalf of a manufactured home lender related to compliance with RESPA.
- **RESPA (manufactured home lender)**
  Economic analysis of FMV of prospects from a YouTube influencer on behalf of a manufactured home lender related to compliance with RESPA.
- **RESPA (large financial institution)**
  Economic analysis of FMV of home buyer leads for a real estate company on behalf of a large financial institution related to compliance with RESPA.

**Valuation, market analysis, and business strategy**

- **The Potential Economic Impact of Legalizing iGaming on Casino Revenues in Five States**
  Developed study to provide a comprehensive analysis of the potential economic impact of legalizing iGaming in New York, Illinois, Louisiana, Maryland, and Virginia. Measured the observed impact of iGaming in six states where iGaming is already active: New Jersey, Delaware, Pennsylvania, West Virgina, Michigan, and Connecticut. The study conducted 34 consumer research interviews and an online survey among 2,389 current and prospective gaming consumers to develop a data-driven understanding for how iGaming impacts the market. This study provides a framework, an analysis of the observed impact of iGaming, and a set of projections to best enable policymakers to make informed decisions. The study projects potential revenues in the projection states using the changes observed in the iGaming states in combination with each iGaming and projection state's unique characteristics. Developed supplemental studies to evaluate the impact of iGaming on casino-related jobs in New York, Illinois, Maryland, and Louisiana.

- **Business Strategy and Growth**
  Developed business plan and financial strategy for water purification company. Market analysis, analysis of customer demand, pricing, revenues, expenses, unit economics, financing, operations, sales, marketing, distribution, and acquisition.

- **Patent valuation**
  Valuation of patents and license agreements related to diagnostic applications and nutritional applications using lipid, protein, and genetic markers for gestational, infant, and children's nutrition. Market analysis, analysis of expenses, projected revenues, and costs. Implementation of income approach and cost approach.

- **Patent valuation**
  Valuation of patents and company relating to addressing systems and related technologies for augmented reality, virtual reality, and other applications. Market analysis, analysis of expenses, projected revenues, and costs. Implementation of Income Approach, Market Approach, and Cost Approach.

- **Labor, sports**
  One and done: A data-driven analysis of the National Basketball Association policy for player entry.

- **Labor, sports**
  Economic analysis of how a multibillion-dollar television deal impacted player and team salaries and wages, including the impact on each individual player and future players, projected multiple years into the future.

- **Sports technology**
  Due diligence for private equity firm seeking to acquire a sports sensor technology company.

- **Sports**
  Ticket pricing optimization for a Major League Baseball team.

- **e-Commerce**
  Pricing strategy and optimization for a $100 million food and beverage company, resulting in 30% increase in year-over-year gross profits.

- **e-Commerce**
  Pricing strategy and optimization for a $700 million online gifts retailer, resulting in 15% increase in year-over-year gross profits in the peak holiday period.

## ARTICLES AND PUBLICATIONS

"The Potential Economic Impact of Legalizing iGaming on Casino Revenues in Five States," with Laura O'Laughlin, Analysis Group (2024)

"Adjusting Patent Royalty Rates for Inflation," with Pyung "Pete" Yu, James Feroli, Megan Fasules-Todd, and Victoria Bystritsky, *International Asset Management* (2024)

"Trade Secret Disputes: Quantifying Damages," with John Browning, Minh Doan, Della Cummings, and Thomas McGahee, *Corporate Disputes* (2024)

"This apportionment strategy can help protect your IP damages award," with Brett Irvin and DeForest McDuff, *Intellectual Asset Management* (2023)

"Thinking Economically About Nexus in Commercial Success," with DeForest McDuff and Sophia Luo, *Landslide* (2023)

"Patents and Antitrust in the Pharmaceuticals Industry," with DeForest McDuff and Noah Brennan, *Competition* (2021)

"Thinking Economically About Blocking Patents: Did Acorda Create a New Paradigm?" with DeForest McDuff and Noah Brennan, *Landslide* (2020)

"Results of The California International Marathon 2018 (Numbers and Data Visualization)," Economics Athletes (2018)

"What Makes a Great Athlete: The Data Under the Hood," Economics Athletes (2018)

"One and Done: A Data-Driven Analysis," with Danny Schayes and Ryan Sullivan, Intensity Corporation (2014)

"Rent or Buy: The Effectiveness of Netflix and Redbox Windows," The University of Chicago (2013)

"Can Movie Studios and the U.S. Government Stop Internet Movie Piracy?" The University of Chicago (2013)

"The Illegal Movie Market: A Title-by-Title Analysis," Dissertation, The University of Chicago (2013)

"Demand for Bundled vs. À La Carte Movie Products," Dissertation, The University of Chicago (2013)

*A Proposed Growth Strategy for the National Hockey League* (2013)

*Deal or No Deal: Individual Decision Making with Uncertainty* (2007)

## PRESENTATIONS AND SPEAKING ENGAGEMENTS

"RESPA Section 8A Compliance and Valuation," California Mortgage Bankers Association 2022 Legal Issues and Regulatory Compliance Conference (December 13, 2022)

"Compliance Technology in Real Estate," California Mortgage Bankers Association 2021 Legal Issues and Regulatory Compliance Conference (December 8, 2021)

"Economic Experts with Insight Economics' Dr. Mickey Ferri," The Thoughtful Entrepreneur (August 13, 2020)

"Improve Your Long-Distance Running Using Economics, Data, & Science," San Diego Track Club (July 15, 2020)

"What Makes a Great Athlete: Data Under the Hood," Let's Go Data Science (August 30, 2018)

"The Role of AR/VR in Company Strategy," DeveloperWeek (February 16, 2017)

"Full-body Motion Capture in Virtual Reality," UC Berkeley Virtual Reality Experience Convention (October 8, 2016)

"How to Grow Social VR Communities," UC Berkeley Virtual Reality Experience Convention (October 8, 2016)

"The Future of Smart Clothing," Wearable Technology Show (October 5, 2016)

"What Makes a Perfect Sports Wearable," Wearable Technology Show (October 5, 2016)

"Motion Capture Clothing for Exercise and Health," Silicon Valley Innovation and Entrepreneurship Forum (September 30, 2016)

**PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS**

2019–Present American Economic Association

**COMMUNITY INVOLVEMENT**

2021–Present USATF
*Panelist, National Athletics Board of Review*

2019–Present USATF San Diego-Imperial
*Communications Chair, Board of Directors*

2015–2025 Rady School of Management at UC San Diego
*Coffee Chat (provided career advice to Ph.D. students in STEM)*

2024 Pepperdine University, Delta Sigma Pi business fraternity
*Guest speaker on economics and careers*

2022 Hoover High School, Social Justice Academy
*Guest speaker on economics and careers*

2019–2020 Del Norte High School
*Track and Field Coach*

2017 The Future of Sports Technology Hackathon at DeveloperWeek
*Lead Organizer*

2017 Developing Full-body Experiences in Virtual Reality at UploadVR
*Lead Organizer*

2017 Creating a Full-body Interactive Game in Virtual Reality at Upload LA
*Lead Organizer*

2016 Virtual Reality Hackathon
*Organizer*

2014 Rady School of Management at UC San Diego
*Career Day (provided career advice to Ph.D. students in STEM)*

CONFIDENTIAL

# EXHIBIT 2

## DOCUMENTS REVIEWED AND/OR RELIED UPON

| Bates Ranges | | |
|---|---|---|
| NCH0000003 | — | NCH0000008 |
| NCH0000016 | — | NCH0000019 |
| NCH0000025 | — | NCH0000027 |
| NCH0000059 | — | NCH0000061 |
| NCH0000064 | — | NCH0000069 |
| NCH0000071 | — | NCH0000073 |
| NCH0000075 | — | NCH0000076 |
| NCH0000079 | — | NCH0000081 |
| NCH0000084 | — | NCH0000086 |
| NCH0000092 | — | NCH0000095 |
| NCH0000113 | — | NCH0000115 |
| NCH0000118 | — | NCH0000121 |
| NCH0000124 | — | NCH0000131 |
| NCH0000138 | — | NCH0000142 |
| NCH0000147 | — | NCH0000149 |
| NCH0000151 | — | NCH0000152 |
| NCH0000154 | — | NCH0000161 |
| NCH0000164 | — | NCH0000166 |
| NCH0000172 | — | NCH0000175 |
| NCH0000191 | — | NCH0000195 |
| NCH0000209 | — | NCH0000223 |
| NCH0000226 | — | NCH0000228 |
| NCH0000241 | — | NCH0000245 |
| NCH0000250 | — | NCH0000255 |
| NCH0000257 | — | NCH0000268 |
| NCH0000274 | — | NCH0000284 |
| NCH0000289 | — | NCH0000293 |
| NCH0000297 | | |
| NCH0000301 | — | NCH0000303 |
| NCH0000305 | — | NCH0000307 |
| NCH0000311 | — | NCH0000323 |
| NCH0000326 | — | NCH0000332 |
| NCH0000349 | — | NCH0000350 |
| NCH0000370 | — | NCH0000373 |
| NCH0000381 | | |
| NCH0000393 | — | NCH0000394 |
| NCH0000408 | — | NCH0000411 |
| NCH0000414 | — | NCH0000415 |

