**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| ERIC FINNERUD,<br>SOUND ALIVE ENTERPRISE, LLC, and<br>DISTROMINT, LLC,<br><br>*Plaintiffs and Counterclaim-Defendants*,<br><br>v.<br><br>NCHAIN UK LTD,<br><br>*Defendant and Counterclaim-Plaintiff.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action<br>File No.: 1:24-cv-05280-SDG |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT AND COUNTERCLAIM-PLAINTIFF NCHAIN UK LTD'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>Background and Parties</u>

1. Eric Finnerud (known as "E. Smitty") holds himself out to be a record producer and influencer. Ex. 1 at 14:4–7, 23:4–8, 114:25–115:6.

2. Finnerud resides in and works from Lawrenceville, Georgia, a suburb of Atlanta. Ex. 1 at 32:4–10.

3. Sound Alive Enterprise, LLC ("Sound Alive") is a Georgia member-managed LLC. Finnerud has been its sole member since Sound Alive's formation in 2021. Ex. 1 at 21:1–24.

4. DistroMint, LLC is a Georgia member-managed LLC, with Finnerud and his wife, Destiny Perry, being the sole members. Ex. 12 at –891; Ex. 1 at 76:13–15.

5. nChain UK Ltd ("nChain") is a limited company incorporated in England and Wales with its principal place of business in London. nChain is part of the nChain Group, which, during the relevant time, provided blockchain-related software development, IP licensing, and consulting services. *See* Dkt. 19-1 (Declaration of Ms. Spiers-King) ¶¶ 4–5; *see also* Dkt. 61 (nChain's Answer) Resp. No. 5.

**The DistroMint Idea and Finnerud's Provisional Patent**

6. In mid-2022, Finnerud came up with an idea for a solution that integrates music distribution services with blockchain-based tokenization. Ex. 7 No. 1 (pp. 1–2); Ex. 3 at 628:23–24.

7. Finnerud filed a provisional patent application No. 63/389,715, "Blockchain integration in Digital Music Distribution," on July 15, 2022. The provisional patent application is solely in Finnerud's name: he is identified as both the applicant and the inventor. Ex. 13.

8. Finnerud does not have formal training in writing software code and has never been employed in a job that required him to write software code. Ex. 1 at 17:10–13; 18:10–12.

**Finnerud Meets Christen Ager-Hanssen**

9. Finnerud asserts that he met Christen Ager-Hanssen, who later became the CEO of the nChain Group, in June or July of 2022 via X (formerly known as Twitter). Ex. 1 at 22:4–23:8. After an initial exchange via X direct messaging, the two did not speak for months. Ex. 1 at 23:2–24:2.

10. Ager-Hanssen became CEO of the nChain Group in November 2022. Around that time, Finnerud learned about the nChain Group. Ex. 1 at 25:15–20; *see also* Dkt. 61 (nChain's Answer) Resp. 30.

11. On November 28, 2022, Finnerud sent Sound Alive's pitch deck and his provisional patent application to Ager-Hanssen, stating that he "look[s] forward to working with [Ager-Hanssen] in any and all capacities." Ex. 14 at –007. Finnerud sent this email to Ager-Hanssen at Ager-Hanssen's email account for one of his companies, Custos Group (cah@custosgroup.com); he did not send it to Ager-Hanssen's nChain email account. Ex. 14; Ex. 1 at 24:14–19.

12. The Sound Alive pitch deck that Finnerud sent to Ager-Hanssen represented, among other things, that Sound Alive "patent[ed]" its "Music Distribution w/Blockchain Integration Technology" concept in July 2022. Ex. 14 at –010. In fact, no patent has ever been granted based on the "Music Distribution w/Blockchain Integration Technology" application anywhere in the world. Ex. 2 at 303:7–304:15, 322:12–324:22, 342:22–25, 414:2–4.

**Finnerud and nChain Conduct Preliminary Negotiations**

13. Finnerud organized a video call with Ager-Hanssen on December 12, 2022, to pitch a potential business relationship. Ex. 1 at 29:2–11, 33:14–35:9; Ex. 7 No. 3 (p. 3). The invitation for this video call went to Ager-Hanssen's Custos Group email account, not his nChain email account. Ex. 15.

14. Finnerud, not Ager-Hanssen, arranged the December 12 call. Ex. 1 at 29:11.

15. Ager-Hanssen attended the call from his office in London, United Kingdom. Ex. 1 at 33:5–13.

16. Only Finnerud and Ager-Hanssen attended the December 12 call. Ex. 1 at 30:11–14.

17. There are no contemporaneous accounts of what was said at the December 12 meeting in the discovery record. Finnerud asserts that he took notes during that call but no longer has them. Ex. 1 at 38:8–39:25.

