# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC and DISTROMINT, LLC, | : |
| Plaintiffs, | : CIVIL ACTION FILE NUMBER: 1:24-cv-05280-SDG |
| versus | : |
| NCHAIN UK LTD, | : |
| Defendant. | |

VIDEOTAPED DEPOSITION OF
ERIC FINNERUD

Volume I

Pages 1-289

9:36 a.m.

August 4, 2026

STANTON LAW
410 Plasters Avenue NE
Atlanta, GA 30324

Susan DiFilippantonio, RPR, RMR, CRR, CSR 2125

APPEARANCES:

On Behalf of the Plaintiffs, ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC and DISTROMINT, LLC:

ELSBERG BAKER + MARURI, PLLC
BY: Jared Ruocco
Sean Foley
350 Fifth Avenue
38th Floor
New York, NY 10118
212.597.2606
jruocco@elsberglaw.com
sfoley@elsberglaw.com

On Behalf of the Defendant, NCHAIN UK LTD:

NONNI HOMOLA
BY: Mark Nonni
410 N. Gadsden Street
Tallahassee, FL 32301
850.601.1111
mark@noho.law

MORGAN & MORGAN
BY: Frederick A. Rispoli (via videoconference)
18100 Von Karman Avenue
Suite 200
Irvine, CA 92612
949.898.6587
frederick.rispoli@forthepeople.com

Also Present: Michael Bond, videographer

I N D E X


| WITNESS/EXAMINATION | PAGE |
|---|---|
| ERIC FINNERUD | 7 |
| EXAMINATION BY MR. RUOCCO | 7 |
| DISCLOSURE | 283 |
| CERTIFICATE OF REPORTER | 287 |
| SIGNATURE OF DEPONENT | 289 |


E X H I B I T S


| | |
|---|---|
| Finnerud Exhibit 1, Defendant and Counterclaim-Plaintiff nChain UK LTD's Notice of Rule 30(b)(6) Deposition of Sound Alive Enterprise, LLC | 19 |
| Finnerud Exhibit 2, Plaintiffs' Response to Defendant's First Interrogatories | 27 |
| Finnerud Exhibit 3, E-mail dated February 21, 2023, re: DistroMint Partnership Agreement 2-20-23 | 51 |
| Finnerud Exhibit 4, Defendant and Counterclaim-Plaintiff nChain UK LTD's Notice of Rule 30(b)(6) Deposition of DistroMint, LLC | 65 |
| Finnerud Exhibit 5, E-mail dated March 20, 2023, re: Eric Finnerud Prints 3.20.23, Bates stamped SA0000087 through SA0000903 | 69 |
| Finnerud Exhibit 6, Plaintiffs' Response to Defendant's First Requests for Production of Documents | 83 |
| Finnerud Exhibit 7, E-mail dated February 3, 2023, re: DistroMint Company Details 3/2/23 | 101 |
| Finnerud Exhibit 8, Correspondence dated February 27, 2024, re: Notice of Breach; Claim for Conversion of Intellectual Property; Litigation Hold Notice dated 29 January 2024, Bates stamped SA0004558 through SA0004567 | 105 |

Finnerud Exhibit 9, E-mail dated May 26, 2024, re: NSF SBIR/STTR Copy of Submitted Pitch - 0082215, Bates stamped SA0003469 through SA0003473 112

Finnerud Exhibit 10, Plaintiff DistroMint, LLC's Certificate of Interested Persons and Corporate Disclosure Statement 129

Finnerud Exhibit 11, E-mail dated June 22, 2023, re: DistroMint Update 5.23.23 142

Finnerud Exhibit 12, E-mail dated July 6, 2023, re: Meeting 6.7.2023, Bates stamped SA0002096 through SA0002098 157

Finnerud Exhibit 13, E-mail dated February 7, 2023, re: NBA Moments 163

Finnerud Exhibit 14, E-mail dated August 30, 2023, re: DistroMint Launch Update 8-29-23 165

Finnerud Exhibit 15, E-mail dated May 11, 2023, re: Nameservers down, Bates stamped SA0001492 through SA0001494 180

Finnerud Exhibit 16, Screenshot of DistroMint Investment Structure 187

Finnerud Exhibit 17, E-mail dated August 10, 2023, re: Critical Update from nChain (DistroMint Update 10.8.23), 195

Finnerud Exhibit 18, E-mail dated June 10, 2023, re: DistroMint Meetings 197

Finnerud Exhibit 19, E-mail dated June 10, 2023, re: DistroMint Investment Structure 10.6.23 204

Finnerud Exhibit 20, E-mail dated June 10, 2023, re: DistroMint Meetings 214

Finnerud Exhibit 21, United States Patent and Trademark Office Confirmation No. 8902, Filing Receipt 230

Finnerud Exhibit 22, United States Patent Application Publication, Pub.No.: US 2024/0020681 A1 245

Finnerud Exhibit 23, E-mail dated June 21, 2023, re: Provisional Patent Application Conversion 249

Finnerud Exhibit 24, E-mail dated March 7, 2023, re: DistroMint and Provisional Patent Application 258

(Tuesday, August 4, 2026 9:36 a.m.)

THE VIDEOGRAPHER: This is File Number 1 in the videotaped deposition of Eric Finnerud in the matter of Finnerud, et al. versus nChain UK LTD, et al. in the United States District Court for the Northern District of Georgia, Atlanta Division, Case Number 1:24-cv-05280-SDG.

This deposition is being held at the offices of Stanton Law in Atlanta, Georgia on August 4, 2026. The time on the monitor is 9:36 a.m. My name is Michael Bond. The Court Reporter is Susan DiFilippantonio. We're here on behalf of Digital Evidence Group.

Counsel, if you will, please introduce yourselves for the record, after which the Court Reporter will swear in the witness.

MR. RUOCCO: Jared Ruocco from Elsberg Baker & Maruri on behalf of nChain UK Limited.

I'll note for the record that nChain UK Limited is appearing for and taking this deposition subject to and without prejudice to its objections to personal jurisdiction, and also note for the record that the parties did stipulate that portions of this deposition may be in 30(b)(6) capacity.

MR. FOLEY: Sean Foley of Elsberg Baker &

Maruri for nChain UK Limited.

MR. NONNI: Mark Nonni from Nonni Homola on behalf of the plaintiffs. My co-counsel, Fred Rispoli, is not here right now, but he will be appearing at some point throughout this deposition.

ERIC FINNERUD,

called as a witness at the instance of the Defendant, being first duly sworn, was examined and deposed as follows:

EXAMINATION

BY MR. RUOCCO:

**Q. Good morning, Mr. Finnerud. Thank you for coming. Do you understand that you're under oath today?**

A. Yes, I do.

**Q. And do you understand the oath that you just took is the same one that you would take if you were testifying in court?**

A. Yes, sir.

**Q. And you agree that you will tell the truth and testify accurately in your deposition here today?**

A. I do.

**Q. If at any time you do not understand a question that I have asked, will you please let me know?**

A. Yes.

**Q. Otherwise, I'll assume you understood my**

question. Okay?
A. Okay.
Q. Do you understand that there is a Court Reporter and a videographer here today?
A. Yes.
Q. And they will be transcribing and recording everything that is said today. Do you understand that?
A. Yes, sir.
Q. And can you think of any reason why your deposition should not proceed today?
A. No.
Q. Have you had your deposition taken before?
A. Never.
Q. Before we get started, I'd like to set some ground rules.
First, I would ask that you allow me to finish asking my questions before you start to respond, and I will wait for you to finish answering before asking my next question, and that will make it easier for the Court Reporter to follow us. Is that fair?
A. Yes.
Q. And for all of my questions, I will need an audible response. No head nods, things like that. Do you understand?
A. Yes.

Q. Now, do you understand that this case involves entities called Sound Alive Enterprise, LLC and nChain UK Limited?
A. Yes.
Q. If I refer to Sound Alive Enterprise, LLC as "Sound Alive," you'll know what I mean?
A. Yes, I will.
Q. And if I refer to nChain UK Limited as "nChain," you'll know what I mean?
A. Yes.
Q. Did you prepare for this deposition today?
A. Yes.
Q. Okay. Can you please identify for me each day on which you did anything to prepare for this deposition?
A. To my memory, I prepared Wednesday, Thursday, Friday, Saturday, Sunday, Monday.
Q. And when you say Wednesday, Thursday, Friday, Saturday, Sunday and Monday, you mean every day since last Wednesday; is that right?
A. Yes.
Q. And how long did you spend preparing for the deposition, approximately?
A. Hours.
Q. Ballpark, how many hours do you think?

A. I would say somewhere between, I'd say, 10 to -- 10 to 12 hours.

**Q. Did anybody help you prepare for your deposition?**

A. I spent two hours maybe total, max, with Mark on Thursday and then another two on Friday, and I spoke with Fred for like half an hour.

**Q. And you referenced Mark and Fred. Are you referring to your attorneys?**

A. Yes. Mark Nonni and Fred Rispoli.

**Q. And how did you meet with Mr. Nonni and Mr. Rispoli?**

A. Via the phone.

I have a question. If I refer to Mark or to Fred, would you prefer me to use their last names?

**Q. Feel free to refer to them however you feel most comfortable and natural. I'm just -- want to clarify for the record who you're referring to.**

A. Okay.

**Q. Apart from your lawyers, was anybody else at these meetings?**

A. No.

**Q. Did any -- or did you review any documents at these meetings?**

A. No.

**Q. Aside from what you might call formal prep sessions, did you communicate with anybody else about your deposition?**

A. No.

**Q. Just -- I want to get some background on you, Mr. Finnerud. Can you please tell us where you're from?**

A. I'm from Atlanta.

**Q. Okay.**

A. So -- well, outside of Atlanta. So I would call it Gwinnett County.

**Q. Okay.**

A. That's where I'm from now. But I was born in Santiago, Chile, and I came to the United States when I was three and a half, four years old, had my four year -- my fourth birthday in Connecticut. I became a citizen in Hartford, Connecticut at five. And I was born -- excuse me. I was raised in the Northeast, went to prep school at Kent. I also went to -- well, I went to rectory first, then I went to Kent School. Then after that, St. Thomas More, where I graduated. And I played football, basketball, baseball, and I was on the Dean's list.

**Q. Okay. Thank -- thank you for all that.**

A. Uh-huh.

**Q. So -- so you mentioned the Kent School and the**

**St. Thomas More school. So what -- what is the Kent School?**

A. The Kent School is a prestigious boarding school in northern Connecticut, right on the border of New York and Connecticut.

**Q. And how long did you study at the Kent School for?**

A. I was there for two years.

**Q. And then after the Kent School, is that when you went to the St. Thomas --**

A. Yes.

**Q. -- More school?**

A. Yeah. For my senior years, I did at St. Thomas More.

**Q. And what is that school?**

A. It's another very well-respected boarding school, private school, Catholic school. And, you know, we're known for our basketball, and now our football. So, you know, just a great opportunity for young men.

**Q. After you went to -- to St. Thomas More, did you go anywhere for college?**

A. Yes.

**Q. Where did you go to college?**

A. I went to East Carolina.

**Q. Did you complete a degree there?**

A. No, I did not.
**Q. And when did you leave?**
A. I left, I want to say, around my sophomore year.
**Q. And why -- why did you decide to leave East Carolina University?**
A. Honestly, it just -- it -- I was young. It didn't work out for me. And I started my first production company.
**Q. And since you left East Carolina University, have you studied at any other schools?**
A. I only took a very brief master class administered by Abbey Road, the -- the engineers at Abbey Road in London, and that was basically online PDF format.
**Q. Did you obtain any degree from the Abbey Road school?**
A. No.
**Q. And I believe you mentioned a moment ago that after you leave -- left East Carolina University, you went to pursue a production company; is that right?**
A. Yeah. Music production.
**Q. And --**
THE REPORTER: I'm sorry, what did --
THE WITNESS: Music production. Yeah.
BY MR. RUOCCO:

**Q. And what was the name of that production company?**
A. Smitty Productions.
**Q. And how long -- let me -- let me back up.**
**Professionally, you go by E. Smitty; is that right?**
A. Yes, sir.
**Q. Can you just tell us how -- how that name came to be?**
A. Really, it was a nickname that one of my artists gave me. It related to something totally -- that has nothing to do with music, really. It was -- so I just took the nickname. I thought it was cool and, you know, I ran with it.
**Q. We might look at some documents today in which people refer to you as E. Smitty or Smitty. Is that -- is that typical, for people to refer to you like that?**
A. Yes. Yes, absolutely.
**Q. So you were at -- or you founded Smitty Productions. How long did you work there?**
A. To my best memory, Smitty Productions operated until around 2010, 2011, before I just operated more as -- as an independent contractor and then started my independent distribution company, yeah.

**Q. And so after 2010, 2011, did Smitty Productions shut down?**

A. I never shut it down, but I kind of moved on from that name. So I had a very small deal -- distribution deal with Ingrooves Universal, and I kind of pulled out of that and I left that alone. So, you know, I kind of left the Smitty Productions thing in the past and just went by the name E. Smitty as my producer name.

**Q. Do you reference Ingrooves and Universal -- did you move over there after Smitty Productions?**

A. I was still Smitty Productions when I got the distribution deal. It's in my Wikipedia page, if you want to reference it, yeah.

**Q. And how long did you have a distribution deal with -- with Ingrooves?**

A. About two years.

**Q. And was that 2010 and 2011?**

A. I think I signed the agreement -- to my best memory, I think I signed the agreement in 2009, and then I ended it in 2011, around the time my grandmother passed away.

**Q. And then after you ended the distribution agreement with -- with Ingrooves what did you do?**

A. I just continued to make music and produce

records and engineer records for spent artists and major label artists.

**Q. And were you doing those things for any organization in particular?**

A. Not until I started my own record label, slash -- it was really a -- you know, nowadays we don't just have record labels, we have mainly distributors. So I started a distribution company. And, really, it's just by the label in the beginning. It was -- first it was SAS Management, and then we moved that to Sound Alive Records as soon as I got down here to Atlanta. I came to Atlanta the end of 2012, beginning of 2013, and I was signed briefly with Brick Squad as general manager.

**Q. Are you familiar with an entity called DistroMint, LLC?**

A. Yes.

**Q. Are you the CEO of DistroMint, LLC?**

A. I am.

**Q. Have you ever been employed as a software developer?**

A. Yes.

**Q. Where?**

A. I contracted for or with nChain as the lead -- the head of business development for DistroMint as an

independent contractor via Sound Alive.
**Q. But as part of that engagement, were you writing software code?**
A. I didn't write code, but I did create wire frames, and I did create graphics and provided patents. One -- the first patent was digital -- or was music distribution with blockchain integration. That was the provisional patent before we took it to a full patent application.
**Q. Okay. We'll get into all those things, but have you ever been employed in any job that required you to write software code?**
A. No.
**Q. Have you ever written software code at all?**
A. Yes.
**Q. And when was that?**
A. Designing various websites, HTML, JavaScript.
**Q. And what websites were those?**
A. SoundAliveStudios.com. SoundAliveRecords.com in many capacities, so many versions of it; VacationMag -- or Vacation-Mag.com. And, you know, there were many more. I just can't remember off the top of the head.
**Q. And you -- did you write that code from scratch yourself?**
A. At times.

**Q. Can you be more specific? What do you mean by "at times"?**

A. Well, I have enough general knowledge to understand how to input a embed code, and at times, you know, the embed code has to direct to the proper asset, whether it be an image or an audio file or whatnot whatever you are trying to embed in a player.

And so, the code has to be changed. You have to direct it correctly or else it's not going to generate.

**Q. And do you have any formal training in writing software code?**

A. No, I do not.

**Q. Now, Mr. Finnerud, do you understand that you're appearing here today as a 30(b)(6) witness for Sound Alive?**

A. I don't know what that means. Maybe you could explain that.

**Q. Sure. So do you understand that you've been designated as Sound Alive, as it's 30(b)(6) witness on certain topics, and that your testimony on those topics is binding on that company?**

**Do you understand that?**

A. So 30(b) means binding, is that what that means?

**Q. Well, let's take a look at -- all right.**

MR. RUOCCO: Can I get Tab 159?

BY MR. RUOCCO:
**Q. I'm showing you what's being marked as Finnerud Exhibit 1.**
A. Okay.
(Finnerud Exhibit 1, Defendant and Counterclaim-Plaintiff nChain UK LTD's Notice of Rule 30(b)(6) Deposition of Sound Alive Enterprise, LLC, was marked for identification.)
BY MR. RUOCCO:
**Q. And this is a document entitled Defendant and Counterclaim Plaintiff NChain Limited Notice of 30(b)(6) Deposition of Sound Alive Enterprise, LLC.**
**Do you see that?**
A. Yes.
**Q. Have you seen this document before?**
A. Yes, I have.
**Q. Do you understand that this is the Rule 30(b)(6) notice that was served on Sound Alive by nChain?**
A. Yes.
**Q. Okay. And let's see.**
A. I did -- I did -- I received this by e-mail. I did.
**Q. And have you had an opportunity to review the topics in this?**
A. Yes.

Q. Okay. And do you understand that you are the 30(b)(6) witness who's been designated by Sound Alive to respond to these topics?

A. Yes, I do.

Q. Now, can you turn for me to page 8 of the document and look at the first two topics, please?

A. Yes.

Q. So the first two topics are the ownership of Sound Alive and the identity and roles of all persons with a management or governance function of Sound Alive, including, but not limited to, officers, directors or their equivalent.

Do you see that?

A. Yes.

Q. And are you prepared to testify about those topics today?

A. Yes.

Q. And what did you do to prepare to give testimony on those topics on behalf of Sound Alive?

A. Just going over the details of my role. I'm not a big giant corporation. So, you know, be pretty simple answers.

Q. Did you speak to anybody else at Sound Alive to get answers to -- to any of these questions?

A. I'm the sole proprietor.

**Q. So you are the sole owner of Sound Alive; is that right?**
A. Yes, I am. The CEO and owner, founder.
**Q. And Sound Alive was founded in 2021; is that right?**
A. No. Sound Alive was founded -- okay. We're talking about Sound Alive Enterprise. Yes, 2021 is correct.
**Q. And have you been the sole owner of Sound Alive since it was founded in 2021?**
A. Yes.
**Q. And Sound Alive is a member-managed LLC; is that right?**
A. Yes.
**Q. And --**
A. Next page.
**Q. -- Sound Alive does not have any members other than you; is that right?**
A. That's correct.
**Q. And you are the managing member of Sound Alive?**
A. Yes.
**Q. Okay. And have you been the managing member of Sound Alive since the company was formed in 2021?**
A. Yes.
**Q. Does Sound Alive have any officers?**

A. No.
**Q. Does anyone other than you work for Sound Alive?**
A. No.
**Q. Switching gears a bit, Mr. Finnerud, do you know someone named Christen Ager-Hanssen?**
A. Yes.
**Q. And who is Christen Ager-Hanssen?**
A. He's a Norwegian venture capitalist entrepreneur.
**Q. When did you first meet Mr. Ager-Hanssen?**
A. I met Christen in 2022, in the middle of 2022, via the Algorand blockchain.
**Q. I'm sorry. Did you say Algorand?**
A. Yeah, Algorand, A-L-G-O-R-A-N-D.
**Q. Thank you.**
A. Yeah.
**Q. And did you say middle of 2022? Was it the fall of 2022?**
A. I would say around -- somewhere between June and July is when we first engaged.
**Q. Okay.**
A. I don't know the -- I don't recall the exact date, yeah, but somewhere in there, yeah.
**Q. And how -- I think you said you met on the Algorand blockchain.**

A. So --
**Q. Can you tell me just how -- how sort of your first meeting with him came to be?**
A. Yeah, sure. You know, I was doing things in the crypto world in terms of just being one of the largest influencers, in the world actually at that point, for four different blockchains. So it was HBAR, ALGO, XLM. No, no, it wasn't XLM.
It was XRP, HBAR, ALGO and LCX were the tokens that I was really familiar with the blockchains and the friends I had built, and I was just, you know, spreading my music around, and I saw Christen. I thought he was really amazing.
I read part of his book, Jellyfish, and I kind of just resonated with his whole vibe. I thought he was a super cool dude and, you know, somehow, I guess I -- I popped on his radar, and he sent me a DM, and he was like, "I want to help you."
And I was like, "Awesome." I responded, and I never heard back from him for months. It was a long time. I did write him on my birthday, 9/11, and he retweeted my release. So I put out a couple of releases. I put out a song with a single, an artist. I can't remember the name of the song, but it was catchy, and he reposted it on his page, and I got really excited

about that.
And then I put out the Sound Alive compilation.
**Q. You mentioned that Mr. Ager-Hanssen sent you a DM. You mean direct message?**
A. Yes.
**Q. What platform are you speaking of?**
A. On X, what's called X. It was Twitter back then.
**Q. When was the last name you spoke with Mr. Ager-Hanssen?**
A. The last time I actually had a phone call with him, I want to say April of 2023. It's been a long time.
**Q. Are you familiar with a company called the Custos Group?**
A. Yes, I am.
**Q. And what is the Custos Group?**
A. I believe that's one of Christen's companies. That's all I know.
**Q. When -- when you first began speaking with Mr. Ager-Hanssen in 2022, did you correspond with him using his Custos Group e-mail address?**
A. No. At the end of 2022, I would say that -- yes, but in the first, like, communications, no.
**Q. Okay.**

A. Yeah.
**Q. So when you first started talking to Mr. Ager-Hanssen, you were exchanging messages over Twitter/X, right?**
A. Yes, that's it.
**Q. And then as time went on, you started to exchange e-mails with him at his Custos Group e-mail address?**
A. Yes.
**Q. Okay.**
A. I think this was around the very, very beginning, like, the earliest stages of him taking the job at nChain or taking the position. I don't want to call it a job. It was a position, CEO.
**Q. And when did you first learn about nChain?**
A. I learned about nChain, I want to say, around the middle -- beginning to middle of November, and really, it was, we had a mutual friend in the Algorand blockchain. I don't recall her name, but she said, "You know, Christen is, you know, a really awesome guy."
And I said, "Well, I'm a -- I am a Viking too." Because my dad is Norwegian. Well, my adopted father is Norwegian. That's how I got the name Finnerud, and so I was fascinated with Ager-Hanssen, you know, and his whole style and vibration.

And my mom named me Eric after Erik the Red. So I kind of resonated with that, and I was like, you know, "We could be Vikings together."

**Q. Okay. So I think you said you learned about nChain in the beginning or middle of November of 2022, though?**

A. I -- yeah, that's when I learned about the company nChain. I was aware of VSV, and also aware of Satoshi, and things of -- well, Craig Satoshi, Craig Wright and, you know, the various litigations that were going on between the Bitcoin, BTC, and the BSV and the BCH maxies. So I was following all that stuff.

**Q. Okay. But the first the name nChain popped up onto your radar was November of 2022?**

A. That I can recall. You know, I may have seen it before, but it -- it didn't like stroke my memory.

**Q. Okay.**

A. Am I on the right page?

**Q. Yeah. Keep that one handy --**

A. Okay.

**Q. -- because we're probably going to come back to it today.**

A. Put that right there, okay.

**Q. Okay. I'm going to show you -- I'm going to show you what's being marked as Finnerud Exhibit 2.**

A. Sure. Thank you.
(Finnerud Exhibit 2, Plaintiffs' Response to Defendant's First Interrogatories, was marked for identification.)
BY MR. RUOCCO:
**Q. And this is a document entitled "Plaintiffs' Response to Defendant's First Interrogatories," correct?**
A. Yes.
**Q. Okay. And have you seen this document before?**
A. Yes, I have.
**Q. Okay. And these are responses from yourself, Sound Alive and DistroMint, LLC to nChain's interrogatories in this lawsuit; is that right?**
A. Yes.
**Q. Okay. And you prepared in providing information in connection with these interrogatory responses; is that right?**
A. Absolutely.
**Q. And you're the person who verified that the responses in these interrogatories were true and correct, to the best of your knowledge; is that right?**
A. Yes.
**Q. And you would agree that it's important to provide truthful and correct information in response to interrogatories?**

A. 100 percent.
**Q. Can you turn for me to Interrogatory Number 9, please?**
A. Sure.
**Q. And the interrogatory asks, "Identify each communication between any plaintiff and Christen Ager-Hanssen, including, for each communication, the dates, participants, subject and medium; e.g., phone, e-mail or form of messaging service."**
**Did I read that all correctly?**
A. Yes.
**Q. And then -- and the response begins, "In approximately 2022 and 2023, there were many written communications and verbal communications between Eric Finnerud and Christen Ager-Hanssen regarding negotiating the terms of the development agreement, verbally entering into the development agreement, reducing such verbal agreements to writing, and performing their respective obligations under the development agreement."**
**Did I read that correctly?**
A. Yes, you did.
**Q. Okay. So throughout 2022 and 2023, you had communications with Mr. Ager-Hanssen regarding negotiating the terms of the development agreement; is that right?**

A. Yes, that's correct.

**Q. Okay. Now, in this case, you allege that you had a meeting with Mr. Ager-Hanssen on December 12, 2022; is that right?**

A. Yes.

**Q. And where did that alleged meeting take place?**

A. That meeting took place over -- I believe it was Zoom or Microsoft Teams. I think it was Zoom, yeah. Or it might have been Google Meet.

**Q. Okay.**

A. It was arranged by myself.

**Q. Okay. And aside from you and Mr. Ager-Hanssen, did anyone else attend that alleged meeting?**

A. Not to my knowledge.

**Q. And other than yourself and Mr. Ager-Hanssen -- well, okay. So other than yourself and Mr. Ager-Hanssen, no one else attended the December 12, 2022, meeting; is that right?**

A. I don't believe anyone attended, but I did meet his -- one of his counselors after the meeting. David Brookes.

**Q. Okay. And let's just stay focused on the December 12, 2022, meeting. So Mr. Books was not at that meeting; is that right?**

A. He was in the background somewhere, in another

office.
**Q. So -- so was Mr. Brookes participating in the meeting on December 12, 2022, or was he not?**
A. He -- I was introduced to him after the meeting. Yeah.
**Q. Okay. So -- so during the meeting on December 12, 2022, though, Mr. Brookes was not on the videoconference with you and Mr. Ager-Hanssen; is --**
A. No.
**Q. -- that right?**
**And so this meeting on December 12, 2022, that was solely between yourself and Mr. Ager-Hanssen; is that right?**
A. Yes.
**Q. Okay. And approximately what time of the day was it when you had this alleged meeting with Mr. Ager-Hanssen?**
A. If I recall, it was somewhere around 5:00 a.m. in the morning my time. It was very early. It may have been -- it was either 5:00 a.m., like really, really early, or it was really, really late. So that's the only way that I ever spoke to Christen, was either like really early or really late. He is on a totally different time zone and also just works very late.
**Q. Okay. So you can't recall exactly what time of**

**day it was when you had the meeting?**

A. We had a couple meetings. And, you know, the first two meetings that we had were just like interviews. Like he -- he basically grilled me for, you know, two or three hours, and we talked about politics and life and technology and philosophy and things of that nature.

**Q. Okay. But I want to just focus in on this December 12, 2022, meeting --**

A. Yes.

**Q. -- that you can't recall exactly what time of the day that meeting happened; is that right?**

A. I would have to refer to my records.

**Q. Okay. But -- but sitting here today, you just -- you can't remember what time of day the December 12, 2022, meeting happened; is that right?**

A. I just know it was dark. So, you know, it was like really early in the morning or it was very late at night. Like it was not during daylight hours. And, you know, if -- forgive me, but, you know, it was three years ago, so.

**Q. Okay. But -- but you do recall it was dark outside?**

A. Yes, absolutely.

**Q. And where were you when you were participating**

**in the meeting?**

A. I was inside of my living room/office/production studio, broadcast studio.

**Q. And I don't mean to intrude into your personal space, but is -- is your living room, office, production studio -- is that all the same place?**

A. Yes. [redacted], Lawrenceville, Georgia.

**Q. And that address, that's your home address?**

A. Yes, it is.

**Q. Okay. And -- but are -- is -- is the living room, the office and the production studio at your home -- is that all one room?**

A. That's my area, yes. But I have two -- two offices and I have two actual studios.

**Q. Okay. But are -- is -- is -- are the living room, production studio and your office different rooms at your house?**

A. That particular room is set up to be all three for me, E. Smitty, because of the activities that I partake in.

**Q. Okay. Okay. So when you had this alleged meeting with Mr. Ager-Hanssen on December 12, 2022, you were in the part of your house that -- that has -- or that is your office/production studio/personal living**

**room; is that right?**

A. Yes.

**Q. Okay. And are there windows in that room?**

A. Yes. And white pillars.

**Q. And do you remember where Mr. Ager-Hanssen was taking the videoconference from?**

A. I believe he was in his office.

**Q. His office at the Custos Group company?**

A. I -- I don't know if it was that office. I just know he was in a very nice office.

**Q. And -- and where in the world did you understand Mr. Ager-Hanssen to be taking this meeting from?**

A. London.

**Q. And can you just tell us everything that was discussed during this alleged meeting you had with Mr. Ager-Hanssen on --**

A. Yes.

**Q. -- December 12, 2022?**

A. Absolutely.

**Q. Please.**

A. The first discussion was we just talked about people, you know, people who use their left brain and their right brain. And he called me brilliant and he told me I was a rock star and he loved what I was doing.

And I said, you know, It -- is it okay if I

share with you my patent and my idea? And I did that.

He said it was brilliant. And he said -- he said, I want to help you.

And he -- I said, Well, how -- how are we going to do this thing?

And he said, We're going to be partners. He was like, We're Vikings.

And I said, Well, what are the terms of this arrangement?

He's like, We going to be 50/50, Eric. He's like, That's how I work with everybody. He's like, 50/50.

And I was a little shocked because I felt like I was bringing more to the table than he was bringing to the table, and so I was thinking more of like a 70/30 deal or a 60/40. So I was kind of shocked, but nevertheless, it was an opportunity. I felt like Christen was a standup dude. He's very well spoken and just straight to the point.

And so I agreed to it, I said 50/50. I said, That sounds good. And I said, You know, what about some, you know, working capital, I said, because this is going to take a lot of time?

And he was like, Eric, I can't give you a lot of money. He was like, If you have too much money, he's

like, you -- you know, you lose focus. He's like, But I want you to focus on the project. He said -- he said -- first he said, Maybe 125, 175,000.

And I just said 150,000.

He was like, Okay, $150,000, $12,500 split up in 12 payments for a year. He said, You are going to lead your development team. My guys here, we're going to work together, we're going to build your platform.

And I said, Fantastic.

And I announced it on X to tens of thousands of people. I announced leading my development team and my deal with nChain and with Christen. And I announced nChain. And Christen responded. He reposted everything, repost -- and I -- I made a video of it. So I made it public. And I got a lot of hate from the BSV and the nChain communities because they -- I guess they thought that I wasn't qualified because I was a record producer and -- yeah. I mean, they're just a bizarre group of people.

**Q. Okay. So that's a complete account of everything that happened at the December 12, 2022, meeting; is that right?**

A. Yeah. I mean -- and if we want to go in steps, like I shared my patent with him because my platform is based off the patent and -- which is a process. It was

a crypto process. We discussed it. He called me brilliant and told me I was a rock star. He said he's been watching me, he wants to help me. And, you know, that's when we talked about the -- the agreement and we outlined a -- you know, he made the -- the proposition to me, and I took it.

**Q. Okay. But other than what you just described, there's nothing else that occurred or was discussed during the alleged December 12, 2022, meeting between you and Mr. Ager-Hanssen, was there?**

A. He just said that I was going to start on Monday, the following Monday. He was like -- I was like, So when do I start?

And he was like, The following Monday.

And I said, Well, how do I get paid?

And he said, "You're going to send me an invoice every month, every 30 days."

