# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC and DISTROMINT, LLC,

Plaintiffs,

versus

NCHAIN UK LTD,

Defendant.

CIVIL ACTION FILE NUMBER: 1:24-cv-05280-SDG

VIDEOTAPED DEPOSITION OF
ERIC FINNERUD

Volume II

Pages 290-583

9:05 a.m.

August 5, 2026

STANTON LAW
410 Plasters Avenue NE
Atlanta, GA 30324

Susan DiFilippantonio, RPR, RMR, CRR, CSR 2125

APPEARANCES:

On Behalf of the Plaintiffs, ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC and DISTROMINT, LLC:

NONNI HOMOLA
BY: Mark Nonni
410 N. Gadsden Street
Tallahassee, FL 32301
850.601.1111
mark@noho.law

MORGAN & MORGAN
BY: Frederick A. Rispoli (via videoconference)
18100 Von Karman Avenue
Suite 200
Irvine, CA 92612
949.898.6587
frederick.rispoli@forthepeople.com

On Behalf of the Defendant, NCHAIN UK LTD:

ELSBERG BAKER + MARURI, PLLC
BY: Jared Ruocco
Sean Foley
350 Fifth Avenue
38th Floor
New York, NY 10118
212.597.2606
jruocco@elsberglaw.com
sfoley@elsberglaw.com

Also Present: Michael Bond, videographer

I N D E X


| WITNESS/EXAMINATION | PAGE |
|---|---|
| ERIC FINNERUD | 295 |
| EXAMINATION | 295 |
| BY MR. RUOCCO | |
| DISCLOSURE | 577 |
| CERTIFICATE OF REPORTER | 581 |
| SIGNATURE OF DEPONENT | 583 |


E X H I B I T S


| | |
|---|---|
| Finnerud Exhibit 25, November 7, 2023, re: Eric Finnerud Executed Agreements 7.11.23 | 296 |
| Finnerud Exhibit 26, E-mail dated November 22, 2023, re: Review of ISR - DistroMint - "Distributed Distribution with Blockchain Integration" - 444954PCT | 304 |
| Finnerud Exhibit 27, E-mail dated August 31, 2023, re: Eric Finnerud Print | 308 |
| Finnerud Exhibit 28, Patent Cooperation Treaty International Search Report Written Opinion of the International Searching Authority | 313 |
| Finnerud Exhibit 29, E-mail dated July 29, 2024, re: Final Update Pitch, Bates stamped SA0003778 through SA0003780 | 329 |
| Finnerud Exhibit 30, DistroMint Platform Pitch Deck | 332 |
| Finnerud Exhibit 31, Declaration of Eric Finnerud | 357 |
| Finnerud Exhibit 32, E-mail dated November 8, 2023, re: DistroMint, Distrofy Critical Update 11.7.23, Bates stamped SA0003077 through SA0003079 | 366 |
| Finnerud Exhibit 33, E-mail dated September 7, 2023, re: DistroMint Catchup and Design Alignment, Bates stamped SA0002809 | 378 |

| | |
|---|---|
| Finnerud Exhibit 34, E-mail dated September 26, 2023, re: Meeting DistroFy/DistroMint 26.9.2023, Bates stamped SA0002881 through SA0002888 | 388 |
| Finnerud Exhibit 35, E-mail dated September 28, 2023, re: DistroMint Update 9.28.23, Bates stamped SA0002883 | 389 |
| Finnerud Exhibit 36, E-mail dated December 14, 2023, re: E. Smitty nChain Restructure proposal | 393 |
| Finnerud Exhibit 37, Sound Alive Records Invoices dated from December 12, 2022 through May 5, 2024, varied Bates stamped documents | 416 |
| Finnerud Exhibit 38, E-mail dated July 25, 2024, re: Project Pitch 00082215, Bates stamped SA0003763 through SA0003769 | 512 |
| Finnerud Exhibit 39, E-mail dated March 6, 2025, re: SCF #34 - Build Award Update, Bates stamped SA0005875 | 514 |
| Finnerud Exhibit 40, Correspondence dated February 27, 2024, Notice to Principal is Notice to Agent; Notice to Agent is Notice to Principal, re: NChain - DistroMint - Conversion of Intellectual Property and Related Matters - CMS ref. COHU/EDN/206680.000001, Bates stamped SA0004779 through SA0004826 | 523 |
| Finnerud Exhibit 41, E-mail dated May 5, 2024, re: January, February Consulting Invoices 2024, Bates stamped SA0003453 through SA0003455 | 544 |
| Finnerud Exhibit 42, Press Release dated October 3, 2025, Entitled Blockchain Breakthrough: Federal Court Crushes nChain's Dismissal Bid in DistroMint, LLC's Explosive Contract Clash | 562 |

Finnerud Exhibit 43, Eric Finnerud and Sound Alive Enterprise, LLC's Answer and Affirmative Defenses to nChain UK LTD's Counterclaims 569

(Wednesday, August 5, 2026 9:05 a.m.)

THE VIDEOGRAPHER: This is the continuation of the deposition of Eric Finnerud in the matter of Finnerud, et al., versus nChain UK LTD, et al. Today's date is August 5, 2026. The time on the monitor is 9:05 a.m.

Will the Court Reporter please swear in the witness.

ERIC FINNERUD,

called as a witness at the instance of the Defendant, being duly sworn, was examined and deposed as follows:

THE REPORTER: Thank you.

THE WITNESS: Yes, ma'am.

EXAMINATION

BY MR. RUOCCO:

**Q. Welcome back, Mr. Finnerud, and good morning.**

**So yesterday we were discussing the nonprovisional patent application you filed in the summer of 2023 related to the DistroMint platform. Do you remember that?**

A. Yes.

**Q. Okay. And you ultimately retained the law firm Page White Farrer to represent you in connection with preparing and submitting that nonprovisional patent application; is that right?**

A. At that point, yes.

**Q. Okay. And if I refer to that firm as Page White, you'll know what I mean?**

A. Yes.

**Q. Okay. And the Page White firm did ultimately help you prepare and file that nonprovisional patent application in the summer of 2023; is that correct?**

A. In the condition that the patent was in at that time period, yes, but not the current version of it.

**Q. Okay. And Page White is a law firm based in the United Kingdom; is that right?**

A. I believe so.

**Q. And you, Eric Finnerud, were Page White's client on that occasion; is that right?**

A. Yes.

**Q. Were there any other clients on that engagement aside from you?**

A. No, sir.

**Q. And in connection with your engagement of Page White, you signed a power of attorney appointing Page White your attorney; is that correct?**

A. Yes.

MR. RUOCCO: Can I see Tab 132, please?

(Finnerud Exhibit 25, November 7, 2023, re: Eric Finnerud Executed Agreements 7.11.23, was

marked for identification.)

BY MR. RUOCCO:

**Q. I'm showing you what's being marked as Finnerud Exhibit 25. And Mr. Finnerud, this is a July 11, 2023, e-mail from you to a Thomas Mahon and others. The subject line is "Eric Finnerud executed agreements 7-11-23," correct?**

A. Yes, that's correct.

**Q. And here in your e-mail to Mr. Mahon, you write, "Dear Thomas, I've attached all the executed agreements and signed the," quote/unquote, "other matters in good faith. I thank you for your timely correspondence in working with nChain and myself."**

**Do you see that?**

A. Yes.

**Q. Okay. And then if you turn to the attachment, on the first page, ending in 593, there is a document entitled "General Power of Attorney." This general power of attorney is made July 11, '23 by Eric Finnerud of [redacted], Lawrenceville, Georgia 30046, USA, the, quote, "principal." Do you see that?**

A. Yeah.

**Q. Okay. And is this the power of attorney you executed appointing Page White your attorneys in connection with preparing the nonprovisional patent**

**application?**

A. This looks a little short.

**Q. What -- what do you think looks short about this?**

A. This doesn't look like the document, the exact -- and you know what, I may have signed a different power of attorney document, as well, with the -- with the U.S. patent firm that I'm working with now, with Messner Reeves. So that form is like this long.

**Q. Okay. Are you saying that you think this document itself is -- is incomplete in some way?**

A. I mean, I think this represents when -- you know, nChain's assistance in -- in helping me work with Page White, ultimately, to enhance and amend the original provisional patent. But in terms of filing the patent, we did that with a different law firm.

**Q. Okay. But is this document the general power of attorney that you signed with the Page White firm?**

A. I believe so, to my knowledge. And it was a long time ago.

**Q. Okay.**

A. Yeah.

**Q. And if you'll just turn for me to the -- the final page, 595.**

A. Uh-huh.
**Q. It says "executed and delivered as a deed by Eric Finnerud," and there is a signature. That is your signature?**
A. Yes.
**Q. Okay. If you are -- stay on page 595 for me, please. Do you see the provision stating "governing law and jurisdiction"?**
A. Yes.
**Q. Okay. And it states, "This general power of attorney in any dispute or claim, including non-contractual disputes or claims arising out of or in connection with or its subject matter or formation shall be governed and construed in accordance with the law of England and Wales. The courts of England and Wales shall have non-exclusive jurisdiction to settle any dispute or claim, including non-contractual disputes or claims arising out of or in connection with this power of attorney or its subject matter or formation."**
**Do you see that?**
A. Yeah, I see it.
**Q. Okay. So this power of attorney was made subject to the laws of England and Wales; is that right?**
A. That's what it says.
**Q. And any dispute or claim connected to the -- the**

**subject matter of this power of attorney is also governed by the laws of England and Wales; is that right?**

A. I can't agree with you because I think -- I think we served notice of when we revoked the power of attorney. Yeah.

**Q. But I'm asking at the -- at the point in time when you executed this power of attorney in 2023 --**

A. Well, we didn't have a dispute in 2023. We have a dispute now, in 2026.

**Q. Okay. But just listen to my question.**

**When you executed this power of attorney in 2023, you understood that you were executing a power of attorney with a United Kingdom law firm and the power of attorney was governed by the laws of England and Wales, correct?**

A. At that point in time. And I also said in good faith. So, you know, believing that nChain wasn't going to breach contract or renege on their obligations. So, you know, obviously, you know, I cooperated with my partner. We're 50/50 partners.

**Q. But in 2023, you executed --**

A. I answered the question.

**Q. Let me just ask it again.**

**So in 2023, you executed this power of attorney**

**with a UK law firm that was governed by the laws of England and Wales, correct?**

A. I answered the question. Next.

**Q. No. I'm going to ask it again.**

**So in 2023, you executed a power of attorney with a UK law firm that was governed by the laws of England and Wales; is that correct?**

A. In 2023, yes, I did.

**Q. Okay. And so any dispute or claim related to your nonprovisional patent application is governed by the laws of England and Wales; isn't that right?**

A. Not presently. Not in today's capacity.

**Q. And why do you think that's the case?**

A. Because we're right here, right now, doing a deposition that's carried on eight -- seven hours yesterday and we're going to do another seven or eight today and -- yeah. I mean, nChain breached contract and, you know, we filed a complaint. So, yeah, I mean, this really doesn't apply to -- this is back in 2023, before nChain breached their -- their contractual agreement with me.

**Q. And to your understanding, what is the effect of this alleged breach on whether or not the claims are governed by the laws of England and Wales?**

MR. NONNI: Object to form.

THE WITNESS: I don't have any formal or professional legal training, so I couldn't answer that question.
BY MR. RUOCCO:
**Q. Did you ever write to Page White to revoke power of attorney?**
A. Well, I can't testify that I didn't, but I don't recall.
**Q. And, I mean, when -- when you --**
A. And the reason why I say that is because the subject matter popped up with the first counsel, with Jimmy. So, you know, I don't -- I don't recall, and that's why I can't say that I didn't -- or that we didn't. And then at the same time, I can't really talk about that.
**Q. And in 2023, you didn't raise any objection to this power of attorney being governed by the laws of England and Wales, did you?**
A. Only in 2023, when nChain was carrying out the partnership and doing their -- their due diligence and, you know, the relationship was good and solid, yeah, I had no objection because I absolutely trusted them and believed in good faith that they were not going to, you know, breach the contract.
**Q. Okay. So in 2023, before the alleged breach of**

**contract, you had no objection to signing a power of attorney that was governed by the laws of England and Wales, right?**

A. That's correct.

**Q. Okay. Now, we -- you can put that to the side.**

A. (Complying.)

**Q. We -- we -- we've talked about this a little bit yesterday. But you have not received a -- a patent in connection with the nonprovisional patent application you filed in July 2023, correct?**

A. I've received a draft of the patent and an amended -- twice now amended version of the patent, and that's what we -- we filed for an extension on Monday and we refiled the patent. So we won't be able to hear back from anybody for probably three to six months.

**Q. Okay. But at this point in time in 2026, you've not received a patent from the United States patent office for the nonprovisional patent application?**

A. They haven't approved it yet, but it's in the process.

**Q. Okay. So you -- you've not received any approved patent from the United States Patent and Trademark Office for the nonprovisional patent application related to the DistroMint platform, correct?**

A. It's in examination again.

**Q. Okay. But you've still not received the actual patent, correct?**
A. I can't receive it until it's either been examined or, you know, disapproved or approved.
**Q. So you have not received it, then, correct?**
A. It hasn't been approved and it hasn't -- it's in examination right now. It's being examined.
**Q. And you haven't received an approved patent in connection with that nonprovisional patent application from any governmental authority in the world responsible for issuing patents, have you?**
A. No, not yet. However, that can change because we're in examination, as I stated previously.
MR. RUOCCO: Let me take a look at Tab 223, please.
(Finnerud Exhibit 26, E-mail dated November 22, 2023, re: Review of ISR - DistroMint - "Distributed Distribution with Blockchain Integration" - 444954PCT, was marked for identification.)
BY MR. RUOCCO:
**Q. I'm going to show you what's being marked as Finnerud Exhibit 26.**
A. Thank you.
**Q. And this is a November 22nd, 2023, e-mail from**

**you to Arthur Roberts and cc'ing James Marchant. The subject is "Forward review of ISR DistroMint," quote, "distributed distribution with blockchain integration 444954 PCT," correct?**

A. Oh, the -- the subject of the e-mail?

**Q. I'm just asking -- so this is an e-mail that you sent to Mr. Roberts and others on November 22nd, 2023, under that subject line, correct?**

A. Yeah.

MR. RUOCCO: Okay. And I will just state for the record I don't think this document has a Bates number on it, but I understand this is how it was produced to us. And, Counsel, for your benefit, I understand the Bates number is SA000391_O, all caps.

MR. NONNI: Thank you.

BY MR. RUOCCO:

**Q. So if we turn to the bottom of the e-mail, there's a November 22, 2023, e-mail from Mr. Roberts, and he writes, "Hello, Eric. How are things? A search report from WIPO as conducted by the European Patent Office came to us recently. Please find the e-mail from our attorney below. I attached the search report for your reference, along with the specification."**

**Do you see that?**

A. Yes. That's WIPO.
**Q. Okay. And if we look down further to the third page of the document, at the bottom there's a November 17, 2023, e-mail from Thomas Mahon; is that right?**
A. Yes.
**Q. And Mr. Mahon was one of the Page White lawyers who was working on the nonprovisional patent application; is that correct?**
A. Yeah. I believe Thomas Mahon was, yes.
**Q. And Mr. Mahon writes, "Hi, Arthur. PCT application number PCT IB 2023/057275, DistroMint 30M national face deadline 15 January 2025, current footprint not yet assigned."**
**Do you see that?**
A. Yes.
**Q. And then he writes, if you turn over to the next page, "This is the PCT application that was filed for Eric 'E. Smitty' Finnerud's DistroMint invention."**
**Do you see that?**
A. Oh, wow. That's quite telling, isn't it?
**Q. Well, I'm just asking if you see that in the document, sir.**
A. Yeah. It's actually great.
**Q. Okay. And so PCT as used here means Patent**

**Cooperation Treaty; is that correct?**

A. I believe so.

**Q. And do you understand that the Patent Cooperation Treaty allows you to use one application to file for a patent in multiple countries at the same time?**

A. Yes. Yeah. But we only filed in the United States, yeah.

**Q. Okay. And Mr. Mahon mentions "Eric 'E. Smitty' Finnerud's DistroMint invention." You see that, right?**

A. Yes.

**Q. Okay. So he -- he's referring here to the nonprovisional patent application that you had filed in connection with the DistroMint platform; is that correct?**

A. I believe so. I would have to look through my files to match the numbers for -- for the PCT. But definitely W02020/0290082 is the -- is the full patent, is -- is PCT IB 2023/05275 taken to a -- a full application.

**Q. Okay. So the -- the application number, the one ending in 057275, you understand that to be a reference to the nonprovisional patent application you submitted in July 2023?**

A. That's correct.

**Q. Okay.**
A. No -- and that was July 2022 that I submitted the application.
**Q. Okay. I'm talking -- let's just take a look at a document so that we can clarify this.**
MR. RUOCCO: Can I see Tab 174, please.
THE WITNESS: Remember, because it was previous to my engagement with nChain.
BY MR. RUOCCO:
**Q. Okay. I'm showing you what's being marked as Finnerud Exhibit 27.**
(Finnerud Exhibit 27, E-mail dated August 31, 2023, re: Eric Finnerud Print, was marked for identification.)
BY MR. RUOCCO:
**Q. And just keep -- keep Exhibit 26 out. I just want to, you know, show you the record so you can have a clear understanding.**
**So Exhibit 27 is a August 31st, 2023, e-mail, Sound Alive rep, you, to -- it's a -- customer0698@yahoo.com.**
A. Oh, okay.
**Q. The subject is "Eric Finnerud print."**
**And if you turn to the attachment, this is a document entitled "PCT power of attorney."**

**Do you see that?**
A. Yeah. I think I got it confused.
**Q. Okay.**
A. Yeah.
**Q. I just want you to just take -- take a look at the bottom of this PCT power of attorney. It says "title invention, digital tokens using blockchain."**
A. Uh-huh.
**Q. Then there's an international application number below it and it states "PCT IB 2023/05275."**
**Do you see that?**
A. Yes.
**Q. Okay. So does this refresh your recollection that the PCT application number that Mr. Roberts was referring to in his e-mail of November 17, 2023, referred to your nonprovisional patent application filed in July 2023?**
A. I do. But I would like to cross-reference it with the actual document because we have it here with us.
**Q. Okay. If you want --**
A. If that's possible.
**Q. And I believe that's Exhibit 22.**
A. Thank you.
Okay, if you can show me where it says --

**Q. Sure. So I just want to -- let's look at Exhibit 22 and -- and the PCT power of attorney. The title of the invention --**
A. Yeah.
**Q. -- on the PCT power of attorney is "digital tokens using blockchain," right?**
A. Okay, yeah. So I got confused. The international application number -- so this is the U.S., United States, patent application.
**Q. Right.**
A. And the -- the publication of the application, which shows that it's been filed.
**Q. Uh-huh.**
A. I don't see the U.S. -- the United States patent application number on this -- on this particular document.
**Q. Okay. But I'm asking -- so my question is just, the PCT power of attorney, it lists the title of invention, "digital tokens using blockchain," right?**
A. Yes, it does say that.
**Q. And "digital tokens using blockchain" is also the name of the invention on the U.S. nonprovisional patent application; is that right?**
A. It is.
**Q. Okay. So, I mean, though they may have**

**different application numbers whether they're filed internationally or in the United States, Mr. Mahon's November 17, 2023, e-mail is addressing the same invention that you claim in the U.S. nonprovisional patent application filed in July 2023; is that right?**
A. Yeah.
**Q. Okay. So if you look back at Mr. Mahon's November 17, 2023, e-mail, he writes, "I have reviewed the attached ISR that has been issued by the EPO."**
**Do you see that?**
A. You mean the -- the -- by WIPO?
**Q. Well, he writes here -- we're on the third page of the exhibit -- "I've reviewed the attached ISR that has been issued by the EPO."**
**Do you see that sentence?**
A. "I've reviewed" -- okay. It's in the -- I guess you call it the second paragraph.
**Q. Yeah.**
A. EPO. I'm not familiar what the EPO is. So Eur- -- European Patent Office is what that -- that stands for.
**Q. Okay. So you do know what it is. It's the European Patent Office?**
A. I'm guessing.
**Q. Okay. Do you --**

A. I believe that's what it is.
**Q. Okay. Do you understand that ISR as used here means International Search Report?**
A. Yeah.
**Q. And is it your understanding that an International Search Report is created during the Patent Cooperation Treaty process?**
A. No. That -- that's available on WIPO. WIPO is World International Patent Organization, and that's where this patent was published before it was, you know, approved. It was an incoming patent and then it was classified with other similar patents. I think Bank of America had one that was fed -- fit into the same category or something like that.
**Q. Okay. But I'm -- I'm just asking, as a matter of process, do you understand that during the Patent Cooperation Treaty process, an International Search Report is created?**
A. Yes.
**Q. Okay. And the International Search Report is generated by a governmental authority with responsibility for patents. Do you understand that?**
A. Yes.
**Q. Okay. And here, Mr. Mahon is referring to an International Search Report that has been issued by the**

**European Patent Office; is that right?**
A. Yes.
**Q. And if you look at the next paragraph, he writes, "The examiner objects that the subject matter of** Claim 1 lacks novelty over D1 delta (W0" -- or "WO 2020/092900A2)."
Do you see that?
A. Yes.
**Q. Okay. And the examiner that Mr. Mahon is referring to here is an examiner from the European Patent Office; is that right?**
A. I -- I can't clarify that because of -- I don't have the examiner's name.
MR. RUOCCO: Okay. Can we take a look at Tab 182, please?
(Finnerud Exhibit 28, Patent Cooperation Treaty International Search Report Written Opinion of the International Searching Authority, was marked for identification.)
BY MR. RUOCCO:
**Q. Let me show you what's being marked as Finnerud Exhibit 28.**
**Okay. And Mr. Finnerud, I will tell you this document again doesn't appear to have a Bates number on it, but it was produced to us from your files, and the**

internal Bates number that we have received for it is SA000151_O, all caps.

Okay. So this -- this Exhibit 28 is a document entitled "Patent Cooperation Treaty International Search Report," correct?

A. Yeah.

Q. Okay. And is this the International Search Report that Mr. Mahon is referring to in his e-mail of November 17th?

A. Yeah, but it doesn't make any reference to the applicant's or agent's file reference.

Q. Okay. But I -- my -- my question is just, is this -- this is the International Search Report that Mr. Mahon was referring to, correct?

A. You would have to ask Mr. Mahon.

Q. Okay.

A. Yeah.

Q. Well, let's take a look at the search report itself.

So it says the applicant is Eric Finnerud, right?

A. Yes, sir.

Q. That's you, right?

A. Yes.

Q. Okay. And then it says "priority date 15

**July 2022." You see that?**
A. 15 July 2022, yes, that's correct -- no, no. That's earliest priority date. Okay. So the priority date, that's 2022. That's -- see -- because what they're doing is they're linking this from my original provisional patent application, Number 63389715, filed on July 15, 2022. So priority date is one year directly afterwards, which would be the -- which would be the -- the 17 July 2023 in the international realm and then 15 July 2023 in the United States.
**Q. That -- that -- correct.**
**So my -- my question is simply, this -- this International Search Report is being made in reference to the nonprovisional patent application you filed on July 17, 2023; is that right?**
A. I believe so.
**Q. Okay. And if you could just turn for me in this application to -- it's the third-to-last page. There is a header, box number V, Roman numeral, "reason statement under Rule 43 biz 1A with regard to novelty, inventive step or industrial capacity, citations and explanations supporting such statement."**
**Do you see that box?**
A. Oh, the novelty claim?
**Q. Yes.**

A. Yes.
**Q. Okay. And so the -- the European Patent Office in this International Search Report, if you'll look to -- well, just look to the novelty side. So -- so under novelty, it says "no, Claims 1 through 28." Do you see that?**
A. Yes.
**Q. Okay. So in this International Search Report conducted by the European Patent Office, the patent office determined that none of the claims in your nonprovisional patent were novel, right?**
A. It's a search report.
**Q. Okay. But that -- that was the finding of the European Patent Office, that none of the claims in your nonprovisional patent application were novel; is that right?**
A. No. This is a -- that -- that was the findings of an International Search Report. Written opinion. It says "written opinion of the International Searching Authority."
**Q. Okay.**
A. It's an opinion.
**Q. Okay. So -- so in the opinion -- well, here, the International Searching Authority is the European Patent Office, right?**

A. I -- it doesn't say European Patent Office. That's the problem. It says "International Search Report." Can you show me where it says it's signed off by the European Patent Office?

**Q. Sure.**

**So do you want to turn -- and remember I got this document from your files, okay?**

A. Okay.

**Q. If you want to -- if you want to turn to the page before this --**

A. Yeah.

**Q. -- okay, at the bottom of the page, do you see name and mailing address of the ISA? And then under that, it says "European Patent Office"?**

A. What does ISA stand for?

**Q. Sir, this is -- first, I ask the questions in the deposition. But this is also your document. Okay?**

**So do you understand ISA to refer to International Searching Authority?**

A. Yeah. That makes a lot more sense.

**Q. Okay. And does this refresh your recollection that the International Searching Authority conducting this International Search Report was the European Patent Office?**

A. Yeah, the European Patent Office written opinion

of the International Searching Authority.
**Q. Okay. And -- and, sir, it was the opinion of the European Patent Office and the International Searching Authority that all the claims in the nonprovisional patent application that you filed on July 17, 2023, were not novel; is that correct?**
A. Well, I guess whoever was helping me didn't do very good -- very well. But, you know, that was the reason why the application was rejected in the United States and why we had to amend it and refile it.
**Q. Okay. I understand you have since refiled the application. But I am just simply asking, it was the opinion of the European Patent Office as the International Searching Authority that all of the claims made in your July 17th, 2023, nonprovisional patent application lacked novelty, correct?**
A. That's what the document says.
**Q. And if -- if you look back at Mr. Mahon's e-mail -- we're now back in Exhibit 26, okay, and still on that third page in this third paragraph down in the e-mail, okay. Mr. Mahon writes, "The examiner objects that the subject matter of Claim 1 lacks novelty over D1 WO 2020/092900A2. Unfortunately, the examiner seems to be correct. D1 also discloses a digital distribution platform for distributing content using a blockchain. A**

**user can upload digital content to a platform for the platform to tokenize. The platform acts as a marketplace for the sale and transfer of tokens."**
**Do you see that?**
A. I see that. And I also see where it says that, "The examiner also objects that the subject matter of all the dependent claims lack novelty." I disagree. And then if you look in the written opinion, where it says "industrial applicability, IA," it says that Claims 1 through 28, yes.
So there's a lot of dynamics to the -- the patent, and that's the purpose of me trusting nChain, is working through the kinks and perfecting it so that we could -- and that's the part of the 50/50 partnership.
**Q. No, but you -- you've testified already this morning, right, and, I believe, yesterday you have now resubmitted the nonprovisional patent application?**
A. Yes.
**Q. And I believe you testified yesterday that you resubmitted the nonprovisional patent application to address some of the issues that the European Patent Office had raised in this search report; is that right?**
A. We actually already had addressed those issues. This is the -- the third time filing the app- -- file -- excuse me. The third time filing the application.

**Q. Okay.**
A. So I -- we refiled it -- we refiled it back in October of 2025. I can't remember -- I think Rowan was my attorney at the time at Messner Reeves. It got rejected after examination, and then we had a grace period to take the patent and avoid abandonment and make the amendments and refile it, and we did that on Monday with the new attorney.
**Q. And who is the new attorney?**
A. I can't remember her name off of tops.
**Q. Okay.**
A. I've only met her once.
**Q. Okay.**
A. Yeah.
**Q. So I just want to understand the chronology here. So you filed the non -- this nonprovisional patent application in July of 2023, right?**
A. Yes.
**Q. And you did that with the Page White firm, correct?**
A. Did it with Messner Reeves in the United States.
**Q. Well, I'm -- I'm talking about the -- the -- the application that we've been discussing, the one in Exhibit 22, okay?**
A. It never got filed in Europe. It got examined

like for opinion, but it was never filed in any other territory except the United States.

**Q. We'll -- we'll get back to that.**

**But what I'm saying is the -- you filed this nonprovisional patent application in July of 2023 using the Page White firm, correct?**

A. They didn't actually do the filing.

**Q. Okay. You filed a nonprovisional patent application in July of 2023, correct?**

A. July 15th in the United States, I believe.

**Q. Okay. And then that application was --**

A. No. 17th. I apologize.

**Q. Okay.**

A. Yeah.

**Q. So you filed this nonprovisional patent application in -- in -- on July 17th of 2023, right?**

A. Yeah, related to my original provisional.

**Q. Okay.**

A. Number 63/389,715.

**Q. And that application was rejected, correct?**

A. That's correct.

**Q. Okay. And then you filed it again sometime later in 2025, correct?**

A. In 2025 -- in October of 2025, late October, Rowan -- I'll have to pull up his name -- he -- we made

some corrections because we had received a response from the examiner, and she pointed out three different points that needed to be changed. So then we made the changes, I paid him -- or I paid the attorney -- the -- my attorneys at Messner Reeves, and we resubmitted.

And then we waited for the examiner, and she came back and she said, Well, this is still not correct, X, Y, Z, and we need to, you know, make these changes. And so we made the changes and refiled and filed a continuance or an extension, which -- we paid for an extension and then refiled on Monday of this week.

**Q. Okay. So after you filed the second application in 2025 with the new law firm, that application was again rejected; is that right?**

A. It wasn't rejected, but there were some questions that the examiner had, and so she hadn't rejected it yet. And, really, what we were going to do is interview the examiner so that we could understand how to get the patent to be approved, because it was to her understanding that she didn't fully understand the dynamic about it and that it was a process. You know, she said it was more like software and -- this is -- was her opinion, and she said it's hard to -- to patent software.

And I said, It's not software, this is an actual

process. And that's what the patent describes, a process.

And so, you know, we fixed that. We amended the -- this application right here. We amended it and we made it more of a process, explained it better as a process. We didn't change the title of the -- of the patent. And resubmitted it on Monday.

**Q. Okay. And so -- but -- but focusing on the -- the renewed application that you made in 2025, after you submitted a revised nonprovisional patent application in 2025 through new counsel, it also is not approved, correct?**

A. I don't know if it -- she didn't -- she didn't make a ruling on it.

I would have to like really go into my files and really understand it -- or I would have to talk to my -- my patent attorneys and just kind of get the chronology a little bit more exact.

**Q. But just after you filed a renewed nonprovisional patent application in 2025 using new counsel, the United States Patent and Trademark Office did not give you approval for that patent application, did it?**

A. It's still being examined.

**Q. And -- and the United States Patent and**

**Trademark Office has not given you the approval on that application, have they?**

A. It can't make a determination on approval or rejection unless it's being -- unless it's been examined.

**Q. Sir, sitting here today, you've not received approval for the nonprovisional patent application that you filed with the United States Patent and Trademark Office, correct?**

A. Yet --

**Q. Okay.**

A. -- is what I think you want to say.

**Q. And when -- after you filed the -- the new nonprovisional patent application in 2025, you also did not receive approval in connection with that application, did you?**

A. Yet, because the examiner wanted us to go back and fix a few things. And then I was supposed to meet with my attorney and we were supposed to have an interview with the -- with the examiner, but I ended up getting assigned a new attorney. And that's who handled the -- the refiling again or the response.

**Q. Okay. You don't -- and you -- just sitting here today, you don't remember that attorney's name, right?**

A. Not off the top of my head.

**Q. Okay.**

A. Yeah. I met her like, I think -- when did I meet her? I met her about a month ago.

**Q. And I just want to -- just so the record is clear, you made references to -- to real Rowan and Messner Reeves. Is Rowan an attorney at the Messner Reeves firm?**

A. Yeah. Ro- -- Rowan was an attorney at Messner Reeves.

**Q. Okay.**

A. He's no longer there.

**Q. Okay.**

A. Yeah. But they've bounced me around a few times, so I have got -- I've had three or four different attorneys at Messner Reeves that represented me.

