# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC and DISTROMINT, LLC, | : |
| Plaintiffs, | : CIVIL ACTION FILE NUMBER: |
| versus | : 1:24-cv-05280-SDG |
| NCHAIN UK LTD, | : |
| Defendant. | : |

VIDEOTAPED DEPOSITION OF
ERIC FINNERUD

Volume III

Pages 584-671

8:59 a.m.

August 6, 2026

STANTON LAW
410 Plasters Avenue NE
Atlanta, GA 30324

Susan DiFilippantonio, RPR, RMR, CRR, CSR 2125

APPEARANCES:

On Behalf of the Plaintiffs, ERIC FINNERUD, SOUND ALIVE ENTERPRISE, LLC and DISTROMINT, LLC:

MORGAN & MORGAN
BY: Frederick A. Rispoli
18100 Von Karman Avenue
Suite 200
Irvine, CA 92612
949.898.6587
frederick.rispoli@forthepeople.com

On Behalf of the Defendant, NCHAIN UK LTD:

ELSBERG BAKER + MARURI, PLLC
BY: Jared Ruocco
Sean Foley
350 Fifth Avenue
38th Floor
New York, NY 10118
212.597.2606
jruocco@elsberglaw.com
sfoley@elsberglaw.com

Also Present: Michael Bond, videographer

I N D E X


| WITNESS/EXAMINATION | PAGE |
|---|---|
| ERIC FINNERUD | 587 |
| EXAMINATION BY MR. RUOCCO | 587 |
| EXAMINATION BY MR. RISPOLI | 600 |
| EXAMINATION BY MR. RUOCCO | 655 |
| EXAMINATION BY MR. RISPOLI | 661 |
| DISCLOSURE | 665 |
| CERTIFICATE OF REPORTER | 669 |
| SIGNATURE OF DEPONENT | 671 |


E X H I B I T S

(None Proffered.)

(Thursday, August 6, 2026 8:59 a.m.)

THE VIDEOGRAPHER: Good morning. This is the beginning of Media Number 1 on August 6, 2026. The time is 8:59 a.m. This is the deposition of Eric Finnerud for the case Finnerud, et al., versus nChain UK LTD, et al.

Will the Court Reporter please swear in the witness.

ERIC FINNERUD,

called as a witness at the instance of the Defendant, being first duly sworn, was examined and deposed as follows:

EXAMINATION

BY MR. RUOCCO:

**Q. Good morning, Mr. Finnerud.**

A. Good morning.

**Q. Welcome back.**

**If you'd take out Exhibit 1.**

A. Yep.

**Q. This is the 30(b)(6) notice to Sound Alive Enterprise, LLC.**

A. Yes.

**Q. And if you'd turn to me -- with me to page 9, Topics 10 and 11.**

A. (Complying.)

Okay.
**Q. And we -- we were discussing these topics yesterday, and I believe you said you were going to spend the night and get yourself more familiar with these topics --**
A. Yes.
**Q. -- right?**
A. Yes.
**Q. Have you had a chance now to do that?**
A. Yes. I've had a brief opportunity to take a deeper dive into things.
**Q. Okay. And are -- do you feel prepared to testify about Topics 10 and 11 today?**
A. To the best of my knowledge.
**Q. Okay. If you could take out Exhibit 43.**
A. Okay.
**Q. And this is the document entitled "Eric Finnerud and Sound Alive Enterprise, LLC's Answer and Affirmative Defenses to nChain UK Limited's Counterclaims," correct?**
A. Yes, sir.
**Q. Okay. And so if you could turn for me to page 12.**
A. Okay.
**Q. If we look to paragraph 48, the -- the allegations in the counterclaim is, "Finnerud has**

alleged that he and Sound Alive entered into a," quote/unquote, "development agreement pursuant to which nChain UK would own 50 percent of DistroMint, LLC."
Do you see that?
A. Yes.
Q. And then the response is, "Finnerud and Sound Alive deny the allegations in paragraph 48."
Do you see that?
A. Yes, I do see it.
Q. Okay. And what's the basis for you and Sound Alive denying that allegation?
A. It was a typo.
Q. It was a typo?
A. Yeah.
Q. Okay.
A. We don't deny it.
Q. Okay. So you -- you -- you admit that allegation now?
A. That -- that we alleged that Sound Alive entered into a development agreement pursuant to which nChain UK would own 50 percent of DistroMint, LLC?
Q. Yes.
A. Yes.
Q. Okay. Let's look at paragraph 40, which starts on page 10 and goes over to page 11.

A. Please excuse me. My allergies are a little worse today.

**Q. That's okay.**

**Please let me know when you're there.**

A. Yes. I'm -- Number 40?

**Q. Yes.**

**Okay. So the algorithm in paragraph 40 is, "Finnerud holds himself out as the owner and operator of DistroMint, LLC."**

**And the response is, "Finnerud and Sound Alive deny the allegations in paragraph 40."**

**You see that?**

A. So I believe this is a typo, as well, because I hold myself as an owner and operator of -- of DistroMint, LLC and I also -- in regards, nChain was my partner, so 50/50.

**Q. Okay. So you -- you admit the allegation in paragraph 40?**

A. Yes. Yes.

**Q. Okay. Let's see. Let's go to the next page on 42 -- or 40 -- yes, paragraph 42, page 11.**

A. Yes.

**Q. "Finnerud presents himself as the CEO of DistroMint, LLC. See e.g. Exhibit 4, Finnerud's LinkedIn profile."**

**The response was, "Finnerud and Sound Alive deny the allegations in paragraph 42."**
**Do you see that?**
A. Yes. It's another typo, so.
**Q. Okay. Do you or Sound Alive plan to submit an amended answer where you correct any of these typos?**
MR. RISPOLI: Counsel, we'll amend the answer, you know, if there's no objection on those.
MR. RUOCCO: So objection -- well, we'll take that under advisement. I'm just asking if the witness plans to --
MR. RISPOLI: Okay.
THE WITNESS: Yeah, I plan to lean on my counsel and -- and make the changes. I'm not a professionally trained, you know, law guy, so --
BY MR. RUOCCO:
**Q. Okay.**
A. Yeah. That's why these were confusing for me yesterday.
**Q. Okay.**
A. Yeah.
**Q. Understood.**
**Can you look for me at pages 5 and 6 of the answer.**
A. (Complying.) Pages 5 and 6. Whoa. This says 5

of 19. Okay. Okay.
**Q. Yeah. I'm looking at paragraph 13.**
A. Yes.
**Q. "Plaintiff Finnerud, a Georgia-based music producer, alleges that in or around December 2022 he approached Ager-Hanssen with a proposal. On information and belief, Finnerud represents that he had intellectual property that would revolutionize the music industry, a blockchain-based service that would allow artists to distribute, create NFTs, and earn greater royalties for their art. Finnerud wanted the nChain group's expertise in developing his unnamed concept, which was to be run by his company, Sound Alive Enterprise, LLC. See Docket 365, Exhibit D to Exhibit 1."**
**The response was, "Finnerud and Sound Alive deny the allegations in paragraph 13."**
**Do you stand by that denial or do you admit that allegation?**
A. Well, I didn't approach Christen. Christen approached me.
**Q. Okay. So that's the basis for denying the allegation?**
A. Yes.
**Q. Okay. And let's see. Paragraph 14, "Finnerud also offers his purported marketing experience and**

**connections in the music industry to nChain UK. Ager-Hanssen directed that nChain UK pay Sound Alive $12,500 monthly for Finnerud's purported consulting services to the nChain group concerning music-related matters, primarily the project to be developed by nChain's software development team."**

**"Finnerud and Sound Alive deny the allegations in paragraph 14."**

**Do you stand by that denial or do you admit that allegation?**

A. Yeah, I stand by the denial.

**Q. Okay. What's the basis for the denial?**

A. It's inaccurate.

**Q. Okay. What part is inaccurate, do you think?**

A. The ascertaining [sic] that I offered anything besides my patent and my intellectual property. Right.

**Q. Okay. Okay. Can you turn for me to the affirmative defenses part of the answer?**

A. Yes.

**Q. That's on page 16.**

A. Yes.

**Q. Okay. If you could look to the second affirmative defense.**

A. Uh-huh.

**Q. It states, "NChain UK's contract-based claims**

**are barred because it committed a prior material breach as alleged in plaintiffs' Complaint. See OCGA Section 13-5-8."**
**What is the basis for that affirmative defense?**
A. Because nChain had already breached the original agreement.
**Q. And -- and what was the prior material breach that you allege nChain committed?**
A. Well, nChain -- I would refer to the Complaint.
**Q. And when was it that you think that nChain committed a prior material breach?**
A. I would refer to the Complaint because that has the full details in there.
**Q. Okay. So there's nothing you can offer us on the basis for the second affirmative defense other than what's already in the Complaint?**
A. I'm not going to offer anything else because I find the Complaint to be accurate.
**Q. Let's look at the fourth affirmative defense.**
A. Okay.
**Q. It states, "NChain UK has not sustained any injury or damages as a result of any act or conduct by Finnerud or Sound Alive."**
**Do you see that one?**
A. Yes. That's correct.

**Q. Okay. What's the basis for this affirmative defense?**

A. I mean, I don't see how nChain, a multibillion-dollar company, could have sustained any damages, you know, when I relied heavily on them and their expertise and they reneged on me, you know.

And to add a little bit, you know, yesterday you asked me, you know, why would nChain stop working with you and, you know, breach the agreement. And, I mean, it's simple: They just did not like the terms that Christen Ager-Hanssen had -- and I had agreed upon on -- on or around the 12th of December, and so they gave me the restructure proposal, which was -- completely flipped it into their favor, so basically the little guy getting screwed over by the big billion-dollar corporation.

**Q. Is that the basis for your affirmative defense, that nChain did not suffer any injury or damages?**

A. Yeah. I mean -- and I did not breach the contract; they did.

**Q. But that's -- so, sir, these are your affirmative defenses, okay?**

A. Right.

**Q. And so these -- these assume if -- if it is proven that you did breach the contract, why you are not**

**going to -- you shouldn't be found liable. Okay? That -- that's what affirmative defenses are.**
**I'm just asking you --**
A. I -- I'll be honest with you: I leaned heavily on my attorneys for this type of stuff because I'm -- I'm not a professionally trained lawyer. So that's why -- you know, I'm -- I'm an expert in the music industry as a record producer, and, you know, I leaned heavily on -- you know, that's why I hire attorneys.
**Q. And, I mean, is it part of your fourth affirmative defense that nChain couldn't have suffered damages because it's a large company?**
A. I feel like nChain was -- had every advantage and I trusted in them. I believed in them. And, you know, I really thought that we were going to, you know, revolutionize the music industry and do amazing things together, and unfortunately that's not the way things panned out.
**Q. Do you allege that you and Sound Alive suffered damages in this case?**
A. Absolutely.
**Q. And can you explain for us how you and Sound Alive damages -- how you and Sound Alive would have sustained damages but not nChain UK?**

A. Yes.
**Q. And how would that be?**
A. My complaint outlines all the damages. And Dorothy Haraminac, you know, puts a, you know, ballpark figure on -- on those damages.
**Q. All right. Let's look at the fifth affirmative defense.**
**"NChain UK's claims are barred in whole or part by its failure to mitigate damages."**
**What's the basis for that affirmative defense?**
A. NChain never, in our entire relationship, voiced to me any type of failure on my behalf to perform my duties or any mistakes that I made, and they never pursued any, you know, legal recourse for that.
At the same time, you know, through -- there were no damages through the -- the course of our relationship. The damages were actually done to myself, DistroMint and Sound Alive.
**Q. All right. So it -- it's -- it's your testimony that nChain does not share in any damages that DistroMint, LLC, you or Sound Alive would have suffered?**
A. No.
**Q. If you look at the sixth affirmative defense.**
A. Yes.
**Q. The -- it states, "The damages nChain UK seeks,**

**if awarded, would result in unjust enrichment to nChain UK."**
**What's the basis for that affirmative defense?**
A. Well, if nChain breached the contract and I received the damages, if they were awarded damages, then they would not -- being awarded or being rewarded for damaging my business and my venture. And as a -- as a, like, multibillion-dollar company and I'm just, you know, a regular little guy, you know, it -- it's obviously that's very lopsided.
**Q. Right. So the damages you're seeking here in this case are for damages to your venture and your business, right?**
A. The damages to DistroMint, to Sound Alive Enterprise and myself and, you know, every -- all -- everything outlined in our complaint. So if you want to refer to the Complaint for the, you know, that would be the best way to -- again, I'm not an attorney, and I have no professional training, so I am leaning heavily on my -- my attorneys to assist me with these matters.
**Q. Okay. But the damages that you're alleging in this case were to your venture and your business; is that right?**
A. The damages I'm alleging are the damages that we suffered on our behalf. Like, I can't claim damages for

another party that's not my -- not me per se, like, personally.

**Q. Okay. And then the seventh affirmative defense, "nChain UK's misrepresentations, concealment and improper conduct bars the equitable relief it seeks. Finnerud and Sound Alive relied, to their detriment, on nChain UK's misrepresentations and concealment of facts. Such inequitable conduct constitutes unclean hands and nChain UK's request for equitable relief should be dismissed."**

**What is the basis for that affirmative defense?**

A. Again, I would, like, rely on -- this is where I rely on my counsel because I'm not a -- I'm not trained in law.

**Q. Okay. But what are the misrepresentations that you or Sound Alive alleged nChain committed?**

A. I would refer to the Complaint.

**Q. And what about the acts of concealment you and Sound Alive allege nChain committed?**

A. I would refer to the Complaint.

**Q. And what's the improper conduct that you and Sound Alive allege nChain committed?**

A. I would refer to the Complaint.

**Q. So you have nothing to offer us on the basis of the seventh affirmative defense other than what's**

**already stated in the Complaint?**

A. I'm not going to speak or add anything to -- other than looking at the Complaint and, you know, you can pull what you want out of that.

**Q. Okay.**

MR. RUOCCO: I'll pass the witness.

EXAMINATION

BY MR. RISPOLI:

**Q. All right. Eric, I might be jumping around a little bit --**

A. Okay.

**Q. -- because I know you covered a lot from the first two days of testimony. I'll try and go in somewhat of an order that makes sense.**

MR. RISPOLI: And forgive me, Counsel, I was not able to be around for yesterday, so I'm going to try not to rehash old ground, and feel free to let me know if I am.

BY MR. RISPOLI:

**Q. Are you a lawyer?**

A. No.

**Q. Do you have any legal training?**

A. No, I don't.

**Q. Do you have any business law training?**

A. No, sir.

**Q. Sound Alive, is that -- are there any employees at Sound Alive besides yourself?**
A. No, sir.
**Q. Have you ever run a business with more than five employees?**
A. No, sir.
**Q. In your interactions with nChain, how many individuals associated with nChain, if you want to give me a range, do you think you interacted with in the course of the DistroMint project?**
A. I would say at least 25 individuals.
**Q. In your interactions with those individuals, did you -- were you under the impression that they were nChain employees?**
A. Yes.
**Q. Were you under the impression that they were specifically nChain UK employees?**
MR. RUOCCO: Object to form and scope.
THE WITNESS: I believe them to be all part of nChain.
BY MR. RISPOLI:
**Q. Did anyone at nChain, during the course of your interactions, ever explain the different nChain affiliates that you've heard discussed throughout Dale's deposition in terms of nChain Ventures, nChain Slovenia?**

**Did you know that there were different nChain affiliates?**
A. No, sir.
MR. RUOCCO: Object to form and scope.
BY MR. RISPOLI:
**Q. Did Dale Evans tell you that he was a lawyer?**
A. Yes.
**Q. Did he ever tell you he was not a licensed attorney?**
MR. RUOCCO: Object to the form and scope.
THE WITNESS: No.
BY MR. RISPOLI:
**Q. Did you think he was acting as an attorney for the DistroMint project?**
A. I did.
MR. RUOCCO: Object to form and scope.
BY MR. RISPOLI:
**Q. Did you trust him?**
A. Yes.
**Q. Did he ever tell you that he was not your attorney?**
MR. RUOCCO: Object to form and scope.
THE WITNESS: No.
BY MR. RISPOLI:

**Q. What was your understanding of why you needed to be interacting with Dale Evans?**
A. Well, he was assigned to our project or to me as legal.
**Q. Well, who -- when you say "assigned," who do you believe assigned him?**
A. I believe Christen did, but I'm not 100 percent.
**Q. Did you interact with intellectual property attorneys at nChain?**
A. I did.
**Q. Do you remember who they were?**
A. Arthur Roberts, I believe.
**Q. Do you think there were any others?**
A. I believe there was Mr. Alizon, but I'm not sure if I actually -- I don't remember actually meeting him, like, doing a Zoom.
**Q. Did you believe that Mr. Roberts and Mr. Alizon were working as attorneys for the DistroMint project?**
A. Yes.
MR. RUOCCO: Object to the form and scope.
BY MR. RISPOLI:
**Q. Did either of those two ever tell you that they were not representing DistroMint?**
MR. RUOCCO: Object to the form and

scope.