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| NCH0000420 | — | NCH0000422 |
| NCH0000424 | — | NCH0000426 |
| NCH0000429 | — | NCH0000431 |
| NCH0000483 | — | NCH0000486 |
| NCH0000496 | — | NCH0000498 |
| NCH0000500 | — | NCH0000501 |
| NCH0000504 | — | NCH0000506 |
| NCH0000509 | — | NCH0000511 |
| NCH0000514 | — | NCH0000519 |
| NCH0000522 | — | NCH0000525 |
| NCH0000528 | — | NCH0000530 |
| NCH0000534 | | |
| NCH0000538 | — | NCH0000541 |
| NCH0000558 | — | NCH0000562 |
| NCH0000564 | — | NCH0000566 |
| NCH0000571 | — | NCH0000572 |
| NCH0000574 | — | NCH0000578 |
| NCH0000582 | — | NCH0000583 |
| NCH0000585 | — | NCH0000586 |
| NCH0000589 | — | NCH0000590 |
| NCH0000593 | — | NCH0000627 |
| NCH0000674 | | |
| NCH0000691 | | |
| NCH0000695 | — | NCH0000698 |
| NCH0000734 | — | NCH0000744 |
| NCH0000749 | — | NCH0000753 |
| NCH0000756 | — | NCH0000757 |
| NCH0000760 | — | NCH0000762 |
| NCH0000765 | — | NCH0000772 |
| NCH0000800 | — | NCH0000802 |
| NCH0000812 | — | NCH0000815 |
| NCH0000834 | — | NCH0000845 |
| NCH0000860 | — | NCH0000861 |
| NCH0000871 | — | NCH0000872 |
| NCH0000889 | — | NCH0000890 |
| NCH0000910 | — | NCH0000911 |
| NCH0000916 | — | NCH0000917 |
| NCH0000964 | — | NCH0000966 |

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| NCH0000969 | — | NCH0000971 |
| NCH0000975 | — | NCH0000976 |
| NCH0000991 | — | NCH0000992 |
| NCH0000997 | — | NCH0001005 |
| NCH0001018 | | |
| NCH0001021 | | |
| NCH0001035 | — | NCH0001040 |
| NCH0001043 | — | NCH0001045 |
| NCH0001048 | — | NCH0001051 |
| NCH0001117 | — | NCH0001118 |
| NCH0001137 | — | NCH0001141 |
| NCH0001302 | — | NCH0001303 |
| NCH0001335 | — | NCH0001336 |
| NCH0001360 | | |
| NCH0001413 | | |
| NCH0001416 | — | NCH0001417 |
| NCH0001454 | | |
| NCH0001483 | — | NCH0001485 |
| NCH0001521 | — | NCH0001522 |
| NCH0001541 | — | NCH0001543 |
| NCH0001549 | — | NCH0001551 |
| NCH0001596 | — | NCH0001597 |
| NCH0001618 | — | NCH0001619 |
| NCH0001680 | — | NCH0001683 |
| NCH0001688 | — | NCH0001691 |
| NCH0001707 | — | NCH0001708 |
| NCH0001710 | | |
| NCH0001712 | — | NCH0001713 |
| NCH0001744 | — | NCH0001748 |
| NCH0001762 | — | NCH0001763 |
| NCH0001867 | — | NCH0001876 |
| NCH0001930 | — | NCH0001932 |
| NCH0001940 | — | NCH0001943 |
| NCH0001948 | — | NCH0001950 |
| NCH0001952 | | |
| NCH0001993 | — | NCH0001995 |
| NCH0002030 | — | NCH0002031 |
| NCH0002057 | — | NCH0002066 |

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| NCH0002082 | — | NCH0002085 |
| NCH0002087 | — | NCH0002091 |
| NCH0002097 | — | NCH0002102 |
| NCH0002110 | — | NCH0002112 |
| NCH0002117 | — | NCH0002122 |
| NCH0002125 | — | NCH0002126 |
| NCH0002150 | — | NCH0002152 |
| NCH0002168 | — | NCH0002176 |
| NCH0002185 | — | NCH0002195 |
| NCH0002207 | — | NCH0002217 |
| NCH0002231 | — | NCH0002232 |
| NCH0002235 | — | NCH0002236 |
| NCH0002240 | — | NCH0002242 |
| NCH0002269 | — | NCH0002272 |
| NCH0002295 | — | NCH0002296 |
| NCH0002334 | — | NCH0002335 |
| NCH0002338 | — | NCH0002339 |
| NCH0002342 | — | NCH0002346 |
| NCH0002375 | | |
| NCH0002378 | | |
| NCH0002383 | | |
| NCH0002395 | | |
| NCH0002402 | — | NCH0002406 |
| NCH0002412 | — | NCH0002413 |
| NCH0002416 | — | NCH0002418 |
| NCH0002427 | | |
| NCH0002447 | — | NCH0002448 |
| NCH0002454 | — | NCH0002456 |
| NCH0002463 | — | NCH0002465 |
| NCH0002469 | — | NCH0002470 |
| NCH0002484 | — | NCH0002486 |
| NCH0002495 | — | NCH0002497 |
| NCH0002509 | | |
| NCH0002539 | | |
| NCH0002548 | — | NCH0002549 |
| NCH0002551 | — | NCH0002552 |
| NCH0002579 | — | NCH0002585 |
| NCH0002640 | | |

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| NCH0002662 | — | NCH0002663 |
| NCH0002684 | — | NCH0002687 |
| NCH0002853 | — | NCH0002855 |
| NCH0003123 | | |
| NCH0003125 | — | NCH0003126 |
| NCH0003504 | — | NCH0003506 |
| NCH0003513 | — | NCH0003514 |
| NCH0003648 | — | NCH0003650 |
| NCH0003719 | — | NCH0003729 |
| NCH0003750 | — | NCH0003752 |
| NCH0003907 | — | NCH0003917 |
| NCH0003920 | — | NCH0003934 |
| NCH0003957 | | |
| NCH0003974 | — | NCH0003976 |
| NCH0004000 | — | NCH0004001 |
| NCH0004107 | — | NCH0004116 |
| NCH0004120 | — | NCH0004126 |
| NCH0004129 | — | NCH0004131 |
| NCH0004134 | — | NCH0004148 |
| NCH0004151 | — | NCH0004160 |
| NCH0004164 | | |
| NCH0004168 | — | NCH0004175 |
| NCH0004180 | — | NCH0004183 |
| NCH0004185 | — | NCH0004199 |
| NCH0004211 | — | NCH0004228 |
| NCH0004230 | — | NCH0004231 |
| NCH0004237 | — | NCH0004241 |
| NCH0004246 | — | NCH0004323 |
| NCH0004331 | — | NCH0004341 |
| NCH0004353 | — | NCH0004358 |
| NCH0004362 | | |
| NCH0004365 | — | NCH0004398 |
| NCH0004410 | — | NCH0004419 |
| NCH0004436 | — | NCH0004440 |
| NCH0004442 | — | NCH0004449 |
| NCH0004452 | | |
| NCH0004457 | — | NCH0004462 |
| NCH0004469 | — | NCH0004474 |

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| NCH0004480 | — | NCH0004481 |
| NCH0004484 | — | NCH0004504 |
| NCH0004505 | — | NCH0004515 |
| NCH0004762 | — | NCH0004764 |
| NCH0004769 | — | NCH0004774 |
| NCH0004817 | — | NCH0004818 |
| NCH0004829 | — | NCH0004847 |
| NCH0004864 | — | NCH0004865 |
| NCH0004892 | — | NCH0004895 |
| NCH0004953 | — | NCH0004962 |
| NCH0005007 | — | NCH0005025 |
| NCH0005036 | — | NCH0005037 |
| NCH0005048 | — | NCH0005051 |
| NCH0005069 | — | NCH0005079 |
| NCH0005091 | — | NCH0005095 |
| NCH0005097 | — | NCH0005099 |
| NCH0005106 | | |
| NCH0005109 | — | NCH0005135 |
| NCH0005139 | — | NCH0005142 |
| NCH0005201 | — | NCH0005202 |
| NCH0005276 | — | NCH0005278 |
| NCH0005288 | — | NCH0005291 |
| NCH0005432 | — | NCH0005434 |
| NCH0005436 | | |
| NCH0005448 | — | NCH0005499 |
| NCH0005502 | — | NCH0005508 |
| NCH0005512 | — | NCH0005514 |
| NCH0005529 | — | NCH0005547 |
| NCH0005588 | — | NCH0005589 |
| NCH0005596 | — | NCH0005599 |
| NCH0005607 | — | NCH0005609 |
| NCH0005620 | — | NCH0005624 |
| NCH0005630 | — | NCH0005635 |
| NCH0005637 | — | NCH0005638 |
| NCH0005736 | — | NCH0005738 |
| NCH0005798 | — | NCH0005801 |
| NCH0005824 | | |
| NCH0005861 | — | NCH0005863 |