18. Finnerud claims that, during the December 12 call, he told Ager-Hanssen about his idea for a blockchain-based platform for music-related NFTs combined with a music distribution platform and his provisional patent application "Music Distribution w/Blockchain Integration Technology." Ex. 1 at 33:21–34:24, 35:20–36:6.

19. The December 12, 2022 meeting did not result in a written agreement. Ex. 7 No. 3 (p. 3).

20. However, Plaintiffs allege the call resulted in an oral "Development Agreement," which was supposedly reduced to writing in a February 20, 2023 email exchange (Ex. 16). Ex. 7 No. 3 (p. 3).

21. Regarding the terms of the alleged Development Agreement, Plaintiffs' interrogatory responses describe them as the following: "nChain UK LTD agreed to commit its resources towards the development, support, and launch of Eric Finnerud's platform and patent: 'Blockchain Distribution W /NFT Minting' and 'DistroMint, LLC'; Sound Alive and nChain UK LTD agreed to a split ownership of fifty percent; nChain UK LTD agreed to compensate Eric Finnerud through Sound Alive at a rate of $12,500.00 per month for consulting services nChain UK LTD required as part of its development and support of DistroMint." Ex. 7 No. 4 (p. 4); *see also* Ex. 1 at 33:21–38:7.

22. Finnerud testified that the alleged Development Agreement had no additional terms beyond those Plaintiffs identified in their interrogatory responses. *See* Ex. 1 at 48:21–24.

23. DistroMint, LLC was not formed until February 20, 2023 and thus did not exist when Finnerud met with Ager-Hanssen on December 12, 2022. Ex. 12 at

–891. DistroMint, LLC was not one of the topics Finnerud discussed with Ager-Hanssen on December 12. Ex. 1 at 33:21–38:7.

24. Finnerud did not identify Sound Alive as one of the members of DistroMint, LLC in his 30(b)(6) testimony on behalf of that entity (Ex. 1 at 74:18–22 (Finnerud, Destiny Perry, and nChain would jointly own DistroMint, LLC)), and DistroMint, LLC's corporate records do not indicate Sound Alive was ever a member. Ex. 12 at –891 (listing Finnerud and Perry as sole owners of DistroMint, LLC).

25. As to what nChain supposedly received under the alleged Development Agreement, Plaintiffs have claimed the following: nChain would receive a 50% interest in DistroMint, LLC, *see* Ex. 16 at –233; nChain would receive 50% of the platform and Finnerud's (unrealized) patent, *see* Ex. 1 at 42:19–22; nChain would receive 50% of the "company" and the "IP," *see* Ex. 3 at 646:8–12; and a 50/50 split without specifying what, *see* Ex. 7 No. 4 (p. 4).

26. In his deposition, Finnerud did not identify getting support from nChain in prosecuting his provisional patent application as one of the topics that he discussed with Ager-Hanssen on December 12. Ex. 1 at 36:18–38:2.

27. Regarding the parties to the alleged Development Agreement, Plaintiffs have asserted at different times that they were: (i) Sound Alive and DistroMint, LLC

(Ex. 1 at 47:20–24); (ii) Sound Alive, nChain, and possibly Finnerud (Ex. 16 at –233); and (iii) Sound Alive and nChain (Ex. 7 No. 4 (p. 4)).

**Finnerud Invoices nChain for Fees**

28. Finnerud sent Ager-Hanssen a consolidated 12-month invoice on December 13, 2022, stating: "Total Payments: $150,000 Divided into 12 Payments of $12,500 USD." Ex. 17.

29. Ager-Hanssen replied that "[i]t's []one invoice for every month[,]" and Finnerud confirmed. Ex. 18 at –047.

30. On December 19, 2022, Finnerud attended an introductory call with a team from nChain Slovenia, another entity within the nChain Group, to discuss creating an NFT marketplace. Ex. 20 at –097.

31. On January 5, 2023, Finnerud sent a revised monthly invoice to nChain, along with his banking information. That invoice also stated: "Total Payments: $150,000 Divided into 12 Payments of $12,500 USD." Ex. 21 at –959.

32. nChain wired its first payment to Finnerud on January 6, 2023. The recipient bank was in Tupelo, Mississippi. Ex. 22 at –981, –984.

**Finnerud Owns and Controls DistroMint, LLC**

33. On January 26, 2023, nChain Group Project Manager Urban Bratina emailed Finnerud, requesting details of the company that would run the platform and asking whether the company was already registered. Finnerud responded that "the

company will be run by Sound Alive Enterprise, LLC," and that he needed "to know the country/territory of origin to which site [would] be hosted." Ex. 23 at –148.