**Q. Okay. Okay. So just to break it down, so during this alleged December 12, 2022, meeting, you discussed with Mr. Ager-Hanssen your -- your patent idea; is that right?**

A. Well, I had already submitted and published the patent.

**Q. Okay. During the December 12, 2022, meeting, you discussed with Mr. Ager-Hanssen the -- the patent**

**that you had published and the idea in that patent; is that right?**
A. Yeah, I shared it with him.
**Q. And then you and he discussed the idea that you and he would be partners 50/50; is that right?**
A. Yes.
**Q. And then you and he discussed that you would be -- that you would receive a fee of $150,000 split into 12 payments over the next 12 months; is that right?**
A. Yes, sir.
**Q. Okay. And then you and he discussed that you would lead a development team to -- to build the platform?**
A. Lead -- lead a development team at nChain, yeah. I would be assigned a group of individuals that I would work with. So first, I obviously had to meet the head honcho at nChain Slovenia, Roman, and that was my first meeting, and Roman was in charge of putting my team together.
**Q. And other than those things that we just discussed, there is no other things that you and Mr. Ager-Hanssen discussed during this alleged meeting on December 12, 2022, was there?**
A. Well, he said this is -- you know, this is a -- I said, "Well, let this be on record. This is an oral

agreement that we have here." And, you know, I said, "Let's, you know, move it forward as fast as possible."

**Q. Okay. And other than the terms that you just mentioned, though, there were no other terms that were discussed during that December 12, 2022, meeting between you and Mr. Ager-Hanssen; is that right?**

A. Not that I recall.

**Q. Did you take any notes at that meeting?**

A. I did.

**Q. And how did you take the notes?**

A. I wrote them down.

**Q. Do you still have those notes?**

A. Sadly, as I write notes all the time, I regularly dispose of my notes because I would have a pile this high. (Gesturing). Yeah, I'm a note taker.

**Q. Okay. So you don't have the notes anymore?**

A. No, I don't.

**Q. Other than the notes that you don't have anymore, do you have any other record of what happened at the December 12, 2022, meeting?**

A. Just the public announcements on X, on Twitter, and I believe I also announced it on Facebook and on LinkedIn. Excuse me. LinkedIn and Facebook.

Sorry, I am losing my voice.

**Q. Do you have any audio recordings of the meeting?**

A. No, I do not.
**Q. Do you have any video recordings of the meeting?**
A. No.
**Q. Okay. Other than the notes you took by hand, did you use any AI or software that transcribed what happened during the meeting?**
A. No, I did not.
**Q. You mentioned that the meeting happened over some kind of videoconference. Did you take any screenshots of the meeting?**
A. No, I didn't.
**Q. And so sitting here today, you don't have any written record of -- that was created at the time the meeting happened of what was said during that meeting, do you?**
A. I would refer back to my post on X where I clearly state my partnership with nChain.
**Q. But you did that X post after this meeting occurred, right?**
A. Yeah.
**Q. Okay. You don't have any record today of -- strike that. Let me ask a better question.**
**You don't have any record that was taken during the meeting of what was said during the meeting, do you?**
A. Not in my possession, no.

**Q. Okay. And now in this case, you allege that you entered a development agreement with nChain through Mr. Ager-Hanssen; is that right?**

A. Yes, sir.

**Q. And you allege that reported development agreement was an oral agreement, correct?**

A. At first it was an oral agreement. Before, I had a very brief phone call with him in January when I tried to request my first payment, and Christen said, "Eric," he said, "I need something in writing as well." He said, "Send me an e-mail and write down nChain 50 percent ownership, and you 50 percent ownership of the DistroMint."

**Q. And -- and I'm sorry, when did you say that phone call occurred?**

A. I want to say it was briefly -- I want to say it was -- it was right after I had incorporated DistroMint, LLC.

**Q. And so you incorporated DistroMint, LLC in February of 2023; is that right?**

A. I would have to refer to my records.

**Q. Okay.**

A. But it was probably -- yeah. So it was somewhere between the end of January and -- yes, and -- and, you know, the exact date, I could look that up or

we could refer back to the agreement. I'm sure you guys have it on file.

But yeah, I would say the day of or the day after I incorporated DistroMint, LLC, that's when I had the phone call with Christen, and he directed me, telling me that I needed to put it in writing in order to receive my payment.

**Q. Okay. So after you had the December 12, 2022, meeting with Mr. Ager-Hanssen, you had a further phone call with him?**

A. Very brief.

**Q. Okay.**

A. Yeah.

**Q. And remember, let's go back to the ground rules. Just allow me to ask my question --**

A. Sure.

**Q. -- and then I will wait for you to answer.**

**After you had the December 12, 2022, meeting with Mr. Ager-Hanssen, you had a further phone call with him in either January or February of 2023, correct?**

A. Yes, I -- I honestly believe it to be in February.

**Q. Okay.**

A. Yeah.

**Q. Okay.**

A. My memory is a little -- a little -- this is three years ago, so, you know.

**Q. Okay. And during this phone call that you believe you had with Mr. Ager-Hanssen in February of 2023, he expressed the need for you to commit the terms of the development agreement to writing --**

A. Yes.

**Q. -- is that right?**

A. (Witness moves head up and down.)

**Q. Okay.**

A. He said he couldn't release a payment to me unless I put that in writing and send it to him so he could share it with the financial department and also the head of -- the chair -- the head chairman of -- well, the top guys at nChain needed to know what was going on even though Christen was the CEO.

**Q. Now, what were the terms of the development agreement as you understood it?**

A. The terms of the agreement were that nChain was to provide me with development of the platform and help me launch the platform in exchange for 50 percent ownership of the platform and 50 percent of my patent.

And to explain this because, you know, some people don't understand the value. My patent was really based off of redesigning and restructuring the major

record label industry dashboard, and that's what the -- the purpose of this whole entire project wasn't just to get users. You know, it wasn't about revenue. It was the idea that we could sell it back to all the major record labels because I had access to a major record label dashboard.

**Q. And -- and what record label dashboard was that?**

A. I have an Orchard Sony dashboard, and I also have a Symphonic.

**Q. And other than what you just described, there are no other terms of the development agreement; is that right?**

A. Well, I was responsible for leading my team, the design. I also needed to be present for meetings, sometimes daily and, you know, I would share my expertise and my music industry knowledge, and also share my, you know, if you want to call it my celebrity network and, you know, we would -- it would be -- Christen said to me, he said, "Eric, you are going to build it."

He said, "Then you are going to run the company, and then we exit out of the company."

He said, "When you exit, you come to London, buy a house and work for nChain as a -- with me here in London and we do our radio show," because he knew then

that -- I guess by English law, you know, I couldn't actually be an employee of nChain. So that's why I was a contractor.

But he wanted me -- he really wanted me to be part of the company, honestly, but, you know.

**Q. So when you first started speaking with Mr. Ager-Hanssen, you had an expectation that you would go to work for nChain in London at some point?**

A. I figured maybe some years down the line, yes, or whatever company he would want me to come work with. He just said I was a great person. I was honest, and a people person, and just straightforward, and he said I was overly prepared, and I said -- and I -- he just liked my personality, and he told me I was a rock star.

He said he wanted -- wants -- he wants people like me, people who feel, people who have vibration, character.

**Q. Okay. But at the start of this relationship with Mr. Ager-Hanssen, you had some expectation that you would relocate to London to go work for nChain there?**

A. I planned on it within two or three years. I didn't know how long it would take to complete DistroMint and then exit out of it because the whole plan was just build it. I didn't put any real thought other than, you know, creating this amazing platform,

providing a solution for the music industry, and then, you know, basically changing the whole way that people and artists interact in music.

**Q. Okay. And I want to go back to the -- the terms of the development agreement.**

**So I believe you said that your understanding was that nChain would help you develop the platform and launch it, right?**

A. Yes.

**Q. Okay. And you understood that nChain would be taking a 50 percent ownership?**

A. In exchange for the services they provided, yeah.

**Q. Well, I just want -- I want to just make sure that we're really clear on what the -- what you understood the terms of this --**

A. Yes.

**Q. -- this agreement to be.**

**So let's do it this way. So can you turn for me to Interrogatory Number 4, please?**

A. Yes.

**Q. Okay. And so the -- the interrogatory, the question is "Describe in detail each term of the alleged development agreement," correct?**

A. Uh-huh.

Q. And then the response is "The material terms included but are not necessarily limited to the following: NChain UK Limited agreed to commit its resources toward the development, support and launch of Eric Finnerud's platform and patent, blockchain distribution, W/NFT minting and DistroMint, LLC.

"Sound Alive and nChain UK Limited agreed to a split ownership of 50 percent. NChain UK Limited agreed to compensate Eric Finnerud through Sound Alive at a rate of $12,500 per month for consulting services nChain UK Limited required as part of its development and support of DistroMint."

Did I read all of that correctly?

A. Yes.

Q. Okay. Is that a complete and accurate list of the terms of the alleged development agreement?

A. I would say that's the -- the foundation.

Q. Are there any other terms of the development agreement other than what you included in your response to Interrogatory Number 4?

A. I think things were more formalized as we progressed.

Q. Okay. So as you continued to work with nChain over the course of 2023, you were trying to get your arrangement with them formalized; is that right?

A. Well, we were trying to go from a verbal agreement, oral agreement -- excuse me -- to a -- we have it on paper, you know, an e-mail, but then to a formalized document.

**Q. Okay. So as of -- as of the phone conversation that you had with Mr. Ager-Hanssen in February of 2023, you had no formalized documentation of an agreement between yourself and nChain; is that right?**

A. Just the -- the e-mail I'm referring to.

**Q. Okay. But I'm talking about the phone -- I believe you testified earlier that the phone conversation you had with Mr. Ager-Hanssen was before you had sent an e-mail to nChain about this, right?**

A. Yes.

**Q. So -- so as of the phone conversation you had with Mr. Ager-Hanssen in February of 2023, you had no formalized documentation of an agreement between yourself and nChain; is that right?**

A. Yes, sir.

**Q. Now, who are the parties to the development agreement?**

A. The parties of the development agreement are nChain -- nChain -- excuse me -- Sound Alive Enterprise and DistroMint, LLC.

**Q. And what is Sound Alive supposed to get through**

**the agreement?**
A. 50 percent ownership of DistroMint and the patent, and nChain owns 50 percent of DistroMint and the patent.
**Q. Look for me just at the interrogatory again, please.**
A. Yeah.
**Q. So it begins, "The material terms included, but are not" -- "are not necessarily limited to the following."**
**Are there any material terms to the development agreement that are not included in this interrogatory response?**
A. Interrog- -- did you say 3?
**Q. Sorry. We're on Interrogatory 4.**
A. Okay. We're still there?
**Q. Yeah, we're still there.**
**So the -- your response begins, "The material terms included, but are not necessarily limited to the following."**
**And my question is, are there material terms to the alleged development agreement that are not included in this interrogatory response?**
A. Not to my knowledge.
**Q. Can you look back at the 30(b)(6) notice,**

please? Yeah, that's Exhibit 1.
A. Page?
Q. And can you turn to page -- or Topics 9, 16, 17, and 18. Let me get the page number for you. I believe Topic 9 -- let's just start there and we'll go through this, okay?
A. Yeah.
Q. So it starts on page 9, and the topic is, "The basis for and preparation of Sound Alive's responses to interrogatories served by nChain UK in this action."
Do you see that there?
A. Yes.
Q. Okay. And then if we turn to -- I believe it's the next page, Topic 16, "Any agreements regarding DistroMint, including the Development Agreement and any amendments thereto, consulting agreements, or other written understandings concerning DistroMint."
And then Topic 17, "Communications between Sound Alive, on the one hand, and Christen Ager-Hanssen, nChain UK, other nChain Group entities, or any third party, on the other hand, concerning the subject matter of this Action, DistroMint, the alleged Development Agreement, and/or nChain UK's alleged 'US efforts to develop and promote DistroMint and Mr. Finnerud and Sound Alive' as alleged in Paragraphs 45, 47 through 49,

52, 54-55 of the Complaint."
And, finally, Topic 18, "Meetings between Sound Alive, on the one hand, and Christen Ager-Hanssen, nChain UK, other nChain Group entities, or any third party, on the other hand, concerning DistroMint or the alleged Development Agreement."
Do you see all those topics?
A. Yes.
Q. And do you understand you've been designated as Sound Alive's 30(b)(6) witness on those topics?
A. Yes.
Q. Are you prepared to testify on behalf of Sound Alive on those topics?
A. Yes.
Q. Okay. It's a lot of windup to a pretty short question: In your capacity as Sound Alive's 30(b)(6) witness, are there any material terms to the alleged development agreement other than the ones reflected in Sound Alive's response to Interrogatory Number 4?
A. I believe that there are developments to the terms.
Q. So it's your understanding that the terms of the development agreement evolved over 2023?
A. Yes.
MR. RUOCCO: We've been going for about

an hour. Why we don't we take a ten-minute break.
THE WITNESS: Sounds good.
THE VIDEOGRAPHER: The time is 10:36 a.m.
We're off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 10:49 a.m.
We're on the record.
BY MR. RUOCCO:
**Q. Welcome back, Mr. Finnerud.**
**I'm going to show you what's being marked as Finnerud Exhibit Number 3.**
A. Thank you.
(Finnerud Exhibit 3, E-mail dated February 21, 2023, re: DistroMint Partnership Agreement 2-20-23, was marked for identification.)
BY MR. RUOCCO:
**Q. And this is a February 21st, 2023, e-mail from someone named Andy Moody to you, Mr. Finnerud, and Mr. Ager-Hanssen. The subject line is "DistroMint partnership agreement 2-20-2023," correct?**
A. Yes.
**Q. And I want to just be clear upfront: I -- I'm going to ask you some questions about this document, and I'm asking for your responses both in your personal capacity and your capacity as Sound Alive's 30(b)(6)**

witness. Do you understand that?
A. Yes, sir.
Q. If at any point you feel you need to distinguish between whether you're answering on behalf of yourself versus Sound Alive, just let me know, okay?
A. Okay.
Q. Okay. Okay. So you mentioned in your earlier testimony that you had a phone call with Mr. Ager-Hanssen in February of 2023 to discuss the terms of the development agreement; is that right?
A. Yes.
Q. And I believe you said you sent him an e-mail after that meeting; is that right?
A. Yes.
Q. Okay. And there's an e-mail from you to -- to Mr. Ager-Hanssen at the bottom of this chain on February 21st, 2023. Do you see that?
A. Yes.
Q. Is that the e-mail that you say that you sent after you had this phone call with Mr. --
A. Yes.
Q. -- Ager-Hanssen?
A. Yes.
Q. And is it your contention that this document is meant to confirm the terms of an alleged oral

development agreement you claim you and Mr. Ager-Hanssen had reached?
A. Yes. The foundation, definitely.
Q. And before you sent this e-mail on February 21st, 2023, you didn't send any other writing to Mr. Ager-Hanssen purporting to confirm the terms of the alleged oral development agreement --
A. No.
Q. -- did you?
Okay. Just so I have a clean record, just before you sent this e-mail on February 21st, 2023, you didn't send any other writing to Mr. Ager-Hanssen purporting to confirm the terms of the alleged development agreement, did you?
A. No.
Q. And before you sent this e-mail on February 21st, 2023, you didn't send any other writing to anyone else at nChain purporting to confirm the terms of the alleged oral development agreement, did you?
A. I was only in contact with Christen.
Q. So that's a no?
A. No.
Q. And you sent this meeting -- or strike that.
You sent this e-mail approximately two months after you had that alleged meeting on -- with

Mr. Ager-Hanssen on December 12, 2022, right?
A. Yes.
Q. And when you wrote this e-mail on February 21st, 2023, you weren't basing it on any writing or recording you had of what was said during the December 12, 2022, meeting, were you?
A. Based off of my notes, but I don't have them. And just the direction that Christen gave me.
Q. Okay. So -- so the only writing that you referenced in connection with writing this February 21st, 2023, e-mail was the set of notes you took of the December 12, 2022, meeting, and you don't have those notes anymore --
A. No, sir.
Q. -- is that right?
And you still have -- okay. So you have Exhibit 2, which are the interrogatory responses, and I want you to take that out. We're going to ask -- I'm going to ask you some questions to compare this February 21st, 2022, e-mail and those interrogatory responses. Okay? And we're going to stay on Interrogatory Number 4, okay?
A. Okay.
Q. Okay. Now, turning first to Interrogatory Number 4, it states with regard to the development

agreement -- and I quote -- "The material terms included nChain UK Limited agreed to commit its resources toward the development, support and launch of Eric Finnerud's platform and patent."

Did I read that correctly?

A. Yes.

Q. And if you turn back to the February 21st, 2023, e-mail, in your February 21, 2023, e-mail, you don't make any mention of nChain committing resources toward the development, support or launch of your platform or patent, do you?

A. In the 21st?

Q. Yes.

DistroMint specifically.

Q. I'm sorry, do you see the word "patent" at all in your February 21st, 2023, e-mail?

A. No.

Q. So in your February 21st, 2023, e-mail, you don't make any reference to the development, support and launch of your platform or your patent, do you?

A. I do see a mention, distromint.com at DistroMint with nChain, 30 Market Place.

Q. Is it your understanding that what you were purporting to patent was the distromint.com website?

A. Yeah. That's the patent. I mean, the patent is based -- we built the platform based off the patent.

**Q. So -- so you think that your patent is for this domain name "distromint.com"?**

A. It's -- the domain absolutely represents the -- the patent. We didn't build any other platform. And the whole purpose was to take this patent and turn it into a platform so we have a viable product to -- to sell back to the labels.

**Q. So -- so your testimony is that when you wrote "https://url.us.m.mimecastprotect.com/s/CdLFC68Vg7U7R5qkC5s7Xh5n5EQ?domain=distromint.com" --**

A. Uh-huh.

**Q. -- that was meant as a commitment that nChain would develop, support and launch your platform and your patent?**

A. Absolutely.

**Q. And it's your testimony that nChain should have understood by the inclusion of this website domain name that they had an obligation to support you in the development, support and launch of your platform and patent?**

A. Yes.

**Q. And that's -- that's the only thing in this document that you say memorializes the term between yourself and nChain regarding the development, support**

**and launch of your platform and patent?**
A. In this -- in this particular e-mail, yes.
**Q. You don't use the word "platform" anywhere in this e-mail, do you?**
A. No. I use an actual platform.
**Q. But my question is: You don't use the word "platform" anywhere here in this e-mail, do you?**
A. Well, much like Dale testified that, you know, partnership means, you know, supposed we would get to that. You know, you can interpret it how you want to.
**Q. Okay. But my only question is just, did you use the word "platform" in this e-mail or not?**
A. I mentioned the platform.
**Q. You're having a difficult time answering a pretty straightforward question.**
**Just tell me where in the e-mail it says the word "platform"?**
A. I don't see it, yeah.
**Q. You don't use the word "patent" either, do you?**
A. No.
**Q. I mean, this February 21st, 2023, e-mail does not, in its terms, memorialize the alleged terms of the development agreement as you and Sound Alive have described it in your interrogatory responses; isn't that right?**

A. I mean, it absolutely does memorialize it because it's the terms of the 50 percent and 50 percent.

**Q. Okay. We'll get to that in a moment, but I'm asking you about what you claim nChain's responsibilities were regarding the development of the platform and patent, right?**

**You're telling me that the only thing that nChain would know based on this e-mail -- strike that.**

**You're telling me that when nChain wrote this e-mail, they would have to infer from your inclusion of the www.DistroMint domain address that they had an obligation to develop and help you launch their -- your platform and patent?**

A. Yeah. I mean, they paid invoices for months and months and months to Sound Alive Enterprise, the party here that agreed to give up 50 percent ownership of DistroMint, which was the platform that we had already began to develop.

And at that point, we were almost complete -- completely finished the -- the platform. We finished it a month later. The MVP was ready a month later. We were already in penetration testing.

**Q. Okay. But I'm asking you a very -- a very specific question, which is just, the only thing in this e-mail that you say memorializes a term that nChain had**

**to help you in the development, support and launch of**
**domain address, right?**
A. I don't agree.
**Q. Okay. What else is in this -- in this document that -- that would put nChain on notice that they had made this agreement?**
A. Well, we have two parties, two companies. We have addresses. We have an actual platform. We have social media linked to the platform. And I mean, the terms are pretty clear, 50 percent ownership to nChain, 30 Market Place, London W1W 8AP, United Kingdom, 50 percent ownership to Sound Alive Enterprise, LLC.
**Q. Now, other than this February 21st, 2023, e-mail, can you identify any document in which nChain committed to help you develop -- well, strike that.**
**Other than this February 21st, 2023, e-mail, do you have any other document that laid out as a term of the contract, you -- that nChain had agreed to help you develop, support and launch your platform and patent?**
A. Yeah. I think we have an entire history of e-mails. Even this one right here where you have the company CEO agreeing because he's paying my invoice. The invoice says at the bottom 150,000 in 12 payments of -- of 12,500 and -- on every invoice.

And it says here, from Mr. Andy Moody, "Hi Christen, no problem." And Andy Moody is the chief financial officer.

"Hi Christen, no problem. We will release the payments this morning."

So I would assume he is talking about my payments and not anyone else's because the e-mail is addressed to me and not anyone else. So myself, Christen and Andy, and we have two nChain e-mail addresses, and we have my e-mail address in which we did the -- you know, the interaction with.

So that's how I would interpret it.

**Q. Okay. So you made -- you made reference to this -- these payments of $150,000 over 12 months in your response, right?**

A. Yes.

**Q. Okay. There's no reference in here, in this e-mail nChain will pay Mr. Finnerud $12,500 per month for -- for a 12-month period, is there?**

A. No. It's in the invoice that gets paid --

**Q. Okay.**

A. -- by the Chief Financial Officer.

**Q. But I want to understand your --**

A. No. It's not in this particular e-mail, yeah.

**Q. Okay. So you --**

A. Yeah.
**Q. You would agree with me that this February 21st, 2023, e-mail does not list all the terms of the development agreement as you allege them; is that correct?**
A. I think it -- it lists the commitment of my -- my company and nChain's company in working together.
**Q. Okay. But my question is different.**
**You would agree with me that this February 21st, 2023, e-mail does not list all the terms of the development agreement as you have alleged them; isn't that right?**
A. Can you say that one more time?
**Q. Sure. You would agree with me that this February 21st, 2023, e-mail does not list all the terms of the development agreement as you have alleged them in this lawsuit; isn't that right?**
A. Yeah. I would say it just has some of the foundation of it.
**Q. So the February 21st, 2023, e-mail has some of the foundation for the development agreement, but it does not list all of its terms; is that correct?**
A. Yeah. I think terms expanded as we developed and continued.
**Q. Okay. So -- so since you wrote this**

**February 21st, 2023, e-mail, the terms of the development agreement as you understood it changed; is that right?**
A. We added things later on.
**Q. Okay. So this February 21st, 2023, e-mail does not represent the final terms of the development agreement as you understand it; is that right?**
A. It definitely represents the foundation. So, like, the beginning, you know, when you start and things were always negotiable and always can expand.
**Q. Okay. So when you sent the February 21st, 2023, e-mail to Mr. Ager-Hanssen and Mr. Moody, you understood the terms in there were negotiable; is that correct?**
A. I understood that, but what I really understood was that in order for us to, you know, really continue, I needed to give ownership, 50 percent of it, to nChain, and I needed to do that in writing.
So outside of my verbal or oral agreement with Mr. Ager-Hanssen, it needed to be some type of paper trail, and that's why I created this e-mail and I sent it over. Also, I wouldn't have been released any payments. Their payments were, you know, concurrent with our oral agreement.
So while this may not represent the entire oral agreement, this was a portion of the -- me doing my due

diligence and nChain following through with their due diligence.

**Q. Okay. So this February 21st, 2023, e-mail does not represent the entire oral agreement you understood you had with nChain; is that right?**

A. Yes, that's correct.

**Q. And you understood when you sent this February 21st, 2023, e-mail that the terms of the development agreement as you understood it were negotiable; is that right?**

A. Yeah. I mean, I'd say that to -- negotiable to where they expanded, and then at the end of the day, you know, it would really just be whether both parties agreed to those -- those terms.

**Q. Okay. So when you sent this February 21st, 2023, e-mail, you understood that the terms of the development agreement as you understood it were not set; is that correct?**

A. No, that's not correct.

**Q. You understood, though, that the terms were still negotiable, correct?**

A. Well, that things could be added. I understood that we had an agreement and that I had to do my due diligence, which I did, and then, you know, could be expanded on.

**Q. And when you say that things could be added, who would be doing the adding, you or nChain?**

A. Well, I would talk to Christen and run it through him, and he was the CEO of nChain.

**Q. No. But was it your understanding that nChain could add terms to the development agreement?**

A. Well, nChain could approve requests from me.

**Q. Okay. So was it your understanding that it was only you who could change the terms of the development agreement?**

A. No. I mean, it's a partnership. We're in a partnership. So, you know, I guess we had to come to an agreement. We had to -- both parties had to agree to it because that's what a real partnership is. A partnership isn't a company just deciding for one end what they're going to do and then, you know, imposing that on the other party because it's advantageous for them.

**Q. Okay.**

A. So it had to be in agreement. 50/50. I can't say that enough.

**Q. Okay. So there's a reference here. So it says, "I agree to the terms of 50/50 partnership of DistroMint, LLC."**

**Do you see that?**

A. Yes.
**Q. And that's the 50 percent that's referenced in your response to Interrogatory Number 4?**
A. Yeah, yep.
**Q. Okay. And it's your contention that under the alleged development agreement, nChain and Sound Alive would each get 50 percent ownership of DistroMint, LLC; is that right?**
A. Yes, and the platform, yep.
**Q. Okay.**
A. It's -- which maintains -- obviously, contains many assets, and I would even go further and say the patent is an asset of the platform.
**Q. Okay. And do you understand that you've been designated on behalf of DistroMint, LLC as its 30(b)(6) witness?**
A. Yes, sir.
**Q. I'm going to show you what's being marked as Finnerud Exhibit 3.**
A. Sure. Yeah, 2, 1, 3.
**Q. Okay. And this?**
(Finnerud Exhibit 4, Defendant and Counterclaim-Plaintiff nChain UK LTD's Notice of Rule 30(b)(6) Deposition of DistroMint, LLC, was marked for identification.)

BY MR. RUOCCO:
Q. This is a document entitled Defendant and Counterclaim Plaintiff NChain UK Limited of Notice 30(B)(6) Deposition of DistroMint, LLC, correct?
A. Yes.
Q. And have you reviewed this document before?
A. Yes, I have.
Q. Okay. And can you just look for me -- we're going to be at pages seven and eight in this document.
A. Yes.
Q. Topics -- it's going to go 1 through 4. They are the formation of DistroMint, LLC; the ownership of DistroMint, LLC from the time of its formation through the present, including the date on which each person became a member; each member's capital contribution, each member's percentage of ownership, any changes in such percentages of ownership, and the dates of any such changes; the identity and roles of all persons within management or governance function of DistroMint, LLC from the time -- from the time of its formation through the present, including, but not limited to, officers, directors, or their equivalents; Perry's relationship, which is a reference to Destiny Perry --
A. Yeah.
Q. Perry's relationship to DistroMint, LLC,

including her ownership, membership, management or any contribution to DistroMint, LLC.
Do you see all those topics?
A. Yes, sir.
Q. Okay. And then can you also turn for me to -- well, actually, just look at the bottom of page 7.
A. Yes.
Q. Topic 7, "All governance and regulatory compliance and/or regulatory filings" -- "filings, documents of or concerning DistroMint, LLC, including any articles of organization, amendments; operating agreements, draft or final; member consents; minutes; resolutions; and membership ledger of or concerning DistroMint, LLC."
Do you see all those things?
A. Yes, sir.
Q. Okay. And -- and are you prepared to testify about these Topics 1, 2, 3, 4 and 7 on behalf of DistroMint, LLC?
A. Absolutely.
Q. And what did you do to prepare to give testimony on behalf of DistroMint, LLC?
A. I did my Wednesday, Thursday, Friday, Saturday, Sunday, Monday prep, just going over a few documents provided. There were six different documents, including

this one, this Defendant and Counterclaim Plaintiff nChain Notice 30(b).

**Q. Okay.**

A. Yeah.

**Q. And can you pull out Exhibit Number 1 for me? That's the, yeah, Sound Alive 30(b)(6) notice.**

A. Yes, sir.

**Q. And if you turn to page 13 and then over to 14, I'm looking at Topics 40 and 41.**

A. (Complying.) Okay.

**Q. Okay. And Topic 40 in this Sound Alive 30(b)(6) notice is "DistroMint, LLC's formation and ownership from the time of its formation through the present, including the date in which each" -- "each person became a member, each member's capital contribution, each member's percentage of ownership, any changes in such percentage of ownership, and the dates of any such changes." And Topic 41 is, "The identity and roles of all persons with a management or governance function of DistroMint, LLC from the time of its formation through the present, including, but not limited to, officers, directors or their equivalents."**

**Do you see all those topics?**

A. Yes. Yes, sir.

**Q. Okay. And are you -- do you understand you have**

also been designated Sound Alive's 30(b)(6) witness on these topics too?

A. Yes.

Q. Okay. And are you prepared to testify about that?

A. Yes.

Q. Okay. I'm going to show you what's being marked as Finnerud Exhibit 5.

A. Yep.

(Finnerud Exhibit 5, E-mail dated March 20, 2023, re: Eric Finnerud Prints 3.20.23, Bates stamped SA0000087 through SA0000903, was marked for identification.)

(Off-the-record discussion.)

BY MR. RUOCCO:

Q. And this is a March 20, 2023, e-mail from the Sound Alive rep e-mail address to customer06988@yahoo. The subject is "Eric Finnerud prints 3-20-2023," correct?

A. Yes.

Q. The Sound Alive rep e-mail address, that -- that's one that you would use personally?

A. Yes. Yeah.

Q. Okay.

A. All files which -- all e-mails that I turned

over to my attorneys and -- for this case.
**Q. Okay.**
A. Sound Alive. Now.
**Q. And when -- when -- when we see that e-mail address in documents, should we generally understand it's you who is the sender or the recipient unless it says that somebody else is?**
A. Yes.
**Q. Okay. Can you turn for me to the second attachment or these blue slip sheets? I'm looking at the one that ends in 890 here at the bottom.**
A. Yes, sir.
**Q. Okay.**
A. Whoa. 890, yes, sir.
**Q. And this is a document from the Secretary of State of the State of Georgia entitled "Certificate of Organization," correct?**
A. Yes.
**Q. Okay. And it states, "DistroMint, LLC, a domestic limited liability company, has been duly organized under the laws of the State of Georgia on February 20, 2023."**
**Do you see that?**
A. Yeah.
**Q. And DistroMint was -- DistroMint, LLC was formed**

**on February 20, 2023; is that correct?**
A. No -- oh, yes, absolutely. Yeah. I was confused. Sorry.
**Q. Okay. And if you could turn for me to the next page.**
A. Yep.
**Q. This is a document entitled "Articles of Organization" --**
A. Yes, sir.
**Q. -- and it states "electronically filed, Secretary of State, filing date February 20, 2023."**
**Do you see that?**
A. Yep.
**Q. Okay. So -- so these are the articles of organization that DistroMint, LLC filed with the State of Georgia on February 20, 2023; is that right?**
A. Yes.
**Q. And it's important that information filed with the state government be accurate, correct?**
A. That's correct.
**Q. Okay. There's a line that says "principal office address," and it lists 300 Colonial Center Parkway, Suite 100 North, Roswell, Georgia 30076, the USA. That wasn't an actual address that --**
A. It's -- it's a registered agent.

**Q. Okay.**
A. Yeah.
**Q. So -- so this is the address for the registered agent you used to organize DistroMint, LLC, right?**
A. And also the -- the address that we would use for the actual company.
**Q. Okay.**
A. Yeah.
**Q. Did DistroMint, LLC ever have any operations from this address?**
A. Not that I recall.
**Q. Okay.**
A. We could have utilized it potentially. But since DistroMint as a -- as a company never launched because of the whole nChain debacle, you know, we weren't able to really take advantage of that.
**Q. Okay. There's an individual, a Nat Smith, with title "organizer" here?**
A. Yeah.
**Q. He -- he's the registered agent you had submit the paperwork to set up DistroMint, LLC with the State; is that right?**
A. I did it online.
**Q. Okay.**
A. So I wouldn't know who that person personally

is.