**Q. And can we just look back at -- we're going to look back at Mr. Mahon's e-mail again from November 17th of 2023. So he writes, "The examiner objects that the subject matter of Claims" -- "Claim 1 lacks novelty over D1," and then there is a number here, WO 2020/092900A2, in parentheses. Do you see that?**

A. I'm -- I'm totally lost. What exhibit are we on?

**Q. We're on Exhibit 26.**

A. 26? And we're on page 3?

**Q. Yes. Third page, yes.**
A. Yeah, okay. This is page 4. Lacks novelty -- yeah. I mean, we've gone over this already.
**Q. Well, no, I'm just -- let me ask my question, okay? So --**
A. What's the question?
**Q. Yes. The question is, this number WO 2020/092900A2, do you understand that to refer to a patent obtained by someone else?**
A. Over D1, 02 -- so these numbers here refer to the WIPO like, you know, public publishing -- excuse me, the -- the public document which you can go on WIPO, on the World International -- or World Intellectual Property Organization and you can look up numbers, and it will show you that -- incoming patents or patents that have been submitted for filing. And that's just the international like number for that.
So I'm assuming as -- I don't know. I don't have WO2 020/02 -- or 092900A2 -- I don't have that in front of my face. And then, of course, our patent -- my patent, the digital tokens using blockchain also got assigned that -- a number like that. So, I mean, this is in reference to the examination -- not examination. Right here, the -- the search report and the opinion.
**Q. Okay. So let's look back at -- at -- at the**

**search report, then, that's Exhibit 28. Okay.**
A. Yeah.
**Q. Okay. So let's go to the second-to-last page. There's a header that says "Re Item 5." Do you see that?**
A. Item 5 on the last page?
**Q. On the second-to-last page, "Re Item 5."**
A. The second-to-last page, where it says -- wait. And you -- Exhibit 28?
**Q. Yeah. The -- the -- the International Search Report, Exhibit 28. There's a -- your --**
A. Okay. The last page is --
**Q. I'm saying the second-to-last page.**
A. Okay.
**Q. There is a header "Re Item 5." Do you see that? Right at the top.**
A. Oh, re, R-E.
**Q. Yes.**
A. Item 5. Sorry. I was looking for R-A-Y or something else.
**Q. Okay. And it says under that heading, "Reason statement with regard to novelty, inventive step or industrial applicability, citations and explanation supporting such statement" and "1, reference is made to the following documents: D1 WO2020 092900A2."**

A. Okay.
**Q. Basic question here. Just compare --**
A. Yes.
**Q. -- Exhibit 28 and 26, right. You'd agree with me that that -- that number referenced here in the International Search Report is the same number that Mr. Mahon referenced in his e-mail, correct?**
A. Yeah. Verona Holdings, Yantis, Jonathan, as the inventor --
**Q. Right.**
A. -- et al.
**Q. Right. So this is -- this is a -- this WO20 092900A2 number is referencing a patent that had been obtained by someone else, this Verona Holdings and Yantis, Jonathan et al.; is that right?**
A. Yes.
**Q. Okay. And so it was the -- the determination of the examiner at the European Patent Office that the invention that you claimed in your nonprovisional patent application from July 2023 was not novel compared to this prior existing patent; is that right?**
A. Yes.
**Q. And you've stated, I think, already you've now submitted a few applications trying to --**
A. Amend.

**Q. -- amend --**
A. Yeah.
**Q. -- your -- your original nonprovisional patent application, right?**
A. That's correct.
**Q. And you understand that you can't get a patent issued if the invention you're claiming isn't novel; is that right?**
A. That's correct.
**Q. Okay.**
A. Most patents just don't go through, you know. They have to be amended a few times.
**Q. Okay. I think a few times -- well, let's just look at --**
MR. RUOCCO: Can I get Tab 135?
(Finnerud Exhibit 29, E-mail dated July 29, 2024, re: Final Update Pitch, Bates stamped SA0003778 through SA0003780, was marked for identification.)
BY MR. RUOCCO:
**Q. And this is 29. I'm showing you what has been marked as Finnerud Exhibit 29. And this is a July 29, 2024, e-mail from Susan Welch to you. The subject is "final update pitch," correct?**
A. Yes.

**Q. Who is Susan Welch, by the way?**
A. She's just a friend.
**Q. And were -- were you at some point in 2024 communicating with Ms. Welch for help in making submissions for funding for the DistroMint platform?**
A. She wanted to help me, so she offered her help. She was a friend that I met. She saw one of my podcasts, and she's a holder of XLM, so she's a big fan of the Stellar Community, and so she said, Hey, I'll help you out.
**Q. And the thing she was going to help you out with was trying to get funding for the DistroMint platform?**
A. Yes.
**Q. Okay. You had sent Ms. Welch an e-mail on July 29, 2024, and I just want to look at the -- the first paragraph. It says, "DistroMint platform was designed to replace the current music industry business models which only benefit intermediary/middlemen. The music industry has been using outdated methods of calculating and monetizing digital content for years, and with the inability to claim ownership of digital content, the entire music industry lacks clarity, transparency, and leaves a temptation for companies and intermediaries to take unfair advantage of creators. The first version of DistroMint is a redesigned Sony**

**music distribution dashboard and platform that encompasses traditional major label music distribution, dashboards with blockchain NFT minting technology that writes data directly to the blockchain and allows for secure peer-to-peer transactions over the secure blockchain smart contract to assign royalties to contributors and the sale or trade of NFTs, non-fundable tokens, on the secured DistroMint marketplace, which has been designed to be more robust than OpenSea, the leading NFT marketplace in the world."**

**So do you see all that there?**

A. Yes, I do.

**Q. Okay. So I just -- my question is, what did you mean when you wrote "the first version of the DistroMint" -- sorry. What did you mean when you wrote, "The first version of DistroMint is a redesigned Sony music distribution dashboard and platform"?**

A. I meant that with my partnership with nChain, with our 50/50 partnership, the first version of DistroMint is exactly as described in this paragraph.

**Q. Okay. And so the idea you had for the DistroMint platform was based off the Sony -- Sony music distribution dash -- dashboard?**

A. Sony -- Orchard Sony. Remember I testified yesterday that I have access to a dashboard, Orchard

Sony. So I say Sony as the owner, the parent company, of -- of Orchard.

**Q. Okay. So the idea you had for the DistroMint platform was based off of the Sony Orchard distribution dashboard?**

A. Yeah, re- -- redesigning the major record label dashboard and adding blockchain functionality to it and changing it up and -- you know.

MR. RUOCCO: Can we take a look at Tab 172, please?

(Finnerud Exhibit 30, DistroMint Platform Pitch Deck, was marked for identification.)

BY MR. RUOCCO:

**Q. Before we move on, Ms. Welch said, "I would take out the first paragraph" -- or sorry. She writes, "I would take the first paragraph out detailing the Sony battle. Outside, looking in, I would be afraid of being caught up in a legal battle. You have the patent, there is nothing Sony can do."**

**Do you see that part of her e-mail?**

A. Yes.

**Q. So she -- Ms. Welch advised you to take out this language regarding Sony in the first paragraph of your draft e-mail below?**

A. Yeah. But she's not an expert. She doesn't

know anything about what she's talking about.
**Q. But she -- it was her concern, after reading that, that mentioning the Sony music distribution dashboard and platform might land you in a legal battle with Sony?**
A. Well, she can think whatever she wants, but that technically wouldn't happen.
**Q. Why -- and why would that technically not happen?**
A. Because you have to have an actual product out there that's generating income for a company like that to come after you.
**Q. Okay. And so did you anticipate that if you got the DistroMint platform out there, Sony would come after you for some sort of intellectual property claim?**
A. No. As a matter of fact, we were going to sell the -- the technology back to Sony.
**Q. Okay. So why -- why is it, then, that Ms. Welch is concerned about a legal battle between you and Sony?**
A. Because she's -- she's an old lady and she's just a friend and she -- she really knows nothing about the music industry or blockchain. That is not her speciality. She just likes me as a person and she's a big fan, so -- you know, she was a really sweet old lady. We're good friends. I haven't talked to her in,

I think, a year or better. It's been a long time. But, you know, that's it.

She is unknowledgeable about any of this type of stuff. I wouldn't -- I would take her opinion like a grain of salt. The only thing she was decent at is maybe grammar, you know.

**Q. Do you know where Ms. Welch worked in 2024?**

A. I don't know. She's like a stranger that I met on the internet, honestly. Like we've never met face to face, besides a Zoom call or something like that. Excuse me.

**Q. Did you consult with Ms. Welch about submitting your application to the National Science Foundation?**

A. I asked -- well, she asked to help me out with anything, and I sat down and kind of just, you know, took some of her advice. Because the only advice that she was giving me was just grammar and -- and that's it, because she couldn't give me any technical help like in -- as far as understanding the invention and the -- you know, everything that it entails.

**Q. Did Ms. Welch work at a company called Cerebrum, to your understanding?**

A. I -- I don't know anything about where she worked at. I just know she was working for -- I don't know the name of the company. So I believe she was

working for a startup that does pharmaceutical research or something like that. I have no idea, honestly. I don't -- I can't give an exact on her employment.

**Q. Did you go to Ms. Welch in connection with her -- strike that.**

**Did you go to Ms. Welch for advice about how to submit applications for funding for the DistroMint platform?**

A. She did similar work for her boss, the startup or whatnot, and she offered to -- you know, to help me. And I did -- like we -- we had a few calls and so forth. And at the end of the day, I ended up telling her like, you know, I don't really need your help. Because it just wasn't helpful like to the -- in the capacity that I needed. I might have hurt her feelings, so I do apologize.

**Q. Okay. I'm showing you what's being marked now as Finnerud Exhibit 30. And there are -- you will see there is a couple of documents stapled together here. Again, I understand that this is how it was produced to us, but I want to call your attention, I think, to the last one in the group.**

**So if you would turn to -- yes, it is a document on United States Patent and Trademark Office letterhead, application number 63527998. Filing date 7/20/2023.**

**It's addressed to you.**
**Do you see this document?**
A. Yes, I do.
**Q. And is this a filing that you made with the United States Patent and Trademark Office --**
A. Yes.
**Q. -- on July 20, 2023?**
A. This is the second part of my patent, yes.
**Q. Okay. You say second part of your patent. This is a -- this is a separate patent application, though, from the first one, correct?**
A. Well, I -- I went back through the -- the full patent application, and I was able to connect this patent to -- this technology is also included in the full patent application. And I believe that we did that because when I went to London Blockchain -- I talked about, you know, blockchain, digital audio video monetization by the second.
**Q. Now, Mr. -- I'm looking at the transcript from yesterday, Mr. Finnerud.**
A. Yes.
**Q. And you did -- you testified yesterday that this second patent application was, and I quote, "never taken to a full patent application"; is that right?**
A. That's incorrect.

**Q. Okay. So when did you -- when did you file a full patent application for this?**

A. No. This patent is included in the -- no. I found -- I discovered language in here. I said this is very patenty, and I said it possibly could have been written by AI. This is the conversion of the provisional patent, the original one that I filed in -- on the 15th of 2022, and if you turn to page -- well, actually, if you turn to Figure 2, when we're talking about UTXO and TX, this process right here is the exact process that's being described in the -- this provisional patent application right here in terms of the -- where it's at -- yeah. So a transactional -- it's a transaction-based model that basically allows for a asset to be assigned a special -- a UTXO, is what it's called.

**Q. So --**

A. TX stands for transaction. UTXO stands for --

**Q. I'm going to ask you to show us your phone --**

A. Sure.

**Q. -- because anything that you are looking at while you are testifying is fair game.**

A. Yeah, absolutely. Do you want me to e-mail it to you?

**Q. I'm just saying, so -- I mean, you are --**

**what -- what is this document that you're pulling up here on your phone?**

A. It's a Google search.

**Q. Okay. So you are just showing us a Google search for UXTO?**

A. No. For UXTO and how the -- the technology is used in the DistroMint digital tokens using blockchain patent.

**Q. Is it your testimony that the document you -- the Google search that you have now done on your phone reflects how the testimony describing that patent works -- sorry -- in that patent application works?**

A. It connects -- this provisional -- this one right here directly into the full patent application.

**Q. Okay. So I just want to get the chronology straight.**

A. Yeah.

**Q. If we can pull out the -- the provisional -- or the nonprovisional patent application we have been discussing. Again, that is Exhibit 22.**

A. I e-mailed that to -- to -- to you, by the way, You and -- and Fred, and you can --

**Q. Okay. So if you look at Exhibit 22, we've already discussed this, but you filed a nonprovisional patent application on July 17, 2023, right? We're on**

Exhibit 22.
A. Exhibit 22. Yes.
Q. So you filed a nonprovisional patent application on July 17, 2022?
A. Yes.
Q. Okay. And then you filed this new additional provisional patent application on July 20th, 2023, right?
A. Yep.
Q. Sorry. I asked you the wrong -- I asked you the wrong question.
So you filed the nonprovisional patent application on July 17, 2023 --
A. Yes.
Q. -- right?
A. (Witness moves head up and down.)
Q. Okay. And then you filed a new non -- or a new provisional patent application on July 20th, 2023?
A. Yes, I did.
Q. Okay. So notwithstanding what you are saying now about the technology described in the second provisional patent application being in the nonprovisional patent application, at the time in 2023, you felt the need to file a provisional patent application with this technology, right?

A. Yes. I wasn't aware that -- that this -- some of this language was actually being used in the full patent application because, like I said, you know, a lot of this is patenty talk. That was the whole purpose of -- of taking the provisional, original patent and taking it to the next level was, you know, get an expert.

So as you can see, though, this patent application right here, this is the -- the streaming by the second part, which I talked about in London Blockchain, and I believe that was in early May. So I had already spoken about this idea. I just had not taken the steps to go ahead and patent it.

Now I figured that this will help, and I did turn this patent over to nChain as well.

**Q. Okay. That's a patent application --**

A. Yeah.

**Q. -- in '22?**

A. Well, no. This is a -- this is a provisional patent. I mean, it's -- once it goes through, you pay the -- the filing fee. This is good for a year.

**Q. And that year has long since expired, correct?**

A. Yes.

**Q. Okay.**

A. And I did not try to take this in its capacity

too, but I discovered yesterday when I was going through the patent application, I did discover that there was language in here -- or excuse me -- part of the invention that's mentioned in here, this invention is -- is mentioned in this application as well.

**Q. Okay. So you never took any steps to progress the provisional patent application that you filed on July 20, 2023, to a nonprovisional status?**

A. No. It seems that nChain, who had the -- or excuse me -- Page White, who had the power of attorney, they were watching it closely, and -- and they added this in -- into the application.

**Q. Well, I believe you testified that the first time that thought ever occurred to you was yesterday; is that correct?**

A. Yeah. No, not the thought. The first time I fully understood, because I -- I said to myself, you know, let me go review the application and just make sure, you know, I'm -- I'm hip to everything we got going on here even though we have a totally different application now.

But, yeah, I wanted to understand it, and then I discovered that there is a connection between this application and this one. Well, the idea of -- that I filed here.

Q. Okay. I wanted to just ask a very specific question.
So the provisional patent application you filed on July 20, 2023, Application Number 63527998?
A. Yeah.
Q. You never took any steps to progress that provisional patent application itself to --
A. No.
Q. -- nonprovisional status?
A. No.
Q. And you, Eric Finnerud, were the inventor on this nonprovisional -- sorry -- or you, Eric Finnerud, were the inventor on the provisional patent application filed on July 20th, 2023; is --
A. Yes.
Q. -- that right?
A. Yes.
Q. And you, Eric Finnerud, were the applicant on this provisional patent application filed on July 20th, 2023; is that right?
A. That's correct.
Q. Okay. And you've not received any patent in connection with this?
A. No.
Q. Okay.

A. It's confusing. I know. I think what -- what happened was -- is, I had a lot of people watching me, especially in the BSV community, and -- and nChain, and when I went on stage at London Blockchain, I basically broke down this entire patent without filing it. Previous to filing this patent, I broke down the technology because the question that they asked me was, you know, bigger -- the stage was called bigger or better, and they were saying, how can BSV be used to -- how can BSV scale?

And I basically answered that BSV can scale if we look at it from a standpoint of microtransactions or nano transactions. And in the music industry, where we can monitor music streaming by the second instead of by, like, you know, the song play or the minute, but by the second so that artists can be fairly compensated.

So what I think is, you know -- at this point, obviously, I had already signed -- we had -- I already signed an agreement, a power of attorney, or maybe that came later, but I already had an agreement with nChain, and we were working on taking, you know, my provisional patent to a full application, and I believe that in that process, the attorneys, they added in there, the -- the streaming by the seconds, the blockchain digital audio video monetization by the second, which is cool.

No. And I recognized that last night because I was trying to understand the language. Some of this language, it can be very confusing, you know. I know what a TXID is. I was a little confused about UTXO, and then I did a Google search. I said, you know, "What does UTXO mean?" And then I said, "How does UTXO relate to Eric Finnerud's digital tokens using blockchain," and then it gave me a whole understanding, and then it talked about the process of monetizing music by the second with the DistroMint platform using the UTXO as a special token.

It's -- well, it's a little bit more complex than that, but I will send you the e-mail or whatever.

**Q. Okay. Thank you.**

**Have you ever trademarked the name DistroMint?**

A. That is an ongoing process right now.

**Q. Okay. So you don't have a trademark for the name DistroMint?**

A. It's not been approved yet.

**Q. Okay. Have you ever trademarked the name DistroFy?**

A. Not yet.

**Q. Why don't we take our first break?**

A. Okay.

THE VIDEOGRAPHER: The time is 10:18 a.m.

We're off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 10:34 a.m.
We're on the record.
BY MR. RUOCCO:
**Q. Welcome back, Mr. Finnerud.**
**Can you please take out exhibits 1 and 4 for me, which would be the 30(b)(6) notices, please?**
A. Thank you.
**Q. And if you look in the -- I think it's Exhibit 4 -- the DistroMint, LLC 30(b)(6) notice, Topic 25. It's at page 10.**
**It states, "The DistroMint platform, including its source code, its authorship and development, third-party services, software and blockchain used for or integrated into this platform or the source code, and their relationship to the nChain group."**
**Do you see that topic?**
A. Yes, I do.
**Q. Do you understand that you are DistroMint, LLC's 30(b)(6) on that topic?**
A. Yes, I do.
**Q. Are you prepared to testify about that?**
A. Yes, I am.
**Q. And then if you look at Exhibit 1 for me.**

A. Exhibit 1?
**Q. Yeah. And this should be the -- the Sound Alive 30(b)(6) notice.**
A. Oh, okay. Yes.
**Q. And if you could turn for me to page 11 and Topic 23, please.**
A. Yes.
**Q. And that topic is, "The DistroMint platform, including its source code, its authorship and development, third-party services, software and blockchain used for or integrated into the platform or the source code, and their relationship to the nChain group, and any of Sound Alive's efforts to develop as well as market and promote the DistroMint brand, as alleged in paragraph 1, 6, 41, 86 of the Complaint."**
**Do you see that topic?**
A. Yes.
**Q. And do you understand you're Sound Alive's 30(b)(6) witness on that topic too?**
A. Yes.
**Q. And are you prepared to testify about that topic?**
A. Yes.
**Q. Was DistroMint -- or was the DistroMint platform based on the BSV blockchain?**

A. This version, the first version of DistroMint that we created with nChain, was supposed to be based on the BSV blockchain. So I would say that as far as payment rails, not yet. But NFT minting, the -- the cryptographic address existed on the BSV blockchain, and then the actual data existed on AWS.
**Q. Okay. What does BSV stand for?**
A. I'm sorry. Bitcoin Satoshi Vision.
**Q. Okay. And, I mean, to the best of your understanding because -- what is or was the BSV blockchain?**
A. To the best of my understanding, a BSV blockchain is supposed to be based off of -- supposedly based off of the original Bitcoin White Paper and in terms of being able to use -- it's a -- it's a peer-to-peer cash system.
**Q. Do you know what Binance is?**
A. Yes, I do.
**Q. Binance is one of the world's largest cryptocurrency exchanges; is that right?**
A. That's correct.
**Q. And the BSV token was delisted from Binance in April of 2019; is that right?**
A. I -- I heard something like that, yeah.
**Q. Do you know what Circle is?**

A. Is Circle another crypto exchange?
**Q. I'm just asking, do you -- do you -- are you aware of a company called Circle in the cryptocurrency industry?**
A. I've heard of them.
**Q. Okay.**
A. Yeah.
**Q. Are you aware that Circle is a cryptocurrency exchange platform?**
A. I -- that was my first guess.
**Q. Are you aware that Circle delisted in the BSV token from its exchange in 2023?**
A. I don't know the exact time, but I do know that BSV was delisted from almost all exchanges.
**Q. Okay.**
A. Yeah.
**Q. And those other exchanges would include Coinbase; is that right?**
A. You would have to tell me because I don't have a list of all the exchanges.
**Q. Okay. But you understand that the BSV token was delisted from almost all the exchanges?**
A. Yes.
**Q. Okay. Have you watched the trading price for the BSV token over time?**

A. Yes, I have.

**Q. Okay. Are you aware that the BSV token's trading price has steadily declined from its peak in mid 2021?**

A. In -- I believe BSV was over $1,000 at its highest peak, and then now it's like worth 12 bucks. Yeah. I don't own any BSV, no.

**Q. Good for you.**

A. Yeah.

**Q. Are -- are you aware that the daily trading volumes for the BSV token have also fallen significantly since 2021?**

A. Yes, because, I mean, even if you look at the market cap, you know, from $2 billion to 246 million, that's a huge loss.

**Q. And switching gears a bit. Do you know what HandCash is?**

A. Yes, I do.

**Q. What is HandCash?**

A. HandCash is a wallet that was created. It's also one of the -- we'll just put it this way: The Fairway Family Office, they basically run and control all of BSV. So HandCash is just another one of their companies. And HandCash was also the wallet that we chose to use for DistroMint for the login part.

**Q. Do you know what AssetLayer is?**
A. Yes, I do.
**Q. And what is AssetLayer?**
A. AssetLayer is a company out of, I believe, the -- the gentleman Jackson Laskey and -- I can't remember the other gentleman's name. They're out of Pennsylvania, United States, and they were tasked with basically doing the minting for DistroMint, you know, the NFT tokens and so forth.
**Q. And do you know what Stripe is?**
A. Yes, I do.
**Q. And what is Stripe?**
A. Stripe is an international payment processor for fiat currencies.
**Q. And was Stripe used in connection with the development of the DistroMint platform?**
A. Yes, it was.
**Q. And what was Stripe used for in connection with the DistroMint platform?**
A. Stripe was our payments on-ramp and off-ramp, because we didn't have a -- we didn't -- we were not using BSV at that moment in time. It was for the MVP site, the -- and the testing and so forth. We started with a Stripe account that was registered to DistroMint.
**Q. And when -- when you say that we were not using**

**BSV in that moment, you mean the MVP site for the**
**DistroMint platform was not accepting --**
A. BSV payments.
**Q. -- BSV as a form of payment?**
A. Yeah. No BSV payments, just BSV minting for the NFTs. That's it.
**Q. Okay.**
A. And AssetLayer was the protocol that handled that.
**Q. Okay. Thank you.**
**Now, we've already discussed this a bit, but you worked with a team from nChain Slovenia in connection with the DistroMint platform; is that right?**
A. Yes, sir.
**Q. Okay. And who were the members of the team in nChain Slovenia who you worked with?**
A. In the beginning, it was Tina, Urban, Matevz, Damir and Nac -- that's how you pronounce it -- Nac or Nick. And there were a couple other folks who popped in and out, but those were my regulars.
**Q. Okay.**
A. And Roman was the -- he was the CEO of nChain Slovenia. But I was under the understanding that they were part of the, you know, 250-plus conglomerate of nChain, you know, London, Slovenia, because from my

understanding from what Roman told me, he said that when Christen was hired, Christen came and he bought nChain Slovenia and then added them to nChain UK or, you know, into the same entity, combined it.

**Q. There weren't 250-plus people working on the nChain -- strike that.**

**There weren't 200 or more people on the nChain Slovenia team who were working on the DistroMint platform, were there?**

A. Well, I -- I -- I wouldn't know because at the same time, nChain published an article in which they stated that, I guess, 200-plus people were involved in DistroMint.

**Q. Okay. But you didn't interact with 200 or more people in -- from nChain --**

A. I interacted with a lot of people.

**Q. Okay.**

A. So I can't remember everyone, but it was -- it was enough people.

**Q. Okay. But, I mean, 200 would be a lot, right?**

A. Well, you're not going to meet every single dev or DevOps in the -- you know, I didn't meet our head DevOps, which is Luca. I didn't meet him until I came to London Blockchain and I -- I met him in person and shook his hand. And I also hung out with Urban.

**Q. You didn't interact, though, with 200 people from nChain in connection with the DistroMint platform, did you?**

A. No. No. No.

**Q. And the members of the nChain Slovenia team were the ones who actually wrote the code for the DistroMint platform, correct?**

A. No. I believe that the DevOps is who was doing the code writing.

**Q. And -- and what is the distinction between DevOps and the nChain Slovenia team?**

A. Well, the -- Luca was part -- he wasn't part of my actual team, but the DevOps is who launches the protocol. Development operations. And Luca was the one, I believe, who helped construct the code.

Damir and Nick and Matevz -- Matevz did a lot of calculations. Damir was doing like basically -- I was articulating to him via my diagrams and screenshots, and also I did a mock website -- I took my Sound Alive records and I did a mock DistroMint site just to give them an idea of what I wanted it to physically look like.

**Q. Okay. You mentioned Luca.**

A. Yeah.

**Q. What was your -- did -- did you understand that**

**he worked in Slovenia?**
A. I believe so.
**Q. Okay. And to your understanding, it was Luca in Slovenia who was --**
A. He's --
**Q. -- writing the code of the DistroMint platform --**
A. Yeah. He's the code guy, yeah.
**Q. Okay. Now, you did not write any of the code for the DistroMint platform yourself, did you?**
A. No.
**Q. Okay.**
A. I did create the blueprint for it. I told you I'm not a professional code writer.
**Q. Okay. Do you -- do you know what GitHub is?**
A. Yes, I do.
**Q. All right. And what is GitHub?**
A. GitHub is a repository where code can be stored.
**Q. And --**
A. Source codes for all kinds of platforms all over the world.
**Q. And was there a GitHub repository for the DistroMint platform?**
A. I was made aware of a GitHub repository in -- last week in Dale's testimony.

**Q. Okay. You never had access to the GitHub repository for the code written for the DistroMint platform?**

A. I never tried to access it until nChain breached the contract. And then when I got the grants from AWS and Microsoft Azure and I needed to basically move the -- I needed the source code and I needed to move the container service over from AWS to Microsoft Azure in order to, you know, keep the site up and running without having to pay out of pocket, because I would have used the -- the grants that they gave me. That was when I was made aware that they were not -- well, first of all, everyone acted like -- especially -- yeah. I'm rambling on. Continue.

**Q. Okay. But -- but in 2023, you didn't have access to the GitHub repository for the DistroMint platform, did you?**

A. Or the DistroMint platform?

**Q. No. In -- in 2023, you didn't have access to the GitHub repository for the DistroMint platform, did you?**

A. I didn't know it existed, honestly, because I thought the source code was stored in the AWS containers.

**Q. And in 2023, you never went into the GitHub**

**repository for the DistroMint platform, did you?**
A. Yes. We conducted a search with HandCash.
**Q. Sorry. I'm -- I'm confused by your answer.**
**So what I'm asking is, in 2023, did you, Eric Finnerud, go into the GitHub repository for the DistroMint platform?**
A. No. I was unable to access it, but we did go to GitHub with HandCash. We tried to search and find the DistroMint repository. It would have been labeled DistroMint, but, obviously, nChain, they gave it another name. They hid it.
**Q. And you did not have login credentials for the GitHub repository for the DistroMint platform, did you?**
A. No, I didn't.
**Q. And all the coding for the DistroMint platform, that happened in Slovenia, right?**
A. To my knowledge.
**Q. And in 2023, you were aware that the members of the nChain Slovenia team were -- well, I will ask you a different question.**
**In 2023, you were aware that the code for the DistroMint platform was being written in Slovenia, correct?**
A. Yes, I believe so. Slovenia or London, yeah.
**Q. And we've discussed this a bit already, too, but**

**you would have meetings with the members of the nChain Slovenia team in connection with the DistroMint platform, right?**
A. Yes.
**Q. Okay. Were all those meetings videoconferences?**
A. Yes.
**Q. No members of the nChain Slovenia team ever traveled to Georgia to meet with you, did they?**
A. No.
**Q. And when you would have videoconferences with the nChain Slovenia team, were the members of the nChain Slovenia team in Slovenia?**
A. Yes, I -- I believe so. Sometimes someone might have been traveling.
**Q. Okay. And in 2023, as you were having the meetings with the members of the nChain Slovenia team, you understood that they were all in Slovenia?**
A. I -- I believe so unless, you know, they were somewhere else.
**Q. Okay.**
MR. RUOCCO: Can I have Tab 63, please?
(Finnerud Exhibit 31, Declaration of Eric Finnerud, was marked for identification.)
BY MR. RUOCCO:
**Q. I'm showing you what's being marked as Finnerud**

**Exhibit 31, and if you turn to the second page of the document, which confusingly is labeled page 1 of 12.**

A. Yes.

**Q. It's a document entitled Declaration of Eric Finnerud, right?**

A. Yes.

**Q. And then if you turn to the final page, it's -- it states, "Pursuant to 28 USC, Section 17462, I declare under penalty of perjury that the foregoing is true and correct, executed on February 23, 2025, in Lawrenceville, Georgia," and then there is a signature over your name, correct?**

A. Yes.

**Q. Is this your signature?**

A. It's my electronic signature.

**Q. Okay. And this document is a declaration that you submitted to the Court in connection with this lawsuit; is that right?**

A. Yes.

**Q. Okay. And do you believe the statements in this declaration are true and accurate?**

A. Are there any specific statements that you would like to review?

**Q. Well, we will review specific statements. I'm just asking you --**

A. I do believe.

**Q. Okay.**

A. Yes.

**Q. Okay. So let's -- let's turn to paragraph 14.**

A. (Complying.) Okay.

**Q. And it states, "In January 2023, to advance joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, nChain increased its activity in the US engaging in at least 13 meetings with me via Sound Alive to discuss DistroMint in its continued development as well as its promotion to the US."**

A. Yes.

**Q. Are all 13 of the meetings that you reference here, meetings with the nChain Slovenia team?**

A. I believe so.

**Q. Okay.**

A. I would have to reference my calendar, but I went through my calendar and this was information that my attorneys requested.

**Q. Okay.**

A. It may have not all been in Slovenia, though.

**Q. Okay. And you said reference your calendar. Would there be calendar invites to confirm each of the meetings referenced there?**

A. There would be -- it would be listed on my calendar.

**Q. Would -- when you would meet with the nChain Slovenia team, would it be the nChain Slovenia team that would send you a calendar invite for the meeting?**

A. Yes.

**Q. Okay. And did you produce all of the calendar invites that you received from the nChain Slovenia team in discovery?**

A. Yes, I did.

**Q. There are a number of meetings. You know, we can go through them each one by one if you prefer, but if you could look at paragraph 15, 16, 17, 18, 20, 23 and 25, there are a number of meetings referenced in each of those paragraphs.**

**Can you tell me if all of those meetings were with the members of the nChain Slovenia team?**

A. From paragraphs 23 through 25?

**Q. So the paragraphs I want to -- we can just go one by one.**

A. Okay.

**Q. So I mean -- okay. We will look at paragraph 15. In February, it states -- it's page 5.**

A. Yes.

**Q. "In February 2023, to advance our joint US**

venture in DistroMint, as well as earn the Sound Alive consulting fee, nChain continued its efforts to develop and promote DistroMint with me via Sound Alive, engaging in at least another 13 meetings. These meetings included participated by legal counsel for nChain."

Do any of these meetings referenced here, are they different than the ones that you had with the nChain Slovenia team?

A. Yes.

Q. And what -- what additional meetings are referenced here that were not with the nChain Slovenia team?

A. So legal counsel for nChain would be Dale, whom I thought was an actual counselor and found out later, because I thought that he was assigned as -- as a -- as our attorney for DistroMint. And then there were probably meetings with, I want to say -- off the top of my head, I would have to look at and just refer back to my calendar.