THE WITNESS: No. And I would take it further and say that Mr. Arthur Roberts, he inferred that we were a team by saying, you know, "our attorneys."

BY MR. RISPOLI:

**Q. What do you mean by that?**

A. I was deposed earlier this week and in some of the e-mails, there was a -- an e-mail from Arthur Roberts, and he referred to the attorneys as "our attorneys."

**Q. Did Mr. Roberts ever provide you with legal advice about any of the -- the process for securing your patent?**

MR. RUOCCO: Object to the form and scope.

THE WITNESS: Yes.

BY MR. RISPOLI:

**Q. What was the extent of that legal advice, if you remember?**

MR. RUOCCO: Object to form and scope.

THE WITNESS: To -- that we would need to take the patent to a full patent application and we would need to go through Page White.

BY MR. RISPOLI:

**Q. Did nChain -- how did -- how did you come to start a relationship with Page White?**
A. I signed a power of attorney agreement, which was exhibited yesterday and from there, I started -- I guess we e-mailed a few times and may have had a call between Thomas Mahon.
**Q. Did you do any research to find Page White on your own?**
A. No, sir.
**Q. Was the attorneys at Page White something that was arranged for you by nChain?**
A. Yes.
**Q. Did you ever pay Page White for any legal services?**
A. No, sir.
**Q. Did you tell the attorneys at Page White that you were living in Georgia?**
A. Yes.
**Q. What was your understanding of what Page White was doing for the DistroMint project?**
A. I believe they were assisting me in helping take the provisional patent to a full patent application.
**Q. You -- what time was it in 2022 that you met Mr. Ager-Hanssen?**
A. I said -- as I testified, on or around the

middle of the summer, somewhere maybe like between June or July of 2022 via the Algorand blockchain.

**Q. And what was -- when -- there's been discussion about the oral agreement in October of 2022.**

**What was that?**

A. Oh, the oral agreement? You mean the December 12th oral agreement?

**Q. I'm sorry. December 12th.**

A. Yes. The oral agreement was that we were going to partner. Christen said, "Hey, you know, you're brilliant, Eric, you know, we're Vikings." He's like -- and I -- I showed the first -- was the introduction of the provisional patent, and I broke down my idea to him and showed it to him, and he said, you know, Eric, he's like, you know, I won't -- you're brilliant. He's like, We're going to partner. We're going to help you build this.

And, you know, I said, Well, what are the terms? And he's like, 50/50. He said 50/50. You are going to run the company. He was like, Then, we're going to exit.

**Q. The -- that accent, what was that?**

A. That's Norwegian.

**Q. Mr. Ager-Hanssen, to your understanding, was Norwegian descent?**

MR. RUOCCO: Object to the form.
THE WITNESS: Yes.
BY MR. RISPOLI:
**Q. Are you -- do you remember the time frame when you incorporated DistroMint, LLC in Georgia?**
A. Yes. I believe it was right before the February 20 -- 21st e-mail, I believe. Yes.
**Q. So is that February 2023?**
A. Yes.
**Q. What had you done up until that point from the communication you just discussed in December of 2022 -- from December 2022 to the time you filed the incorporation of DistroMint, LLC in Georgia, what were you doing with nChain in that time period?**
MR. RUOCCO: Object to form and scope.
THE WITNESS: I turned over my patents and I turned over diagrams. I turned over wireframes. Basically moving parts of the -- the new dashboard that we were going to be building. I was meeting regularly, and I had met with my new developers. I met with Tina. I met Nick, Damir, Matevz, Urban, Roman. Roman was the first meeting because he was basically the software guy and he was in charge of the software developers.
And just -- basically, we were already --

kind of started constructing what would be
the -- the new music platform. I also did a mock
website on soundaliverecords.com.
BY MR. RISPOLI:
**Q. And this was all in the time period between**
**December 2022 and February 2023?**
A. Yes.
MR. RUOCCO: Object to the form.
THE WITNESS: And, of course, I was
already, you know, promoting --
BY MR. RISPOLI:
**Q. Hold on. Let me just ask the next question.**
A. Okay. Apologize.
**Q. Yeah.**
**Why did you -- did anybody from nChain tell you**
**to create a DistroMint, LLC entity?**
A. Christen Ager-Hanssen.
MR. RUOCCO: Object to the form.
BY MR. RISPOLI:
**Q. What -- can you tell me the circumstances of**
**your understanding as to why it was Mr. Ager-Hanssen**
**that said create a DistroMint, LLC entity?**
A. I believe because Christen was the CEO of
nChain.
**Q. When do you remember him telling you to create a**

**DistroMint corporate entity?**
A. In the original agreement. But it wasn't DistroMint, it was a -- he was basically telling me, you know, that I'm going to run the company.
**Q. Did Mr. Ager-Hanssen ever tell you not to incorporate in Georgia?**
A. No, sir.
MR. RUOCCO: Object to the form.
BY MR. RISPOLI:
**Q. Did you open any bank accounts in Georgia for DistroMint?**
A. Yes.
**Q. Which ones?**
A. Just a DistroMint, LLC bank account.
**Q. What was the Georgia bank?**
A. It was Renasant Bank.
**Q. Had you used that for Sound Alive?**
A. Yes.
**Q. You remember the discussions earlier in your deposition about -- sorry, the questions earlier in your deposition about potentially having a British Virgin Islands entity for DistroMint?**
A. Yes.
**Q. What was your understanding as to what would happen with the Georgia LLC -- the Georgia DistroMint,**

**LLC if a BVI LLC was created?**
A. That it would remain.
**Q. Did anyone at nChain ever tell you to close the -- or -- I'll rephrase.**
**Did anyone at nChain ever tell you to dissolve the Georgia DistroMint entity?**
A. No, sir.
**Q. There was some questions about some of the activities you undertook for the DistroMint project. Do you remember those questions?**
A. Yes.
**Q. Regarding the reference in the invoices to a press campaign, do you remember putting that term "press campaign" in your -- in the Sound Alive invoices?**
A. Yes.
**Q. And what was the press campaign, if you can provide the detail as to that?**
A. As described yesterday.
**Q. Can you give me a little detail?**
A. Yes. It was a article that I constructed covering London Blockchain, my interaction with nChain, our partnership, and how exciting it was to, you know, bring the next step of the invention into play at the London Blockchain conference, basically monetization of content by the second. And I wrote the article, edited

it, and I paid for some press release assistance and then also submitted it to many sources.

**Q. Were you active on social media, promoting the DistroMint project during the 2023 time period?**

A. 24 hours a day, whenever I was awake and -- I would even wake up in the middle of the night or any time -- I probably slept maybe 2 hours at a time before I would get back on social media. I was monitoring social media all the time, retweeting nChain executives, any project that nChain was promoting or was putting out on social activities, any nChain employees, any announcements, any press releases, I mean, literally everything. Because I considered them my team. You know, I was proud to be a part of it and I trusted them and, you know, I really felt like I was excited. I was really excited.

**Q. Was there anything for the social media campaign that you were doing to maximize audience reach?**

A. Yes. I was utilizing all of my services and my entire network, which, you know, is -- approaches, you know, half a million followers on multiple social networks and -- subscribers. And I also used micro freelancers and various marketing websites like YouLikeHits, Like4Like, Fiverr, Zeerk, to -- in addition to my efforts of promoting and pushing nChain,

DistroMint around the clock.

**Q. Some of those entities that you just mentioned -- Fiverr, Zeerk, micro freelancers -- can you explain in a little more detail what those are and how they related to promoting the DistroMint project?**

A. Yes. So basically these are platforms where you can basically pay for work for hire. They call it micro freelancers because you can get a lot done for, you know, affordable price. And so, I mean, I rely heavily on them when it comes to promoting.

You want to get back links established for a post or for an article, or if you want to amplify a post and get it more interactions, more retweets, likes, reposts, things of that nature -- you know, amplifying everything online along with utilizing my network. So the combination of both, you know, sets us aside from, you know, any other company or business that you would think would utilize social media to, you know, grow awareness, grow their network and, you know, gain notoriety.

Notoriety was -- was very important because, you know, when people see you and they -- and you're available and you look like a billboard, it's -- it's invaluable. And at -- at times, you know, I -- I've been paid for posting, previous to my engagement with

nChain, for high-volume, high-impression, viral posts on social media.

**Q. In -- based on your experience in the music industry, how important is -- would you -- how important would you say it is to engage in marketing activities in relation to the music industry?**

MR. RUOCCO: Object to the form.

THE WITNESS: Ab- -- absolutely vital, because if nobody knows who you are, you know, your product -- no one is ever going to hear your music. And I like to call it the major label rollout where we take an idea or a product and we put -- put it everywhere and drill it until it becomes a household name, until it -- it's undoubtedly, you know, viral.

BY MR. RISPOLI:

**Q. Did you take any steps in regard to the DistroMint project -- promotion of the DistroMint project to reach out to artists or other individuals in the music industry?**

A. I did.

**Q. And can you describe some of the artists that you reached out to?**

A. I reached out to all of our Sound Alive Records artists, including CED DA Wicked, Akompliss, Boo

Jackson, Rappin' 4-Tay, Craig G, Kool G Rap, Sadat X, Chino XL. The list goes on and on and on.

**Q. And -- and aside -- in addition to the artists on the Sound Alive label, did you reach out to any other artists?**

A. Well, I want to correct myself. Some of those artists are not actually Sound Alive Records artists. All right. So I would say Chino XL, Kool G Rap, Sadat X, Craig G, Blaq Poet are not on -- actually on our label. And we only distribute Rappin' 4-Tay, Akompliss and Boo Jackson. But I kind of fumbled everybody together -- or huddled everybody together. Excuse me.

**Q. And in these discussions, did you describe the DistroMint project?**

A. Yes. And most of these artists actually contacted me and -- and asked questions about DistroMint and how they could get on DistroMint and whether or not they could get their music tokenized and distributed.

**Q. With the artists that you spoke to, did they -- did some indicate that they would sign up and use the --**

A. Everyone did.

**Q. -- the DistroMint platform?**

MR. RUOCCO: Object to the form.

THE WITNESS: Everybody did.

BY MR. RISPOLI:

**Q. And in addition to the artists you've named, are there any other artists that you reached out to that you can remember as you sit here today?**

A. I -- I remember Mike the Great. I also reached out to -- gosh. You know, I worked with so many artists that I -- I can't recall every single name.

**Q. If you had to come up with a range number of artists that you reached out to to discuss DistroMint, what would you put that figure at?**

A. I would say over 1,000.

**Q. In terms of the efforts to reach out to over 1,000, would this be just -- can you describe the type of communications? By that, I mean phone, e-mail, social media.**

A. Mainly social media and -- and phone calls. We also ran a contest for DistroMint, the Rap Hennessy freestyle challenge, in which we offered the top freestyle winner a bottle -- 50 -- no, 750-millileter bottle of Hennessy, plus a $500 prize. And then the second, third and fourth place prices and honorable mention, we gave away a -- a Neumann clone microphone, which is a really nice microphone, and we also gave away, I think, five other -- I think they were condenser microphones. And we also gave away a pint of Hennessy to the winner.

We had tons of submissions, I would say in the hundreds. And then we had many, many posts of the submissions underneath the actual tweet or the -- that was tweeted out. And we got, you know, tens of thousands of impressions, hundreds of likes and retweets. And I think we got over 2 million spins on SoundCloud and -- and -- I -- I said we had a million downloads. I don't know if that's accurate, but we definitely had some thousands of downloads of the actual instrumental on the SoundCloud.

**Q. Do you remember who won the -- that challenge?**

A. Yes.

**Q. Who was it?**

A. YN -- I believe his name is YN Nas or some -- something to that extent. And then I believe in second place was MC -- gosh, I'm trying to remember. He's from -- he's from Queens. MC -- his name starts with MC. And then we had a third prize winner, I believe, was a gentleman -- he's wearing glasses in the video. He's showing off his liquor bottles in his college dorm room, and that's under the post. And then in fourth place was -- I -- I think fourth place or honorable mention was our -- our artist, Akompliss.

Now, that -- that is who we awarded the fancy microphone to just because he was our artist and -- you

know, we didn't want to seem biased by picking him as a winner. He did a video, as well. He shot the video in like Toronto, Ontario. It was like cold outside, snow.

**Q. And -- and I appreciate that.**

A. Yeah.

**Q. How -- excluding artists, did you reach out to any other music industry entities or individuals in your promotional efforts of DistroMint?**

A. I did. I reached out to Derek Sivers, who was the founder of CD Baby and the founder of -- I believe he's the founder of DistroKid and possibly TuneCore. He's a very powerful guy in the music business. We've been in contact for -- well, actually since he started CD Baby, because that was where I first started with my -- distributed my first albums. And, I mean, he's a really likeable guy. And I -- I wrote him. I said, Hey, Derek, you know, this is my platform, DistroMint. You know, no offense -- or no runoff of DistroKid. He had already sold DistroKid. I said, Would you take a look at the platform and -- and, you know, give me your -- your idea. And I explained to him what the platform was.

So there's an e-mail between us in the records.

**Q. Did you have any understanding based on your communications with him as to whether he was interested**

**in getting involved in the DistroMint platform?**
A. I believe he was. I believe he was willing to give me some guidance. He wrote me back, and he said -- he said, "Very cool. I will check it out," or "Cool platform. I'll check it out."
**Q. Did you have any other -- did you make any efforts to reach out to anybody in the music industry for -- catalogue rights to well-known artists?**
A. Yes.
MR. RUOCCO: Object to the form.
BY MR. RISPOLI:
**Q. What did you do?**
A. So I have a friend of mine, long-term friend that I have been working with since probably around, I want to say, 2011, Charve Norris of Concore Entertainment. Previously, I believe he managed Beyonce, like, in her early days, like maybe in her teens, and he's with Universal Music Group for a while, End Grooves, and he is -- also managed Tito Jackson, Michael Jackson's, I believe his brother or his uncle.
Yeah, Charve, if you check him out on Instagram, Charve the Don, you see him in his big houses and his fancy cars. He's a big-time dude.
**Q. All right. Did you make any efforts to reach out to anybody in regards to potentially securing the**

**Bruce Springsteen catalogue for DistroMint?**
A. I spoke directly to Christen.
**Q. And what was the discussion with Christen about the Springsteen catalogue?**
MR. RUOCCO: Object to form.
THE WITNESS: It was a discussion in April when he called me on the phone, and he said, "Eric, I'm with Todd Bows [sic] or Todd Boehly."
I might be mispronouncing it. I can actually give you a written spelling of it.
And he -- he said, "I'm in New York. I'm with him for a week." He's like, "We're talking." He's like, "He wants to put Bruce Springsteen's entire catalogue on DistroMint." He was like, "Can you send -- or have you worked on the pitch deck? Can you send the pitch deck over?"
You know, things of that nature.
BY MR. RISPOLI:
**Q. Were there any efforts by you to secure any other catalogs for major, well-known musicians besides the individuals we've already talked about?**
A. Yes.
**Q. And what were those other major artists?**
A. So I met with William DuVall, the lead singer of Alice in Chains, and we were discussing -- William was

absolutely on board. He wanted to be one of the first artists to have his catalogs on DistroMint. So that would involve also, you know, bringing on board Alice in Chains, and then we were -- William was like, you know, Here's Metallica's digital press pamphlet thing, and he was like, you know, We can bring Metallica or, you know, I will talk to these guys. They would love to be a part of DistroMint as well.