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| NCH0005876 | — | NCH0005878 |
| NCH0005889 | — | NCH0005890 |
| NCH0005896 | — | NCH0005898 |
| NCH0005900 | — | NCH0005904 |
| NCH0005920 | — | NCH0005924 |
| NCH0005962 | — | NCH0005968 |
| NCH0005977 | — | NCH0005985 |
| NCH0006006 | — | NCH0006010 |
| NCH0006014 | — | NCH0006019 |
| NCH0006021 | | |
| NCH0006027 | — | NCH0006028 |
| NCH0006050 | — | NCH0006053 |
| NCH0006081 | — | NCH0006083 |
| NCH0006200 | — | NCH0006201 |
| NCH0006219 | — | NCH0006222 |
| NCH0006229 | — | NCH0006230 |
| NCH0006266 | — | NCH0006270 |
| NCH0006316 | — | NCH0006317 |
| NCH0006470 | — | NCH0006471 |
| NCH0006526 | — | NCH0006527 |
| NCH0006559 | — | NCH0006560 |
| NCH0006667 | — | NCH0006670 |
| NCH0006676 | — | NCH0006680 |
| NCH0006732 | | |
| NCH0006747 | — | NCH0006749 |
| NCH0006970 | — | NCH0006971 |
| NCH0007355 | — | NCH0007358 |
| NCH0007365 | — | NCH0007370 |
| SA0000100 | — | SA0000103 |
| SA0000132 | — | SA0000133 |
| SA0000311 | — | SA0000314 |
| SA0000366 | — | SA0000367 |
| SA0000470 | — | SA0000472 |
| SA0000630 | — | SA0000644 |
| SA0000660 | — | SA0000664 |
| SA0000669 | — | SA0000683 |
| SA0000770 | — | SA0000778 |
| SA0000858 | — | SA0000860 |

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| Bates Ranges | | |
|---|---|---|
| SA0000870 | | |
| SA0000879 | — | SA0000880 |
| SA0000887 | — | SA0000903 |
| SA0000966 | — | SA0000968 |
| SA0001108 | — | SA0001109 |
| SA0001156 | — | SA0001157 |
| SA0001171 | — | SA0001172 |
| SA0001179 | — | SA0001185 |
| SA0001187 | — | SA0001189 |
| SA0001217 | — | SA0001218 |
| SA0001221 | — | SA0001234 |
| SA0001296 | — | SA0001305 |
| SA0001310 | — | SA0001312 |
| SA0001587 | — | SA0001601 |
| SA0001665 | — | SA0001678 |
| SA0001682 | — | SA0001684 |
| SA0001689 | — | SA0001691 |
| SA0001746 | — | SA0001750 |
| SA0001771 | — | SA0001772 |
| SA0001840 | — | SA0001844 |
| SA0001850 | — | SA0001856 |
| SA0002041 | — | SA0002057 |
| SA0002096 | — | SA0002098 |
| SA0002427 | — | SA0002428 |
| SA0002447 | — | SA0002449 |
| SA0002489 | | |
| SA0002525 | — | SA0002535 |
| SA0002641 | — | SA0002642 |
| SA0002888 | | |
| SA0003080 | — | SA0003081 |
| SA0003095 | — | SA0003097 |
| SA0003121 | — | SA0003124 |
| SA0003183 | — | SA0003209 |
| SA0003346 | — | SA0003362 |
| SA0003403 | — | SA0003405 |
| SA0003437 | — | SA0003442 |
| SA0003444 | — | SA0003445 |
| SA0003469 | — | SA0003473 |

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

| **Bates Ranges** | | |
|---|---|---|
| SA0003562 | — | SA0003564 |
| SA0003763 | — | SA0003773 |

Legal Documents:

Declaration of Eric Finnerud, *Eric Finnerud, Sound Alive Enterprise, LLC and DistroMint, LLC v. nChain Holding AG and nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, February 4, 2025.

Defendant nChain UK Ltd's Responses and Objections to Plaintiffs Eric Finnerud, Sound Alive Enterprise, LLC, and DistroMint, LLC's First Interrogatories, *Eric Finnerud, Sound Alive Enterprise, LLC, and DistroMint, LLC v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, February 9, 2026.

Defendant nChain UK Ltd's Responses and Objections to Plaintiffs Eric Finnerud, Sound Alive Enterprise, LLC, and DistroMint, LLC's Notice of Deposition of FRCP 30(b)(6) Witness for Defendant nChain UK Ltd., *Eric Finnerud, Sound Alive Enterprise, LLC, and DistroMint, LLC v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, June 10, 2026.

nChain UK Ltd's Answer, Affirmative Defenses, and Counterclaims, *Eric Finnerud, Sound Alive Entertainment, LLC, and DistroMint, LLC v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, October 14, 2025.

Notice of Removal, *Eric Finnerud, Sound Alive Entertainment, LLC and DistroMint, LLC v. nChain Holding AG and nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, November 18, 2024.

Opinion and Order, *Eric Finnerud, et al. v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, September 30, 2025.

Plaintiffs' Expert Disclosure, *Eric Finnerud, et al. v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, April 1, 2026.

Plaintiffs' Response to Defendant's First Interrogatories, *Eric Finnerud, et al. v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, April 2, 2026.

Revised Scheduling Order, *Eric Finnerud, et al. v. nChain UK Ltd*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280-SDG, April 30, 2026.

Expert Report:

Expert Witness Report Prepared by Dorothy Haraminac, *Eric Finnerud, Sound Alive, and DistroMint v. nChain Holding AG and nChain UK*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:24-cv-05280, June 1, 2026.

Articles, Books, and Publications:

Allen, Mark A., et al., "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, 3rd Ed., Federal Judicial Center, 2011.

Campino, Jose, and Shiwen Yang, "Decoding the Cryptocurrency User: An Analysis of Demographics and Sentiments," *Heliyon*, Vol. 10 (2024).

Damodaran, Aswath, "Relative Valuation," available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/multiples.pdf.

Damodaran, Aswath, "Valuing Young, Start-up and Growth Companies: Estimation Issues and Valuation Challenges," Stern School of Business, New York University, May 2009, available at https://pages.stern.nyu.edu/~adamodar/pdfiles/papers/younggrowth.pdf.

Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 4th Ed. (2025), Wiley.

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

Articles, Books, and Publications (continued):

Damodaran, Aswath, *The Dark Side of Valuation: Valuing Young, Distressed, and Complex Businesses*, 2nd Ed. (2010), Pearson Education.

Duffus, David, et al., "Forensic & Valuation Services Practice Aid, Attaining Reasonable Certainty in Economic Damages Calculations, Revenues, Costs and Best Evidence," *AICPA* (2020), Association of International Certified Professional Accountants.

Eaton, Gregory W., et al., "Peer Selection and Valuation in Mergers and Acquisitions," *Journal of Financial Economics*, Vol. 146, No. 1 (2022), 230-255.

"Fair Value Measurements," PwC, September 2022 (citing to § 4.4.2 ("Cost Approach"), ASC 820-10-55-3D), available at https://viewpoint.pwc.com/dt/us/en/pwc/accounting_guides/fair_value_measureme/assets/pwcfairvalueguide072026.pdf.

Hacibedel, Burcu, and Hector Perez-Saiz, "Assessing Macrofinancial Risks from Crypto Assets," International Monetary Fund, September 2023, available at https://www.imf.org/-/media/files/publications/wp/2023/english/wpiea2023214-print-pdf.pdf.

International Valuation Standards Council, *International Valuation Standards* effective January 31, 2025, IVS 103.

IRS, "Discount for Lack of Marketability, Job Aid for IRS Valuation Professionals," September 25, 2009, available at https://www.irs.gov/pub/irs-lbi/dlom.pdf.

Koller, Tim, et al., *Valuation: Measuring and Managing the Value of Companies*, 7th Ed. (2020), Wiley.

Koller, Tim, et al., *Valuation: Measuring and Managing the Value of Companies*, 8th Ed. (2025), Wiley.

OECD, "Lessons from the Crypto Winter: DeFi Versus CeFi," *OECD Business and Finance Policy Papers*, No. 18 (2022).