34. On February 20, 2023, at 10:29 a.m., Finnerud organized DistroMint, LLC as a Georgia member-managed limited liability company with himself and Destiny Perry as the sole members. Ex. 12 at –891.

35. Finnerud admits that he and Perry, his wife, were the only founding members of DistroMint, LLC. Ex. 1 at 73:18–74:4, 74:23–75:4, 76:13–15, 79:8–13.

36. On February 20, 2023 (Eastern Time), Finnerud (from his Sound Alive email) emailed Ager-Hanssen stating that, on behalf of Sound Alive, he "agree[s] to the terms of 50/50 Partnership of Distromint, LLC" with nChain. Ex. 16 at –233; Dkt. 36-2 at 2. Finnerud did not include any corporate documents or any other details such as EIN to identify "Distromint, LLC."

37. The February 20, 2023 email did not mention Perry or otherwise reflect her assent to admit nChain to DistroMint, LLC. Ex. 16 at –233.

38. Ager-Hanssen responded: "Thanks 🙏 I will arrange an agreement as soon as possible but will pay the invoice tomorrow morning." Ex. 16 at –233.

39. On February 22, 2023, *i.e.,* after the February 20 email exchange, Nat Smith, as organizer of DistroMint, LLC, executed DistroMint, LLC's Initial Resolutions, which resolved to organize the company on February 20 with two members: Finnerud and Perry. Ex. 12 at –893. The Initial Resolutions also attached,

among other draft documents, an unsigned operating agreement listing Finnerud and Perry as the LLC's sole members. Ex. 12 at –898.

40. Finnerud and Perry never met to discuss DistroMint, LLC. Ex. 1 at 99:10–13. Nevertheless, Plaintiffs' interrogatories assert that Finnerud and Perry "met and unanimously consented" to add nChain as a 50% member/owner of DistroMint on February 20, 2023. Ex. 7 No. 8 (p. 6).

41. DistroMint, LLC never adopted an operating agreement. Ex. 1 at 93:18–21.

42. Finnerud and Perry never passed a formal resolution to add nChain as a member to DistroMint, LLC, or to otherwise alter the LLC's membership. *See* Ex. 1 at 79:3–92:23.

43. There are no membership consent forms, operating agreements, tax documents, ledgers, or any other corporate documents identifying nChain as a member of DistroMint, LLC. *See* Ex. 1 at 79:3–92:23, 93:18–21, 94:8–19, 99:10–21, 100:8–101:1, 139:17–140:15.

44. On March 2, 2023, in an email to Urban Bratina, Finnerud listed himself and Perry as the sole members of DistroMint, LLC, referring to himself as CEO and Perry as VP. In that email, Finnerud also shared, for the first time, DistroMint, LLC's address and EIN (92-2501692), email (info@distromint.com), and phone number (888.447.1520). Ex. 24 at –398.

**Development of the DistroMint Platform**

45. Between January 2023 and September 2023, nChain Slovenia's development team held calls with Finnerud and received his input on non-technical aspects of what would become the DistroMint platform. Ex. 4 at 137:10–17, 138:13–17, 178:19–179:7.

46. All communications between Finnerud and nChain affiliates, including nChain Slovenia's development team, were virtual. No affiliated person of nChain or nChain Slovenia traveled to Georgia as part of working on the DistroMint platform. Members of nChain Slovenia built the source code in Slovenia. Ex. 5 at 28:12–15; Ex. 2 at 353:5–354:11, 357:7-9.

47. nChain Slovenia's development team created the source code and built the DistroMint platform from a technical perspective. Finnerud is not a computer programmer and did not write any of the DistroMint platform's source code himself. Ex. 3 at 633:19–634:18; Ex. 2 at 353:5–354:11.

48. The nChain Slovenia development team stored the DistroMint platform's source code in an nChain-controlled GitHub repository. Ex. 4 at 235:25–236:5; Ex. 5 at 100:4–10.

49. Finnerud never had access to the source code stored in the nChain-controlled GitHub repository. Ex. 2 at 356:12–14; Ex. 4 at 236:5.

50. nChain owned the DistroMint platform's source code and never agreed to transfer copyright to any of the Plaintiffs. Ex. 4 at 148:24–149:8, 191:23–192:5.

51. The DistroMint platform was hosted on Amazon Web Services ("AWS"), in an account Finnerud owned and paid for. Ex. 4 at 166:19–25; Ex. 2 at 381:11–23, 383:1–8.