**Q. Okay.**

A. No personal capacity.

**Q. Okay. In 2023, did DistroMint, LLC have any dedicated office space?**

A. No, because we didn't -- we never launched, meaning the -- the distromint.com platform never -- never launched. You know, we just had an MVP and that -- the things went sour with -- with the whole situation with nChain when they reneged on their part of the promise. So, yeah.

**Q. Okay. But in 2023, DistroMint, LLC never had any dedicated office space; is that right?**

A. No office space.

**Q. Has DistroMint, LLC ever had any dedicated office space?**

A. No, because -- never launched.

**Q. Okay. And then it says, under optional provisions, "This LLC is member managed," and then it lists "member, Eric Finnerud; member, Destiny Perry." Do you see that?**

A. Yes.

**Q. And when it was formed on February 20, 2023, DistroMint, LLC told the State of Georgia that its only members were you, Eric Finnerud, and Destiny Perry; is**

**that right?**
A. To my knowledge. I didn't report -- this is what was done in the business -- you know, in terms of creation.
**Q. Well, you -- I think you said a moment ago you -- you -- you were the one -- let me back up a second.**
**You were the one who caused DistroMint, LLC to be formed; is that correct?**
A. Yeah. I electronically filed it.
**Q. Okay. And so you went on the computer and you electronically entered the information to get DistroMint, LLC set up; is that right?**
A. Yes.
**Q. Okay. And when you went to get DistroMint, LLC set up, you entered in as the members yourself, Eric Finnerud, and Destiny Perry; is that right?**
A. Yeah, with -- with the understanding that we were going to be 25 percent -- I was going to be a 25 percent member, she was going to be a 25 percent member, and then nChain would own 50 percent of the company.
**Q. Okay. But on February 20, 2023, you sat at the computer to set up DistroMint, LLC and you entered in that the only members of the company were yourself, Eric**

**Finnerud, and Destiny Perry, correct?**

A. Yeah, because I couldn't give the company to -- I couldn't give -- give my actual consent to giving half the company to it unless it was established. Christen directed me, said, Eric -- he said, you know, Organize and then give us half the company. He said 50/50.

And I did that because in the beginning I wanted to -- to tokenize my actual distribution company. But then I came up with this bright idea, DistroMint, distribution plus NFT tokenization, blockchain integration. And, you know, it matched my patent exactly, bar none. So that's how we came about, DistroMint. And I thought about it for a second. "Distro," DistroKid. DistroMint. DistroMint. DistroMint. Yeah.

**Q. Okay. But my -- my only question is, when -- when you sat at the computer on February 20, 2023, and made the filing with the State of Georgia, the only members that you identified of DistroMint, LLC were yourself, Eric Finnerud, and Destiny Perry, correct?**

A. Yes, to establish the -- the company to give to Christen and nChain. So I could agree to 50 percent to them and 50 percent to us.

**Q. And so -- and then your understanding too was that -- I believe you testified to this a moment ago --**

**after you had organized the company and identified yourself and Ms. Perry as the only members, you and Ms. Perry would each transfer 25 percent of your ownership to nChain; is that right?**

A. We transferred 50 percent of ownership. It would be 50 percent to nChain and 25 percent to me, 25 percent to Destiny.

**Q. Okay. So it was your understanding that at some point nChain would become a member of DistroMint, LLC, but you and Ms. Perry would remain members of that company; is that right?**

A. We believed so.

**Q. And just for the record, Ms. Perry is your wife; is that right?**

A. Yes.

**Q. Is DistroMint, LLC a member-managed LLC?**

A. It's managed by me.

**Q. Okay. You are the managing member?**

A. Yes.

**Q. Have you always been the managing member of DistroMint, LLC since it was formed in February of 2023?**

A. Yes.

**Q. Ms. Perry is not also a managing member?**

A. She is a member. I gave her the ownership part of it because the ultimate goal was to exit out of this

platform, sell it, and she's my wife, and I've got this platform patent that I know is going to be worth, you know, hundreds of millions of dollars, possibly billions of dollars, as it can be resold back to the major industry, you know, from the dashboards of -- of the music industry, and -- and being the first to tokenize and put blockchain integration into an actual platform, yeah, of course, I wanted -- I wanted her to have, you know, a nice stake in that because she has all of our children. We have nine children together. So I am trying to create generational wealth for all of them.

**Q. And when you organized DistroMint, LLC on February 20, 2023, you did not include nChain as one of the initial members of DistroMint, LLC did you?**

A. No, I did not. I included them as owner.

**Q. And when you organized DistroMint, LLC on February 20th, 2023, you did not include Sound Alive, LLC as one of DistroMint's initial members, did you?**

A. As one of DistroMint's initial members?

**Q. So my question is: When you organized DistroMint, LLC on February 20th, 2023, you did not include Sound Alive as one of the initial members of the DistroMint, LLC, right?**

A. Well, it -- I'm not a huge business corporation guy. So at that time, I probably didn't understand, and

still to this day, understand if you can incorporate in an -- incorporate in a corporation. You get what I am saying? Like, incorporate in a corporation. It just -- it seemed a little bit confusing for me.

**Q. Okay. But Sound Alive was not identified as one of the initial members of DistroMint, LLC, right?**

A. They're two separate entities.

**Q. Okay. Let's turn to the -- a couple pages, to the one ending in 893.**

A. Uh-huh.

**Q. And this is a document entitled Initial Resolutions, correct?**

A. Yes.

**Q. Okay. And it states, "I, Nat Smith of Northwest Registered Agent Service, Inc., being the organizer of DistroMint, LLC, a Georgia Limited Liability Company, hereby resolve to relinquish signing authority to the members named below and adopt the following resolutions."**

**And it states in the first point, "Resolve the named members of the Limited Liability Company are hereby named Eric Finnerud and Destiny Perry."**

**Do you see that?**

A. Yes.

**Q. And these are DistroMint, LLC's initial**

**resolutions; is that right?**
A. Yes.
**Q. And DistroMint, LLC's initial resolutions also state that it's you, Mr. Finnerud, and Destiny Perry who are the only members of DistroMint, LLC as of February 20, 2023, correct?**
A. Yes.
**Q. And Mr. Finnerud, as a matter of fact, it was you and Ms. Perry who were the only members of DistroMint, LLC as of February 20, 2023; isn't that right?**
A. Until we agreed to give half, go 50/50 with nChain, yes, that's correct.
**Q. Now, does DistroMint, LLC have any resolutions naming nChain one of its members?**
A. I would refer back to Exhibit 3.
**Q. Okay. But that's -- that's an e-mail?**
A. Yeah.
**Q. I'm asking: Does DistroMint, LLC have -- it doesn't -- let me ask it this way: DistroMint, LLC does not have any resolutions naming nChain one of its members, does it?**
A. Not in the initial filing, but after the initial filing, we have an agreement here, DistroMint Partnership Agreement 2/20/23.

**Q. And so you're testifying here on behalf of DistroMint, LLC. Anywhere in DistroMint, LLC's files, is there a resolution like the one we're looking at in Exhibit 5 that names nChain one of the members of the company?**

A. I mean, not in the initial filing.

**Q. Okay. But move past the initial filing. So --**

A. Yeah.

**Q. -- DistroMint, LLC does not have anywhere in its files, a resolution naming nChain one of its members, does it?**

A. It says here on the e-mail, 50 percent ownership to nChain 30 Market Place, London W1W 8AP United Kingdom, in Exhibit -- Exhibit 3.

**Q. I am asking whether DistroMint, LLC has a resolution that named nChain one of its members?**

**I think the answer is no; is that right?**

A. How would you define a resolution?

**Q. Sir, we are looking at the copy of DistroMint's initial resolution, correct?**

A. Yeah. I already answered that question.

**Q. Okay. Let me ask this: Since this initial resolution --**

A. Yes.

**Q. -- does DistroMint, LLC have any resolutions?**

A. In this form on this particular document, no. We have an e-mail which was sent later in the day in which an agreement was arranged between Christen Ager-Hanssen, Andy Moody and Eric Finnerud.

**Q. Okay. So -- so there is no document in the form of a resolution in the files of DistroMint, LLC that named nChain one of its members; is that correct?**

A. I can't concur because I'm not going to lie under oath, and I have an e-mail here which serves as 50/50 agreement.

**Q. Sir, do you understand what a resolution is on behalf of a limited liability company?**

A. I understand, but larger than that, I understand the agreement that we had, which was 50/50. And so, despite how the entity was created -- nChain, you know, they're my business partners. I'm not listed in their resolutions, you know, and we're talking about a company here, platform and a big idea, and we're 50 percent ownership to nChain and 50 percent ownership to Sound Alive Enterprise.

So this -- companies negotiate all the time. That's not abnormal practice.

**Q. Okay. Let's take a look at -- let's go back to Exhibit Number 4, please. And this is the DistroMint, LLC 30(b)(6) --**

A. Okay.
**Q. -- notice. And turn for me, in the notice, if you would, to page 8.**
A. Okay. All right. Can you tell me what exhibit that is again?
**Q. Yeah, sure. It's Exhibit 4.**
A. Okay. Hold on. Yep, here we go. Page 8. Got you.
**Q. Okay. And the bottom of the page, it says, "The location of documents potentially responsive to nChain UK's document request in this action, the process by which DistroMint, LLC identified such documents and the process by which DistroMint, LLC produced any documents in this action."**
**Do you see that?**
A. Yes.
**Q. Do you understand you've been designated by DistroMint, LLC to testify about this topic?**
A. Yes.
**Q. And you're prepared to testify about this topic?**
A. Yes.
**Q. As DistroMint, LLC's managing member, did you participate in collecting and producing documents from DistroMint, LLC in response to nChain's document request in this lawsuit?**

A. Yes.
**Q. And did DistroMint, LLC do a diligent search of its files for documents responsive to nChain's document request in this lawsuit?**
A. Yes.
**Q. I'm showing you -- I'm showing you what's being marked as Finnerud Exhibit 6.**
(Finnerud Exhibit 6, Plaintiffs' Response to Defendant's First Requests for Production of Documents, was marked for identification.)
THE WITNESS: Thank you. Are we still on page 8?
BY MR. RUOCCO:
**Q. Yes. You can put that one to the side.**
A. Okay.
**Q. I want to talk about Exhibit 6.**
**So Exhibit 6, this is a document entitled Plaintiffs' Response to Defendant's First Request for Production of Documents, correct?**
A. Yes.
**Q. Okay. And have you seen this document before?**
A. Yes, I have.
**Q. Okay. Can you -- did you participate in having this document prepared?**
A. No, I didn't.

**Q. Okay. Did you have attorneys on behalf of yourself, DistroMint, LLC and Sound Alive prepare this document?**

A. So can we back up? The previous question you asked me, can you repeat that one more time?

**Q. My question is just, did you participate in having this document, which are the responses to nChain's First Request for Production, did you participate in having this document created?**

A. Well, I have to re -- restate that because I am the plaintiff and these documents are coming from me, yes.

**Q. Okay. Can you turn for me to Request Number 21 which, is on page 6?**

A. Yes.

**Q. Okay. And request -- excuse me -- Request 21 says -- or asks for "Documents sufficient to show the ownership membership management and governance of DistroMint, LLC without regard for the relevant period, including articles of organization, any amendments; operating agreements, draft or final, member consents, minutes, resolutions and membership ledger."**

**Do you see all that?**

A. Yep.

**Q. Okay. And DistroMint, LLC conducted a search**

**for documents in response to this request from nChain; is that right?**
A. I believe we did.
**Q. And after conducting a search, DistroMint, LLC has not identified any resolutions in its files that name nChain as one of its members, does it?**
A. I can't lie under oath. Again, you know, I sent this e-mail in which, clearly, it states the address of DistroMint, including its registered agent and where -- where -- where the company is represented at, and it has the company.
So I gave 50 percent ownership to nChain and -- and, you know, we maintain 50 percent ownership as Sound Alive Enterprise already doing business with -- with nChain. So it would be -- I just can't -- I can't say it the way that you want me to say it.
So once again, maybe we can move on to the next question.
**Q. No. I'd like an answer to my question, which is, there is no resolution in DistroMint, LLC's files that name nChain as one of its members; isn't that true?**
A. Well, our e-mail states right here that we're 50 percent owners --
**Q. Okay.**
A. -- of -- of DistroMint and nChain is 50 percent

owner of nChain. So if you think I'm going to say something different, I'm not.

**Q. Okay. But I'm going to ask again because you've seen now, right, you've seen what a -- what a resolution looks like --**

A. Right.

**Q. -- from DistroMint, LLC, right? Okay.**

A. That's the resolution. Many businesses structure, at the beginning, a certain way and then change structure as things progress. Granted, that the business even gets off the ground. And the problem here is nChain, you know, reneged on all of their commitments and, therefore, you know, causing a lot of problems.

**Q. Okay. What I'm asking, though, is -- you looked through DistroMint, LLC's files, and you did not find a document titled a resolution that named nChain as one of DistroMint, LLC's members, did you?**

A. No. I -- I found a file that lists them as a 50 percent owner.

**Q. Sir, you're referring to an e-mail that you sent yourself on February 21st, 2023, correct?**

A. Yeah. I didn't send it to myself. I sent it to the CEO of nChain and the Chief Financial Officer of nChain.

**Q. Okay. So -- so aside from that February 21st,**

**2023, e-mail, after you reviewed all the files, you did not find a resolution that named nChain as one of the members of DistroMint, LLC, correct?**

A. After -- after this e-mail?

**Q. No. At any point in time since the company was created, aside from that February 21st, 2023, e-mail, you've not found any resolutions that name nChain as one of the members of DistroMint, LLC, have you?**

A. I -- I don't remember, honestly.

**Q. Now, after you conducted a search of the files, you didn't find any resolutions for DistroMint, LLC that named Sound Alive as one of its members either, did you?**

A. Once again, I have to -- I have this e-mail here, and I don't think it would hold up in front of a judge if I said that I didn't write this e-mail and that 50 percent ownership to nChain and 50 percent ownership to Sound Alive Enterprise and then a payment execution and then progression of many months of, you know, partnership and -- and working together -- you know, I just -- I couldn't -- I couldn't say that. I just -- I can't do that. I can't -- I can't -- like I said, the answer you want me to give you, I just -- my good conscience and under oath, I'm -- I just can't say it the way you want me to say it.

**Q. Okay. So -- so aside from this February 21st,**

**2023, e-mail that you keep pointing to, you've not found any resolutions -- strike that.**

**Aside from this February 21st, 2023, e-mail that you keep pointing to, you've not found any document in the files of DistroMint, LLC in which Sound Alive is identified as one of the members; is that right?**

A. Unfortunately, I -- I can't agree with you because I have an actual screenshot of a document with myself and Dale in a -- in a Zoom call and -- which we're -- I'm listed, actually, as a 51 percent member and nChain's listed as a 49 percent member. And this is around the time that Christen had really gotten on Dale to, you know, construct a formal agreement based off of our oral agreement, this February 21st e-mail. So that's it.

**Q. Yeah. Sir, you know, we're asking you pretty straightforward questions. We're just trying to understand what the corporate documents at these companies reflect. Okay?**

A. Yeah.

**Q. So my question is simply, you've not found a document titled a resolution in the files of DistroMint, LLC that identify nChain as one of the members, right?**

A. Again, this is going to sound redundant, but it -- the e-mail states here clearly, and then I have

the interaction, the Zoom call with Dale, which states similar terms. And I have an oral agreement with Mr. Ager-Hanssen and nChain.
So, you know, regardless of the -- the resolutions, you know, I don't -- I don't want to lie and say that I -- I don't have documentation which says that -- different, that would have the formation of the companies, but like I said, companies form and then they change structure all the time. So I don't know why this would even matter. I think this is, you know, irrelevant.
**Q. None of that was in response to my question.**
**My question is just, you looked at the files for DistroMint, LLC, right?**
A. Yes.
**Q. Okay. And when you looked through the files, the only document from DistroMint, LLC that you found titled a resolution is -- is this one --**
A. Well, I --
**Q. -- dated February 20th -- or dated February 22nd, 2023, correct?**
A. I believe in -- in Georgia this is the only file -- I mean resolution that can be produced. However, you know, membership and further arrangements can change, as all businesses do.

**Q. Now, you -- you never sat down and -- and drafted a document titled a resolution, like this one that named nChain as one of the members of DistroMint, LLC, did you?**

A. I don't have the authority to speak on their behalf.

**Q. Well, sir, no. You here are one of the 50 percent owners of DistroMint, LLC, correct?**

A. Yeah, but I believe they would have to have been present.

**Q. Okay. So -- so your understanding of how this worked was that you had to be physically present with nChain to transfer a -- an equity interest in DistroMint, LLC to them?**

A. No. I mean I'm not going to forge somebody's handwriting.

**Q. That's not my question, sir.**

**At -- at the point in time, okay, when the company was founded in February of 2023, you and Ms. Perry were the only members of DistroMint, LLC. That's your testimony, correct?**

A. So I'm going to -- I'm going to state it this way: Via these initial resolutions as a -- as they stand, these are facts, definitely. However, the structure of DistroMint changed in that very same day, a

few hours later, as I served a notice on behalf of myself, Eric Finnerud, E. Smitty, E. Smitty, Sound Alive Enterprise, LLC, 300 Colonial Center Parkway, Suite 100N, Roswell, Georgia 30076. I agree to the terms of at DistroMint with nChain, 30 Market Place, London W1W8AP, United Kingdom; distromintllc dot -- .com at DistroMint, 50 percent ownership to nChain, 30 Market Place, London W1W8AP, and then 50 percent ownership of Sound -- ownership to Sound Alive Enterprise, LLC. And then, you know, the rest is "blessings, Eric Finnerud, Sound Alive Enterprise, LLC."

So I did agree that these documents, these resolutions, are -- are facts, as -- as you stated. However, the framework changed later on, later in that day, when I sent this e-mail and then I received a response back from nChain agreeing to make my payments after I serve -- and this is the instructions that Christen gave me. He said, You need to send me an e-mail and give half your company to nChain and half to you.

**Q. Sir, you understand you are -- you're testifying on behalf of DistroMint, LLC today? Do you understand that?**

A. Yes.

Q. Okay. So what I'm trying to get at is just a very simple question about -- about the documents that actually exist in DistroMint, LLC's files. Okay?
A. Sure.
Q. Do you understand that?
A. Yes.
Q. Okay. So I am asking not Eric Finnerud personally, I am asking DistroMint, LLC, is there a document in your files titled a resolution that identifies nChain as one of the members of the company?
A. Could you specify which files?
Q. I think I just did. I'm asking --
A. In the articles of organization?
Q. I am asking DistroMint, LLC, is there a document in its files titled a resolution that identifies nChain as one of the members of the company?
A. It just seems like a double negative here. I -- I don't remember. I don't recall.
Q. And I am asking DistroMint, LLC, is there a document in its files titled a resolution that identifies Sound Alive as one of the members of the company?
A. I don't recall.
Q. Now, if we look back at the initial resolution document --

A. What page, please, sir?
**Q. Sure. We are still on 893.**
A. Okay.
**Q. Okay?**
A. 893.
**Q. Yep. Are you there with me?**
**On -- so we are in -- we are in Exhibit 6 -- no, sorry, 5 -- we are in Exhibit 5.**
A. Okay.
**Q. Okay. And we're still on that page right there, so stay right there on that page. Okay?**
**Okay. And if you look at point 3, it says, "A copy of the articles of organization of the above-named limited liability company is complete," and then it also says "resolved that the general provisions of an operating agreement to be adopted and included as official records of a limited liability company."**
**Did DistroMint, LLC ever have an operating agreement?**
A. We're a very small company that never launched, so I don't believe we did.
**Q. Okay. Did DistroMint, LLC ever have a list of its members?**
A. Yes.
**Q. Okay. And where does it keep the list of its**

**members?**
A. I don't have those documents presently in front of me. I would have to refer to more document pulls. But once again, I would refer back to the initial resolution and the e-mail marked the 2nd -- or the 21st of February 2023, Exhibit 3, and SA0000893, regarding DistroMint.
**Q. Okay. I'm asking DistroMint, LLC, is there a document in its files titled a list of shareholders or shareholder ledger?**
A. We're a small company, so I don't recall having anything that extravagant.
**Q. Okay. So does DistroMint, LLC have any documents entitled list of shareholders or shareholder ledger that identify nChain as one of its members?**
A. Well, since we never launched because nChain reneged on all their promises, we just have a platform that never launched and never could be -- couldn't divvy out shares for a company that never got off the ground.
**Q. So just so I'm clear -- and I am asking DistroMint, LLC -- there's no document in its files titled a list of members or ledger of members that identified nChain as one of the members of the company; is that right?**
A. That's not -- that's incorrect.

**Q. I believe you testified a moment ago that DistroMint, LLC doesn't have a formal list of shareholders or a formal ledger of shareholders, correct?**

A. I said I don't recall.

**Q. Okay. So sitting here today testifying on behalf of DistroMint, LLC, you can't recall whether the company has a formal list of members or a formal ledger of members; is that right?**

A. Yes.

**Q. Okay. And so sitting here today, you -- you can't recall a document in DistroMint, LLC's files that's a formal list of members or a formal ledger of members that identifies nChain as one of the members of the company, can you?**

A. Can you repeat the question again?

**Q. Sure.**

**Sitting here today, you can't recall a document in the files of DistroMint, LLC that's a formal list of members or a formal ledger of members that identifies nChain as one of the members of the company, can you?**

A. Yes, I can. It's the e-mail from the 21st of February 2023 from Eric Finnerud, soundalivenow@gmail.com to Christen Ager-Hanssen and Andy Moody, in which the e-mail clearly shows 50 percent

ownership to nChain and 50 percent ownership to Sound Alive Enterprise, whom I was already doing business with -- with nChain.

**Q. Sir, a moment ago, I believe you testified in your capacity as DistroMint, LLC's 30(b)(6) witness that you couldn't recall whether the company had a formal list of members or a formal ledger of members. Correct?**

A. Well, the questions have been so repetitive and confusing that, you know, I don't -- I don't know how to answer some of these questions. So I would just really -- at the end, I would refer to the e-mail because it has everything in there. That's the same e-mail, Exhibit 3. It's pretty clear-cut and dry. You know, so we can spin it a million different ways or we can just look at the facts.

**Q. Okay. So I guess my -- my question is, is the only document that you're going to point to that you say identifies nChain as one of the members of DistroMint, LLC that February 21st, 2023, e-mail?**

A. No.

**Q. Okay. What are the other documents that -- that DistroMint, LLC contends identify nChain as one of its members?**

A. The DistroMint investment structure presented by Dale Evans on July 28th, and I would contend, also, you

could even look at the restructure agreement that was presented by Dale Evans in which if no agreement existed, then what are we reconstructing? That is the question.

**Q. Okay.**

A. So as my understanding, we have a 50/50 agreement, 50 percent ownership to nChain, 50 percent ownership to Sound Alive and, yeah, I mean we have a platform here that never launched because nChain reneged on their duties as, you know, I said many, many times, and that's about it.

**Q. Okay. Other than the documents that you just mentioned, does DistroMint, LLC contend that it has any documents in its files that formally list nChain as one of its members?**

A. I don't recall.

**Q. Can you take a look for me at page 903 of Exhibit 5?**

A. Yes, sir.

**Q. It's the --**

A. Is there a 903? Okay.

**Q. Yes.**

A. There we go.

**Q. Okay. And this is a document entitled LLC Membership Certificate.**

Do you see that?
A. Yes, it's a printed membership certificate.
Q. Okay. My question is, does DistroMint, LLC have any record of having sent a membership certificate like this to nChain?
A. I don't recall.
Q. Does DistroMint, LLC have any record of having sent a membership certificate like this to Sound Alive?
A. I don't recall.
Q. Okay. Now, I believe you mentioned earlier -- well, actually take out Exhibit 4 for me. It's the DistroMint, LLC 30(b)(6) notice.
Let me know when you have that, okay?
A. Six.
Q. Okay.
A. Yeah.
Q. Okay.
A. Hold on. Let me.
Q. So we're in Exhibit 4, Topic 5, okay?
A. Two, Topic 5. Hold on. Okay. 5, 6, 1, 2, 3, 4, 5, 6.
Q. Okay. So you see Topic 5 here?
A. Yes.
Q. It says, "Each meeting of the members of DistroMint, LLC from the time of its formation through

**the present, including the date, attendees and subject of each meeting," correct?**
A. Yes, sir.
**Q. And you also -- you understand that you've been designated DistroMint, LLC's 30(b)(6) witness on this topic?**
A. Yes.
**Q. And you're prepared to testify on that topic?**
A. Yes, sir.
**Q. Have the members of DistroMint, LLC ever had an official meeting?**
A. Not as members. Like, me and Destiny have not had any meetings together about -- regarding DistroMint, but I've had many meetings with -- with nChain. We have 50/50 and -- just with the developers and -- my e-mail history and my Google Teams or my calendar will reflect DistroMint meeting 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, whatever plethora of -- I think it was like 80 meetings that we had, something like that, or more. Just not -- I can't remember off the top of my head. Many, many meetings.
**Q. Why don't we take our next break?**
A. Okay.
THE VIDEOGRAPHER: The time is 12:00 p.m. We're off the record.

(Recess.)
THE VIDEOGRAPHER: The time is 12:14.
We're on the record.
BY MR. RUOCCO:
**Q. Welcome back, Mr. Finnerud. Before the break, we were discussing some -- some documents in DistroMint, LLC's files.**
**Does DistroMint, LLC have any documents in its files called Member Consents?**
A. I don't know what that is, honestly. We're just a small company. So I'm not a big corporation, you know, like nChain.
**Q. You've not seen any documents in DistroMint, LLC's files called Member Consents, have you?**
A. I'll be honest with you, I really don't know what that -- that document even is. I'm not familiar. I'm just a small businessman, you know, small company.
**Q. So you don't recall having seen a document in DistroMint, LLC's files called Member Consent?**
A. Like, I mean, I'm giving you my -- my most truthful answer, which is that I don't know what that is. You know, like small, small company. You know, I'm not a big firm with 200-plus employees or used to have 200-plus employees, I think, yeah. I think there were 250 people working there when I was working with nChain.

It's a very big company.
**Q. Okay. Now, Mr. Finnerud, isn't it true that after you formed DistroMint, LLC on February 20, 2023 you continued to hold yourself and Ms. Perry out as the sole owners of DistroMint, LLC?**
A. No.
**Q. Okay.**
MR. RUOCCO: Can we see tab 10, please?
(Finnerud Exhibit 7, E-mail dated February 3, 2023, re: DistroMint Company Details 3/2/23, was marked for identification.)
BY MR. RUOCCO:
**Q. And I'm showing you what's being marked as Finnerud Exhibit 7.**
A. Thank you.
**Q. And, Mr. Finnerud, this is a March 2nd, 2023, e-mail from you to an Urban Bratina, subject: DistroMint Company Details 2/23/23 -- or sorry -- 3/2/23, correct?**
A. Yeah. That's a strange date. Okay. That is the UK. No. Month, day, year. No. Okay. So they do it day then month. Okay.
**Q. Okay. So this is an e-mail from you to Mr. Bratina, subject line: DistroMint Company Details 3/2/23, correct?**

A. Yeah, but part of the e-mail is missing.

**Q. What part do you think is missing?**

A. Urban asking me for the company information for the platform DistroMint.com.

**Q. Okay. Well, in this e-mail, you -- well, let me back up a second.**

**So Mr. Bratina had asked you for company information; is that right?**

A. He asked me for the company details.

**Q. Okay.**

A. Yeah.

**Q. And then you were providing this information to him in response to this request; is that right?**

A. Yes.

**Q. And then it lists DistroMint, LLC, and then below that there is a heading that says, "LLC Members."**

**Do you see that?**

A. Yes.

**Q. And then below that it says, "CEO, Eric Finnerud; VP, Destiny Perry," correct?**

A. Yes.

**Q. You don't list nChain as one of the LLC members of DistroMint, LLC here in this e-mail, do you?**

A. Not in this e-mail.

**Q. And this is approximately two weeks after you**

**sent that February 21st, 2023, e-mail to Mr. Moody and to Mr. Ager-Hanssen, correct?**
A. That's what the e-mail says.
**Q. Okay. And then this e-mail that you sent approximately two weeks after you sent that February 21st, 2023, e-mail to Mr. Ager-Hanssen and Mr. Moody, you identified yourself and Ms. Perry as the only LLC members of DistroMint, LLC, correct?**
A. Well, in the United States, because nChain owned the other half in -- 50/50 in London. So we were the US members of -- of DistroMint, the platform. And Urban had requested that information, the DistroMint company details in order to start creating some of the -- the assets like the Stripe account XYZ because we were under the impression that while nChain owned 50 percent of the company and the patent, you know, the IP, we would still be running DistroMint from the United States. You know, I didn't have any other impression.
**Q. It was your understanding that any equity interest that nChain would have in -- in the DistroMint platform, it would hold outside the United States; is that right?**
A. I don't understand how that would -- structure would even happen. I think that would have been if the company had actually launched, and because we never

launched, you know, many of the details are a little foggy for me.

**Q. Okay. So, but getting back to this March 2nd, 2023, e-mail, you don't identify nChain as one of the LLC members, right?**

A. Well, I already identified nChain as a member of -- as a 50 percent owner in -- on the February 21st, 2023, e-mail, Exhibit 3. So I don't think I'm going to write them as owners in every single e-mail once we already have an agreement.

**Q. Okay. And in this March 2nd, 2023, e-mail, you don't identify Sound Alive as one of the LLC members of DistroMint, LLC, do you?**

A. That's -- that's my confusion. Like, I don't -- I don't understand business like, probably, I should. So yeah, I am just a little guy, and I am dealing with a big billion-dollar corporation.

**Q. Okay. I'm just asking simply, though, in this March 2nd, 2023, e-mail, you didn't identify Sound Alive as one of the LLC members of DistroMint, LLC, right?**

A. Well, I sent it from Sound Alive now, and I've done -- which is -- all my Sound Alive Enterprise invoices and business dealings with nChain came from this particular e-mail, which you previously identified as, you know, Eric Finnerud, Sound Alive Enterprise,

LLC. Those e-mails would come from Sound Alive now at Gmail.

**Q. Okay. Well, let's take a look at another document then.**

A. Okay.

MR. RUOCCO: Can I get tab 68, please?

(Finnerud Exhibit 8, Correspondence dated February 27, 2024, re: Notice of Breach; Claim for Conversion of Intellectual Property; Litigation Hold Notice dated 29 January 2024, Bates stamped SA0004558 through SA0004567, was marked for identification.)