Q. Okay.

A. Because that's a lot of meetings, you know, 13 meetings.

Q. Okay.

A. Yeah.

Q. Do you recall how many times you met with

**Mr. Evans in February 2023?**
A. I believe just once.
**Q. Okay.**
A. Yeah.
**Q. Do you believe that the other 12 meetings referenced here were all with the nChain Slovenia team?**
A. I don't have the -- I don't have my calendar in front of me, so I can't tell you.
**Q. Okay. We'll go to the paragraph 16.**
A. Yep.
**Q. "In March 2023, to advance our joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, nChain continued its US efforts to develop and promote DistroMint with me via Sound Alive engaging in another -- at least another 14 meetings."**
**Do you see that?**
A. Yes, I do.
**Q. Okay. Do you know whether any of those 14 meetings were with anyone at nChain other than the nChain Slovenia team?**
A. I would have to consult my calendar. Any question you have here --
**Q. Okay.**
A. -- is going to be calendar based, but I had a ton of meetings with Slovenia, and then I met with

various people in nChain in London and so forth.

**Q. Okay. So fair to say we should look for the calendar invites that you produced in discovery to confirm what the meetings described here --**

A. Yes.

**Q. -- in your declaration refer to?**

A. I based -- all this is based off of my calendar. So I counted up the meetings, the dates, the times and provided all that information and screenshots of my calendars.

**Q. Okay.**

A. Yeah.

**Q. And it was nChain who would send you the calendar invites for these meetings?**

A. NChain scheduled my meetings for like three months, four months, five months in advance.

**Q. Okay.**

A. Yeah.

**Q. Okay. But nChain would send you the calendar invites for those meetings?**

A. Yes.

**Q. Okay.**

A. They invited me to all of them.

**Q. Okay. So the way for us to just check what the meetings referenced here in your declaration refer to**

**are to check the calendar invites that nChain sent you; is that --**

A. Yes.

**Q. Okay.**

A. Or to check my calendar, and it'll say -- if you were to see my calendar and you click on a specific meeting, it says "organizer," and it will say, you know, "Dale at nChain" or "Urban Bratina at nChain."

**Q. Okay.**

A. Yeah.

**Q. Do you know whether you produced an electronic, like, copy of your actual calendar?**

A. I believe so. And if I -- if we didn't, we can get that over to you.

**Q. Now, if you just turn to paragraph 25.**

A. Yes.

**Q. Yes. It states, "In September 2023, to advance our joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, nChain continued its US efforts to develop and promote DistroMint with me via Sound Alive engaging in at least another five meetings."**

**Do you see that?**

A. Yes.

**Q. After September 2023, you stopped having regularly scheduled meetings with nChain; is that**

**correct?**

A. What happened was, I got a notification from Urban, I believe on October 2nd, stating -- or I -- I don't want to get the date wrong, but Urban sent me a message and said that, "Regardless of the fall-out with Christen," he said, "we are continuing our research and development and our scheduled meetings will continue."

Around the 7th, which I had meetings all the way scheduled, I want to say, all the way through March of 2024, as like we were going to continue, you know, building DistroMint, adding more features and more amendments to the project, if you want to call it that.

My meetings disappeared around October 7th, like, they were completely deleted, and I sent a message to Roman, I believe you could reference the e-mail from yesterday, I believe, and I said, "Were all my meetings canceled?"

And then magically the next day, all my meetings are back up, and I would even say that they added more meetings. However, nChain did not show up to any of those meetings for, like, the next October, November, December, January, February, March, all the way they -- the meetings that they scheduled, and they showed up to none of them.

So that's October, November, December, January,

February, March. So for six months, they ghosted me.
**Q. Now I'm showing you what is being marked as Finnerud Exhibit 32.**
A. Yes.
**Q. Okay.**
(Finnerud Exhibit 32, E-mail dated November 8, 2023, re: DistroMint, Distrofy Critical Update 11.7.23, Bates stamped SA0003077 through SA0003079, was marked for identification.)
THE WITNESS: Sorry. Thank you.
BY MR. RUOCCO:
**Q. Okay. And this is a November 8, 2023, e-mail from you to Roman Puhek. The subject is "DistroMint DistroFy critical update 11-7-23," correct?**
A. Okay. Wait, wait. What page are we on?
**Q. I'm just on the front -- first page.**
A. Okay. Critical update. Where does it say "critical update" -- oh.
**Q. I'm just asking --**
A. There it is. Okay. All right. Yes.
**Q. Okay. Okay. So here, if you turn to the second page, ending in 78, you sent an e-mail to Mr. Puhek on November 7, 2023, and you wrote --**
A. Huh?
**Q. Page 78. Are you with me?**

A. Oh. Yeah. Yeah.
Q. Okay. So you wrote an e-mail: "Hi, family colleagues, best buds. While this has been a confusing time, I've gotten some clarity from the majority owner. I'm fully confident in nChain and Calvin Ayre and we are ready to move things forward. I've had conversations with Calvin, and he had advised me to focus on the technology, and therefore we must" -- all caps -- "continue building these products and solutions. Meetings on every Tuesday from today to February 20th of 2024 are a requirement. I sat in today by myself, and nobody showed up. That is not acceptable. I require a reschedule for tomorrow or Thursday."
Do you see that?
A. Yes.
Q. Okay. And then Mr. Puhek responds to you later the same day, and he writes -- and this is on page 77. Mr. Puhek writes, "Hi, Eric. As far as we understand, there is no formal clearance for us to continue the work. I believe the situation will clear soon and we'll act accordingly, but until it does, we cannot. Thank you for understanding."
Do you see that?
A. Yeah, I see that.
Q. Okay.

A. Now, do you see what I said? And it corroborates everything that I -- I explained. I said, "I apologize for any confusion around the time of Christen's depart. Urban had canceled all regularly scheduled meetings. Then you notified me of the pause. I woke up yesterday morning and my Google Calendar had new meetings, including yesterday, the 7th, through the 20th of February 2024, so it was a bit confusing for me and I assumed we were resuming development. Either way, I will continue to wait patiently for any updates."

So -- which is why I had wrote, "Hi, family, colleagues, best buds." I'm talking to my team and I'm telling them show up to the meetings because they're scheduled.

**Q. Okay. So what I -- but -- so -- so you reached out on November 7th to tell nChain that you thought the meetings should be rescheduled, and the response that Mr. Puhek, on behalf of nChain, gave you was there's no clearance to continue work on the DistroMint project, correct?**

A. I don't know the chron- -- the chronology -- excuse me -- of -- or the succession of -- of the e-mails. But we can spin it and just pick and prod or we can tell the whole story, because the full communication is what the judge is going to want to

hear. He's not going to want to hear you -- snippet here and there, snip this, snip that. That's just a tactic. That doesn't work. If you don't hear the full story, you cannot actually tell the full story to its complete and honest, truthful content.

**Q. Mr. Finnerud, we're trying to understand the full story through the deposition, okay? And you sent --**

A. You -- you're --

**Q. -- Mr. Puhek an e-mail on --**

A. There's pieces missing. Take it up with Calvin. Where's the rest of the e-mail?

**Q. Sir, this is an e-mail -- do you see the Bates stamp in the bottom?**

A. Yeah -- what is a Bates stamp?

**Q. Okay. So that -- so a Bates stamp signifies who produced the document, okay?**

A. Okay.

**Q. This one is SA0003077.**

A. Okay.

**Q. The SA Bates numbers are documents that you produced in this case. Do you understand that?**

A. I didn't produce them personally, but my team did.

**Q. Okay.**

A. Yeah.
**Q. All right. So this document so far as it was produced to us is what was in your file, sir. Okay? Do you understand that?**
A. Yes. If -- if we produced these documents, that's -- that's correct.
**Q. Okay.**
A. But the order of which you're presenting them to me is confusing. So could you like rephrase your question?
**Q. Sure. So -- okay. You wrote to Mr. Puhek on November 7th, 2023; is that right?**
A. Tuesday, November 7th, 2023.
**Q. Yeah.**
A. Let me see. Yes, I did.
**Q. Okay. And when you wrote to him, you -- you told him that, "Meetings on every Tuesday from today to February 20th of 2024 are a requirement. I sat in today by myself and nobody showed up. That is not acceptable. I will require a reschedule for tomorrow or Thursday."**
**You wrote that to him, correct?**
A. Not to -- not to Roman. I wrote that to my -- my -- my team.
**Q. Okay. So it --**
A. And I called them family, colleagues, best buds.

**Q. Okay.**

A. Yeah. Because I -- I -- I always bid my team up.

**Q. Okay. Fine.**

**So -- so you acknowledge, though, on November 7, 2023, you wrote, it's your understanding, to the members of the nChain Slovenia team that, "Meetings on every Tuesday from today to February 20th of 2024 are a requirement. I sat in today by myself and nobody showed up. That is not acceptable. I require a reschedule for tomorrow or Thursday," correct?**

A. Yeah.

**Q. Okay. And then mu- -- Mr. Puhek responded to the e-mail that you had sent on November 7th; is that correct?**

A. Yeah. I think -- I think you -- yes, that's -- that's correct. But I think, to make it less confusing, the order should be, you know, in chronological order.

**Q. Well, it is in chronological order. This is just the way documents get produced in discovery, where the first e-mail in the chain is at the back and the last one is at the front. That's just the way it always works.**

A. Okay.

**Q. Okay. But --**
A. I didn't know that.
**Q. Yes. Okay.**
**But Mr. Puhek responded to the e-mail that you had sent on November 7th, correct?**
A. Yes. Because I -- I did speak to Calvin Ayre briefly. I -- I talked to him on X, and, you know, he was just telling me -- he said -- he really said focus on the technology, the same things he's always been telling me, just like, you know, keep working. Like I didn't see anywhere where he said we're pausing and we're not working with you anymore. And at that point, Calvin Ayre was the known majority owner, even though I believe him to be the majority owner the entire time. But he announced his $570 million investment into nChain in the middle of the summer. So when Christen departed, Calvin was left over, and then he had his people in charge, his Fairway Family Office people that he brought in and whatnot.
**Q. Okay. My -- my -- my only question, though, Mr. Finnerud, was Mr. Puhek responded to the e-mail that you had sent on November 7th. That's correct?**
A. He said, "Hi, Eric. As far as I understand, there is no formal clearance for us to continue the work. I believe the situation will clear soon and we

will act accordingly, but until it does, we cannot. Thank you for your understanding."

**Q. Okay. So then you -- you understood as of November 7th, 2023, that nChain would not be continuing work on -- on the DistroMint platform, correct?**

A. No, I didn't -- I didn't -- I didn't understand that. I was still in -- in contention that they were going to honor the agreement and they weren't going to breach contract. And of course I was cordial with Roman. He's the head of -- of the Slovenia -- my -- he's in charge of all my devs. And I said, "I apologize for any confusion around the time of Christen's departure. Urban had canceled all my regularly scheduled meetings, and then you notified me of the pause. I woke up yesterday morning and my Google Calendar had new meetings on it."

So I assumed that things had -- they made a resolution or Calvin had talked to them and said, Hey, Smitty, you know, put him back on the freaking calendar and let's continue the work.

And so I showed up on the -- on the 7th, and there was nobody there. And I had meetings scheduled -- think about it. You have Google Meets that are not scheduled by you, but scheduled by your business partner, by your 50/50 business partner, and they

schedule them for six months. And I miscalculated here. I think they went into March of 2024, not through the 20th of February, but I would have to -- I'd have to reference my calendar.

But I was very confused and it was misleading, and it led me to believe that there was eventually going to be a continuation of our -- our partnership and our collaboration and -- so, yeah, I mean, I -- I didn't understand that -- that this was the end.

**Q. Okay. But what I'm asking you is, the morning of November 7th, 2023, it -- it's your contention you woke up and there were new meeting invitations from nChain to you; is that right?**

A. Yes.

**Q. Okay. And then you reached out to the members of the nChain Slovenia team, saying that they had missed one of the newly scheduled meetings; is that right?**

A. Yes.

**Q. Okay. And then Mr. Puhek from nChain Slovenia responded to you in response to that e-mail and said to you, "There is no formal clearance for us to continue work," correct?**

A. He did say that.

**Q. Okay. And then you told him, in response to his e-mails, "I will continue to wait patiently for any**

**updates," corrected?**

A. Actually, he said, "Hi, Eric. As far as we understand, there is no formal clearance for us to continue work. I believe the situation will clear soon and we will act accordingly, but until it does, we cannot thank you for the understanding. Roman."

**Q. Okay. So --**

A. But "I believe the situation will clear soon and we will act accordingly" was, you know, kind of like, you know, optimistic and had me believing that, you know, the situation would clear up and we'd continue work.

**Q. Right.**

**But as of November 7, 2023, Mr. Puhek communicated to you that they were not continuing work at that point in time, correct?**

A. I would have to refer back to that e-mail.

**Q. Okay. But you understood as of November 7, 2023, that nChain Slovenia was not, in fact, going to continue to have regularly scheduled meetings with you as of that date, correct?**

A. Well, the meetings were not deleted at -- by that -- at that point.

**Q. Okay. So when you told Mr. Puhek that you would continue to wait patiently for updates --**

A. Yeah.
**Q. -- you understood that you would not have any more regularly scheduled meetings with nChain Slovenia until you received a further update; isn't that true?**
A. I didn't understand anything that you assert that I understand, number one. And number two, you don't speak for me; I speak for myself.
**Q. No, you did speak for yourself, sir, and what you said was, "I will continue to wait patiently for any updates," correct?**
A. And so how does that translate to what you just said?
**Q. I'm asking you. I'm asking you, you told Mr. Puhek in response to his e-mail saying that there would be no continued work at that time, that you would continue to wait patiently for any updates.**
**Those were your words, correct?**
A. Can you rephrase the question, please?
**Q. Sure. Mr. Puhek told you on November 7th, 2023, that there was no formal clearance for nChain Slovenia to continue work on the DistroMint platform, correct?**
A. On February 7, 2023? You said that there was no formal clearance to continue work, but he believed that the situation would clear soon and that they would act accordingly.

**Q. Okay. And then response -- there were some other e-mails exchanged in between, but in response to his e-mails, you told him, "I will continue to wait patiently for any updates," correct?**

A. That's correct.

**Q. Okay. So my question is, as of this e-mail that you sent Mr. Puhek on November 8, 2023, you did not expect to continue to have regularly scheduled meetings with the members of the nChain Slovenia team until you had received a further update from nChain; isn't that true?**

A. That's a very confusing statement, and I cannot corroborate that. What I can tell you is that if I'm waiting patiently for updates, that means I'm -- I'm in the expectation that meetings are going to continue eventually and that, like Mr. Roman says, I believe the situation will clear up soon and we will act accordingly.

**Q. So it was your expectation as of November 8, 2023, that meetings with nChain Slovenia would eventually resume at some point in the future?**

A. Well, I don't want to say "expectation." I think that's a bad word. I think I want to say that the positive thinking side of me wanted that to happen.

**Q. Okay.**

A. Because really and truly, I had not gotten to the precipice of where we are now, and in good faith, I wanted to continue regardless of Christen's departure.

**Q. Okay.**

MR. RUOCCO: Can we get tab 175, please?

BY MR. RUOCCO:

**Q. I'm showing you what's being marked as Exhibit 33.**

(Finnerud Exhibit 33, E-mail dated September 7, 2023, re: DistroMint Catchup and Design Alignment, Bates stamped SA0002809, was marked for identification.)

BY MR. RUOCCO:

**Q. Okay. And this is a September 7th, 2023, calendar invite from Damir Rekic to you, Urban, under the subject line "DistroMint's Catch Up and Design Alignment, September 7, 2023," correct?**

A. Yes.

**Q. Okay. And this is an example of the type of calendar invite the members of the nChain Slovenia team would send you to schedule the meetings; is that right?**

A. This is independent examples because Urban would schedule all the meetings, like, a month at a time, or two months at a time in advance, and he would have, like, every Tuesday blotted out and, you know, we would

all be invited, and I would be invited to the meeting.

I would get a notification to my Sound Alive e-mail. This is a -- aside from just the -- the meetings that we had with, like, the entire team, if like a particular one of my -- one of my team -- one of my guys, if they needed to talk to me about something or I -- we -- in the group meeting, you know, there are certain parts and moving parts of the platform that needed to be changed or updated or whatever, then we would schedule an individual meeting.

So this one is just individually, let's see -- the whole team is notified, but this meeting, I believe, was individually with me and Damir, and me and Damir met, you know, quite a few things just on an individual basis.

**Q. Okay. Mr. Bratina was the one who would send the invites for the regularly occurring meeting between you and the nChain Slovenia team; is that correct?**

A. I mean, he was the project manager.

**Q. Okay. But was he the one --**

A. Yes.

**Q. -- who would send the invoice?**

A. Yes. Yes. Yes.

**Q. Okay. And the -- the invites that you say you received on November 7, 2023, those came from**

**Mr. Bratina?**
A. I believe so. They came from nChain.
**Q. Okay.**
A. Yeah. I would have to go look at the schedule, but I believe it came from Urban.
**Q. Okay.**
A. Urban or an nChain e-mail. Yes, more than likely Urban.
**Q. Okay. Now, Mr. Finnerud at some point, you set up an AWS site for the DistroMint platform; is that correct?**
A. That's correct.
**Q. Okay. And AWS stands for Amazon Web Services, true?**
A. Yes, sir.
**Q. Can you pull out -- yeah, Exhibit 2, please, which are the interrogatory responses? I think the Court Reporter has them.**
A. Thank you.
**Q. And if you could turn for me to your response to -- or to Interrogatory Number 5?**
A. (Complying.)
**Q. And that's on page 4. Interrogatory Number 5 asks, "Identify the, quote/unquote, DistroMint development site referenced in paragraph 57 of the**

**Complaint."**
**And the response is, "It's a cloud storage site owned by Eric Finnerud and controlled by nChain UK Limited, which houses the DistroMint source code. As part of performing plaintiffs' obligations under the development agreement, Eric Finnerud provided nChain UK with credentials of administrative access to the site by adding him to his AWS account."**
**Do you see that?**
A. Yes, I do.
**Q. The -- the DistroMint development site referenced in your complaint refers to the AWS site that you set up; is that right?**
A. Yes.
**Q. And you controlled the login credentials for the DistroMint development site; is that right?**
A. Which -- which login credentials are you talking about?
**Q. Well, I'm talking about the login credentials to the AWS site.**
A. I was the -- the -- in charge of the site, and I assigned and added team members like Luca, and I think there were a couple other guys.
**Q. Okay. So you were the one responsible for giving members of the nChain Slovenia team --**

A. Access.

**Q. -- access to the DistroMint development site?**

A. Yes. Well, to the AWS. The DistroMint development site login was done with HandCash, so it's two separate things. I don't want to confuse that.

**Q. I want to be clear about what -- about what you're saying.**

A. Yes.

**Q. So when -- when a user was going to log in to the DistroMint development site from the front end, they had to use a HandCash account, right?**

A. Yes.

**Q. But the AWS site and the login credentials that you controlled, controlled the back end of the site; is that right?**

A. Well, that controlled the storage, all of the storage. Now, the admin for the actual DistroMint -- the dev site or the full website, it would be the controls for the entire platform, but the actual -- where the -- the containers of the data, of the build and, supposedly, the source code, was all stored on AWS.

**Q. And you controlled the login credentials for that AWS account, correct?**

A. I own the account.

**Q. Okay. And do you still have access to that account today?**

A. No, I do not.

**Q. Okay. And why is it you don't have access to that account?**

A. I couldn't afford to continue paying the bills, and after so many days, AWS deletes the account if it's a -- if the bill goes unpaid.

MR. RUOCCO: Why don't we go off the record?

THE VIDEOGRAPHER: The time is 11:24 a.m. We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 11:38 a.m. We're on the record.

BY MR. RUOCCO:

**Q. Welcome back, Mr. Finnerud.**

**Did the nChain Slovenia team build what is called an MVP site for the DistroMint platform?**

A. Yes.

**Q. And MVP stands for minimum viable product; is that right?**

A. That's correct.

**Q. And an MVP site is a basic, stripped-down site built with just enough core features to test the**

**business idea; is that right?**

A. I wouldn't call it that.

**Q. How would you describe an MVP site?**

A. A minimum viable product is one that can perform. It's basically the -- the foundation for what can be expanded on. So it's like the first version of the site and -- and, you know, once the MVP is done, then, you know, you do things like penetration testing, and then you launch it.

**Q. And an MVP site is not the fully finished version of the site, is it?**

A. It -- it was never going to be fully finished for the next three years because we had so many updates that we were -- and things that we were going to add to the platform as -- as time progressed.

**Q. As best as you can recall, what functions did the MVP site to the DistroMint platform have in 2023?**

A. So in 2023, you could log in with a HandCash wallet. You could create your profile as an artist or a label or as a collector or a fan; it was called a fan. You could -- as an artist or a label, you could upload content. So that would be JPEGs, MP4s, you know, MP3s, WAV files, and then that content could be tokenized into -- or could be minted into NFTs and then placed into sale on the marketplace as a collection or as an

individual file.
And at the same time, you could also enter in all the metadata in the -- in the same process when you're minting your NFTs or whatnot because all the content gets uploaded first.
And then from there, you select whether you want to mint NFTs and send the distribution or if you just want to send a distribution or if you want to do both.
**Q. Okay. You mentioned minting files. In 2023, is it true that the MVP site could only mint image files?**
A. No.
**Q. Okay. So is it your testimony, at least you understood, the MVP site could also mint video or audio too?**
A. Absolutely.
**Q. And what is that understanding based on?**
A. It's based on that the file size had to be under 50 megabytes.
**Q. And why -- why was that relevant?**
A. Because the larger the size, then it would take up too much space, and some of that space was dedicated to the blockchain, and then the other space was the storage of the actual file.
Because this is like a mirror, you know, it's stored on AWS and it's stored on the BSV blockchain via

asset layer.
And DistroMint is -- is a music platform, so the fact -- it had to be able to do MP3s and -- and WAVs.
**Q. Well, the MVP site didn't support music streaming, did it?**
A. Not streaming. It supported the sale of the distribution of the music assets to traditional distribution, which would be handled by Orchard Sony and then -- but via me, via Sound Alive, and it would go to my distribution dashboard. So we could send it to traditional distribution on the left hand, and then on the right hand, you know, we're minting NFTs and that's going out to the marketplace.
So it's all under one umbrella, which is something that nobody's ever done. Yeah, there's many people who have tokenized music and have these platforms that you can mint NFTs, but nobody is doing both. And what -- the whole idea behind it was if -- if I can create this platform that does both and then introduce it to the music industry, it would bring Web3 and blockchain to mainstream music.
**Q. Okay. And -- and the music distribution part, that was something that would have to be done manually through the platform; is that right?**
A. Well, the actual -- the assets would be uploaded

by the artist, and then we would receive notification in the ad -- admin panel. And then at that point we could send it to -- we can, you know, send it to the -- the distributors.

**Q. Okay. And that would be a manual process; is that right?**

A. That would be done by the administrator of the site.

**Q. On a per-notification basis; is that right?**

A. Well, I mean, if we got like a batch of -- of notifications, we'd just do them all at once. It was really up to the customer, though, what they want.

**Q. Okay. But for the MVP site as it existed in 2023, if a customer wanted to distribute any content, the administrator for the platform would have to initiate that process themselves?**

A. They'd have to go into the new files that have been submitted and then, yeah, it would be done -- I guess you would call it manually. Like it wasn't a direct pipeline yet.

**Q. Okay.**

A. We needed an API for that.

**Q. And the MVP site also didn't support video streaming in 2023, did it?**

A. Not streaming, but you could play -- you could technically play back video. But it wasn't being streamed or monetized.

(Finnerud Exhibit 34, E-mail dated September 26, 2023, re: Meeting DistroFy/DistroMint 26.9.2023, Bates stamped SA0002881 through SA0002888, was marked for identification.)

BY MR. RUOCCO:

**Q. Okay. And I'm showing you what's being marked as Finnerud Exhibit 34. And this is a September 26, 2023, e-mail from Urban Bratina to you, subject is "meeting DistroFy/DistroMint 26-9-2023," correct?**

A. Yes.

**Q. Okay. And this is a summary of what you and the members of the nChain Slovenia team discussed during the meeting on September 26, 2023?**

A. Yes.

**Q. Okay. And if you see, in the row from Mr. Bratina, the first bullet is, "Before we go live, we still need legal documents."**

**And if you turn to -- me to the second page, the action items are "legal Dale," right?**

A. Yes.

**Q. All right. So during this September 26th, 2023,**

**meeting, Mr. Bratina communicated to you that you and nChain still needed to work out legal documents before the DistroMint platform could go live; is that right?**

A. Yeah. The -- the problem with -- with him stating that, though, is that he -- he doesn't have that authority.

**Q. And what do you mean "he doesn't have that authority"?**

A. Because I don't even know what he's talking about when he says "we" -- "we still need legal documents."

**Q. Well --**

A. Because it's not very specific.

**Q. -- isn't it true that you personally were continuing to communicate with Mr. Evans and even Mr. Ager-Hanssen, you know, regarding your legal understanding of how you should proceed with the launch of the DistroMint platform as of late September 2023?**

A. I only was communicating with Dale.

**Q. Okay.**

MR. RUOCCO: Can I get Tab 111, please?

THE WITNESS: And then if I did communicate with Christen, you know, I didn't get a response.

(Finnerud Exhibit 35, E-mail dated

September 28, 2023, re: DistroMint Update 9.28.23, Bates stamped SA0002883, was marked for identification.)

BY MR. RUOCCO:

**Q. I'm showing you what's being marked as Finnerud Exhibit 35.**

A. Okay.

**Q. And this is a September 28, 2023, e-mail from yourself --**

A. Yeah.

**Q. -- to Dale Evans and Christen Ager-Hanssen, correct?**

A. Yeah. Oh, yeah.

**Q. And this is a couple days after you had the meeting with the nChain Slovenia team on September 26, 2023, that we just discussed, right?**

A. That's correct.

**Q. Okay. And you write, "Dear Dale and Christen, thank you for your assistance in everything involving the creation of DistroMint. I'm currently waiting on a legal understanding of how we should proceed with a launch or is a launch necessary for an exit. I hope this letter finds you well. Best, Eric E. Smitty Finnerud," correct?**

A. Yes.

**Q. Okay. And so as of this --**

A. This -- this corroborates what -- this brings back -- this helps me understand, definitely.

**Q. Okay. And so as of September 28, 2023, you and nChain had not worked out a legal understanding of how you should proceed with the launch of the platform; is that right?**

A. I think what I was referring to with the legal understanding is the -- the same topics that Dale was continuing to bring up, which was the -- the BVI, you know, and the concerns that he had. And what I was basically stating is, you know, can we -- can we sell the platform because it's been done.

And at this point, you see -- and we even reference back to this meeting. I'm glad you brought this up. We're talking about DistroFy. Well, DistroMint has been completed for five months and -- or longer, and I'm -- I'm coming up with -- with new things for us to work on in the meantime. DistroFy is basically based off of -- that's the streaming side of things. So that's the patent that you -- you shared with me earlier, which is blockchain digital audio video monetization by the second. Well, that's what DistroFy is.

And so I brought the idea to the fellows,

because I had sent Christen an e-mail, as well, and I said, Listen, you know, here's the new ideas and the new platforms that I want to work on. DistroMint is done.

I wasn't getting a whole lot of communication from him. Dale was stalling out and wasn't giving me actual steps to take to launch DistroMint. So I sent this e-mail and I said, Hey, you know, "Thank you for your assistance in everything involved in the creation of DistroMint. I'm currently waiting on a legal understanding of how we should proceed with the launch or is a launch necessary for an exit."

Is the launch necessary for us to just sell the platform? Because at that point, I was starting to get fed up and I was like, you know, I want to do something. I want to progress in same way. Because we haven't launched it. It's been a long time. I'm being cordial with people.

And then I put my team back to work. I said, Hey, look, we're going to do this DistroFy thing. So I created the logos and assets, I sent it over to them, and we started kind of brainstorming on -- on how we were going to build this next platform.

**Q. Okay.**

A. Well, it's going to be in addition to DistroMint. It would be the streaming side of

DistroMint, which we had already discussed in the very early discussions of DistroMint in terms of how we would upgrade it, you know, MVP Version 2.0, Version 3.0, Version 4.0, et cetera.

**Q. Okay. And the -- the -- the legal understanding that you reference here are those same issues with the BVI that you were discussing with Mr. Evans?**

A. Whatever surrounded us not launching. I was like, you know, hey, what's the deal, at that point.

**Q. Okay. Let's take a look at Tab 58, please.**

(Finnerud Exhibit 36, E-mail dated December 14, 2023, re: E. Smitty nChain Restructure proposal, was marked for identification.)

BY MR. RUOCCO:

**Q. Okay. I'm showing you what's being marked as Finnerud Exhibit 36.**

A. Yes, sir.

**Q. Okay. And this is a December 14, 2023, e-mail from Mr. Evans to you, copying James Marchant. Subject is "E. Smitty nChain restructure proposal," correct?**

A. Yes, it is.

**Q. And then in his cover e-mail, Mr. Evans writes, "Attached is the restructure proposal which we have signed off, reflecting a call we had the other week and**

**with a bit more of the detail," correct?**
A. Yes.
**Q. Okay. And if we turn to the attachment, this is the restructure proposal that Mr. Evans referenced in his cover e-mail; is that right?**
A. Yes.
**Q. Okay. Can you turn for me to the page ending in 869? I think it's the second page of the restructure proposal.**
A. Yes.
**Q. Okay. And in Item 4, it starts, "The project company has not been incorporated."**
**Do you see that?**
A. "The project company has not been incorporated"?
**Q. Yes.**
A. Well, I mean, he could say that. Why did Dale provide me with a restructure proposal or amendment when he couldn't provide an original amendment? So -- you see what I'm saying? This is totally contradictory. And how does a restructure proposal even exist if there wasn't an original agreement?
**Q. Well -- so I think that's what we're -- we're discussing here. "The project company has not been incorporated" --**
A. That's not true.

**Q. -- and that's a true statement, correct?**
A. Not true at all.
**Q. Okay. So what was the project company, as you understood it, as of December 14, 2023?**
A. Distromint.com. Dev.distromint.com. DistroMint, LLC.
**Q. Okay. And it states, "The initial expectation was that the platform would be owned and operated by a company called DistroMint, LLC, which E. Smitty formed for these purposes. Enforcement action by the SEC and other U.S. regu-" -- "regulators during 2023 suggested that attempting to operate the platform within the U.S. would carry too much risk and greater regulatory compliance burden."**
**Do you see that?**
A. Yeah, I see that.
**Q. All right. And -- and we had discussed this yesterday, correct?**
A. I believe so.
**Q. And during the middle of 2023, you had discussions with Mr. Evans in which he communicated to you that nChain believed there was too much regulatory risk around basing a project company for the DistroMint platform in the United States; isn't that right?**
A. You said I had a conversation with him? He

expressed that to me.

**Q. Okay. And so this paragraph accurately reflects the state of your discussions with nChain as of December 14, 2023, doesn't it?**

A. Nope.

**Q. Okay. Well, you said Mr. Evans had communicated to you concerns about operating the DistroMint platform from the United States, correct?**

A. The problem is, you're not looking at the context of the entire discussion here, and we never had a discussion where Dale said that the company has not been incorporated.

**Q. So I mean is it your testimony that the items in the current position column here do not accurately reflect the parties' discussions as of December 14, 2023?**

A. The statements are Dale's statements and there is some inaccuracies in here.

**Q. Okay. So there are inaccuracies here in the restructure proposal?**

A. Yes, because this isn't the restructure. This is the current position that you're in column, and it says here, "nChain and E. Smitty were expected to own 50 percent of shares in the project company."

The company never launched, number one. Okay?

So this talk of shares and -- and stuff like that, like I don't even know what he's talking about. It was very confusing. And then saying that the project company has not been incorporated.

And I will take it a step back. Why would Eric Finnerud incorporate DistroMint, LLC and not add nChain? Well, in order for me to give half the company to nChain, I would have to be in possession of the company first. Henceforth, which is why Christen told me to incorporate it because I was bringing my intellectual property, my provisional patent, that was part of the 50/50 deal.

But even with bringing my patent doesn't mean that the IP just all of a sudden it -- it doesn't belong to me anymore. It still belongs to me, but I'm giving 50 percent of it in terms of, we sell the platform, 50 percent of revenue and -- and 50 percent of the licensing capability, we split it. It's a business deal.