**Q. And the conversation with William DuVall, for example, do you remember around what time period that was taking place?**

A. This was probably around January, February of 2023. So my continued work in terms of in -- into -- to continue to promote and consult and market and push and connect.

**Q. At any time, did nChain ever tell you to stop any of your promotional activities prior to October of 2023?**

A. No.

**Q. At any point in time, did anyone from nChain ever tell you that they were unsatisfied with the efforts you were undertaking from a promotional perspective?**

A. No.

**Q. At any time, did anyone from nChain tell you**

**they were having any problems with the way you were managing the production team with you and Mr. Bratina?**

A. No.

**Q. You were asked some questions in your deposition about some e-mails and applications, for example, to the government about statements you made about 100 percent -- your 100 percent ownership in DistroMint.**

**Do you remember those questions?**

A. Yes.

**Q. Were all of those -- those statements regarding your 100 percent ownership in DistroMint, did those occur after nChain had terminated their relationship with you?**

A. Yes.

**Q. What was your understanding of your ownership in the project post-termination of nChain's involvement in it?**

A. My understanding was that nChain abandoned ship, and I did everything in my power to just keep things going.

**Q. Were you able to keep things going?**

A. No.

**Q. Why not?**

A. Didn't have the money, the resources. I didn't have the legal expertise. I didn't have the patent

expertise. I -- you know, I didn't have my team, my developers. I had no source code.

So I was unable to maintain -- the website was -- my login credentials for HandCash and the admin panel had been disconnected or taken from me as of October, the beginning of October. Actually, I realized it was at the end of September.

**Q. Why do you believe that not having access to the source code impacted your ability to move DistroMint forward?**

A. Because I wasn't able -- without the source code, I was unable to utilize the $175,000 in credits that I had acquired or that I had been awarded as a grant from Microsoft Azure. So in order to move DistroMint from one storage container service, which was AWS, to Microsoft Azure, you need the source code.

**Q. Why -- what -- the loss of login rights with HandCash, how did that impact your ability to move DistroMint forward?**

A. I couldn't log in and show people the actual website because I was used to being able, in meetings especially with -- between or artists and entities and people that I was showing off the site to -- I showed it off to a lot of people, obviously, the -- the MVP.

I -- you can't get in and actually create or

show a demo account. You can't show the marketplace. You can't click and show how to upload files and -- and the artists profile. I mean, you can't access the admin. You can't do anything. So it's just basically a website that has links that you can click on, but you can't actually log in and do anything with it and, you know, exhibit it and show it off.

**Q. What was your understanding of the relationship between nChain and HandCash?**

A. So --

MR. RUOCCO: Object to the form and scope.

THE WITNESS: -- I believe HandCash is -- the go-to wallet -- there is two wallets that nChain relied heavily on. It was RockWallet and the HandCash wallet, and there was a third wallet, but we didn't really use that.

We were going to go with RockWallet first, but we went with HandCash, but I believe that the owner of HandCash and the owner of RockWallet and the owner of nChain are all the same person.

BY MR. RISPOLI:

**Q. And who is that, to your understanding?**

MR. RUOCCO: Object to the form.

THE WITNESS: To my understanding it's Calvin Ayre and the Fairway family office.
BY MR. RISPOLI:
**Q. All right. I am going to show you Exhibit 37.**
A. Okay.
**Q. And I'm assuming you testified to this yesterday. These are all invoices contained in Exhibit 37 that were submitted by you?**
A. Yes, sir.
**Q. You created these?**
A. Yes, I did.
**Q. At -- in submitting these invoices to nChain, did you ever overbill nChain for any expenses?**
A. No.
**Q. Did you ever underbill nChain for any expenses?**
A. I did.
**Q. What do you mean by that? Or can you identify what you underbilled them on?**
A. Yes. SA 1191, I submitted this invoice with the anticipation that it would be paid, you know, pretty quickly. At the time, the rate for my flight was, you know, it was reasonable; however, the invoice wasn't paid, and so I ended up waiting some time, and the price -- the cost of my flight went up almost $1,000 to my recollection.

And so I ended up paying more for my flight, and I paid -- I ended up having to pay less for a hotel. I did not want to inconvenience nChain and send an amended invoice, so I just kind of left it alone.

**Q. When you say you didn't want to inconvenience nChain, what do you mean by that?**

A. I mean I didn't want to be like a -- you know, have to submit another amended invoice.

**Q. Were you worried about harming, drawing -- let me rephrase that -- sending an amended invoice, did you have any concerns that that might annoy the folks at nChain?**

A. I just -- I didn't want to -- I didn't want to bother Christen, number one; and number two, the payment processing was so, like, it was so random, you know, I never knew when an invoice was actually going to get paid. So I just submitted them and sometimes, you know, they would be paid at this time, and sometimes they would be paid at that time. It was very irregular.

**Q. During this time in 2023, what would you say the percentage of your income came from the DistroMint project?**

A. 100 percent.

**Q. Did you put your work that you would do with Sound Alive records on the back burner during this**

**project?**

A. I did.

**Q. And why?**

A. Because I was absolutely just too busy, and I want to rephrase that. I don't want to say 100 percent. 100 percent of -- if the income is probably -- is -- is probably -- it's --

**Q. But would a different figure like, you know, 90 or 80 --**

A. Yes.

**Q. -- or 70 percent, what would be the best accurate estimate that you would say this income from the nChain comprised your professional income?**

A. For my professional -- my professional income basis, I would have to say, you know, 90 -- close to 90, between 90 and 95 percent. So, you know, this was my total focus. This is everything that I was doing. I was living this. I gave my entire life to this, like, this was my big chance. I'm a little guy, you know, I have a life-changing opportunity to, you know, revolutionize the music industry and, you know, I'm thinking, Hey, you know, I meet this amazing freaking $2 billion company, and Christen Ager-Hanssen is a billionaire, and I'm just like, you know, I'm tickled every day. I'm like, Wow, this is my opportunity, you

know because.

**Q. Well, with the --**

A. Can I get a break? I'm all right.

**Q. Just take a second. Do you want to?**

A. No. I just -- I come from -- I struggle.

**Q. Hold on, Eric, until I ask the questions. Just take a moment.**

A. Yeah. So go ahead.

**Q. Let me -- let me ask you, if you go to SA 1832 --**

A. Yes, sir.

**Q. -- in Exhibit 37.**

A. Give me a second. You said 1832?

**Q. 1832, yes.**

A. Okay. All right.

**Q. Do you see the item that you had billed for, for utilities?**

A. Yes.

**Q. What -- can you describe what that means?**

A. Well, I had an increase in utilities since I had began my engagement with nChain. I don't have a typical setup. You know, I have a really -- a movie and broadcast production set in my living room, complete with wall-mounted speakers, you know, a giant screen, multiple monitors, several computers, you know,

recording equipment, cameras, just a lot of electronic use. And, you know, when I started working with nChain, was powering this equipment like all the time, like 24 hours a day. Sometimes I would go upstairs and sleep, I'd leave it on because I was running like a YouLikeHits campaign or I was running some sort of other marketing software, Like4Like or something, where I needed to be able to monitor the posts and see if they were getting the traction that they need. And then I could -- you know, I could change the variables so that the post could be amplified more.

I was also just online, monitoring everything at that time. I was very excited about nChain and I was just really excited about, you know, being a part of -- of something. This was like a life-changing opportunity.

So, excuse me, I -- I got a little emotional for a second because I -- you know, I had never been in this type of situation before and -- in terms of like having this great of an opportunity. And, you know, I thought this was, you know, my -- I wanted to say my winning ticket. This was like, you know, winning the lottery to me, is -- is coming up with this platform, you know. I came up with the idea in the middle of 2022. I met --

**Q. Well, let me --**

A. I'm rambling.
**Q. I appreciate that.**
A. Yeah.
**Q. Let me just ask you -- sticking with the utilities.**
A. Yes.
**Q. How did you go about making a determination as to what was -- let me back up a little bit.**
**These were utilities billed from your personal residence?**
A. Yes.
**Q. But you operated -- the way you described your setup, I mean, would it be fair to characterize that as a full production studio?**
A. Yes.
**Q. And so you have a full production studio at your house?**
A. I do.
MR. RUOCCO: Object to the form.
BY MR. RISPOLI:
**Q. Okay. How did you make a determination as to the utilities, the costs that were in addition to just your regular living?**
A. I mean, I just -- I'm used to paying a certain amount, and I noticed a -- you know, a spike in

the -- the monthly cost of the utility bills.
**Q. Did -- for the invoices that you submitted in 2023, were those all ultimately paid by nChain?**
A. Yes, they were.
**Q. So this invoice on SA 1832 in Exhibit 37 was paid by nChain?**
A. Yes, it was.
**Q. Did nChain ever ask you any questions about the utility charge, for example?**
A. No, they didn't.
**Q. Okay. For the web services, what would those be?**
A. As described in my deposition yesterday, basically all the activities that I partaked [sic] in involving social media and, you know, using the micro freelancers and then the various software to, you know, engage, boost, enhance, multiply, monitor. And this is an activity that I did around the clock, like I said, 24 hours a day. If I wasn't asleep, you know, I had my computers on or I had my devices by my side. If I woke up in the middle of the night, you know, if anything was posted by nChain or its affiliates or any companies that Christen was working with or any companies that nChain was working with, you know, I would go -- I would be right there to support and post it, repost it, like it

and put it on my social networks.
**Q. On SA 245 in Exhibit 37, regarding the trademark registration, was the trademark registered for DistroMint?**
MR. RUOCCO: Object to the form.
THE WITNESS: It was abandoned.
BY MR. RISPOLI:
**Q. What do you -- well, was there an initial -- an -- an initial registration?**
A. No.
**Q. So what do you mean by "it was abandoned"?**
A. The E. Smitty and DistroMint registrations or attempts at trademarks were abandoned because they needed to be amended and fees needed to be paid, and I didn't pay the fees and did not get them amended.
**Q. Did anybody at nChain ever tell you not to take any steps to register the DistroMint trademark?**
A. No, sir.
MR. RUOCCO: Object to the form.
BY MR. RISPOLI:
**Q. Okay. Do you still have -- let's see, this was -- Exhibit 43 in front of you?**
A. Yes, I do.
**Q. All right. And that's the answer to the counterclaim?**

A. Yes.
**Q. I want you to go to the second affirmative defense.**
A. Okay.
**Q. Now, I know you were just asked questions about that this morning and I know you said you're not a lawyer.**
A. Yes.
**Q. But in your relationship with nChain regarding the DistroMint project, when would you say is the first time that you believed nChain wasn't meeting their end of the agreement that you thought was in place?**
A. When my meetings were canceled and then they abruptly reappeared on the calendar, but then I was notified by Mr. Puhek that, you know, there was going to be a pause and a review. At that point, I felt -- I was devastated, but I -- I just kept pushing forward because I had belief and faith that, you know, we were still going to work things out.
**Q. The testimony that you provided on losing access to the source code, did you feel that was a violation of the agreement between you and nChain?**
MR. RUOCCO: Object to form.
THE WITNESS: I do.
BY MR. RISPOLI:

**Q. Why?**
A. Well, I felt like if, you know, it's based off of my patent and the whole entire project is built off of my framework, you know, technically, the invention would fall into -- it would be my invention, so therefore, I should have access to the source code. However, I did not know that the source code even existed in the GitHub, that there was a GitHub repository because we searched for it and I, with the help of HandCash, we have actually went into GitHub and we looked for a DistroMint source code.
**Q. Well, did you -- in your meetings with Mr. Bratina and those developers, did you work on the source code jointly?**
MR. RUOCCO: Object to form.
THE WITNESS: I -- I'm not a coder, so I did not write the actual code.
BY MR. RISPOLI:
**Q. Well, I know you -- you said you're not a coder but did you -- were there discussions with Mr. Bratina about what you wanted the MVP of DistroMint to look like?**
A. I provided the entire blueprint for what it should look like.
**Q. So you would have -- you would have con- --**

**would you have conversations directing Mr. Bratina, you know, what to do on the coding side, and would he report back to you?**

A. Yes. He would report -- he would take the info that I would give him and he would give it to Luca, and Luca was our DevOps, developer operations, operative, operations something like that. He's the guy who is in there inputting the code, but I'm providing, obviously, all the assets from the music to the artists to the -- the, you know, design, the dashboard, everything, giving all these assets, and then Luca is taking out this stuff, and he is putting it into code.

**Q. Do you feel that the source code that made up DistroMint, there was a component of your work that went into that?**

A. Yes --

MR. RUOCCO: Object to form.

THE WITNESS -- I do.

BY MR. RISPOLI:

**Q. Can you think of any way -- well, after nChain had restricted your access to the source code and the login credentials, what steps, if any, did you take to keep DistroMint going?**

MR. RUOCCO: Object to form.

THE WITNESS: I took many steps. I --

the first step was, I tried to secure the AWS account because, as you know, hosting on AWS is expensive. So I went and I got the grant from AWS by submitting the platform to AWS. They awarded me $1,000. And then I went to Microsoft Azure. I had a friend at Microsoft, and he said, you know, "They're giving away grants for, you know, viable projects, you know, submit," and I submitted, and they gave me a $25,000 grant. If I spent 12,500 of the grant, they would -- that would unlock another 150,000. So it was 175,000 total.

I talked to a few developers at Microsoft Azure, and I was researching on how to migrate from AWS to Microsoft Azure, and they were like, you know, "Well, you need to find the source code," and so at that point, we went into the container service of AWS and we searched for the source code, and we could not find it anywhere.

I then came back to nChain. I requested a copy of the source code or the address of the source code. I also met with HandCash, and they said, "Okay. We will look for it," and then I requested them.

I said, "Why is my login credentials for my HandCash changed because without these

credentials, I'm unable to get in on the admin panel for DistroMint."

So at that point, you know, I just kept doing my activities from, you know, believing that either we would come to some sort of resolution eventually and just -- I kept it going. I interviewed A&Rs. I met with various people like Jeanette Borzon at Feature.fm. I, you know, kept close contact with my close comrades in the industry like Charve Norris, you know, and just -- just anything and everything that I could. The social media posts kept going. I kept saying, "Coming soon, DistroMint, you'll see" in my X posts, you know, anticipating, and people kept asking me, you know, "When's DistroMint's launch? When launched? When launched?"

BY MR. RISPOLI:

**Q. Okay. For -- after -- beginning in January of 2024, did nChain ever ask you -- well, did nChain ever make any communications with you about wanting anything from you, from their perspective, to finish DistroMint?**

MR. RUOCCO: Object to form.

THE WITNESS: No.

BY MR. RISPOLI:

Q. After you had indicated that you were not going to agree to the restructure proposal that has been discussed, did nChain ever reach out to communicate with you again?
A. Never.
Q. They never asked -- they never asked you for anything? They never asked you to return anything related to DistroMint?
A. No, sir.
Q. Did they ever ask you to repay them any funds that they had paid you?
A. No.
Q. Did anybody at nChain ever reach out to you to give you the impression that there was anything that they wanted returned to them regarding the DistroMint project?
A. No, sir.
Q. For -- do you feel -- well, how would you describe what you feel you lost from the DistroMint project ending up -- well, let me rephrase that.
How do you feel about what happened, what you've lost from the DistroMint project not ultimately becoming a commercial product?
MR. RUOCCO: Object to form.
THE WITNESS: I apologize. I haven't

grieved yet from this whole situation. So some of the questions you're asking me, I'm being forced to deal with the emotion that I feel right now, which I haven't -- I've been just hiding them.

I feel like -- I don't want to feel like I lost everything, but I lost a major opportunity. I feel like I lost a lot of credibility in the music industry. I feel like I lost a life-changing opportunity that, you know, I've struggled a lot as an independent producer. You know, I'm an expert at what I do. I'm accomplished. I produced big records, but haven't got some of the credibility. You know, I don't have the big Grammies and the, you know, the plaques on my wall, and I've been part of these huge productions.

And so, you know, this was my way to, not just for myself, but change the music industry because it's a very shady industry, and I wanted to bring some transparency to the industry and for other artists so that we could change the way that artists are treated and we could take back control of the music industry.

So I feel like I've lost almost everything. And, of course, there is the money aspect of -- of this. You know, I don't know how

much this project could have been worth if it had been launched. Christen said it was a decacorn, to my understanding, a multibillion-dollar project. You know, Bruce Springsteen's catalogue just sold for $500 million. I missed out on that. That's not on DistroMint because DistroMint's never launched and nChain decided to screw me.