Orcutt, John L., "Valuing Young Startups is Unavoidably Difficult: Using (and Misusing) Deferred-Equity Instruments for Seed Investing," *Franklin Pierce School of Law*, University of New Hampshire, June 25, 2020, available at https://scholars.unh.edu/cgi/viewcontent.cgi?article=1445&context=law_facpub (accessed June 26, 2026).

Pratt, Shannon P., and Alina V. Niculita, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th Ed. (2008), McGraw-Hill.

Restatement (Second) of Contracts § 344, 347 (1981).

Ritter, Jay R., "Initial Public Offerings: Updated Statistics," Warrington College of Business, University of Florida, June 18, 2026, available at https://site.warrington.ufl.edu/ritter/files/IPO-Statistics.pdf.

Sakariyahu, Rilwan, et al., "One Crash, Too Many: Global Uncertainty, Sentiment Factors and Cryptocurrency Market," *Journal of International Financial Markets*, Institutions & Money, Vol. 94 (2024), 1-17.

Weil, Roman L., et al., *Litigation Services Handbook: The Role of the Financial Expert*, 6th Ed. (2017), Wiley.

Wirtz, Harald, "Valuation of Intellectual Property: A Review of Approaches and Methods," *International Journal of Business and Management*, Vol. 7, No. 9 (2012), 40-48.

Zhan, Yuanzhu, et al., "Success and Failure of Blockchain Technology Providers: Founders' Power, Beyond-Blockchain Exploration and Centralized Decision-Making," *Journal of Operations Management*, Vol. 71 (2025), 893-916.

Financials:

nChain UK Limited, Annual Report and Financial Statements for the year ended December 31, 2024, available at https://find-and-update.company-information.service.gov.uk/company/09823112/filing-history.

Believe SA, "FY'23 Organic Growth of 14.4% with Growth Recovery in Q4, as Expected; Strong Profitability Improvement and Free Cash Flow Close to Breakeven; 2024 Outlook: Another Step Towards Long-Term Objective," March 13, 2024, available at https://www.believe.com/wp-content/uploads/2026/01/2024-03-13-Believe-FY-2023-earnings-US-3.pdf.

BTCS Inc., Form 10-K for the Fiscal Year Ended December 31, 2023, filed March 21, 2024, available at https://www.sec.gov/Archives/edgar/data/1436229/000149315224010797/form10-k.htm (accessed July 18, 2026).

CONFIDENTIAL

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

Patent Documents:
"International Preliminary Report on Patentability," International Searching Authority, December 1, 2024.
"Office Action Summary," United States Patent and Trademark Office, February 3, 2026.

Websites:
"About TuneCore," TuneCore, available at https://www.tunecore.com/what-is-tunecore (accessed June 26, 2026).
"About Us," DealRoom Technologies, Inc., available at https://dealroom.net/company/about (accessed July 16, 2026).
"Apple Music Preferred Distributors," iTunes Connect Resources and Help, Archived Web Version dated October 2, 2023, available at https://web.archive.org/web/20231002142456/https://itunespartner.apple.com/music/partners (accessed June 26, 2026).
"Be Prolific," DistroKid, Archived Web Version dated October 3, 2023, available at https://web.archive.org/web/20231003014039/https://distrokid.com/ (accessed June 26, 2026).
"Binance Will Delist BCHSV," Binance, April 15, 2019, available at https://web.archive.org/web/20190417102243/https://support.binance.com/hc/en-us/articles/360026666152 (accessed June 16, 2026).
"Bitcoin SV USD Price (BSV-USD)," Yahoo Finance, available at https://finance.yahoo.com/quote/BSV-USD/history/ (accessed June 26, 2026).
"Business Employment Dynamics - Field Definitions," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/help/def/bd.htm (accessed June 26, 2026).
"Business Employment Dynamics: Frequently Asked Questions," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/bdm/bdagefaq.htm (accessed June 26, 2026).
"CD Baby Celebrates 25 Years of Empowering Independent Music," CD Baby, November 20, 2023, available at https://diymusician.cdbaby.com/music-news/cd-baby-celebrates-25-years/ (accessed June 23, 2026).
"Derek Sivers," TED, available at https://www.ted.com/speakers/derek_sivers (accessed June 23, 2026).
"Detailed Business Counts," NAICS Association, available at https://www.naics.com/business-lists/counts-by-company-size/ (accessed June 26, 2026).
"DistroKid Overview," PitchBook, available at https://pitchbook.com/profiles/company/229479-13#overview (accessed June 26, 2026).
"DistroKid Scaling Growth with a Data-Driven Marketing Strategy," Insight Partners, available at https://www.insightpartners.com/portfolio/distrokid (accessed June 23, 2026).
"DistroKid Valued at $1.3 Billion After Funding from Twitter Investor Insight Partners," Music Business Worldwide, August 16, 2021, available at https://www.musicbusinessworldwide.com/distrokid-valued-at-1-3-billion-after-investment-from-insight-partners/ (accessed June 26, 2026).
"DistroMint, LLC," Georgia Company Directory, available at https://www.georgiacompanyregistry.com/companies/distromint-llc/ (accessed July 22, 2026).
"Drops," OneOf, available at https://www.oneof.com/app/drops (accessed July 23, 2026).
"E. Smitty," LinkedIn, available at https://www.linkedin.com/in/therealesmitty (accessed June 25, 2026).
"ESPN Enters Into Multi-Year Agreement with UnitedMasters," ESPN Press Room, July 9, 2020, available at https://us.espnpressroom.com/press-releases/2020/07/espn-enters-into-multi-year-agreement-with-unitedmasters/ (accessed June 23, 2026).
"For Artists: We Have a Distribution Plan for Every Stage of Your Music Career," UnitedMasters, Archived Web Version dated October 14, 2023, available at https://web.archive.org/web/20231014065841/https://unitedmasters.com/en/artists (accessed June 26, 2026).
"Going Public," U.S. Securities and Exchange Commission, September 3, 2024 available at https://www.sec.gov/resources-small-businesses/going-public (accessed July 24, 2026).
"How OpenSea Dominated the NFT Space — A Growth Case Study!," Medium, available at https://medium.com/thecapital/how-opensea-dominates-the-nft-space-case-study-0f723545e063 (accessed June 23, 2026).
"How Sound Alive Records is 'Revolutionizing the Music Industry,'" Sound Alive Records, available at https://www.soundaliverecords.com/post/how-sound-alive-records-is-revolutionizing-the-music-industry (accessed June 18, 2026).

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

Websites (continued):
"Introduction to Web3," Ethereum.org, available at https://ethereum.org/web3/ (accessed July 21, 2026).
"Market Analysis Reports," NAICS Association, available at https://www.naics.com/market-analysis-reports/ (accessed June 26, 2026).
"NAICS Code Identification Tools," NAICS Association, available at https://www.naics.com/search/ (accessed July 22, 2026).
"nChain Company Statement," nChain, Archived Web Version dated September 30, 2023, available at https://web.archive.org/web/20240203233231/https://nchain.com/nchain-company-statement/ (accessed June 25, 2026).
"nChain UK Limited," Companies House, available at https://find-and-update.company-information.service.gov.uk/company/09823112 (accessed June 25, 2026).
"NFT," Statista, available at https://www.statista.com/outlook/fmo/digital-assets/nft/worldwide/ (accessed June 25, 2026).
"Non-fungible Tokens (NFT)," Ethereum, available at https://ethereum.org/nft/ (accessed July 21, 2026).
"OneOf NFT Platform Adds American Express as Backer in $8.4M Round," OneOf, August 2022, available at https://about.oneof.com/press-aug-2022-oneof-nft-platform-adds-american-express-as-backer/ (accessed July 23, 2026).
"Onlymusix," Onlymusix, available at https://www.onlymusix.com/ (accessed July 16, 2026).
"OpenSea," Dune, available at https://dune.com/rchen8/opensea (accessed June 26, 2026).
"OpenSea," Y Combinator, available at https://www.ycombinator.com/companies/opensea (accessed June 26, 2026).
"OpenSea Fees," OpenSea Docs, September 25, 2023, available at https://docs.opensea.io/changelog/opensea-fees (accessed July 22, 2026).
"Pricing," CD Baby, Archived Web Version dated October 1, 2023, available at https://web.archive.org/web/20231001061849/http://cdbaby.com/cd-baby-cost/ (accessed June 26, 2026).
"PwC Deals Insights: How to Value a Start-Up Business," PwC, available at https://www.pwc.com/ee/en/services/transaction-services/pwc-deals-insights--how-to-value-a-start-up-business.html (accessed June 26, 2026).
"Resources for Investors," Y Combinator, available at https://www.ycombinator.com/investors (accessed July 16, 2026).
"Sellouts," DistroKid Support Center, available at https://support.distrokid.com/hc/en-us/articles/4410721731347-Sellouts (accessed July 16, 2026).
"Series A Diligence Checklist," Y Combinator, available at https://www.ycombinator.com/library/3h-series-a-diligence-checklist#corporate-records-and-charter-documents (accessed June 29, 2026).
"Share Your Music With the World," DistroKid, available at https://distrokid.com/ (accessed June 25, 2026).
"Sound Alive Enterprise, LLC," Georgia Company Directory, available at https://www.georgiacompanyregistry.com/companies/sound-alive-enterprise-llc/ (accessed July 22, 2026).
"Soundbase," available at https://bsvradar.com/apps/soundbase (accessed July 22, 2026).
"Staff Observations in the Review of Smaller Reporting Company IPOs," U.S. Securities and Exchange Commission, March 4, 2009, available at https://www.sec.gov/divisions/corpfin/guidance/cfsmallcompanyregistration.htm (accessed July 24, 2026).
"Successful Initial Public Offering of Believe on Euronext Paris," Believe, June 9, 2021, available at https://www.believe.com/press-release/successful-initial-public-offering-of-believe-on-euronext-paris/ (accessed June 26, 2026).
"Table 7. Survival of private sector establishments by opening year: Total Private," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/bdm/us_age_naics_00_table7.txt (accessed June 26, 2026).
"Thank You for Building Sound With Us," sound.xyz, available at https://www.sound.xyz (accessed July 20, 2026).
"TokenTraxx – Enabling True Creative Freedom," TokenTraxx, Archived Web Version dated January 22, 2026, available at https://web.archive.org/web/20260122201024/https://www.tokentraxx.com/ (accessed July 16, 2026).
"Top Cryptocurrency Exchanges Ranked by Volume," CoinMarketCap, available at https://coinmarketcap.com/rankings/exchanges/ (accessed June 16, 2026).