52. Finnerud was "in charge" of the AWS account, and he had control to add and assign members to the account. Ex. 2 at 381:11–382:3, 382:23–25.

53. Finnerud provided nChain personnel with credentials and administrative access to the AWS account. Ex. 7 No. 5 (p. 4); Ex. 2 at 381:21–382:3.

54. Only a containerized "image," *i.e.,* "a compiled version," of the DistroMint source code was uploaded to AWS, which allowed the platform to be deployed in the AWS environment. *See* Ex. 4 at 242:6–16.

55. Finnerud eventually lost access to AWS because he stopped paying for the account. Ex. 2 at 383:1–8.

56. Around March 2023, the nChain Slovenia development team was close to finalizing a minimum viable product ("MVP"). Ex. 1 at 58:19–22.

57. The nChain Slovenia development team continued work on the DistroMint platform until approximately August 2023. *See* Ex. 5 at 128:3–129:4; Ex. 26 at –250.

58. Finnerud attended the London Blockchain Conference on May 31, 2023 and met with nChain personnel while there. Ex. 27; Ex. 2 at 439:17–440:11.

59. nChain reimbursed Finnerud's claimed expenses for attending the conference. Ex. 28 at –139; Ex. 29 at –191; *see* Ex. 9 No. 5 (pp. 11–12) (payment of May 11, 2023).

**<u>Finnerud and nChain Continue Negotiations</u>**

60. Finnerud and nChain continued to negotiate terms of a potential agreement into mid-2023. *See infra* ¶¶ 61–76.

61. Dale Evans, a member of nChain's legal team, was brought into the DistroMint project in January 2023. *See* Ex. 30 at –097.

62. Evans and Finnerud met via Microsoft Teams to "run through the activities [Finnerud was] planning and where nChain fits into the process." Ex. 30 at –097.

63. In the first instance, Evans was tasked with drafting the user terms and conditions for the DistroMint platform. Ex. 4 at 123:1–25. Evans was not aware of any legal relationship between nChain and the DistroMint project or Sound Alive. Ex. 4 at 124:1–5.

64. Ager-Hanssen instructed Evans to draft an "agreement regarding DistroMint ownership" in June 2023. Ex. 4 at 224:23–225:10.

65. nChain was concerned about, among other things, the risk posed by potential U.S. regulation of the DistroMint platform once it launched, so nChain did not want the platform to operate through a U.S.-based entity like DistroMint, LLC. Ex. 5 at 79:21–80:1, 185:19–186:25; Ex. 4 at 234:20–235:12.

66. Over the course of several months, Evans and Finnerud discussed where the DistroMint project company would be incorporated. *See* Ex. 31 at –444. The parties never reached agreement on the issue. *Infra* ¶¶ 67–76.

67. On June 23, 2023, Evans emailed Finnerud about nChain's regulatory concerns, attaching a court opinion letter and saying: "this was the case I was referring to about the blurring of arguments around collectables. Your baseball card analogy is very much on point," and this is "the kind of analysis of the various elements of the *Howey* test when considering whether NFTs could be viewed as securities." Ex. 25. Finnerud replied: "I do understand your point of view, and I respect your concerns." Ex. 31 at –444; Ex. 1 at 163:18–164:23.

68. On June 27, 2023, Finnerud told the nChain Slovenia team that the question of where to incorporate the project company for the DistroMint platform remained unresolved. According to meeting minutes, Finnerud explained that "the company will (probably) be reincorporated in UK, where laws are less restrictive [for] the projects like Distromint." Ex. 32 at –436.

69. On July 28, 2023, Evans presented a potential investment structure for the DistroMint project to Finnerud via Microsoft Teams. *See* Ex. 4 at 220:18–221:20. The proposed investment structure contemplated Finnerud and nChain owning 51% and 49%, respectively, of the DistroMint project company, which would be incorporated in the United Kingdom and subject to UK tax law. Finnerud and nChain would execute a collaboration agreement, and Finnerud would continue to provide consultancy services. Ex. 33 at –276.

70. The proposed investment structure was forward-looking; there was no agreement between nChain and Finnerud in place at the time of the July 28, 2023 meeting. Ex. 4 at 222:24–223:3, 224:9–11, 227:3–5.

71. The July 28, 2023 meeting did not result in an agreement. *See* Ex. 4 at 227:7–10.

72. On August 1, 2023, Finnerud once again acknowledged there was no agreement, including concerning the project company's place of incorporation, in an email to Ager-Hanssen, stating that he was "taking Dale's advice to finalize our agreement and co-decide jurisdiction." Ex. 34 at –798.