BY MR. RUOCCO:

**Q. I'm showing you what's being marked as Finnerud Exhibit 8.**

A. Thank you.

**Q. This is a collection of some -- some different letters. I will just let you know, this is how it was produced to us. The one I want to ask you about is the letter that starts at page ending in 562. It's on January 29, 2024.**

**Are you there?**

A. Yeah.

**Q. Okay. And so this is a January 29, 2024, letter from a Valhil Law, PC to nChain UK Limited, correct?**

A. Yep.
**Q. And you retained ValHil Law PC to represent you in connection with preparing this letter; is that right?**
A. Yes, but isn't this attorney-client privilege?
**Q. Well, sir, this is a letter that your lawyer sent to nChain, so, no.**
A. Okay. All right. Just checking.
**Q. But also, if you have any questions, I want to clarify it for you.**
A. Yeah.
**Q. I think it's obvious by now, but I'm not -- I'm not your lawyer. If you want to confer with your lawyer about any issues --**
A. Okay.
**Q. -- regarding privilege, please, by all means, ask him. Okay?**
MR. NONNI: I agree with what he is saying.
BY MR. RUOCCO:
**Q. So -- okay. So you had Valhil Law, PC prepare this letter on your behalf; is that correct?**
A. Yes.
**Q. And you provided Valhil Law, PC information in connection with them preparing this letter; is that right?**

A. Yes.
**Q. Did you review this letter before Valhil Law, PC sent it to nChain?**
A. Yes.
**Q. And you reviewed and approved this letter before it was sent out; is that right?**
A. Yes.
**Q. And do you believe the contents of this letter are true and accurate?**
A. To my knowledge.
**Q. Okay.**
A. I'm sure we're going to go through the details of it.
**Q. So I want you to look at the first paragraph of the letter. And it begins, "This firm represents Eric Finnerud, professionally known pursuant to his own trademark, E. Smitty."**
**And then if you go down to subpoint 2, it describes you as sole equity holder of DistroMint, LLC.**
**Do you see that?**
A. Yeah.
**Q. Okay. And is that a true statement?**
A. I think it -- it's a confusing statement.
**Q. Okay. Well, did -- I -- on January 29, 2024, you considered yourself to be the sole equity holder of**

**DistroMint, LLC; isn't that right?**
A. I'll be honest with you: I'm just a small businessman, so I don't understand what that would even entail. And because the company never launched, I don't know how I could hold any equity for a company that never launched.
**Q. Okay. So are you -- are you backing away now from this statement in this January 29, 2024, letter from Valhil Law?**
A. I don't understand what that means either.
**Q. Okay.**
A. Like what's the statement?
**Q. Well, how else would Valhil Law have come to understand you were the sole equity holder of DistroMint, LLC if you didn't tell them that?**
A. I think Mr. -- Mr. Valhil misunderstood things and maybe had made a mistake, because that's why he's not my attorney now.
**Q. Okay. So do you think that there's mistakes and inaccuracies in this January 29, 2024, letter from Valhil Law?**
A. Specifically, but not in its entire content. There are some specific errors.
**Q. Okay.**
A. But it would take me to -- I would have to go

through this like a bunch of times in order to like pick out every little knickknack.

**Q. Fair enough.**

**You will agree with me, right, when Valhil Law wrote this letter to nChain in January of 2024, didn't claim that nChain was the 50 percent owner of DistroMint, LLC, did they?**

A. Again, I -- I really don't -- don't give this letter much energy just because this doesn't represent who I'm being represented by right now at this moment in time. So, you know, it -- it does talk about the breaches of the development agreement and conversion, you know, and talks about all the damages, you know, that -- that nChain has committed against me. You know, that's -- that's good information. But other than that, I mean, this is not -- you know, I'm not represented by Jimmy anymore, and so we disengaged, you know, quite a while ago.

**Q. Okay.**

A. Yeah.

**Q. But would you agree with me there is no reference in this -- this letter from January 2024 from Valhil Law, your attorneys at that time, in which they state that nChain was the 50 percent owner of DistroMint, LLC, right?**

A. Well, again, I'm not engaged with Mr. Valhil and I don't think that this letter holds much evidence or credibility in terms of determining the parties. I think I would have to refer back to, you know, the original agreement, which, you know, happened a lot of -- way previous to that.

So, I mean, let me see. It -- I would have to go through this. Okay, in part of the oral agreement entered -- yeah, it does say so. It says a party -- that certain oral agreement entered into between E. Smitty and nChain UK LTD, together with its subsidiaries and affiliates, the development agreement or -- on or about February 21st. See, it's referring to February 23rd -- 21st, 2023, and -- yeah, it's right here. So it's in reference. So in that -- in that context, that's correct.

**Q. Well, in fact, right -- so -- so -- so -- so the Valhil law firm made reference to this February 21st, 2023, e-mail that you've been citing throughout your testimony so far today, correct?**

A. Yeah, but it -- the stake is sole equity holder of DistroMint, LLC --

**Q. Sir, I'm going to need you to just answer the questions that I'm asking.**

A. Okay.

Q. And your own -- your lawyer will have an opportunity, if he thinks it appropriate, to ask you any questions after I'm -- I've concluded my examination.
A. Okay.
Q. I'm going to ask you -- I've been giving you some leeway so far today, but I really need you to answer the question that I'm asking you. Okay?
A. All right.
Q. Okay. So -- so I'm saying the Valhil Law, PC firm made reference to the February 21, 2023, e-mail that you've been bringing up throughout your testimony today, correct?
A. Yeah, 50/50.
Q. Okay. And -- and notwithstanding having referenced that e-mail, in the same paragraph of their letter, they refer to you as the sole equity holder of DistroMint, LLC; isn't that right?
A. That's what the -- the e-mail says. I mean, the -- is this an e-mail? It is an e-mail, yep -- no. Registered mail. Via e-mail and registered mail.
Q. Okay. And Valhil Law also did not say that Sound Alive is a 50 percent owner of DistroMint, LLC, did it?
A. Yeah, I think Valhil Law didn't fully understand the -- or they may have made a mistake in their writing

this letter.

**Q. Okay. All right. Let's take a look at Tab 128, please.**

A. 128?

**Q. No, sorry. You don't have that yet.**

A. Okay. Sorry.

(Finnerud Exhibit 9, E-mail dated May 26, 2024, re: NSF SBIR/STTR Copy of Submitted Pitch - 0082215, Bates stamped SA0003469 through SA0003473, was marked for identification.)

BY MR. RUOCCO:

**Q. Okay. So I am going to show you what's being marked as Finnerud Exhibit 8 -- or 9. 9, rather. Okay.**

THE WITNESS: Thank you, ma'am.

BY MR. RUOCCO:

**Q. Okay. And this is a May 26, 2024, e-mail from the National Science Foundation to you at the Sound Alive e-mail address, subject "NSF SBIR/STTR copy of submitted pitch," correct?**

A. Yes.

**Q. Okay. And it begins -- the National -- or, sorry. It begins, "Dear Eric, thank you for your recent project pitch submission to America's Seed Fund powered by the National Science Foundation. For your records, see below a complete record of the content of your**

submitted pitch. You should receive a response to your pitch to the e-mail address you listed within one month of submission. Please reach out to" -- it gives an e-mail address -- "if you have any questions."

Do you see all that?

A. Yes.

Q. Okay. And the -- the National Science Foundation is a federal government agency; is that right?

A. Yes.

Q. And you submitted a pitch to the National Science Foundation for a grant from America's Seed Fund; is that right?

A. Yes.

Q. Okay. And if you will turn to me -- for -- to the attachment. This is a -- a copy of the pitch that you submitted to the National Science Foundation that they reference in their cover e-mail, right?

A. Right.

Q. Okay. And this pitch was related to the DistroMint platform; is that correct?

A. Well -- well, the platform had already dissolved itself. So where you see under Number 7, "corporate website, none applicable," I was trying to get the platform rebuilt, so I wanted to raise the

funding to hire my own -- to -- devs, because we never launched because of nChain's breach.

**Q. Okay. Look at Item Number 4 for me, if you would.**

A. Yep.

**Q. It's DistroMint, LLC. Do you see that?**

A. Yes. Still existed.

**Q. Okay. So you -- you submitted this -- this pitch to the National Science Foundation on behalf of DistroMint, LLC; is that right?**

A. Yes.

**Q. Okay. And it's important that the submissions that you make to the government be true and accurate, right?**

A. That's correct.

**Q. Okay. And it's especially important that the submissions you make to the government be true and accurate when you are seeking money from the government; isn't that right?**

A. Yes.

**Q. Okay. So turn for me to page 472.**

A. Uh-huh.

**Q. And it's Item 17, "Briefly describe the company and team."**

**It says, "The visionary behind DistroMint is**

**none other than E. Smitty, a leading record producer with a mission to revolutionize the music industry. DistroMint is currently just a small LLC formed in the state of Georgia, is co-owned with E. Smitty's wife."**
**Did I read all that correctly?**
A. Yes.
**Q. Okay. And you told the National Science Foundation that DistroMint, LLC is just a small LLC formed in the state of Georgia that you co-owned with your wife; isn't that right?**
A. I said that after we had separated from nChain and I was still seeking resolution, damages, et -- et cetera.
**Q. This statement was true as of the time that you made it, correct?**
A. This statement right here?
**Q. Yes.**
A. In this particular website, in context of what we're doing here -- I mean, once again, nChain is no longer in the picture. They've already destroyed my platform. I don't have a company website anymore. I have nothing. And this is just my attempt to reclaim it, you know. And it was very hard because I couldn't -- had zero access to the -- the source code. I requested it, and they said they didn't have it. And

then Dale testified last week that nChain does have the source code, it's in a GitHub repository. So at this point we had already served them separation.

**Q. Okay. So let me get this straight. Is it your position that nChain never had the equity in DistroMint, LLC?**

A. I don't think either of us had equity because the platform never launched because nChain breached the contract.

**Q. Okay. So you never got to the point where you actually gave nChain equity in DistroMint, LLC; is that right?**

A. No. It -- equity can't exist in something that's never launched. It doesn't exist. It's like we did all this work for nothing, for nChain to breach and just destroy it and then, you know, hold on, maintain, you know, hiding the -- the -- the -- the source code to the point where we even hired a forensic examiner to search for the source code on the AWS platform and we couldn't find it. And then we also searched GitHub. And normally source codes, especially for platforms, are public -- publicly accessible on GitHub. So locking away the source code and us not being able to launch, there's no way possible that, you know, anything could have come of it because there was -- platform never

launched. Would I like to see it launch one day? I would.

**Q. Do you remember what my question was?**

A. Vaguely.

**Q. Okay. I -- I just -- I asked you, you never got to the point where you actually gave nChain equity in DistroMint, LLC; is that correct?**

A. I gave them half the company. I gave them half the platform, and the e-mail says it. I mean, if this is going to be a thing about -- we're just going to be redundant, I am just going to keep referring back to exhibit -- what is it? Oh, Exhibit 3.

So, I mean, I'm not a business man. I don't really understand, like, equity and all these other different terminologies that you are using. I'm a very small company, but I will tell you that at this point, the company had been totally decimated in terms of, we didn't even have a MVP site anymore because at that point, I couldn't even afford the -- the hosting fees to keep going on.

**Q. So -- but I want to just understand. When you told the federal government that DistroMint, LLC was just a small LLC formed in the State of Georgia that you co-owned with your wife --**

A. Yeah.

**Q. -- you were being truthful, correct?**
A. I believe Jimmy had already served nChain separation.
**Q. And what did you understand the legal effect of that separation to be?**
A. We are claiming back on your IP, and these are the damages and return it back to Mr. Smitty.
**Q. And so do you understand that nChain is -- nChain was never an owner of DistroMint, LLC; is that right?**
A. That's incorrect.
**Q. So how was it that you're able to represent to the federal government that the only owners of the company were yourself and your wife?**
A. Because Jimmy had already served them separation, so there was no -- at this point, there is no nChain, and there is no DistroMint. It's just an idea. It's something that we -- we said, "Hey, you know, it didn't work out with nChain. We're not going to lay on our backs and act like, you know, we're not going to try to actually still do it," and that's what I did.
I spent almost a year or longer trying to figure out a way to get this thing launched because, you know, obviously, I was very disappointed and very damaged by

the way that nChain treated us.
**Q. Okay. Sir, I'm going to repeat what I just told you a few moments ago. Okay? I need you to answer the questions that --**
A. I answered the question sufficiently.
**Q. -- ask. I -- I -- I understand --**
A. I'd like to go to the next question, please.
**Q. Okay. The question is, when you told the federal government that you and your wife were the sole owners of DistroMint, LLC, that was a true statement? Yes or no?**
A. It was true because Jimmy, our then attorney, had already served nChain with e-mail and, what's it called, certified mail. Let me see. E-mail and registered mail, served separation notice, and also demanded back the return of the intellectual property.
**Q. Was it your understanding that you could terminate the development agreement?**
A. NChain terminated the agreement. It was already terminated. They terminated it back in September, the end of September.
**Q. Okay. So it was your understanding that nChain could terminate the development agreement?**
A. I didn't know that they could, but that's what they did.

**Q. So you understood that nChain had terminated the development agreement, yes?**

A. Well, they were -- it was either I go along with the restructure proposal in which, basically, they're just blackmailing me because they said, "Well, you know, if you don't accept the restructure proposal," this is from Dale and James Marchant, "that, oh, DistroMint is just going to sit and it will never be anything," if I don't agree to the terms of restructure agreement.

**Q. Okay. So you understood that by the end of 2023, nChain had terminated the development agreement; is that right?**

A. Yeah, they reneged. They -- they totally breached the agreement.

**Q. No. I'm asking you -- and I need you to listen to the question that I'm asking you.**

**I'm asking you, was it your understanding by the end of 2023 that nChain had terminated the development agreement? That was your understanding?**

A. It was my understanding that they had breached the agreement.

**Q. Okay. So explain for us how you came to tell the federal government in 2024 that you and your wife were the only people who owned DistroMint, LLC?**

A. Because our attorney served nChain separation, a

separation notice and demanded the return of the intellectual property.

**Q. Okay.**

A. Including the source code --

**Q. So --**

A. -- and all related DistroMint IP, everything. He said, "Give it back," and he said, "You breached the agreement. We can no longer be your partners, and you need to return everything to E. Smitty," and that's what -- what he said.

So I mean, what, am I going to lie and say I'm still in business with nChain? I think that would be lying to the government if I said that.

**Q. Okay. So I want to get something really clear.**

**So you've made some statements, and you are testifying in the 30(b)(6) capacity about what owns what company. You understand that, right?**

A. Yeah.

**Q. Okay. And you said that you don't understand the way equity works, correct?**

A. No.

**Q. Okay. So you cannot offer any testimony in this trial or in this lawsuit about how the equity in DistroMint, LLC worked; is that correct?**

A. I think I would need to speak to my counsel

and -- and maybe learn some things, but I could definitely testify if I was knowledgeable.

**Q. No. Sir, I'm asking you here, you're here. You told me that you're prepared to testify about --**

A. I am --

**Q. No. Let me finish my question.**

**You've already testified that you are prepared to testify about the ownership of DistroMint, LLC at the deposition here today, correct?**

A. I'm -- I'm prepared to answer any questions. However, to the capacity of, you know, these e-mails and these messages that you are throwing around here, they all come from a -- separate timelines. So things change, and things develop and things don't develop, and at this time, there was no DistroMint platform.

**Q. I am merely asking, sir, you -- you've now said that you don't understand the way that equity in a limited liability company works, correct?**

A. Well, I mean, I don't have a giant understanding of it like a major corporation like nChain does.

**Q. I understand that's a theme you want to keep bringing up in your testimony, but what I am asking you is, you have said that you don't understand the way that equity in a limited liability company works, correct?**

A. Yes, I said that.

**Q. Okay. And so you cannot offer any testimony about the way that the equity in DistroMint, LLC worked, correct?**

A. No. I can offer testimony that I don't understand.

**Q. Okay. And that's the only testimony that you can provide?**

A. I'm not going to say yes to that.

**Q. Sir, we have a right to -- to ask you questions and get the answers.**

A. You do, and I have a right to respond.

**Q. I understand. But at the same time, you cannot both claim to not understand something and then say you're going to answer questions about it.**

A. I didn't say that. You put those words in my mouth.

**Q. Okay. You have no understanding of the way the equity in DistroMint, LLC worked, true?**

A. I have no understanding of how any equity would work in a company that never launched. This is a company that never launched because of nChain's breach of contract and the total mistreatment of me, myself and what I was trying to -- to build.

**Q. Okay. So you never got to the point in time where you were going to give equity in DistroMint, LLC**

**to nChain, correct?**

A. Well, not according to the restructure agreement, which says that the equity was split at 50/50 percent, and that they were trying to get me to agree to a convertible debt in -- in return of 100 percent ownership of the company.

So nChain already, in that document, admits to being 50/50 owners, and then they're talking about equity. They're talking about convertible debt. I know a little bit about what convertible debt is because I did research on it, but that would mean that, you know, once again, they're -- they're trying to blackmail me.

They're trying to tell me that if I did not accept these terms of the restructure proposal, that they are just going to lay on it. And that's what they did and that's why the company never launched because I never agreed to the restructured proposal terms.

**Q. So the company -- the -- the DistroMint platform never launched, right?**

A. MVP and that's it, and then they -- they stole all the -- they changed my login credentials. They withheld the source code. And so any attempt that I made to try to revive it without accepting the terms of the restructure proposal agreement, I -- they were stifled.

**Q. Okay. So -- so the DistroMint platform, that never launched, yes?**

A. Yeah, it never launched.

**Q. Okay. And the DistroMint, LLC business, that never launched either, correct?**

A. Well, actually, yeah, we didn't make a dollar because of the -- of the -- the project never launching, so we couldn't generate any revenue.

**Q. Okay. And so when -- when -- when the project stopped --**

A. Uh-huh.

**Q. -- okay, you went your way with the equity in DistroMint, LLC, and nChain went its own way; is that what happened?**

A. No. We just -- I -- I didn't agree to the restructure proposal, so they maintained -- they basically held or stole -- withheld the -- the source code and the IP, and they refused to pay my invoices unless I agreed to the restructure proposal.

And then, boom. I mean, I ended up seeking a legal remedy. I met Jimmy, and Jimmy served them with a separation letter.

**Q. And you made several references in your testimony to IP.**

A. Yeah.

**Q. Who owned the IP?**
A. I mean, I'm the contractor. I own it. It's based off my patent.
**Q. Okay.**
A. So I am giving half of it to nChain, 50/50. I'm giving 50/50 -- 50 percent of it, the entire platform. So we can go over, like, the structure of the LLC and this, that and the third. The overall gist of things is I agreed to giving 50 percent of my patent, my company, the platform, the revenue. We sell the company. It's going 50 percent to nChain, 50 percent to me.
**Q. Okay. DistroMint, LLC didn't own the IP, though, did it?**
A. DistroMint, LLC?
**Q. Yes.**
A. Well, I registered the trademark in my name, Eric Finnerud. So, you know, I don't -- I don't understand law enough to know whether or not DistroMint would have owned it or not, but because it's based off of the patent, it's an actual blueprint of how we built out the platform, I would say that nChain owned 50 percent of it, and I owned 50 percent of it.
And if you were to say we used the formal term DistroMint to represent the ownership of assets, which are clearly outlined in this entire case and in all the

e-mails, that's what you would -- what you would go by.
**Q. Okay. DistroMint, LLC, the company, didn't own any IP related to the DistroMint platform, correct?**
A. We owned -- owned -- owned the -- half of the 50 percent of the actual -- the website, which is IP, because that's a source code, that's an entire build-out, and then there's a patent attached to it.
**Q. Okay. Sir, I need you to begin to -- to differentiate between yourself personally and the companies here, okay? So -- so you have yourself personally, you have DistroMint, LLC, you have Sound Alive, okay. So what I'm asking you -- DistroMint, LLC, that company, did not own the IP related to the DistroMint platform; is that true?**
A. It's a double negative because I'm a member of DistroMint and half owner of -- of it, according to the agreement that we had 50/50. So, I mean, I can't say they're not an owner of -- of -- or partial owner of the patent.
**Q. Sir, I need answers to these questions. You told me that you were here and prepared to answer these questions. If you're not prepared to answer these questions, we're going to have to come back at a different time when you are prepared to answer these questions. The questions require that you understand**

**the difference between yourself personally and the companies that you also named in this lawsuit. Okay?**

**So I'm asking you very specifically, did -- let's go one by one. Did DistroMint, LLC own the patent that you claim for the DistroMint platform?**

A. Half of it.

**Q. And what document evidenced that DistroMint, LLC owned half of that patent?**

A. Exhibit 3, the e-mail sent on February 21st, 2023, that states here that 50 percent -- it says 50 percent ownership to nChain, 30 Market Place, London, WIW 8AP, United Kingdom, 50 percent ownership to Sound Alive Enterprise, LLC.

**Q. Okay. Other than that February 21st e-mail, did DistroMint L- -- we'll get -- we'll get to this in a moment, I guess.**

A. Okay.

**Q. Let's look back at the -- at the -- the application and pitch to the National Science Foundation, okay. You didn't tell the National Science Foundation that nChain was a 50 percent owner of DistroMint, LLP -- or LLC, did you?**

A. No, because Jimmy had already served them separation and said -- and was demanding them to return

back the IP and -- and the -- the source code. And at the same time, we're a company that never launched. So this is -- this is starting fresh from nothing after we have been obliterated by nChain. We have nothing. We have no money. We have no platform. We have nothing to show for -- for any of the work that -- or our contributions to the actual agreement with nChain.

**Q. Okay. And you didn't tell the National Science Foundation that Sound Alive was a 50 percent owner, correct?**

A. Again, I don't understand how an LLC can own an LLC. I think it's two different entities.

**Q. Okay.**

A. I feel like it's the idea the patent -- the platform -- the whole gist. I think like getting into these type of discussions doesn't really resolve the actual issue, which is that nChain breached contract and that we incurred millions of dollars in damages because -- you know, because of their behavior. And it's just -- it's not fair.

MR. RUOCCO: Okay. Can I get Tab 61, please.

(Finnerud Exhibit 10, Plaintiff DistroMint, LLC's Certificate of Interested Persons and Corporate Disclosure Statement, was marked for

identification.)
BY MR. RUOCCO:
**Q. I'm going to show you what's being marked as Finnerud Exhibit 10.**
A. Sure.
**Q. And this is a document entitled "Plaintiff, DistroMint, LLC's, Certificate of Interested Person and Corporate Disclosure Statement," correct?**
A. Yeah, I guess.
**Q. And if -- if you turn to page 3, you'll see here that this is signed by the attorneys for you and DistroMint, LLC and Sound Alive, Mr. Nonni, correct?**
**There is a question pending. I'm just asking, this -- this document, this is a document, the "Plaintiff, DistroMint, LLC's, Certificate of Interested Persons and Corporate Disclosure Statement" that was filed with the court in this lawsuit; is that right?**
A. I don't -- yeah, but what does this have to do with anything?
**Q. Well, I'm going to ask you. But I'm saying this is a document that DistroMint filed in this lawsuit, correct?**
A. Yes.
**Q. Okay. And it's -- you'd agree with me it's important for the filings that you make in court to be**

**true and accurate, right?**
A. Yes.
**Q. Okay. And here on page 2, up at the top it says, "Plaintiff DistroMint, LLC has no parent corporation and no publicly held corporation owns 10 percent or more of its stock."**
**Do you see that?**
A. Yes.
**Q. And that's a true and accurate statement, right?**
A. In today's date, which is three years later after nChain -- or two years after nChain -- no, three years. Almost -- yeah, today's date, which is -- we're in the -- the -- 2026. Yes, that would be correct.
**Q. So this -- this statement is true and accurate, correct?**
A. Yeah. I mean, we're talking about a company that never launched.
**Q. So this -- this -- this statement that DistroMint has no parent corporation, no publicly held corporation owns 10 percent or more of its stock, that's true, correct?**
A. We don't have any stock. We never launched.
**Q. So it -- it's your understanding that because the company never launched, no one ever held any membership interest in DistroMint, LLC; is that right?**

A. No, that's not right. We're 50/50 with nChain.

**Q. Okay. You said that you don't have any stock because you never launched, right?**

A. Well, I mean, you have to generate revenue and then become a company that generates enough money to be even -- to generate stock. I mean, you can't -- what -- are you going to divvy up $0?

**Q. Do you understand that the term "stock" refers to the ownership interest in the company, as opposed to profits, revenues, anything like that?**

A. Yeah. And like I said, Jimmy had already served separation.

And I don't want to interrupt, but can we take a break soon? I need to get some aspirin.

**Q. Sure. Let me ask a couple more questions.**

A. Sure.

**Q. So what is your understanding of the effect of DistroMint, the platform, having never launched, on the ownership of DistroMint, LLC?**

A. Well, because Jimmy served them separation and because the platform never -- never took off, it's -- you know, I mean, it's just -- I don't -- I don't -- I don't know what the -- what -- where we would stand legally or in a court because, you know, my -- my last -- during the time that we were with nChain, we

were 50/50 partners and had a partnership agreement. And so everything that happened afterwards, I'm just a little confused about.

I'm a small businessman. I'm not a super articulate company with, you know -- I just -- I -- I wouldn't be able to understand how to even answer that question, honestly.

**Q. Okay. So you -- you just -- you can't answer for us anything about what happened to the membership interest in DistroMint, LLC, correct?**

A. Well, as far as I'm concerned, the membership interest is 50/50 ownership, as Exhibit 3 states and as the 28th DistroMint investment structure proposal that Dale presented me. And then you can reference back to the restructure agreement, which shows the current position, and then the restructure proposal. So, I mean, that's three actual pieces of evidence in paper which all kind of state the same thing.

So, I mean, it's really hard for me to understand anything outside of that. I'm -- I'm not -- I'm not a lawyer and I'm not a giant company, so I don't understand company structure like that.

**Q. Okay. But you felt comfortable enough -- we've seen now -- one, two, three -- four different documents in which you told someone after February 21st, 2023,**

that it was you and Ms. Perry who were the sole owners of DistroMint, LLC, correct?
A. Well, after Jimmy served notice of separation, what am I supposed to do, lie?
Q. Nope. Nope. Nope.
Let's look back at some of the other documents, then. Because I know you -- you've -- you've pointed to Mr. Valhil's [sic] e-mail several times, okay, but let's take a look at it, okay. So the e-mail you sent -- let's take out Exhibit 7.
A. (Complying.)
Q. Okay. So -- so this is an e-mail from March of 2023 between you and Urban Bratina at nChain, right?
A. Yeah. That's 2023.
Q. And the -- excuse me. That's what this is, correct?
A. Yes.
Q. Okay. And you weren't represented by the Valhil firm at this point in time, correct?
A. No. I was still working with nChain.
Q. Exactly.
So at this point in time, had you even met anyone from the Valhil Law firm?
A. No.
Q. No.

**So they didn't cause you in this e-mail to tell Mr. Bratina you and Ms. Perry were the only owners of DistroMint, LLC; is that right?**

A. No. It said -- it doesn't say DistroMint owners. It says DistroMint company details that I'm providing to nChain --

**Q. Sir --**

A. -- who is 50 percent owners.

**Q. -- it says "LLC members" and it identifies you and Ms. Perry, correct?**

A. Right. But the subject of the e-mail doesn't say owners. It says "Subject: DistroMint company details."

**Q. Sir, do you understand that the members of the LLC are the owners of that LLC?**

A. Not if we have a 50/50 partnership deal with nChain.

**Q. This is -- and that question has nothing to do with nChain. Do you understand as DistroMint's 30(b)(6) witness that the member of an LLC is one of the owners of the LLC?**

A. Yes, I understand that.

**Q. Okay. So when you identified the LLC members in this e-mail on March 2nd of 2023, you were identifying the owners of DistroMint, LLC, correct?**

A. No. This is only part of the e-mail. We need to look at the whole e-mail, and I would ask you to reference the entire e-mail in order to -- to be able to address this correctly.

**Q. Well, sir, this is the entire document as I have it.**

A. It's not the whole e-mail. There is a whole long string. It's about seven or eight e-mails long. So just -- we can circle things and put our eyeballs onto certain things and -- and pull anything out of it, but if we don't have the whole, complete story, then it's irrelevant.

**Q. Okay. When you sent this e-mail to Mr. Bratina on March 2nd, 2023, and you identified the LLC members for DistroMint, LLC, you are identifying the owners of that company. That is correct, right?**

A. No. I -- and that's what I said. I need to see the whole entire e-mail because I can't answer this message -- or excuse me -- this question factually or truthfully without the entire e-mail chain from Mr. Urban Bratina and -- and myself.

**Q. Okay. Well, in a few moments, we will take our lunch break, and what I am going to ask you to do is, during that lunch break, if you think that there is a fuller copy of that e-mail chain, bring it back with**

**you. Okay?**
**And I am also going to put on the record that if it's --**
A. It's in the files that we -- we delivered to you guys.
**Q. It does not seem that you are prepared to answer questions on behalf of DistroMint, LLC regarding its ownership, and we reserve our rights to keep the deposition open as -- as regarding that.**
A. Okay. And I want to put on record that it seems that you are very angry. You have raised your voice at me several times, and you are frustrated, and I understand that. However, you know, I would like to be talked to with respect, and I am answering the questions to the greatest of my capacity.
**Q. Sir, I have been totally professional with you the whole time. I'm trying to get answers to the question so that we can understand these things. If you can answer the questions in a yes-or-no fashion, okay, then we can get to our answers easier.**
**I understand that there are certain themes that you would like to bring up, but again, as I told you before, your counsel will have an opportunity to question you about those things, okay?**
A. All right.

**Q. When I'm asking you questions about the ownership of DistroMint, LLC, I am entitled to get an answer from the company itself.**

A. Right.

**Q. Okay. Do you understand that?**

A. I gave you answers.

**Q. Okay. And just to clarify, your answer is, when it comes -- well, when it comes to matters of the ownership interest in DistroMint, LLC, the membership interest of DistroMint, LLC, you don't understand how those work; is that right?**

MR. NONNI: Object to form.

THE WITNESS: No. I feel like the questions are baiting into get -- you tricking me to saying what you want me to say, into which these actual questions are much more complex and intricate. So, you know, me being -- taking the oath and being on the stand, I'm not going to be tricked into saying anything that's untrue or saying that I understand something that I don't understand.

So I reserve that right.

All right. So are we good?

MR. RUOCCO: We can take a break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 1:07 p.m. We're off the record.

(A luncheon recess transpired.)

THE VIDEOGRAPHER: The time is 1:55 p.m. We're on the record.

BY MR. RUOCCO:

**Q. Welcome back, Mr. Finnerud. Will you please take out Exhibit Number 4, which is the nChain 30(b)(6) notice, please?**

A. Yes, sir.

**Q. And turn for me, if you would, to Topic 9 on page 8?**

A. Page 8. Yes, sir.

**Q. Okay. And Topic 9 states, "All tax filings of DistroMint, LLC," correct?**

A. Yes, sir.

**Q. Do you understand that you have been designated as DistroMint, LLC's 30(b)(6) witness on this topic?**

A. Yes.

**Q. Are you prepared to testify about this topic?**

A. Yes.

**Q. Okay. And what did you do to prepare to give testimony on this topic?**

A. Just basically reviewed the -- the paper, the subject and give you my -- intent to prepare to give you

my testament to the best of my knowledge and ability.
Q. Okay. Do you know what a K-1 form is?
A. No, I'm not familiar with that.
Q. Okay. Has DistroMint, LLC ever issued a K-1 form to nChain?
A. Not to my knowledge.
Q. Has DistroMint, LLC ever issued a K-1 form to Sound Alive?
A. Not to my knowledge.
Q. Has DistroMint, LLC ever issued any tax filing forms to nChain?
A. None.
Q. Has DistroMint, LLC ever issued any tax filing forms to Sound Alive?
A. No.
Q. Okay. Can you take out Exhibit Number 6, please?
A. Yes.
Q. The topic -- or Request Number 22 on page 7?
A. Yep.
Q. And the request is for all tax filings of any plaintiff that referenced DistroMint, LLC, including the tax filings of DistroMint, LLC without regard for the relevant time period.
Do you see that?

A. Yes.
**Q. Okay. Did -- did DistroMint, LLC do a search for documents in response to this request?**
A. Yes.
**Q. Did it turn up any tax filings that had been -- strike that.**
**Did it turn up any tax forms that had been issued to nChain?**
A. No. We didn't file any taxes because we never existed, like we never launched. We made no money.
**Q. You -- you personally, Eric Finnerud, have never received a tax form from DistroMint, LLC; is that right?**
A. Nothing. We did not file it, yeah, because we have zero revenue.
**Q. Okay. Can you just take out Exhibit 1, which is the 30(b)(6) notice to Sound Alive?**
A. Yes.
**Q. And I apologize if these questions seem tedious. I just want to clarify the capacity that you're testifying in.**
**If you could turn to page 9, Topic 12?**
A. (Complying.)
**Q. Topic 12 in the Sound Alive 30(b)(6) notice is the location of documents potentially responsive to nChain UK's document request in this action, the process**

**by which Sound Alive identifies such documents and the process by which Sound Alive produced any documents in this action, correct?**

A. Yes.

**Q. Do you understand you're Sound Alive's 30(b)(6) witness on this topic?**

A. Yes.

**Q. Are you prepared to testify about it?**

A. Yes.

**Q. And did Sound Alive also do a search for any documents regarding the tax filings of Plaintiffs that reference DistroMint, LLC?**

A. Yes.

**Q. Okay. And Sound Alive didn't find any documents in response to that request either?**

A. No.

**Q. Okay.**

MR. RUOCCO: Can I get --

(Finnerud Exhibit 11, E-mail dated June 22, 2023, re: DistroMint Update 5.23.23, was marked for identification.)