So Dale, once again -- and this is why I didn't agree to this, because Dale. Dale. Dale. Dale. Dale acted in bad faith and this agreement showed me exactly who Dale really was, and I have -- there is so much more to tell you, but I'm -- I'm not going to get there to that.

**Q. No. Actually, let's hear it. Why is it your -- why do you think that Mr. Evans would purposely act in bad faith towards you?**

A. You know, that's a good question. I think you might want to ask Dale that question.

**Q. Okay. But sitting here today, you can't think of any reason why Mr. Evans would purposely act in bad faith to you?**

A. Because he was directed to.

**Q. Okay. By whom?**

A. By upper management.

**Q. And who in upper management?**

A. Calvin Ayre, James Marchant, people who blocked me on social media.

**Q. And do you have any direct evidence of that having happened?**

A. Absolutely. Screenshots.

**Q. Screenshots of what?**

A. Screenshots of being blocked on social media by -- at the time, the new CEO who was a temporary CEO, James Marchant, and then later on -- or maybe around -- I don't know exactly the time, but then Calvin Ayre. I can pull up my -- I'm not going to do that right now, but I will show you. I have screenshots.

**Q. Okay. Let me ask you a better question.**

**Do you have any direct evidence of Mr. Evans being instructed by upper management at nChain to act in bad faith toward you?**

A. Yeah. They refused -- they breached the contract. They refused to continue my payments, and then they told me if I don't sign this proposed restructure agreement, that DistroMint is going to sit and nothing is ever going to happen to it, and it would just be a sitting project, and they are not going to pay any invoices, and that if I don't -- if I don't agree to the restructure proposal, that I'm not getting anything, is what they told me.

**Q. You mentioned that, you know, you believe nChain breached the contract.**

**Can you just explain for me all the reasons why you believe nChain breached the contract?**

A. Yeah. Everything that I've testified about.

**Q. No, but like specifically, how did nChain breach the contract? What -- what did it do that breached the contract?**

A. It's explained in -- in the Complaint. Referenced the Complaint.

**Q. Okay. But, like, what -- can you just explain to us what acts nChain took or did not take that you considered to be a breach of contract?**

A. Yes, in my complaint. You have my complaint.
**Q. Okay. But you, as you're sitting here testifying personally, you lived through this, you're testifying in a 30(b)(6) capacity, you can't just sit here and explain for us what you think are the breaches of contract?**
A. Once again, I'm going to refer back to my full complaint because that is -- the full contract breach is explained in the Complaint, in this deposition, in yesterday's deposition, and in tomorrow's deposition, all of it is there for you.
**Q. Now, if we look back at the restructure proposal, it -- it states, "Initial investigatory work suggested that incorporating a project company in British Virgin Island, BVI, at first, on a limited unregulated basis, and then seeking BVI regulated status corporal launch would be the safest approach."**
**Do you see that?**
A. Yeah, but this is just somebody stating words. It doesn't mean anything. This is coming from Dale.
**Q. Okay. So the restructure proposal, this doesn't mean anything because it was just coming from Dale; is that right?**
A. I did not say the restructure proposal doesn't mean anything. I'm referring to the sentence that you

just read me.

**Q. Okay. Well, we've seen communications in which you told Mr. Evans that you were taking steps to incorporate a project company in the British Virgin Islands, correct?**

A. Correct. I said that -- I did not say that I was taking steps. I said I had done my own research and I discovered -- or I found a company that would do the incorporation and help launch a bank account, and I said, "Can we move now because I have the solution since you didn't bring it to me. You did not provide the solution." I did it on my behalf, but I am still having to deal with Dale.

**Q. Right. So in your understanding in 2023, was that to move forward with the DistroMint platform, you would have to take steps to incorporate a project company in the British Virgin Islands; is that right?**

A. That was one of the options, but that was not the only way forward, but it just seemed like one of the, you know, ways that Dale was throwing out there, and I figured, hey, let's -- let's try to make it happen.

**Q. Is it true that this current position column reflects just the state of your discussions with nChain as of December 14, 2023?**

A. Well, there's some truths in this, and there is some things that are not -- that are stated inaccurately in -- in the left column if we're talking about the current position.

Yes, nChain -- I did undertake day-to-day operations of the platform. I don't know what this authority granted the board of directors of the project company --

**Q. Well, who was on -- actually, let me ask the question.**

**Who was on the board of directors of the project company?**

A. Well, it says here, to be formed. I'm on the board.

**Q. Okay. So, right, there was no board of directors of the project company because it had not been formed yet, right?**

A. What do you mean? DistroMint, LLC. It says right here.

**Q. No. You were just -- you were -- you were undertaking to identify things that you had done --**

A. Right.

**Q. -- and you identified two?**

A. I'm actually reading a sentence.

**Q. No. But let me ask my question.**

**And you identified in Section 2 here, subpoint 1, it says, "Undertake the day-to-day operation of the platform with an authority granted by the board of directors of the project company to be formed."**
**That's what that states, right?**
A. That's -- that's -- you did not let me finish saying what I was saying.
**Q. Well, I'm just asking, that's what this statement says, right?**
A. It's an inaccurate statement.
**Q. Well, because there -- there was no project company, right?**
A. I -- I couldn't finish saying what I was saying because you interrupted me. So at this point, I don't have anything else to say about this -- this -- can we move on to the next topic?
**Q. Well, no. Let me ask.**
**So you -- you said, "I did undertake day-to-day operations of the platform. I don't know what authority is granted by the board of directors of the project company." And --**
A. Yeah, because I didn't finish saying my sentence when you jumped in because I had not finished reading the whole thing, and I was speaking out loud.
**Q. Okay. But my --**

A. Because I am -- I'm reading the language.

**Q. Okay. But there were no directors of the project company, right?**

A. That's an inaccurate statement. Look, say E. Smitty would undertake the day-to-day operation, and then hammer it with something untrue afterwards so that when I read it out loud, there is a half truth and then there is a half lie to it. I'm not doing that. That's pathetic.

**Q. Sir, you pointed to this part of the document yourself, and you started --**

A. Pointing to a part of a document is not against the law, buddy.

**Q. Nobody said that it was, sir, okay? Now, you pointed to this part of the document yourself, you started to describe this as a thing that you had actually done until you got to the part where you realized it says that the project company was yet to be formed?**

A. I'm reading through it out loud, and I'm reading through it, and -- forgive me. I should not read through it out loud on record because you're going to spin whatever I say, and say that I said this and said that. So therefore, like I said, I'm done with this particular document, and move on to the next thing.

**Q. You're refusing to answer any more questions about the restructure proposal?**

A. I'll answer questions, but if -- you got to rephrase them and make them actually make sense.

**Q. Yeah, okay.**

**My question is, who was on the board of directors of the project company as of December 2023?**

A. It was just me and my wife.

**Q. Okay. Okay. Let's look at Subpart 23, License Use of His IP in the DistroMint Brand.**

**Do you see that?**

A. Yes.

**Q. Okay. Now, those are also things that as of December 14, 2023, had not happened, right?**

A. No. The way you're reading this is, you're reading -- and that's the inaccuracy of this is, you're reading it as if, you know, all of this is -- is true or all of this -- this is false or whatever. It's so much in here that has to be ironed out. And so, this is why I believe that if this does go to trial, you know, we will be able to explain to the judge, you know, the inaccuracies in Dale's restructure proposal, which is exactly why I refused the -- the proposed restructure because even in the current position, there's inaccuracies here that Dale -- Dale's making statements,

some of them which are not true, some of which are true.
So we would have to go through this with a fine-tooth comb, and so I believe that's what trial is for.
And the proposed restructure is absolutely just ridiculous. It's only in nChain's favor. A little guy with a two-party LLC taking $675,000 in -- in convertible debt, and I found out what convertible debt is, and it's -- it's pretty bad. It's -- it's a -- I don't want use the word, but it's -- it's absolutely in the favor of nChain.
**Q. Did you ever pay nChain cash for any of the work it did?**
A. No. I gave them 50 percent of the -- the product that we created, which is DistroMint, and gave them 50 percent of my -- of my patent, which is pending.
**Q. So -- but you never paid nChain any cash, right? True?**
A. We had a -- we had an agreement. We had a -- an oral agreement from December 12th, which carried on to, you know, February 21st e-mail. And then from there, there were many proposed amendments and such. That wasn't the structure of our agreement.
**Q. No, I know. But I'm saying you never -- you never gave them any cash, right?**

A. That was not the structure of our agreement.
**Q. Right.**
**But there was no cash that went from Eric Finnerud to nChain, right?**
A. That wasn't the structure of our agreement.
**Q. But there was cash that went from nChain to Eric Finnerud, wasn't there?**
A. Of course. I'm providing --
**Q. Okay.**
A. I'm giving up half of everything that I have.
**Q. Right. Okay.**
**So -- so you got paid cash, they did work, they didn't get paid cash, and it's your position that in this case, you're the person who is wronged?**
A. Actually, that's incorrect. I did work and I provided my patent and I provided my expertise and I provided all of my -- my celebrity and my social media following, over 500,000 followers on -- combined on my socials. I brought a lot to the table. You know, basically, if you took -- take a look at nChain's footprint on the internet, they have maybe 1/20th or 1/25th of the -- of the reach -- of the global reach of the internet real estate that I control as E. Smitty, as Sound Alive. I'm in a much bigger ballpark than they are.

So they -- they get advantage of having me, my expertise as a -- as a music producer, my 26-plus years from the industry, my entire social media network, my innerworkings and dealings inside of the music industry, and then a product that -- you know, we're talking about a decacorn. DistroMint as a -- you know, had it launched, we might have exited out for $400 million, a billion dollars, and then half of that would have went to nChain. And then had they not breached the agreement, half of the patent would be going to them for licensing, as well. We'd be splitting that money and making every single record label and platform pay us to use our technology.

**Q. But I'm just trying to understand what you're saying. So -- so all these things that you just mentioned -- the -- the social media followers, the big ballpark that you play in on the internet -- you got paid $150,000 for contributing all those things, didn't you?**

A. It's not enough. I got paid for my consulting services.

**Q. Okay. So -- okay.**

**And -- and then you -- you're claiming that it's going to be some massive success, this platform, right?**

A. I mean, I think everybody knows that.

**Q. So why would nChain just back out of it?**
A. I can't answer that. You have to ask nChain why they would do that.
**Q. Okay.**
A. And that's -- that's been my biggest question mark.
**Q. Okay. Now, I want to go back to the restructure proposal. Item 2 (iii), "licensed use of his IP in the DistroMint brand."**
**Let's look at the DistroMint brand. That was never trademarked, right?**
A. It was -- we're in the process.
**Q. Okay. So you didn't license the DistroMint brand, did you?**
A. Where does it say "brand"?
**Q. "Licensed use of his IP and DistroMint brand."**
A. Yeah, I mean, we would take -- we would take basically -- I think -- once again, I think Dale is just -- he's -- he's jargoning [sic] on, and some of this is -- is understandable and some of it is not. So some of it's accurate and some of it's inaccurate. And like I said, we'd have -- I would have to sit down, and I could write down everything that's accurate about this current position and everything that's inaccurate about what he's saying in here.

**Q. Okay. But you never -- you never licensed over a DistroMint brand --**

A. We never -- we never -- we never completed -- we never launched. If we launched the platform, then, yes, whatever, you know, Music Choice or Spotify or whatever -- I'm just naming companies as examples -- could be like, okay, DistroMint, we want to use your platform or we want to have a license agreement with your platform and be, you know, your exclusive distributor and connect our API so that when artists come on and they want to distribute and mint, it just goes straight to us.

I mean, that's part of the -- the licensing aspect of DistroMint brand. I mean, imagine there is no nec- -- necessary need -- well, except on a very -- maybe a security basis, to log into the admin panel and everything is automated because we have APIs connected to DistroMint. Yeah, we didn't get to that -- that point yet. And then at the same time, someone wants to use the same idea of the technology, which is backed by a patent, and then we say, Okay, well, we'll give you a license to it or you can pay us an upfront fee and, boom, you can copy it. That's what that means.

**Q. Okay. And you never got to the point where you had a patent either, right?**

A. The patent was brought in from the beginning of the agreement.

**Q. Sir, you filed -- you filed a provisional patent application in July of 2022, correct?**

A. And -- and I paid the -- the fees, and -- and that patent was issued to me. It gave me one entire year to take the provisional patent to a full patent. That doesn't mean it's not a patent. It's still a patent. It's still recognized. It's -- just hasn't been examined.

**Q. But -- so you filed a provisional patent application on July -- in July 2022, right?**
**True?**

A. Yes.

**Q. Okay. And then that provisional patent application, that's good for -- for one year, right?**

A. Yes.

**Q. So it expired in July of 2023, right?**
**Yes?**

A. Yes. It would have expired, yeah.

**Q. Okay. And then at that point you --**

A. Unless it was taken to a full patent application.

**Q. Right.**
**And at that point, you -- you re- -- you filed a**

**nonprovisional patent application, right?**
A. Yes.
**Q. And now, three years later, you still have not obtained an approved patent in connection with that application, have you?**
A. The patent is still in examination. And as I stated many times on the record, that -- patents take time. And if you saw the communications with our attorneys, okay, and -- between Arthur and our attorneys at -- they stated that even the first examination could take up to -- well, so the time of examination to take up to 30 months.
So then you have the examination period. We don't know how long that might take. It might take 90 days, it might take 6 months. It really depends on what the judge has on her -- her docket -- the examiner. And then from there, she can come back and say, Well, I'm probably not going to approve this patent unless you make these changes or amendments to X, Y, Z. And then at that point we can make the amendments, like we did Monday, I believe the 3rd, of this week, and we resubmitted. And we also submitted for an extension.
**Q. Okay. But in December of 2023, you didn't have a patent to license, did you?**
A. Yes, we did.

**Q. No. You were -- you had -- you had applied for a nonprovisional patent application, correct?**
A. At that point I was still under the understanding that, you know, if -- if nChain hadn't breached the contract, that that patent would have probably been approved. And, you know, that's why I came to them, because they're the patent experts. Remember, they have 2500 patents in their portfolio and 1500 pending patents. They're the largest patented -- they're the Number 2 patent company in the world; nChain.
**Q. How -- how did nChain cause the United States patent office to twice reject your patent application?**
A. It -- you clearly don't understand patents. And as an attorney, I -- I really -- I question that.
**Q. Well, I -- I'm asking you, sir -- you've already testified --**
A. There's no such thing as a patent that just goes through its first time. It may be two, three, four times. It takes time. Sometimes patents take years before they actually get approved, because they have to be found completely novel. So we were still within that process.
**Q. And you're still in that process today, aren't you?**

A. Yes, I am.

**Q. Okay. So in -- in December of 2023, you had no final patent to license to anybody, did you?**

A. Yet.

**Q. Okay.**

A. But we had no -- no platform launched either because nChain breached. Do you see how it all kind of connects?

**Q. Honestly, no. And I'm -- I'm -- I'm asking you the question, right. I asked you before to explain the -- the -- the breach of contract. But can you explain for us how nChain breached this contract?**

A. Yes. I just -- I just explained. And every -- this whole testimony explains, and also my complaint explains. So now you're just asking me to go on record and -- and grill me. Well, grill me in -- in -- in a different way, because at the end of the day, I provided everything possible: All my files, all the information that you guys requested, and an honest and truthful testimony what I've been through.

**Q. Okay. Let's -- let's switch gears, then. Can you pull back out the Exhibit 1, which is the Sound Alive 30(b)(6) notice, please?**

A. Yes. (Complying.)

**Q. And if you could turn for me in that notice to**

Topics 27 through 30 --
A. Uh-huh.
Q. -- on page 12. I'm going to read them all at once.
"All payments sought or received by Sound Alive concerning DistroMint, including from nChain."
"All statements of work, time records, or other documentation of or by Sound Alive concerning its services for nChain UK."
"Any financial consideration received by Sound Alive from any person other than nChain UK in connection with DistroMint."
"Sound Alive's financial and accounting records and tax filings relating to DistroMint or the alleged Development Agreement."
Do you see all those?
A. Yes.
Q. Do you understand you're Sound Alive's 30(b)(6) witness on those topics?
A. I do.
Q. And are you prepared to testify about them?
A. Yes.
Q. And what did you do to prepare yourself to testify?
A. I consulted with my attorneys and I read this

document right here.

(Finnerud Exhibit 37, Sound Alive Records Invoices dated from December 12, 2022 through May 5, 2024, varied Bates stamped documents, was marked for identification.)

BY MR. RUOCCO:

**Q. Okay. And I'm showing you a document that's being marked as Finnerud Exhibit 37. I'll represent to you that this was marked, I believe, as the Exhibit 3 in the 30(b)(6) deposition of Mr. Evans.**

(Tendered.)

So, Mr. Finnerud, do you recognize the -- the documents here?

A. Yes.

**Q. Okay. And what are -- what are these documents?**

A. These are the invoices that I sent nChain.

**Q. Okay. And if you could, just on the first invoice, the first page in the notes, it gives bank wire information, beneficiary bank, Renasant, and then it states customer name, Eric Finnerud, and then there is a customer account number, 30025729.**

**Do you see that?**

A. Yes.

**Q. Is that bank account held in your name?**

A. This was a banking error.

**Q. So you included that account by mistake?**
A. Yes.
**Q. Okay. Just so I'm clear, if any payments were made to that account, is that a personal account that you hold?**
A. This account right here?
**Q. Yeah.**
A. Yes.
**Q. Okay.**
A. Which is why the -- I didn't look at the -- I didn't look at this particular invoice, and I was doing it on a contractural, independent contractor basis.
**Q. Are you --**
A. The correct account, though, is Sound Alive Enterprise, LLC account number.
**Q. Okay. Are you the one who personally generated these invoices?**
A. Yes.
**Q. And do you use, like, software or something --**
A. Yes.
**Q. To generate them?**
A. Yes.
**Q. What software do you use?**
A. Free Invoice Accounting or something like that.
**Q. Okay.**

A. Invoice Generator.
**Q. Okay.**
A. You just type it in Google. It's a free invoice generator.
**Q. Okay. And -- and you mentioned a moment ago, you were doing the contracts on an independent contractor basis; is that right?**
A. For a previous project that I was working on, yes, and so that's how the -- that's how the wrong account got placed there. That wasn't supposed to be there. It was supposed to be the Enterprise account on the first page.
**Q. And did you understand yourself to be an outside contractor for nChain?**
A. Yes.
**Q. And we discussed this a bit yesterday, but it was your expectation at the beginning of your relationship with nChain that at some point you would relocate to London to work for nChain full-time?**
A. I was -- I was considering that to be an option because Christen had brought it up. It was probably going to be maybe three years down the line, like, way down the line because first we would have to exit out of DistroMint. That was his -- his plan.
**Q. When did Mr. Ager-Hanssen tell you that you**

**would have to exit out of DistroMint, before --**
A. In our first -- in our initial agreement on December 12th.
**Q. Okay.**
A. Because he was discussing to me how he wanted to work with me in the long run, and he was saying, you know, "Eric, you are brilliant." He was like, "We need people like you at nChain." He was like, "I can only have you as a contractor right now due to English law," and he said, "but we are going to build -- we are going to partner 50/50. We are going to build this platform," and he said, "then you going to exit out, and once you exit, you come buy a house in London and you come work with me in London at nChain," or whatever company, you know?
**Q. Okay.**
A. And I thought it was a cool idea, and he said, "We will have a radio station. We will do a radio show." Because he said he liked my personality.
**Q. Okay. Looking at the invoice --**
A. Yes.
**Q. -- do you see under the item that says, "December 12, 2022, consulting and business development services."**
A. Yes.

**Q. And if you turn to the next document, this one is similar. It says, "January 13, 2023, consulting and business development services," correct?**

A. Yes.

**Q. Do each of the invoices you submitted to nChain for consulting of business development services have a similar line item?**

A. Have a similar line item? I don't know what that means.

**Q. Okay. There's no -- so here, just look at this December 12th invoice. There is no, like, itemized detail on the work that you performed in this month, right?**

A. No. It says consulting and business development services, and then at the bottom, it says "Total payments, $150,000 divided into 12 payments of 12,500 USD per month. Thank you."

And this is as Christen directed me to send him the invoices.

**Q. Okay. But I'm simply asking, when you would generate invoices for consulting and business development services to nChain, you didn't, like, provide a description of the specific things that you had done in that month, did you?**

A. I don't think many invoices have an actual

specific description when it comes to this type of business. So I mean, I don't know why that would be an expectation. It clearly says, "consulting and business development services," and for each month that I invoiced, I did provide the -- the consulting and business development services to nChain and to my team in Slovenia.

**Q. Okay. I am just asking, do you -- like, does nChain -- sorry. Strike that.**

**Do you or Sound Alive have any contemporaneous time records of the things that you were working on in any one of these months?**

A. Yeah. I mean, we have all our meetings, and basically just, you know, running things around the clock.

**Q. Okay.**

A. Yeah.

**Q. You didn't -- did you keep any time logs of what you were doing on a month-to-month basis in connection with the DistroMint platform?**

A. It's contract work. So I wasn't being paid an hourly wage. So I have -- I'm charging them as agreed by our agreement on the 12th, exactly what Christen said. He said he's going to compensate me 12,500 a month to lead my team to develop DistroMint.

**Q. Okay.**
A. That's for the time that I put in, and I mean, could I have charged more? Probably, yeah. I mean, I sure could have. If this had been -- the amount of time that I put into DistroMint, if -- if I had that amount of clients in mixing and mastering and engineering, you know, I probably wouldn't be able to keep up with the work, it would be so much.
**Q. You just said that if you had the amount of time you put in it DistroMint's with your mixing and mastering clients, you would not have time to keep up with the work; is that right?**
A. No. I said that if I -- the amount of time that I designated to working on behalf of my partner nChain, if I had spent that same amount of time, like, every month with doing mixing and mastering services for my mixing and mastering clients, for example, I would not be able to keep up with the work.
**Q. So the DistroMint project was a -- was a big project for you?**
A. It was a big project for everybody.
**Q. Okay.**
A. I put in many hours, you know, many, many, many hours, and it -- if I were to calculate the hours, you know, I would have to just go through e-mails, meetings.

I would have to go through all my documents to calculate the amount of hours that I put in, you know? And then even just the time I spent online servicing their social accounts, you know, even things nonrelated to DistroMint, anything related to nChain, any project coming out of nChain, anything Christen did, anything Calvin Ayre did, you know, I was promoting it for them and getting them hundreds of likes and retweets and, you know, basically sharing the wealth of my network.

**Q. Can you just describe for me in as much detail as you can, the consulting and business development services you say you provided to nChain?**

A. Sure. Absolutely. So I provided them with my -- as an insider, as a music industry insider who has been in the industry for 25, 26 years, I gave them an inside look at what a major record label dashboard looks like. Then I also -- I showed them how to develop that dashboard and redevelop the dashboard into a viable product that not only handled, you know, traditional -- well, we can call it traditional, but we can call it traditional major record label distribution on one end, but then the actual functionality of adding the blockchain to it.

So each time that I met with my team, you know, it was a description of graphics. There was wire

frames. There are snapshots of portions of the dashboard that I wanted to build and how to build it. And then I spent, you know, hours and hours designing an iMockup site on my Sound Alive record site to give the developers kind of a blueprint for how I wanted to lay out the DistroMint platform. So that took many hours.

And then each time we had meetings, I had to give them updates on -- on what we were building, and they would go back and forth with me, and we would go through details, and we would go through, you know, what's next, what build is next, you know, what's the next step, what Stripe account needs to be connected, HandCash account, XYZ. I mean it's so much, I really couldn't just -- I believe that my declaration explains my duties very clearly.

**Q. Okay. Are there any business or consulting -- are there any consulting or business development services that you say that you provided to nChain that are not described in your declaration?**

A. Possibly.

**Q. Okay. Let's just take a look then at Exhibit 31, please?**

A. 31?

**Q. Yes.**

A. Which one is that?

**Q. Your declaration.**

A. Okay. Yeah, okay. Exhibit 1.

**Q. Yeah. Just for the record, it's Exhibit 31 of your deposition. There is a cover page on it that says Exhibit 31.**

A. Okay.

**Q. That is just to give the lawyers a headache.**

A. Okay.

**Q. Okay. So turn for me if you would to page 3.**

A. Yes.

**Q. So it says, "Examples of directives I received from nChain included," let's start with A, it says, "leveraging Sound Alive's industry knowledge and experience to engage with multiple US record labels, executives and music distributors."**

**Do you see that?**

A. Yes, sir.

**Q. So who were the US record labels?**

A. Well, if you turn to -- let's see -- if you turn to the page -- I don't know if I listed the actual -- obviously, Orchard Sony, Feature FM. I mean, many -- many just independent indie labels and -- and such, but I mean, leveraging my -- my knowledge, it says, "experienced, engaged with multiple US record labels, executives and music distributors."

I mean, I don't remember it all off the top of my head. The list is long. I talked to a lot of people about DistroMint, and I went through my Rolodex and went through all of my contacts and made phone calls left and right.

**Q. Other than Orchard Sony and Feature FM, sitting here today, do you remember any other US record labels that you reached out to in connection with the DistroMint platform?**

A. Executives. But like I said, I -- I would have to refer back to my records. And I don't -- I think that, you know, name -- naming the obvious, obviously, and the ones that are listed in the -- in here. But, I mean, it's -- it's so many people. I mean, do I just need to -- I mean, I would have to refer to my -- to my records, honestly --

**Q. Okay.**

A. -- and go through any contacts.

**Q. So who were the -- who were the executives?**

A. I would have to refer. It's -- it's not -- I don't have a list of it in front of me right now.

**Q. Okay. So sitting here today, you just can't recall the names of any executives that you reached out to in connection with the DistroMint platform?**

A. No. I -- I would have to go through my records

because I don't have a list of it in front of me.
**Q. What about the -- the music distributors; who were they?**
A. Like I said, I don't have a list in front of me.
**Q. Okay. So you just can't recall the names of any of the music distributors, sitting here today; is that right?**
A. No. I -- I need a -- I need a -- to go through my records.
**Q. Okay. Let's look to B, "leveraging Sound Alive's musician network to engage with various artists to secure commitments to utilize DistroMint's services."**
A. Yeah.
**Q. You see that?**
A. Yeah.
**Q. So who were the names of some of the artists?**
A. I mean, that's in -- that's in the hundreds. There's no way I can just give you a list off the top of my head.
**Q. My question was just who were the names of some of them.**
A. I would prefer to refer to my records.
**Q. Sitting here today, you just can't give me the name of any of the artists you're referring to here in paragraph 10-B of the declaration?**

A. I mean, it's -- it's too long. The list is so long.

**Q. Okay. Let's go to C, "leveraging Sound Alive's reputation and network to amplify social media posts for nChain."**

**Just -- what did that involve?**

A. Basically, I -- I leveraged all of my social accounts and we retweeted and liked and shared media posts for nChain; nChain executives; Calvin Ayre, Christen Ager-Hanssen; Turkey Chop, who is Stefan Matthews; Ayre Ventures. Yeah. I mean, so much. I -- it's -- it -- the list -- it's another one of those things I would have to refer to records, I -- it's so much.

**Q. Do you remember any of the, you know, posts that you liked or retweeted?**

A. Yeah. I mean, anything pertaining to nChain, anything pertaining to companies that nChain was helping develop on the blockchain, anything pertaining to its -- its top people, speaking engagements, promotions, any marketing or PR campaigns, any articles about nChain, any articles about Christen, anything about DistroMint. I think we had two or three articles about DistroMint.

I mean, basically it's a day-to-day operation. Every day we amplify their posts because we have the

followers. And so we amplifying them every day. I mean, I do. That's -- that's my job, you know, as -- as an amplifier, as a -- as a -- I don't want to call myself a celebrity, but as a name in the industry and as somebody who has a large following, I utilize that to help grow the networks and the awareness around nChain and its subsidiaries.

**Q. Okay. Let's look at paragraph E --**

A. Yeah.

**Q. -- "planning for," quote, "road show engagements, publicizing DistroMint through speaking engagement and presentations, for example, at music schools."**

A. Yes.

**Q. What were some of the speaking engagements?**

A. Well, I was going to -- and it says "planning," so, you know.

The goal was to hit, you know -- we have a couple different schools here in Atlanta, including like Full Sail. And then we have a network of Full Sail schools. And then you also know that there's like the Berklee School of Music. My brother, Raydar Ellis -- Brian Raydar Ellis is a -- he is a professor at Berklee School of Music in Boston. So, you know, it's a pretty prestigious school, and of course I was going to reach

out to him and everybody in my Rolodex. I mean, once again, the list is beyond long. It's -- it's so much stuff. It -- I can't -- off the top -- I don't have like a list of it in front of me.

**Q. Just so I understand, the name of the school in Atlanta was -- what's it called?**

A. What do we have? I can't remember the first school, but there is a Full Sail.

**Q. Okay.**

A. Are you familiar with Full Sail?

**Q. Personally, no.**

A. Okay.

**Q. Did -- did you actually reach out to Full Sail?**

A. I was planning. Yeah.

**Q. Well, you were planning to reach out to them?**

A. Yeah, "planning for road show engagements, publicizing DistroMint through speaking engagements and presentations."

**Q. No, but you -- you were planning to reach out to Full Sail; is that right?**

A. No. I was putting together like my plans. Like I was putting -- stacking documents and lists of -- of venues and things of that nature where I was going to, you know, plan to do the engagements and so forth. But the platform never launched.

**Q. But did you get into any communications with the Full Sail school about road show event --**

A. You know, I can't remember. Yeah. I made so many phone calls.

**Q. Let's go to -- to subparagraph F, "Securing grants from Amazon Web Services and Microsoft Azure, approximately 176,000" --**

A. Yes.

**Q. -- "for hosting and development of DistroMint."**

**When was it that you secured these grants?**

A. This was around the time that nChain decided to renege on me. So this is me attempting to keep DistroMint alive, regardless of losing all my support. The time when you claim that I should have accepted that nChain had completely stopped working with me. So in -- at the same hand, while I was hopeful that we could fix something, I went ahead -- and I believe this was in October -- I got the thousand-dollar grant from Amazon Web Services for Dis- -- for DistroMint when I submitted the project idea and the pitch.

And then Amazon -- Microsoft Azure, they sent me a congratulations for a $25,000 Amazon Web Services media award, and then if I spent 12,500 of it within the first -- I think it was like the first 90 days or something like, that they would award me the other

150,000. It would unlock -- excuse me. Not award, but unlock. So I had to spend a certain amount of money. So I was desperately trying to get the source code for DistroMint so that we could migrate DistroMint from Amazon Web Services to Microsoft Azure because with $175,000 in credits, that would probably power the platform for like the next two or three years. That would cover the cost -- the hosting costs. Because that was the most expensive part of DistroMint, was the hosting.

**Q. You never paid for any of these credits, did you?**

A. No, never. And I announced them on my social. So you can check @therealesmitty and you'll see that I have the -- the date and time when I was awarded these and -- of course thanking Amazon startup -- AWS startups and thanking Microsoft Azure startups or whatever their -- their -- you know, Azure, whatever their handle is on socials.

**Q. Okay. Let's go to subparagraph G, "Building and developing the U.S. Social media following for DistroMint."**

A. Yes.

**Q. Actually, before I get there, just who -- who did AWS and -- and Azure give the credits to? Was it**

**you or Sound Alive?**
A. They gave it to DistroMint, because I applied from info@distromint.com.
**Q. Okay. Is there -- is there any documentation of -- of these credits?**
A. Yes. I -- I told you, screenshots of the -- of the congratulations from them, from the -- from AWS and from Microsoft Azure.
**Q. Okay. Let's go back to subparagraph G, "building and developing the U.S. social media following for DistroMint."**
A. Yes.
**Q. What -- just what did that entail?**
A. Starting from zero and building "@DistroMint," the handle on X, Twitter. I'm really big on X and Twitter. That's my favorite social platform. But, you know, that was mainly the focus, and I think we got it to somewhere around 3,400. It may be more than that. I don't know. The account still exists and it's still growing.
**Q. Okay. Any posts in particular that you remember making in 2023?**
A. Oh, yeah.
**Q. Okay. What are some of those posts?**
A. Just posts kind of sneak-peeking DistroMint and

then talking about the platform and sharing the pitch deck. And we also ran a Rap Hennessy Challenge where we gave away, I think, 5 microphones, a 750-milliliter bottle of Hennessy, and a Neumann clone microphone, so like a really nice mic, like a $1500 mic, and a bunch of smaller mics for smaller prizes, and the big bottle of Hennessy, a pint of Hennessy. And basically what we did is we created a contest where I created a custom beat and then I engaged artists. I said, Hey, you know, download the beat, give me your best freestyle, post it under this post, and, you know, 1, 2, 3 and -- and honorable mentions will receive these prizes, X, Y, Z.