And, you know, hey, I don't know what happened with Christen and with nChain, but I do know that you know that, you know, they didn't like the terms that Christen laid out in our initial agreement. So they came back to me with the restructure proposal, and I didn't agree to it, and it -- everything else went to, you know, went to crap after that. Excuse my language.

BY MR. RISPOLI:

**Q. Can you -- as you sit here today, can you get DistroMint to a commercial product the way you and nChain had designed without nChain's resources?**

MR. RUOCCO: Object to form.

THE WITNESS: Probably not. Not in the state that I'm in right now. And I'm working on another project because I decided I'm not going to just, you know, fall over and roll over. That's why I haven't dealt with my emotions surrounding

this whole situation until you started asking some really, you know, sensitive questions that made me think about it.

And, no, I definitely needed nChain because their resources, my dev team. I loved those guys. I thought Dale was an awesome dude until, you know, until really, we started having the conversations of the restructure proposal and all that. You know, I trusted Dale. I trusted nChain.

I'm just a little guy. They have all the resources. They're the patent experts. You know, they have all the money in the world to make something like this happen. The CEO is a billionaire. The majority owner is a billionaire. I mean, it's like -- you would think that these companies like this would do good, sound business.

BY MR. RISPOLI:

**Q. Let me ask you some questions about Exhibit 36.**

A. Okay.

**Q. If you could flip to the restructure proposal.**

A. What page?

**Q. All right. It should be the second page of the exhibit, NCH 1868.**

A. Okay.

**Q. For the current position column, does the statement that nChain UK and E. Smitty are 50/50 owners of the DistroMint platform, does that reflect your understanding of where the parties were at that time?**
A. Yes.
**Q. Does -- the reference to DistroMint platform, what does that mean to you in connection with the entity DistroMint, LLC?**
A. It's the same thing.
**Q. The next sentence, "The platform was developed," was there anything in that sentence that you disagree with in terms of that being what the current position was, to your understanding?**
A. The platform was developed by an nChain development team under the guidance of E. Smitty, yes.
**Q. The third sentence, do you feel that that accurately reflected the state of affairs at that time?**
A. Yes.
**Q. Is there anything in the current position column that you felt was inaccurate for that time period?**
A. Let me see. The platform was developed by nChain -- excuse me. I -- I agree with the first.
**Q. So current position, Row 1, you would agree with?**
A. Yes, sir.

**Q. That's a -- let me take it row-by-row.**
**Is there anything from current position, Row 2, that you would dis -- you disagree with the description?**
A. Some of the language in here, as Mr. Ruocco had pointed out yesterday, was a bit confusing for me just because I am not trained in business law. So there is certain things in business that I just don't know, and the statement where it says "within authority granted by the board of directors of the project company," and it says "to be formed," and the project company is DistroMint, which is DistroMint, LLC.
So it had already been formed. So I felt like Mr. Dale's statement and the way he tried to spin that and say, you know, throw in there that it -- to be formed means that he was not acknowledging DistroMint, LLC, which had already been submitted to nChain.
**Q. Anything else in Row 2?**
A. It says "lead promotional activities in conjunction with nChain marketing teams."
I'll be honest with you, nChain did not participate or did very little to -- in the marketing department, even -- I mean, they wrote maybe two articles and put a post on X, and then I amplified that, and they abruptly pulled down the article when the fall-out happened with Christen. They deleted it,

erased it.
**Q. But that wasn't -- the deletion wasn't until after the -- some of the activities you've described such as the withholding of the source code?**
A. Yeah, it was afterwards. This was probably around -- this was after 2023, sometime in 2024. Lead promotional -- okay. Now, I did lead the promotional activities. I'd say I did '99 percent of all the promotional activities.
**Q. If you look at the Row 2 --**
A. Yes.
**Q. -- did -- do you see where it says "time recorded at nChain internal rates," and then it has a US dollar figure?**
A. Yes.
**Q. Did nChain ever tell you how much -- prior to seeing this restructure proposal, did nChain ever tell you what it was valuing the time spent on the project by its developers?**
A. Never.
**Q. Do you have any idea where that number comes from?**
A. I have no idea.
**Q. Did nChain ever -- well, when Dale -- is the Dale the one who presented this restructure proposal to**

**you?**
A. Yes.
**Q. Did Dale ever offer you any other information such as the, like, billing records of the development team?**
A. No, he did not.
**Q. Did anybody on the other -- on the development team ever give you any information as to a dollar figure that they were putting on their time spent on the project?**
A. I accidentally sent one of my invoices to Urban and we had a discussion, and he told me that the developers were paid a salary, that it wasn't hourly based.
**Q. But in terms of the -- any dollar figure for the time they were spending just related to DistroMint, did you get -- ever get any information like that?**
A. No -- no conversation of that ever happened.
**Q. And Row 2, do you see Roman iii, with the three little iii's, do you see the 20 -- reference to 2010 rates?**
A. Yeah, I don't know what that is.
**Q. Had you ever had a discussion with Dale ever at that point about what 2010 rates meant?**
A. No.

**Q. Had you ever had a discussion with Dale about bridge financing and fundraising assistance?**
A. I said that I wanted -- I said that I had the intention to raise funds or venture capital, and that I would need assistance one day.
**Q. With regard to DistroMint?**
A. Yes.
**Q. Was this before or after the restructure proposal was presented?**
A. This was probably around the time the MVP site had completed.
**Q. If we go to the next page, Row 4, do you agree with the statement "The project company has not been incorporated"?**
A. No, I do not.
**Q. And why not?**
A. Because DistroMint had been incorporated as DistroMint, LLC in Georgia, United States by me.
**Q. The next sentence, "Initial expectation was the platform would be owned and operated by the company called DistroMint, LLC, which E. Smitty formed for these purposes."**
**Do you take issue with that statement?**
A. I -- I take issue with the part that says "initial expectation" because it was actual bar none --

it was a fact that the -- the company was called DistroMint, LLC, which I formed for the purpose of distromint.com.

And yes, I do agree with the part that says owned and operated, like I would be operating the -- as Christen said, he was like, "Eric, you're going to run the company."

**Q. Was that with the expectation that there was a 50 percent ownership in that company by nChain?**

A. Yes. I agreed to give 50 percent of the company to nChain and 50 percent of the IP. 50/50 down the middle, that's how Christen said.

**Q. The final sentence there at the bottom, "nChain and E. Smitty were each expected to own 50 percent of the shares in the project company."**

**Do you feel that was an accurate statement of the current position?**

A. It's accurate, but I questioned it yesterday because, you know, the project never launched, so how would we divvy up shares for a platform that never launched?

**Q. Was the project company DistroMint, LLC, to your understanding?**

A. Yes. If shares existed, though, I do agree 50 percent would be mine and 50 percent would be

nChain's, yes.
**Q. At any point in time during the -- well, during the entire relationship with nChain during your work with them on the DistroMint project, was your understanding that it was always a 50/50 joint collaboration?**
MR. RUOCCO: Object to form.
THE WITNESS: Yes.
MR. RISPOLI: Do you mind if we go off the record for a quick break?
MR. RUOCCO: Sure.
THE VIDEOGRAPHER: The time is 10:30 a.m. We're off the record.
(Recess.)
THE VIDEOGRAPHER: The time is 10:45 a.m. We're on the record.
BY MR. RISPOLI:
**Q. All right. Eric, I think I'm almost -- we're getting towards the end of my questions.**
**In your deposition you've referred to yourself as an independent contractor for nChain. Do you remember saying that?**
A. Yes, I do.
**Q. What is your -- why do you use that term to describe your role as what you did for nChain?**

A. Well, because I couldn't actually be an employee of nChain due to British law, as Christen explained to me.

**Q. Is that the only basis for your consideration that you're an independent contractor was that just you were not an employee?**

A. Well, that's how I operate. I'm not a -- you know, a big multi-person company.

**Q. What is your belief as to the reason behind why your relationship with nChain was abruptly ended with regard to the DistroMint project?**

MR. RUOCCO: Object to the form.

THE WITNESS: I believe that there was an internal conflict at the very top of nChain. I don't know when it started, but I think when Christen was terminated -- I believe Calvin Ayre and Christen had a conflict into which, you know, Calvin wanted to, you know, delete and destroy everything that Christen had ever created.

I mean, there were other projects that got nipped. I mean, Planetary Metaverse, Gate2Chain and AssetLayer eventually closed their doors and there were, probably a dozen other companies and projects that got X'd out.

BY MR. RISPOLI:

**Q. To your understanding, were these all projects that Mr. Ager-Hanssen had spearheaded as CEO?**
MR. RUOCCO: Object to the form.
THE WITNESS: Brought -- brought them to the table, announced them on his socials, you know, these are some of the activities, like, that I would partake in in supporting as Christen announces this new project and this new investment and this new company. And I would, obviously, retweet it and post it and promote it and blow it up.
BY MR. RISPOLI:
**Q. What were some of those projects?**
A. I just named them.
**Q. And so nothing else in addition to what you stated?**
A. I can't remember, it was so many. There was another project that tokenized cattle or tokenized livestock and then there was the Planetary Metaverse, there was the Gate2Chain, there was AssetLayer. There was a big announcement about AssetLayer and then he announced that AssetLayer was teaming up with DistroMint to do the NFT collaboration in terms of being part of the tech for my company.
**Q. What was your understanding of what happened to**

**those projects that you've described in addition to DistroMint when Mr. Ager-Hanssen was terminated?**

MR. RUOCCO: Object to the form and scope.

THE WITNESS: Those projects were either put on hold or they ended. I met a lot of those guys in London and then I never saw them or spoke to them again.

BY MR. RISPOLI:

**Q. Did you rely on nChain to advance your patent?**

A. Yes. I did my provisional patent, so the original one that I brought to the table.

**Q. Regarding the number of meetings that you had with nChain developers while you were working on the DistroMint project, would the best source for the number of those meetings be the Teams scheduling that you received by e-mail?**

A. Yes, and my calendar, I would say.

**Q. Did anyone -- sorry, if I already asked this -- at nChain ever ask you to submit any receipts to support any of the items charged in your invoices?**

A. No.

**Q. I know it was a little emotional but we were talking about your damages and I think you -- was one of the items of damage, damaged credibility?**

A. Yes.

MR. RUOCCO: Object to the form.

BY MR. RISPOLI:

**Q. And what do you mean by -- how was your credibility damaged in the fallout of what happened to the DistroMint project?**

MR. RUOCCO: Object to the form.

THE WITNESS: When engaging with certain artists and, you know, any type of plan I had to forward DistroMint, I always had the bad stain of being associated with nChain, basically carrying that burden on my shoulders. And nChain's reputation, obviously, is not a good one right now especially, you know, with the way that they maneuver as a company. And they went from being this big, gigantic conglomerate to just, you know, nothing. I mean, I don't think their Twitter account has been active -- or X account has been active in a year or longer.

And they -- you know, people see -- they see that I have -- I'm in a controversy and they think twice about working with me.

BY MR. RISPOLI:

**Q. Did the time that you spent on the DistroMint project prevent you from putting other time into other**

**professional efforts?**

MR. RUOCCO: Object to the form and scope.

THE WITNESS: Absolutely. As I testified, you know, this is like every minute of my breathing life. If I wasn't asleep I was doing something related to DistroMint, supporting my partners at nChain and their affiliates.

BY MR. RISPOLI:

**Q. Do you know if nChain was having any of its patent attorneys work on your patent in any non-US offices?**

A. I believe Page White was located in London.

**Q. Well, do you know if there were any filings undertaken on your behalf for -- for example, the European office?**

A. Mr. Ruocco showed me a patent, it's exhibit -- I don't have the exhibit. It's basically a valuation, may I see the -- Mr. Ruocco, may I please see the patent?

**Q. Well, you discussed it in another exhibit?**

A. Yes, I did.

**Q. Did you provide the DistroMint, LLC corporation information to anyone at nChain other than Mr. Ager-Hanssen?**

A. Yes.

**Q. And did anyone at nChain ever direct you to take any action with regard to DistroMint, LLC after you gave them that information?**

A. I don't understand the question.

**Q. Sure. Once -- who did you provide -- outside of Mr. Ager-Hanssen, who did you provide the information to at nChain regarding the DistroMint, LLC?**

A. Urban Bratina because he requested it.

**Q. Did he ever say anything to you about needing to close -- or sorry, dissolve DistroMint, LLC and reform it in a different jurisdiction?**

A. No.

**Q. Did you -- and I don't know if I misheard this -- but did you ever meet with Mr. Ager-Hanssen in New York?**

A. No, I didn't. He called me from New York.

**Q. And that call was in relation to the discussions about the Springsteen catalogue?**

A. The Springsteen catalogue. And then I had also told him that I needed some extra funding for business expenditures anticipating the launch of DistroMint and that was when he directed me to send the invoices to Mr. Moody.

**Q. Did you tell Mr. Ager-Hanssen that you lived in Georgia?**

A. Yes.
**Q. So, to your understanding he knew you were a Georgia resident?**
MR. RUOCCO: Object to the form.
THE WITNESS: Yes.
BY MR. RISPOLI:
**Q. Did anybody at nChain ever ask you to consider moving to the UK?**
A. Yes.
**Q. When was this?**
A. It was a conversation -- our first engagement or when we made the agreement around December 12th, Christen and myself -- and Christen told me that after we built the project together -- and he said, hey, he was like, we are going to build it. You going to run the company. We do this 50/50, you know, that spiel. And he was like, after that you exit, you move to London and you come work for me here. He said, but you can't -- you can't work here now because British law says -- or English law says you can't be an employee of nChain, he says, so you are contracting.
Sorry for the accent I -- I love that voice. I remember him so well.
**Q. Based on your work on the DistroMint project, if you had all the resources necessary, what would it take,**

**from your understanding, to get the project commercially viable?**

MR. RUOCCO: Object to the form.

THE WITNESS: It would take a lot. We'd have to -- at the point that it's at right now? Yeah, it's a dead project. It would have to be completely rebuilt from the ground up and recoded and redeveloped. It would have to be completely revamped and updated and upgraded. I would need somebody big like an nChain to step in and help me out.

MR. RISPOLI: All right. No further questions from me.

EXAMINATION

BY MR. RUOCCO:

**Q. Okay. Mr. Finnerud, I'll try to be quick about this. I know we have been here --**

A. You got it.

BY MR. RISPOLI:

**Q. -- for a while.**

**Okay. In the questions that your attorney asked you, I believe you responded and said that you recall having worked with 25 individuals on the nChain team in connection with the DistroMint platform. Do you remember that testimony?**

A. Yes, sir.
**Q. Can you name who those people are?**
A. I can't name every single one of them off the top of my head, but I would say in -- a ballpark figure would be about 25 different people if we count all of the marketing people, all the people in the finance department, all of the developers that I spoke with, all the top tier people that I spoke with. I mean, it's just a long list of people.
**Q. Okay. And how did you come to the 25 ballpark number?**
A. It's -- I'm just thinking because, you know, there's -- there's many people whom I met along the way that -- and I was just trying to add it up in my head. And, I mean, that was just an estimate, you know.
**Q. Okay.**
A. Yeah.
**Q. In your testimony in response to your counsel's questions, you mentioned a bank account that DistroMint, LLC has --**
A. Yes.
**Q. -- is that right?**
A. (Witness moves head up and down.)
**Q. Okay. DistroMint, LLC no longer has a bank account?**

A. No, it doesn't.
**Q. When did it cease to have a bank account?**
A. I want to say 2024.
**Q. Okay. And has DistroMint, LLC produced any records from this bank account in this case?**
A. I don't know.
**Q. Okay. In response to your counsel's questions relating to the expense invoices, I believe you said for the press campaign that you paid for some press release assistance. Do you remember that?**
A. Yes.
**Q. How much did you pay for the press release assistance?**
A. I don't remember.
**Q. You gave some testimony where you said that you did about 99 percent of the promotional activity for the DistroMint platform. Do you remember that testimony?**
A. Yes.
**Q. And I think you said something to the effect that nChain did very little on the marketing front for the DistroMint platform; is that correct?**
A. Yes.
**Q. And you've described in your responses to your counsel's questions several outreaches that you said you had with executives in the music industry and artists in**

**the music industry. Do you remember that testimony?**
A. Yes.
**Q. And you told us some things that those people had told you about their interest in the DistroMint platform; is that right?**
A. Yes.
**Q. And you're just telling us what these other people told you, right?**
A. I don't know what the context of what those things are.
**Q. Okay. Well, I'm just saying when you're telling us when -- when executives and artists expressed interest in the DistroMint platform, you're just relaying to us conversations that you had with these people that nChain weren't a part of; is that right?**
A. Yes, the questions you asked me yesterday, to clarify, because you had asked me about my claims for my consulting payments, and basically you were asking about the companies or the record labels and record executives and artists that, you know, I had reached out to or had been in contact with in order to promote and push the DistroMint platform.
**Q. Okay. Thank you.**
**You gave some testimony about it being your impression that Calvin Ayre was, quote, destroying**

**everything that Christen had ever created. Do you remember that testimony?**
A. Yes.
**Q. You never formally worked at nChain's offices in London, did you?**
A. No, I did not.
**Q. You weren't there at those offices when Mr. Ager-Hanssen was fired, were you?**
A. I was not there.
**Q. You weren't at nChain's offices and -- in the -- in the immediate aftermath after Mr. Ager-Hanssen was fired, were you?**
A. No, I wasn't.
**Q. When you say that Calvin Ayre wanted to destroy everything that nChain [sic] had ever created, is that just based on your general impressions and not something that you observed personally?**
A. I observed.
MR. RISPOLI: Form objection.
THE WITNESS: I observed personally a very public battle, which even was all over the freakin' X and Twitter, like, these guys were going at it.
BY MR. RISPOLI:
**Q. Okay. So when you say that it was your**

**understanding that Calvin Ayre wanted to destroy everything that Christen had ever built, that is based on things that you observed on social media?**

A. Yes. Yes, directly from Christen and then from Calvin and then various nChain entities. There was quite a public fallout, yes.