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**


<u>Websites (continued)</u>:

"TuneCore Overview," PitchBook, available at https://pitchbook.com/profiles/company/53438-41#affiliates (accessed June 26, 2026).

"TuneCore Artists Earn over $134 Million in 2014 from 7.5 Billion in Downloads and Streams," PR Newswire, January 27, 2015, available at https://www.prnewswire.com/news-releases/tunecore-artists-earn-over-134-million-in-2014-from-75-billion-in-downloads-and-streams-300025839.html (accessed June 26, 2026).

"TuneCore Has Paid Indie Artists Over $2bn To Date – And Is Now Paying Them Over $400m Per Year," Music Business Worldwide, October 14, 2020, available at https://www.musicbusinessworldwide.com/tunecore-has-paid-indie-artists-over-2bn-to-date-and-is-now-paying-them-over-400m-per-year/ (accessed June 23, 2026).

"TuneCore Pricing," TuneCore, Archived Web Version dated September 25, 2023, available at https://web.archive.org/web/20230925002558/https://www.tunecore.com/pricing (accessed June 26, 2026).

"U.S. Dollars to Euro Spot Exchange Rate," Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/AEXUSEU (accessed July 22, 2026).

"UnitedMasters Doubles Down on Education and Coaching with Blueprint, a New Artist Development Feature," PR Newswire, November 8, 2023, available at https://www.prnewswire.com/news-releases/unitedmasters-doubles-down-on-education-and-coaching-with-blueprint-a-new-artist-development-feature-301980814.html (accessed June 23, 2026).

"Webinar: Why Startups Fail with Tom Eisenmann," YouTube, April 8, 2021, available at https://www.youtube.com/watch?v=IHPrQXjkBQQ (accessed July 24, 2026).

"What Happens at YC," Y Combinator, available at https://www.ycombinator.com/about (accessed July 16, 2026).

"What Startups Should Know About Due Diligence," DealRoom Technologies, Inc., available at https://dealroom.net/blog/startup-due-diligence (accessed June 29, 2026).

"Who Are the Biggest Players in Music Streaming?" Voronoi, available at https://www.voronoiapp.com/business/Who-Are-the-Biggest-Players-in-Music-Streaming-2223 (accessed July 13, 2026).

"Why We Exist," UnitedMasters, available at https://unitedmasters.com/en/about (accessed June 23, 2026).

"YouTube Music Directory," YouTube Music, Archived Web Version dated October 2, 2023, available at https://web.archive.org/web/20231002230858mp_/https://servicesdirectory.withyoutube.com/directory/#?services=preferred-music-distributor&page=2 (accessed June 23, 2026).

Arthur, Rob, and Yudmila Adaya, "When to apply a discount for lack of marketability," Grant Thornton, April 4, 2024, available at https://www.grantthornton.co.uk/insights/when-to-apply-a-discount-for-lack-of-marketability/ (accessed June 26, 2026).

Audius, "Welcome $AUDIO to Mainnet," Audius Blog, October 22, 2020, available at https://blog.audius.co/posts/welcome-audio-to-mainnet (accessed July 20, 2026).

Beganski, André, "Robinhood to Delist Bitcoin SV, Market Sell Remaining User Balances," Decrypt, January 11, 2023, available at https://decrypt.co/118951/robinhood-delist-bitcoin-sv-market-sell (accessed June 16, 2026).

Chew, Zoe, "Startup Ideas: Web3 Music, Creator Economy and Metaverse," Medium, October 31, 2022, available at https://medium.com/@whizzoe/web3-music-roles-of-nfts-creator-economy-metaverse-d43c53951695 (accessed July 16, 2026).

Clark, Bill, "Understanding Valuation Caps," MicroVentures Blog, November 14, 2025, available at https://microventures.com/understanding-valuation-caps (accessed July 23, 2026).

CoinMarketCap, "Audius Price Today, AUDIO to USD Live Price, Marketcap and Chart," CoinMarketCap, available at https://coinmarketcap.com/currencies/audius/ (accessed July 20, 2026).

Craig, Tim, "'OpenSea is in big trouble' as Tiger Global cuts valuation by 76%," DLNews, April 25, 2023, available at https://www.dlnews.com/articles/web3/opensea-valuation-slashed-76-by-tiger-global/ (accessed June 22, 2026).

Curry, David, "Music App Report 2026," Business of Apps, May 7, 2026, available at https://www.businessofapps.com/data/music-app-report/ (accessed July 13, 2026).

Damodaran, Aswath, "Damodaran Online," available at https://pages.stern.nyu.edu/~adamodar/New_Home_Page/papers.html#mult (accessed July 22, 2026).

Devens, Chase, "State of Crypto Fundraising – Q3 2023," Messari, October 5, 2023, available at https://messari.io/report/state-of-crypto-fundraising-q3-2023 (accessed June 26, 2026).

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**


Websites (continued):

Eisenmann, Tom, "Why Start-ups Fail," Harvard Business Review, May-June 2021, available at https://hbr.org/2021/05/why-start-ups-fail (accessed June 23, 2026).

Forristal, Lauren, "DistroKid acquires website builder Bandzoogle to expand its toolset for artists," TechCrunch, September 14, 2023, available at https://techcrunch.com/2023/09/14/distrokid-acquires-website-builder-bandzoogle-to-expand-its-toolset-for-artists/ (accessed June 26, 2026).

Henslee, Joshua, "HandCash on Circle Termination: It May Have Happened for the Best," Coingeek, February 7, 2023, available at https://coingeek.com/handcash-on-circle-termination-it-may-have-happened-for-the-best/ (accessed June 16, 2026).

Houghton, Bruce, "DistroKid has Acquired Bandzoogle," Hypebot, September 13, 2023, available at https://www.hypebot.com/distrokid-has-acquired-bandzoogle/ (accessed June 26, 2026).

Khatri, Yogita, "The Funding: Why the Bar for Crypto VC is Higher than Ever," The Block, April 19, 2026, available at https://www.theblock.co/post/398015/the-funding-why-the-bar-for-crypto-vc-is-higher-than-ever (accessed June 18, 2026).

King, Ashley, "Spotify's 'Preferred Distributor' List Now Includes 23 Companies," Digital Music News, February 2, 2023, available at https://www.digitalmusicnews.com/2023/02/02/spotifys-preferred-distributor-list-now-includes-23-companies/ (accessed June 26, 2026).

Kotashev, Kyril, "Startup Failure Rate: How Many Startups Fail and Why in 2026?," Failory, January 12, 2026, available at https://www.failory.com/blog/startup-failure-rate (accessed June 26, 2026).

Matney, Lucas, "NFT Music Rights Startup Royal Banks $55M Investment Led by a16z Crypto," TechCrunch, November 22, 2021, available at https://techcrunch.com/2021/11/22/nft-music-rights-startup-royal-banks-55m-investment-from-a16z-crypto/ (accessed July 20, 2026).