73. By the end of August, Evans had ruled out the United States and several European jurisdictions, including the UK, due to, among other issues, regulatory and compliance concerns. Evans did, however, identify the British Virgin Islands as a

potentially viable target. He shared these views with Finnerud by email on August 30, 2023. Ex. 35 at –922.

74. Finnerud responded: "[M]y research matches yours, I've already found a company that will incorporate DistroMint in BVI and act as a registered agent, and help with opening a bank account. To my knowledge there are very few hoops to jump through with the BVI setup." Ex. 35 at –922.

75. Evans and Finnerud met the next day to discuss incorporating the DistroMint project company in the British Virgin Islands. Ex. 36 at –628; Ex. 4 at 144:13–17.

76. As of September 19, 2023, nChain and Finnerud had not agreed on jurisdiction, and Evans was still drafting versions of the agreement. Ex. 37 at –977.

**<u>Finnerud's Failed Patent Applications</u>**

77. In June 2023, members of nChain's in-house legal team contacted Finnerud about converting his provisional patent application to a non-provisional application. *See, e.g.,* Ex. 38 at –145. In one of these communications, Evans relayed the view of Robert Alizon, nChain's Chief IP Officer, that Finnerud's "US provisional [patent application] describes a business method referring to some technical means but does not substantiate one or more inventions sufficiently that those can be claimed in a US regular patent application." *Id.*

78. Thereafter, Arthur Roberts, nChain's IP Counsel, connected Finnerud with the UK law firm Page White Farrer Limited ("Page White") for the purpose of converting Finnerud's provisional patent application into a non-provisional application. Ex. 39 at –337.

79. On July 11, 2023, Finnerud executed a General Power of Attorney appointing Page White as his counsel in connection with the non-provisional patent application. *See* Ex. 40. That General Power of Attorney states: "This general power of attorney and any dispute or claim (including non-contractual disputes or claims arising out of or in connection with it or its subject matter or formation[)] shall be governed and construed in accordance with the law of England and Wales." Ex. 40 at –094.

80. Finnerud filed U.S. Provisional Patent Application No. 63/389,715, "Blockchain Integration in Digital Music Distribution," with the U.S. Patent and Trademark Office ("USPTO") on July 15, 2022. Ex. 13.

81. Finnerud alone was listed as both the applicant and the inventor on the application. Ex. 13 at –4107; Ex. 1 at 236:14–19.

82. On July 17, 2023, Finnerud filed a non-provisional patent application related to and drawing its priority date from the U.S. Provisional Patent Application No. 63/389,715. That non-provisional patent application was given International Application Number PCT/IB2023/057275 and was subsequently published on

January 18, 2024 under publication number US 2024/0020681 A1 and WO/2024/013726 A1. Again, Finnerud alone was listed as both the applicant and the inventor on the non-provisional patent application. *See* Ex. 59; Ex. 60.

83. In a report completed in October 2023, the European Patent Office concluded that every claim in Finnerud's non-provisional patent application lacked novelty. Ex. 41 at –717, 721–723; Ex. 2 at 318:11–17.

84. The USPTO rejected Finnerud's non-provisional patent application. Ex. 2 at 321:8–21. Finnerud submitted a revised application in October 2025; that application was not approved. Ex. 2 at 321:22–322:8.

85. Finnerud has never received a patent in connection with any of the patent applications described *supra* ¶¶ 77–84. Ex. 2 at 303:7–304:13, 322:12–324:22, 342:11–25, 414:2–4.

**nChain Group Terminates Christen Ager-Hanssen**

86. On or around September 27, 2023, nChain Group terminated Christen Ager-Hanssen as CEO for serious misconduct. Ex. 33 at –268–269. Urban Bratina informed Finnerud of Ager-Hanssen's termination on October 2, 2023. *Id.*

87. Following Ager-Hanssen's termination, nChain and the nChain Slovenia development team paused work on the DistroMint project. Ex. 4 at 112:17–113:6.

88. On October 6, 2023, Roman Puhek informed Finnerud that nChain Slovenia had to "temporarily halt the projects, that have no legal ground (contract). The best and fastest way to continue is you[r] positive reply to that email [Ex. 33] where you suggest the beginning of negotiations for contractual relationship to continue to develop Distromint. This would normally be a software development agreement that guaranties the development team to you and revenue to us." Ex. 42 at –229.

89. Finnerud responded: "It's not my fault because Dale, Christen & I were in the middle of negotiating the contract/agreement when the fallout occurred. I have a 12 month agreement with Christen working as a Contractor and Consulting nChain on how to develop this technology. I also provided my IP, Patents and diagrams in exchange for development and business support for nChain. I do have a sample diagram of the structure of my Agreement with nChain from Dale if that would be helpful." Ex. 42 at –229.