MR. RUOCCO: I'm going to show you what's being marked as Finnerud Exhibit 11.

THE WITNESS: Thank you.

BY MR. RUOCCO:

Q. Okay. And this is a June 22, 2023, e-mail exchange between yourself and Dale Evans. The subject line is DistroMint Update 5/23/23, correct?
A. Yes.
Q. And if you -- the numbers on this one are at the top. If you would turn for me to the page that ends in 229, please?
A. Yes.
Q. It writes, "Dear Dale, just giving you a quick update. We are close to launch within the next 30 to 45 days. I just wanted to touch base with you and see if there was any update on terms and conditions. Thank you for all of your help."
Do you see that e-mail?
A. Yes.
Q. Mr. Evans was a member of nChain legal department; is that right?
A. I believe him to be, not only a member, I thought he was an attorney.
Q. Right.
A. Yeah.
Q. And then if you just turn to the -- page 228, we have here on June 21st, Mr. Evans' response.
Let me know when you find it.
A. 228?

Q. Yes. I think it's just the next e-mail from the middle page there.
A. Okay. Okay.
Q. Yes. Do you see this here, this 21?
A. Yes.
Q. So Mr. Evans writes, "Hi Eric, sorry it has taken me too long to get back in touch with you. We are rather hectic over here at the moment, particularly lead up to half year."
And he said, "I've obtained guidance from Christen and David Brookes, our general counsel, as to how we need to put together the overall structure and documenting the arrangements with you for the DistroMint platform and its operation. When you have some time in the next couple of days to talk with me about this, my calendar is reasonably flexible the next couple of afternoons UK time."
Do you see this?
A. Yes.
Q. Okay. And then I believe, if you turn to the next page, this is the front page now, you respond to Mr. Evans, and you write, "Thank you for this message. I totally understand nChain is elevating to new heights, and it's a very busy and exciting time. How does this Friday at 2:00 p.m. BST look for you?"

**Do you see this?**
A. Yes.
**Q. So you and Mr. Evans were exchanging these e-mails in late June of 2023; is that correct?**
A. Yes.
**Q. And this was approximately four months after you sent your February 21st, 2023, e-mail to Mr. Ager-Hanssen; is that right?**
A. Yes.
**Q. And Mr. Evans communicated to you that nChain needed to put together the overall structure in documenting the arrangements with you for the DistroMint platform and its operations; is that right?**
A. Yes.
**Q. And the overall -- and by "overall structure," did you understand Mr. Evans to mean how you and nChain might divide ownership in a project company for the DistroMint platform?**
A. I think what he meant was draft up the formal agreement proposed from our oral arrangement on December 12th and, you know, the e-mail on the 21st of February because, you know, by that time, I had already been working with nChain for two months or so, you know, we started pretty early.
And Christen, in the -- in the first meeting

when we actually made an oral agreement, David Brookes, I believe, was supposed to be in charge of my -- of a formal agreement, and then that task moved on to Dale and nChain as nChain -- as I believed him to be the legal guy or whatever. So he was supposed to be doing the terms and conditions and putting the formal arrangement or agreement, whatever you want to call it, you know, based off of our oral agreement and then our agreement on the 21st via e-mail.

**Q. Okay. So Mr. Evans was the person at nChain you were communicating with about working out formal agreement for your arrangement with nChain; is that correct?**

A. I was communicating with Christen, and Christen was communicating with Dale and telling Dale to, you know, get it together basically. He asked him to do it a few times, and I don't know. For some reason, I feel like it just didn't happen the way that it should have.

Dale, I felt like he acted in bad faith, and he just kept pushing it, pushing it and pushing it and pushing it.

And then there were various other things that were going on in the company, which I was unaware of.

**Q. But there came a point in the middle of 2023 where you began to have communication with Mr. Evans**

**about working out a formal agreement for your arrangement with nChain; is that correct?**
A. Yeah. I believe we had the first talk, though, in February --
**Q. Okay.**
A. -- when we discussed the terms and condi- -- he said -- he introduced himself and said, Hi, I'm Dale Evans. You know, I work with legal and I'm tasked with creating your terms and conditions and also a formal agreement from you and Christen's original oral agreement and the e-mail which you sent on the 21st.
**Q. Okay. But as of late June 2023, you and nChain had not finalized the overall structure for how the two of you might divide ownership in a project company for the DistroMint platform; is that right?**
A. I don't think the word "finalize" -- I think we didn't have an actual formal agreement from what we had already finalized with the oral engagement.
**Q. Okay. And as of June 2023, you and nChain had not yet documented any arrangements between you concerning the DistroMint platform; is that correct?**
A. No, that's not correct.
**Q. Well, as of June 2023, you and nChain continued to negotiate how the two of you might divide ownership in a project company for the DistroMint platform; is**

**that right?**
A. No, that's not right.
**Q. As of June 2023, weren't you and nChain still negotiating the documentation regarding any relationship the two of you had regarding the DistroMint platform?**
A. No. We were just waiting for a formal piece of document, formal agreement that would be generated from Christen and I's original oral arrangement and then the, you know, documentation from the e-mail that I sent on the 21st to nChain, to the CEO and the CTO -- or CFO -- excuse me -- Christen Ager-Hanssen and Andy Moody, in terms of the arrangement for the ownership of the platform.
**Q. Okay. Well, just looking at Exhibit 11 --**
A. Yeah.
**Q. -- I mean, Mr. Evans wrote to you that he had obtained guidance regarding how we need to put together the overall structure in documenting the arrangement with you for the DistroMint platform and its operation, right?**
A. Yes.
**Q. And then he had asked you for a meeting, and you responded with some times for a meeting, right?**
A. Yes.
**Q. Okay. And you -- you did ultimately meet with**

**Mr. Evans to discuss that topic after exchanging these e-mails in June 2023, right?**

A. I believe we met, yes, very briefly. We had a small meeting. But we didn't actually fully go over it until we got into that July 28th meeting where I took the screenshot. And I did that on purpose. I wanted to show -- first of all, I wanted to understand, because he flashed it up there and it was up there for a minute, but, you know, you can't always memorize everything. I wanted to see how the structure looked in terms of the DistroMint investment structure. And he had chargeables and nonchargeables, things of that nature.

So I wanted to just look at it. And, I mean, it was very favorable and it was honest and, you know -- I had -- in my call, I believe, in either April, it was -- whenever Christen had went to New York, I had mentioned to him that, you know, Dale was kind of dragging his feet with the -- with the formal agreement, with, you know, formalizing it, you know, giving -- putting it on a formal document and whatnot from our actual oral engagement and then the e-mail that I had sent over in order to agree to giving nChain and -- and, you know, 50 percent ownership of the platform and the IP and myself or my party 50 percent ownership. So that's when he had got on Dale and Dale said that, you know, he is

swamped and he's busy and lots of stuff, so.

**Q. Okay.**

A. Yeah.

**Q. So let's look back at Exhibit 3, then.**

A. Okay.

**Q. That's the February 21st, 2023, e-mail.**

A. Yep. I got to pull it up.

**Q. Yes.**

A. Uh-huh.

**Q. And I believe you just testified it was your impression that Mr. Evans was dragging his feet, I believe is your term, in getting you the -- the formal documentation for your arrangement; is that right?**

A. It sure seemed like it.

**Q. Okay. But after you sent the February 21st, '21, e-mail -- or sorry.**

**After you sent the February 21st, 2023, e-mail you -- you understood that you needed to actually reach a written agreement with nChain regarding your arrangement, right?**

A. I desired to have that, but I felt like when Christen had directed me to, you know, send this particular e-mail in which I'm offering up half of the -- of the platform to nChain, I'm in the understanding that we're already in an agreement. And

then I -- I felt like we had already -- and I know that we were already in -- in an oral arrangement. So to solidify this and to justify them releasing payments to me via our oral agreement, I needed to -- to put it from my e-mail address, my business, you know, Eric Finnerud, soundalivenow@gmail.com -- send that directly to Christen, who could share it with the CFO and -- so we have like a trail here, a paper trail.

**Q. Okay. But just if we're looking at Mr. Ager-Hanssen's response to your e-mail on February 1st, 2023 -- and I am here in Exhibit 3, just to be clear.**

A. Yeah.

**Q. He writes, "I will arrange an agreement as soon as possible."**

**Do you see this?**

A. Uh-huh.

**Q. So -- and that -- that's the agreement that you understood went from being Mr. Brookes' responsibility to Mr. Evans' responsibility, correct?**

A. Yes.

**Q. Okay. And so after the February 21st, 2023, e-mail exchange with Mr. Ager-Hanssen, you understood that you still needed to execute a written agreement with nChain regarding your arrangement, correct?**

A. I believed that that's what would've been a plausible next step. Again, I don't have any business law experience or any professional legal training. You know, I -- I left that up to nChain because they had all the resources, the lawyers, you know, the blockchain experts and all that good stuff. So I was really looking at them for guidance and assistance in -- into -- into that direction.

I did what Christen told me to do, which was, you know, create the LLC for DistroMint and send the e-mail, you know, stating out the terms. I -- I just followed what he told me to do, you know. He's the CEO. He's a very busy guy.

**Q. Okay. And then -- but after -- after he sends you this e-mail on February 21st, 2023, you understood that someone from nChain would be following up with you about a written agreement, correct?**

A. It was an expectation. I expected.

**Q. Okay.**

A. Yeah.

**Q. Okay. Okay. Now, in your -- let's go back to Exhibit 11, please. That's the June e-mail exchange.**

A. Oh, yeah. How did this -- oh, no. That's 7. Exhibit 11?

**Q. Yes.**

A. Oh, it's right in front of my face. Okay.
**Q. It's okay.**
**Okay. So before, we just discussed this e-mail where Mr. Evans told you, you know, you needed to put together the overall structure and documenting the arrangements with you for the DistroMint platform and its operation. In your response, you don't tell him, Dale, we've already worked all that out, right?**
A. Well, I -- I can't say anything until I receive something from him, you know. So I was expecting to receive a document from him, you know, and then I could raise my concerns.
**Q. Okay. Now, I think you -- you answered this a moment ago, but after you exchanged this e-mail with Mr. Evans on June 21st and 22nd, you continued to have meetings with him related to the DistroMint platform, right?**
A. We had two more meetings before everything ceased, before the issues arised [sic].
**Q. Okay.**
A. Yeah.
**Q. And you continued to have like some e-mail correspondence with Mr. Evans after this June e-mail exchange, right?**
A. I believe so. I would have to refer to the

records because, you know, there's quite a bit of e-mails.

**Q. Okay.**

A. Yeah.

**Q. And in the course of your discussions with Mr. Evans from the summer of 2023 onward, he relayed to you that nChain was unwilling to invest in any project company for the DistroMint platform that was based in the United States, correct?**

A. He said he was willing?

**Q. No. My question was the opposite.**

A. Oh.

**Q. So in the course of your discussions with Mr. Evans, he relayed to you that nChain was unwilling to invest in any project company for the DistroMint platform that was based in the United States, right?**

A. No, he never said that.

**Q. Is it your testimony that Mr. Evans never raised concerns about the regulatory risks and burdens that would be associated with basing a DistroMint platform --**

A. He said --

**Q. -- company in the United States?**

A. Sorry for interrupting.

He said that he was concerned. But there were two different ways that we were going to tackle that.

He said either the servers for the platform for DistroMint would be hosted in BVI or we'd just keep our base here in the United States and then incorporate at the same time, you know, in BVI and run the structure from there while I'm still operating in the United States, to where, you know, we have some sort of safety net. And then the other -- the other option was just servers in BVI and I run it from the United States, you know, because of their jurisdiction. And I guess they have different governing laws out there.

Christen never actually came to me and told me that he had any concerns. It was Dale who struck the concerns. But he did kind of push it off as Christen had told him, you know. But I don't -- I don't know what to belive, so -- yeah.

**Q. Okay. At -- at some point in your conversations with Mr. Evans, he communicated to you that nChain had concerns about regulatory risk and burden that would be associated from basing a DistroMint platform company in the United States, right?**

A. Actually, he said it was his concern. He never used the language "nChain."

**Q. Okay. You understood Mr. Evans to be a lawyer working for nChain, though, right?**

A. Yeah, but I didn't know that he wasn't a lawyer

or that he wasn't licensed in -- in Britain to -- or in the UK to be a lawyer.

**Q. Okay. But -- but from your impression, when you were communicating with Mr. Evans, you understood him to be representing nChain in your communications, right?**

A. Well, I thought he was almost like a mentor. Like I was relying on his expertise, you know. He was helping guide me. I thought he was.

**Q. But when you were having conversations with Mr. Evans, you understood he was representing nChain in those conversations, right?**

A. The language he used, it seemed more personal than nChain. He didn't say nChain is taking this position or, you know, X, Y, Z. He was just citing his concerns. And I told him that, you know, I trusted -- because I believed him to be an actual attorney, I told him I trusted him and I trust what -- what you say and I'm willing to cooperate in whatever capacity to make sure -- make this partnership work, you know.

**Q. Okay. But you weren't having any conversations with Mr. Evans about the two of you reaching an agreement personally, right?**

**Let me ask you a better question.**

**Like, you did not understand yourself to be, like, negotiating an agreement with Dale Evans, the**

**individual, right?**
A. Well, I thought it was Dale's responsibility in legal to basically be the -- you know, the -- the expert in that field because, like I said, I -- I have no professional legal training, and I'm, you know, just a very inexperienced business -- well, I am experienced in -- in music production and -- and engineering when it comes to the, like, business law and, you know, professional legal training and all that, I -- I relied on nChain for that. That's -- part of the partnership is -- part of why I agreed to the partnership is because they had those experts on their team.
**Q. Okay. And Mr. Evans was one of those experts as you understood it?**
A. As I believed, yes, I did.
MR. RUOCCO: Can I get tab 102, please?
(Finnerud Exhibit 12, E-mail dated July 6, 2023, re: Meeting 6.7.2023, Bates stamped SA0002096 through SA0002098, was marked for identification.)
BY MR. RUOCCO:
**Q. I'm going to show you what's being marked as Finnerud Exhibit 12.**
A. Thank you.
**Q. And this is a July 6, 2023, e-mail from Urban**

**Bratina to you, subject, Meeting 6/7/2023, correct?**
A. Yes.
**Q. Okay. And just to get ourselves oriented, so this is like a couple of weeks after you and Mr. Evans had exchanged the e-mails we just looked at regarding the overall structure and documentation for the DistroMint project, right?**
A. No. This is -- this is three weeks before Dale went over the DistroMint investment structure with me in a Zoom call.
**Q. Understood. But I'm just asking, just to set ourselves up, if you compare Exhibit 11 and Exhibit 12, we're just now a couple weeks after the e-mails that you and Mr. Evans exchanged in Exhibit 11?**
A. Yeah. Yeah.
**Q. Okay. And we -- we've discussed them a little bit before, but Mr. Bratina was the project manager on the development team for the DistroMint project; is that right?**
A. Yeah, he was my project manager, yeah, but he's under me.
**Q. And Mr. Bratina was based in Slovenia; is that right?**
A. Slovenia nChain offices.
**Q. And Mr. Bratina would send summaries like the**

**one here in Exhibit 12 after the meetings between you and the members of the nChain Slovenia team; is that right?**
A. Yes.
**Q. And this is a summary of a meeting that you had with the nChain Slovenia team on or about July 6, 2023?**
A. Yep.
**Q. Okay. And as you can see here, there's a table that lists people under a who column, and then notes next to those people, right?**
A. Yeah.
**Q. And the bullets next to each person's name, that reflects what that person said during the meeting; is that right?**
A. Yeah. Urban took these notes.
**Q. But is that what the bullets are meant to reflect, what each of these people said during the meeting?**
A. I believe so.
**Q. And so the bullets next to Smitty reflect what you said during the meeting, right?**
A. Yes.
**Q. And if we look to the Smitty line, third bullet from the bottom, it says, "Dale is concerned about SEC."**
**Do you see that?**

A. Yes.
**Q. Okay. And during the meeting you had with the nChain Slovenia team on or about July 6, 2023, you expressed that Mr. Evans had told you he was concerned about the SEC; is that right?**
A. Yes.
**Q. And the SEC refers to the United States Securities and Exchange Commission, right?**
A. Yes.
**Q. And by July 6, 2023, Mr. Evans had expressed to you that nChain did not want to invest in a project company based in the United States because that company might be subject to regulation by the United States Securities and Exchange Commission; isn't that right?**
A. No, he never expressed it. NChain did not want to invest. That -- see, that's where you are getting it wrong. That never happened.
**Q. Okay. Well, the DistroMint platform was meant to allow users to trade non-fungible tokens, right?**
A. It was more than just that.
**Q. Okay. But that's -- that's one of the things that the DistroMint platform was meant to do, trade NFTs, right?**
A. It was designed to be traditional music distribution on one hand, minting of NFTs and

marketplace on the right hand. If you are familiar with a platform named OpenSea, the way that we designed DistroMint was to be more robust and even better than OpenSea.

Now OpenSea is a company that's being run out of New York, okay? So they -- and they -- you know, they're still up and running. So that was my argument that I gave Dale was that, you know, I was not that concerned about -- about jurisdiction, SEC practice and all that because I looked at -- I did a lot of research, and I looked at -- at OpenSea and I said, you know, they're up and running, you know.

Granted, they -- you know, they're doing millions of dollars in transactions per month. It said they were doing 2.4 billion at one point. So they are doing a lot of -- a lot of transactions.

So I knew that we weren't big yet. We had not launched, and I was not really that concerned about it. However, once again, I did trust Dale, and I listened to him because he was telling me -- you know, he is giving me advice, and I am believing that he is an attorney, and I am like, "Hey, you know, we're going to do everything by the book," is what I said because I valued my partnership with nChain, and you know, if they are getting in hot water, I get in hot water, you know.

I wanted to make sure that it was -- we were taking care of each other, you know.

**Q. Okay. But Mr. Evans had expressed to you concern about potential SEC regulation of the DistroMint platform, correct?**

A. Yes.

**Q. Okay. And I -- we will talk about the platform more later, but I just want to clarify.**

**One of the things it was meant to do was allow users to trade non-fungible tokens, right?**

A. Yes, purchase, trade and sell.

**Q. Okay. And if I refer to non-fungible tokens as NFTs, you will know what I mean, right?**

A. Yes, I know exactly what you are saying.

**Q. And by July 6, 2023, Mr. Evans had relayed to you that nChain was concerned that the United States Securities and Exchange Commission might consider the NFTs that might be traded on the DistroMint platform to be securities under US securities laws; is that right?**

A. No. He -- what he conferred to me was his -- what's the word? Was basically his concerns, okay? And so the wording didn't come from -- like, nChain was not used in a sentence. He just -- and -- and he never sent an e-mail which -- which stated those particular concerns either, to my knowledge. But he did -- in our

conversations, he brought it up.

**Q. Okay.**

MR. RUOCCO: Can we get tab 27, please?

(Finnerud Exhibit 13, E-mail dated February 7, 2023, re: NBA Moments, was marked for identification.)

BY MR. RUOCCO:

**Q. I'm showing you what's being marked as Finnerud Exhibit 13.**

A. Okay. Thank you.

**Q. And this is a July 2nd, 2023, e-mail from you to Dale Evans. The subject is NBA Moments, correct?**

A. NBA moments? Yeah, yeah, yeah, yeah.

**Q. Okay. And this -- so this is a few days before you had the July 6th meeting with the members of the nChain Slovenia team, correct?**

A. Yeah.

**Q. Okay. And Mr. Evans writes, this is on June 23rd, 2023, "Hi Eric, this was the case I was referring to about the blurring of arguments around collectables. Your baseball card analogy is very much on point."**

**And then he sends you a link to the Skadden.com website, which he says, "gives an overview of the decision which is more user friendly," and he continues, "the case is not on all fours with DistroMint by any**

means, particularly in that the blockchain in question for NBA moment was private, and that was an important element to this decision, but it is the kind of analysis of the various elements of the Howey test when considering whether NFTs could be viewed as securities."

Do you see all that?

A. Yes.

Q. Okay. And then you respond, "I do understand your point of view, and I respect your concerns."

And then so -- so you -- Mr. Evans, in this e-mail, is communicating to you some legal research he had done on the issue of whether the US Securities and Exchange Commission might consider NFTs to be traded on the DistroMint platform to be securities; is that right?

A. Yes, but what I would like to do is, I want to read the -- my whole response.

I said, "Dear Dale, I do understand your point of view, and I respect your concerns. I would like to move forward in the most legally compliant way in my country and the country that nChain performs from. Those are my requests, and to which I am requesting your legal guidance from. Thank you again for your time, patience and understanding. Best, E. Smitty."

Q. Okay. Yes.

But all I'm asking is, in this June 23rd, 2023,

**e-mail Mr. Evans relayed to you the concern that the U.S. Securities and Exchange Commission might view the NFTs traded on a DistroMint platform to be securities under American securities law, right?**

A. Yeah, but it doesn't -- the problem is, he does not say anything about the SEC. He just says that the NFTs could be viewed as securities.

So, again, it just -- it seems like he's, you know, concerned, but there is no SEC mention. There is no mention of nChain feels this way about blah, blah, blah, you know.

**Q. Okay.**

MR. RUOCCO: Can we take a look at 40, please.

MR. FOLEY: 40?

MR. RUOCCO: Uh-huh.

(Finnerud Exhibit 14, E-mail dated August 30, 2023, re: DistroMint Launch Update 8-29-23, was marked for identification.)

BY MR. RUOCCO:

**Q. Okay. I'm showing you what is being marked as Finnerud Exhibit 14.**

A. Yes, sir. Thank you.

**Q. And this is an August 30, 2023, e-mail from you to Mr. Evans. The subject is DistroMint Launch Update**

8/29/23, correct?
A. Yep.
Q. Okay. And if you look down at the bottom of the first page in his e-mail to you on August 30th, Mr. Evans writes, "Progress on the regulatory front from where to incorporate the platform provider, mindful of day one plans and likely expansion is summarized below."
Do you see that?
A. Say it again.
Q. Sure. Here, just under the middle of the page, Mr. Evans writes, "Progress on the regulatory front for where to incorporate the platform provider, mindful of day one plans and likely expansion is summarized below."
Do you see this?
A. Yep.
Q. Okay. And so here in this e-mail, Mr. Evans was updating you on nChain's research regarding the jurisdictions in which a project company for the DistroMint platform could be safely incorporated, wasn't he?
A. Yeah, but do you see the date? This is the end of -- of August. This is August 30th. This is less than a month before they breached the contract. So I mean, he's doing this at the last minute when he's already been harping on for months about personal

concerns.
So the fact that this came up now, it shows me that, you know, it's a little -- a little too late, a little late, too sorry.
**Q. Okay. So -- so is it your testimony that this August 30th e-mail from Mr. Evans is the first time that Mr. Evans suggested that the project company for the DistroMint platform would have to be incorporated outside the United States?**
A. It's not the first time.
**Q. Okay.**
A. But it's the first time that he actually provided some sort of actual documentation of it, because, I mean, previous to that -- "need to talk to Jack Cause" -- yeah, I mean, this -- we were already kind of at the end of the relationship.
**Q. Well, Mr. Finnerud, if you want to turn back to Exhibit 13, we -- we just saw an e-mail that Mr. Evans sent you at the end of June 2023 where he sent you legal research and expressed concern that the U.S. Securities and Exchange Commission might view NFTs traded on the DistroMint platform as securities, correct?**
A. Yeah, he sent me an article. I wouldn't call that legal research, but --
**Q. Okay.**

A. -- yeah.
**Q. So before he sent you this August 30, 2023, e-mail, Mr. Evans had already communicated to you that -- that he was concerned about potential SEC regulation of the DistroMint platform, correct?**
A. He never used the language "SEC" until the 30th of -- of August, which was, you know, less than a month before we stopped working together, so.
**Q. Well --**
A. Yeah.
**Q. -- Mr. Finnerud, if you want to look back at Exhibit 12, we -- we just saw an e-mail memorializing a meeting that you had with the members of the nChain Slovenia team on July 6th --**
A. Yeah.
**Q. -- where you told the members of the nChain Slovenia team that Dale was concerned about the SEC, right?**
A. Yeah.
**Q. Okay.**
A. That happened in a verbal conversation. That didn't happen through e-mail. The first time he actually mentions the SEC in an e-mail like in writing.
**Q. Okay.**
A. Yeah.

**Q. But I -- I'm -- what I'm asking you is, before this August 30, 2023, e-mail, Mr. Finnerud had communicated to you in some form or fashion that nChain was concerned about the potential SEC regulation of the DistroMint platform, correct?**

A. He communicated to me, but not nChain as a company. Like he didn't tell me, Mr. Finnerud, you know, nChain as your partner -- as your 50/50 partner, you know, we're concerned about, you know, SEC regulations and -- and where we're -- we're launching an incorporation and all that stuff. So, I mean, it's just kind of dragging on, as you can see.

**Q. So I -- is it your testimony that Mr. Evans was just taking time out of his day, unrelated to his work at nChain, to provide you information about the potential risks of SEC regulation of the DistroMint platform?**

A. No. I -- I feel like Mr. Evans was hindering the -- the launch of it and just, you know, continuing to pause it over and over and over again, just basically keeping it from launching because -- I mean, this all was on -- contingent of, you know, these are the -- the things that -- like as I said in -- in the -- as I said in the e-mail I said that, you know, I would like to move forward in the most legally compliant way in my

country and the country that nChain performs in -- from, you know.

So, I mean, you know, like I'm looking at us like we're partners. I -- I don't want them to get in -- into hot water and I don't want to get myself in hot water. But as you see, it just dragged on. It just kept dragging on. At what point do we see a solution?

**Q. Well, I -- so you keep pointing to that language from your e-mail on -- on July 2nd to Mr. Evans where you said, "I would like to move forward in the most legally compliant way in my country and the country nChain performs from."**

**The country nChain performs from, that would be the United Kingdom?**

A. Well, to my knowledge.

**Q. Okay. And you understood that -- that nChain needed to get comfortable itself that it would be able to participate in the DistroMint platform in a way that it considered legally compliant, right?**

A. I -- I have that understanding, but it wasn't an understanding that -- that I got from Dale. It was an understanding of our partnership. And, you know, like I said, I came into this in good faith and really saw us launching this platform and making a lot of money, changing the music industry, and then exiting out of it

and splitting the profit 50/50.
At this point Dale was not helpful at all, is what I would tell you.
**Q. Okay. If we look at the Exhibit 13 quickly --**
A. Yes.
**Q. -- did you read the article in the link that Mr. Evans sent you?**
A. I think I breezed through it and -- yeah, I -- I vaguely remember it.
**Q. Okay. Do you remember the article referring to the U.S. -- to U.S. securities laws?**
A. I -- honestly, I don't recall. I just know that -- "NFTs where securities survives" -- "suit alleging NBA top shot NFTs where security survives" -- yeah, I mean, I realize that, you know, they had some sort of issue, but it says here they survived. This link gives an overview of the decision which is more user friendly.
**Q. Okay. We'll -- we'll come -- we'll come back to that.**
A. Okay.
**Q. Okay. So -- so just focusing on the August 30th e-mail?**
A. Yep.
**Q. So under where he says pro -- "progress on the**

**U.S." -- "on the regulatory front for where to**
**incorporate the platform provider, mindful of day one**
**plans and likely expansion is summarized below," the**
**first country listed among the few here is USA, right?**
A. Yes. This is -- this is what -- from -- from
what he says, yeah.
**Q. Okay. And Mr. Evans wrote, "USA not considered**
**safe at present due to uncertainty with SEC approach to**
**investment contracts and exchange activities."**
**Do you see that?**
A. Yeah.
**Q. Okay. So nChain informed you that the United**
**States was not a safe jurisdiction to incorporate a**
**project company for the DistroMint platform due to**
**uncertainty with the SEC approach to investment**
**contracts and exchange activities, right?**
A. No. Dale informed me.
**Q. Dale Evans from nChain informed you that, right?**
A. Yes. But he didn't find -- he didn't like show
me the law.
**Q. Okay.**
A. Yeah. So, I mean, it's just his opinion. And
then up here, he didn't respond to what I had already
done. Because I had already done my research, and I
said, "Dear Dale, thank you for that information.

My" -- "my research matches yours. I've already found a company that will incorporate DistroMint in BVI and act as a registered agent and help with opening a bank account. To my knowledge, there are very few hoops to jump through with the BVI setup. I would like to discuss further for maybe 10 to 15 minutes. Tomorrow 3:00 p.m. BST is perfect. Thank you again for this important information."

And, see, the problem that I have with his response is that, you know, he's basically acting like he didn't receive that e-mail from me. And -- and I did -- I did do the research and found a way to, you know, jump a few hurdles.

**Q. So -- okay. Let's -- let's focus on the e-mail that you sent in response then, okay?**

A. Uh-huh.

**Q. So in there you start -- you say, as you said, "Thank you for that information. My research matches yours."**

A. Yeah.

**Q. So you did your own research into the potential jurisdictions where a project company for the DistroMint platform might be organized, right?**

A. I did my research on BVI.

**Q. Okay.**

A. But I didn't research like every location. I just did the BVI thing because that was his suggestion.
**Q. Okay.**
A. Yeah.
**Q. So you -- you did -- you did -- you did research into how to organize a DistroMint platform company in the BVI; is that right?**
A. Yes, I did.
**Q. Okay. And just for the record, when we say "BVI," we're referring to the British Virgin Islands, right?**
A. British Virgin Islands.
**Q. Okay. And -- and based on your research, you agreed with nChain that -- that BVI would be the best jurisdiction in which to organize a project company for the DistroMint platform; is that right?**
A. I said it would be the best alternative, according to the research that -- well, the -- the -- the communications that we made between each other. You know, I found -- I found the information to be insightful in terms of, you know, an alternative place to launch it, as opposed to launching it from, you know, the United States soil or, you know, having the servers in BVI or whatever, you know, whatever we were going to decide to do.

**Q. Okay. So as of August 30th, 2023, you were beginning to take steps to set up a project company in the British Virgin Islands for the DistroMint platform; is that right?**

A. I took -- I took some steps in terms of research, but I didn't actually like physically, you know -- I didn't get the registered agent yet and I didn't, you know, add the -- add the DistroMint corporation to BVI or open up a bank account in BVI or any of that yet. And -- and never did, so, you know, that's kind of the end of that.

**Q. Okay. So -- but you -- you were, in August 2023, looking into the steps you would need to take to incorporate a DistroMint platform company in the BVI; is that fair?**

A. Yeah. I wanted to -- I wanted to validate what -- what Dale was saying because this -- this thing has been dragging on for so long now at this point. And I'm trying to get him to speed up, and I figured, well, you know, if I do my little bucket list of research and come back and say, Okay, yeah, you know, I can corroborate what you're saying, then maybe the site would actually launch, we could actually launch the site, like launch the platform and, you know, get some users and shop the platform to various record labels so

that they could buy the technology as well.

**Q. Okay. And just some of the steps that you took, you know, around late August 2023 to set up a DistroMint BVI company were looking for and finding a company that could act as a registered agent; is that right?**

A. Yeah. But I wouldn't say that that's -- that's just doing research, you know, because to take steps, you would actually have to, you know, physically take the steps. So just doing the research, I guess you could -- R -- R&D, research.