It was called the DistroMint Rap Hennessy Challenge, and it did really good. We got some hundreds of submissions. We got tons of engagement. We created thousands of impressions and clicks for -- for DistroMint and for nChain. And then we also -- we gave away some cool prizes. And I think the top prize was $500 plus the -- the -- the 750-milliliter Hennessy bottle.

And, really, what it was is the artists came on and they would just do a freestyle about Hennessy because they're trying to win the -- the drink or whatever. And then at the same time, I was trying to catch Hennessy's attention and get them to partner with

us. You know, DistroMint, Hennessy, I felt like that was a cool brand that would -- would bring a lot of eyes. So, I mean, it did bring a ton of eyes to us.

And, actually, the beat was downloaded, I think, a million times on SoundCloud. Downloads. Oh, wait. I -- I think it got a million plays, maybe 2 million plays. I don't know how many downloads it got, though. So -- so scratch that. But it's on the Sound -- I believe it's on Sound Alive Records' SoundCloud, the Rap Hennessy Challenge.

And then we -- we were going to do a Crown Royal challenge and -- and do the same thing.

But, yeah, I mean -- yeah, we -- we -- I created several viral posts for DistroMint, like several, and just kind of documented it along the way, showing my fans and showing my followers all the progressing, you know, sneak peeks at the site, what the artist dashboard would look like, things of that nature.

**Q. Okay. Let's look at sub paragraph H --**

A. Yes.

**Q. -- "negotiating with advertising firms regarding U.S. billboard advertising and other advertising media, including in Times Square."**

A. Yes.

**Q. See that one?**

A. Uh-huh.
**Q. Who were the advertising firms?**
A. I don't know their names off the top of my head. I can't remember, but we talked to a number of them and, yeah, we were talking about Times Square, like large-format billboards, digital billboards, and then we were talking about bus stops, and then we were talking about the -- you know, in Manhattan downtown, you know the little, small advertising boards, yeah, we were talking to companies that basically rented those out.
**Q. Okay.**
A. And then on the highway, on Highway 85 and Highway 485 in Georgia, we talked to a couple companies about doing the billboards. And then, of course, we were going to do the -- we were going to do a DistroMint Hummer, and we were going to do, I think, a DistroMint Sprinter or something like that. We were going to wrap it with the DistroMint, and then have drivers driving those vehicles around in Atlanta just every day just kind of -- to onboard users and, you know, make it real big.
**Q. You never actually took out any of the billboards, though, right?**
A. No, we did not take any billboards out.
**Q. And you did not do the Hummer or Sprinter?**

A. No, we didn't.
**Q. Okay. And then sub I, "Engaging firms for DistroMint social media management, marketing, funnel building and fundraising."**
A. Yes.
**Q. Do you see that one?**
A. Yes.
**Q. Who were those firms?**
A. Let's see, Jack Lopez of Marketing 360. So Marketing 360 was one of the -- of the firms. And there was another one that you probably see all the time on -- on Facebook -- no. Yeah, on Facebook. They have an advertisement. Let's see. Continue negotiations for six months' viral marketing campaign for DistroMint, yeah. Then the A&R hirings. So I -- you know, basically interviewing all these people who I put -- I put a job listing on LinkedIn, and then I spent, you know, quite a bit of time interviewing candidates and bringing some A&Rs on board.
**Q. What is an A&R?**
A. Artist and repertoire or artist relations, yeah. Basically, you know, an intermediary between a platform and the artist, so somebody who understands music and understands the artistry of music, and they can go and recruit the artists and bring them to the platform, and

they can also vet them, you know, so we're not like bringing, you know, trash artists on the platform and all that.

Now, of course, the artists that I bring to the platform are going to be legitimate because I only work with the best of the best. So that's why I said off gate, I can't tell you every single name. You could go on my Sound Cloud, and you could look at -- at the list of artists, and it's hundreds, and go on my Wikipedia page, which has not even been updated since 2017. And my Sound Cloud is Sound Cloud/Sound Alive Studios.

And I mean, I've got, you know, tens of artists up there. So, of course, any artist that I worked with, any artist that took interest, and then, of course, we had people hitting us up all the time on X, on DistroMint X, on Sound Alive Records X and, you know -- and actually, that's how I met Susan Welch, was through her hearing about me talk about DistroMint in a YouTube podcast or something like that. I don't know. I was on some show.

**Q. And if we were going to go on to your Sound Alive --**

A. Yeah.

**Q. -- Records, Sound Cloud account, where would we find the artists listed? Where on the page?**

A. No. If you go on -- on Sound Cloud/Sound Alive Studios.
**Q. Yes.**
A. Yeah, the artists' names are listed. The names of the artists and then the song. Should have about 5,000, 600 followers or something like that on Sound Cloud.
**Q. Okay.**
A. I mean, I -- I reached out to everybody, whether they got a phone call or whatever or I hit them up on X or Facebook or wherever. I reached out to a ton of people, and my network in music is vast because that's what I do.
**Q. All right. Let's look at -- turn to paragraph 19 of the declaration.**
A. Sure.
**Q. It said, "On May 30, 2023, nChain paid for me via Sound Alive to visit London and host a panel discussion during the London Blockchain conference," right?**
A. That's true.
**Q. And it probably goes without saying that that was in London that you did that, right?**
A. What?
**Q. That was London that you attended -- you went to**

**London to do this blockchain?**
A. Absolutely, yeah, and I met -- met directly with Christen, Roman. I met with Urban, Luca, our head DevOps. I met Calvin Ayre. I briefly met Craig Wright. We just kind of darted eyes at each other because he had blocked me the first day that I became a part of the BSV community.
Stefan Matthews, I met him. I met Dale in London. I'm trying to remember. It was so many people. I shook hands with, like, I don't know, at least 500 people in London.
**Q. Okay. And --**
A. However --
**Q. -- how long was that trip, by the way, if you remember?**
A. I went -- I left on a Tuesday, returned on a Thursday. I did not want to leave my wife with the baby because we had a three-month-old, four-month-old baby. I also didn't want to mingle and go to their parties. And I had gotten invited to a bunch of parties and stuff, and I was just like, "No, I'm not going. I'm here for business."
**Q. Okay. Let's go to paragraph 21.**
A. Yep.
**Q. So then June 27, 2023, "To advance our US**

**venture in DistroMint, as well as earn the Sound Alive consulting fee from Lawrenceville, Georgia, I wrote, edited and published an official press release to over 139 newspapers and publications in the Greater Atlanta area and nationwide, including PR News Wire, Yahoo Finance --**

A. Financing.

**Q. -- Financing, Benzinga and other top AP news agencies covering DistroMint."**

**How -- how long did you spend working on that press release?**

A. I think I -- I think I spent at least -- I would say at least a day writing it and perfecting it, and at the time, we didn't have AI, so I couldn't just throw it in to the AI and say, you know, correct it. But at the same time, you know, getting it out to everybody, that was quite an effort.

So a lot of -- a lot of submissions and e-mails, and then getting the actual placements and getting the placements on Yahoo Finance, PR News Wire, Financing, Benzinga, and some AP news agencies to cover DistroMint.

The article, E. Smitty, Serial Record Producer/ Mixologist/Blockchain Inventor Patents the "Solution" That Will Change the Music Industry Forever, and, you know, that was at the suggestion of the editors, and the

article basically talked about me speaking at London Blockchain, and talking about how, you know, I'm working with nChain, and they're my partners, and DistroMint is our project that we created and, you know, this is sponsored by Calvin Ayres, whatever, Sharks agency.

At the time we were actually -- me and Calvin were kind of building, so things looked kind of good and, you know, I'll be honest with you, I -- I enjoyed London.

**Q. Okay. Let's turn to paragraph 23 and 24.**

A. Yeah.

**Q. And we will start with 23. "In August 2023, nChain continued its US efforts to develop and promote DistroMint with me via Sound Alive, engaged in at least another five meetings. By August 4, 2023, to advance our joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, I met with Solo Pedres of --**

A. Padera.

**Q. -- Padera -- I'm sorry -- "I met with Solo Padera of Rolling Stone to discuss an article to be published in Rolling Stone from a collaboration with his app, Calaxy app."**

A. Yeah.

**Q. Okay. How long was the meeting with Solo on August 4, 2023?**

A. I don't recall. We probably talked for at least 30 minutes, maybe 45.

**Q. Did you ever end up publishing an article in Rolling Stone?**

A. No, because the platform never launched, and that was the main key. He's a writer. Well, this guy right here, Solo, he's of the Hedera Hashgraph. So they are not a blockchain; they're a Hashgraph. And Hedera is where he built his platform, which is basically called Calaxy app. I think it's like a tokenized version of social media or -- or Twitter, but he raised $70 million, which is pretty impressive.

So I was kind of -- I was telling -- I was meeting with him, and then also his best friend, who is a San Antonio Spur, something like that, and we were just talking about how we could -- he told me he was very interested in my build, which is DistroMint, and was like, you know, "I'm writing a tech section in Rolling Stone." He was like, "So when you guys launch, I would love to feature you in an article and talk about the -- you know, the DistroMint platform because we think it's really cool," you know, things of that nature.

And then just getting general advice from him because he is a founder that, you know, raised

$70 million, that's pretty impressive, you know what I mean?
**Q. Okay. And you never actually went through with the collaboration with Solo's app, Calaxy app?**
A. Yeah, because he said he could not write about a project that never launched.
**Q. On the next paragraph, "On August 28, 2023, to advance our joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, I met with Jack Lopez of Marketing 360 to discuss a six-month trial of a marketing campaign for DistroMint."**
**How long was the meeting between yourself and Mr. Lopez on August 28th?**
A. I don't recall how long the meeting was. It was pretty long.
**Q. And how did you conduct that meeting?**
A. It was a Zoom call. Zoom or Microsoft or Google Meet.
**Q. Okay.**
A. Zoom or Google Meet. I can't remember.
**Q. And let's go back to the meeting with Solo.**
A. Yeah.
**Q. How did you conduct that meeting?**
A. Same way. All my meetings that I'm able to, like, recall, not all my meetings, but a lot of meetings

that I am able to recall, I recall them because I can recall a face, and I talk to a lot of people. Sometimes you forget because phone conversations are a little different.

**Q. Okay. And just a couple more, and then we will take a break.**

A. Okay.

**Q. Okay. So the next paragraph, paragraph 25 states, "In September 2023 to advance our joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, nChain continued its US efforts to develop and promote DistroMint with me via Sound Alive engaging in at least another five meetings.**

**"On September 12, 2023, to advance our joint US venture in DistroMint, as well as earn the Sound Alive consulting fee, I met with Brandon Hansen, CEO of Marketing 360 to discuss a six-month viral marketing campaign for DistroMint."**

**So let's stop there for a second.**

**So how long was this meeting with Mr. Henson on September 1, 2023?**

A. I don't know, maybe 30 minutes to an hour. Same, you know.

**Q. And that was also a --**

A. Google Meet or a Zoom, yeah.

**Q. And you mentioned a six-month viral marketing campaign that you discussed with Mr. Lopez and Mr. Henson, like what would that viral marketing campaign entail?**

A. So we were going to give them $20,000 and allow them to create all the social media assets and run DistroMint social on X, on Instagram or Meta, so that would be Instagram or Facebook, and -- and create the assets every day weekly, and just let them build it, let them run it.

So it would be something that, you know, while I'm handling, you know, the development side of things and the, you know, the business side of things, I have some extra help, some firepower. So I mean, like, at this point, like, at this culmination, I am anticipating, you know, that we're going to launch eventually or I'm thinking it would have already been launched, but to ramp things up, and I was trying to get Christen to get excited.

So I did a lot more -- you know, we were doing a lot of things because we were anticipating the launch of DistroMint and, you know, it never launched.

**Q. The next paragraph, "September 8, 2023, to advance our joint U.S. venture in DistroMint as well as earn Sound Alive consulting fee, I again met with Jack**

**Lopez of Marketing 360 to continue negotiations for a six-month viral marketing campaign for DistroMint."**

A. That's correct.

**Q. Approximately how long was that meeting on September 8th?**

A. I don't recall, but I believe somewhere in the half an hour to hour range. Somewhere in there.

**Q. Okay. And that was also --**

A. A Zoom, yeah, or a Google Meet.

**Q. Okay. And you discussed the same subject matter with Mr. Lopez on the September 8th call that you discussed with Mr. Henson and Mr. Lopez on the other calls --**

A. Yeah. Yeah, yeah. Let me see. I think Jack was doing a follow-up, and I was basically telling him how -- you know, I was giving him instructions on how, you know, we would make the payment or how I wanted him to invoice us or whatnot.

MR. RUOCCO: Okay. All right. Let's take a break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: The time is 1:04 p.m. We're off the record.

(A luncheon recess transpired.)

THE VIDEOGRAPHER: The time is 1:40 p.m.

We're on the record.
BY MR. RUOCCO:
**Q. Welcome back, Mr. Finnerud. We're still on Exhibit 31 --**
A. Yes, sir.
**Q. -- which is your declaration. If you, on page 8, could look for me at paragraph 27.**
A. Yes.
**Q. It states, "On November 17, 2023, to advance our joint U.S. venture in DistroMint as well as earn the Sound Alive consulting fee, I met with several A&R candidates on behalf of DistroMint to interview and screen A&R hirings for DistroMint."**
**Do you see that?**
A. Yeah.
**Q. And by November 17, 2023, nChain had communicated to you that it was halting work on the DistroMint platform, correct?**
A. Yes.
**Q. Okay. And do you recall who some of the A&R candidates you met with were?**
A. Not off the top of my head. But I was meeting with around, I would say, anywhere from two to five candidates every day or every other day, so a pretty busy time. I also referenced the LinkedIn

advertisement.
**Q. And -- and what would your meeting with the A&R candidates entail?**
A. Basically just explaining the platform, showing them the platform, explaining the duties that I would need them to -- to carry out, and then, you know, getting information about them, their music business experience, you know, have -- who they've worked with and how many artists in their capacity have they worked with, X, Y, Z, things of that nature.
**Q. Okay. So if you look back -- look down to -- to paragraph 28, it said, "On November 21, 2023, to advance our joint U.S. venture in DistroMint as well as earn the Sound Alive consulting fee, I met with several A&R candidates on behalf of DistroMint to interview and screen A&R hirings for DistroMint and Sound Alive." And then if you turn to paragraph 29 --**
A. Yep.
**Q. -- it says similar thing. It states, "On November 24, 2023, to advance our joint U.S. venture in DistroMint as well as earn the Sound Alive consulting fee, I met with several A&R candidates on behalf of DistroMint to interview and screen A&R hirings for DistroMint and Sound Alive."**
**You -- you mom- -- you mentioned a moment ago**

**that you met with, you know, approximately two to five**
**A&R candidates per day. When you say "per day," do you**
**mean each of November 17th, 21st and 24th?**
A. Yes.
**Q. Okay. And how did you conduct those meetings?**
A. Zoom, probably Google Meet. So I have a
them the link and then they schedule their meeting.
**Q. Okay.**
A. Yeah.
**Q. And then if we turn to paragraph 30, it states,**
**"On November 28, 2023, to advance our joint U.S. venture**
**in DistroMint as well as earn the Sound Alive consulting**
**fee, I reached out to SSBCI capital programs on behalf**
**of DistroMint to negotiate a strategic partnership.**
**Later that day, I met with Jeanette Borzon of Feature.fm**
**to discuss getting Feature.fm API functionality to**
**DistroMint."**
**So just take them in -- in parts. So what did**
**the outreach to SSBCI capital programs entail?**
A. I don't recall that meeting. I would have to --
I'd have to look that up one more time. My mind is
drawing a blank on that one.
But Jeanette Borzon of Feature.fm, discuss
adding the Feature.fm API functionality to DistroMint --

Feature.fm is basically -- they're like a record label, but they're a major -- I'll put it to you like this: They designed the original -- or they added features to the original dashboards of the major record labels, and basically they do metrics and they do like analytics and so forth. So you can see what platforms you're streaming on and, you know, get -- get analytics on your music, who it's going to, social media posts, you know, plays, spins on YouTube, X, Y, Z, just kind of conducting that type of -- of activity. And, basically, in order to use Feature.fm, you either sign up for it or the -- you can add it as an API, which would be just an -- a addition to the DistroMint dashboard.

**Q. Okay. Before the meeting on November 28, 2023, did you have any other meetings with Feature.fm?**

A. I believe I did.

**Q. Did those meetings relate to DistroMint --**

A. Yeah.

**Q. -- the DistroMint platform?**

**Okay.**

A. And first -- at first I met with Jeanette. Then I met with their CEO. And I was basically attempting to do like a partnership with DistroMint and Feature.fm just because I felt like their company could benefit from working with us because of our platform, we -- our

dashboard and everything that we were doing.
**Q. And what's the earliest you recall meeting with anyone from Feature.fm?**
A. Let's see. You know, I don't remember. But it may be in this document here somewhere.
**Q. Okay.**
A. Yeah, but I know we had -- we had a couple of meetings and -- two with Jeanette and then one with the -- with the CEO. I don't remember his name. It may be in here somewhere.
**Q. Okay. How long did the November 28, 2020, meeting with Ms. Borzon last?**
A. Probably 30 minutes or so.
**Q. And did you conduct that one by videoconference too?**
A. Yes.
**Q. All right. And then the next paragraph, paragraph 31, states, "On December 1, 2023, to advance our joint U.S. venture in DistroMint as well as earn the Sound Alive consulting fee, I met with Forecastr," which is spelled F-O-R-E-C-A-S-T-R -- "to discuss integration with DistroMint," right?**
A. Yeah.
**Q. Okay. And do you recall who from Forecastr you met with?**

A. No, I don't. But I believe it would be in my records.

**Q. Prior to December 1st, 2023, can you recall any other meetings that you had with -- let me ask you a better question.**

**Do you recall having any meetings with Forecastr before December 1st, 2023?**

A. I don't believe so. And I do believe that they were a company that came from my Microsoft Azure grant, so a company that was part of the perks. Was like connecting with a bunch of different companies to help your startup.

**Q. Okay.**

A. Yeah.

**Q. And how -- how long, approximately, was the December 1st meeting with Forecastr?**

A. Maybe 15, 20 minutes.

**Q. Okay. And how did you conduct that meeting?**

A. It was -- it was a Zoom or a Google Meet.

**Q. Okay. And then paragraph 32: "Further, in 2023 I conducted in-person meetings with various high-profile community members of the blockchain network Bitcoin Satoshi Vision. I met with an individual from BSV 1Sat Ordinals in Marietta, Georgia, to promote DistroMint."**

**So let's stop there. Do you recall who this**

**individual from 1Sat Ordinals was?**

A. I'm trying to remember. I don't remember.

**Q. Okay. What is BSV 1Sat Ordinals?**

A. It's some sort of a -- so 1Sat stands for like 1 Satoshi and ordinals means like the first guys to do it or something like that. I mean, these are like OG BSV people. They're like hardcore Bitcoin guys.

**Q. Okay. Is -- is BSV 1Sat Ordinals like an organization?**

A. They're like -- like an NFT gang or something like that, yeah.

**Q. Do you understand them to be like a formal company or entity?**

A. Just a very popular and large community in BSV.

**Q. Okay.**

A. Like they -- they hold a lot of clout in BSV. So, I mean, any -- anybody in the BSV community that -- that holds a lot of clout, has good following and, you know, is popular, if they're going to agree to -- if they're going to agree to work with you or whatnot, then, you know, they're going to bring the BSV community in. And obviously we wanted that, you know, because we built DistroMint on BSV.

**Q. Okay. And do you recall approximately when in 2023 you met with this individual from BSV 1Sat**

**Ordinals?**
A. I don't remember.
**Q. Okay.**
A. I just know he was based in Marietta, Georgia. Yeah.
**Q. Do you recall about how long that meeting lasted?**
A. Probably 30 minutes.
**Q. And with this meeting with this individual from BSV 1Sat Ordinals, would that have also been over a video -- videoconference?**
A. Yes.
**Q. The next sentence in your declaration here, it states, "I met with an individual from the BSV Association to discuss the DistroMint," quote/unquote, "party bus for an event in Seattle."**
**Is -- is the BSV Association a formal organization --**
A. Yes.
**Q. -- or entity?**
A. Yeah.
**Q. Okay. And are they based in Seattle?**
A. He was based in Seattle. And the association -- I'm not sure where BSV Association is based, but I do know it's owned -- it's another Calvin Ayre company.

**Q. And do you recall when in 2023 you had this meeting from the individual with the -- with the BSV Association?**

A. I can't remember. I think we met a few times, and I also met him in London, like, he was one of the first people to shake my hand, him and Kurt Wuckert.

**Q. Do you remember this person's name?**

A. Yeah. Gosh, I'm trying to remember right now. You know what? If I -- I can check my records and -- and I would -- I would remember it, not off the top of the head. He's big -- big guy, a really big guy with a cowboy hat and a big beard. I'm trying to remember. Not Brad, you know, and I don't want to just guess. It's been a while. And he was one of the main people that started attacking Christen online when Christen got fired. So I kind of -- I stopped talking to the guy.

**Q. Okay.**

A. Yeah. I was -- I was a little -- I was just confused about that.

**Q. The next sentence states, "I met with another individual from the BSV Association about speaking in an upcoming convention in Atlanta, Georgia to promote DistroMint."**

A. Yeah.

**Q. Do you recall who this individual from the BSV**

**Association was?**
A. She was a woman. I met her. Well, she -- she reached out to me on LinkedIn. I don't recall her name, but she did want me to come to a convention in Atlanta, and then she connected me with another gentleman, whom I don't recall as well because I meet so many people, an African-American gentleman who was holding the convention, and he wanted to bring me in as a speaker, and I actually -- I just -- I ended up not showing up because I felt kind of sketch about the lady.
I was kind of starting to put the picture together about how they got two opposing sides here in the -- in the nChain BSV community, and it's kind of like, you know, one side is Christen Ager-Hanssen, the other side is Calvin Ayre, and then you seen the connections that all these people have and it just, you know, kind of spooked me out a little bit.
**Q. Do you recall when in 2023 you had this meeting with the individual from the BSV Association regarding the convention?**
A. I don't recall when, but I believe it was on or near around the time that nChain breached the agreement.
**Q. Did you ultimately speak at this convention?**
A. No, I did not. Yeah.
**Q. Last --**

A. I was asked to. I -- I didn't show up.

**Q. I also -- the last sentence of this paragraph states --**

A. Yeah.

**Q. -- "I also conducted an interview with the BSV miner to discuss nChain and DistroMint."**

**Do you recall who this BSV miner was?**

A. Well, there's a couple of them. Kurt Wuckert, and he has a show called CoinGeek, which is Calvin Ayres's media arm, and Kurt Wuckert is the -- I guess he's the main host or the person. He also has GorillaPool, which is a mining company. So I've done several interviews with Kurt.

**Q. And is Kurt Wuckert the BSV miner that is referenced here in the last sentence of paragraph 13?**

A. Yeah. Yeah. And I did more than one interview. I did quite a few interviews with him.

**Q. Do you recall approximately when you did the interviews with Mr. Wuckert?**

A. I would say the first interview was somewhere in the spring when we had kind of already built the MVP, and so we discussed DistroMint, and then I had another meeting or another -- another interview I believe where or we had a -- we had a communication where he was reporting -- and because CoinGeek is an actual -- a news

site, so it actually indexes in the news on Google.

I was rectifying -- or I was clarifying to him that, you know, I don't have anything to do with the -- the Christen Ager-Hanssen saga or whatever, and yes, we were business partners, but, you know, I'm not Christen's -- I don't know what -- what they were trying to say.

They were saying something crazy about me, and so I went in there and he was saying, you know, Smitty is not really a blockchain guy and blah, blah, blah. He was just reporting something, and I went in there and clarified it. And, yeah, I mean, I've had a few words with Kurt, but nothing crazy over the past year or so.

You'll see him. He's the host of CoinGeek, bald-headed guy from Florida, and he's got the -- he's got, like, a Bitcoin building. Well, BSV building in Florida where the Citadel or something like that, something like that, whatever they call it.

**Q. Okay. Aside from things that you testified about in your deposition or in this declaration that you submitted to the Court, are there any other tasks that you performed that you considered to be consulting and business development services for nChain?**

A. So many to list. Yeah, there's plenty more.

**Q. Can you name some of them?**

A. Yeah. You know, just if we circle back to, you know, the -- the amount of contacting that I did, I mean, and promoting too, I have tens of thousands of artists in my network. So I would write, you know, a great deal of these artists individually, and I would also make sure to contact them, whether it be phone calls or e-mail or whatever.

I mean, there's so many different ways, and I promoted to, you know, my network of artists, like I said, tens of thousands of artists, obviously, the whole purpose of DistroMint, the way we were going to make money wasn't going to be off of just revenue. I think the revenue-based idea would have -- I don't think Christen would have agreed to terms with me if I had based it on revenue.

I think the bigger idea is that DistroMint is -- is an actual dashboard, and it's a utility that can be used by large record labels and distribution companies or licensed to them, and that's where the value of DistroMint is.

So I mean, I never expected to onboard, like, you know, 1,000, 2,000, 5,000, 10,000 artists and think that, you know, revenue alone was going to make DistroMint work. DistroMint for me was the idea of having the intellectual property, the patent, and the

platform and the dashboard, you know, and that's what made it so valuable, and I think that's where the real value in it is, you know, they say, you know, especially when it comes to tech start-ups, your -- your startup is only worth pre-revenue. As soon as you make revenue then, you know, it kind of devalues the platform.

So, yeah, I mean, despite, you know, wanting to spread the word and all my efforts that I did, you know, the long game for me was to, you know, the exit game where we either licensed the -- the patent and the platform to other major corporations and companies, record labels, distributors, XYZ, and the technology and such because it could apply to a number of different medium. So that's where -- you know, that's -- that's where I stand.

**Q. Okay. I mean, now having given that response --**

A. Yeah.

**Q. -- is there anything else that you consider to be consulting and business development services that you provided to nChain that you've not identified here in your deposition testimony or in that declaration that you submitted to the Court?**

A. Yeah, I mean just hours of day, hours and hours and hours every single day that I spent focused on, you know, activities as described, and similar activities as

described in my deposition and in this document here, my declaration and such.

Could I refer to my records and give you, like, some more names and so forth? Absolutely, you know, if necessary. You know, I -- I really just lived this, you know, I lived it the entire time I was in it, and probably a year after, I was still living this, and this is like every day for me. So I mean, when there wasn't a moment or time when I wasn't working on this unless I was, you know, hugging my wife or kissing my kids on the head.

**Q. Just take a look at Exhibit 1, which is the -- yeah, it's the Sound Alive 30(b)(6) notice page 12, Topic 26.**

A. Yeah.

**Q. It's the service performed by Sound Alive for nChain UK.**

**Do you see that?**

A. Yeah.

**Q. Do you understand that you're Sound Alive's 30(b)(6) witness on that topic?**

A. Yes.

**Q. Are you prepared to testify about that topic?**

A. Yes.

**Q. Sound Alive doesn't contend that it performed**

**any services for nChain other than the ones you say that you performed personally, right?**

A. I can't in good faith say that -- that -- so much to it, you know?

**Q. But you're the only owner have Sound Alive, right?**

A. Yeah.

**Q. Okay. And no one else works at Sound Alive but you, right?**

A. No. But I hired, like, micro, if you want to call it, micro freelancers and so forth, and input different variable softwares and things of that nature to, you know, kind of assist in running things and making things bigger.

**Q. Okay. Who were the micro freelancers?**

A. So just various people who I don't know from India off of various platforms that I would use.

**Q. Where did you find them?**

A. On platforms, like on freelancer platforms such as, like, Fiverr and Zeerk, Like4Like and YouLikeHits, and things of that nature.

**Q. What did you use them for?**

A. Mostly for just social media and advertising, marketing services, things of that nature.

**Q. And what were some of the social media and**

**advertising and marketing services that they performed?**

A. In terms of helping boost and grow the interactions, impressions and things of that nature.

**Q. And how would they help boost the interactions?**

A. Just through their expertise. And then using a system of points at times, we could use, like, a barter system where you buy an amount of points, and you, you know, support someone else's or subscribe to their channel or like something.

I mean, it's a tedious process, and it takes hours and hours and hours and hours, but, you know, if you want to get that interaction up, and you are talking about a platform that never launched and, you know, social media that's, you know, in its infancy stage that we're building and we are also trying to grow things, so -- you know, on top of utilizing my network and then putting some power behind it, you know, some Twitter advertisements, things of that nature.

**Q. What were the -- were there any specific companies that you reached out to for the freelance work?**

A. Not specific companies, just freelancers, independent freelancers.

**Q. And how would you get in contact with the independent freelancers?**

A. Just do it through the platforms that I mentioned.

**Q. Which were what?**

A. I mentioned Zeerk, and I mentioned Fiverr, Like4Like, YouLikeHits.

**Q. Do you have documentary records of this?**

A. Yes.

**Q. You produced them all in discovery?**

A. I don't believe -- I really can't recall, honestly, and I don't know how I would -- I would produce some of those records because some of these accounts that you -- you buy an account and you're not actually connected with the person. You're just -- you know, you're purchasing the points or you're -- you're supporting -- you're using an account in YouTube or Facebook or Instagram, and you're administering, like, a like or a retweet or repost or whatever, and then you earn points. And then you barter those points, like you say, "Well, I have this certain service I need done. I need this post reposted on those platforms. I need this post liked on these platforms."

Are you okay?

**Q. No, I am fine. Keep going.**

A. And, you know, upload the URL of the post, and then folks can earn points, and you put a point value on

it and say, "Okay. Well, you are going to earn ten points if you do this task for me." And then boom, boom, boom, and then that just -- it runs itself.

**Q. So you didn't pay any microfinances [sic] in cash, right?**

A. Sometimes. But it would -- it would be converted into cash onto the actual platform. So like a platform like Zeerk, you upload Bitcoin or you upload, you know, PayPal or whatever, you know -- I try not to use a credit card -- and you upload a dollar amount, and then they have cash on the site which they can -- you can then use to purchase service, you know, like a freelancer service, marketing service or whatever. And then at that point you give them the instruction, you give them the URL, whatever they need to do, and then they do the service and -- and that's done.

**Q. And what were some of the like specific things -- let me ask this: What were some of the specific things that you had micro --**

A. Freelancers?

**Q. -- freelancers do --**

A. Yeah.

**Q. -- with regard to the DistroMint platform?**

A. So some of the things that -- that we would do is basically, you know, like I explained earlier,

reposting, liking, social media management, amplifying posts. They're called back links, which are basically adding URLs into Google search engine, you know, to amplify a particular post. So like if I wanted a publicity campaign that I ran for DistroMint, I want it to -- all that to start showing up on the front page, then we would do some back links.

**Q. Is -- look at your -- at page 4 of your declaration.**

A. Page 4 of my declaration?

**Q. Yes. That's paragraph -- Exhibit 31.**

A. Yes.

**Q. Okay. So it says -- this is in paragraph 10. So we start with 10-C, "leveraging Sound Alive's reputation and network to amplify social media posts for nChain, such as @nChainGlobal on X."**

A. Yeah.

**Q. And then look at subparagraph G, "building and developing the U.S. social media following of DistroMint."**

**Is the work you did with micro --**

A. Micro freelancers.

**Q. -- freelancers any different than the items that you described here in points --**

A. Yeah.

**Q. -- C and G?**

A. Yeah, it's different, because, you know, we were paying out these micro freelancers to -- to do the work, on top of the work that I was doing to -- you know, leveraging my reputation and my social network, which is -- you know, when you combine my X account, which has -- I think we have 169,000 followers on that. At the time DistroMint was out -- we were working on that, I think I was around 180 or 175,000. And then I also utilized my record distributor or my record label, Sound Alive Rec, to repost and retweet a lot of -- well, anything that I repost and retweet, I do it on -- on -- on that account, as well. And that was 80,000 followers.