**Q. Okay. You also mentioned in your responses to your counsel's questions that you didn't pursue some other professional opportunities while you were working on the DistroMint platform. Do you remember that testimony?**

A. Yes.

**Q. And what were those other professional opportunities?**

A. Production of albums, production of singles, productions of EPs, mix and mastering clients, promotional gigs where -- you know, because we do marketing and promotions as well for the artists, so we might run campaigns for them, blog campaigns, PR press campaigns, YouTube campaigns, Spotify placement campaigns, Sound Cloud placement campaigns. I mean, the list is really, really long.

**Q. Are there any specific customers or clients or projects that you turned away because you were working on the DistroMint platform?**

A. I can't remember because I turned away so many people at that time. I was very focused.
**Q. Can you name one?**
A. I mean, a lot of the clients were new to me, so, like, you know, I'm not going to remember somebody off of a first name basis if -- you know, because these were all people who had interest in me during the engagement with nChain because it was very big. It was very publicized. It looked big. So I got a bunch of new -- like an influx of artists who were, you know, dropping me messages off my website or, you know, reaching out, calling, whatever.
**Q. Okay. But sitting here today, you can't name for us the artists --**
A. I would have to --
**Q. -- an or project or client that you turned away because you were working on the nChain?**
A. I would have to refer to my records, honestly, because these are, like, first-time customers.
MR. RUOCCO: No further questions.
THE WITNESS: Okay.
EXAMINATION
BY MR. RISPOLI:
**Q. All right. Just to follow up very briefly on one thing that defense counsel asked.**

**The 25 number of people that you interacted with at nChain, Eric --**
A. Yes.
**Q. -- let's just start with the development team.**
A. Yep.
**Q. You -- can you name all the people that you remember working with on the development team?**
A. Okay. Tina, Urban.
**Q. Don't worry about me writing anything down.**
A. All right. Yeah. Tina, Urban, Matevz, Damir, Luca, Roman. And there's more in my e-mail. All right.
**Q. On the executive side, you know, if we're counting Dale --**
A. Yeah.
**Q. -- and who would you think of in that orbit, level of nChain --**
A. Well, Dale, Christen.
**Q. Let me just make sure I ask the question.**
**Starting with Dale, who else did you interact with at nChain at that level?**
A. Okay. So Dale, Christen, Andy Moody, Simon Wood, Mr. David Brooks. And then there was -- what's his name? The patent -- the patent folks, so, obviously, it was e-mail with Mr. Alizon, Arthur Roberts. And then there were marketing people. I don't

remember their names, but it was at least two women in the marketing department. And there was a -- you know, there were a couple of developers and there was a project manager or organizer. I think he was a project organizer.

**Q. We saw e-mails with Christine Leong on the --**

A. Yeah, Christine Leong.

MR. RUOCCO: Object to the form.

BY MR. RISPOLI:

**Q. Let me finish the question.**

A. Okay.

**Q. We saw an exhibit e-mail with Christine Leong on there. Did you ever interact with her outside of e-mails?**

A. No, I didn't.

**Q. Do you remember interacting with anybody named Yun Lo?**

A. I don't recall.

**Q. Did Mr. Ager-Hanssen have an executive assistant that you worked with?**

A. I believe so.

MR. RUOCCO: Object to the form.

BY MR. RISPOLI:

**Q. Do you remember who that was?**

A. Dragos.

MR. RISPOLI: All right. No further questions from me.

MR. RUOCCO: Okay. Nothing further here.

MR. RISPOLI: And we will read and sign.

THE VIDEOGRAPHER: The time is 11:09 a.m. We're off the record.

(The deposition was concluded at 11:09 a.m.)

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity. Such form shall be attached to the deposition transcript, I make the following disclosure: I am a Georgia Certified Court Reporter. I am here as a representative of Digital Evidence Group.

Digital Evidence Group, was contacted to provide court reporting services for the deposition. Digital Evidence Group, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c). Digital Evidence Group, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have

been made to cover this deposition. Digital Evidence Group, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Susan DiFilippantonio

Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

STATE OF GEORGIA:
COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

Susan DiFilippantonio

Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 11-22-2030
Georgia Certificate Number 2125

CAPTION

The Deposition of ERIC FINNERUD, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF FULTON

Before me, this day, personally appeared, ERIC FINNERUD, who, being duly sworn, states that the foregoing transcript of his deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

*If no changes need to be made on the following two pages, place a check here ____, and return only this signed page.*

Case: Eric Finnerud, et al. vs Nchain UK LTD.
Witness Name: Eric Finnerud - Volume 3
Deposition Date: 08/06/2026

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected. Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group

Copyright 2026 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Eric Finnerud, et al. vs Nchain UK LTD.

Witness Name: Eric Finnerud - Volume 3

Deposition Date: 08/06/2026

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

| | |
|---|---|
| ______________ | ______________________________ |
| DATE | WITNESS SIGNATURE |
| ______________ | ______________________________ |
| DATE | NOTARY |

Errata Sheet

NAME OF CASE: Eric Finnerud, et al. vs Nchain UK LTD.

DATE OF DEPOSITION: 08/06/2026

NAME OF WITNESS: Eric Finnerud - Volume 3

Reason Codes: 1. To clarify the record.
2. To conform to the facts.
3. To correct transcription errors.

Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________
Page _____ Line ______ Reason ______
From _______________________ to _______________________

_________________________
ERIC FINNERUD - VOLUME 3

**$**

**$1,000** 624:24 635:5

**$12,500** 593:3

**$175,000** 622:12

**$2** 626:23

**$25,000** 635:9

**$500** 615:19 639:5

**1**

**1** 587:3,18 592:14 641:23

**1,000** 615:10,12

**10** 587:24 588:13 589:25

**100** 603:7 621:7,11 625:23 626:5,6

**10:30** 647:12

**10:45** 647:15

**11** 587:24 588:13 589:25 590:21

**1191** 624:19

**11:09** 664:5, 7

**12** 588:22

**12,500** 635:9

**12th** 595:12 606:7,8 654:12

**13** 592:2,16

**13-5-8** 594:3

**14** 592:24 593:8

**150,000** 635:11

**16** 593:20

**175,000** 635:11

**1832** 627:10,13, 14 630:5

**1868** 640:24

**19** 592:1

**2**

**2** 611:7 616:6 642:2,17 643:10 644:19

**20** 607:7 644:20

**2010** 644:20,24

**2011** 618:15

**2022** 592:5 605:23 606:2,4 607:11,12 608:6 628:24

**2023** 607:8 608:6 611:4 620:13,18 625:20 630:3 643:6

**2024** 636:19 643:6 657:3

**2026** 587:1, 3

**21st** 607:7

**24** 611:5 628:4 630:19

**245** 631:2

**25** 601:11 655:23 656:5,10 662:1

**3**

**30(b)(6)** 587:20

**36** 640:19

**365** 592:14

**37** 624:4,8 627:12 630:5 631:2

**4**

**4** 590:24 645:12

**4-tay** 614:1, 10

**40** 589:24 590:5,7, 11,18,21

**42** 590:21 591:2

**43** 588:15 631:22

**48** 588:24 589:7

**5**

**5** 591:23,25

**50** 589:3,21 615:18 646:9,10, 11,14,25

**50/50** 590:16 606:19 641:2 646:11 647:5

654:16

**6**

**6** 587:1,3 591:23,25

**7**

**70** 626:11

**750-millileter** 615:18

**8**

**80** 626:9

**8:59** 587:1, 4

**9**

**9** 587:23

**90** 626:8, 15,16

**95** 626:16

**99** 643:8 657:16

**A**

**A&rs** 636:7

**a.m.** 587:1, 4 647:12, 15 664:5,8

**Ab-** 613:8

**abandoned** 621:18 631:6,11, 13

**ability** 622:9,18

**abruptly** 632:14 642:24 648:10

**absolutely** 596:22 613:8 620:1 626:4 652:4

**accent** 606:22 654:22

**access** 622:8 623:3 632:20 633:6 634:21

**accidentally** 644:11

**accomplished** 638:11

**account** 609:14 623:1 635:2 651:18 656:19,25 657:2,5

**accounts** 609:10

**accurate** 594:18 616:8 626:12 646:16,18

**accurately** 641:17

**acknowledging** 642:15

**acquired** 622:13

**act** 594:22

**acting** 602:14

**action** 653:2

**active** 611:3 651:18,19

**activities** 610:9 611:11 613:5 620:17 630:14 636:4 642:18 643:3,8,9 649:6

**activity** 630:18 657:16

**acts** 599:18

**actual** 616:3,9 622:20 633:17 645:25

**add** 595:7 600:2 656:14

**addition** 611:24 614:3 615:1 629:22 649:15 650:1

**address** 635:20

**admin** 622:4 623:4 636:1

**admit** 589:17 590:17 592:17 593:9

**advance** 650:10

**advantage** 596:14

**advice** 604:13,19

**advisement** 591:10

**affairs** 641:17

**affiliates** 601:24 602:2 630:22 652:8

**affirmative** 588:18 593:18,23 594:4,15, 19 595:1, 17,22 596:2,12 597:6,10, 23 598:3 599:3,11, 25 632:2

**affordable** 612:9

**aftermath** 659:11

**Ager-hanssen** 592:6 593:2 595:11 605:24 606:24 608:17,21 609:5 626:23 649:2 650:2 652:24 653:6,14, 24 659:8, 11 663:19

**agree** 637:2 639:13 641:22,23 645:12 646:4,24

**agreed** 595:11 646:10

**agreement** 589:2,20 594:6 595:9 605:3 606:4,6,7, 9 609:2 632:12,22 639:12 654:12

**ahead** 627:8

**Akompliss** 613:25 614:10 616:23

**albums** 617:15 660:15

**Algorand** 606:2

**algorithm** 590:7

**Alice** 619:25 620:3

**Alive** 587:20 588:18 589:1,7, 11,19 590:10 591:1,5 592:13,15 593:2,7 594:23 596:20,24 597:18,21 598:14 599:6,16, 19,22 601:1,2 609:17 610:14 613:24 614:4,7 625:25

**Alizon** 603:14,17 662:24

**allegation** 589:11,18 590:17 592:18,22 593:10

**allegations** 588:25 589:7 590:11 591:2 592:16 593:7

**allege** 594:8 596:20 599:19,22

**alleged** 589:1,19 594:2 599:16

**alleges** 592:5

**alleging** 598:21,24

**allergies** 590:1

**amazing** 596:17 626:22

**amend** 591:7

**amended** 591:6 625:3,8,10 631:14,15

**amount** 629:25

**amplified** 628:11 642:23

**amplify** 612:12

**amplifying** 612:14

**Andy** 662:21

**announced** 649:5,22

**announcement** 649:21

**announcements** 611:12

**announces** 649:8
**annoy** 625:11
**anticipating** 636:14 653:21
**anticipation** 624:20
**apologize** 608:13 637:25
**application** 604:23 605:22
**applications** 621:5
**approach** 592:19
**approached** 592:6,20
**approaches** 611:20
**April** 619:7
**arranged** 605:11
**art** 592:11
**Arthur** 603:12 604:3,9 662:24
**article** 610:20,25 612:12 642:24
**articles** 642:23
**artist** 616:23,25
**artists** 592:9 613:19,22, 25 614:3, 5,7,15,19 615:1,2,5, 8 617:6 618:8 619:23 620:2 622:22 623:3 634:9 638:20,21 651:9 657:25 658:12,20 660:18 661:10,14
**ascertaining** 593:15
**asleep** 630:19 652:6
**aspect** 638:25
**Assetlayer** 648:22 649:20,21, 22
**assets** 634:9,11
**assigned** 603:3,5,6
**assist** 598:20
**assistance** 611:1 645:2,5 657:10,13
**assistant** 663:19
**assisting** 605:21
**assume** 595:24
**assuming** 624:6
**attempts** 631:13
**attorney** 598:18 602:9,14, 22 605:3 655:21
**attorneys** 596:5,10 598:20 603:9,18 604:5,10, 11 605:10, 16 652:11
**audience** 611:18
**August** 587:1,3
**authority** 642:8
**awake** 611:5
**awarded** 598:1,5,6 616:24 622:13 635:4
**awareness** 612:19
**awesome** 640:6
**AWS** 622:16 635:1,2,3, 4,14,17
**Ayre** 624:2 648:16 658:25 659:14 660:1
**Azure** 622:14,16 635:5,13, 14

**B**

**Baby** 617:10,14
**back** 587:17 611:8 612:11 618:3

625:25
629:8
634:3
635:19
638:21
639:12

**bad** 651:10

**ballpark** 597:4 656:4,10

**bank** 609:10,14, 15,16 656:19,24 657:2,5

**bar** 645:25

**barred** 594:1 597:8

**bars** 599:5

**based** 613:3 617:24 633:2 644:14 654:24 659:16 660:2

**basically** 595:14 607:18,23, 25 609:3 610:24 612:6,7 623:4 630:14 651:11

652:18
658:18

**basis** 589:10 592:21 593:12 594:4,15 595:1,17 597:10 598:3 599:11,24 626:15 648:4 661:6

**battle** 659:21

**began** 627:21

**beginning** 587:3 622:6 636:18

**behalf** 597:12 598:25 652:15

**belief** 592:7 632:18 648:9

**believed** 596:15 632:11

**believing** 636:4

**Beyonce** 618:17

**biased** 617:1

**big** 595:15 618:22 626:19 638:11,13 648:8 649:21 651:16 655:10 661:8,9

**big-time** 618:23

**billboard** 612:23

**billed** 627:16 629:9

**billing** 644:4

**billion** 626:23

**billion-dollar** 595:15

**billionaire** 626:24 640:15

**bills** 630:1

**bit** 595:7 600:10 629:8 642:5

**Blaq** 614:9

**blockchain** 606:2

610:21,24

**blockchain-based** 592:9

**blog** 660:19

**blow** 649:10

**blueprint** 633:23

**board** 620:1, 3 642:9

**Boehly** 619:8

**Boo** 613:25 614:11

**boost** 630:17

**Borzon** 636:8

**bother** 625:14

**bottle** 615:18,19

**bottles** 616:20

**bottom** 646:13

**Bows** 619:8

**Bratina** 621:2 633:13,20 634:1 653:8

**breach** 594:1,7,11 595:9,19, 25

**breached** 594:5 598:4

**break** 627:3 647:10

**breathing** 652:6

**bridge** 645:2

**briefly** 661:24

**brilliant** 606:11,15

**bring** 610:23 620:6 638:19

**bringing** 620:3

**British** 609:21 648:2 654:19

**broadcast** 627:23

**broke** 606:13

**Brooks** 662:22

**brother** 618:20

**brought** 649:4 650:12

**Bruce** 619:1, 13 639:4

**build** 606:16 654:15

**building** 607:19

**built** 633:3 654:14 660:2

**bunch** 661:9

**burden** 651:12

**burner** 625:25

**business** 598:7,13, 22 600:24 601:4 612:17 617:12 640:17 642:6,7 653:20

**busy** 626:4

**BVI** 610:1

**C**

**calendar** 632:14 650:18

**call** 605:5 612:7 613:11 653:17

**called** 587:10 619:7 645:21 646:1 653:16

**calling** 661:12

**calls** 615:15

**Calvin** 624:2 648:16,18 658:25 659:14 660:1,5

**cameras** 628:1

**campaign** 610:13,14, 16 611:17 628:6 657:9

**campaigns** 660:19,20, 21

**canceled** 632:13

**capital** 645:4

**carrying** 651:11

**cars** 618:23

**case** 587:5 596:21 598:12,22 657:5

**catalogs** 619:20 620:2

**catalogue** 618:8 619:1,4,14 639:4 653:18,19

**cattle** 649:18

**CD** 617:10, 14

**cease** 657:2

**CED** 613:25

**CEO** 590:23 608:23 640:14 649:2

**Chains** 619:25 620:4

**challenge** 615:17 616:11

**chance** 588:9 626:19

**change** 628:10 638:17,20

**changed** 635:25

**characterize** 629:13

**charge** 607:24 630:9

**charged** 650:21

**Charve** 618:15,21, 22 636:10

**check** 618:4, 5,21

**Chino** 614:2, 8

**Christen** 592:19 595:11 603:7 606:10 608:17,23 619:2,3 625:14 626:23 630:23 639:2,9,11 642:25 646:6,12 648:2,16, 17,19 649:7 654:13 659:1 660:2,4 662:17,21