Mims, Taylor, "TuneCore: Tops $5 Billion in Artist Earnings: 'Creative Freedom and Financial Success Can Go Hand in Hand'," Billboard, November 13, 2025, available at https://www.billboard.com/pro/tunecore-5-billion-artist-earnings-milestone/ (accessed June 26, 2026).

OKX Learn, "What Is Bitcoin SV (BSV)?," OKX, June 2, 2026, available at https://www.okx.com/en-us/learn/what-is-bitcoin-sv-bsv (accessed July 21, 2026).

Park, Danny, "OpenSea Hits Highest Monthly Users Since 2023 as OS2 Exits Beta; Trading Volume Remains Well Below Previous Highs," The Block, June 9, 2025, available at https://www.theblock.co/post/357409/opensea-hits-highest-monthly-users-since-2023-as-os2-exits-beta-trading-volume-remains-well-below-previous-highs (accessed June 26, 2026).

Robbins, Jacob, "AI Startups Grabbed a Third of Global VC dollars in 2024," PitchBook, January 9, 2025, available at https://pitchbook.com/news/articles/ai-startups-grabbed-a-third-of-global-vc-dollars-in-2024 (accessed July 23, 2026).

Royal, "Royal 2.0: Rebuilding for Web3," Paragraph, April 10, 2024, available at https://paragraph.com/@royal-3/royal-2-0-rebuilding-for-web3 (accessed July 20, 2026).

Shutler, Ali, "Sound Raises $20 Million, Opens Music NFT Platform to All Artists," Decrypt, July 12, 2023, available at https://decrypt.co/148246/sound-raises-20-million-opens-music-nft-platform-all-artists (accessed July 16, 2026).

Sound.xyz, "Sound.xyz Opens to All, Raises $20m to Help Artists Make a Living from Their Music," Paragraph, July 12, 2023, available at https://paragraph.com/%40soundxyz/sound-xyz-opens-to-all-raises-20m-to-help-artists-make-a-living-from-their-music (accessed July 20, 2026).

Stassen, Murray, "Diplo Is the Latest Artist to Let Fans Buy Shares in His Streaming Royalties on $55M-Backed NFT Platform Royal," Music Business Worldwide, March 25, 2022, available at https://www.musicbusinessworldwide.com/diplo-is-the-latest-artist-to-let-fans-buy-shares-in-his-streaming-royalties-on-55m-backed-nft-platform-royal123/ (accessed July 24, 2026).

Terrell, Ellen, "Dun and Bradstreet Publications at the Library of Congress: Business Identification Service," Library of Congress, available at https://guides.loc.gov/dun-and-bradstreet/business-identification-service (accessed July 23, 2026).

Thomas, Langston, "The Music NFT Bible: A Guide to the Future of Sound," NFT Now, September 28, 2022, available at https://nftnow.com/guides/complete-guide-to-the-nft-music-ecosystem/ (accessed July 16, 2026).

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

Websites (continued):

Thorn, Alex, and Gabe Parker, "Crypto & Blockchain Venture Capital – Q4 2024," Galaxy Insights, January 15, 2025, available at https://www.galaxy.com/insights/research/crypto-blockchain-venture-capital-q4-2024 (accessed June 26, 2026).

Venette, Anthony, CPA/ABV, "DLOM Decoded: Busting Myths and Mastering Marketability Discounts," DeJoy & Co., May 29, 2024, available at https://www.teamdejoy.com/blog/dlom-decoded (accessed July 21, 2026).

Yahya, Ali, and Jane Lippencott, "Investing in Sound.xyz," a16z crypto, July 12, 2023, available at https://a16zcrypto.com/posts/article/investing-in-sound-xyz/ (accessed July 21, 2026).

Plaintiffs' Production:

'OpenSea is in big trouble' as Tiger Global cuts valuation by 76% - DL News.pdf
09823112_ap01_2024-12-02.pdf
09823112_cs01_2024-05-09.pdf
09823112_cs01_2025-05-15.pdf
09823112_mr01_2024-05-15.pdf
09823112_psc04_2025-03-06.pdf
09823112_tm01_2023-10-04 (1).pdf
09823112_tm01_2023-10-04.pdf
09823112_tm01_2024-12-02.pdf
1.pdf
1-1.pdf
1-2.pdf
1-3.pdf
1-4.pdf
1-5.pdf
1971_0310_SECInstitutionalInvestor_25.pdf
2018-04-11 nchain bch patent.pdf
2019-12-31 financials.pdf
2020-12-31 financials.pdf
2021-12-31 financials.pdf
2022_32931.pdf
2022-12-31 financials.pdf
2023-08-17 Fulfilling our promise_ empowering DistroMint to disrupt the music industry - nChain.pdf
2023-09-01 nchain partnership distromint.pdf
2023-12-31 financials.pdf
2023skkb116.pdf
2024-07-06 fulfilling our promise.pdf
2024-12-31 financials.pdf
2024-EWHC-1230-Comm-nCHain-formerly-HEH-Holding-v-Ager-Hanssen.pdf
2462.pdf
36.pdf
36-1.pdf
36-2.pdf
36-3.pdf
36-4.pdf
36-5.pdf
56.pdf
56-1.pdf
61.pdf
61-1.pdf
61-2.pdf
61-3.pdf

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

Plaintiffs' Production (continued):
61-4.pdf
About – nChain – Medium.pdf
Announcing OpenSea's new funding _ OpenSea.pdf
Audius - 2026 Company Profile, Team, Funding & Competitors - Tracxn.pdf
Audius Gives Away 30 Million AUDIO Tokens to Celebrate 250 Million Music Streams _ Anh_ba_Cong - COLE on Binance Square.pdf
Audius Launches Solana Token Airdrop for Artists as Music Streams Top 250 Million - Decrypt.pdf
Audius price today, AUDIO to USD live price, marketcap and chart _ CoinMarketCap.pdf
Audius Price USD, AUDIO Price Live Charts, Market Cap & News.pdf
Audius Price_ AUDIO_USD Live Price Chart, Market Cap & News Today _ CoinGecko.pdf
Audius raises $5.5M from General Catalyst, Lightspeed, Pantera, and Kleiner Perkins to build a Decentralized, Community Owned Music-Sharing Protocol _ by Audius _ Audius _ Medium.pdf
Believe generated $952.7m in annual revenues last year, up 15.7% YoY - Music Business Worldwide.pdf
Believe is a public company, as CEO Denis Ladegaillerie rings bell on Paris stock market debut - Music Business Worldwide.pdf
Berber Jin post 11 17 2021.png
Bitcoin SV Sinks to All-Time Low, Is Any Hope Left for ‘Satoshi’s Vision_’.pdf
Bruce Springsteen sells his entire music catalogue for $500m.pdf
Community-owned music platform Audius celebrates success by rewarding artist and fan communities – EARMILK.pdf
companies_house_document (1).pdf
companies_house_document.pdf
Discover Believe group's FY 2023 results - Believe.pdf
DistroKid raises funding at $1.3 billion valuation.pdf
DistroKid Receives Investment from Leading Software Investor Insight Partners Valuing the Company at $1.3 Billion _ Insight Partners.pdf
DistroKid valued at $1.3 billion after funding from Twitter investor Insight Partners - Music Business Worldwide.pdf
DistroMint - The Ultimate Platform for Music NFTs and Distribution - DEV SITE APR 2024.pdf
DistroMint - The Ultimate Platform for Music NFTs and Distribution - DEV SITE JAN 2024.pdf
DistroMint HandCash.jfif
Distromint LondonBlockchainConf-Presentation as pdf.pdf
Distromint LondonBlockchainConf-Presentation.pptx
DistroMint MarketPlace Screenshot 1.jfif
DistroMint MarketPlace Screenshot 2.jfif
DistroMint PitchDeck Compressed 2.pdf
DistroMint Platform.jpg
DistroMint Screenshot 2.jfif
DistroMint Screenshot 2.jpg
DistroMint Screenshot 3.jpg
doc 62 joint preliminary report and discovery plan.pdf
doc 63 answer and affirmative defense.pdf
doc 68 scheduling order.pdf
HandCash _ App Gallery 2022-10-01.pdf
HandCash _ App Gallery 2025-09-10.pdf
HandCash _ App Gallery.pdf
Handcash app soundbase.pdf
Handcash Wallet.pdf
Handcash.pdf
IFPI releases Global Music Report 2024, highlighting growth in subscription streaming globally - Music Canada.pdf
Latest Audius News - (AUDIO) Future Outlook, Trends & Market Insights.pdf