90. Later that day, Finnerud emailed Puhek: "I found the Investment structure that was being negotiated with Dale/Christen/nChain, I would like to initiate negotiations so that all our hard work and this amazing project doesn't go to waste." Ex. 43 at –256. In this email, Finnerud included an image of the potential investment structure he had discussed with Evans on July 28, 2023, which had contemplated (among other things) that the project company for the DistroMint

platform would be organized outside the United States and that Finnerud, personally, would own 51% of that non-U.S. company and nChain 49%. *Id.*

91. On October 8, 2023, Finnerud emailed Puhek and Christine Leong, stating that "Dale, Christen & I were in the middle of negotiating the contract/agreement when the fallout occurred," and "I've attached a copy of the Investment Structure that was being negotiated with Dale, Christen & nChain." Ex. 33 at –266. Finnerud attached to this email the same potential investment structure he had discussed with Evans on July 28, 2023, which he had also emailed to Puhek on October 6. Ex. 33 at –276.

92. On November 8, 2023, Finnerud emailed the nChain Slovenia development team that "[m]eetings on every [T]uesday from today to February 20th of 2024 are a requirement. I sat in today by myself and nobody showed up. That is not acceptable." Puhek responded that "there is no formal clearan[c]e for us to continue the work." Ex. 44 at –077–078.

**<u>Finnerud Rejects nChain's Draft Proposal</u>**

93. On December 14, 2023, Evans sent Finnerud a document titled "E. Smitty / nChain Transaction Restructure Proposal" (the "Restructure Proposal"). *See* Ex. 45.

94. nChain intended this proposal to "restructure" the positions the parties found themselves in as of early December 2023, in which Finnerud had no

"ownership of anything that would have been helpful in the future operation … of the platform," including its source code. Ex. 4 at 191:18–192:5.

95. Evans's December 14 email stated that "if you are happy to move forward on this basis . . . we will start to pull together the documentation. If there is detail we have missed please do let us know." Ex. 45 at –867.

96. The "Restructure Proposal" is organized into two sections: "Current Position" and "Proposed Restructure." It also contains an express legal effect clause stating that "this Proposal is non-exhaustive and does not constitute a legally binding contract between the parties or give rise to legally enforceable rights or binding obligations; it merely represents the present intention of the parties. Any transaction remains subject to each party completing its due diligence and execution of legally binding documentation. Nothing in this Proposal creates any obligations on any party to enter into any transaction and any party hereto may by written notice to the other party at any time end discussions and negotiations under or in connection with this Proposal, without having to give any reasons for doing so." Ex. 45 at –870.

97. The "Current Position" reflects the status of negotiations, not an existing agreement between the parties. *See* Ex. 5 at 188:1–3. The "Current Position" describes nChain and Finnerud as "50/50 owners of the Distromint platform." This refers to a "loose description" of nChain's and Finnerud's respective ownership of the assets that would be used by the DistroMint platform, such as the

source code that had been written by nChain and the provisional patent application that had been filed by Finnerud. Ex. 4 at 204:6–11; Ex. 5 at 162:12–23, 179:2–180:10. It did not refer to the parties' collective ownership of the DistroMint platform itself. Ex. 4 at 202:19–22; Ex. 5 at 179:2–10. Evans, who wrote the Restructure Proposal, explained that the description of nChain and Finnerud as "50/50 owners" was not accurate because the assets nChain had to offer to the fledgling enterprise, including the source code, were more valuable than the ones Finnerud had to offer. Ex. 5 at 180:1–10, 181:10–14.

98. Finnerud has stated that the Restructure Proposal, including the "Current Position" column, contains "inaccuracies." Ex. 2 at 396:13–25, 405:13–406:11.

99. The Restructure Proposal also states that nChain and Finnerud "were each expected to own 50% of the shares in the Project Company," which "has not been incorporated." Ex. 45 at –869.

100. The "Current Position" also states that the "[i]nitial expectation was [that] the platform would be owned and operated by a company called Distromint, LLC which E.Smitty formed for these purposes." Ex. 45 at –869.

101. However, the "Current Position" further states that "[e]nforcement action by the SEC and other US regulators during 2023 suggested that attempting to operate the Platform from within the US would carry too much risk and greater

regulatory compliance burden." Ex. 45 at –869. It then states that "[i]nitial investigatory work suggested that incorporating the Project Company in British Virgin Islands (BVI), at first on a limited unregulated basis and then seeking BVI regulated status before full launch would be the safest approach." *Id.*

102. The "Current Position" separately states that Finnerud would "license use of his IP and the Distromint brand." Ex. 45 at –868. Finnerud had no patents or trademarks related to the DistroMint platform to license as of the date of the Restructure Proposal and had not granted any such licenses. *See* Ex. 2 at 303:7–304:13, 322:12–324:22, 410:1–19, 414:2–4, 498:18–23; Ex. 3 at 631:2–15.