**Q. Okay. But by August 30th, 2023, you had already found a company that could help you incorporate a -- DistroMint in the BVI and act as the company's registered agent, yes?**

A. Yes, but Dale never responded with an approval, and that's what I was waiting on.

**Q. Okay. And as of August 30, 2023, you'd also done some research, at least, into the process for opening a bank account in the BVI for a company-owned DistroMint platform, correct?**

A. Well, there was one company, and if you do a Google search and just type in, incorporate in BVI, it's a company that acts as a registered agent, and they basically -- you pay them whatever, a couple-thousand-dollar fee, and they -- they get your --

your -- your company incorporated, and then they help you open a bank account. It's all one service.

**Q. Okay.**

A. Yeah.

**Q. But as of August 30, 2023, you understood that to progress the DistroMint project forward you would need to organize a project company, correct?**

A. No. I -- I understood that an alternative way to launch DistroMint because I was listening to Dale's advice and I believed him to be an actual attorney and giving me good legal advice in the discussions that we had and in good faith, also being an nChain employee and being a partner, you know, you're -- we're on the same team. So I'm not going to screw you over. Don't screw me over. Excuse any language.

**Q. Okay. So as of October 30, 2023, though --**

A. October 30th?

**Q. Sorry. Thank you for the correction. I appreciate that.**

**As of August 30th, 2023, the project company for the DistroMint platform had not been finalized; is that right?**

A. No, we had not launched the actual platform because of all these holdups because of Dale's lack of anything.

**Q. Okay. And one of the holdups was, there was no project company ready for the platform yet, right?**

A. No. One of the holdups was Dale kept halting the platform. He kept halting it back. There was always one reason, then the next reason. Then there was -- you know, it was just excuse after excuse for not launching the platform, and I think one of these excuses is the whole -- the whole -- because I provide the solution, and I should have gotten an e-mail back.

Especially if we are 50/50 partners, don't you think he's going to write back and -- and give me some more input instead of trying to completely halt it and keep halting it?

I mean, I think that Dale, I just don't think that he was working in my interest at that time. I don't think we were actually -- I don't think he really represented the interests of -- of, you know, Christen, Andy and the guys whom I originally, you know, started this whole business, nChain upper tier.

**Q. And did you communicate any of that to Mr. Evans at the time?**

A. I never talked to Dale again until after Christen was fired and he was having clean-up meetings, tidying-up meetings, as he calls them.

**Q. Okay. I want to just be -- be clear about some**

**stuff. So I mean you said that there were a number of holdups in the late summer of 2023 to actually getting the DistroMint platform launched, right?**

A. Yeah.

**Q. And this issue around incorporating the project company, that was one of the holdups, wasn't it?**

A. Well, it was a concern that Dale arised but, like I said, there is never a specific language in any of these -- these meetings or -- excuse me -- these e-mails that state, "Eric, nChain is concerned about this, that and the third."

So it seems more of like a -- just him. He's been directed by somebody to stall the DistroMint platform for whatever reason, internal. I have no idea because there's so much that went on that I have absolutely no knowledge of and, like I said, I am not a -- you know, I'm not a professional legal guy, and I have very limited business law knowledge.

So I'm just trying to do my best to hold up my side of the bargain, my side of the 50/50 partnership. And I'm not going to curse him out and say, you know, what are you doing? I'm going to be patient, and that's what I am known for, just being patient and letting things kind of unravel.

**Q. Well, let's take a look at --**

A. Dale. Dale. Dale.

**Q. Okay. Let's take a look at -- tab 93, please.**

(Finnerud Exhibit 15, E-mail dated May 11, 2023, re: Nameservers down, Bates stamped SA0001492 through SA0001494, was marked for identification.)

BY MR. RUOCCO:

**Q. Now in a minute, I am going to show you what has been marked as Finnerud Exhibit 15, but I think you just testified to, you know, it's not your way to curse somebody out, I think was your phrase, you know, if they're doing something that you don't like; is that right?**

A. Yeah, I mean I believe in -- in business courtesy.

**Q. Okay.**

A. Yeah.

**Q. Let's -- I'm going to show you what's -- and so let me just ask. So I mean, if somebody during the DistroMint project was doing something that you didn't like, it was not your practice to tell them, "Hey, I don't like that you're doing this thing"?**

A. No. I just reported it to Christen.

**Q. Okay. Let's take a look at Finnerud Exhibit 15 then.**

A. I may have even corrected my team as well.
Yeah, thank you.
Q. Okay. So Mr. Finnerud, this is a May 11, 2023, e-mail from yourself to Urban Bratina. The subject is Main Server is Down, correct?
A. Yeah.
Q. And he writes to you, if you turn to the last page, he wrote you an e-mail on May 11, 2023. He says, "This is a big problem now. The DistroMint isn't working anymore and we cannot log into the account on AWS. Do you at least have access to the account and can login? Was the card for billing active before or did you activate it now? I think this amount will need to be paid to them to unfreeze it as soon as possible."
Do you see all that?
A. Yeah.
Q. Okay. And then you respond to Mr. Bratina, "Let's not be rude or jump to any conclusions."
Do you see that?
A. Yeah.
Q. And feel free to read all of these communications, but Mr. Bratina apologizes. He said, "Sorry if it looked rude, not my intention at all," and then you write back to him, "I've already answered your question. We need to get on Zoom so I can get some

things clear because I'm not feeling the energy," and then, you know, you two discuss having a Zoom, and on the top e-mail, you write, "You don't need to do anything. Please stop. I had a meeting with Christen last night that was exceptional. I am very, at this point, unhappy with your behavior and energy."

Do you see that?

A. Yep.

Q. Okay. So this is an example in which someone from an nChain company did something that you didn't like, right?

A. Yeah, these are my -- my developers. Well, this is my project manager Urban, yeah.

Q. Right. And I'm not going to say that you cursed him out, but you expressed your displeasure to Mr. Bratina as this issue was arising in real time, right?

A. Absolutely.

Q. And as Mr. Evans, back in relation to the discussion of SEC regulation and all of that, as he was raising those issues, you did not send him any similar e-mail like that saying, "Dale, you are dragging your feet. This is bad faith."

You didn't say anything like that to him, did you?

A. No, I didn't. But that's -- at that time, I still believed that -- you know, I still had belief in Dale, and then this issue arised from -- what really kind of set me off is, this was -- I believe it was one of the days that we actually were not meeting.

So I am used to getting up very early, and I think I was in bed, and -- if you knew the nature of my Slovenia team, especially Urban, you know, he's a little bit -- he can be a little panicky at times. All the guys can. You know, they are -- they're from Slovenia. They have a very different accent and a very different sound, and when he said to me, "Was the card for billing active or could you activate it," you know, I think I may have taken that a little bit too personal. This amount will need to be paid to unfreeze blah, blah, blah.

And -- when, actually, the issue was that AWS was going through a maintenance, so all the sites were down. And so, you know, I was half asleep. I was -- I think I was tired. Yeah, 3:02 a.m., yeah, I think this was just bad timing and, you know, this was like a -- this is like me and my team, and I corrected them maybe twice in the entire relationship, and then I had Christen correct them one time.

**Q. Okay.**

A. But this is very different from like a lawyer, you know, who's giving me advice about the SEC. This is -- this is my actual developer team in whom I am thinking I am not wanting them to panic and start jumping the gun and thinking that this is -- you know, making -- coming to conclusions is what I didn't want him to do because he was kind of panicky type anyways but, you know, we had been working together for so long. So I mean, we kind of -- you know, at times they brought their -- their questions to me at times, too, so I mean, it was more like brothers.

**Q. Okay. But I think -- I think you already provided this answer. You never like sent Mr. Evans an e-mail like this where you said, you know, "Dale, you're taking too long. This is bad faith," right?**

A. Well, I did not analyze things like I have now, you know, being in this lawsuit, and I'm seeing now, the bigger picture, and I'm seeing how -- how big the breach is, and I'm seeing Dale's part in it, and then listening to his testimony last week, that was like the nail in the coffin.

So I mean, it just -- you know, if I had maybe put my guard up a little bit more, but I still -- I mean I had belief that the -- the platform was going to launch and that we were going to, you know, do great

business because we were already working together. So I was really -- you know, I still trusted in Dale at that point.

**Q. Okay.**

A. Yeah.

**Q. And you were working cooperatively with Mr. Evans in the late summer of 2023; is that right?**

A. Absolutely.

**Q. Okay. And one of the things that you were working with him cooperatively on is trying to figure out where you might incorporate --**

A. Just trying to --

**Q. Let me ask my question.**

A. Sorry, my bad.

**Q. No, it's okay.**

**One of the things that you were working cooperatively with Mr. Evans on in the late summer of 2023 was trying to figure out where you might incorporate a project company for the DistroMint platform, right?**

A. That was one of the topics. The main issue is, can we please just launch the platform, and that's anything to launch the platform. That is why I was willing to cooperate with him to that capacity.

**Q. And if we just look back on Exhibit 14 here,**

**which is the August 30th e-mail between you and**
**Mr. Evans.**
A. Yep.
**Q. You know there are four different companies --**
**or, sorry -- there are four different countries**
**identified here, USA, UK, Germany and BVI? This is in**
**Mr. Evans' e-mail, right?**
A. Uh-huh.
**Q. Okay. And of those four jurisdictions,**
**Mr. Evans communicated that it was the BVI that he**
**considered to be the safe one for a DistroMint project**
**company to incorporate in; is that right?**
A. He said likely to be possible to incorporate,
yeah.
**Q. Okay.**
A. Yeah.
**Q. Likely to be possible. And his assessment for**
**the USA, UK and Germany was -- was very negative; is**
**that right?**
A. His opinions. He didn't provide any, like,
legal documentation besides, like, a link to an article,
but he didn't, like, give me the law, you know?
**Q. Okay. But you understood it was Mr. Evans' view**
**that there would be significant regulatory risk to**
**incorporating a DistroMint platform company in the USA,**

**the UK or Germany; is that right?**
A. Yes, that it was his view, yes.
**Q. Okay. Okay. And let's look back -- now --**
MR. RUOCCO: Can I have tab 161, please.
(Finnerud Exhibit 16, Screenshot of DistroMint Investment Structure, was marked for identification.)
BY MR. RUOCCO:
**Q. I'm showing you what's being marked as Finnerud Exhibit 16.**
A. Yes, sir.
Thank you.
**Q. Okay. Now, Mr. Finnerud, a few times, I think, in your testimony today, you mentioned that you had a Zoom call with Mr. Evans in late July of 2023 and you took a screenshot during that videoconference; is that right?**
A. Yes. July 28th.
**Q. Okay. And that's -- this is a screenshot of the meeting you were referring to?**
A. Yes.
**Q. Okay. And you had this Zoom meeting -- or it might be Microsoft Teams, but you -- you had a videoconference with Mr. Evans on July 28, 2023; is that right?**

A. Yes, sir.
**Q. Let me just ask -- we talked about this room a little bit this morning. You can see in the lower right-hand corner, there's a picture of you. Is this the studio/office/living room in your home --**
A. Yeah.
**Q. -- that you're referring to?**
A. White pillars.
**Q. Okay?**
A. Hammond organ in the back.
**Q. Okay. Now, you see here that there's a -- a diagram in the middle of the document?**
A. Yes, sir.
**Q. Okay. And did Mr. Evans display this diagram to you during this July 28, 2023, videoconference?**
A. Yes, he did.
**Q. Okay. And the point of this diagram was to show you how you and nChain might divide ownership in a potential project company for the DistroMint platform; is that right?**
A. No.
**Q. Okay.**
A. This is an exact diagram of how he was drafting the formal agreement.
**Q. Okay. So you understood this -- this -- this**

**diagram to be a reflection of how Mr. Evans was drafting formal documentation for an arrangement between yourself and nChain?**

A. Yeah. He said that Christen directed him directly to do it, and that before he could show me the actual document, he said he wanted to meet with me and just go over a few things and just kind of, you know, look at the layout and -- yeah, I mean, there obviously was a change. It went from 50/50 to 51 percent E. Smitty and 49 percent nChain.

**Q. Okay.**

A. However, the structure of, you know, chargeable inputs and nonchargeable inputs, things of that nature, still kind of remained about the same.

**Q. Okay. So I want to just break down some of the things that you said. So there are -- there's a box here in the, let's call it, upper left-hand corner. It says "E. Smitty," right?**

A. Yes.

**Q. Okay. And that's -- that's you, Eric Finnerud; is that right?**

A. Yes.

**Q. Okay. And then there is a line from E. Smitty to project company. Do you see that?**

A. Yes.

**Q. Okay. And so under this proposal, you, Eric Finnerud, would be one of the co-owners of the potential project company for the DistroMint platform; is that right?**

A. Yes, sir.

**Q. And -- and if you look for me to the project company box, under project company it says "UK incorporated, UK tax," right?**

A. Yeah.

**Q. Okay. And did you understand UK incorporation to mean that under this proposal, the project company for the DistroMint platform would be incorporated in the United Kingdom?**

A. Not necessarily because the platform -- so I guess he was throwing out there a proposal for -- and this is maybe -- but, see, this -- this is where it's confusing, because even that can be interpreted as, you know, nChain working on the project company and then DistroMint platform operator, XX incorporated underneath it, and then it says "UK tax" and then it says "platform." So, you know, this whole BVI talk, I mean, that kind of -- you know, that kind of dwindles out.

**Q. Okay. But what I -- what I -- what I'm getting at here is, did you understand when it says "UK incorporated," that that means United Kingdom**

**incorporated?**
A. United Kingdom incorporated? Yes, I do believe so.
**Q. Okay. And then, ultimately, you know, as we've already discussed, this idea of having a project company in the United Kingdom morphed into having a project company in the British Virgin Islands; is that right?**
A. I mean, that was one of Dale's concerns that he had -- he had arose [sic].
**Q. Okay. So the idea went from, you know, July 28, 2023, that the project company might be organized in the United Kingdom, to end of August 2023, the project company might be organized in the British Virgin Islands; is that right?**
A. Yeah.
**Q. Okay.**
A. And to the extent of, you know, once again, we're talking about companies -- they change, they morph, you know, things happen. So, I mean, moving forward, for an actual platform to launch, you know, these were some of the things that were discussed.
I think the most important part of this and the telling part is it's showing, you know, the investment structure, it's showing the payments, it's also showing, you know, ownership. It's showing that there -- an

agreement actually exists, despite Dale not providing what Christen had been asking him to do for the entire -- entirety of our whole relationship, until the relationship was broken and he tries to provide me with a restructure proposal.

**Q. Okay. So do you --**

A. Which is vastly different than this.

Sorry. I apologize.

**Q. No, that's okay. I apologize too.**

A. Yeah.

**Q. So you anticipated this question, but the percentages reflected next to your line and the nChain UK line, that's meant to reflect how much equity you and nChain would each have in this -- in this project company to be formed; is that right?**

A. I believe so, yeah, because it has shares underneath it.

**Q. Okay.**

A. So I guess that answers your previous question, was -- was there ever a -- some sort of agreement for shares of the company. And there is the answer right there, because it says shares under nChain, 49 percent; shares under E. Smitty, 51 percent.

**Q. Okay. So here, under this structure, you, E. Smitty, would be owning 51 percent of the project**

**company and nChain would be owning 49 percent; is that right?**

A. Yes.

**Q. Okay. And it's your understanding that as of July 28, 2023, this diagram reflected the state of the drafting of a formal arrangement between yourself and nChain?**

A. Yeah, it -- it -- as he explained it to me, he said that Christen was getting on him to put the agreement together. He said he had a draft completed and he had sent it to Christen, and he said that, you know, he couldn't send it to me yet until Christen approved it, but this was, you know, the structure -- the investment structure that he had put together.

**Q. Okay. And after you had this meeting, you anticipated or expected that you would receive a written agreement from nChain that more or less memorialized these terms?**

A. A formal document that would -- because we're going -- we're morphing from oral agreement on the 12th, to e-mail engagement agreement partnership, 50/50, on the 21st of February. And then from here to July 28, 2023, we have basically the same thing being reflected here, with a -- little changes here and there, but it's a little bit more detailed.

So as -- as I stated in the beginning, you know, we had our -- our basic foundation, which was the oral agreement, and then things got added on as we progressed.

**Q. And they got -- they got changed too, right, like, for example, you ended up with, under this structure, 51 percent instead of 50, right?**

A. Yes.

**Q. Okay.**

A. Which I was more than -- than, you know, happy with. So when Dale presents me stuff like this, of course I'm going to, you know, trust him and believe in him.

**Q. And now, Mr. Finnerud, do you understand that Mr. Ager-Hanssen was terminated as the CEO of nChain in late September 2023?**

A. I believe around September 29th. Yes.

**Q. And as of the time that Mr. Ager-Hanssen was terminated in early -- or, sorry.**

**As of the time Mr. Ager-Hanssen was terminated in late September 2023, you and nChain were still negotiating formal documentation regarding the DistroMint platform, right?**

A. There really wasn't a negotiation because they promptly -- they -- they pulled the plug on my project

by the 7th. And I had received an e-mail around that time from CTO Christine Leong stating that all projects were being halted without an agreement. And I responded and I said, No, we have an agreement. And I referenced the e-mail, the oral agreement, and then I also sent her a screenshot of the DistroMint investment structure.

And she responded and said, Thanks for this information. You know, I'll get back to you as soon as possible.

I didn't hear from her until finally Dale reached out like, I want to say, the end of October, somewhere near the beginning or middle of November. And that's when we had our first call, and that was with Dale Evans and James Marchant.

**Q. Okay.**

A. But, yeah, I mean, as of October, my -- my development team, they stopped showing up.

**Q. So let me get --**

A. So I had --

**Q. -- Tab 149, please.**

MR. FOLEY: 49?

MR. RUOCCO: Yes, please.

(Finnerud Exhibit 17, E-mail dated August 10, 2023, re: Critical Update from nChain (DistroMint Update 10.8.23), was marked for

identification.)
BY MR. RUOCCO:
**Q. I'm going to show you what's being marked as Finnerud Exhibit 17.**
A. Thank you.
**Q. And this is an October 8, 2023, e-mail from you to Christine Leong and some others, subject "Critical Update From NChain, DistroMint Update" --**
A. Yeah.
**Q. -- 10-8-23, right?**
A. Yes.
**Q. And in your testimony a few moments ago, you -- you referenced an e-mail from Christine Leong --**
A. Yeah.
**Q. -- that you received in early October 2023; is that right?**
A. Yes.
**Q. Okay. And --**
A. Oh, wow, it's not a whole bunch of stuff.
**Q. Okay. If we look at -- is it page ending in 268?**
A. Yep.
**Q. This seems to have been sent to you by Mr. Bratina, but is this the e-mail that you were referring to in your earlier testimony?**

A. No. This is not the e-mail from Christine Leong.

**Q. Okay.**

A. This is the one -- and I received that, I believe, around the 7th of October. Christine contacted and reached out to all the projects in -- that were being built under Christen.

**Q. Okay. So just -- just put that to the side for me for a second, though.**

A. Okay.

**Q. I'm going to show you what is being marked as Finnerud Exhibit 18.**

A. Okay.

(Finnerud Exhibit 18, E-mail dated June 10, 2023, re: DistroMint Meetings, was marked for identification.)

THE WITNESS: Thank you.

BY MR. RUOCCO:

**Q. And this is an October 6th, 2023, e-mail from you to Roman Puhek, subject, DistroMint meetings, correct?**

A. Yes.

**Q. Okay. And Mr. Puhek, was he the head of nChain Slovenia?**

A. Yes.

Q. And let's see. If we turn to the second page of the exhibit, this is an e-mail you sent on October 6th, 2023, and you ask, "Is next week's meeting canceled?"
A. Meetings.
Q. Sorry. Yes. "Is next week's meetings canceled?"
A. Yes.
Q. And Mr. Puhek responds, "I hope you receive the e-mail from us, Urban, with the update on last events. We unfortunately had to temporarily halt the projects that have no legal ground (contract). The best and fastest way to communicate is your positive reply to that e-mail where you suggest the beginning of negotiations for contractual relationship to continue development of DistroMint. This would normally be a software development agreement that guarantees the development team to you and revenue to us."
Do you see that?
A. Yeah, I see that.
Q. Okay. And so on October 6th, 2023, Mr. Puhek, the head of nChain Slovenia wrote to you to inform you that nChain was temporarily halting work on the DistroMint platform; is that right?
A. He said halt the projects. He didn't say DistroMint. He said the projects.

**Q. Okay. But did you understand Mr. Puhek's e-mail to be in reference to DistroMint?**
A. I -- I understood it to be all the projects that Christen had brought to the table, and I think at that point, like 16 different companies, projects that Christen had developed with nChain.
**Q. Okay. And that would include --**
A. That would include --
**Q. -- the DistroMint platform?**
A. Yeah, the DistroMint platform. That's correct.
**Q. And Mr. Puhek informed you that the reason nChain had halted work on the DistroMint platform was that there was no contract between you and nChain concerning the project; is that right?**
A. There was a contract, an agreement, however, this is the jargon that they began. And as you can see here, this is where they started claiming that there was not an agreement or a contract. So I mean that is all part of the game that they play. I mean, this is how we got majorly, you know, done really poorly. This was the beginning of it.
**Q. Okay. But so you understood October 6th, 2023, that nChain did not believe it had a contract with you concerning the DistroMint platform; is that right?**
A. It doesn't believe that we have a contract

agreement right now despite piles and piles of work and evidence and -- and eight-hour depositions that prove that there is a 50/50 agreement.

**Q. Okay. But in October of 2023 --**

A. They were saying the same thing. That is when they started saying that, but it came from the fallout with Christen. Whatever fallout nChain and Christen had, you know, I had nothing to do with it. And, you know, and as a result, I'm just -- damages from -- from their fiasco.

NChain could have -- could have still carried out their obligation, but they chose instead to fully breach the agreement and never launched DistroMint, and so we're here right now. We would not even be here. I mean I would have still been working with nChain honestly, regardless of who the CEO was, if they had just, you know, good faith -- in good faith honored the original agreement.

**Q. Okay. But my only question is, October 6, 2023, Mr. Puhek, the head of nChain Slovenia, reached out to you and told you that it was nChain's position it did not have a contract with you, right?**

A. That's what he said, and I rectified that.

**Q. Okay.**

A. You know?

**Q. Yeah, so -- and you did respond to his e-mail and you said, if we look here at Exhibit 18, you said, "It's not my fault because Dale, Christen and I were in the middle of negotiating the contract/agreement when the fallout occurred."**

**Do you see that?**

A. Yep, and then it says I have -- oh, sorry.

**Q. Okay. I'm saying, so the fallout that you mention here refers to nChain terminating Mr. Ager-Hanssen; is that right?**

A. I believe. I don't know what the whole -- what it all entails because it was just a big shock for me.

**Q. Okay. And you acknowledged in this e-mail that as of early October 2023, you and nChain were still negotiating a contract/agreement; is that right?**

A. A formal contract/agreement formalizing. I did say, also, "I have a 12-month agreement with Christen working as a contractor and consulting nChain on how to develop this technology. I also provided my IP patents and diagrams in exchange for development and business support for" -- that should say from nChain -- "I do have a sample diagram of the structure of my agreement with nChain from Dale if that would be helpful."

**Q. Okay. So -- right. So you did say all those things.**

A. Yeah.
**Q. Let's start -- let's start with the first one.**
**So you said, "I have a 12-month agreement with Christen working as a contractor in consulting nChain on how to develop this technology," right?**
A. Yeah.
**Q. Okay. And so you considered that 12-month consulting agreement referenced here to be separate than the other contract/agreement you were continuing to negotiate with nChain as early October 2023; isn't that right?**
A. No.
**Q. Well, you separated those two things when you wrote your e-mail, right?**
A. No.
**Q. You said, "I'm -- I'm continuing to negotiate the contract/agreement. Separately, I have a 12-month agreement with Christen working as a contractor and consulting nChain on how to develop this technology."**
A. I never used the language "separately," and also, it's not two separate e-mails. It's everything in one e-mail, and it also -- once again refer back to previous testimony where you said that the 12-month consulting agreement was not combined with the intellectual property, the patents, and et cetera, in

exchange for development and business support from nChain.

And then I also referenced the diagram of the structure of my agreement with nChain from Dale, and that's the screenshot, Exhibit 16, and then that's also one of the exhibits in Exhibit 17 from the e-mail that I had sent to Roman and Christen -- Christine, Christine Leong.

You will see the -- the Exhibit 16, and Exhibit 17 as well. So sharing with him like proving, hey, we have an agreement, and we are 50/50 partners or 51/49 percent partners in this thing, you know, don't -- don't pull the plug on my -- on my project.

**Q. Right. So.**

MR. RUOCCO: Let's go off the record.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 3:25 p.m. We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 3:40 p.m. We're on the record.

BY MR. RUOCCO:

**Q. Welcome back, Mr. Finnerud.**

**Okay. I'm going to show you what's being marked as Finnerud Exhibit 18 -- sorry -- 19.**

(Finnerud Exhibit 19, E-mail dated June 10, 2023, re: DistroMint Investment Structure 10.6.23, was marked for identification.)

THE WITNESS: Thank you.

BY MR. RUOCCO:

**Q. And in your prior answer and in your -- before we get into Exhibit 19, in your prior answer and in your communication with Mr. Puhek from October 6th, 2023, you mention that you have a sample diagram of the structure of my agreement with nChain from Dale.**

**Do you remember that?**

A. Yeah. I said, "Dear Roman, I found the investment structure was being negotiated with Dale, Christen, nChain, and I would like to initiate negotiations so that all our hard work in this amazing project doesn't go to waste."

So I mean I would even consider this -- you know, anything from after the oral agreement would be just amendments. That's how I would look at it, amendments to the, you know, to the original agreement.

**Q. Okay. So let's back up a second.**

**So you are now quoting from Exhibit 19, right?**

A. Yep.

**Q. So in your earlier e-mail from October 6th to Mr. Puhek, you referenced a diagram, correct, with**

**your -- of the structure of your agreement with nChain from Dale, right?**

A. Can you show me --

**Q. Sure.**

A. -- what exhibit?

**Q. Exhibit 18.**

A. 18.

**Q. Yeah.**

A. Yeah. I -- exhibit -- I -- excuse me -- I spoke of diagrams in two different forms; one was the diagrams of the -- the dashboard that we were designing for DistroMint, which was the -- basically the redesign of the -- of the Sony dashboard, and then I said, "I do have a sample diagram of the structure of my agreement with nChain."

So I guess it would be a diagram of the structure of the amendments to the original agreement. I -- easy to say that moving forward, anything after the oral and the -- excuse me -- February 21st e-mail are amendments to the agreement, original agreement.

**Q. Okay. Well, we will get into that in a minute, but my only question is, when you refer to the diagram in your e-mail to Mr. Puhek, you are referencing the diagram that you and Mr. Evans discussed during the videoconference on July 28th, 2023?**

A. Yes, I am referencing those amendments.
**Q. And then if we look at Exhibit 19, this is an October 6th, 2023, e-mail from Sound Alive to Roman Puhek. The subject is DistroMint Investment Structure 10/6/23, correct?**
A. Yep.
**Q. Okay. And then as you just mentioned, you wrote -- and this is a follow-up to the e-mail you -- we just discussed in Exhibit 18, right?**
A. Yep.
**Q. And then you write, "Dear Roman, I found the investment structure that was being negotiated with Dale/Christen/nChain. I would like to initiate negotiations, that all our hard work in this amazing project don't go to waste."**
**Did I read that correctly?**
A. Yeah. It doesn't go to waste, yeah.
**Q. Okay.**
A. Yeah.
**Q. Okay. And you even included a screenshot from the meeting that you had from July 28, 2023, with Mr. Evans, right?**
A. Yes.
**Q. And that's the same screenshot that we discussed earlier today; is that right?**

A. That's correct.
**Q. And that screenshot contains a diagram of an investment structure in which you personally and nChain would divide ownership in the project company for DistroMint platform, right?**
A. Yes. It shows the amendments to the already executed, you know, verbal or oral agreement and the agreement from the 21st of February 2023.
**Q. Mr. Finnerud, I have to tell you, you know, you're referencing this phrase "amendments," and --**
A. Yeah.
**Q. -- earlier in your testimony today, you were pretty certain that the -- the diagram here reflected in your July 28, 2023, videoconference with Mr. Evans reflected the -- the agreement that you had with nChain.**
A. Yeah.
**Q. Okay. And you understand that that diagram does reflect that?**
A. Yeah. The -- I mean, calling them amendments is basically -- okay. Just a moment. I don't have a ringer on or anything.
It's just we're adding to what we originally started with; you know, as I call it, the foundation.
**Q. Okay. So it's your understanding, then, that this diagram from the July 28, 2023, videoconference**

**with Mr. Evans replaced whatever had come before in your discussions with nChain?**

A. Added. I don't want to say replaced, you know. I'm going to use caution saying replaced. I would say it added to. And that's why I call it an amendment --

**Q. Okay.**

A. -- because we are building off of something that we already had established.

**Q. Okay. And just explain for us -- how did it add?**

A. Well, it gives more details.

**Q. That's it?**

A. And more specifics.

**Q. But the specifics are -- are different, are they not?**

A. Some.

**Q. Okay. Like, for example, right, one of the differences is how much each side would own; isn't that right?**

A. Yeah. This -- in this diagram, these proposed amendments, I mean, they're pretty favorable for -- for my company. So, I mean, you know, this is part of the reason why I was led to believe that Dale was actually a standup guy acting in good faith.

**Q. And I believe you testified earlier it -- it was**

**your understanding that you and nChain were going to enter a written agreement that reflected the terms shown here in this diagram; is that right?**

A. I had already entered into a written agreement. At this point we were amending it. And at the same time, I was also led to believe that Dale was like my attorney, like he was representing the platform DistroMint. So, you know, I'm taking his advice, as you've seen in my previous testimony and the e-mails and I'm basically trusting him.

**Q. Now, in your -- your e-mail to Mr. Puhek on October 6th, 2023, you -- you asked to resume negotiations regarding the -- the structure shown in the screenshot; is that right?**

A. Yes.

**Q. Okay. So as of October of 2023, you were still trying to negotiate with nChain on the structure in which the two of you might divide ownership in the project company for DistroMint; is that right?**

A. No. My project had already been halted, and it started, with first -- the first week of October, all my Teams meetings, my Google Meets or my Microsoft Teams meetings with my developers were deleted. They were deleted off my calendar, and they were scheduled by nChain. And then when I made -- when I started

questioning things, all of a sudden the meetings reappeared on my calendar.

So they were just kind of -- they were just acting very hasty. I got a letter from Urban in one of these exhibits you'll see where he states that everything is all good, we're going to continue our -- our research and development, you know, this situation with Christen will not affect us.

Yeah, right here, Exhibit 17. He says -- and Urban says, "As you might be aware, Christen Ager-Hanssen has terminated" -- "has been terminated as the CEO of nChain on the 27th of September '23. Leandro Nunes and other members of Mr. Ager-Hanssen's team are also placed on suspension pending independent investigation. In no way would this change in personal effect our ongoing discussions, our technology product, research and development, and consulting services leadership, and team remains intact and unaffected. In the interim, all sales and client relationships will be supported by myself, Roman Puhek, Thomas Moretti, under the stewardship of Christine Leong, our CIO."

Excuse me. I called her CTO. It's CIO. Yes. For the record.