And then we had the DistroMint account, which was at 3,000 and change. Then we had like -- at that point, I think we were at 8,000 followers on Instagram, 17,000 followers on Facebook. I think we had a combined 190,000 on ReverbNation. SoundCloud combined was about 7- or 8,000. And YouTube, we had 13,000 subscribers, somewhere around that ballpark.

So, I mean, you start adding everything up -- my LinkedIn, I've got like 13,000 followers there, as well. I mean, you start adding up everything, adding up all the socials, and it's a -- it's a grand number. So, I

think it's close to a half a million, you know, our reach.

**Q. So other than the testimony you've given today, including that testimony about the micro freelancers, and the things stated here in your declaration, are there any other consulting and business development services that you or nChain say that you provided -- strike that.**

**Other than the testimony that you just gave regarding the micro freelancers, the other testimony you've given over the last two days, and the contents of the declaration you submitted in this case, is there any other consulting and development services that you or SoundCloud assert you provided to nChain?**

A. Sound Alive. You said SoundCloud.

**Q. I'm sorry.**

A. Yeah.

**Q. I'll -- let me ask the better -- the right question, then.**

**So other than the testimony you just gave about the micro freelancers, the other testimony you've given over the last two days, and the contents of your declaration that's submitted in this case, is there any other consulting or development services that you or Sound Alive say that you provided to nChain?**

A. Yeah, there -- possibly, yes. I don't want to say there isn't because that's not everything in my entire memory. I would have to go back and, you know -- so, I mean, yeah, it's possible that there could be quite a bit more. I mean, I'm not remembering every single detail because it's -- this is, you know, three years ago.

**Q. Okay. But you've -- you've told us about all of the consulting and business development services that you and Sound Alive say that you provided to nChain that you can remember?**

A. That I can recall, yes. Yes.

**Q. Okay. Okay. Okay. We're back in Exhibit 37, please.**

A. Okay.

**Q. And if you'd turn with me to the page ending in 191.**

A. 191?

**Q. Yes.**

A. Okay.

**Q. And let me know when you're there --**

A. 191, I don't know where that is. Okay. 191?

**Q. Yes.**

A. Okay.

**Q. Okay. Do you recognize this document?**

A. Yes, I do.
**Q. And what is it?**
A. This is an invoice to nChain for a approved expense.
**Q. Okay. And did you prepare this invoice personally?**
A. Yes.
**Q. And did you submit this invoice to nChain on May 2nd, 2023?**
A. On or around. I'm not sure because they -- they -- the way that they processed payments was very bizarre and it was very random. So I didn't know when I was actually going to get the payment.
**Q. But did -- and your side, on the Sound Alive side, did you submit this invoice on --**
A. Yes. It was -- it was probably -- at -- the date says here on the date -- okay. Due date on the 3rd, blah, blah, blah.
I submitted it -- like any payments that you see here were submitted on those dates. When they were paid out, that's up to nChain. They had a very random system -- payment system and, you know, I don't -- I didn't expect it -- or expect to know when it would be paid, honestly.
**Q. And here in the first line is travel expenses**

**Atlanta --**
A. Yeah.
**Q. -- to London, May 30th to June 1st, 2023. Do you see that?**
A. Uh-huh.
**Q. And there's a charge for $3,434.25. You see that?**
A. Yes.
**Q. And what were those travel expenses?**
A. That's the flight -- roundtrip flight on Delta from Atlanta to London Heathrow Airport, and back from London Heathrow to Atlanta. And the actual cost was probably more like 4,000 and change, so, yeah, that number is incorrect. I actually undercharged them or whatever. I ended up paying more. And due to that, I stayed -- I think I stayed at -- I can't remember the name of the hotel, but the hotel was -- I sacrificed on the hotel. And I also stayed by the airport. I was supposed to stay at the Conrad for one night, which is, you know, a pretty nice hotel. Because I had planned on staying for some days through the week, but my wife convinced me -- she said, You just need to come home. And I said, Cool.
**Q. But you did expense nChain for the -- for the Conrad Hotel, right?**

A. Yeah. I also expensed them for a flight that didn't -- that costed [sic] a lot more than the -- the value here.
**Q. Okay. And how did you pay for the flight?**
A. I paid for the flight -- I believe I paid with a debit card online.
**Q. And what account was the debit card connected to?**
A. I believe it was connected to the Sound Alive Enterprise account.
**Q. Okay.**
A. Yeah.
**Q. So if we were to look at the statement balance from May of 2023, it would reflect the amount you actually paid for this flight?**
A. Yeah.
**Q. Okay. Okay. Let's -- let's turn to the page ending in 832.**
A. Okay.
**Q. And this is an invoice dated June 9, 2023, right?**
A. Yes.
**Q. And do you recognize this document?**
A. Yes, I do.
**Q. Is this another invoice that you submitted to**

**nChain for expense reimbursement?**
A. Yes. This is approved by invoice -- excuse me. Approved by nChain's finance department, and it went through, you know, three or four different people.
**Q. You approved this invoice personally?**
A. I can't approve it. I don't have the capacity.
**Q. I asked you the wrong question.**
**You prepared this invoice --**
A. I prepared it, yes.
**Q. Okay. So -- and you did submit this to nChain on or about June 9, 2023?**
A. Yes.
**Q. Okay. What was the press campaign expenses referenced here?**
A. So that reference is to the campaign that I ran for -- it was right after London Blockchain, the article that I published in Yahoo Finance, Finanzen -- no, no. Is it -- what is it? Finanzen, Benzinga, Yahoo Finance and AP News outlets and like 129 other newspapers.
**Q. So the press campaign line here refers to the -- the article --**
A. Yeah. Here it is -- no, that's not it. That's nChain's article. Where is it?
**Q. This is a reference to the article referenced at paragraph 21 of your declaration?**

A. Where is my declaration? What document is that again?
**Q. Exhibit 31?**
A. 31, okay. Exhibit -- screwing it up. Yeah -- no, no, no, no. Wait -- that's -- you said 21, right? Yes, here it is.
**Q. Exhibit 31.**
A. Yeah, 21.
**Q. 31. Paragraph 21 in Exhibit 31.**
A. Yep. Yep. And this is just a sample of what the article looks like right here, this Newswire link right there. So, I mean, obviously there were many more links involved.
**Q. Okay.**
A. Including the Yahoo Finance link.
**Q. Okay.**
A. I screenshot most of these -- well, most of the big ones and I put it -- I posted it on all my socials, as well, and -- yeah.
**Q. The --**
A. Calvin Ayre retweeted me.
**Q. The $3,000 for press campaign reflected on the June 9, 2023, invoice is that -- that's for the -- the press release that you wrote in June of 2023?**
A. Yes.

**Q. Did you pay any of these news outlets to run the story?**

A. I paid a premium subscription price to -- to run the -- the main story, yes, I did, and then I contacted other media conglomerates. I've been writing articles for years, so.

**Q. Who did you pay the premium subscription price to?**

A. It was either PR Cision or it was another company. I can't remember off the top of my head.

**Q. And how much did that cost?**

A. I think -- I don't recall because I don't have, like, my books in front of me.

**Q. Okay.**

A. Yeah. But I also -- I put my fee on there as well in terms of the amount of time that I spent writing the article, and then the efforts that I put out there in terms of contacting and getting -- distributing the press release to various news outlets and so forth.

**Q. Okay. So the press campaign expense line item reflects time that you thought had you spent?**

A. Extra time, yeah.

**Q. On -- okay.**

A. Something I wasn't asked to do, but I did it anyway, and I also -- you know, I wrote a nice article.

It was about nChain. It was about -- I wrote a nice article about Calvin Ayre, and basically just, you know, trying to grow things, and I think maybe like a few days later or a few weeks later, Calvin Ayre announced the acquisition or the majority acquisition of nChain with the $570 million investment, so -- and then I noticed after that, that nChain and Calvin's company started mimicking what I was doing in terms of, you know, utilizing the press and going with the companies that I was using.

**Q. Okay. And so you felt that the time that you expended working on this press release was not covered by the $12,500 consulting fee you were charging to nChain for that month; is that right?**

A. No, not when I'm putting my own money in it too.

**Q. Well, how much of your own money did you put into it?**

A. I mean, I couldn't remember off the top of the head, but I will tell you that they're not -- these are not cheap campaigns. If I had an example, you know, somewhere in the range of, you know, 1,000 to $6,000 per campaign, so.

**Q. And -- and so -- and how did you -- to the extent that you paid for anything to some third party in connection with this press campaign, how did you pay for**

**it?**

A. I used a debit card.

**Q. And what debit card connected to what account?**

A. Either the credit line or another -- I can't remember what I used to pay for this particular campaign.

**Q. All right.**

A. I may have even had a couple of credits previously because this is the company that I -- companies that I have been known to work with in the past or rely on in terms of press because, like I said, I've written quite a bit of articles in the hundreds, and so, you know, I have go to's that I -- and, you know, they write me and whatnot.

**Q. And then this credit line item here --**

A. Yeah.

**Q. -- $2,500, what were those credit line expenses?**

A. I don't have -- I don't have them off the top of my head, but I was basically, you know, getting a reimbursement for the funds that I had depleted out of the credit line I got -- I initially established the credit line as a safety net for any expenses, if, you know, I wasn't going to receive my consulting fee in time, then I needed to have some way to keep operations running, you know, for various things that I -- various

activities that I was doing.
**Q. And -- and who maintains the credit line?**
A. I maintained the credit line at that time.
**Q. Is the credit line in your name or in Sound Alive's name?**
A. I believe it was in my name.
**Q. And what organization is the lender on this credit line?**
A. I don't know because I don't have this account open anymore.
**Q. Did you --**
A. So, I don't recall.
**Q. Did you preserve any of the statements from that credit line?**
A. I'll have to look into my files.
**Q. Okay. What -- the Google Fi company phones, $1,250, what's that expense for?**
A. So that was for four Google Fi phones.
**Q. Okay. And how did you pay for those?**
A. Probably with a debit card online.
**Q. And debit card, who had the debit card, you or Sound Alive?**
A. I'll be honest with you, I don't recall.
**Q. Do you have any documents reflecting what you spent on these Google phones?**

A. Yes.
**Q. And what documents are those?**
A. The actual receipts of purchasing the phones.
**Q. Do you still have those receipts?**
A. I can try to find them in my files.
**Q. And who was going to use those four Google Fi phones?**
A. They were going to be used for DistroMint.
**Q. No. But who was going to use them?**
A. I was going to use them, and anyone else -- I just wanted -- I wanted four lines because I went to London. My phone, I had no service. I had to rely on a Google Voice and a Wi-Fi connection. So I researched, and I -- I saw that Google Fi had the best international phone service.
And so for $1,250, that got me the actual phones, like four phones, and it was four lines for -- I think it was like four lines for 80 bucks a month or something like that. I still have Google Fi, so I still have the same four lines. The numbers may have changed, and the devices may have upgraded, but I still use Google -- Google Fi, but that was just the first purchase. So you're getting the phones, and you're getting, like, the first month of service or whatever and, you know, they have the international switch so you

can turn your phone on international, boom.

So I was considering that -- I had just came back from London, and I had horrible communication when I was out there. That's -- I figured I needed to have a phone that I could use. I figured that I would be coming back out to London again maybe for London Blockchain 2 or for, you know, to launch DistroMint or anything else Christen needed me for to come out that way.

**Q. Okay. So did you buy four phones with this $1,250?**

A. Yes.

**Q. And did you give the phones to anybody else?**

A. No.

**Q. Where are the phones now?**

A. The phones now?

**Q. Yeah.**

A. I have one in my possession, but it's not the phone that -- the original phone because this was three years ago. So the actual phones, they have been discarded --

**Q. Okay.**

A. -- because they got upgraded.

**Q. What happened to the other three phones? What -- did you give those to three other people?**

A. They didn't -- just went out of date. I did not give them to anybody.
**Q. You didn't -- why did you need four?**
A. Why did I need four? Because I felt like it was a -- I felt like I would need four lines to run a big company like DistroMint that I am anticipating to launch.
**Q. But no one else but you worked at Sound Alive at this time, right?**
A. Yeah, but for -- it's not about that. It's about DistroMint and we're scaling it, and so I wanted to be prepared.
**Q. So you -- so you bought four phones and then just, what, left them in the box?**
A. No, I did not leave them in the box.
**Q. So you took them out? You used them?**
A. I don't understand.
**Q. Did you use all four phones?**
A. To a certain capacity, just to connect -- because the Google phone, you can connect it to various e-mails.
**Q. So were all four of the phones activated?**
A. Yes.
**Q. Did you personally use all four of those phones?**
A. Not on a personal capacity.

**Q. Did any other people who you know use any of those four phones?**
A. No.
**Q. You are going to testify under oath that you did not give any of those three phones to anybody else?**
A. I'm going to testify that I'm giving you the best of my ability, my answer.
**Q. You just don't remember whether you gave one of the other three phones to somebody else?**
A. I mean, I don't have them in my possession anymore.
**Q. No. But back in 2023, did you give one of these Google phones to somebody else?**
A. I don't recall.
**Q. You don't recall?**
A. No.
**Q. Okay. Utilities. $1,250 for utilities?**
A. Yes.
**Q. What are the utilities described here?**
A. They are utilities that would be directed towards my house.
**Q. Okay. So utilities on your house?**
A. Yeah.
**Q. The web services, $2,500?**
A. Yeah.

**Q. What -- what are those web services?**
A. As I described, some of those web services can be, you know, payments that I made for -- that I recall, payments on -- on platforms like, you know, on freelancer platforms and so forth, you know, to buy tokens and to hire micro freelancers, things of that nature.
**Q. Okay. So the web services are for the micro financiers?**
A. Freelancers.
**Q. I'm sorry. The web services charges here, $2,500, that is for micro --**
A. Yeah.
**Q. -- freelancers?**
A. Yeah.
**Q. Okay. And then $5,000 in travel expenses. What was that for?**
A. Just various travel expenses --
**Q. Where did you go?**
A. -- approved by nChain.
**Q. Where did you go?**
A. I can't remember.
**Q. You can't remember where you went?**
A. No. I mean, I -- I travel a lot of places.
**Q. Okay. Let's look at --**

A. And Dale testified that this went through a chain of command and it went through, you know, three or four different approvals, especially -- including the board had to approve it, any -- any expense. So you are grilling me on expenses that nChain approved, and it's not like they couldn't have been, "Well, Smitty, no," you know, so.

**Q. Okay. So I am just -- don't be defensive. I am just trying --**

A. I am not being defensive at all, not at all.

**Q. I'm just trying to figure out --**

A. I'm just confused.

**Q. -- what these expenses are.**

**So let's go to page 190, okay?**

A. Okay. Yep.

**Q. So -- all right. So this a document dated July 10, 2023.**

A. Yes.

**Q. Is this another --**

A. So more web services, Twitter organizations for two months, I believe that was two separate accounts.

**Q. Okay.**

A. So for DistroMint and for -- I believe we tagged my name with the gold checkmark, so I don't recall, but I do know that Twitter organizations around that time,

was around -- it was either 1100 or $2,000 a month per organization. Or it might have been 2000 per month per organization, and then it's like 300 bucks when you add another organization. It's X now. So we're three years later, and I got the gold checkmark because I was anticipating the launch of DistroMint.

And once again, nChain saw my gold checkmark, and they copied me. They went and got a gold checkmark, and then started gold checkmarking their CEO, their various high-ranking board member people on X, and all of that, but we did that for like two months I think. It might have been two months.

But at that point, it just -- it didn't seem like it was -- okay, yeah, there we go. Yeah, we did two months --

**Q. So --**

A. -- three months.

**Q. -- my -- my question was simply, is this a July 10, 2023, invoice that you submitted --**

A. Yes.

**Q. -- to nChain for expense reimbursement?**

A. Yes. And --

**Q. Okay.**

A. -- and nChain ran it through their chain of command and approved it.

**Q. Okay. Okay. Now, the -- the web services that you mentioned here is -- for $2,000, is that also for micro freelancers?**

A. Yeah. Any -- any web service activities that -- that I was running that, you know, required that. I can't remember everything off the top of my head. It's --

**Q. Okay.**

A. -- you know, three years ago.

**Q. You don't remember exactly what these web services were in the July 10 invoice?**

A. You can say -- you can say that a portion of it went -- definitely went to micro freelancers and promotional sites, absolutely.

**Q. Okay.**

A. Marketing.

**Q. And how did you pay for the web services?**

A. The same way in the process -- the method that I explained to you.

**Q. But would -- would you use a debit card to pay for the $2,000 worth of web services?**

A. It would either be with a PayPal -- I did not use a debit card because the -- a lot of these freelancers and so forth, you know, they're based in foreign countries, and so, you know, I don't trust sites

that much to put -- put the credit information on there.
**Q. Okay. So you paid with the -- for the web services on PayPal account --**
A. Probably -- not a PayPal account. Maybe like a -- a temporary PayPal card or something like that; you know, something that -- that is not going to expose my information out on like the -- the dark web or whatever.
**Q. Okay. So you might have paid for the web services with a temporary PayPal card?**
A. Yeah. Or with a PayPal account, yeah.
**Q. Okay. Would there be any record of you having spent $2,000 on those web services?**
A. I would have to go through my records and -- and see if -- if that record is still showing up.
**Q. Okay.**
A. Because a lot of the platforms that, you know, I was using at the time, very much like Twitter, changed from Twitter to X, and some of the web services that I was using back then also upgraded and either changed their platform or they moved to like another platform. So, you know, I would have to -- I would have to check my records.
**Q. Okay. Can you flip back with me to page 832?**
A. Yeah.
**Q. The prior invoice from June 9th.**

A. Yes.
**Q. So it -- would you have used a -- some form of PayPal payment for these web services too?**
A. These web services? I don't recall, honestly --
**Q. Okay.**
A. -- because it was so long ago. Yeah.
**Q. Okay. You don't remember how you paid for these things, though, right?**
A. Well, I mean, I used whatever method that was available.
**Q. Well, what methods were available?**
A. I mean, you have PayPal, you have Bitcoin, you have, you know, points, a barter. So, I mean, whatever -- whatever I build up. At times, you know, if you build up enough barter points, you know, you don't have to pay actual cash because you can just -- you can share your points. You can set your points out.
**Q. So -- so were you expensing nChain for expenses that you had not actually incurred in cash?**
A. No. There's a -- there's a cash value to everything, absolutely.
**Q. No. But, sir, the -- you didn't pay someone cash for all the expenses shown here, did you?**
A. Yes, I did.
**Q. So -- so for the web services, there's a record**

**somewhere of you having given someone cash for those web services, correct?**
A. Not personally giving that -- a single person cash, but, you know, there might be -- if I checked my records, there may be a record of -- of me, you know, using the service or using the platform and then, you know, the amount of -- of transactions and -- and the number of, you know, freelancers that I used or hired and whatnot.
**Q. Would there be a record of have -- you have -- having expended cash on those things?**
A. Well, I mean, the cash gets converted.
**Q. Well, did you put cash into these platforms in --**
A. I didn't put like physical cash, but, you know, either through PayPal or through a debit card or a credit card or like a payment processor, you know.
**Q. So -- so there would be a record somewhere -- a bank statement, a credit card statement -- that would show you actually having put money on to these platforms?**
A. I would think there would be.
**Q. Okay. What debit card or credit card would you have used to put money on to these platforms?**
A. Like not a -- not a direct credit or debit card.

**Q. So you can't -- just can't recall how you actually paid for the web services that you charged nChain for --**

A. I don't recall like the specifics of every single transaction. No, I don't.

**Q. Okay. How about the utilities here on page 832?**

A. Yeah.

**Q. How did you pay for those?**

A. 832? Where?

**Q. Yeah. Right in the middle. So these are the utilities, right, where this is a June 9, 2023, invoice?**

A. 832, you said?

**Q. Yes.**

A. Give me a second. I'm trying to find it.
Okay. 832. So June 9, 2023?

**Q. Yes.**
**Okay. So how did you pay for the utilities?**

A. So utilities, paid with a debit card probably.

**Q. Okay. And the -- your personal debit card or a Sound Alive debit card?**

A. I would say a third-party debit card.

**Q. Who would the third party be?**

A. I mean, I say a third party like because a -- the -- the -- the payment wasn't actually -- didn't have like a name on the account. For utilities.

**Q. What -- what do you mean the payment didn't have a name on the account? What does that mean?**

A. That means that, you know, we used like a prepaid card or something to that extent.

**Q. Okay. So you would have used a -- like a prepaid credit card --**

A. Yeah.

**Q. -- to pay these utilities?**

**So is there no record of you having paid these utilities?**

A. Yeah. I mean, the -- the invoices for the utilities paid.

**Q. Okay. Okay. So the invoice you have for the utilities reflect how you paid the invoice --**

A. It doesn't say like the -- the -- like what -- whose name paid the -- the actual payment, but it -- they're paid. My lights are still on.

**Q. Okay. Do you have a bank account or a credit card account that you used to pay these utilities?**

A. At that point back then, I would say, you know, I don't recall.

**Q. The -- the travel expenses, how did you pay for those?**

A. Travel expenses?

**Q. Yes.**

A. Probably with the Sound Alive Enterprise card.
**Q. Okay. So if we look at the statements for the Sound Alive --**
A. You'll see a lot of --
**Q. -- bank account --**
A. Yeah.
**Q. -- we'll see -- we'll see $5,000 worth of travel expenses?**
A. Probably a lot more.
**Q. Okay. But that's where we should look to see how much you spent on travel?**
A. Yes.
**Q. Okay. Let's go back to 190.**
A. Okay. What page is that?
**Q. Yeah, the -- I will give you it's a little confusing. It's -- it's just one page. So there's one invoice in between the one we were just looking at and the one I want to look at. This is the one from July 10th.**
A. Okay. I'm looking for it.
Okay, I'm here.
**Q. Okay. So the Twitter organizations, two months' expenses, $2300 --**
A. Yeah.
**Q. -- what was that for?**

A. That was the same thing, for the -- for the gold badges on -- on X, or what they call Twitter now.

**Q. Okay. And that -- that cost $1150 --**

A. So --

**Q. -- per badge?**

A. Yeah, yeah. I think it was -- and, you know, now that I -- I recall a little bit, I -- and I'm only -- this is only what I believe. I believe at the time it was $1,000 for the first account, and then if you wanted to tag an extra account, it was an extra $150. So it's like 1150 a month. And I think we had already had the gold badge since June. So I think we had June, July. And then in the next invoice -- the next expenses invoice -- yeah, right here. So then we -- okay. Yeah. No, that was July, August. And then we had Twitter organizations for September and October, which we -- we prepaid ourselves and then we invoiced nChain back for that.

Now, before you like jump the gun on all this, I do want you to know that I had a phone call with Christen on April -- in April, when he was in New York and he was with Todd Bowle or Todd Bowles or Todd Boehly, the billionaire. Todd Bowles, does that ring a bell?

**Q. Todd Bowles rings a bell because he used to be**

**the head coach of the New York Jets. That's how I know him. I think he's currently the head coach of the Tampa Bay Buccaneers --**

A. Okay. So --

**Q. But that -- I -- you asked me and I'm --**

A. Maybe it's Todd Boehly.

**Q. But also, you know, I'm -- it's my job to answer -- or ask the questions, not answer the questions.**

A. Right. But I was giving my response, though.

**Q. Well, I think you had answered it, but why don't -- you had a conversation with Mr. Boehly you wanted to tell us about --**

A. No. I had a conversation with Christen --

**Q. Okay.**

A. -- regarding the -- the expenses that nChain would cover.

**Q. Okay.**

A. Yes. So he was in New York. He was with Todd Bowles [sic]. Todd Bowles is the one who owns Bruce Springsteen's catalogue. And Christen called me and he said, Eric, he said, you know, I'm with Todd Bowles for a week. I'm in New York. He's like, you know, He wants to bring Bruce Springsteen's catalogue to DistroMint. We're talking about it.

And I said, Awesome, brother. I said, Listen, Christen, I have some upcoming expenses that I'm going to bill nChain for because I'm ramping up for the launch of DistroMint.

And he said, It's okay. He's like, Send -- send it over to -- send it to Andy.

And then if you reference the e-mail from Simon Wood on the 4th, Simon specifically said to me -- he said, Eric -- he said -- he said, You know, you can send expenses in. He was like, Hold on to the receipts. He said, You probably won't need them unless we're audited. And that's what he said to me. He said, Just hold on to the receipts.

So before you jump into the grilling, I went to the CEO and I got his permission first, and then I also got an okay in September -- on the September 4th e-mail from Simon Wood. And then on top of it, nChain has a chain of command when they have their finance department. So if they don't want -- if they find something that -- that they don't like, you know, they're going to -- they're not going to pay it. They showed me that, because they stopped paying my invoices for my consulting agreements in October.

**Q. Okay. So Mr. Wood told you to hang on to the receipts?**

A. Yes.
**Q. Did you do that?**
A. Yes.
**Q. So you have them all still?**
A. I have to refer to my files.
**Q. So you are going to go home tonight and you are going to find all the receipts, and I am going to get them tomorrow?**
A. I don't know if I can produce them that quickly.
**Q. How long can you get me the receipts?**
A. I am not sure.
**Q. So the utilities here on page 190, are those still the utilities on your house?**
A. On page 190?
**Q. Yes.**
A. Yes.
**Q. Okay. And you would have paid for those the same way that you paid for the prior utilities you billed to nChain?**
A. Yes.
**Q. Okay. And then if we turn to the next page, this is another expense report from July 24, 2023, right?**
A. Yeah.
**Q. Okay. And here, we have utilities $1,243. Are**

**those still utilities on your house?**

A. Yes.

**Q. And you paid for them the same way you paid for the other utilities?**

A. Yes.

**Q. The credit line here, is that the credit line that you referred to before?**

A. Yes.

**Q. And do you remember what you put on the credit line for this $2,500 charge?**

A. I don't recall.

**Q. Okay. Trademark registration DistroMint, E. Smitty, $5,000?**

A. Yeah.

**Q. What was this for?**

A. That was for a trademark registration application for DistroMint and E. Smitty.

**Q. But you testified earlier you never got DistroMint trademarked?**

A. The application was abandoned and my E. Smitty application was abandoned as well; however, I have -- I think I have 90 days to send a rebuttal and try to revive it.

**Q. And who did you pay the trademark registration fees to?**

A. I don't remember the company's name.
**Q. Okay.**
A. Yeah.
**Q. And how did you pay for them?**
A. I don't recall how I paid for them either. I don't know the specific method. A lot of these questions you're going to ask me, this is, you know, three years ago. I don't remember or recall the exact specifics. I really don't have all that information in front of me, so it would be -- it's really hard, and right now, what you are trying to do is make me seem like a bad guy, and I appreciate your questions; however, you know, the honest truth is I don't recall a lot of details from these particular things.
I just recall that Christen gave me the okay. Andy Moody approved these expenses via nChain, and it went through a chain of command. It even went through Dale, and Dale testified that any invoice that comes through nChain, it has to get the approval of the CFO, the Chief Financial Officer. And then he also testified that he believed that, you know, "Eric made any of these invoices in -- that he sent these invoices in good faith?" And he said, "Yes."
So, you know, can we move on to the next topic now?

**Q. No. The web services here on the July 24, 2023, invoice, are those the same type of web services you described before?**

A. I'm not going to repeat it over and over again. You are just going -- flipping and back and forth and --

**Q. Sir, you submitted another charge for another $2,500 in web services.**

A. Yeah.

**Q. I'm trying to figure out --**

A. We're ramping up operations. Things are -- we are spending a lot more money. We're moving. I've got, you know, so much amount of money that I can expend of my own per month, which I shouldn't even have to, but out of the goodness of my heart and out of being a partner with -- 50/50 partner with nChain and truly believing that we are about to launch, okay, I'm believing that this thing is going to the moon, I'm putting my money in, and I'm investing my time and my efforts and, you know, this is money that I didn't have to do. I could have just saved this money and put it away for my nine kids for college, but I am -- I'm showing nChain that I'm going to invest my company into a company that I believe in and that I believe and note to be my 50/50 partner.

**Q. But, sir, I'm asking you to explain --**

A. You're asking me to explain the details --
**Q. -- what -- what did you allegedly spend this money on?**
A. You're -- you're asking me to explain details of what I don't remember, like, I don't have all the numbers in front of me now.
**Q. Okay. Then look at the invoice then, 695, it's dated August 29, 2023.**
A. Yeah.
**Q. Okay. Do you remember what these expenses were for?**
A. I just explained it.
**Q. But do you remember specifically what -- what are the number 25?**
A. Mark, I have already explained this particular page. We've already been on -- on 695.
**Q. We have not. This is an August 29, 2023, invoice.**
A. Look -- yes, you did. You are recanting now because you did already reference this page. You're trying to confuse me. Look, Twitter organizations, two months, September, October.
**Q. Sir.**
A. Web services, travel.
**Q. Sir. Sir. You submitted an invoice for that**

**also on July 10th. If you look back --**
A. Right.
**Q. -- at 190, we talked about that invoice. On that invoice, you billed for web services, Twitter organizations, utilities?**
A. Yeah.
**Q. And then again on August 29, 2023, you again billed for separate charges for web services, Twitter organizations --**
A. That's right.
**Q. -- and travel?**
A. But I --
**Q. The amounts --**
A. Okay. You're not going to let me talk.
**Q. No. I am pointing to you in the record, the expenses in these are not identical. We did not speak already about August 29th, 2023.**
A. It's identical because we did -- we specifically talked about Twitter organizations.
**Q. Yes.**
A. Okay. And I pointed out that we covered July and August. So that's two months of Twitter organizations, and then we have September and October, that's another two months of Twitter organizations.
**Q. Okay.**

A. So.
**Q. I'm asking you these -- these questions. Now, there is $2,500 for travel on that August 29th invoice --**
A. Yes.
**Q. -- what was that for?**
A. Just various travel expenses.
**Q. Okay. Where did you go?**
A. Traveling all over --- around the Atlanta metropolitan area.
**Q. How did you pay for it?**
A. I bought gas with my debit card. I don't remember.
**Q. Your debit card or Sound Alive's debit card?**
A. I don't recall, honestly.
**Q. Okay. Now, sir, you will notice right, for almost all the expenses you show in here, $2,500, $2,200, $2,500, they are all nice round numbers for the most part, aren't they?**
A. I mean, could I -- I -- you consider that.
**Q. Okay. These -- the amounts that you've shown here on these expense reimbursement invoices, these are not actual amounts that you incurred for expenses in relation to the DistroMint platform, are they?**
A. Yes, they are.

**Q. So if we look at the receipts, if you actually produced for us the receipts, will we find transactions equalling out to the exact amounts that you expensed nChain for?**

A. If I'm -- if I'm able to recover any receipts of all -- or some of the receipts, yes. You will find that the amounts are the same.

**Q. Okay. And you'll try to get us those receipts?**

A. Yes, I will try my best. I mean, granted, it's three years ago and some of these records, I may not have, but I will do my best to produce some receipts for you guys.