**Christine** 663:6,7,12

**circumstances** 608:20

**claim** 598:25

**claims** 593:25 597:8 658:17

**clarify** 658:17

**click** 623:2, 5

**client** 661:16

**clients** 660:16,23 661:4

**clock** 612:1 630:18

**clone** 615:21

**close** 610:3 626:15 636:9 653:10

**closed** 648:22

**Cloud** 660:21

**code** 622:2, 9,12,16 632:21 633:6,7, 11,14,17 634:8,12, 13,21 635:15,17, 20,21 643:4

**coder** 633:16,19

**coding** 634:2

**cold** 617:3

**collaboration** 647:6 649:23

**college** 616:20

**column** 641:1,19

**combination** 612:16

**commercial** 637:23 639:18

**commercially** 655:1

**committed** 594:1,8,11 599:16,19, 22

**communicate** 637:3

**communication** 607:11

**communications** 615:13 617:25 636:20

**companies** 630:22,23 640:17 648:24 658:19

**company** 592:13 595:4 596:13 598:8 606:20 609:4 612:17 626:23 642:9,10 645:13,20 646:1,7,9, 10,15,22 648:8 649:9,24 651:15 654:16

**complaint** 594:2,9, 12,16,18 597:3 598:16,17 599:17,20, 23 600:1,3

**complete** 627:23

**completed** 645:11

**completely** 595:13 655:7,8

**Complying** 587:25

591:25
**component** 634:14
**comprised** 626:13
**computers** 627:25 630:20
**comrades** 636:9
**con-** 633:25
**concealment** 599:4,7,18
**concept** 592:12
**concerns** 625:11
**concluded** 664:7
**Concore** 618:15
**condenser** 615:23
**conduct** 594:22 599:5,8,21
**conference** 610:24
**conflict** 648:14,17
**confusing** 591:18 642:5
**conglomerate** 651:16
**conjunction** 642:19
**connect** 620:15
**connection** 641:7 655:24
**connections** 593:1
**consideration** 648:4
**considered** 611:13
**constitutes** 599:8
**constructed** 610:20
**constructing** 608:1
**consult** 620:14
**consulting** 593:3 658:18
**contact** 617:13 636:9 658:21
**contacted** 614:16
**contained** 624:7
**container** 622:15 635:16
**content** 610:25
**contest** 615:16
**context** 658:9
**continue** 620:14
**continued** 620:13
**contract** 595:20,25 598:4
**contract-based** 593:25
**contracting** 654:21
**contractor** 647:21 648:5
**control** 638:21
**controversy** 651:21
**conversation** 620:9 644:18 654:11
**conversations** 634:1 640:8 658:14
**cool** 618:4
**copy** 635:20
**corporate** 609:1
**corporation** 595:16 652:22
**correct** 588:19 591:6 594:25 614:6 657:21
**cost** 624:24 630:1
**costs** 629:22
**counsel** 591:7,14 599:13 600:15 661:25
**counsel's** 656:18 657:7,24 660:8
**count** 656:5
**counterclaim** 588:25 631:25
**Counterclaims** 588:19

**counting** 662:13

**couple** 663:3

**Court** 587:7

**covered** 600:12

**covering** 610:21

**Craig** 614:1, 9

**crap** 639:15

**create** 592:10 608:16,22, 25 622:25

**created** 610:1 624:10 648:19 659:1,15

**credentials** 622:4 634:22 635:24 636:1

**credibility** 638:7,12 650:25 651:5

**credits** 622:12

**current** 641:1,12, 19,23 642:2 646:17

**customers** 660:23 661:19

**D**

**DA** 613:25

**Dale** 602:6 603:2 640:6,9 643:24,25 644:3,23 645:1 662:13,17, 19,21

**Dale's** 601:24 642:13

**damage** 650:25

**damaged** 650:25 651:5

**damages** 594:22 595:5,18 596:13,21, 24,25 597:3,5,9, 16,17,20, 25 598:5, 11,12,14, 21,24,25 650:24

**damaging** 598:7

**Damir** 607:21 662:10

**dashboard** 607:19 634:10

**David** 662:22

**day** 611:5 626:25 628:4 630:19 645:5

**days** 600:13 618:17

**dead** 655:6

**deal** 638:3

**dealt** 639:25

**decacorn** 639:2

**December** 592:5 595:12 606:7,8 607:11,12 608:6 654:12

**decided** 639:7,23

**deck** 619:15,16

**deeper** 588:11

**Defendant** 587:10

**defense** 593:23 594:4,15, 19 595:2, 17 596:12 597:7,10, 23 598:3 599:3,11, 25 632:3 661:25

**defenses** 588:19 593:18 595:22 596:2

**delete** 648:18

**deleted** 642:25

**deletion** 643:2

**demo** 623:1

**denial** 592:17 593:9,11, 12

**deny** 589:7, 16 590:11 591:1 592:15 593:7

**denying** 589:11

592:21

**department** 642:22 656:7 663:2

**deposed** 587:11 604:8

**deposition** 587:4 601:25 609:20,21 621:4 630:13 647:20 664:7

**Derek** 617:9, 17

**descent** 606:25

**describe** 613:22 614:13 615:12 627:19 637:19 647:25

**description** 642:3

**design** 634:10

**designed** 639:19

**destroy** 648:18 659:14 660:1

**destroying** 658:25

**detail** 610:17,19 612:4

**details** 594:13

**determination** 629:7,21

**detriment** 599:6

**dev** 640:5

**devastated** 632:17

**developed** 593:5 641:10,14, 21

**developer** 634:6

**developers** 607:21,24 622:2 633:13 635:12 643:19 644:13 650:14 656:7 663:3

**developing** 592:12

**development** 589:2,20 593:6 641:15 644:4,7 662:4,7

**devices** 630:20

**Devops** 634:6

**diagrams** 607:17

**digital** 620:5

**direct** 653:1

**directed** 593:2 653:22

**directing** 634:1

**directly** 619:2 660:4

**directors** 642:9

**dis** 642:3

**disagree** 641:11 642:3

**disconnected** 622:5

**discuss** 615:8

**discussed** 601:24 607:11 637:3 652:20

**discussing** 588:2 619:25

**discussion** 606:3 619:3,6 644:12,23 645:1

**discussions** 609:19 614:13 633:20 653:17

**dismissed** 599:10

**dissolve** 610:5 653:10

**distribute** 592:10 614:10

**distributed** 614:18 617:15

**Distrokid** 617:11,18, 19

**Distromint** 589:3,21 590:9,15,

24 597:18, 21 598:14 601:10 602:15 603:18,24 605:20 607:5,13 608:16,22 609:1,3, 11,14,22, 25 610:6,9 611:4 612:1,5 613:18 614:14,16, 17,22 615:8,16 617:8,17 618:1 619:1,14 620:2,8 621:7,11 622:9,15, 19 625:21 631:4,12, 17 632:10 633:11,21 634:14,23 636:2,13, 22 637:8, 15,19,22 639:6,18 641:3,6,8 642:11,15 644:16 645:6,17, 18,21 646:2,22 647:4 648:11 649:22 650:2,15 651:6,10, 24 652:7, 22 653:2, 7,10,21 654:24 655:24 656:19,24 657:4,17, 21 658:4, 13,22 660:10,25

**Distromint's** 636:15 639:6

**distromint. com.** 646:3

**dive** 588:11

**divvy** 646:20

**Docket** 592:13

**document** 588:17

**dollar** 643:14 644:8,15

**Don** 618:22

**doors** 648:23

**dorm** 616:20

**Dorothy** 597:4

**downloads** 616:8,9

**dozen** 648:23

**Dragos** 663:25

**drawing** 625:9

**drill** 613:13

**dropping** 661:10

**dude** 618:23 640:6

**due** 648:2

**duly** 587:11

**duties** 597:13

**Duvall** 619:24 620:9

**E**

**e-mail** 604:9 607:7 615:13 617:23 650:17 662:11,24 663:12

**e-mailed** 605:5

**e-mails** 604:9 621:5 663:6,14

**e.g.** 590:24

**earlier** 604:8 609:19,20

**early** 618:17

**earn** 592:10

**edited** 610:25

**effect** 657:19

**efforts** 611:25 615:11 617:8 618:7,24 619:19 620:22 652:1

**electronic** 628:1

**emotion** 638:3

**emotional** 628:17 650:23

**emotions** 639:25

**employee** 648:1,6 654:20

**employees** 601:1,5,

14,17
611:11

**end** 618:19
622:7
632:11
647:19

**ended** 624:23
625:1,2
648:10
650:6

**ending**
637:20

**engage** 613:5
630:17

**engagement**
612:25
627:21
654:11
661:7

**engaging**
651:8

**English**
654:20

**enhance**
630:17

**enrichment**
598:1

**entered**
589:1,19

**Enterprise**
587:21
588:18
592:13
598:15

**Entertainment**
618:16

**entire**
597:11
611:20
619:14
626:18
633:3,23
647:3

**entities**
612:2
617:7
622:22
660:5

**entitled**
588:17

**entity**
608:16,22
609:1,22
610:6
641:7

**EPS** 660:16

**equipment**
628:1,3

**equitable**
599:5,9

**erased** 643:1

**Eric** 587:5,
9 588:17
600:9
606:11,14
619:8
627:6
646:6
647:18

662:2

**established**
612:11

**estimate**
626:12
656:15

**et al** 587:5,
6

**European**
652:16

**Evans** 602:6
603:2

**eventually**
636:6
648:22

**EXAMINATION**
587:13
600:7
655:14
661:22

**examined**
587:11

**excited**
611:15,16
628:13,14

**exciting**
610:22

**excluding**
617:6

**excuse** 590:1
614:12
628:17
639:15
641:22

**executive**
662:12
663:19

**executives**
611:9
657:25
658:12,19

**exhibit**
587:18
588:15
590:24
592:14
623:7
624:4,8
627:12
630:5
631:2,22
640:19,24
652:17,18,
20 663:12

**exhibited**
605:4

**existed**
633:8
646:24

**exit** 606:21
654:17

**expectation**
645:19,25
646:8

**expected**
646:14

**expenditures**
653:21

**expense**

657:8

**expenses** 624:13,15

**expensive** 635:3

**experience** 592:25 613:3

**expert** 596:7 638:10

**expertise** 592:11 595:6 621:25 622:1

**experts** 640:12

**explain** 596:23 601:23 612:4

**explained** 617:21 648:2

**expressed** 658:12

**extent** 604:19 616:15

**extra** 653:20

**F**

**fact** 646:1

**facts** 599:7

**failure** 597:9,12

**fair** 629:13

**Fairway** 624:2

**faith** 632:18

**fall** 633:5 639:24

**fall-out** 642:25

**fallout** 651:5 660:6

**familiar** 588:4

**family** 624:2

**fancy** 616:24 618:23

**favor** 595:14

**Feature.fm.** 636:8

**February** 607:7,8 608:6 620:12

**feel** 588:12 596:14 600:17 632:21 634:13 637:18,19, 21 638:3, 5,7,8,23 641:16 646:16

**fees** 631:14,15

**felt** 611:15 632:16 633:2 641:20 642:12

**figure** 597:5 615:9 626:8 643:14 644:8,15 656:4

**filed** 607:12

**files** 623:2

**filings** 652:14

**final** 646:13

**finance** 656:6

**financing** 645:2

**find** 594:18 605:7 635:15,18

**finish** 636:21 663:10

**Finnerud** 587:5,9,15 588:17,25 589:6 590:8,10, 23 591:1 592:4,7, 11,15,24 593:7 594:23 599:6 655:16

**Finnerud's** 590:24 593:3

**fired** 659:8, 12

**first-time** 661:19

**Fiverr** 611:24 612:3

**flight** 624:21,24 625:1

**flip** 640:21

**flipped** 595:14

**focus** 626:17

**focused** 661:2

**folks** 625:11 662:23

**follow** 661:24

**followers** 611:21

**forced** 638:2

**forgive** 600:15

**form** 601:18 602:4,10,17,23 603:20,25 604:15,21 607:1,15 608:8,18 609:8 613:7 614:23 618:10 619:5 623:11,25 629:19 631:5,19 632:23 633:15 634:17,24 636:23 637:24 639:20 647:7 648:12 649:3 650:3 651:2,7 652:2 654:4 655:3 659:19 663:8,22