**CONFIDENTIAL**

**EXHIBIT 2**

**DOCUMENTS REVIEWED AND/OR RELIED UPON**

Plaintiffs' Production (continued):
nChain (@nChainGlobal) _ X.pdf
nChain (@nChainGlobal) _ X2.pdf
nChain announces first implementation of Verifiable AI on Bitcoin.pdf
NCHAIN UK LIMITED people - Find and update company information - GOV.UK.pdf
NCHAIN UK LIMITED persons with significant control - Find and update company information - GOV.UK.pdf
nchain youtube.pdf
NFT kingpin OpenSea lands monster $13.3B valuation in new raise _ TechCrunch.pdf
NFT Marketplace OpenSea Valued at $13.3B in $300M Funding Round.pdf
NFT Music Platform Royal Closes $55M Funding Round Led by A16z.pdf
NFT music rights startup Royal banks $55M investment led by a16z Crypto _ TechCrunch.pdf
OpenSea _ Dune.pdf
Robinhood to Delist Bitcoin SV, Market Sell Remaining User Balances - Decrypt.pdf
Robinhood to Delist Bitcoin SV, Market Sell Remaining User Balances.pdf
rss-companion.pdf
Social Banner.jpg
Sound Raises $20 Million, Opens Music NFT Platform to All Artists - Decrypt.pdf
Sound.xyz NFT Platform Gets $20M From Andreessen Horowitz, Snoop Dogg.pdf
Sound.xyz raises $5M from a16z to explore how web3 can upend the economics of the music business _ TechCrunch.pdf
Soundbase - Discover Independent Music site as of 2026-01.pdf
Soundbase - Discover Independent Music small.pdf
Soundbase - Discover Independent Music.pdf
Soundbase.click WHOIS, DNS, & Domain Info - DomainTools.pdf
SOURCES_ OpenSea Eyes $13 Billion Valuation.pdf
TuneCore - Music Business Worldwide.pdf
TuneCore parent Believe launches Paris IPO after 'prolific' Q1.pdf
UnitedMasters - 2026 Funding Rounds & List of Investors - Tracxn.pdf
UnitedMasters Announces $50 Million Series B Investment Led by Apple.pdf
UnitedMasters Closes $50M Series C led by Andreessen Horowitz (a16z) to Further Empower Independent Artists to Find Commercial Success in Creator Economy.pdf
UnitedMasters raises $50m funding at a valuation of $550m - Music Ally.pdf
UnitedMasters Raises $50M in Investment Led by Apple.pdf
UnitedMasters valued at $550m, after raising $50m in new funding round - Music Business Worldwide.pdf
With $70M from Alphabet, UnitedMasters replaces record labels _ TechCrunch.pdf
Wright-v-McCormack-Final-Judgment-for-Hand-Down.pdf

**EXHIBIT 3**

# DOCUMENTS AND INFORMATION INVESTORS TYPICALLY ANALYZE TO EVALUATE EARLY-STAGE STARTUP COMPANIES

## I. CORPORATE RECORDS AND CHARTER DOCUMENTS

1. Organizational documents, *e.g.*, certificate of incorporation, certificates of designation, amendments, and bylaws
2. Board and shareholder meeting minutes and written consents
3. Corporate organizational chart showing parent companies, subsidiaries, and affiliates, if any

## II. LEADERSHIP, MANAGEMENT, AND EMPLOYEES

1. Description of the company's management structure and a list of officers, directors, employees, and consultants, including their contact information for due diligence interviews
2. Resumes or CVs of founders and key employees, including past employment, past businesses, past compensation, and exits
3. Employee handbook and employee benefit plans
4. Documentation on employment agreements, consulting agreements, compensation, equity incentives, severance, and change-of-control arrangements for founders and key employees
5. References from customers or past employers who can speak about founders and key employees for due diligence interviews
6. Interviews with founders and key management personnel

## III. BUSINESS PLAN AND FINANCIALS

1. Current business plan and financial projections, including key growth drivers, underlying assumptions, business prospects, and predictability of future performance
2. Historical financial statements and financial reports (*e.g.*, profit & loss statements and balance sheets)

**EXHIBIT 3**

**DOCUMENTS AND INFORMATION INVESTORS TYPICALLY ANALYZE TO EVALUATE EARLY-STAGE STARTUP COMPANIES**

3. Budgets, budget-versus-actual analyses, analysis of cash flow, burn rate, and liquidity runway
4. Investor presentations and periodic investor updates
5. Documentation describing the company's business model and revenue model
6. Market studies, market sizing analyses, total addressable market (TAM), competitive analyses, and distribution plans
7. Key operating metrics and performance indicators
8. Risk assessments, key business risks, and mitigation plans
9. Exit strategy or strategic alternatives analyses, if available
10. Prior valuation analyses and internal valuation materials
11. List of potential comparable companies, with valuations, valuation dates, and analyses of comparability with the target company

## IV. CUSTOMERS, SUPPLIERS, AND STRATEGIC PARTNERSHIPS

1. Customer lists and sales pipeline information, with contact information for potential diligence interviews
2. List of key suppliers, with contact information for potential diligence interviews
3. List of strategic partners, with contact information for potential diligence interviews

## V. PRODUCTS

1. Documentation describing the company's products, services, and underlying technology
2. Product development roadmap and development timeline
3. Documentation describing the company's technology, key suppliers, and key technical dependencies
4. Documentation on product testing, usage, customer feedback, and product reviews

**EXHIBIT 3**

**DOCUMENTS AND INFORMATION INVESTORS TYPICALLY ANALYZE TO EVALUATE EARLY-STAGE STARTUP COMPANIES**

## VI. COMPANY OWNERSHIP, SECURITY ISSUANCES, AND RELATED AGREEMENTS

1. Current capitalization table and historical capitalization information, if available
2. List of stockholders, including issuance dates and original issuance price
3. List of option holders, including grant dates and exercise prices
4. Names of current investors, with contact information for potential diligence interviews
5. Equity incentive plans, stock option plans and agreements relating to outstanding options, warrants, rights (including conversion or preemptive rights), vesting schedules, or the purchase or acquisition of any of the company's securities
6. Shareholder agreements, voting agreements, registration rights agreements, investor rights agreements, transfer restrictions
7. Any other documents relating to historical equity financings and securities issuances

## VII. INTELLECTUAL PROPERTY

1. Schedules of trademarks, patents, copyrights, domain names, and applications
2. Documentation of intellectual property assignments
3. Description of R&D capabilities
4. Analysis of intellectual property risks and circumstances under which the company could lose access to its intellectual property assets

## VIII. MATERIAL AGREEMENTS

1. Material customer, supplier, licensing, consulting, management, marketing, partnership, and joint venture agreements
2. Terms of service and standard customer agreements

**EXHIBIT 3**

**DOCUMENTS AND INFORMATION INVESTORS TYPICALLY ANALYZE TO EVALUATE EARLY-STAGE STARTUP COMPANIES**

3. Intellectual property licenses and other agreements relating to proprietary rights, proprietary information or technology, including employee confidentiality and proprietary information agreements

4. Real property and personal property leases

5. Documents relating to indebtedness, liabilities, mortgages, liens, loans, and other financing documents

6. Insurance policies

7. Confidentiality and nondisclosure agreements

8. Other material agreements, contracts, understandings, or proposed transactions, including agreements involving material obligations or commitments

## IX. INFORMATION REGARDING DISPUTES AND POTENTIAL LITIGATION

1. Correspondence or documents relating to pending or threatened actions, suits, proceedings, or investigations

2. Allegations of infringement or other intellectual property disputes

3. Employment-related and labor disputes

4. Judgments, orders, writs, or decrees binding on the company

CONFIDENTIAL

## EXHIBIT 3

## DOCUMENTS AND INFORMATION INVESTORS TYPICALLY ANALYZE TO EVALUATE EARLY-STAGE STARTUP COMPANIES

Notes & Sources:

*See* "Series A Diligence Checklist," Y Combinator, available at https://www.ycombinator.com/library/3h-series-a-diligence-checklist#corporate-records-and-charter-documents (accessed June 29, 2026). Y Combinator is a three-month program that invests in startup companies and provides them with resources. Since 2005, Y Combinator has funded over 5,000 companies and worked with over 7,000 founders. ("What Happens at YC," Y Combinator, available at https://www.ycombinator.com/about (accessed July 16, 2026); "Resources for Investors," Y Combinator, available at https://www.ycombinator.com/investors (accessed July 16, 2026).)

*See* "What Startups Should Know About Due Diligence," DealRoom Technologies, Inc., available at https://dealroom.net/blog/startup-due-diligence (accessed June 29, 2026). DealRoom Technologies, Inc. ("DealRoom") is a company that offers a platform with a centralized hub for managing the full lifecycle of mergers and acquisitions deals. DealRoom's website indicates that it is used by over 160 companies, from private equity-backed rollups to global public companies. ("About Us," DealRoom Technologies, Inc., available at https://dealroom.net/company/about (accessed July 16, 2026).)