103. The "Current Position" also states that Finnerud would "undertake the day to day operation of the Platform within authority granted by the board of directors of the Project Company (to be formed)." Ex. 45 at –868. No such Project Company or board of directors existed as of the date of the Restructure Proposal. *See* Ex. 4 at 193:10–22; Ex. 2 at 402:11–14.

104. In the "Proposed Restructure" portion of the Restructure Proposal, nChain contemplated offering a to-be-formed Project Company that would be owned 100% by Finnerud convertible debt equal to the $675,000 nChain had expended on the DistroMint project as of that date. Ex. 45 at –868–869.

105. Finnerud rejected nChain's draft proposal. Ex. 3 at 639:12–15.

106. After rejecting nChain's proposal, Finnerud hired the law firm Valhil Law, PC to serve a demand letter on nChain, claiming a breach of the alleged "Development Agreement" between Finnerud and nChain and seeking $100 million. The letter described Finnerud as the "sole equityholder of DistroMint, LLC." Ex. 46 at –562–563.

**Finnerud Received Substantial Compensation from nChain**

107. nChain paid Finnerud through Sound Alive a total of $175,000 in consulting fees between January 2023 and January 2024. Ex. 9 No. 5 (p. 10). These payments were all wired to a bank in Mississippi. *Id.*

108. In addition, nChain paid Finnerud $44,377.25 for expenses that he claimed. Ex. 9 No. 5 (p. 10).

109. Finnerud's claimed expenses include:

a. $5,000 for trademark registration applications for "E. Smitty" and "DistroMint" that Finnerud claims he abandoned. Ex. 47 at –425; Ex. 2 at 498:12–23.

b. A total of $3,493 for utilities for Finnerud's home. Ex. 48 at –832; Ex. 49 at –190; Ex. 47 at –425; Ex. 2 at 483:17–23.

c. $2,500 for "travel," which Finnerud claims was for the cost of gas used while "[t]raveling . . . around the Atlanta metropolitan area." Ex. 50 at –695; Ex. 2 at 503:2–13.

d. $1,250 for four Google Fi phones. Ex. 48 at –832; Ex. 2 at 479:16–18. Finnerud testified that he had only one phone and did not give the other three to anyone else, and that the other three had been discarded. Ex. 2 at 481:13–482:2. Perry testified, however, that she received a Google phone from Finnerud that she still uses. Ex. 6 at 12:7–13:4.

e. $1,200 for one night at the Conrad Hotel in London, notwithstanding that Finnerud claims he did not stay at that hotel. Ex. 29 at –191; Ex. 2 at 472:18–473:1.

110. Finnerud never provided any documents in support of his claimed expenses. Ex. 3 at 650:19–22; *see also* Ex. 2 at 496:10–13, 504:1–12.

111. nChain incurred approximately $514,000 in labor costs associated with development of the unlaunched DistroMint platform. Ex. 10 No. 24 (p. 13).

112. Finnerud never paid any money to nChain for the work it performed in connection with development of the unlaunched DistroMint platform. Ex. 2 at 406:12–14.

113. Finnerud never assigned any interest in his patent applications (which were ultimately rejected) to nChain. Ex. 1 at 240:8–15, 244:17–19.

114. nChain did not develop further products from its work on the DistroMint platform. Ex. 9 No. 8 (p. 13).

115. Finnerud admits he could not achieve a commercially viable DistroMint project without nChain, due to his need for both nChain's resources and the Development Team. Ex. 3 at 639:17–640:5.

**Finnerud Presents the DistroMint Platform as His Own and Unsuccessfully Tries to Raise Funds**

116. In or around November 2023, before Finnerud rejected nChain's "Restructure Proposal," Finnerud began positioning the DistroMint platform as his own platform to third parties and started seeking "partnerships" and funding. *See, e.g.,* Ex. 51; Ex. 52; Ex. 53; Ex. 54.

117. For example, on November 28, 2023, Finnerud emailed the State Small Business Credit Initiative seeking information about grant programs to fund "the continued development and launch of the [DistroMint] platform" and "working capital to hire staff and expand the operation," representing himself as "the founder" of Sound Alive and of "the blockchain start-up DistroMint, LLC." Finnerud attached a DistroMint pitch deck developed with the assistance of nChain, *see* Ex. 53 at –183. The substance of the pitch deck came from Finnerud. *See* Ex. 2 at 518:21–520:10.