**Q. Are you done?**

A. Yes.

**Q. Do you remember my question?**
A. Can you repeat it?
**Q. I want -- I want to know, at some point in that speech, did you forget what the question was?**
A. I may have.
**Q. Okay.**
A. Yeah.
**Q. Yeah. It's going to be easier if you just listen to the question that I ask.**
A. Okay.
**Q. So in -- in October of 2023, you were still negotiating with nChain regarding the terms of the contract between the two of you, weren't you?**
A. We were negotiating -- they were amendment proposals.
**Q. Do you use the term -- let's see. So we have -- let's look back at Exhibit 17, 18 and 19.**
A. (Complying.)
**Q. Okay. So Exhibit 17, we'll start there.**
A. Uh-huh.
**Q. Okay? So this is an October 8, 2023, e-mail, again, from yourself to Christine Leong and others at nChain, right?**
A. Christine Leong, yes.
**Q. Leong, okay.**

A. Yes. Yeah.
Q. And in this e-mail, you write, "Dale, Christen and I were in the middle of negotiating the contract/agreement when the fallout occurred."
Do you see that?
A. Yes.
Q. Okay. Put that one to the side, please.
A. (Complying.)
Q. Let's go to Exhibit 18.
A. (Complying.) Yep.
Q. Are you there?
A. Yep.
Q. So this is another e-mail from you to Roman Puhek on October 6th, so right in the same time period. You wrote, "It's not my fault because Dale, Christen and I were in the middle of negotiating the contract/agreement when the fallout occurred."
That's what you said, right?
A. Yep.
Q. Okay. And then let's look to Exhibit 19. And in Exhibit 19 is another e-mail from you to Mr. Puhek on October 6, 2023, and you wrote, "I found the investment structure that was being negotiated with Dale/Christen/nChain. I would like to initiate negotiations so that all our hard work in this amazing

**project doesn't go to waste."**

**That's what you said, right?**

**That's what you said, yes?**

A. I said more than that.

**Q. You said, "This is from my call with Dale 7-28-23 at 9:17 a.m. Eastern Standard Time. Best, Eric E. Smitty" -- "E. Finnerud," correct?**

A. You previously referenced the first e-mail in which I said, well, it's not my fault because Dale, Christen and I --

**Q. No. Mr. Finnerud, I'm asking you a question now about Exhibit 19 --**

A. I -- I can't answer the question if you're not going to include the full context --

**Q. The --**

A. -- of the e-mail.

**Q. -- the question I'm asking is about Exhibit 19.**

**All you state in Exhibit 19 is, "I found the investment structure that was being negotiated with Dale/Christen/nChain. I would like to initiate negotiations so that all our hard work in this amazing project doesn't go to waste. This is from my call with Dale 7-28-23 at 9:17 Eastern Standard Time."**

**That's what you said; is that right?**

A. It's whatever the e-mail says.

**Q. Okay. I'm going to show you what's being marked as Finnerud Exhibit 20.**

(Finnerud Exhibit 20, E-mail dated June 10, 2023, re: DistroMint Meetings, was marked for identification.)

BY MR. RUOCCO:

**Q. This is an October 6th, 2023, e-mail from Christine Leong to Roman Puhek. And down further, there's an e-mail again from -- well, I guess it's the same one to you and -- and Roman. So you can just put that one to the side.**

**But my -- my question is, we have here in Exhibit 17, 18, 19, three different communications from early October 2023, right after you found out that -- that nChain was halting work on the DistroMint project, right?**

A. It appears.

**Q. Okay. And in each of those communications, right, you say that you either were negotiating an agreement with nChain as of that time or that you would like to negotiate an agreement with nChain as of that time; isn't that true?**

A. I wanted to negotiate amendments that were being proposed.

**Q. No. I'm going -- I'm going to remind you that**

you're under oath right now.
A. Exactly.
Q. So it's very important that your testimony here be truthful.
At no point in any of these e-mail correspondences did you use the term "amendment," did you?
A. I'm using it now.
Q. You're using it now, right.
A. Yeah.
Q. In the context of a lawsuit after you already sent these communications; is that fair?
A. No. In the context that I already had an oral agreement and then I had a February 21st agreement and then -- or -- per se, and then we had amendment proposals here from Mr. Dale Evans. And this is all referenced in all of these messages. So it would be entirely incorrect and I'd be lying if I said there was no agreement and that we didn't have -- already have a 50/50 relationship that we were building on and, you know, we were still amending. So --
Q. Sir, can you point me to any written communications from that time --
A. Yeah.
Q. -- that -- no. Any written communications

**before that time in which you discussed an amendment to the agreement?**

A. Well, I'm calling them amendments because in truth, anything after the original oral agreement and then the e-mail that I sent on the 21st is considered what you would call an amendment or an amendment proposal.

**Q. Okay. You've been testifying throughout your testimony today that you're not a lawyer, you don't have a lot of business law experience, right?**

A. No, I don't.

**Q. Okay. And -- but -- but -- and when did you come to the understanding of what it means to amend the contract?**

A. I mean -- because it's a change or it's a proposed change.

**Q. No. When did you come to -- when in time did you come to the understanding that what you were proposing were amendments to the contract?**

A. All I have to do is think back to December 12, 2022, and February 21st, 2023.

**Q. So you thought that you were amending the contract in December 12, 2022?**

A. No. That's when we originally entered into this agreement, into this engagement.

**Q. I understand that that's when you think you entered an agreement. I'm asking you when you, Eric Finnerud, like came to the realization that you thought you were amending an agreement.**

A. I didn't amend the agreement.

**Q. When did you, Eric Finnerud, hear the phrase "amend the agreement" for the first time?**

A. I heard it when this --

**Q. You gestured to your lawyer.**

A. -- DistroMint investment structure was shown to me, and as you can see, there is a change to the original situation which we have a 51 percent ownership to me, of DistroMint, 49 percent to nChain.

I would call that an amendment or a proposed amendment. An amendment -- what does amend mean? It means to change, to bring forth, and I talked about this earlier in my testimony, evolution, and that sometimes businesses change and evolve, and structure of companies change and all that, but like I said -- and I'm not a legal expert, but I do understand what an amendment is, a simple amendment.

I write little simple distribution agreements, and at times, I have had to amend them to please a client, you know, things of that nature, but I understand. And I also understand the basis of the fact

that this whole entire agreement started on December 12th, February 21st, 2023, and that everything that preceded that were just proposed amendments because that's really all it's doing.

**Q. Mr. Finnerud, the video will reflect that you gestured to your lawyer before you started to answer that -- that question.**

**Is the first time that you thought to use the word "amendment" when you conferred with your lawyer during a break?**

A. I did not talk to Fred about.

**Q. That's not an objectionable question.**

MR. NONNI: Yeah. I am just going to instruct him to not discuss any conversations with his lawyers. He can answer the question without divulging specifics of conversations with your lawyers.

THE WITNESS: Yeah.

MR. NONNI: I am not going to instruct him not to answer.

BY MR. RUOCCO:

**Q. Did you speak with your lawyer during the break?**

A. Briefly.

**Q. Okay. Is the first time that you thought to use the word "amendment" during that break?**

A. No.

**Q. Okay. When was the first time you thought to use the word "amendment"?**

A. Throughout the entire process, thinking about this and looking at all of the ways that -- all the trap questions, all the double negatives, everything that we got going on here, I mean -- and so, you know, number one, I'm going to protect the integrity of my testimony, which is, and I still stand by it, that an agreement 50/50, agrees -- excuse me -- exists and existed since Christen and I engaged on the 12th of December.

And then the -- the e-mail on February 21st, 2023, reflects that, you know, moving forward, and then we have all these examples of proposed changes or, as you could call it -- you know, I'm asking nChain to negotiate with me because they've pulled the plug on my project, and I don't want them to pull the plug on all the project regardless if Christen is the CEO or not.

You know, I'm wanting my project to continue and I am wanting them to hold up their end of the contract and not breach the contract because I already knew where this was heading, and I felt like maybe these guys -- you know, maybe Christen and them had an internal matter, an issue and it has nothing to do with me.

So I mean, I didn't like being dragged into this

and I wanted to just keep my project going.

**Q. In Exhibit 19 when you say, "I found the investment structure that was being negotiated with Dale, Christen and nChain," is that an accurate description of what that -- that screenshot shows?**

A. It shows the investment structure, but as we can -- as we both know that -- from the original date of the agreement, December 12th, 2022, that these are additives in here, a few of them, and then some of it reflects the actual original agreement.

So you want to call them additives, amendments, changes, proposed changes, whatever you want to call them, you can call them whatever you want to call it, but that's exactly what it is.

**Q. Okay. So you would agree with me that -- that the terms between December 2022 and July 2023 changed?**

A. They were proposed changes.

**Q. Well, I thought you said that you liked this -- this structure?**

A. I did.

**Q. Okay. And you've testified before that this structure adequately -- or accurately represented the agreement that you had with -- with nChain?**

A. No, I never testified to that. I said that there are portions of this that accurately represent the

agreement that I had with nChain. However, there are changes, and the 51 -- going from the 50 to 51 percent and the 50 to 49 percent, I mean that's not that big of a change, but it is a change.

And so, it -- this not being -- some of these terms in here, not actually being fully decided, they're proposed amendments. That's what I look at it. That's how I look at it.

**Q. Let's look at -- we already did -- let's look at Exhibit 17.**

A. Sure.

**Q. Okay. So if we turn here to -- you have your e-mail here on October 8, 2023, to Christine Leong and others, and it goes over the course of several pages, and if you look at page 268?**

A. Yep.

**Q. Okay. And the last paragraph here, you say, "I've attached the original DistroMint investment structure that was being negotiated, and I can also resend over my patents, diagrams and such if necessary."**

**Do you see that?**

A. Yep.

**Q. And a few times so far in your testimony, you referred to an e-mail that you sent Christine Leong around this time; is that right?**

A. Yes.

**Q. And is this that e-mail?**

A. I believe so.

**Q. Okay. And the investment structure that you are referencing here is the screenshot of the videoconference with Mr. Evans; is that right?**

A. Yes.

**Q. Okay. And the way that you describe it here is accurate?**

A. What language?

**Q. I'm just saying you said, "I've attached the original DistroMint investment structure that's being negotiated, and I can also resend over my patents, diagrams and such if necessary."**

**So this investment structure was the original DistroMint investment structure, correct?**

A. Of the investment structure that's -- that's referenced to -- on the 28th of July.

**Q. You just used the word "original," right?**

A. I also said, "Thank you very much for everything, and I look forward to continuing our partnership."

**Q. Okay.**

A. Yeah.

**Q. But you say -- you refer to this document,**

**right? On October 8, 2023, you refer to the screenshot of your July 28, 2023, meeting with -- with Mr. Evans as the original DistroMint investment structure, correct?**

A. That's the original DistroMint investment structure, as that screenshot reflects, and that was -- basically, if we look at the events in a chronological order, we have the oral engagement, then we have the February 21st e-mail, and then preceding that, we have the DistroMint investment structure, and that was being negotiated because, remember, we had not finalized a change from 50 percent to 51 percent or 50 percent to 49 percent for nChain.

**Q. Right. You're -- as of July 2023 --**

A. Those --

**Q. -- the terms were not finalized?**

A. Yeah. Those amendments were proposed, but they had not been finalized.

**Q. Well, no. You had not -- you -- you understood that you had to have a written agreement with nChain, correct?**

A. And I did.

**Q. No. But you understood from Mr. Ayre's [sic] e-mail -- I'm sorry.**

**You understood from Mr. Ager-Hanssen's e-mail on February 24, 2023, that you needed to have a written**

**agreement?**
A. He did not say I needed to. He said he would arrange.
**Q. He told you that there would be a written agreement forthcoming, right?**
A. Well, it would be, obviously, amendments to or changes to or adding it to, but an agreement is an agreement whether it's oral or whether it's through an e-mail. And if the -- both parties have carried out their particular duties and they're working in partnership, and there is -- nChain wrote an article about our partnership and then sent it to everybody at nChain, you know.
I don't know what we are arguing here. You're not going to get it out of me.
**Q. Okay. So we'll take a look back at the February 21st e-mail. Take out Exhibit 3, okay?**
A. Here it is.
**Q. Okay. And I just want to focus on Mr. Ager-Hanssen's e-mail on February 21st, 2023, okay?**
A. Yep.
**Q. Okay. And he writes to you, "Thanks. I will arrange an agreement as soon as possible. We will pay the invoice tomorrow morning. That, Andy, can be arranged, please," right?**

A. Okay.
**Q. All right. He does not say we will arrange the amendment to the agreement, right?**
A. He's not trying to change anything.
**Q. Right. But he's not saying we're going -- we're going to do an amendment to the agreement here, right? He's saying there is going to be an agreement coming after February?**
A. He has not proposed any changes. So why would he use the language amendment?
**Q. Okay. But he does not use the word amendment here? That's all I am asking.**
A. I don't see any changes that he's proposed.
**Q. Okay. And then if you look at Exhibit 16, it's the -- the -- the DistroMint investment structure, the screenshot. The title here is DistroMint Investment Structure, right?**
A. Uh-huh.
**Q. It does not say DistroMint investment structure amendment, right?**
A. No. It actually shows amendments.
**Q. No. But I'm asking you a question. It does not say DistroMint investment amendment, right?**
A. It shows changes to the percentages of ownership.

**Q. It showed --**
A. From the original agreement.
**Q. It shows something different than what you allege is the original agreement, that's true. But what I am asking you is, this document does not show DistroMint investment structure amendment?**
A. I considered it an amendment.
**Q. Okay. And so if -- if we look back at all the documents that you produced in this case, are we going to find anyone where you're discussing an amendment to the development agreement?**
A. You are going to see nChain proposing, making several proposals to changes to our original arrangement, including the restructure agreement or proposal.
**Q. Okay.**
A. And that's where you can say a restructure proposal. What is restructure? It's an amendment. It's a change. You're trying to change something from where it originally started into something different. That is a change, and that's what an amendment is. It's a change.
**Q. No. I'm just asking you, like, if we go do a search tonight, if I go do a search tonight of all your e-mails that you produced in this case, am I going to**

**find any e-mails where you are discussing an amendment to the development agreement? Are you going to use that term "amendment"?**

A. What I classify information as, I don't have to discuss it in an e-mail. I can call it what I want to call it. I have that right.

**Q. You can call it whatever you want. What I am asking you is, if I search your e-mails tonight, am I going to find any e-mails or any other documents where you discussed a quote/unquote "amendment" to the development agreement?**

A. Where I discuss an amendment to the development agreement? Yeah. You're going to find an e-mail from Dale Evans to me with the restructure proposal with all of nChain's amendments.

**Q. Okay. But I am asking you a very specific question.**

A. It doesn't make sense.

**Q. If I search your e-mails tonight, am I going to find any e-mails in which you use the term "amendment" to discuss any of your negotiations with nChain about DistroMint?**

A. I don't know, but I -- I implore you to do so if you like.

**Q. Okay. Sitting here today, can you identify for**

**us any written communications from October -- from 2023 in which you use the term "amendment" to refer to any of your discussions with DistroMint?**

A. I would have to refer back to my files.

**Q. Okay. But sitting here today, you cannot identify any written communications from 2023 in which you use the term "amendment" to refer to any of your discussions with DistroMint; is that true?**

A. I can't -- I can't say that that's true either.

**Q. Sitting here today, you cannot recall a single written communication from 2023 in which you used the term "amendment" to refer to any of your discussions with DistroMint; is that true?**

A. It's like 600 e-mails.

**Q. And so if you don't recall, you can tell us. But my -- my question is, sitting here today, you cannot recall a single written communication from 2023 in which you use the term "amendment" to refer to any of your discussions with DistroMint; isn't that true?**

A. I just used it today.

**Q. For the first time?**

A. Not for the first time. I use the word all the time.

**Q. I'm asking you -- and I will keep asking you the question --**

A. Okay.
**Q. -- until you answer it, okay?**
**I'm asking you, as you are sitting here today, you cannot recall a single written communication from 2023 in which you use the term "amendment" to refer to any discussions with Dis- -- with nChain that you had about the DistroMint platform; is that true?**
A. It's a confusing question.
**Q. I'll ask it again.**
**Sitting here today, you cannot recall a single communication from 2023 in which you used the term "amendment" to refer to any discussions that you had with nChain about the DistroMint platform; isn't that right?**
A. I already answered the question. Next question, please.
**Q. No. I'll ask it again.**
A. Okay.
**Q. Sitting here today you cannot recall a single communication from 2023 in which you used the term "amendment" to refer to any discussions you had with nChain about the DistroMint platform? Yes or no.**
A. I don't recall.
**Q. Okay. Let's move on.**
MR. RUOCCO: Can I get Tab 169, please.

Are we on 20?
THE REPORTER: 21.
MR. RUOCCO: Oh, sorry. That's the wrong copy, actually.
(Finnerud Exhibit 21, United States Patent and Trademark Office Confirmation No. 8902, Filing Receipt, was marked for identification.)
BY MR. RUOCCO:
**Q. All right. So this is a document under the letterhead of United States Patent and Trademark Office. The application number is 63389715, the filing date July 15, 2022. It is addressed to you, Mr. Finnerud, at what appears to be your home address.**
**Do you recognize this document?**
A. Yes.
**Q. And -- and what is this document?**
A. This is the patent that became DistroMint.
**Q. And when you say "patent," do you mean provision -- provisional patent application?**
A. Yes.
**Q. Okay.**
A. It was -- it's -- obviously it's, you know, good for a year.
**Q. Okay.**
A. Until it's taken to a full patent application.

**Q. You've never received a patent for the technology described in this application, have you?**
A. Actually, it -- the patent is pending right now. It's in the second or third round of examination.
**Q. Okay. But -- but you haven't actually received the patent for the invention and technology described in this application, have you?**
A. I'm awaiting patent pending.
**Q. Okay. And is -- if you look to the --**
A. We just filed the office action yesterday.
**Q. Okay. If you turn to the page ending in 112, there's a document entitled "Provisional Application for Patent, Invention Title: Blockchain Integration and Digital Music Distribution."**
**Do you see that?**
A. That's correct.
**Q. Okay. Is this the provisional patent application you contend was the basis for the DistroMint platform?**
A. Yes.
**Q. Okay. If I refer to this document as the blockchain integration and digital music distribution provisional patent application, do you know what I mean?**
A. Yes. You -- yes.
**Q. Okay. And can you please just explain for us in**

**as much detail as you can the claimed invention described in this provisional patent application?**

A. Yes.

**Q. And if you would be so kind.**

A. It's a process. If we go to the diagram, then you have a music distributor, and you sign up with your -- with your crypto wallet and you pick a pricing plan, you upload your content, your artwork, video, WAV, MP3, AIFF, any acceptable format, make a payment in crypto, select whatever songs. And that includes the artwork, MP3, WAV, AIFF, image video files for NFT minting and tokenization, miniature NFTs, while at the same time the music, the artwork, images and video is sent to online retailers for sale. NFTs are placed into a marketplace on one platform. Artists who -- the signee with the wallet, obviously, receives payment in cryptocurrency. Any and all royalties from streams, online sales, views, plays, all monitored platforms are sent to Zum -- and now it's called Salmon -- Ethereum or any acceptable crypto wallet that is connected to the assignee's account.

**Q. Okay. Thank you.**

**Is that a complete description of the invention you believe you had come up with in connection with the DistroMint platform?**

A. Well, it's a beginning, a start to it. Obviously there's -- it's -- the full patent is much more com- -- complex and it's much more -- explained in a -- greater diagrams and just, basically, patent -- I like to call it patent language.

And at the same time, you know, there's another patent which I filed, which was the streaming side of things, but we -- we never got to that. But I did turn that in to nChain, as well. So that was the second patent, which was, you know, a -- filed as a provision -- provisional patent, so it wasn't -- and that was never taken to a full patent application.

But, yeah, I mean, this is the process. It's not just the platform for DistroMint, it's the process, because I wanted to be the first to process this idea. And, you know, this is very -- this is like top secret for me and whatnot. But I wanted to -- to take this whole DistroMint platform and -- like I said, you know, we're redesigning the -- the groundwork for the entire music industry so that we can bring music on board to blockchain technology.

**Q. Okay. Do you think that you have now adequately explained, you know, the concept that you were getting at here in the -- in the provisional patent application? Is there anything else you need to add?**

A. I could add a lot of things. However, I don't know what you would want.

**Q. Okay.**

A. So just ask me whatever questions that you have.

**Q. I just want -- I just want you to under -- explain as best you can the technology that you were, you know, claiming to have invented in the provisional patent application and to make sure that, you know, you gave a complete description of it. So have you done that?**

A. Okay. So, I mean, I believe the patent speaks for itself, but I can read it to you.

**Q. Well, I'm not asking you to read the entire thing into the record.**

A. Well, let's just -- let's just get this part of -- into the record. So the -- the version of the invention discussed here includes the platform signup, connection to the crypto wallet, pick your plan, pay with crypto, unload files, select songs for minting --

THE REPORTER: Slow down.

THE WITNESS: Oh, sorry.

Pick your plan, pay with crypto, upload files, select songs to mint NFTs, make sales, collect royalties in crypto.

The relationship between the components.

The platform signs you up, helps you connect your crypto wallet. Plan selects whether you distribute a single or an album, for example. Mint NFT option allows you to tokenize your music and art into a crypto blockchain.

How the invention works. Once you sign up and in -- you're in with your crypto wallet login -- excuse me -- you upload your music, select songs to be minted as NFTs, place them on the market for sale, then collect payments and royalties in the form of cryptocurrencies.

How to make the invention. One must first create a platform that has crypto wallet integration and music, MP3, WAV or AIF upload integration. An outside distribution agreement will be necessary or individual agreements with music distribution platforms. Multiple cryptocurrency wallets and blockchains may add depth and functionality and increase customer pool base. It is optional but it is necessary to have at least one blockchain. These same principles can be applied to art, paintings and video.

How to use the invention. Bob, for example, decides he wants to take his professional music recordings and sell them online and tokenize

his music at the same time. He goes to Sound Alive records or DistroMint -- we would say DistroMint -- creates an account and logs in with his Zum crypto wallet. He selects his plan, uploads his artwork, music and metadata, then selects songs he would like to admit as NFTs.

And I said, Additionally, this invention can be applied to almost anything that can be digitized or viewed, listened to on the internet. Also, it can create minting, distributing and collecting royalties for GIF NFTs, video NFTs, 3D NFTs, graphic NFTs.

BY MR. RUOCCO:

**Q. Okay. And were you, Eric Finnerud, the inventor or the -- on this patent application?**

A. Yes.

**Q. Okay. And you were also the applicant on the application?**

A. Yes.

**Q. Okay. And did you, in fact, file this provisional patent application on July 15, 2022?**

A. Absolutely. I may have filed it -- yeah, it says "date mailed," so, yep.

**Q. Okay. Aside from the United States Patent and Trademark Office, did you file the blockchain**

integration and digital music distribution provisional patent with the relevant governmental authorities in any country other than the United States?

A. No.

Q. At the time you filed the blockchain integration and digital music distribution provisional patent application on July 15, 2022, the company DistroMint, LLC did not yet exist, right?

A. No.

Q. Okay. And let's go back to the 30(b)(6) notices. If you would pull both of them out. These are Exhibits 1 and 4.

A. Yeah, 1 and 4.

Q. Okay. I was going to try to hit these at the same time.

Okay. So if you go to the DistroMint, LLC 30(b)(6) notice, Topics 12 and 26, that's Exhibit 4.

So Topic 12 is all assets of DistroMint, LLC and that's on page 8, and then if we turn to page 10, Topic 26 is DistroMint, LLC's knowledge of any patents, patent applications or provisional patent applications concerning DistroMint or DistroMint, LLC, any representations by or on behalf of DistroMint, LLC to nChain UK and/or Christen Ager-Hanssen concerning such patents, patent applications or provisional patent

applications, including their ownership, funding, prosecution history, scope and any contributions or funding by nChain or UK towards its conversion.
A. Yes.
Q. You understand you've been designated by DistroMint, LLC as its 30(b)(6) witness on those topics?
A. Yes.
Q. And you are prepared to testify about those topics on behalf of DistroMint, LLC today?
A. Yes.
Q. And if we go to Exhibit 1, Topic 24, which is Sound Alive's knowledge of any patents, patent applications or provisional patent applications concerning DistroMint and any representations by or on behalf of Sound Alive, nChain UK and/or Christen Ager-Hanssen concerning any such patents, patent applications or provisional patent applications, including their ownership, funding, prosecution history, scope and any contributions or funding go nChain UK toward its conversion.
Do you see that document?
A. Yes.
Q. And you understand you are Sound Alive's 30(b)(6) witness on that topic as well?
A. Yes, sir.

**Q. And you're prepared to testify on behalf of Sound Alive on that topic?**

A. Yes.

**Q. Okay. All right. You never assigned the blockchain integration and digital music distribution provisional patent application to DistroMint, LLC, did you?**

A. I don't understand how -- what -- in what manner it would be assigned to? I built the entire -- we built the entire DistroMint platform based off this actual patent. So this is what I delivered to Christen Ager-Hanssen when we made the original agreement, and this is how we entered in to the 50/50 agreement.

I trusted him enough to share this with him, and this was part of the original negotiation.

**Q. Okay. I think you mentioned that you filed a further action related to this provisional patent application as recently as yesterday; is that right?**

A. Yes.

**Q. You, Eric Finnerud, personally are the applicant in that case?**

A. Yes.

**Q. So DistroMint, LLC is not the applicant in -- in the pending case regarding the blockchain integration and digital music distribution patent application,**

**right?**
A. Well, if DistroMint had actually launched, it would most definitely be part of the IP for DistroMint. Being that the platform never launched and, you know, we're sitting here going through a deposition, you know, I just took control in terms of, you know, seeing that at least the patent went through.
**Q. Okay. So you -- you personally are the one who continues to exert control over the blockchain integration and digital music provisional patent application, right?**
A. Well, I'm making decisions.
**Q. Okay. That application belongs to you? That's what I asking.**
A. It's in my name.
**Q. Okay.**
A. And I paid -- for the last, probably, year or so, I paid all the invoices.
**Q. You've paid those invoices?**
A. Yes.
**Q. Let me ask the question.**
**What invoices are those?**
A. The invoices from the patent attorneys.
**Q. Okay. So you've personally paid patent attorneys to continue prosecuting this blockchain**

**integration and digital music distribution?**
A. It's not called blockchain integration.
**Q. Okay.**
A. It's -- this patent was converted to a full patent. So the new name of the patent is digital tokens blockchain.
**Q. I appreciate that clarification.**
A. Yes.
**Q. Right. Okay. So the -- the nonprovisional patent application, you're the one who is continuing to prosecute that one, right?**
A. Yes.
**Q. And the nonprovisional patent application you're the one who is continuing to pay all the invoices for attorney time spent on that patent; is that right?**
A. Yes.
**Q. Okay. DistroMint, LLC is not -- it is not the inventor on the nonprovisional patent application, is it?**
A. Well, the actual patent itself, DistroMint was built off of that particular -- that particular application.
**Q. Okay. But -- but you, Eric Finnerud, like the human being, you're the one who -- who is the inventor on that provisional patent -- sorry -- on that**

**nonprovisional patent application; is that right?**

A. Yes.

**Q. Okay. You never entered into any contract with DistroMint, LLC where you assigned the DistroMint, LLC the nonprovisional patent application, did you?**

A. I never entered into a contract with DistroMint. I entered into an agreement with nChain to which this patent application, which is now in its full patent application and whatnot, was basically assigned to the DistroMint platform in terms of we built the DistroMint platform in accordance to these diagrams and instructions here. And then there is other diagrams that I -- you probably have in e-mail you can refer to.

**Q. Okay. But did you ever enter into a contract, Eric Finnerud and DistroMint, LLC, in which you transferred the provisional or nonprovisional patent applications to DistroMint, LLC?**

A. Yes, I did.

**Q. And what is that contract?**

A. The February 21st e-mail and the oral arrangement that I made with Christen Ager-Hanssen, CEO of nChain, on the 12th of December.

**Q. But since that time, you've, Eric Finnerud, the individual, have continued to pay the invoices, file the applications, prosecute the patents, right?**

A. Yes. Yes, and that's because -- and I might add that, you know, my partner abandoned me. So I tried to negotiate, and they didn't answer the call.

**Q. Now, I mean, is it -- is it your testimony that you, Eric Finnerud, the individual, are the person who has the ownership interest in the, you know, technology described in the provisional patent and nonprovisional patent?**

A. Had nChain not breached the agreement, I would 1,000 percent be comfortable with our original agreement. However, them being -- me not being able to -- to reach them, them being unresponsive to me and then abandoning my project, you know, everything is left up to me.

So, you know, I didn't want to take something that's so valuable and now you can kind of start to understand the value, the high value of this technology and why, you know, nChain was getting a steal by owning 50 percent of the platform and the patent. This is -- you know, we're talking, you know, a decacorn. We're talking the music industry itself is, you know, $26 billion a year in streaming and 800 million listeners.

We're -- we're -- I mean, it just -- it goes on and on and on. So that's why, you know, I'm very

disappointed that we didn't come to, you know, an amicable continuance, and that nChain decided to, you know, basically shut the door on our partnership.

**Q. Now -- but is it your understanding that you personally have any ownership -- let me back up.**

**So you said you're currently prosecuting a case for the nonprovisional patent?**

A. Yeah.

**Q. Okay. If you do get the patent, is it your understanding that you personally will own that patent?**

A. I think this case right here will decide that.

**Q. And what do you mean by that?**

A. I mean that the judge is going to make a decision based off of all the information, my testimony, Dale's testimony, and, you know, I think that the patent will remain in my possession.

**Q. Okay. So you think that you are the person who owns the patent if it's granted?**

A. Absolutely.

**Q. Okay.**

MR. RUOCCO: Can we get tab 173, please?

THE WITNESS: Do I need to keep any of these out on the table?

BY MR. RUOCCO:

**Q. I would just keep the 30(b)(6) notices --**

A. Okay.
**Q. -- handy but the rest of it, I think, you can put away.**
A. Okay. Just make room.
**Q. All right. And I'm showing you what's being marked as Finnerud Exhibit 22.**
(Finnerud Exhibit 22, United States Patent Application Publication, Pub.No.: US 2024/0020681 A1, was marked for identification.)
BY MR. RUOCCO:
**Q. Okay. And this is a United States patent application publication. The title of the application is Digital Tokens Using Blockchain, correct?**
A. Yes, sir.
**Q. And do you recognize this document?**
A. Absolutely.
**Q. Okay. And is this the nonprovisional patent application we've been discussing?**
A. Yes, but this is not the present version of it.
**Q. Okay. Fair enough. Is this -- so this has a filing date of July 17th, 2023, right?**
A. Yeah, we amended this application last week.
**Q. Okay.**
A. Completely amending it, and basically, the examiner brought up several questions. I don't have

those questions, like, in front of me, so I can reference to my files if necessary.

And so we made the adjustments, and we did not change the name of the patent, so it's still Digital Tokens Using Blockchain. However, we did make several amendments to -- you know, so that we could get the patent approved, and then we resubmitted -- yesterday, we refiled it and paid the fee.

**Q. Okay. But you did submit this version of the application at least on July 17, 2023?**

A. In 2023, I believe this is the -- the version that was filed.

**Q. Okay.**

A. It's changed twice.

**Q. Okay.**

A. To my knowledge. This is what my attorneys told me.

**Q. Okay.**

A. And this is where we get a little bit more technical, you know, communications between the blockchain and the servers, the networks, you know, TX IDs, UTXOs or outputs, and how various things -- I would say the most layman version is probably Figure 3 and Figure 4 where you can kind of start to see -- and then Figure 5, Figure 6, yeah, pages -- well, it does not say

what pages -- it gives you more of a -- what we were doing here with the -- you know, very basic, you know, my -- obviously, my diagrams aren't that great. I did perfect them in my second patent application, yes, so the diagrams look a lot better.

**Q. Okay. And you were -- once again, you were the inventor on this patent application?**

A. Author. Yes, sir.

**Q. And the applicant as well?**

A. Yes.

**Q. Okay. And this nonprovisional patent application was submitted on July 17, 2023; is that right?**

A. Yes.

**Q. And so this -- aside from the United States Patent and Trademark Office, did you file this application with the relevant government authorities in any other countries?**

A. No.

**Q. Okay. And am I correct in understanding you are the owner of this nonprovisional patent application?**

A. At the time, I had committed via the agreement with Christen 50 percent ownership of this patent at that time. And after the abandonment of the platform and the business relationship, I just maintained making

the decisions of the patent as far as, obviously, yesterday. Monday we filed a last-minute -- because we faced abandonment on the 3rd of August, so we made a last-minute filing.