**Q. Okay.**

A. Yeah. Are we done with this thing now?

**Q. Yeah, we're done with that.**

A. All right. Thank you. Let's keep going.

**Q. Okay.**

A. I want to go home after this.

**Q. Okay. Now, in 2023, did DistroMint, LLC have any customers?**

A. No.

**Q. In 2023, did DistroMint, LLC have any revenues?**

A. No revenue.

**Q. In 2023, DistroMint, LLC didn't generate any profit, did it?**

A. No.
**Q. And --**
A. Would you consider grants profit?
**Q. I'm not going to answer the question. The --**
A. Because I would consider the 175,000 -- $176,000 in grants that I was awarded for DistroMint, I would consider that profit.
**Q. Okay. DistroMint, LLC, has it ever had any customers?**
A. It never launched.
**Q. Okay. So DistroMint, LLC has never had any revenues?**
A. Never, because we never -- where he never launched. The platform stayed in MVP. NChain breached the contract. And after that, we never launched.
**Q. And DistroMint, LLC has never issued a financial statement, has it?**
A. No.
**Q. Now, from October 2023 to today, have you undertaken any efforts to raise funding for the DistroMint platform from sources other than nChain?**
A. Yes.
**Q. Okay. And let's see, who were you working on behalf of when you undertook those efforts DistroMint, LLC or Sound Alive?**

A. I was working on behalf of DistroMint.
**Q. Let's take a look at Exhibit 4.**
A. Yeah.
**Q. And this is the DistroMint, LLC 30(b)(6) notice, okay?**
A. Okay.
**Q. And if you'd turn for me to Topic 38, please?**
A. (Complying.)
**Q. Okay. The topic is, "Any efforts by or on behalf of DistroMint, LLC, or any efforts by Mr. Finnerud, Perry, or Sound Alive for the benefit of DistroMint, LLC, to seek cooperation with any person other than nChain UK for the development or commercialization of any blockchain-based music platform."**
**Do you see that?**
A. Yes.
**Q. Do you understand you're DistroMint, LLC's 30(b)(6) witness on --**
A. Yes, I do.
**Q. And are you prepared to testify about it?**
A. Yes.
**Q. Okay. Okay. From October 2023 to today, you have not been successful in raising any outside funding for the DistroMint platform from anyone, have you?**

A. I don't agree.
**Q. Okay. What -- what funding have you raised for the DistroMint platform from October 2023 to today?**
A. 170 -- $176,000 in grants; $1,000 AWS grant and 120 -- $175,000 Microsoft Azure grants.
**Q. Okay. Aside from the grants from AWS and Microsoft Azure, have you raised any money for the DistroMint platform from anyone --**
A. No.
**Q. -- from October 2023 to today?**
A. No, sir.
**Q. Okay. Approximately how many people did you reach out to from October 2023 to today to ask for funding for the DistroMint platform?**
A. I can't remember.
**Q. We -- we saw that you reached out to the National Science Foundation, for example.**
A. Yeah.
**Q. Did you reach out to other organizations seeking grants or funding?**
A. I believe the Stellar foundation.
**Q. Okay.**
A. And you'll see DistroMint on their website, as well. That was basically just a project of interest or submitted project of interest.

Q. Okay. And -- can you take out Exhibit 9 for me, please.
Okay. And this is the -- if we turn to the exhibit, this is the pitch that you submitted to the National Science Foundation, right?
A. Yes.
Q. Okay. And if you would turn to me -- for me to page 471.
A. Uh-huh.
Q. And let's see. Under Item 13, "Briefly describe the technical objectives and challenges," it states "DistroMint Dev Site is fully built on blockchain technology, hosted on AWS. Currently we need to migrate the platform from AWS to Microsoft Azure, where we will be able to take advantage of credits which will allow the platform to launch and run at zero storage and server costs for the first three to four years. This is patent-pending technology in which we were in the middle of developing the streaming/monetization by the second tech when our previous developers were released from the company we were engaged with as a customer. We also want to add functionality of multichain wallet and ultimately launch the platform successfully and make full use of the patent W02024013726, digital tokens using blockchain."

**Do you see that?**

A. Yes.

**Q. And when you say in this paragraph "our previous developers were released from the company we were engaged with as a company" -- or sorry.**

**When you say in this paragraph "our previous developers were released from the company we were engaged with as a customer," the company there refers to nChain; is that right?**

A. So the previous tech developers -- yeah. What happened was nChain split after Christen. The Slovenia office and nChain, they split.

**Q. Right.**

A. And so the developers were released and -- you know, I may have used the language "as a customer" -- "the company we were engaged with as a customer" -- yeah, I don't -- I don't know why it would have been written that -- in that format. Again, I -- I do believe and I remember this was around the time that I was working a little bit here and there with -- with Susan Welch.

**Q. Okay.**

A. So there may be a -- that might be a typo.

**Q. You were the -- well, you were the person who prepared this pitch, right?**

A. She helped me prepare it. And as you can see, it entered in incorrectly, because there's all different fonts. And normally when I submit a pitch -- so there may be some -- some errors in this.

**Q. Okay. I mean, I'm kind of confused, because earlier today you told us that Susan Welch was like an old woman you met on the internet and she didn't know what she was talking about.**

A. And that's -- and that's why you have the error.

**Q. But -- no. But you let her submit the final version of it --**

A. I didn't let her submit it. I may have submitted it and not proofread it correctly.

**Q. Okay.**

A. Yeah.

**Q. Okay. But this is an accurate statement, right? Like you were --**

A. It's accurate that -- that the patent-pending technology, that we were in the middle of developing a streaming monetization by the second -- like, you know, September, around DistroFy, that era. And the previous developers were released from the company, yeah. NChain's development Slovenia team and nChain, they were -- they were like a -- they were split in half.

**Q. And, I mean, in -- in May of 2024, you told the**

**National Science Foundation that you had been engaged with nChain as a customer, correct?**

A. No. That was -- that was an error.

**Q. Okay.**

A. But that language may have came out because I may have been reading over something nChain related, like -- like a -- an article that I can reference, an article that -- that nChain wrote talking about our partnership but then using the term "customer."

**Q. Okay. So do you think you wrote that language or do you think Ms. Welch wrote that language?**

A. I don't recall, honestly.

**Q. Okay.**

A. Yeah. I know the gist of what I wrote in here in terms of, you know, stating the facts and things of that nature.

**Q. Okay. And you just can't recall how that language came to be included --**

A. No.

**Q. -- in the application?**

**Okay.**

A. Absolutely not. That does not like look something I would write.

**Q. And can you remind us, when was -- when was it you first met Ms. Welch?**

A. I want to say between -- I want to -- to my best memory, I would say the end of 2023.

**Q. Okay.**

A. Around the time that nChain breached the -- our agreement.

MR. RUOCCO: Okay. All right. Let's go off the record.

THE WITNESS: All right.

THE VIDEOGRAPHER: The time is 3:00 p.m. We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 3:16 p.m. We're on the record.

BY MR. RUOCCO:

**Q. Mr. Finnerud, before the break, we were discussing the grant application that you had made to the National Science Foundation. Do you remember that?**

A. Yes, sir.

**Q. And the National Science Foundation ultimately denied your grant request related to the DistroMint platform; isn't that right?**

A. Yes, it did.

**Q. Okay. I'm going to show you what's being marked as Exhibit 38.**

(Finnerud Exhibit 38, E-mail dated July

25, 2024, re: Project Pitch 00082215, Bates stamped SA0003763 through SA0003769, was marked for identification.)

THE WITNESS: Thank you.

BY MR. RUOCCO:

**Q. And this is a July 25th, 2024, e-mail from you to Susan Welch, the subject line "Forward project pitch 00082215."**

**Do you see that?**

A. Yes, sir. Wait. On -- oh, I forwarded the message from Farzin -- Farzin?

**Q. Uh-huh.**

A. Yeah.

**Q. Okay. Okay. And here, the National Science Foundation writes in its e-mail to you, "Dear Eric, Thank you for submitting your company's project pitch to America's Seed Fund powered by the National Science Foundation, the NSF Small Business and Innovation Research, and Small Business Technology Transfer Program. We have determined that the information you submitted is incomplete or requires further clarification for the following reason," and it goes on.**

**"Thank you for submitting a project pitch and sharing information about your proposed project and company. While high-level impact statements have been**

identified, our solicitation necessitates the development of a new technical innovation that enables the product features. The pitch describes in general terms what needs to be done does not adequately clarify what the innovation is, what is technically very challenging and why, and how the solution is differentiated from and preferable over existing solutions."

Do you see that?

A. Yes.

Q. Okay. And so the reason that the National Science Foundation denied your grant request for the DistroMint platform was that you could not adequately explain why the DistroMint platform was a technological innovation; isn't that right?

A. In their opinion.

Q. And the National Science Foundation was not the only organization that denied you a grant request because you could not explain why the DistroMint platform was a technological innovation; isn't that right?

A. What other platform are you referring to?

Q. Sure.

MR. RUOCCO: Can I get Tab 145, please?

(Finnerud Exhibit 39, E-mail dated March

6, 2025, re: SCF #34 - Build Award Update, Bates stamped SA0005875, was marked for identification.)

BY MR. RUOCCO:

**Q. And this is a document being marked as Finnerud Exhibit 39, and this --**

THE REPORTER: Hold on.

THE WITNESS: Thank you.

BY MR. RUOCCO:

**Q. This is a March 6th, 2025, e-mail from the Stellar Community Fund to you. The subject line is "SFF" -- "SF" -- I'm sorry, I misstated that several times.**

**This is a March 6th, 2025, e-mail from the Stellar Community Fund to you. The subject line is "SCF Number 34 Build Award update," right?**

A. Yes.

**Q. I believe you referenced the Stellar Community Fund in your earlier testimony; is that right?**

A. Yes.

**Q. Okay. And you applied for something called the SCF Build Award from the Stellar Community Fund; is that right?**

A. Yes.

**Q. And the SCF Build Award is a grant; is that correct?**

A. It's $150,000 in XLM tokens.

Q. And you made this grant application to the Stellar Community Fund in connection with the DistroMint platform; is that right?

A. Yes.

Q. And the Stellar Community Fund denied your grant request for the DistroMint platform; is that true?

A. Yes.

Q. Okay. And let's look at the e-mail. It states, "Dear team of DistroMint, You are receiving this e-mail because you have been added to the submission. If this was not done by you, please reply to this e-mail. Thank you for submitting to the SCF Build Award. The Stellar Community Fund team reviewed your SCF submission, but unfortunately your project did not meet the requirements set at this time to pass our prescreening round. Please find feedback below.

First bullet, "This project is too early for the Build Award. We recommend working to get more validation/traction."

Second bullet, "SCF funds cannot be used for marketing, only for district development."

Third bullet, "A comprehensive and Stellar-specific technical architecture document is required."

**So one of the things that the Stellar Community Fund found lacking about your grant application was a comprehensive and Stellar-specific technical architecture document, right?**

A. It says here that website and GitHub are both 404 errors. So the fact that DistroMint never launched, doesn't exist, there is no website, that's why they -- they, you know, they denied me, and they reached out to me, I believe on Discord or some other social platform and explained to me that, you know, they can't push forward a project that doesn't have a site.

**Q. Okay. And they also cited here in their e-mail, though, that your application didn't have a comprehensive and Stellar-specific technical architecture document, right?**

A. Yeah. I -- I don't think I understood what that Stellar-specific technical architecture document that was required. So, yeah, I -- I don't think I met the requirements for this particular fund.

And then, also, the main -- reason because they contacted me and said, "We like your site -- we like your idea, your platform idea." You know, they had the DistroMint pitch deck, which is on their website on their pitch site, and they liked the idea. They thought it was awesome. I'm trying to remember who I was

speaking with in the Stellar Community, but I was recommended.

And at that point, they said pitch, and I pitched, and I think I made it through the first stage, and then the second stage, wasn't able to actually show a website or a GitHub, and that's what they require.

**Q. Okay. And you did not provide a technical architecture document --**

A. No, I did not.

**Q. -- to the Stellar.**

**And that was the reason that they denied your grant application, correct?**

A. One of the reasons.

**Q. Now, you mentioned a moment ago the DistroMint pitch deck. At some point in 2023, did you work on a DistroMint platform pitch deck with people at nChain Slovenia?**

A. Yes.

**Q. Can you pull out Exhibit 30, for me?**

A. Sure.

**Q. And just my first question is, is this the DistroMint platform pitch deck?**

A. This is the second version of the pitch deck. The first version was not very attractive, but it had all the same text, and I provided that to my developers

in nChain Slovenia, and this is what they came up with.
**Q. Okay. On all the texts that's shown in this second version of the DistroMint pitch deck, that came from you?**
A. Yes.
**Q. Okay. And then the members of the nChain Slovenia team just help it look prettier?**
A. They made it look prettier, and we may have added a little bit of extra language or subtracted some language.
**Q. Okay. But -- but do you remember any specific language that you added or subtracted?**
A. I think Matevz, he worked on the business model and. As I testified, he is the calculations guy.
**Q. Okay.**
A. And then in the market adoption, I think that's all me. And then, of course, in competition, you know, this is from my experience in the music industry. On the left side, you have CD Baby, UnitedMaster and TuneCore, which are all domestic music distribution platforms.
And then NFT Marketplace is, we have OpenSea, Rara Gold and Sound.xyz. I mean, those are just the top ones.
Competitive advantages, first to market,

secured, that's all me. Problem was me. Solution, market validation, market size, the idea to, you know, use the mobile devices and the laptops, yeah, so I mean --

**Q. All those things that you just mentioned, those are all you?**

A. Yes.

**Q. Okay. Okay.**

A. They just graphically made it look, you know, really attractive.

**Q. Okay. Thank you, you can put that aside.**

A. Yeah.

**Q. Can you pull out Exhibit 1, please, which is the Sound Alive 30(b)(6) notice?**

A. Yes.

**Q. And I'm on page -- page 8?**

A. Okay.

**Q. Topics 3 and 6.**

A. Okay.

**Q. So Topic 3 is, "The nature of Sound Alive's business activities, including the services or products offered by Sound Alive, and the identities of major clients or customers and the work performed for such clients or customers."**

**And Topic 6 is, "Sound Alive's clients projects**

and revenue from January 1, 2021, to the present other than from or relating to nChain, including any work for which Sound Alive was compensated."
Do you see that?
A. Yes.
Q. Do you understand you're Sound Alive's 30(b)(6) witness on those topics?
A. Yes.
Q. And are you prepared to testify on behalf of Sound Alive?
A. Yes, I am.
Q. In 2023, aside from nChain, did Sound Alive have any other sources of revenue?
A. No.
Q. Okay. In 2023, aside from nChain, did Sound Alive have any other customers or clients?
A. No.
Q. Okay. Okay. And we've looked at some of this already, but before you filed this lawsuit, you exchanged some letters with nChain and its lawyers; is that right?
A. I believe so.
Q. Okay. And we had here -- if you can pull out Exhibit 7, please, if you have it. The Court Reporter may have it.

A. Okay. Thank you.
**Q. And turn to -- page 562 is the January 29, 2024, letter from Valhil Law that we looked at yesterday?**
A. This is Exhibit 7.
**Q. There should be more.**
A. Oh, is this one? No, this is seven.
**Q. Okay. So if you turn with me to the page ending in 562 --**
A. Yes.
**Q. -- you'll see the January 29, 2024, letter from Valhil Law to nChain, right?**
A. Yes.
**Q. And this was the first letter that you sent to nChain through counsel; is that right?**
A. I -- to the best of my memory.
**Q. And in this letter you made a demand for $100 million; is that right?**
A. Yes, I believe Jimmy made a demand for $100 million.
**Q. And Jimmy, your lawyer, made that demand on your behalf; is that right?**
A. Yes.
**Q. And nChain responded to this letter through its own counsel at the CMS law firm; is that right?**
A. I don't remember the name of the -- the

attorneys but, yeah, it says CMS.

**Q. Well, you recall nChain sending a letter through its own attorneys in response to Mr. Vallee's letter, right?**

A. Yes.

MR. RUOCCO: Can we go off the record for a minute?

MR. NONNI: Sure.

THE VIDEOGRAPHER: The time is 3:33 p.m. We're off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 3:49 p.m. We're on the record.

BY MR. RUOCCO:

**Q. Welcome back, Mr. Finnerud. Before the break, we were discussing letters that you and your counsel had exchanged with nChain and its counsel before you filed this lawsuit.**

**Do you remember that?**

A. Yes, sir.

**Q. Okay. And I'm going to show you now what's being marked as Mr. Finnerud Exhibit 40.**

A. Thank you.

(Finnerud Exhibit 40, Correspondence dated February 27, 2024, Notice to Principal is

Notice to Agent; Notice to Agent is Notice to Principal, re: NChain - DistroMint - Conversion of Intellectual Property and Related Matters - CMS ref. COHU/EDN/206680.000001, Bates stamped SA0004779 through SA0004826, was marked for identification.)

BY MR. RUOCCO:

**Q. And this is a February 27, 2024, letter from the Valhil Law, PC to CMS Cameron McKenna Nabarro Olswang LLP, correct?**

A. Can you repeat that, sir? I didn't hear you.

**Q. Sure. This is a February 27, 2024, letter from Valhil Law, PC to CMS Cameron McKenna Nabarro Olswang LLP, correct?**

A. Yes, it is.

**Q. And at that point in time, in February 2024, you -- you still had an active engagement with the Valhil Law, PC firm; is that right?**

A. Yes.

**Q. Okay. And the beginning of this letter, the Valhil Law firm writes, "Mr. Hutton, reference is made to your letter dated 27 February 2024 entitled Notice of Breach Claim for Conversion of Intellectual Property Litigation Hold Notice dated 29 January 2024. The response letter in which you informed us that, quote, we**

act for nChain UK Limited. Our client, Eric Finnerud, professionally known pursuant to his own trademark, E. Smitty, was disappointed to receive the response letter."

Do you see that?

A. Yes.

Q. Okay. So before Valhil Law, PC sent this letter on February 27th, you had had the Valhil Law firm send nChain an initial letter on January 29th of 2024, right?

A. That's when Jimmy sent the letter.

Q. Okay. And then nChain responded to that letter from the Valhil Law firm through its own lawyer at CMS, correct?

A. Yes.

Q. And then the Valhil Law firm sent this letter in response to the letter it had received from CMS, correct?

A. I believe so.

Q. Okay. And you were disappointed by the letter that you had received from CMS; is that true?

A. Yes.

Q. Okay. And the reason you were disappointed in nChain's response to your January 29, 2024, letter is that nChain did not agree to give you a settlement payment; is that right?

A. It says here, "E. Smitty desired for the parties to bring about a private and amicable resolution."
**Q. Okay. Right. So it had been your desire to work out a private and amicable resolution to the claims you had asserted in your January 29, 2024, letter, right?**
A. Yes.
**Q. And nChain had communicated through counsel that it was unwilling to do that; is that right?**
A. That's correct.
**Q. Okay. And the February 27, 2024, letter from Valhil Law continues in that paragraph you reference at the end, "E. Smitty believes that the public revelation of these unlawful claims and the associated information will be catastrophic for the BSV blockchain, nChain, and the nChain group, including many affiliated entrepreneurs and developers that E. Smitty has come to adore and respect."**
**Do you see that?**
A. Yes. Where are we?
**Q. Sure. So, sir, in the -- in the second full paragraph of the February 27, 2024, letter from Valhil Law. Okay?**
A. Yes. Right here. "E. Smitty believes" -- yes, I see it.

Q. Okay. So in -- in this letter, your counsel wrote to nChain's lawyers. He said that you, E. Smitty, believe "that the public revelation of these unlawful claims and the associated information will be catastrophic for the BSV blockchain, nChain, and the nChain group, including many affiliated entrepreneurs and developers that E. Smitty has come to adore and respect," correct?
A. Yes.
Q. Okay. And if you look to Exhibit A in this document, this letter, which is at page 782, it lists the Fairway brief as the exhibit to this letter, correct?
A. 782?
Q. Yeah. The page ending in 782. Right before that, yeah.
A. Oh, okay.
Q. Okay. So --
A. Yes.
Q. Okay. So you attached -- you had your counsel attach to this February 27, 2024, letter this document entitled "The Fairway Brief," right?
A. Yeah. That's what Jimmy attached.
Q. Okay. And was the Fairway brief part of the, quote/unquote, associated information referenced by your

counsel in the letter?
A. Can you rephrase --
Q. So in the first page of the letter --
A. Yes.
Q. -- your -- your counsel writes that it was your belief, Mr. Finnerud, "that the public revelation of these unlawful claims and the associated information will be catastrophic for the BSV blockchain, nChain, and the nChain group."
My question is, is the Fairway brief part of the associated information that your counsel is referencing here?
A. I don't know if I can answer that question without revealing attorney-client privilege, because those were discussions that me and Jimmy had.
Q. But this isn't a letter, sir, that your -- your counsel sent to nChain. I'm just asking you, does -- does the phrase "associated information" as used here in the letter that your lawyer sent to nChain refer to the Fairway brief?
A. Not directly in this particular -- I don't know. I don't know how to answer that question, honestly.
Q. Well, through this letter, was it your intent to communicate to nChain that but for a settlement between you, you would release the Fairway brief to the public?

MR. NONNI: And I'm just going to state for the record I'm not going to instruct him not to answer, but if you can answer without revealing confidential communications between you and your attorney, you can definitely answer. If you can't answer without revealing confidential communications, then we would object based on privilege. I just want to put that out there.

THE WITNESS: Yeah, I can't -- I can't answer without revealing confidential privilege.

BY MR. RUOCCO:

**Q. You can't answer as to what your intent was personally?**

A. It -- it wasn't a personal intent. It was -- it was my counsel, and I can't -- I just can't -- I can't breach that.

**Q. Okay. So you're going to -- you're -- you're refusing to respond to that question on the basis of privilege?**

A. Yes.

**Q. Okay. Well, look down at page -- or further on page 779 --**

A. Okay.

**Q. -- at the final paragraph on this page.**

A. Uh-huh.

**Q. It states, "In the coming weeks, we will work with local counsel to bring legal action in the courts of appropriate jurisdiction. We will be naming nChain and several members of the nChain group, including, without limitation, the following, among others, pending the discovery process." And then you list HEH Holding AG, Fairway Family Office AG, Calvin Ayre, IP Holding Limited, DW Discovery Fund, Blarecast Systems, Bitcoin Soundoshi Limited, and Vaiones Corporation, correct?**

A. I didn't partic- -- I didn't personally write this letter. I'm not the author of this letter. So whatever the content of this letter is, is -- it is what it is on paper, but this was written by Jimmy.

**Q. It -- are you saying that you did not provide information to your attorneys at the Valhil Law firm in connection with their preparation of this letter?**

A. I can't answer that question. Again, attorney -- I'd be -- I'd be, you know, breaching attorney-client privilege.

**Q. I'm just asking, yes or no, did you provide information to the Valhil Law firm in connection with them preparing this letter?**

MR. NONNI: I mean, you can answer it if you -- doesn't require revealing any confidential communications.

THE WITNESS: Yes.
BY MR. RUOCCO:
**Q. Okay. And was it your idea to name HEH Holdings AG, Fairway Family Office AG, Calvin Ayre, IP Holding Limited, DW Discovery Fund, Blarecast Systems, Satoshi Limited, and Convey NX in this letter?**
A. No.
**Q. Okay. Now, you've never brought legal action against any of the companies that I just named, did you?**
A. No.
**Q. And you ultimately determined that you did not have viable claims against any of those entities?**
MR. NONNI: Object to the form.
THE WITNESS: Jimmy and I -- what's the word -- ended our engagement.
BY MR. RUOCCO:
**Q. I understand that.**
**I'm just trying to say you never brought legal action against the companies that you named here. Is that because you decided you didn't have any viable claims against them?**
A. No. It was because Jimmy and I ended our engagement.
**Q. But, ultimately, you did not follow through here on the threat to bring legal action against these**

**companies, did you?**
A. I didn't write this letter; Jimmy wrote this letter.
**Q. Did you review this letter before it was sent?**
A. I did review it.
**Q. Did you approve this letter before it was sent?**
A. I trusted my attorney.
**Q. Yeah, but did you approve the letter before it was sent out?**
A. I trusted my attorney.
**Q. And you were okay with the Valhil Law firm sending this letter on your behalf; is that right?**
A. I'm trusting my attorney, so I'm letting him kind of lead the way.
**Q. Okay. But you were -- you reviewed the content of this letter before it was sent, correct?**
A. Yes.
**Q. And you were okay sending it out?**
A. I wasn't okay personally sending it myself, but I was all right with Jimmy taking the proper legal steps because, you know, he's a lawyer. I have no formal legal training and, you know, I don't know law like Jimmy does. So I -- I really just trusted him, like I trust my attorneys now.
**Q. Okay. But you were okay with this letter being**

**sent out on your behalf, true?**
A. I'm trying to understand. Can you rephrase that question?
**Q. At the time that your lawyers at the Valhil Law firm sent this letter to nChain's counsel in February of 2024, you were okay with your lawyers sending this letter, correct?**
A. I just said I trusted them. So to trust somebody means that, you know, whatever actions that they take -- if you trust them, then, you know, I didn't put up a fight and say, No, don't do that.
**Q. Okay. And in this letter from your counsel --**
A. Yeah.
**Q. -- you made threats to nChain that you ultimately did not follow up on; isn't that right?**
A. I didn't make personal threats to nChain.
**Q. But you -- you threatened to name a number of companies in a legal action, correct?**
A. I personally did not make those threats. This is a letter that came from my attorney at the time, and I trusted what he was saying and I trusted that he was, you know, taking the proper steps.
**Q. Okay. So your -- your lawyer made threats in this letter that you ultimately did not follow through on; is that true?**

A. I'm not an attorney.
**Q. I -- I'm merely asking you, you had your lawyer make threats here in this letter and you didn't follow up on them; is that true?**
A. I didn't have my lawyer do anything. I didn't direct him. And I -- once again, we're -- we're kind of toeing the line of -- of confidential -- you know, how we came to the substance of this letter and -- and the decision on -- on how it should be written and all that. That's purely confidential between, you know, me and my attorney, attorney-client privilege, so I can't breach that confidentiality.
**Q. So nothing -- nothing in the content of this letter is privileged because you sent it to nChain.**
**So what I'm saying is, here you threatened to do something and you didn't do it; is that right?**
A. I did not threaten personally anything.
**Q. You -- the law -- the law -- legal action that's referred to here would have been brought in your name, wouldn't it have, sir?**
A. I believe it would have been delivered -- the action would have been delivered by Valhil Law, PC.
**Q. You don't think that you, Eric Finnerud, would have been a plaintiff in the legal action that you were threatening here in this letter?**

A. It never -- it never got any further because Jimmy and I disengaged.

**Q. You would agree with me, though, before you filed this lawsuit, you threatened nChain with legal action that you ultimately didn't follow up on, right?**

A. I would not agree with any of your statements because you're -- you're spinning it again, like you like to do. This is not a letter from me. This is a letter from my attorney.

**Q. Sir, it's -- it's true you were making threats to nChain before you filed this case trying to get a $100 million settlement; isn't that right?**

A. This is a letter from my attorney.

**Q. Okay. And now you're disavowing this letter from your attorney, right?**

A. No. I -- what I'm saying is you're -- you're stating it in the context that I personally wrote the letter and made the threat.

**Q. No, I'm not, sir.**

**Your lawyer sent -- sent this letter on your behalf, did he not?**

A. It's a response letter, and it says "our client." So I was a client of Jimmy's.

"Our client, Eric Finnerud, professionally known pursuant to his own trademark E. Smitty."

**Q. Right.**
**So he referred to you expressly by name, correct?**
A. He said "our client."
**Q. Okay. And you're the client that -- that Mr. --**
A. Vallee.
**Q. -- Vallee was -- was referred to, correct?**
A. Yes.
**Q. Okay. And if you -- you look at the page 781, right --**
A. Which one is that? Oh, in here.
**Q. This is the third page of the letter, right.**
A. Yep.
**Q. He said, "All rights reserved by Mr. Finnerud without prejudice, UCC 1-207, 1-308," right?**
A. Yes.
**Q. Okay. So he's mentioned you again by name, right? Right?**
A. Yes, he's mentioning me by name.
**Q. And Mr. Valhil [sic] is sending this letter on your behalf, correct?**
A. He's -- I'm his client.
**Q. Correct.**
A. At that time, I was his client.
**Q. Correct.**

A. Yeah.

**Q. And so the things that -- the legal action that Mr. Valhil [sic] is threatening nChain with is legal action that he was allegedly planning to take in your name; is that correct?**

A. Yes, I guess so.

**Q. Okay. And -- and, ultimately, you did not follow up on the threatened legal action that -- that Mr. Vallee threatened in this letter, did you?**

A. No. I filed a complaint in the Northern District of Georgia.

**Q. Right. But not against all of the parties named here in this letter, right?**

A. Not me personally. I did not file a complaint personally against the other items in here.

**Q. Right. What you were trying to do in this letter is threaten nChain that you would try to create some big public spectacle of a lawsuit if they didn't give you a settlement payment; isn't that right?**

A. I wasn't personally trying to do anything. This is a letter from my attorney. So once again, I'm not the author of the letter. I did not write the letter. And how we came to the plaintiffs or -- or in this particular letter, I can't even reveal to you because it's just -- it's confidential information between me

and -- and my -- my attorney.

**Q. And so you don't want a payment settlement from nChain; is that your -- your testimony?**

A. I absolutely want a settlement from nChain. That's why I filed a suit --

**Q. Right.**

A. -- in the Northern District of Georgia.

**Q. Right. And you -- 00?**

A. Finnerud, et al., versus nChain UK, LTD.

**Q. Right. And -- and before you filed this lawsuit, you were demanding $100 million, right?**

A. Jimmy sent a demand letter for $100 million.

**Q. Right.**

A. But I can't tell you how he came up to that -- like that number, how that number was reached. Once again, I would be revealing confidential information, so I can't.

**Q. You're not seeking $100 million anymore, are you?**

MR. NONNI: I mean, I'm going to say that would fall under our attorney-client privilege at that point.

BY MR. RUOCCO:

**Q. Well, do you -- do you -- are you trying to get $100 million out of this lawsuit?**

MR. NONNI: I mean, the amount of money that is being sought in the lawsuit would clearly fall under our attorney-client privilege.

MR. RUOCCO: How so? You filed an expert report. You claimed damages in pleadings. Like, how is that -- how is that privileged?

MR. NONNI: The calculations and the conversations that go behind how much money would ultimately being asked of a jury would, I think, clearly fall under attorney-client privilege, and there hasn't been any specific number in the Complaint that would not make it privileged, any conversations or a demand letter from us.

MR. RUOCCO: Okay. We will come back to that in a moment, I guess.

BY MR. RUOCCO:

**Q. Mr. Finnerud, I'm trying to cut through this.**

A. Yes.

**Q. I mean, you -- you made threats to nChain you did not follow up on. You were just trying to get a settlement payment, right?**

A. I don't agree.

**Q. Okay. Well, you -- you said now this several times, at some point, you ceased to be represented by Valhil Law firm, right?**

A. That's correct.
**Q. And then you started to look for a lawyer to represent you in the United Kingdom; is that right?**
A. Yes, I did.
**Q. Okay. And you reached out to several law firms that were based in the United Kingdom to discuss potential claims against nChain; isn't that true?**
A. Yes, it is.
**Q. Okay. Did you reach out to a firm called LawBEAM about representing you in connection with potential claims against nChain?**
A. I can't remember.
**Q. Did you reach out to someone named Rita Francis about potential claims against nChain?**
A. Rita reached out to me.
**Q. Is Rita a lawyer?**
A. No, Rita is a friend from X, from Twitter.
**Q. Did you reach out to a firm called Briffa about representing you in connection with potential claims against nChain?**
A. I can't remember.
**Q. Okay. Did you reach out to a firm called Walker Morris about representing you in connection with potential claims against nChain?**
A. I can't remember.

**Q. Did you reach out to a firm called Pail Solicitors about representing you in connection with the potential --**

A. Can you spell it?

**Q. P-A-I-L.**

A. P-A-I-L. Pail Solicitors? No, I don't -- I don't remember.

**Q. Okay. Okay. But --**

A. And I wasn't reaching out. I would say that my memory, Rita did most of the reaching out to the UK firms.

**Q. Who is Rita?**

A. Rita is a friend of mine. She's a -- she followed my whole DistroMint journey on X. She's a great friend who --

**Q. Was -- was Rita going to be like the client on any of these engagements?**

A. No. She lives in the UK, and she lives in London. She saw my story on X, and she said, "Smitty, I love you," and she's like, "I want to invest into DistroMint." She was like, "But we got to get you, you know, squared away with this whole situation." And she was like, "I will find you an attorney."