**formally** 659:4

**formed** 642:10,12,15 645:21 646:2

**forward** 622:10,19 632:17 651:10

**found** 596:1

**founder** 617:10,11

**fourth** 594:19 596:11 615:20 616:21,22

**frame** 607:4

**framework** 633:4

**freakin'** 659:22

**freaking** 626:22

**free** 600:18

**freelancers** 611:23 612:3,8 630:16

**freestyle** 615:17,18

**friend** 618:13 635:6

**front** 631:22 657:20

**full** 594:13 604:23 605:22 629:14,16

**fumbled** 614:11

**funding** 653:20

**fundraising** 645:2

**funds** 637:10 645:4

**G**

**gain** 612:19

**Gate2chain** 648:22 649:20

**gave** 595:12 615:21,22,24 626:18 635:9 653:2 657:15 658:24

**general** 659:16

**gentleman** 616:19

**Georgia** 605:17 607:5,13 609:6,10,15,25 610:6 645:18 653:25 654:3

**Georgia-based** 592:4

**giant** 627:24

**gigantic** 651:16

**gigs** 660:17

**Github** 633:8,10

**give** 601:8 610:19 617:20 618:3 619:10 627:13 634:5 637:14 644:8 646:10

**giving** 634:10 635:7

**glasses** 616:19

**go-to** 623:14

**good** 587:2,15,16 640:17 651:13

**gosh** 615:5 616:16

**government** 621:6

**Grammies** 638:13

**grant** 622:14 635:3,9,10

**granted** 642:8

**grants** 635:7

**great** 615:4 628:20

**greater** 592:10

**grieved** 638:1

**Grooves** 618:19

**ground** 600:17 655:7

**group** 593:4 618:18

**group's** 592:11

**grow** 612:18,19

**guess** 605:5

**guidance** 618:3 641:15

**guy** 591:15 595:14 598:9 607:23 617:12,16 626:19 634:7 640:11

**guys** 620:7 640:6 650:7 659:22

**H**

**half** 611:21

**Handcash** 622:4,18 623:9,13, 16,19,20 633:10 635:21,25

**hands** 599:8

**happen** 609:25 640:14

**happened** 637:21 639:9 642:25 644:18 649:25 651:5

**Haraminac** 597:4

**harming** 625:9

**head** 656:4, 14,23

**hear** 613:10

**heard** 601:24

**heavily** 595:5 596:4,9 598:19 612:9 623:15

**helping** 605:21

**Hennessy** 615:16,19, 24

**hey** 606:10 617:17 626:22 639:8 654:14

**hiding** 638:4

**high-impression** 613:1

**high-volume** 613:1

**hire** 596:9 612:7

**hold** 590:14 608:12 627:6 650:6

**holds** 590:8

**honest** 596:4 642:20

**honestly** 661:18

**honorable** 615:20 616:22

**hosting** 635:2

**hotel** 625:2

**hourly** 644:13

**hours** 611:5, 7 628:4 630:19

**house** 629:17

**household** 613:14

**houses** 618:22

**huddled** 614:12

**huge** 638:15

**hundreds** 616:2,5

**I**

**idea** 606:13 613:12 617:21 628:24

643:21,23

**identify** 624:17

**iii** 644:19

**iii's** 644:20

**impact** 622:18

**impacted** 622:9

**important** 612:21 613:4

**impression** 601:13,16 637:14 658:25

**impressions** 616:5 659:16

**improper** 599:5,21

**inaccurate** 593:13,14 641:20

**including** 613:25

**income** 625:21 626:6,12, 13,14

**inconvenience** 625:3,5

**incorporate** 609:6

**incorporated** 607:5 645:14,17

**incorporation** 607:13

**increase** 627:20

**independent** 638:10 647:21 648:5

**individuals** 601:8,11, 12 613:19 617:7 619:21 655:23

**industry** 592:8 593:1 596:8,17 613:4,6,20 617:7 618:7 626:21 636:10 638:8,17, 18,19,22 657:25 658:1

**inequitable** 599:8

**inferred** 604:4

**influx** 661:10

**info** 634:4

**information** 592:6 644:3,8,17 652:23 653:3,6

**initial** 631:8,9 639:11 645:19,25

**injury** 594:22 595:18

**inputting** 634:8

**Instagram** 618:21

**instance** 587:10

**instrumental** 616:10

**intellectual** 592:7 593:16 603:8

**intention** 645:4

**interact** 603:8 662:19 663:13

**interacted** 601:9 662:1

**interacting** 603:2 663:16

**interaction** 610:21

**interactions** 601:7,12, 23 612:13

**interest** 658:4,13 661:7

**interested** 617:25

**internal** 643:13 648:14

**interviewed** 636:7

**introduction** 606:12

**invaluable** 612:24

**invention** 610:23 633:4,5

**investment** 649:8

**invoice** 624:19,22 625:4,8, 10,16

630:5

**invoices** 610:12,14 624:7,12 630:2 644:11 650:21 653:22 657:8

**involve** 620:3

**involved** 618:1

**involvement** 621:16

**involving** 630:15

**IP** 646:11

**irregular** 625:19

**Islands** 609:22

**issue** 645:23,24

**item** 627:16

**items** 650:21,25

J

**Jackson** 614:1,11 618:19

**Jackson's** 618:20

**January** 620:12 636:18

**Jeanette** 636:8

**joint** 647:5

**jointly** 633:14

**July** 606:2

**jumping** 600:9

**June** 606:1

**jurisdiction** 653:11

K

**kind** 608:1 614:11 625:4

**knew** 625:16 654:2

**knowledge** 588:14

**Kool** 614:1, 8

L

**label** 613:11 614:4,10

**labels** 658:19

**laid** 639:11

**language** 639:15 642:4

**large** 596:13

**launch** 636:15 653:21

**launched** 636:16 639:2,7 646:19,21

**law** 591:15 599:14 600:24 642:6 648:2 654:19,20

**lawyer** 596:6 600:20 602:6 632:7

**lead** 619:24 642:18 643:6,7

**lean** 591:13

**leaned** 596:4,9

**leaning** 598:19

**leave** 628:5

**left** 625:4

**legal** 597:14 600:22 603:4 604:12,19 605:13 621:25

**Leong** 663:6, 7,12

**level** 662:16,20

**liable** 596:1

**licensed** 602:8

**life** 626:18 652:6

**life-changing** 626:20 628:15 638:8

**Like4like** 611:24 628:7

**likeable** 617:16

**likes** 612:13 616:5

**Limited's** 588:19

**Linkedin** 590:25

**links** 612:11 623:5

**liquor** 616:20

**list** 614:2 656:9 660:22

**literally** 611:12

**lived** 653:24

**livestock** 649:19

**living** 605:17 626:18 627:23 629:23

**LLC** 587:21 589:3,21 590:9,15, 24 592:13 597:21 607:5,13 608:16,22 609:14,25 610:1 641:8 642:11,16 645:18,21 646:2,22 652:22 653:2,7,10 656:20,24 657:4

**LLC's** 588:18

**Lo** 663:17

**located** 652:13

**log** 622:20 623:6

**login** 622:4, 17 634:22 635:24

**London** 610:21,24 650:7 652:13 654:17 659:5

**long** 656:9 660:22

**long-term** 618:13

**longer** 651:19 656:24

**looked** 633:11 661:9

**lopsided** 598:10

**losing** 632:20

**loss** 622:17

**lost** 637:19,22 638:6,7,8, 23

**lot** 600:12 612:8 622:24 628:1 638:7,9 650:6 655:4 661:4

**lottery** 628:22

**love** 620:7 654:22

**loved** 640:5

**Luca** 634:5, 6,11 662:11

**M**

**made** 597:13 621:6 634:13 640:2 654:12

**Mahon** 605:6

**maintain** 622:3

**major** 613:11 619:20,23 638:6

**majority** 640:15

**make** 591:14 618:6,24 629:21 636:20 640:13 662:18

**makes** 600:14

**making** 629:7

**managed** 618:16,19

**manager** 663:4

**managing** 621:2

**maneuver** 651:15

**market** 620:14

**marketing** 592:25 611:23 613:5 628:7 642:19,21 656:6 657:20 660:18 662:25 663:2

**marketplace** 623:1

**mastering** 660:16

**material** 594:1,7,11

**Matevz** 607:22 662:10

**matters** 593:5 598:20

Case 1:24-cv-05280-SDG Document 116-5 Filed 09/30/26 Page 109 of 123



**maximize** 611:18

**MC** 616:16, 17,18

**means** 627:19 642:15

**meant** 644:24

**media** 587:3 611:3,8,9, 17 612:18 613:2 615:14,15 630:15 636:12 660:3

**meet** 626:22 653:14

**meeting** 603:15 607:20,22 632:11

**meetings** 622:21 632:13 633:12 650:13,16

**mention** 615:21 616:23

**mentioned** 612:3 656:19 660:7

**messages** 661:11

**met** 605:23 607:20,21 619:24 628:24 635:21 636:7 650:6

**met along** 656:13

**Metallica** 620:6

**Metallica's** 620:5

**Metaverse** 648:21 649:19

**Michael** 618:20

**micro** 611:22 612:3,7 630:15

**microphone** 615:21,22 616:25

**microphones** 615:24

**Microsoft** 622:14,16 635:5,6, 12,14

**middle** 606:1 611:6 628:24 630:21 646:12

**migrate** 635:13

**Mike** 615:4

**million** 611:21 616:6,7 639:5

**mind** 647:9

**mine** 618:13 646:25

**minute** 652:5

**misheard** 653:13

**mispronouncing** 619:9

**misrepresentations** 599:4, 7,15

**missed** 639:5

**mistakes** 597:13

**mitigate** 597:9

**mix** 660:16

**mock** 608:2

**moment** 627:7

**monetization** 610:24

**money** 621:24 638:24 640:13

**monitor** 628:8 630:17

**monitoring** 611:8 628:12

**monitors** 627:25

**monthly** 593:3 630:1

**Moody** 653:23 662:21

**morning** 587:2,15, 16 632:6

**move** 622:9, 14,18 654:17

**moves** 656:23

**movie** 627:22

**moving** 607:18 654:8

**multi-person** 648:8

**multibillion-dollar** 595:4 598:8 639:3

**multiple** 611:21

627:25

**multiply** 630:17

**music** 592:4, 8 593:1 596:8,17 608:2 613:3,6, 10,20 614:18 617:7,12 618:7,18 626:21 634:9 638:8,17, 22 657:25 658:1

**music-related** 593:4

**musicians** 619:20

**MVP** 622:24 633:21 645:10

**N**

**named** 615:1 649:14 663:16

**names** 663:1

**Nas** 616:14

**nature** 612:14 619:17

**NCH** 640:24

**nchain** 587:6 588:19 589:3,20 590:15 592:11 593:1,2,4, 25 594:5, 8,9,10,21 595:3,8,18 596:12,14, 25 597:8, 11,20,25 598:1,4 599:4,7,9, 16,19,22 601:7,8, 14,17,20, 22,23,25 602:1 603:9 605:1,11 607:14 608:15,24 610:3,5,21 611:9,10, 11,25 613:1 620:16,20, 25 621:12, 18 623:9, 15,21 624:12,13, 15 625:3, 6,12 626:13 627:21 628:2,13 630:3,6,8, 22,23 631:16 632:9,11, 22 634:20 635:19 636:19 637:3,13 639:7,9,19 640:4,10 641:2,14, 22 642:16, 19,20 643:13,16, 17,24 646:9,11, 13 647:3, 21,25 648:2,10, 14 650:10, 14,20 651:11 652:8,10, 23 653:1,7 654:7,21 655:10,23 657:20 658:15 659:15 660:5 661:8,17 662:2,16, 20

**nchain's** 593:6 621:16 639:19 647:1 651:12 659:4,10

**needed** 603:1 628:8 631:14 640:4 653:20

**needing** 653:9

**network** 611:20 612:15,19

**networks** 611:22 631:1

**Neumann** 615:21

**NFT** 649:23

**NFTS** 592:10

**nice** 615:22

**Nick** 607:21

**night** 588:4 611:6 630:21

**nipped** 648:21

**non-us** 652:11

**Norris** 618:15 636:10

**Norwegian** 606:23,25

**notice** 587:20

**noticed** 629:25

**notified** 632:15

**notoriety** 612:20,21

**number** 587:3 590:5 615:7 625:14 643:21 650:13,15 656:11 662:1

**O**

**Object** 601:18 602:4,10, 17,23 603:20,25 604:15,21 607:1,15 608:8,18 609:8 613:7 614:23 618:10 619:5 623:11,25 629:19 631:5,19 632:23 633:15 634:17,24 636:23 637:24 639:20 647:7 648:12 649:3 650:3 651:2,7 652:2 654:4 655:3 663:8,22

**objection** 591:8,9 659:19

**observed** 659:17,18, 20 660:3

**occur** 621:12

**OCGA** 594:2

**October** 606:4 620:17 622:6

**offense** 617:18

**offer** 594:14,17 599:24 644:3

**offered** 593:15 615:17

**offers** 592:25

**office** 624:2 652:16

**offices** 652:12 659:4,7,10

**online** 612:15 628:12

**Ontario** 617:3

**open** 609:10

**operate** 648:7

**operated** 629:12 645:20 646:5

**operating** 646:5

**operations** 634:6,7

**operative** 634:6

**operator** 590:8,14

**opportunities** 660:9,14

**opportunity** 588:10 626:20,25 628:16,20 638:6,9

**oral** 606:4, 6,7,9

**orbit** 662:15

**order** 600:14 622:14 658:21

**organizer** 663:4,5

**original** 594:5 609:2 650:12

**outlined** 598:16

**outlines** 597:3

**outreaches** 657:24

**overbill** 624:13

**owned** 645:20 646:5

**owner** 590:8, 14 623:20, 21 640:15

**owners** 641:2

**ownership** 621:7,11, 15 646:9

**P**

**pages** 591:23,25

**paid** 611:1 612:25 624:20,23 625:2,17, 18,19 630:3,6 631:14 637:11 644:13 657:9 658:15

**partake** 649:7

**partaked** 630:14

**participate** 642:21

**parties** 641:4

**partner** 590:16 606:10,16

**partners** 652:8

**partnership** 610:22

**parts** 607:18

**party** 599:1

**pass** 600:6

**patent** 593:16 604:14,23 605:22 606:13 621:25 633:3 640:12 650:10,11 652:11,17, 19 662:23

**patents** 607:16

**pause** 632:16

**pamphlet** 620:5

**panel** 622:5 636:2

**panned** 596:19

**paragraph** 588:24 589:7,24 590:7,11, 18,21 591:2 592:2,16, 24 593:8

**part** 593:14,18 596:11 597:8 601:20 611:14 620:7 628:14 638:15 645:24 646:4 649:23

**pay** 593:2 605:13 612:7 625:2 631:15 657:12

**paying** 625:1 629:24

**payment** 625:14

**payments** 658:18

**people** 612:22 622:20,23, 24 636:7, 14 651:20 656:2,5,6, 8,9,13 658:3,8,15 661:2,7 662:1,6,25

**percent** 589:3,21 603:7 621:7,11 625:23 626:5,6, 11,16 643:8 646:9,10, 11,14,25 657:16

**percentage** 625:21

**perform** 597:12

**period** 607:14 608:5 611:4 620:10 641:20

**person** 623:22

**personal** 629:9

**personally** 599:2 659:17,20

**perspective** 620:23 636:21

**phone** 615:13,15 619:7

**picking** 617:1

**pint** 615:24

**pitch** 619:15,16

**place** 615:20 616:16,22 620:11 632:12

**placement** 660:20,21

**Plaintiff** 592:4

**plaintiffs'** 594:2

**plan** 591:5, 13 651:9

**Planetary** 648:21 649:19

**plans** 591:11

**plaques** 638:14

**platform** 608:2 614:22 617:17,20, 22 618:1,5 628:23 635:4 641:3,6, 10,14,21 645:20 646:20 655:24 657:17,21 658:5,13, 22 660:10, 25

**platforms** 612:6

**play** 610:23

**Poet** 614:9

**point** 607:10 620:20 632:16 635:16 636:3 644:24 647:2 655:5

**pointed** 642:5

**position** 641:1,12, 19,23 642:2 646:17

**possibly** 617:11

**post** 612:12 616:21 628:11 630:25 642:23 649:10

**post-termination** 621:16

**posted** 630:22

**posting** 612:25

**posts** 613:1 616:2 628:8 636:12,14

**potentially** 609:21 618:25

**power** 605:3 621:19

**powerful** 617:12

**powering** 628:3

**PR** 660:19

**prepared** 588:12

**presented** 643:25 645:9

**presents** 590:23

**press** 610:13,16 611:1,12 620:5 657:9,12 660:19

**pretty** 624:20

**prevent** 651:25

**previous** 612:25

**Previously** 618:16

**price** 612:9 624:24

**prices** 615:20

**primarily** 593:5

**prior** 594:1, 7,11 620:17 643:16

**prize** 615:19 616:18

**problems** 621:1

**process** 604:13

**processing** 625:15

**produced** 638:11 657:4

**producer** 592:5 596:8 638:10

**product** 613:10,12 637:23 639:18

**production** 621:2 627:23 629:14,16 660:15

**productions** 638:15 660:16

**professional** 598:19 626:13,14 652:1

660:9,13
**professionally** 591:15 596:6
**profile** 590:25 623:3
**project** 593:5 601:10 602:15 603:3,18 605:20 610:9 611:4,10 612:5 613:18,19 614:14 621:16 625:22 626:1 632:10 633:3 637:16,20, 22 639:1, 3,23 642:9,10 643:18 644:10 645:13 646:15,19, 22 647:4 648:11 649:8,18 650:15 651:6,25 654:14,24 655:1,6 661:16 663:4
**projects** 635:8 648:20,24 649:1,13 650:1,5 660:24
**promote** 620:14 649:10 658:21
**promoting** 608:10 611:3,10, 25 612:5, 10
**promotion** 613:18
**promotional** 617:8 620:17,22 642:18 643:7,9 657:16 660:17
**promotions** 660:18
**property** 592:8 593:16 603:8
**proposal** 592:6 595:13 637:2 639:13 640:8,21 643:17,25 645:9
**proud** 611:14
**proven** 595:25
**provide** 604:12 610:17 652:22 653:5,6
**provided** 632:20 633:23
**providing** 634:8
**provisional** 605:22 606:13 650:11
**public** 659:21 660:6
**publicized** 661:9
**Puhek** 632:15
**pull** 600:4
**pulled** 642:24
**purported** 592:25 593:3
**purpose** 646:2
**purposes** 645:22
**pursuant** 589:2,20
**pursue** 660:8
**pursued** 597:14
**push** 620:14 658:21
**pushing** 611:25 632:17
**put** 613:12 615:9 619:13 625:24 631:1 642:23 650:6
**puts** 597:4
**putting** 610:13 611:10 634:12 644:9 651:25