## EXHIBIT 4

## ILLUSTRATIVE EXAMPLE OF INCOME APPROACH WITH DIFFERENT DISCOUNT RATES

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| | [A] | [B] | [C] | [D] | [E] |
| [1] FCF | $10,000,000 | $10,300,000 | $10,609,000 | $10,927,270 | $11,255,088 |
| **Discount Rate: 25.0%** | | | | | |
| [2] Discount Factor | 0.8000 | 0.6400 | 0.5120 | 0.4096 | 0.3277 |
| [3] PV of FCF | $8,000,000 | $6,592,000 | $5,431,808 | $4,475,810 | $3,688,067 |
| [4] Terminal Value, Year 5 | $52,694,276 | | | | |
| [5] PV of Terminal Value | $17,266,860 | | | | |
| [6] **Indicated Value** | **$45,454,545** | | | | |
| **Discount Rate: 50.0%** | | | | | |
| [7] Discount Factor | 0.6667 | 0.4444 | 0.2963 | 0.1975 | 0.1317 |
| [8] PV of FCF | $6,666,667 | $4,577,778 | $3,143,407 | $2,158,473 | $1,482,152 |
| [9] Terminal Value, Year 5 | $24,665,406 | | | | |
| [10] PV of Terminal Value | $3,248,119 | | | | |
| [11] **Indicated Value** | **$21,276,596** | | | | |
| [12] *Percentage Reduction* | *53.2%* | | | | |
| **Discount Rate: 85.0%** | | | | | |
| [13] Discount Factor | 0.5405 | 0.2922 | 0.1579 | 0.0854 | 0.0461 |
| [14] PV of FCF | $5,405,405 | $3,009,496 | $1,675,557 | $932,878 | $519,386 |
| [15] Terminal Value, Year 5 | $14,137,489 | | | | |
| [16] PV of Terminal Value | $652,400 | | | | |
| [17] **Indicated Value** | **$12,195,122** | | | | |
| [18] *Percentage Reduction* | *73.2%* | | | | |

# EXHIBIT 4

## ILLUSTRATIVE EXAMPLE OF INCOME APPROACH WITH DIFFERENT DISCOUNT RATES

Notes & Sources:
[1] Assumes $10 million of FCF in Year 1 with an annual growth rate of 3.0%.
[2] = 1 / (1 + 25.0%)^Year. 25.0% represents the discount rate assumed.
[3] = [1] × [2].
[4] = [1][E] × (1 + 3.0%) / (25.0% - 3.0%). 3.0% represents the terminal growth rate assumed.
[5] = [4] × [2][E].
[6] = Sum of [3][A]:[E] + [5].
[7] = 1 / (1 + 50.0%)^Year. 50.0% represents the discount rate assumed.
[8] = [1] × [7].
[9] = [1][E] × (1 + 3.0%) / (50.0% - 3.0%). 3.0% represents the terminal growth rate assumed.
[10] = [9] × [7][E].
[11] = Sum of [8][A]:[E] + [10].
[12] = -[([11] / [6]) - 1].
[13] = 1 / (1 + 85.0%)^Year. 85.0% represents the discount rate assumed.
[14] = [1] × [13].
[15] = [1][E] × (1 + 3.0%) / (85.0% - 3.0%). 3.0% represents the terminal growth rate assumed.
[16] = [15] × [13][E].
[17] = Sum of [14][A]:[E] + [16].
[18] = -[([17] / [6]) - 1].

# EXHIBIT 5

## SUMMARY OF SELECT MUSIC DISTRIBUTION PLATFORMS AS OF AROUND OCTOBER 2023

| | Platform | Subscription Fee Options for Artist | Year Founded | Market Traction as of Around 2023 |
|---|---|---|---|---|
| | [A] | [B] | [C] | [D] |
| [1] | CD Baby | **Pay per release:** $9.99 per single or album | 1998 | Over 2 million artists and nearly 20 million tracks (November 2023) |
| [2] | TuneCore | **Unlimited plans:**<br>• New artist: Free<br>• Rising artist: $14.99 per year<br>• Breakout artist: $29.99 per year<br>• Professional: $49.99 per year<br><br>**Pay per release:**<br>• Free to release a single or an album to social platforms only<br>• $29.99 per album/year or $9.99 per single/year to release to all digital stores | 2006 | Over 1 million artists used to date (October 2020) |
| [3] | DistroKid | **Unlimited plan:** $22.99 per year | 2013 | 2 million artists and 45 million tracks (September 2023) |
| [4] | UnitedMasters | **Unlimited plans:**<br>• Debut: Free<br>• Select: $59.99 per year<br>• Partner: Invite only | 2017 | Over 1.9 million artists (November 2023) and over 500,000 tracks (July 2020) |

Notes & Sources:

[1][B] From "Pricing," CD Baby, Archived Web Version dated October 1, 2023, available at https://web.archive.org/web/20231001061849/http://cdbaby.com/cd-baby-cost/ (accessed June 26, 2026).

[1][C] From "Derek Sivers," TED, available at https://www.ted.com/speakers/derek_sivers (accessed June 23, 2026).

[1][D] From "CD Baby Celebrates 25 Years of Empowering Independent Music," CD Baby, November 20, 2023, available at https://diymusician.cdbaby.com/music-news/cd-baby-celebrates-25-years/ (accessed June 23, 2026).

[2][A] The free unlimited plan that TuneCore offered only enabled releases to social media platforms. *See* "TuneCore Pricing," TuneCore, Archived Web Version dated September 25, 2023, available at https://web.archive.org/web/20230925002558/https://www.tunecore.com/pricing (accessed June 26, 2026).

[2][B] From "TuneCore Pricing," TuneCore, Archived Web Version dated September 25, 2023, available at https://web.archive.org/web/20230925002558/https://www.tunecore.com/pricing (accessed June 26, 2026).

[2][C] From Mims, Taylor, "Tunecore: Tops $5 Billion in Artist Earnings: 'Creative Freedom and Financial Success Can Go Hand in Hand'," Billboard, November 13, 2025, available at https://www.billboard.com/pro/tunecore-5-billion-artist-earnings-milestone/ (accessed June 26, 2026).

# EXHIBIT 5

## SUMMARY OF SELECT MUSIC DISTRIBUTION PLATFORMS AS OF AROUND OCTOBER 2023

Notes & Sources (continued):

[2][D] From Ingham, Tim, "TuneCore Has Paid Indie Artists Over $2bn to Date – and Is Now Paying Them Over $400m Per Year," Music Business Worldwide, October 14, 2020, available at https://www.musicbusinessworldwide.com/tunecore-has-paid-indie-artists-over-2bn-to-date-and-is-now-paying-them-over-400m-per-year/ (accessed June 23, 2026).

[3][B] From "Be Prolific," DistroKid, Archived Web Version dated October 3, 2023, available at https://web.archive.org/web/20231003014039/https://distrokid.com/ (accessed June 26, 2026).

[3][C] From "DistroKid Scaling Growth with a Data-Driven Marketing Strategy," Insight Partners, available at https://www.insightpartners.com/portfolio/distrokid (accessed June 23, 2026).

[3][D] From Houghton, Bruce, "DistroKid has Acquired Bandzoogle," Hypebot, September 13, 2023, available at https://www.hypebot.com/distrokid-has-acquired-bandzoogle/ (accessed June 26, 2026).

[4][A] In October 2023, United Masters offered a "Debut" tier that only enabled social media distribution, in addition to a free 14-day trial of the "Select" tier service. *See* "For Artists: We Have a Distribution Plan for Every Stage of Your Music Career," United Masters, Archived Web Version dated October 14, 2023, available at https://web.archive.org/web/20231014065841/https://unitedmasters.com/en/artists (accessed June 26, 2026).

[4][B] From "For Artists: We Have a Distribution Plan for Every Stage of Your Music Career," United Masters, Archived Web Version dated October 14, 2023, available at https://web.archive.org/web/20231014065841/https://unitedmasters.com/en/artists (accessed June 26, 2026).

[4][C] From "Why We Exist," UnitedMasters, available at https://unitedmasters.com/en/about (accessed June 23, 2026).

[4][D] From "UnitedMasters Doubles Down on Education and Coaching with Blueprint, a New Artist Development Feature," PR Newswire, November 8, 2023, available at https://www.prnewswire.com/news-releases/unitedmasters-doubles-down-on-education-and-coaching-with-blueprint-a-new-artist-development-feature-301980814.html (accessed June 23, 2026); "ESPN Enters Into Multi-Year Agreement with UnitedMasters," ESPN Press Room, July 9, 2020, available at https://us.espnpressroom.com/press-releases/2020/07/espn-enters-into-multi-year-agreement-with-unitedmasters/ (accessed June 23, 2026).