118. On November 28, 2023, Finnerud solicited an investment from a person named "Roger" of Planit Virtual, misrepresenting that DistroMint, LLC was at a "series A valuation." Ex. 55 at –197; Ex. 2 at 507:6–11.

119. On or around January 11, 2024, Finnerud sent a confidentiality agreement to Sologenic Development Foundation Ltd, a blockchain ecosystem, as part of an effort "to develop and market the DistroMint platform." Ex. 56 at –358.

120. On May 26, 2024, Finnerud submitted a grant application to the National Science Foundation describing DistroMint, LLC as "a small LLC" co-owned by Finnerud and his wife. Ex. 57 at –472. The National Science Foundation rejected Finnerud's application. Ex. 58 at –763.

121. In or around early 2025, Finnerud filed a grant application with the Stellar Community Fund for the DistroMint platform. Ex. 19; Ex. 2 at 516:2–5. The Stellar Community Fund rejected Finnerud's application. Ex. 19.

122. Despite his efforts, Finnerud has not raised any money for the DistroMint platform since nChain ceased work on the project in October 2023. Ex. 2 at 506:22–507:11.

**<u>Plaintiffs' Litigation Conduct</u>**

123. Prior to initiating litigation in Georgia, Finnerud considered litigating this case in the United Kingdom and reached out to several UK-based attorneys. Ex. 2 at 540:2–542:20.

124. Finnerud ultimately sued nChain on behalf of himself, Sound Alive, and DistroMint, LLC in this action. *See* Compl.

125. nChain did not participate in DistroMint, LLC's decision to sue nChain. Ex. 2 at 556:16–557:1.

126. Finnerud testified on behalf of DistroMint, LLC in this action. *See* Ex. 1 at 65:14–17.

127. nChain was not asked about, and did not participate in, DistroMint, LLC's decision to appoint Finnerud as its Rule 30(b)(6) representative in this action. *See* Ex. 1 at 9:11–10:13, 10:20–11:4.

128. Finnerud refused to identify any misrepresentations nChain allegedly made during his deposition. Ex. 3 at 599:15–600:4.

129. Plaintiffs' Second Interrogatories allege that nChain made misleading statements in "[p]ublic statements characterizing the relationship as a 'partnership' and DistroMint as leveraging nChain's expertise," and "[s]tatements denying or minimizing nChain's ownership interest, partnership status, or resource-commitment obligations after Plaintiffs refused the one-sided restructuring terms, including any representations that the relationship was purely a consulting arrangement without equity/ownership implications." Ex. 8 No. 12 (pp. 2–3).

130. Finnerud refused to explain how nChain allegedly breached the Development Agreement during his deposition, referring nChain to the Complaint. Ex. 2 at 399:13–400:11, 414:9–20.

131. Plaintiffs contend that DistroMint, LLC is the "music distribution platform described in the Complaint." *See* Ex. 11 No. 5 (pp. 2–3).

132. Plaintiffs claim compensatory damages based on the valuation report of Dorothy Haraminac, *see* Dkt. 115-2, and consequential damages in the form of lost profits, lost business opportunities, and lost goodwill. Ex. 8 No. 16 (pp. 7–8).

133. Finnerud admits that the DistroMint platform never launched, and neither the DistroMint platform nor DistroMint, LLC had customers or generated revenue. Ex. 1 at 125:1–8; Ex. 2 at 504:19–505:15.

This 30th day of September, 2026.

Respectfully submitted,

*<u>/s/ Samantha R. Mandell</u>*
Samantha R. Mandell
Georgia Bar No. 141689
STANTON LAW
410 Plasters Avenue NE, Suite 200
Atlanta, Georgia 30324
Tel. 404-881-1288
samantha.mandell@stantonlawllc.com

Rollo C. Baker IV (admitted *pro hac vice*)
Vivek Tata (admitted *pro hac vice*)
Jared Ruocco (admitted *pro hac vice*)
Sean Foley (admitted *pro hac vice*)
Elizabeth Baines (admitted *pro hac vice*)
ELSBERG BAKER & MARURI PLLC
Empire State Building
350 Fifth Avenue, 38th Floor
New York, New York 10118

Tel. 212-597-2600
rbaker@elsberglaw.com
vtata@elsberglaw.com
jruocco@elsberglaw.com
sfoley@elsberglaw.com
ebaines@elsberglaw.com

*Attorneys for Defendant nChain UK Ltd*