**Q. And do you -- so your understanding, though, is that you, Eric Finnerud, are personally the owner of this nonprovisional patent application?**

A. I'm the owner, and as the, you know, agreement with Christen, I'm giving up 50 percent in exchange for the development and support from nChain and its -- its blockchain developers and expertise in, obviously, law and -- and business.

**Q. And who are you giving up the 50 percent ownership in --**

A. To nChain.

**Q. Okay.**

A. Yeah.

**Q. Okay.**

A. So if you were to look at it and say, well, nChain is still 50 percent owner of -- of this patent application, what you could see is in good faith Mr. Finnerud still maintained the application and did not let it go into abandonment; he maintained it. So --

**Q. Okay.**

A. -- that's a good-faith move.

Q. Let's put that to the side for a minute. We will come back to it, so don't put it too far.
A. Okay.
Q. Okay. So let's look at --
MR. RUOCCO: Can we get Tab 21, please.
(Finnerud Exhibit 23, E-mail dated June 21, 2023, re: Provisional Patent Application Conversion, was marked for identification.)
BY MR. RUOCCO:
Q. This is a big one. But I'm showing you what is being marked as Finnerud Exhibit 23.
A. Good lord. Thank you.
Q. And this is a June 21, 2023, e-mail from Dale Evans to you, copying Robert Alizon and the subject is "provisional patent application conversion," correct?
A. Yes.
Q. Okay. And on -- I'm just looking at the first page here. Mr. Evans wrote, "As mentioned in my other e-mail to you of this evening, I would like to introduce you to Robert Alizon, nChain's Chief IP Officer. Robert and his team will need to talk to you" -- "with you about the technical details of the invention upon which your provisional patent application relies. Below, Robert has kindly spelled out some of the key points about process and analysis required to be undertaken to

move forward with the conversion of the provisional application into a regular application."
Did I read that correctly?
A. Yes.
Q. Okay. And so on June 21st, 2023, Mr. Evans reached out to you to connect you with Robert Alizon; is that right?
A. Yes.
Q. And Mr. Alizon was nChain's Chief IP Officer; is that true?
A. Yes.
Q. Okay.
A. I believe so.
Q. Okay.
A. I don't remember meeting with him, though.
Q. Okay.
A. Yeah.
Q. And -- and Mr. Evans included some feedback from Mr. Alizon regarding the process for progressing your provisional patent application to a nonprovisional patent application?
A. Yes, sir.
Q. And the -- the -- the provisional patent application that was ultimately filed was the one entitled "blockchain integration" -- or sorry. Back up.

The -- the provisional patent was the one we looked at before, the one called "blockchain integration and digital music distribution," right?
A. That's correct.
Q. And then do you see here there is some italicized text below Mr. Evans' signature?
A. Yes.
Q. And this italicized text, was this the feedback that Mr. Alizon had given?
A. I believe so.
Q. Okay. And Mr. Alizon begins, "Eric Finnerud filed a U.S. provisional patent application on 15 July 2022 date of priority, that needs to be converted into a regular patent application by 15 July 2023."
Do you see that?
A. Yes.
Q. Right. And then if we look down to the next paragraph -- or, sorry, the third paragraph, it says, "The U.S. provisional describes a business method referring to some technical meanings but does not substantiate one or more inventions sufficiently that those can be claimed in a U.S. regular patent application."
Do you see that?
A. Yes.

**Q. Okay. So you understand that nChain believed your provisional patent application merely described the business method, right?**

A. That's what I -- I describe it as a -- a process.

**Q. You would describe that provisional patent application as describing a business process? Is that what you're saying?**

A. Like if you think about patents and -- what people don't know is that most patents, especially ones that generate a lot of money, they -- they -- they're a process, so -- a process, a payment process, a process or -- of instructions that lead to an action or a transaction. So, you know, I always believed my patent to be a process.

And this -- all these extra pages in here, this is after we -- or this is before we had kind of shrunk it down to the actual application size. This is a lot more to it. This right here, this whole entire creation right here and so -- okay. They're show -- they're citing -- see, I need to take a look at this. Okay. So -- all right. Goldsten, et al. See, I thought this was the original -- because we had -- I didn't look at the -- we had an original version of this that we consolidated before we submitted this application.

**Q. Okay.**
A. So this was one of the patents to which they were basically referencing and stating that might be a competing patent or something that the examiner might look at and say, well, this has already been done.
**Q. Okay.**
A. Yeah.
**Q. So I just want to back up a second.**
**So by June 21st, 2023, nChain had communicated to you its view that your provisional patent application described a business method, right?**
A. I believe so. I would have to see that actual e-mail. Or are you -- you referring to this e-mail right here?
**Q. I'm referring -- I'm referring to this e-mail, yeah.**
A. Yeah. "Key points analysis undertaken," blah, blah, blah, blah. Next steps -- upon "patent application that is in the form of regular patent application the company similar system, it may help the inventors indicate the" -- "the difference in the" -- yeah, I mean, this was what he referenced in terms of the similarities.
**Q. Okay. But -- but --**
A. And what -- what a patent would look like, what

this -- and -- and this is what we were going for.

**Q. Right. Okay.**

A. Yes.

**Q. So -- all right. So June 21st, 2023, nChain told you they viewed your provisional patent application as just describing a business method, right?**

A. Yeah.

**Q. And then they also told you that they believed your provisional patent application did not substantiate one or more inventions sufficiently that those can be claimed in a U.S. regular patent application, right?**

A. I believe that's what this document said.

**Q. Okay.**

A. Because part of the agreement was -- with Christen was taking the patent to -- from -- obviously it's not -- it's no good, it's just -- as -- as a nonprovisional, so we would need to take it to a full patent. So, I mean, I -- I trusted what they said and I trusted their assessment. They're the ones with the, you know, 2800 patents or whatever in their patent portfolio.

**Q. Okay. And then Mr. Alizon continues. He writes in the next paragraph, "It will be necessary to describe in more detail how the technology works and where the invention lies from a technical perspective, and we**

recommend that invention further substantiated as
assessed against what existed before the filing date
prior art search and assessment."
Do you see that there?
A. Yes.
Q. Okay. And so you understood that nChain
believed that your provisional patent application did
not sufficiently describe how the technology worked,
right?
A. It needed to be amended and improved.
Q. Okay. And -- and you also understood that
nChain believed your provisional patent application did
not sufficiently describe where the invention lies from
a technical perspective, right?
A. Yes, absolutely.
Q. And so Mr. Alizon continues -- see -- into the
next section, under next steps, the second paragraph
there. Do you see that?
A. Yes.
Q. He writes, "On the basis of these elements and
updated patent document, that description, claims and
drawings needs to be drafted in a style that is suitable
to be examined by a patent office such as the USPTO.
That document will need to be filed and filing fees paid
by the date mentioned above. Finally, I am attaching a

copy of a patent application that is in the form of a regular patent application. The company, TuneGO, Inc., has a portfolio patent claiming parts of a similar system may help the inventors indicate the difference between their invention and what is described in the document."

**Do you see all that?**

A. Yes.

**Q. Okay. So -- and then you also understood by June 21st, 2023, that nChain believed your provisional patent application was not drafted in a style that was suitable to be examined by a patent office such as the USPTO, right?**

A. I -- I can concur that I felt the same way.

**Q. Okay.**

A. That's why I went to them. That's why I trust in their expertise.

**Q. And then Mr. Alizon attached a model patent. I think you were just looking at it a moment ago.**

A. Yeah.

**Q. A model patent application that you could use as a template for drafting an application to progress your provisional patent to non -- your provisional patent application to nonprovisional status, right?**

A. Yes.

**Q. Okay. And, I mean, if you just want to glance at that document, you would agree with me that that model nonprovisional patent application just has a lot more detail than your provisional --**

A. Oh --

**Q. -- patent application did, right?**

A. -- that's the whole point of taking it from provisional to full patent application.

**Q. And was it your understanding that nChain believed your provisional patent application -- or strike that.**

**Was it your understanding that nChain believed that you -- you would not get a patent unless the nonprovisional application contained a lot more information than the provisional application?**

A. That was my belief.

**Q. Okay.**

A. Yeah.

**Q. Okay.**

A. And also, competing patents like this right here, obviously, we have to differentiate between the two.

**Q. Okay. Okay. And then would -- would you agree with me that the nonprovisional patent application that you filed in July of 2023 contains a lot more detail and**

**information than the provisional patent application you filed in 2022?**
A. Absolutely, and fully intended to.
**Q. Okay.**
MR. RUOCCO: Can we get tab 28, please?
(Finnerud Exhibit 24, E-mail dated March 7, 2023, re: DistroMint and Provisional Patent Application, was marked for identification.)
THE WITNESS: Do you want me to put this one aside? Do I need it?
BY MR. RUOCCO:
**Q. I think you can put that one to the side.**
A. Okay.
**Q. This is Exhibit 24.**
A. Thank you.
**Q. And this is a July 3, 2023, e-mail from Arthur Roberts to you, copying Dale Evans. The subject is DistroMint and Provisional Patent Application, correct?**
A. Yep.
**Q. Okay. And then if we turn to the second page of the exhibit, you'll see an e-mail from Arthur Roberts on June 28, 2023.**
A. Yes.
**Q. Do you see that?**
A. Wait, what page?

Q. Sorry. It's 484. It's the second page of the exhibit.
A. Okay.
Q. Okay. So first of all, who is Arthur Roberts?
A. Arthur Roberts is -- I believe he is an intellectual property attorney from nChain.
Q. Okay. And --
A. He's got, like, blonde hair and a beard, a big guy. He's cool.
Q. Okay. And Mr. Roberts wrote, if you will look at the second paragraph of his e-mail, "After a bit more research on my part, discussion with the Slovenian developers, and in particular, thinking about how soon you were wanting to launch DistroMint, which I wasn't aware of until towards the end of the meeting, sorry for not asking about this earlier, we think that the best way to move forward with the patent application is to get it drafted and filed as soon as possible and claim priority to your provisional application.
"For the sake of clarity, your provisional application won't need to be withdrawn."
Do you see that?
A. Yes.
Q. And so on June 28, 2023, Mr. Roberts reached out to you to discuss submitting your nonprovisional patent

application, right?
A. Yes.
Q. And then if you look under the heading Non-Provisional/Full Application, it starts with, "Dale and I had a discussion with Matevz from the Slovenian development team today to get a rundown of the technology and that sort of thing. We are also in the process of getting some technical documentation to help progress/convert the provisional application to a full one. Hopefully, we will have access to that document later today and can pass it on to you/your attorneys."
Do you see that?
A. Yes.
Q. So Mr. Roberts and Mr. Evans have reached out sometime in the summer of 2023 to the members of the nChain Slovenia team for information about the technology underlying the DistroMint platform; is that right?
A. Yes.
Q. And the members of the nChain Slovenia team were the ones who knew how the technology underlying the DistroMint platform worked, correct?
A. Yes.
Q. Now you were not the one who understood how the technology underlying the DistroMint platform worked,

were you?
A. Yes.
**Q. Sorry. Are you saying you did not understand how that technology worked or you were not that person?**
A. I absolutely understood how it worked.
**Q. Okay. So let's just look at Exhibit 22, which is the -- the nonprovisional patent application from July of 2023, okay?**
A. Exhibit 22?
**Q. Yeah.**
A. Yeah.
**Q. Okay. Are there any parts of this application that you personally wrote yourself?**
A. Parts of this application that I wrote myself?
**Q. Yes.**
A. Yeah.
**Q. If you can just identify a few examples for us?**
A. Well, Figure 3 is based off of my -- of my provisional patent. If you can go to the diagram where you have the process.
**Q. Okay.**
A. Where you have your user, your platform providers, and basically the connection to the blockchain, and we can say wallet connection. So you have to be connected to a blockchain in order to sign in

with a crypto wallet. All right?

Figure 4 which is all the processes which we entailed in DistroMint. So we had a storage provider, AWS. We had an identity provider, which is called a KYC. We have various protective measures, antivirus and inappropriate content scanners. We have our appointment processor, which is Stripe or BSV, and we have the platform provider, which is DistroMint, and our blockchain processor, which would be the BSV blockchain, and then, like I said, content detection.

So we used that to basically, like, let's say somebody wants to go on DistroMint and they want to download -- or they want to upload, you know, inappropriate, like, pornography or inappropriate pictures, swastikas, racial things, you know, anti anything that was just considered inappropriate, we had a detection technology, and then we did penetration testing.

And then if you look in Figure 5, my process payment content, upload token minting, token listing. So that's just the right hand of it, which is just the blockchain integration of the actual platform. That doesn't actually fully contain the left hand of it, which would be the traditional music distribution.

And why I included both was with the idea of

selling it back to all the major record labels. You know, this technology would be the first to introduce record labels to blockchain technology. And so I felt like it would be, you know, more than advantageous for nChain to be my partner, and that's what -- they felt the same way.

Now Figure 6 is just the payment structure. So you -- the buyer comes on to the marketplace. They administer the payment. Payment goes directly to the seller, and then a token, which is a NFT, is sent to the buyer.

**Q. And what about -- what about Figure 1? What is Figure 1 showing?**

A. Well, Figure 1 is basically the communication between -- you have your nodes, they're called nodes, and your -- so all the guys who are basically, you know, approving and managing the -- the blockchain, the transactions. You have your connection from Alice, you want to call -- Alice is the payer and Bob is the payee. And so before the payments go straight to one another, you have a process -- have you to validate. It's called note validators -- validators, and you have, you know, your connection or your signal being sent from the main server to the blockchain, and all that data being recorded.

So I mean if you think about it like this, blockchain technology is a series of numbers and letters and codes. It's, you know, 26 digits, 27 digits, but it's -- it's unhackable because of, you have uppercase, lower case, number, number, lower case, uppercase. The sequence is what is being -- so recorded. So each particular NFT has to communicate with the blockchain because NFT is assigned a blockchain address just like a crypto address.

And then that particular token, after the money has been sent -- and as you could see here, we have a side channel. So you have a direct P2P, which is person to person. We've got Alice, the payer, and he's Bob directly. So it's like if I give you 50 cents and I put it in your hand, well, there was no middleman.

But then you have the security of the blockchain, basically, is recording this transaction, and then it's going through a secure, you know, system, a network of nodes, and it says P2P network, so that is peer-to-peer. So, you know, this is human hands, not just computers, validating the -- the transaction. That's what a noticed note validator is.

So right now, I run a fully decentralized radio network, and I'm a node. I have 33 nodes, you know? And in our network, we have, you know, 7000 nodes, and

so 7000 servers all over the world which are basically doing the hosting and so forth.

Now the hosting for this particular platform, and which is the reason why we have -- this is a little bit more robust, is because we have a platform that's not being fully hosted by, per se, nChain. It's not on nChain's servers, the blockchain, BSY, is recording the transactions, but the actual content, it needs -- it needs a host. So you need Amazon Web Services or Microsoft as your -- in order to host the data.

And so we're talking the JPEGs, the WAVs, the MP3s, the MP4s the GIFs, G-I-F-S, which is all uploadable content for a platform like DistroMint.

**Q. And I just want to be clear. So when we talked through a number of figures here, I mean, were you the person who -- who drew these figures or you just understand what they are meant to reflect?**

A. Well, I drew my original -- my original plat- -- I helped -- obviously, the platform was my brain child, and I provided all the -- the snapshots and wire frames of what I wanted all the -- the -- the dashboard to look like and the instructions on how it would operate, and then the process, as I -- as I explained, you know, the business process, how it would aggregate, is all in my original patent.

And then, of course, you know, we went into a more detailed abstract, as you can see here, in which we needed to because, you know, you can't take a basic provisional patent and expect -- I don't know any provisional patent that has been converted to a full patent without being completely amended.

**Q. Okay. So now, did you -- you mentioned the abstract here. So you were referencing everything that starts, you know, the --**

A. I know you're not a patent attorney, but in layman's terms, this right here is the same thing as this.

**Q. No. I know. I am asking you a different question, though.**

**So I am just asking you, here we have some narrative after --**

A. Yeah.

**Q. -- the figures, right?**

A. Yes.

**Q. You see this here?**

A. (Witness moves head up and down.)

**Q. Okay. And now, did you write this narrative?**

A. No.

**Q. And who -- who wrote the narrative?**

A. AI.

**Q. Okay. AI wrote this entire document?**
A. More than likely.
**Q. Do you know that for a fact or you are speculating?**
A. I'm not speculating. I mean, most patents nowadays, especially patents that come from nChain, are written in AI, and there is a methodology, you know, and you have attorneys who -- who go in there, you know, and tinker with it a bit, but yeah, they are using AI. Everybody knows that.
**Q. So like, for example, if we look at paragraph, let's say, what, 65 here on page 6.**
A. Yep.
**Q. It says, "One or more of the outputs 203 of the proceeding transaction TX sub 0 comprise a particular UTXO, labeled here UTXO sub 0. Each UTXO comprises a value specifying an amount of the digital asset represented by the UTXO and a locking script which defined a condition which must be set by an unlocking script in the input 202 of the subsequent transaction in order for the subsequent transcript to be validated and therefore the UTXO to be successfully redeemed."**
**Just it means -- what -- what is that telling us?**
A. Well, if you take a look at Figure 2, it's

exactly describing the process which I just described. Basically, in layman's terms, you have no validator and you have -- you have the network communicating with the pay -- payee and the payor. And in order for the transaction to be validated, it has to -- you have to have a communication between a blockchain and the -- and the actual network the -- in the computer.

**Q. Okay. And what's the locking script referred to here?**

A. Locking script, that's just blockchain -- that's -- that's code talk, the stuff that I -- I don't really know very well. As you said, in my earlier testimony, I tes- -- I testified that I am not a professionally trained coder.

**Q. Okay.**

A. Yeah.

**Q. No. So I'm just -- I'm trying to just understand. So, I mean, there -- there's -- you understand that this -- the --**

A. This is patenty talk.

**Q. -- the stuff explained here up to a point, but there is a point beyond which you don't -- it's not your area of expertise?**

A. Well, it's patenty talk.

**Q. Okay.**

A. And -- and when I say that, it means that you're getting more -- more and more intricate and -- look, if you go to 0037, okay -- we're on page 3. "The user 301 selects a distribution plan, and the platform provider mints tokens and sends the song to various distribution outlets."

I mean, I don't want to get too far gone in thinking that, you know, this is not exactly the same thing as this patent. I'm just telling you when you take a patent like this, like the provisional patent, and you take it to a full application, there is going to be -- you're going to talk about script, you're going to talk about code, you're going to talk about connections, you're going to talk about communications between the network and the -- and the user, and the user -- or the payor and the payee, especially in the -- when it comes to blockchain transactions.

And then, you know, you have all of your -- your basic -- all your methods, you know, for storing the content. You know, I -- look, right here, 401 -- or 400 includes the following components/entities: A storage provider -- example, Amazon Web Services -- configured to store digital content; an antivirus detection module configured to scan digital content for computer viruses; a content detection module.

Okay. "Recognition. Configured to scan digital content for one or more illegal, illicit, copyright-protected material and identify provider. Configured to provide or verify user" -- "users' identity." And for short, that's called KYC. "A payment processor configured to process user-to-user payments and/or platform-to-user payments and a blockchain processor configured to process, generate, obtain, store blockchain transactions. The blockchain processor may comprise a wallet application or a wallet application may be provided separately. Each user may operate the wallet application. While each component entity is shown as separate one or more components, entities may be combined. Similarly, one or more components, entities may be operated -- e.g., comprised by -- the platform provider. Each component entity may be embodied in hardware or software."

So, I mean, it --

**Q. Let's just take a look, though, at another -- we'll go to -- if we look at paragraph 65 -- let's look at paragraph 67 --**

A. Sure.

**Q. -- on page 6.**

**So it says, "So in the example illustrated, UTX sub 0, the output of 203 of TF sub 0" --**

A. Yep.
Q. -- "comprises a locking script check sig P sub A, which requires a signature sig P sub A of Alice in order for UTXO to be redeemed strictly in order for a subsequent transaction attempting to redeem UTXO to be valid. Check sig P sub A contains a representation -- i.e., a hash -- of the public key P sub A from a public private key" --
A. Yep.
Q. -- "payor Alice. The input 202 of TX sub 1 comprises a pointer pointing back to TX sub 1 -- e.g., by means of its transaction ID, TX ID sub 0, which embodiments as the hash of the whole transaction TX sub 0. The input 202 of TX comprises an index identifying UTXO sub 0 within TX sub 0 to identify, among other possible outputs of TX sub 0, the input 202 of TX sub 1, further comprises an unlocking script." And then in brackets "sig P sub A, which comprises a cryptographic signature of Alice created by Alice, applying the private key from the key payor to a predefined portion of data sometimes called the message in cryptography. The data or message that needs be on signed by Alice provided a valid signature may be defined by a locking script or by the node protocol or by a combination of these."

**Like can you just tell me like what --**
A. Yeah, you --
**Q. -- what -- what is check sig P sub A?**
A. So that's a hash. Do you know what a hash is?
**Q. Well, I'm just asking you to explain it.**
A. So, I mean, I just explained what a blockchain code is. It's -- it's the same thing as a hash. So a series of numbers and letters. But this -- what you're describing here is Alice -- in order for Alice to -- she's the payee, correct? So she is buying the -- the token in this diagram right here. You have the payor -- excuse me. She's the payor, not the payee. I said that correct -- incorrectly.
So she has to sign the transaction. First she logs in, and then she selects the item that she wants, and then the blockchain commu- -- communicates back with her device. And a node validator is going to come in and say, okay, this is -- this is a good transaction. And then it's going to ask Alice to sign the transaction again. To sign the transaction in, for example, Zonda wallet, you have to enter in your password and then have you -- it says "sign transaction" and you swipe. But have you to enter in your own personal password to make the transaction happen, and that's what this process is -- is -- "Alice applying her private key from the key

payor to a predefined portion of data, sometimes called the message in cryptography, the data or message that needs to be signed by Alice to provide a valid signature by the locking script or by the node protocol."

So she has to provide a valid signature. She has to provide the correct password and then she has to swipe across her wallet and make sure that the node validator sees the correct password and says, yes, this is a valid transaction, we can approve it.

**Q. And you said that you think AI wrote this patent application?**

A. I'm very -- I'm very suspicious. I really do believe so.

**Q. Okay.**

A. Because, I mean, I've --

**Q. Well, I just --**

A. Seen many of these, yeah.

**Q. Okay. My -- my question is, who do you think it was in the middle of 2023 who had -- who asked the AI to prepare this --**

A. Absolutely nChain. But, I mean, as you can see, they took -- they took my -- my patent, my provisional patent, and they just turned it into patenty language and, you know, they made it a little bit more professional -- not a little bit, but, I mean, they --

they really expanded upon it.
**Q. Okay. So -- so nChain was the one working on all the stuff here in the patent application?**
A. Well, I mean, this is with Arthur Roberts, a.roberts@nchain.com.
**Q. Well, you're looking at an e-mail. I'm just asking about the patent application that was submitted --**
A. That's who I -- I -- that's who I was working with. I was working with Robert and then, you know, we -- we got counsel from the United States.
**Q. So was it your understanding that it was nChain who was working on drafting this nonprovisional patent application?**
A. It was my understanding that nChain basically took -- and the facts are irrefutable when you look at the language of this particular patent. And I think I -- I implore you to actually read it. And you read my patent, it's -- it's just a more taken-to-the-next-level thing. And, I mean, obviously, as I agreed, the provisional patent was not going to be sufficient.
But part of our partnership and our 50/50 agreement was the IP, and taking the patent that was used to develop DistroMint and taking that to a full patent application so that we would be protected, number

one, and then we could license out the actual technology as per this particular document, which is the -- Exhibit 16, in which we have nChain licensing AG and a debt obligation for assigned license fee -- nChain license fee agreement. So nChain would be working on my behalf to license the technology. So not only would -- would we be partners in making revenue, but selling -- and this is what I'm talking about, selling it back to the -- the major record labels would be the licensing part, because obviously they're experts in blockchain technology, they're experts in patent. You know, they have a reputation in doing that, so I trusted them as my partner. And like I said, I mean, we have something that is extremely valuable here and, you know, it kind of speaks for itself.

**Q. All right. I am just asking -- so, I mean, we -- we -- we --**

A. Covered a lot of stuff.

**Q. -- we've -- we've looked at, you know, the provisional patent application --**

A. Yep.

**Q. -- the nonprovisional patent application. I think you've already agreed, right, the nonprovisional patent application just has a greater level of technical detail in it than the provisional patent application.**

A. Absolutely.
**Q. Okay. And that -- that additional technical detail, that came from nChain; is that right?**
A. I believe -- and I don't -- like I said, I -- I'm really not sure who helped amend my application. I'm not sure who that person is. It would have been great if I was able to talk with, you know -- shoot -- Andy Moody or even Christen and ask them some questions. I think I'd be more prepared, honestly, because they could tell me a lot more than I've given you guys.
**Q. Okay. I was just -- I'm -- this additional technical detail that was in the nonprovisional patent application that wasn't in the provisional patent application, that didn't come from you; is that right?**
A. Well, I can't say that it didn't come from me because it came from my idea, you know. So, I mean, it was originally -- it's my intellectual property that we just expanded on. And as you can see, the -- it -- like I said, I implore you to read the full application. You'll understand what I'm saying. It's the exact same thing but we added patenty jargon to it.
**Q. Okay. But you were not the person who added the --**
A. The patenty jargon, no.
**Q. Let me just ask my question.**

**So -- so you were not the one who added all of the additional technical detail into the nonprovisional patent application; is that correct?**
A. I'm not the one who added the patenty jargon, is what I will tell you. I would have made it a lot more similar -- excuse me, simpler. But like I said, they're the patent experts. This is my business partner. I'm trust -- once again, just like trusting in Dale, I'm trusting in nChain's IP people.
**Q. Let's look back where -- in Exhibit 24. I just want to be clear.**
A. Yes.
**Q. This is the June 28th, 2023, e-mail from Arthur Roberts.**
A. All right. Hold on. Yes.
**Q. Okay. So if we look under -- let's see, Platform Launch, Mr. Roberts writes, "As you may or may not know, publishing your idea by launching and allowing third parties to view, interact with the platform and put their NFT in a public blockchain can seriously limit the scope of protection you can obtain around the world. There are a few countries, United States, Japan, Korea and Germany which do allow you to obtain some kind of patent protection even after disclosure by the inventor.**
**"These are obviously still big and useful**

**markets of patent protection. So if the launch does end up happening in the next few days, we can still try to obtain protection from a number of places around the world.**

**"Just so we have some idea about what sort of time line we are working with, do you have a particular one you are currently working towards for launching/full access of the platform? I think you mentioned 1 July, but that has been delayed slightly, as you figure out legal-entity-related details."**

**Do you see that?**

A. This is on page 1?

**Q. It's on the second page, 484, first two paragraphs under the Platform Launch header?**

A. Okay. "Just so we know, do you have some idea what sort of time line we're working with? Do you have a particular goal you are currently working towards since -- as you figure out legal-entity-related-details."

You know, that -- that was -- I mean, he was communicating with -- with somebody.

**Q. Okay. Just -- so -- and I just want to ask you, do you see these two paragraphs here in this e-mail, right?**

A. Yes.

**Q. So as of July 2nd, 2023, you understood that launching the DistroMint platform without first obtaining patent protection for your claimed invention could prevent you from getting patent protection at all; is that right?**

A. I don't understand the question.

**Q. Well, Mr. Roberts is telling -- told you publishing your idea by launching and allowing third parties to view and interact with the platform, putting their NFTs in a public blockchain can seriously limit the scope of protection you can obtain around the world.**

**Do you see that part?**

A. And the problem is that we had already launched the Dev site, and that was a public site.

**Q. Okay. But he was telling you, if you move forward without getting patent protection, it could compromise --**

A. He said that, yeah.

**Q. Okay. And then you respond on the top of the -- the page, "We are celebrating our independence and healing from a not-so-friendly illness which ran through our children. Thankful our olders and mom and dad and me and wife did not contract it. There is 11 of us in total. We are a rather large family. I have taken all your guidance, and I would just want to know where the**

**urgency of launch is coming from. I am not urgent, and I only want to follow the best advice for launching the platform."**

**Do you see that?**

A. Yes.

**Q. Okay. And so as of July 2nd, 2023, you did not feel urgency to launch the DistroMint platform; is that right?**

A. Well, again, I was -- I was waiting on Dale, and Dale kept dragging his feet.

**Q. Okay. But you -- you told Mr. Roberts you're not urgent, right?**

A. Well, I said I'm not urgent. I said I only -- and I only want to follow the best advice for launching the platform, and I said, yes, we are very limited in time because this is July 2nd, 2023. July 15th, my provisional patent is -- it expires.

**Q. Okay.**

A. Because you only get one year. When you file a provisional patent, you get one year of protection.

**Q. Okay. And let's just -- let's just look down to Mr. Roberts' e-mail from June 28th under, let's see, the nonprovisional full application.**

**And so he writes, "Dale and I had a discussion with Matevz from Slovenia development team today to run**

down on the technology and that sort of thing. We are also in the process of getting some technical documentation to help progress/convert the provisional application to a full one. Hopefully, we will have access to that document later today and can pass it to you/your attorneys.

"It would be good to instruct your attorneys to draft a full application and provide them with this technical information as soon as we can. We can figure out exactly how we will move forward with this on our call, whether you want to continue to work with them directly with our help or something similar."

Do you see that?

A. Yes.

Q. So here in this June 28, 2023, e-mail Mr. Roberts makes two separate references to your attorneys, right?

A. Yeah.

Q. And he makes suggestions about how you should instruct your attorneys, right?

A. Yes.

Q. Okay. And as of June 28th, 2023, you understood that nChain believed you would retain your own attorneys to prepare your nonprovisional patent application; is that right?

A. Yes.
MR. RUOCCO: Let's go off the record.
THE VIDEOGRAPHER: The time is 5:29 p.m. We're off the record.
(The deposition was concluded at 5:29 p.m.)

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity. Such form shall be attached to the deposition transcript, I make the following disclosure: I am a Georgia Certified Court Reporter. I am here as a representative of Digital Evidence Group.

Digital Evidence Group, was contacted to provide court reporting services for the deposition. Digital Evidence Group, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c). Digital Evidence Group, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have

been made to cover this deposition. Digital Evidence Group, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Susan DiFilippantonio

Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

Susan DiFilippantonio

Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 11-22-2030
Georgia Certificate Number 2125

CAPTION

The Deposition of ERIC FINNERUD, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF FULTON

Before me, this day, personally appeared, ERIC FINNERUD, who, being duly sworn, states that the foregoing transcript of his deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

*If no changes need to be made on the following two pages, place a check here ____, and return only this signed page.*

Case: Eric Finnerud, et al. vs Nchain UK LTD
Witness Name: Eric Finnerud - Volume 1
Deposition Date: 08/04/2026

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2026 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Eric Finnerud, et al. vs Nchain UK LTD
Witness Name: Eric Finnerud - Volume 1
Deposition Date: 08/04/2026

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

(  ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

(  ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

_______________ DATE          _______________ WITNESS SIGNATURE

_______________ DATE          _______________ NOTARY

Errata Sheet

NAME OF CASE: Eric Finnerud, et al. vs Nchain UK LTD
DATE OF DEPOSITION: 08/04/2026
NAME OF WITNESS: Eric Finnerud - Volume 1
Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________

_________________________
ERIC FINNERUD - VOLUME 1

Case: Eric Finnerud, et al. vs Nchain UK LTD
Witness Name: Eric Finnerud - Volume 1
Deposition Date: 08/04/2025

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2026 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Eric Finnerud, et al. vs Nchain UK LTD
Witness Name: Eric Finnerud - Volume 1
Deposition Date: 08/04/2025
I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:
(Check appropriate box):
( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

________________ ________________________________
DATE WITNESS SIGNATURE

________________ ________________________________
DATE NOTARY

Errata Sheet

NAME OF CASE: Eric Finnerud, et al. vs Nchain UK LTD

DATE OF DEPOSITION: 08/04/2025

NAME OF WITNESS: Eric Finnerud - Volume 1

Reason Codes: 1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

_________________________

ERIC FINNERUD - VOLUME 1