**Q. Okay. So you made a friend in London, and she started to help you with the lawyers and in the UK.**

**Is that what happened?**
A. Yeah.
**Q. Okay. Okay.**
A. I never met her in person, though. She was just watching my growth on -- online, like on social media.
**Q. And in working with Rita and, you know, looking at potential UK-based law firms, you anticipated bringing a legal claim against nChain in the United Kingdom; is that right?**
A. It was an option that was laid out on the table the same way launching DistroMint in BVI was an option, you know. It wasn't the final destination, though.
**Q. All right. Because you understood your relationship with nChain to be based in the United Kingdom, didn't you?**
A. I understood my -- my relationship, and according to all the invoices that we went over today, and nChain sending payments to Grayson, Georgia for, you know, nine months, a relationship is from London to Slovenia to the United States.
**Q. Right. The relationship London, Slovenia, over in Europe, right?**
A. Yeah.
**Q. Okay. Now, Mr. Finnerud, earlier, we discussed how nChain informed you that it was halting work on the**

**DistroMint platform in early October 2024, right?**
A. Well, we discussed that nChain stated -- or Mr. Puhek, Roman stated that, you know, it was paused until we got more information, but more than likely, you know, it was going to -- it would get worked out soon and -- and he would let us know when we could unpause, and that's a summary of the -- the e-mail that he sent me.
**Q. Okay. And from October 2023 forward, you didn't have anymore regular meetings with the members of the nChain Slovenia team staff, right?**
A. From October 2024 forward?
**Q. No. I said from October 2023 forward, you didn't have anymore regular meetings with the members of the nChain Slovenia team, did you?**
A. What specific date?
**Q. Well, I'm asking you, you just didn't have recurrent meetings with them from October of 2023 forward, right?**
A. I had scheduled meetings, and they never showed up.
**Q. But there was no, like, exchange --**
A. Like, we never actually got together ever again, and I've had no communication with them since.
Sir, can we take a two-second break? I got a

cramp in my leg.

MR. RUOCCO: Sure. Let's go off the record.

THE VIDEOGRAPHER: The time is 4:14. We are off the record.

(Recess.)

THE VIDEOGRAPHER: The time is 4:18 p.m. We're on the record.

BY MR. RUOCCO:

**Q. Mr. Finnerud, welcome back. I hope the cramp was resolved.**

A. I'm good.

**Q. Before the break, we were just discussing how, you know, from October of 2023 forward, you and the members of the nChain team never actually got back together to have any regular meetings, right?**

A. Yes.

**Q. I'm going to show you what's being marked as Finnerud Exhibit 41.**

(Finnerud Exhibit 41, E-mail dated May 5, 2024, re: January, February Consulting Invoices 2024, Bates stamped SA0003453 through SA0003455, was marked for identification.)

BY MR. RUOCCO:

**Q. And this is a May 5th, 2024, e-mail from**

yourself to Dale Evans, James Marchant and nChain at mystampli.com. The subject is "January, February, consulting invoices 2024," correct?
A. Yes.
Q. Okay. And then you write, "Hello, it has come to our attention that the consulting invoices for January and February are now past due. Please make payment immediately. Thank you."
Do you see that?
A. Yes.
Q. And then if you turn to the attachments --
A. Uh-huh.
Q. -- there is an invoice dated May 5, 2024, for $12,500. It states, "January 2024 consulting and a business development services," and the next page is a similar invoice dated May 5, 2024, also seeking $12,500, and the item is February 2024 consulting and business development services.
Do you see these?
A. Yes, sir.
Q. And did you generate these invoices?
A. I did.
Q. Okay. And so in May of 2024, you reached out to nChain seeking another $25,000 in fees for alleged consulting and business development services; is that

**right?**
A. Yes, sir.
**Q. Okay. And you claim that those services related to work that you had done in January and February of 2024; is that right?**
A. Yes.
**Q. But nChain had told you that it was halting work on the DistroMint platform in October of 2023, true?**
A. NChain breached and they stopped doing their work, but out of good faith, I continued my work in -- in hopes to show them that, you know, I'm still down and we can -- we're going to come to some sort of agreement at some point.
**Q. Well, if you -- if you take out Exhibit 37, this is the invoices that we discussed earlier today?**
A. Yeah.
**Q. Okay. So first page, this is the first invoice that you created on December 12, 2022.**
A. Uh-huh.
**Q. Do you see that right in the first page?**
A. (Witness moves head up and down.)
**Q. And then in the bottom, it says "Terms, total payments, 150,000 divided into 12 payment of $12,500 USD."**
**Do you see that?**

A. Yes.
**Q. Okay. So as -- as -- as you understood it, you would only be receiving 12 months' worth of consulting and business development services payments, right?**
A. Well, for that particular agreement as constituted by what's, you know, written at the bottom of each agreement, the total payments and the total amount of money. However, I had meetings that were scheduled by nChain in January and February, so I assumed that I was still working and -- and maybe my developers were doing something else, but it, you know, was still an obligation on my end, I felt, as the need to continue, you know, moving things forward. So they stopped. That's on them, but I didn't stop. I kept going.
**Q. Well -- but they had told you before that that they were not going to be showing up to meetings in the future, right?**
A. No, they didn't say that. They scheduled the meetings -- first they deleted the meetings. Then they rescheduled them all the way into March. And so it was very confusing for me, and I wanted to make sure that I was holding up my end of the obligation and so, therefore, they couldn't come back to me and say, Well, you know, you were on the clock for these particular

months and these meetings were scheduled and you didn't show up.

And then though I did show up to the meetings and no one showed up, I just wanted to -- to show in good faith that, you know, I kept my end of the bargain. Because they were scheduled by nChain.

**Q. So how -- and how many meetings were there now in -- in --**

A. I don't know. I would --

**Q. -- January and February 2024?**

A. I would have to -- I -- between January and March --

**Q. Yeah.**

A. -- I would have to -- I would have to refer to my calendar. But it was around the same, you know, like one meeting a week with the developers.

**Q. I mean, sir, like is it -- is it your testimony that for two full months, in January and February 2024, you every single week showed up to a Zoom meeting and no one from nChain was there?**

A. Yeah.

**Q. Is that -- is that your -- your meaning?**

A. I mean, I didn't stay for like, you know, a long time. But I clicked in out -- because I was -- my curiosity was, you know, is this like a game or

are -- are they going to show up at some point.
**Q. And -- and -- and as you are having -- you know, you're saying that as you were showing up to these meetings on a weekly basis, were you e-mailing the members of your team, saying, Hey, where is everybody?**
A. I can't recall, but I do believe I've sent some e-mails.
**Q. Okay. Do you recall e-mails from January and February 2024 where as you're sitting on the -- the Teams videoconference and no one is there, you're e-mailing the members of the nChain Slovenia team, saying, Hey, guys, I'm on -- I'm on the Teams, you know, no one else is here, what's going on?**
A. I don't remember.
**Q. Okay. And how long would you sit on -- on the Teams conferences that no one else was on?**
A. I don't know, like five minutes.
**Q. Okay.**
A. Yeah.
**Q. And then you did that for, what, eight weeks between January and February of 2024? Is that your testimony?**
A. I believe into March.
**Q. Okay. And just -- just focus on January and February 2024. So for the five minutes per week that**

**you were showing up to Teams meetings that no one else attended and where nothing occurred, it's your position that you're entitled to $25,000?**

A. I'm entitled to the $25,000 because I did my due diligence to see if my team was actually going to show up. But outside of that, I was doing other activities involved -- involving, you know, promoting, marketing and, you know, building and attempting to keep DistroMint alive and running and keep the platform going.

**Q. Now, earlier, though, you testified that it was your understanding that when Mr. Vallee of the Valhil Law firm sent his first letter to nChain in January of 2024, that effectively terminated the relationship between you and nChain; is that right?**

A. Oh. Can you rephrase that?

**Q. I'm just asking -- earlier you testified that it was your understanding that when Mr. Vallee sent the first letter in January of 2024, that letter effectively terminated any relationship you had with nChain; isn't that right?**

A. Well, do you have a copy of a separation notice?

**Q. Well, I'm -- sir, this is based on testimony that you've given today or -- and yesterday in your deposition.**

A. Yeah.
**Q. I'm asking you --**
A. Because I believe that there was a separation notice. However, I can't recall if I've seen it.
**Q. Well, let's take out Exhibit 8 again.**
A. Okay. Yep.
**Q. And go back to -- this is the January 29, 2024, e-mail -- or letter, rather, from the Valhil Law firm. Let me know when you have that, okay?**
A. Yes.
**Q. Okay. So if you turn to page 563, the third -- the third paragraph, right, the letter states, "As a result of the material breaches of the development agreement by nChain and nChain's coordinated participation with Mr. Ayre and Ayre Ventures to convert the blockchain content IP, the following remedies are hereby demanded: 1, the development agreement is hereby terminated with immediate effect, and nChain no longer has any license or claim whatsoever to the blockchain content, the DistroMint platform or DistroMint, all of which together with any implied rights that may arise pursuant to any power of attorney granted by our client in connection with the development agreement, are hereby revoked with immediate effect."**
**You see that?**

A. Yes, I see it.

**Q. Okay. And so does this refresh your recollection that it's your position that when Mr. Vallee sent this letter on your behalf in January 29, 2024, any legal obligations under the development agreement were terminated effective immediately?**

A. You know, again, I'm not a -- I'm not trained in -- professionally trained in law, and I think there's a little confusion in this -- in this document and in my invoices. And I can't reveal -- again, I can't reveal information pertaining to confidential advice that I received between -- between me and Jimmy.

**Q. Okay. I'm just -- you mentioned some confusion between your invoices and -- and -- and this letter. The confusion is that after your lawyer sent a letter to nChain purporting to terminate the alleged development agreement, you continued to bill nChain for work that you thought you were doing under that agreement, right?**

A. There was no agreement. I just had a whole bunch of extra days added to my calendar, and they were meetings that were scheduled by nChain, and I just wanted to fulfill my obligation because I felt like, you know, if they put me on the clock -- it's like if you have a job and you're supposed to -- you're on the -- on

the schedule on Tuesday, Wednesday, Thursday, you know, you go to work and show up. Otherwise you get fired.

**Q. Okay. So there was no agreement for you to provide services further into 2024; is that right?**

A. It -- it -- it did not -- the -- the expectation of an agreement or -- let me -- let me word this differently.

We had an original agreement, which nChain breached, and the only thing I was trying to do is show in good faith nChain schedules these meetings, that means I'm on the clock. And that's the only belief. So if meanwhile Jimmy serves them a letter and whatnot at the same time, I can't explain to you because I'll be breaking my confidentiality -- I'd be breaching confidentiality between the advice that was given to me by my attorney.

So we got two things going on at the same time. However, I can't tell you why because I would be revealing confidential information, attorney-client privilege.

**Q. Okay. And the way you felt you were operating in good faith was by charging nChain another $25,000?**

A. No, by working at the same time because --

**Q. By -- by attending the meetings --**

A. -- these things.

**Q. -- by attending these meetings that no one else attended?**

A. Not attending meetings. I'm using the meetings as a date, a time and a -- a record of nChain scheduling these meetings, which is very confusing. So in order for the confusion to be silenced, I continued to work on the development of DistroMint in terms of everything I could do on my end: You know, attempting to secure funding, trying to move DistroMint from -- or migrate DistroMint from AWS to Microsoft Azure so that we could take advantage of the 175,000 AWS credits that we had been granted.

**Q. But, sir, again, I'm going to point you back to your attorney's letter from January 29, 2024. You -- this letter states that nChain no longer has any license or claim whatsoever to the blockchain content IT -- IP, the DistroMint platform or DistroMint, correct?**

A. I mean, if that's what the letter says.

**Q. Okay. So none of what you were doing in 2024 was at all for nChain's benefit.**

A. Of course it was.

**Q. How was it for nChain's benefit?**

A. Because I'm showing my due diligence. I'm showing that I'm not going to go breach contract with them. I -- I'm going to carry out whatever they -- they

have still written down. Now, at the same time while my attorney can serve them at any time -- but that's an ongoing process. And I can't tell you why because, once again, you -- you -- you're digging into the con- -- I can't reveal confidential conversations that me and Jimmy had and to the reason why, you know, I -- you understand what I'm saying? So --

**Q. Yeah. I may -- just want to -- and after this, we can move on.**

**But you're -- you're -- you're just say -- telling us you can't explain for us the reason why you continued to invoice nChain for services at the same time your lawyer was saying the alleged development agreement was over and nChain had no ownership interest in DistroMint, because the answer to that question is attorney-client privilege; is that right?**

A. Yes, that's correct.

**Q. Okay. Thank you.**

**Now, Mr. Finnerud --**

A. Yes.

**Q. -- you did ultimately sue nChain here in the Federal District Court of Georgia, right?**

A. That is correct.

**Q. That's why we've had the pleasure of being together for the last couple days.**

A. The pleasure is all mine.

**Q. And -- and you included DistroMint, LLC as a party to this lawsuit, correct?**

A. Yes.

**Q. Okay. Can you look at Exhibit 4 for me? It's the DistroMint, LLC 30(b)(6) notice.**

A. Yes.

Exhibit 1?

**Q. Exhibit 4. It's the -- it's the DistroMint one. And I want you to turn to Topic 13.**

A. Okay. One second.

**Q. Yep.**

A. Topic 13.

**Q. Yes. Okay?**

A. Okay.

**Q. And that's on page 8. Okay? And the -- the topic is which entities or individuals authorized or approved of DistroMint, LLC's initiation of this lawsuit, including any votes or reso- -- resolutions authorizing the initiation of this action.**

**Do you see that topic?**

A. Yes.

**Q. Do you understand that you are DistroMint's 30(b)(6) witness on that topic?**

A. Yes.

Q. Are you prepared to testify about it?
A. Yes, I am.
Q. Who authorized DistroMint, LLC to file this lawsuit?
A. I did.
Q. Let me just make sure we got a clean record.
So who authorized DistroMint, LLC to file this lawsuit against nChain?
A. I did.
Q. Did anybody else participate in the decision to -- let me ask you this. Aside from your attorneys, did anyone else participate in the decision to authorize DistroMint, LLC to file this lawsuit against nChain?
A. No.
Q. Okay. Okay. While we're -- we have the 30(b)(6) notice out, can you turn for me to page 12, Topic 42?
A. Yes.
Q. Okay. The topic is all valuations of DistroMint and DistroMint, LLC.
Do you see that?
A. Yes.
Q. And do you understand that you're DistroMint, LLC's 30(b)(6) witness on this topic?
A. Yes.

**Q. Are you prepared to testify?**
A. Yes.
**Q. And if you take out Exhibit 1, which is the Sound Alive 30(b)(6) notice.**
A. Okay.
**Q. And turn for me, if you would, to page 15, which is -- and paragraph 46.**
A. Page what now?
**Q. Page 15 of Exhibit 1, Topic 46?**
A. Okay.
**Q. Okay. The topic here is also all valuations of DistroMint. Do you see that?**
A. Topic 46, you said?
**Q. Yes. Yes.**
A. Okay, yes.
**Q. Do you understand you're -- you're Sound Alive's 30(b)(6) witness on that topic?**
A. Yes, I do.
**Q. Are you prepared to testify about it?**
A. Yes.
**Q. Does DistroMint, LLC have any internal valuations of DistroMint, LLC?**
A. Yes.
**Q. What are those documents?**
A. Dorothy Haraminac report.

**Q. Okay. So I understand Ms. Haraminac is an expert -- or consultant that you've retained in connection with this lawsuit.**
**Aside from Ms. Haraminac, does DistroMint, LLC have any internal valuations of DistroMint, LLC?**
A. I don't know.
**Q. Aside from the report of -- will you remind me her name? I'm sorry.**
A. Dorothy Haraminac.
**Q. Aside from Ms. Haraminac's report, does Sound Alive have any internal valuations of DistroMint, LLC?**
A. I would refer to Dorothy Haraminac's report.
**Q. Okay. Aside from Ms. Haraminac, has DistroMint, LLC ever hired anyone to perform a valuation of DistroMint, LLC?**
A. We haven't hired, but nChain made a valuation of 10 million.
**Q. Okay. I understand that that's your position in this case. But aside from Ms. Haraminac, did Sound Alive ever hire anyone to perform a valuation of DistroMint, LLC?**
A. No.
**Q. Can you explain to me how you think you, and by "you," I mean you personally, DistroMint, LLC, Sound Alive, how you think that you've suffered damages in**

**connection with the claims that you brought in this lawsuit?**

A. I would refer to the -- I would refer to the -- the claim.

**Q. The Complaint, is that what you mean?**

A. The Complaint, yes.

**Q. Do you have anything to add beyond what's in the Complaint?**

A. I would like to refer to the Complaint.

**Q. Okay.**

A. Yeah.

**Q. And if we -- if we just look at the 30(b)(6) notices --**

A. Yes, sir.

**Q. -- and I know this is tedious, so just bear with me, okay?**

**In Exhibit 1, and that's the Sound Alive 30(b)(6) notice. If you look at --**

A. Okay. Are you talking about Topic 1?

**Q. No. I'm talking about -- so we have Exhibit 1 and Exhibit 4, okay? Those are the 30(b)(6) notices, right?**

A. Yes.

**Q. So for Exhibit 1, if you look at Topic 45, Sound Alive's claimed damages including the basis therefor,**

**the method of calculation and any evidence supporting the alleged damages?**
A. Woah, woah, woah, Okay. Topic 45?
**Q. Yes.**
A. Okay.
**Q. Do you understand that you've been designated Sound Alive's 30(b)(6) witness on that topic?**
A. Yes.
**Q. And you're prepared to testify about it?**
A. Yes.
**Q. And then in Exhibit 4, it's Topic 41, DistroMint, LLC's claimed damages, including the basis therefor, the method of calculations and any evidence of supported the alleged claims.**
**Do you see that?**
A. Yes.
**Q. And do you understand you have been designated DistroMint, LLC's witness on that topic?**
A. Yes.
**Q. And you're prepared to testify?**
A. Yes.
**Q. Does Sound Alive's or DistroMint, LLC have any additional information about the damages they claimed to have suffered in this indication other than what's already stated in the Complaint?**

A. I would refer to the Complaint and to Dorothy Haraminac's report.
**Q. Okay. And -- and so the Complaint and Ms. Haraminac's report are a complete description of the ways in which you, Sound Alive and DistroMint, LLC alleged you have been damaged in connection with this -- with the claims asserted in this case; is that right?**
A. Yes.
**Q. Now, Mr. Finnerud, do you understand that nChain has filed counterclaims in connection with this case as well?**
A. No.
**Q. Okay. Have -- I'm going to show you what is being marked at Mr. Finnerud exhibit -- as Exhibit 42.**
(Finnerud Exhibit 42, Press Release dated October 3, 2025, Entitled Blockchain Breakthrough: Federal Court Crushes nChain's Dismissal Bid in DistroMint, LLC's Explosive Contract Clash, was marked for identification.)
BY MR. RUOCCO:
**Q. And Mr. Finnerud, this is a document entitled Eric Finnerud and Sound Alive Enterprise, LLC's Answer and Affirmative Depends to nChain UK Limited's Counterclaim.**
**Do you see that?**

A. Yeah, sir. I hate to interrupt you. This one has writing in it.

**Q. Oh, let me see that.**

A. (Tendered.)

**Q. Oh, wow. Okay. Thank you for handing that back. Yes. Let's put that -- no. I think we printed the wrong copy. Thank you for letting me know that.**

A. Yes, sir.

**Q. So I'll show you what's now being marked as Finnerud Exhibit 42, and this is an article entitled Blockchain Breakthrough Federal Court Crushes NChain's Dismissal Bid in DistroMint, LLC's Explosive Contract Clash.**

**Do you see that?**

A. Yes.

**Q. And the article is dated October 3, 2025?**

A. Yes.

**Q. And if you turn to the third page of the article, there's a picture of you here at the top?**

A. Yep.

**Q. Did you provide this -- this photograph to the news organization that released this article?**

A. I don't recall.

**Q. You're quoted here in the -- in the second paragraph of this page. It says, "This decision is a**

**crucial step forward in holding powerful blockchain entities accountable for their comments," said E. Smitty.**

A. Commitments.

**Q. Thank you.**

A. Yes.

**Q. "-- this decision is a crucial step forward in holding powerful blockchain entities accountable for their commitments," said E. Smitty. "As creators and innovators, we entered into this agreement in good faith, revolutionized how the music and digital assets are tokenized and distributed. NChain's actions have not only harmed our business, but also underscored the need for transparency and reliability in the tech sector."**

**Do you see that?**

A. Yes.

**Q. And -- and did you provide that quote to the news organization that released this article?**

A. I don't recall.

**Q. Okay. Do you have any reason to believe that the news organization that released this article would make up a quote by you?**

A. I don't believe that either.

**Q. You just don't remember giving this quote?**

A. I've done hundreds of interviews.
**Q. Okay. There is also -- if you turn to the next page.**
A. Yep.
**Q. Second full paragraph, it says, "As the blockchain industry matures, cases like this will set an important precedent for contract enforcement and intellectual property protection," added Frederick Anthony Rispoli and Mark Nonni, cocounsel for the plaintiffs from Hodl Law & Nonni Homola, "We're committed to fighting for creators who rely on these technologies to build the future of entertainment."**
**Do you see that?**
A. Yes.
**Q. And are you aware that your attorneys provided this -- this quote in connection with this article?**
A. I have -- I have no recollection.
**Q. Okay. Did you or your agents contact the news organization that put out this article to ask them to write about this lawsuit?**
A. I don't recall.
**Q. If you look at the bottom of this page that we're on that had the quote from your attorneys, it says -- excuse me -- that the source is DistroMint, LLC.**
**Do you see that?**

A. Yes.
**Q. Okay. And in fact, the source of the information for this article came from DistroMint, LLC; isn't that right?**
A. I don't recall.
**Q. And if you look at the front page of the article with the title on it, it says news provided by DistroMint, LLC, right?**
A. That's what it says.
**Q. Okay. And does that refresh your recollection that DistroMint, LLC was the source of the information in this article?**
A. I -- honestly I -- I don't recall because I -- you know, I've done, like I said, a lot of interviews.
**Q. Okay. Are you disputing that you or your agents provided information in connection with the publications?**
A. I -- I have no recollection, so I don't recall.
**Q. Okay. You just don't remember having provided information to a reporter about the lawsuit?**
A. No, I don't remember.
**Q. Okay. Mr. Finnerud, you know, earlier you testified that you're the sole member of Sound Alive, right?**
A. Yes.

**Q. And you also testified you're the managing member of Sound Alive; is that right?**
A. Yes.
**Q. Is there any person at Sound Alive who would be more knowledgeable about the facts and claims at issue in this case than you?**
A. Absolutely not.
**Q. Okay. Okay. Is there anyone else at Sound Alive who would be able to offer testimony about the facts and claims at issue in this lawsuit other than you?**
A. No.
**Q. So you are the only person who can provide testimony on behalf of Sound Alive in this lawsuit; is that right?**
A. That is correct.
**Q. Okay. And Sound Alive would adopt the testimony that you've given today as its own; is that fair?**
A. Yes, sir.
**Q. Okay. And also the testimony that you gave yesterday, Sound Alive would adopt that too, right?**
A. Yes.
**Q. Okay. And Mr. Finnerud, earlier you testified that you're the managing member of DistroMint, LLC. Do you remember that?**

A. Yes, sir.

**Q. And are you the person at DistroMint, LLC most knowledgeable about the facts and claims at issue in this lawsuit?**

A. I am.

**Q. Is there anyone else at DistroMint, LLC who would be able to offer testimony about the facts and claims at issue in this lawsuit?**

A. I don't believe so.

Can I say one thing on the record? I know Destiny Perry, my wife, is listed as the vice president and, you know, she's to be deposed on Friday, but I'll tell you right now that she was pregnant during my engagement with nChain and Christen Ager-Hanssen, and we had the baby on January 21st, and then for the next, you know, nine months, she was nursing the child. So majority of -- of our meetings with nChain, like my meetings with my team and with everyone else, you know, these are things happening early in the morning. She was not present.

**Q. Okay.**

A. Yeah. So she's going to offer very little testimony. She doesn't -- she doesn't know a lot, yeah.

**Q. Okay. And so Ms. --**

A. I don't want you to waste your time.

**Q. -- Ms. -- Ms. Perry doesn't have any firsthand knowledge about the facts and claims at issue in this case. Is that your understanding?**
A. Yes.
**Q. Okay.**
A. You're just going to get a lot of "I don't knows," and so I'm just giving you the heads-up. Yeah.
**Q. Okay. Would -- turning back to DistroMint, LLC. Would DistroMint, LLC adopt the testimony that you've given in your deposition?**
A. Yes.
MR. RUOCCO: Okay. Let's just take a quick break.
MR. NONNI: Sure.
THE WITNESS: Yes, sir.
THE VIDEOGRAPHER: The time is 4:51 p.m. We're off the record.
(Recess.)
BY MR. RUOCCO:
**Q. I'm showing you what's being marked as Finnerud Exhibit 43.**
(Finnerud Exhibit 43, Eric Finnerud and Sound Alive Enterprise, LLC's Answer and Affirmative Defenses to nChain UK LTD's Counterclaims, was marked for identification.)

BY MR. RUOCCO:
**Q. And this is a document entitled "Eric Finnerud and Sound Alive Enterprise, LLC's Answer and Affirmative Defenses to nChain UK's Counterclaims," correct?**
A. Are you asking me?
**Q. Yes.**
A. Can you repeat the question one more time?
**Q. Sure. This is a document entitled "Eric Finnerud and Sound Alive's" -- "Sound Alive Enterprise, LLC's Answer and Affirmative Defenses to nChain UK Limited's Counterclaims," right?**
A. I'm sorry, I'm a little hard of hearing today.
**Q. Sure, sure.**
**Just focus on the -- on the title of the document. That's all.**
**So this is a document entitled "Eric Finnerud and Sound Alive Enterprise, LLC's Answer and Affirmative Defense to nChain UK Limited's Counterclaims," correct?**
A. Okay.
**Q. Okay. And then if you just turn to me -- for me to the page 18 of 19, you'll -- you'll see that it's signed by your counsel, Mark Nonni. You see that?**
A. 18 and 19, you said?
**Q. 18 of 19.**
A. 18 of 19. Okay.

Okay.
**Q. Okay. And is this the answer and affirmative defenses that you and Sound Alive submitted in this lawsuit in response to nChain's counterclaims?**
A. I don't understand the question.
**Q. Have you seen this document before, sir?**
A. I have not.
**Q. Okay. Are you prepared to testify about the responses that you and Sound Alive made to the allegations in nChain's counterclaims?**
A. Yes.
**Q. Okay. So, for example, let's look at page -- page 12.**
A. Okay.
**Q. Okay. So paragraph 48, "Finnerud alleged that he and Sound Alive entered into a development agreement pursuant to which nChain UK would own 50 percent of DistroMint, LLC."**
**Do you see that?**
A. Yes.
**Q. And then the response is, "Finnerud and Sound Alive deny the allegations in paragraph 48," correct?**
A. "Finnerud has alleged that he and Sound Alive entered into a development agreement pursuant to which nChain UK would own 50 percent of DistroMint."

"Response: Finnerud and Sound Alive deny the allegations in paragraph 48."
I don't understand this.
**Q. Do you -- do you stand by this denial?**
A. I don't -- I know. I mean, I don't understand the document.
**Q. This is a -- so this is your answer to the counterclaims that were filed against you by nChain --**
A. So what was -- what was the counterclaim filed against me?
**Q. Well, the coun- -- so the way the document works is that the paragraph numbers are allegations that nChain made. Okay. And the responses are your response to those allegations, okay?**
A. Yeah. But you read -- you said -- okay. So maybe we got this a little bit messed up. "Deny the allegations in paragraph 48."
"Finnerud has alleged that he and Sound Alive entered into a development agreement pursuant to which nChain UK would own 50 percent of DistroMint, LLC."
That -- you're saying I alleged that -- I don't -- I don't know, is what I'm going to say, because I don't know how to -- I don't understand the question and I don't understand the language.
**Q. Okay. Do you understand this is a document,**

**though, that your lawyer submitted in this lawsuit on your behalf? Right?**

A. It appears so, but it just -- I would need to like consult with my counsel and -- to further understand this better.

**Q. Okay.**

A. "No member of" -- "ever sought or received nChain UK's consent for DistroMint, LLC to appoint counsel in connection with this action."

"Deny the allegation."

**Q. Okay.**

A. Yeah, I would really need to go over this. This is -- "deny the allegations in paragraph 58." "Finnerud" --

THE REPORTER: If you're going to read, I need to be able to hear you.

THE WITNESS: Okay.

THE REPORTER: I'm sorry.

BY MR. RUOCCO:

**Q. Well, let's look at -- there's another one. So go on page 10, for example.**

A. Okay.

**Q. Paragraph 40 states, "Finnerud holds himself out as the owner and operator of DistroMint, LLC."**

**And the response to that was, "Finnerud and**

**Sound Alive deny the allegations in paragraph 40."**
**Do you see that?**
A. Again, I -- I can't understand this unless I -- I need to consult with my counsel to -- to understand this document because it's confusing to me. I don't want to make the wrong assertions [sic] and -- and say the wrong thing, as well, because I know I'm under oath. So it would be great for me to review this document with my counsel.
**Q. Okay. Would you take out the Exhibit 1. It's the 30(b)(6) notice for Sound Alive.**
A. Yep.
**Q. And look at Topics 10 and 11.**
A. Okay.
**Q. Okay. And the -- the topic is "Sound Alive's denials of allegations in its Answer." And then the next topic is, "The basis for Sound Alive's affirmative defenses asserted in this Action, including the nChain UK" -- that nChain UK allegedly committed a prior material breach; that nChain UK did not sustain any injury or damages (Fourth Affirmative Defense); that** nChain UK failed to mitigate damages (Fifth Affirmative Defense); that any damages awarded to nChain UK would result in unjust enrichment (Sixth Affirmative Defense); and that nChain UK engaged in alleged

misrepresentations, concealment, and improper conduct on which Sound Alive relied (Seventh Affirmative Defense)."
Do you see those?
A. Yes.
**Q. Do you understand that you've been designated Sound Alive's 30(b)(6) witness on those topics?**
A. Yes.
**Q. Okay. I take it you're not prepared to testify about those today, though?**
A. To testify about Number 11?
**Q. 10 and 11?**
A. 10 and 11? I'm unprepared to testify about Number 10, but I can concur with 11.
**Q. Okay. So --**
A. In -- to the context that I understand it. And I would say that I would still need to -- I would probably need to refer to -- to my counsel just to -- just to make sure that everything is -- is ironed out perfectly.
**Q. Okay. So here's what I'd like to do, then.**
A. Okay.
**Q. We have tomorrow. Why don't you go get prepared on this this evening, come back, and we'll address Topics 10 and 11 tomorrow. How about that?**
A. Are you all right with that?

**Q. I'm -- I'm -- I want to have you prepared to answer questions about the topics, so why don't you do that.**

A. Okay.

**Q. Okay. So we'll -- we will adjourn until tomorrow.**

A. Okay. Thank you.

**Q. Let's go off the record.**

THE VIDEOGRAPHER: The time is 5:05 p.m. We're off the record.

(The deposition was concluded at 5:05 p.m.)

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity. Such form shall be attached to the deposition transcript, I make the following disclosure: I am a Georgia Certified Court Reporter. I am here as a representative of Cite, LLC.

Cite, LLC, was contacted to provide court reporting services for the deposition. Cite, LLC, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c). Cite, LLC, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Cite, LLC, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Susan DiFilippantonio

Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

Susan DiFilippantonio

Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 11-22-2030
Georgia Certificate Number 2125

CAPTION

The Deposition of ERIC FINNERUD, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF FULTON

Before me, this day, personally appeared, ERIC FINNERUD, who, being duly sworn, states that the foregoing transcript of his deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

*If no changes need to be made on the following two pages, place a check here ____, and return only this signed page.*

Case: Eric Finnerud, et al. vs Nchain UK LTD
Witness Name: Eric Finnerud - Volume 2
Deposition Date: 08/05/2026

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2026 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Eric Finnerud, et al. vs Nchain UK LTD
Witness Name: Eric Finnerud - Volume 2
Deposition Date: 08/05/2026

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

(  ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

(  ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

| | |
|---|---|
| ______________ DATE | ________________________ WITNESS SIGNATURE |
| ______________ DATE | ________________________ NOTARY |

Errata Sheet

NAME OF CASE: Eric Finnerud, et al. vs Nchain UK LTD

DATE OF DEPOSITION: 08/05/2026

NAME OF WITNESS: Eric Finnerud - Volume 2

Reason Codes: 1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

Page _____ Line ______ Reason ______

From _______________________ to _______________________

_________________________

ERIC FINNERUD - VOLUME 2