**Q**

**Queens** 616:17

**question** 608:12 653:4 662:18 663:10

**questioned** 646:18

**questions** 609:20 610:8,10 614:16 621:4,8 627:6 630:8 632:5 638:2 640:2,19 647:19 655:13,21 656:19 657:7,24 658:16 660:8 661:20 664:2

**quick** 647:10 655:16

**quickly** 624:21

**quote** 658:25

**quote/unquote** 589:2

**R**

**raise** 645:4

**rambling** 629:1

**ran** 615:16

**random** 625:15

**range** 601:9 615:7

**Rap** 614:1,8 615:16

**Rappin'** 614:1,10

**rate** 624:21

**rates** 643:13 644:21,24

**reach** 611:18 613:19 614:4 615:11 617:6 618:7,24 637:3,13

**reached** 613:23,24 615:2,4,8 617:9 658:20

**reaching** 661:11

**read** 664:4

**realized** 622:6

**reappeared** 632:14

**reason** 648:9

**reasonable** 624:22

**rebuilt** 655:7

**recall** 615:6 655:22 663:18

**receipts** 650:20

**received** 598:5 650:17

**Recess** 647:14

**recoded** 655:7

**recollection** 624:25

**record** 596:8 647:10,13, 16 658:19 664:6

**recorded** 643:13

**recording** 628:1

**records** 613:24 614:7 617:23 625:25 638:12 644:4 657:5 661:18

**recourse** 597:14

**redeveloped** 655:8

**refer** 594:9, 12 598:17 599:17,20, 23 661:18

**reference** 610:12 641:6 644:20

**referred** 604:10 647:20

**reflect** 641:3

**reflected** 641:17

**reform** 653:10

**regard** 613:17 645:6 648:11 653:2

**register** 631:17

**registered** 631:3

**registration** 631:3,9

**registrations** 631:12

**regular** 598:9 629:23

**regularly** 607:20

**rehash** 600:17

**related** 612:5 637:8 644:16 652:7

**relating** 657:8

**relation** 613:6 653:17

**relationship** 597:11,17 605:2 621:12 623:8 632:9 647:3 648:10

**relaying** 658:14

**release** 611:1 657:9,12

**releases** 611:12

**relied** 595:5 599:6 623:15

**relief** 599:5,9

**rely** 599:12,13 612:9 650:10

**remain** 610:2

**remember** 603:11,15 604:20 607:4 608:25 609:19 610:10,13 615:3,4 616:11,16 620:10 621:8 647:22 649:17 654:23 655:25 657:10,14, 17 658:1 659:2 660:10 661:1,5 662:7 663:1,16, 24

**Renasant** 609:16

**reneged** 595:6

**repay** 637:10

**rephrase** 610:4 625:10 626:5 637:20

**report** 634:2,4

**Reporter** 587:7

**repository** 633:9

**repost** 630:25

**reposts** 612:14

**representing** 603:24

**represents** 592:7

**reputation** 651:13

**request** 599:9

**requested** 635:19,23 653:8

**research** 605:7

**researching** 635:13

**residence** 629:10

**resident** 654:3

**resolution** 636:5

**resources** 621:24 639:19 640:5,12 654:25

**responded** 655:22

**response** 589:6 590:10 591:1 592:15 656:18 657:7

**responses** 657:23 660:7

**restricted** 634:21

**restructure** 595:13 637:2 639:13 640:8,21 643:17,25 645:8

**result** 594:22 598:1

**return** 637:7

**returned** 637:15

**retweet** 649:10

**retweeting** 611:9

**retweets** 612:13 616:6

**revamped** 655:9

**review** 632:16

**revolutionize** 592:8 596:17 626:21

**rewarded** 598:6

**rights** 618:8 622:17

**RISPOLI** 591:7,12 600:8,15, 19 601:21 602:5,13, 18,25 603:22 604:6,18, 25 607:3 608:4,11, 19 609:9 613:16 614:25 618:11 619:18 623:23 624:3 629:20 631:7,20 632:25 633:18 634:19 636:17,25 639:16 640:18 647:9,17 648:25 649:12 650:9 651:3,23 652:9 654:6 655:12,19 659:19,24 661:23 663:9,23 664:1,4

**Roberts** 603:12,17 604:3,10, 12 662:25

**Rockwallet** 623:15,18, 21

**role** 647:25

**roll** 639:24

**rollout** 613:11

**Roman** 607:22 644:19 662:11

**room** 616:21 627:23

**Row** 641:23 642:2,17 643:10 644:19 645:12

**row-by-row** 642:1

**royalties** 592:10

**run** 592:12 601:4 606:20 609:4 646:6 654:15 660:19

**running** 628:5,6

**runoff** 617:18

**Ruocco** 587:14 591:9,16 600:6 601:18 602:4,10, 17,23 603:20,25 604:15,21 607:1,15 608:8,18 609:8 613:7 614:23 618:10 619:5 623:11,25 629:19 631:5,19 632:23 633:15 634:17,24 636:23 637:24 639:20 642:4 647:7,11 648:12 649:3 650:3 651:2,7 652:2,17, 19 654:4 655:3,15 661:20 663:8,22 664:3

**S**

**SA** 624:19 627:9 630:5 631:2

**Sadat** 614:1, 8

**salary**

644:13

**scheduling** 650:16

**scope** 601:18 602:4,11, 17,23 603:21 604:1,16, 21 607:15 623:12 650:4 652:3

**screen** 627:24

**screw** 639:7

**screwed** 595:15

**searched** 633:9 635:17

**Section** 594:2

**secure** 619:19 635:1

**securing** 604:13 618:25

**seeking** 598:11

**seeks** 597:25 599:5

**send** 619:15,16

625:3 653:22

**sending** 625:10

**sense** 600:14

**sensitive** 640:2

**sentence** 641:10,11, 16 645:19 646:13

**September** 622:7

**service** 592:9 622:15 635:17

**services** 593:4 605:14 611:19 630:11

**set** 627:23

**sets** 612:16

**setup** 627:22 629:13

**seventh** 599:3,25

**shady** 638:18

**share** 597:20

**shares** 646:15,20, 24

**ship** 621:18

**shot** 617:2

**shoulders** 651:12

**show** 622:20 623:1,2,7 624:4

**showed** 606:12,14 622:23 652:17

**showing** 616:20 622:23

**sic** 593:15 619:8 630:14 659:15

**side** 630:20 634:2 662:12

**sign** 614:20 664:4

**signed** 605:3

**Simon** 662:21

**simple** 595:10

**singer** 619:24

**single** 615:6 656:3

**singles** 660:15

**sir** 588:20 595:21 600:25 601:3,6 602:3 605:9,15 609:7 610:7 624:9 627:11 631:18 637:9,17 641:25 656:1

**sit** 615:3 639:17

**site** 622:23 645:10

**sitting** 661:13

**situation** 628:19 638:1 640:1

**Sivers** 617:9

**sixth** 597:23

**sleep** 628:5

**slept** 611:7

**Slovenia** 601:25

**Smitty** 631:12 641:2,15 645:21

646:14

**snow** 617:3

**social** 611:3,8,9, 11,17,21 612:18 613:2 615:14,15 630:15 631:1 636:12 660:3

**socials** 649:5

**software** 593:6 607:23,24 628:7 630:16

**sold** 617:19 639:4

**sort** 628:6 636:5

**sound** 587:20 588:18 589:1,6, 10,19 590:10 591:1,5 592:13,15 593:2,7 594:23 596:20,23, 24 597:18, 21 598:14 599:6,16, 19,22 601:1,2 609:17 610:14 613:24 614:4,7 625:25 640:17 660:21

**soundalivereco rds.com.** 608:3

**Soundcloud** 616:7,10

**source** 622:2,9, 11,16 632:21 633:6,7, 11,14 634:13,21 635:15,17, 20,21 643:4 650:15

**sources** 611:2

**speak** 600:2

**speakers** 627:24

**spearheaded** 649:2

**specific** 660:23

**specifically** 601:17

**spelling** 619:10

**spend** 588:4

**spending** 644:16

**spent** 635:9 643:18 644:9 651:24

**spiel** 654:16

**spike** 629:25

**spin** 642:13

**spins** 616:6

**spoke** 614:19 619:2 650:7 656:7,8

**Spotify** 660:20

**Springsteen** 619:1,4 653:18,19

**Springsteen's** 619:13 639:4

**stain** 651:10

**stand** 592:17 593:9,11

**start** 605:2 662:4

**started** 605:4 608:1 617:13,14 628:2 640:1,7 648:15

**Starting** 662:19

**starts** 589:24 616:17

**state** 639:22 641:17

**stated** 600:1 649:16

**statement** 641:2 642:8,13 645:13,23 646:16

**statements** 621:6,10

**states** 593:25 594:21 597:25 645:18

**step** 610:23 635:1 655:10

**steps** 613:17 631:17 634:22,25

**sticking** 629:4

**stop** 595:8 620:16

**storage** 622:15

**struggle** 627:5

**struggled** 638:9

**studio** 629:14,16

**stuff** 596:5 634:12

**submissions** 616:1,3

**submit** 591:5 625:8 635:8 650:20

**submitted** 611:2 624:8,19 625:17 630:2 635:8 642:16

**submitting** 624:12 635:4

**subscribers** 611:22

**suffer** 595:18

**suffered** 596:12,20 597:21 598:25

**summer** 606:1

**support** 630:25 650:20

**supporting** 649:7 652:7

**surrounding** 639:25

**sustained** 594:21 595:4 596:25

**swear** 587:7

**sworn** 587:11

**T**

**table** 649:5 650:12

**taking** 620:11 634:11

**talk** 620:7

**talked** 619:21 635:12

**talking** 619:12 650:24

**team** 593:6 604:4 611:13 621:2 622:1 640:5 641:15 644:5,8 655:23 662:4,7

**teaming** 649:22

**teams** 642:19 650:16

**tech** 649:24

**technically** 633:4

**teens** 618:18

**telling** 608:25 609:3 658:7,11

**tens** 616:4

**term** 610:13 647:24

**terminated** 621:12 648:16 650:2

**terms** 595:10 601:25 606:18 615:11 620:13 628:19 639:11 641:12 644:15 649:23

**testified** 605:25 624:6 652:5

**testify** 588:13

**testimony** 597:19 600:13 632:20 655:25 656:18 657:15,17 658:1,24 659:2 660:11

**thing** 620:5 641:9 661:25

**things** 588:11 596:17,18 612:14 619:17 621:19,21 632:19 642:7 658:3,10 660:3

**thinking** 626:22

656:12

**Thomas** 605:6

**thought** 596:16 628:20 632:12 640:6

**thousands** 616:5,9

**throw** 642:14

**thursday** 587:1

**ticket** 628:22

**tickled** 626:24

**tier** 656:8

**time** 587:4 597:15 605:23 607:4,12, 14 608:5 611:4,7,9 620:10,16, 20,25 624:21,23 625:18,19, 20 628:3, 13 632:11 641:4,17, 20 643:12, 18 644:9, 16 645:10 647:2,12, 15 651:24, 25 661:2 664:5

**times** 605:5 612:24

**Tina** 607:21 662:8,10

**Tito** 618:19

**today** 588:13 590:2 615:3 639:17 661:13

**Todd** 619:8

**tokenized** 614:18 649:18

**told** 644:12 653:20 654:13 658:3,4,8

**tons** 616:1

**top** 615:17 648:14 656:4,8

**topics** 587:24 588:2,5,13

**Toronto** 617:3

**total** 626:17 635:11

**traction** 628:9

**trademark** 631:2,3,17

**trademarks** 631:13

**trained** 591:15 596:6 599:13 642:6

**training** 598:19 600:22,24

**transparency** 638:19

**treated** 638:21

**trust** 602:19

**trusted** 596:15 611:14 640:9

**Tunecore** 617:11

**turn** 587:23 588:21 593:17

**turned** 607:16,17 660:24 661:1,16

**tweet** 616:3

**tweeted** 616:4

**Twitter** 651:17 659:22

**type** 596:5 597:12 615:12 628:19 651:9

**typical** 627:21

**typo** 589:12,13 590:13 591:4

**typos** 591:6

**U**

**Uh-huh** 593:24

**UK** 587:6 588:19 589:3,20 593:1,2 594:21 596:25 597:25 598:2 601:17 641:2 654:8

**UK's** 593:25 597:8 599:4,7,9

**ultimately** 630:3

637:22

**unable** 622:3,12 636:1

**uncle** 618:20

**unclean** 599:8

**underbill** 624:15

**underbilled** 624:18

**underneath** 616:3

**understand** 653:4

**understanding** 603:1 605:19 606:24 608:21 609:24 617:24 621:15,18 623:8,24 624:1 639:3 641:4,13 646:23 647:5 649:1,25 654:2 655:1 660:1

**Understood** 591:22

**undertaken** 652:15

**undertaking** 620:22

**undertook** 610:9

**undoubtedly** 613:14

**United** 645:18

**Universal** 618:18

**unjust** 598:1

**unlock** 635:10

**unnamed** 592:12

**unsatisfied** 620:21

**updated** 655:9

**upgraded** 655:9

**upload** 623:2

**upstairs** 628:4

**Urban** 607:22 644:11 653:8 662:8,10

**utilities** 627:17,20 629:5,9,22

**utility** 630:1,9

**utilize** 612:18 622:12

**utilizing** 611:19 612:15

**V**

**valuation** 652:18

**valuing** 643:18

**variables** 628:10

**venture** 598:7,12, 22 645:4

**Ventures** 601:25

**versus** 587:5

**viable** 635:7 655:2

**video** 616:19 617:2

**Vikings** 606:11

**violation** 632:21

**viral** 613:1, 15

**Virgin** 609:21

**vital** 613:8

**voice** 654:22

**voiced** 597:11

**W**

**waiting** 624:23

**wake** 611:6

**wall** 638:14

**wall-mounted** 627:24

**wallet** 623:14,16

**wallets** 623:14

**wanted** 592:11 620:1 628:21 633:21 637:15 638:18 645:3 648:18 659:14 660:1

**wanting** 636:20

**wearing** 616:19

**web** 630:11

**website** 608:3 622:3,21 623:5 661:11

**websites** 611:23

**week** 604:8 619:12

**well-known** 618:8 619:20

**When's** 636:15

**White** 604:24 605:2,7, 10,13,16, 19 652:13

**Whoa** 591:25

**Wicked** 613:25

**William** 619:24,25 620:4,9

**winner** 615:18,25 616:18 617:2

**winning** 628:21,22

**wireframes** 607:18

**withholding** 643:4

**woke** 630:20

**women** 663:1

**won** 616:11

**Wood** 662:22

**work** 612:7 620:13 625:24 632:19 633:13 634:14 647:3 652:11 654:18,19, 24

**worked** 615:5 619:15 655:23 659:4 663:20

**working** 595:8 603:18 618:14 628:2 630:23,24 639:22 650:14 651:22 660:9,24 661:17 662:7

**world** 640:13

**worried** 625:9

**worry** 662:9

**worse** 590:2

**worth** 639:1

**Wow** 626:25

**write** 633:17

**writing** 662:9

**written** 619:10

**wrote** 610:25 617:16 618:3 642:22

**X**

**X'D** 648:24

**XL** 614:2,8

**Y**

**year** 651:19

**yesterday** 588:3 591:19 595:7 600:16 605:4 610:18 624:7 630:13 642:5 646:18 658:16

**YN** 616:14

**York** 619:11 653:15,16

**Youlikehits** 611:24 628:6

**Youtube** 660:20

**Yun** 663:17

**Z**

**Zeerk** 611:24 612:3

**Zoom** 603:16