# Exhibit 5

**Filed Under Seal**

CERTIFIED
COPY

IN THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ERIC FINNERUD, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION FILE NO. |
| | ) | 1:24-CV-05280-SDG |
| NCHAIN UK LTD, | ) | |
| | ) | |
| Defendant. | ) | |

*HIGHLY CONFIDENTIAL*

VIDEOTAPED DEPOSITION OF:

DALE COLIN EVANS AS 30(b)(6) WITNESS FOR NCHAIN UK LTD

Being taken pursuant to stipulations herein:

July 28, 2026

Commencing at 7:05 A.M. ET

Before Debbie C. Hennings, CCR, RPR

All parties, including the court reporter, appeared remotely.

Job No. 2980484

# I N D E X T O E X A M I N A T I O N S

DALE COLIN EVANS
BY MR. RISPOLI . . . . . . . . . . . . . . . . . . 6
BY MR. RUOCCO . . . . . . . . . . . . . . . . . . . 190
FURTHER BY MR. RISPOLI . . . . . . . . . . . . . .192

* * *

# I N D E X T O E X H I B I T S



| Plaintiff's Exhibit No. | Description | Page |
|---|---|---|
| 1 | Plaintiffs' Notice of Deposition of Dale Evans as FRCP 30(b)(6) Witness for Defendant nChain UK Ltd | 7 |
| 2 | Teams meetings emails | 32 |
| 3 | Invoices | 43 |
| 4 | Twitter post screenshot | 67 |
| 5 | "Fulfilling Our Promise" article | 68 |
| 6 | Closed Deals documents - Bates Nos. NCH4336, NCH4367, NCH4259 | 84 |
| 7 | Email string - Bates Nos. NCH235-NCH236 | 102 |
| 8 | Email string - Bates Nos. NCH1095-NCH1096 | 108 |
| 9 | Email string - Bates Nos. NCH259-NCH259 | 112 |
| 10 | Email string - Bates Nos. NCH4503-NCH4504 | 114 |
| 11 | Email Puhek to Ager-Hanssen - Bates No. NCH1920 | 119 |
| 12 | Forwarded email - Bates No. NCH1920 | 120 |
| 13 | Email - Leong to Ager-Hanssen, et al - Bates Nos. NCH4420-NCH4421 | 124 |



(CONT'd)

| Plaintiff's Exhibit No. | Description | Page |
|---|---|---|
| 14 | Email - nChain Marketing to Ager-Hanssen - Bates Nos. NCH5243-NCH5253 | 127 |
| 15 | Email - Sound Alive Rep to Evans, et al - Bates Nos. NCH5975-NCH5976 | 129 |
| 16 | Email string - Bates Nos. NCH1957-NCH1958 | 132 |
| 17 | Email - Baker to Leong, et al - Bates Nos. NCH5979-NCH5982 | 133 |
| 18 | Email string - Bates Nos. NCH1989-NCH1992 | 137 |
| 19 | Payments Detail Report - Bates Nos. NCH1984-NCH1985 | 139 |
| 20 | General Power of Attorney | 147 |
| 21 | Email string - Bates Nos. NCH5529-NCH5530 | 150 |
| 22 | Email string - Bates Nos. NCH6724-NCH6726 | 154 |
| 23 | Email string - Bates Nos. NCH7250-NCH7253 | 157 |
| 24 | E. Smitty / nChain Transaction Restructure Proposal - Bates Nos. NCH1868-NCH1870 | 162 |

COURT REPORTER NOTE: All exhibits submitted electronically.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

FREDERICK A. RISPOLI, ESQUIRE
Hodl Law Cali, APC
27762 Antonio Parkway
Suite L-1 No. 232
Ladera Ranch, California 92694
213-292-5200
filing@hodllaw.org

MARK W. NONNI, ESQUIRE
Nonni Homola
410 N. Gadsden St.
Tallahassee, Florida 32301
850-601-1111
mark@noho.law

ON BEHALF OF THE DEFENDANT:

JARED RUOCCO, ESQUIRE
SEAN FOLEY, ESQUIRE
Elsberg Baker & Maruri
1 Penn Plaza
New York, New York 10119
212-597-2606
jruocco@elsberglaw.com
sfoley@elsberglaw.com

ALSO PRESENT:

Trey Hall, Videographer
Eric Finnerud
Destiny Perry

* * *

(Pursuant to O.C.G.A. Section 9-11-29(a) and (d) and Section 15-14-37(a), (b) and (c), the court reporter disclosure statement is tendered at the end of the transcript.)

* * *

THE VIDEOGRAPHER: Good morning. We are on the record at 7:05 AM Eastern Time, July 28, 2026, to begin the deposition of Dale Colin Evans in the matter of Eric Finnerud, et al v. nChain UK Ltd.

The venue of this case is in the United States District Court for the Northern District of Georgia, Atlanta Division. The case number is 1:24-CV-05280-SDG. This deposition is taking place via Zoom. The legal videographer is Trey Hall, here on behalf of Steno, whose business address is 315 W. 9th Street, Suite 807, Los Angeles, California 90015.

Would counsel please identify yourselves and state whom you represent.

MR. RISPOLI: Fred Rispoli on behalf of the plaintiffs.

MR. NONNI: Mark Nonni on behalf of the Plaintiffs as well.

MR. RUOCCO: Jared Ruocco. And I'm here with my colleague, Sean Foley, on behalf of the Defendant and Counter-Claimant nChain Ltd UK. We're appearing here today -- or nChain is appearing here today, as is Mr. Evans, subject to their objections on the basis of personal jurisdiction.

Also like to designate the transcript confidential. Also appearing on behalf of the

witness.

THE VIDEOGRAPHER: Thank you, Counsel. Will the court reporter please identify yourself and swear in the witness.

COURT REPORTER: My name is Debbie Hennings. And if I could have counsel stipulate on the record that there is no objection to the court reporter swearing in the witness remotely.

MR. RISPOLI: No objection.

MR. RUOCCO: No objection.

DALE COLIN EVANS,

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. RISPOLI:

Q. Can you please state your name for the record.

A. Dale Colin Evans.

Q. All right. And, Mr. Evans, you were deposed yesterday in this matter, correct?

A. Correct.

Q. And today, for the most part, you are going to be here as the Rule 30(b)(6) witness, which is the corporate representative for -- let me start over. It's 4 a.m. over here.

Mr. Evans, are you aware that today you will be

testifying as the corporate representative for nChain UK Ltd on certain designated subjects?

A. Yes, sir.

Q. And as part of being the corporate representative, you understand that you are stepping into the shoes of nChain UK Ltd and giving testimony on the company's behalf rather than your personal behalf?

A. Yes, I understand.

Q. Based on our long deposition yesterday, did you need me to go over any of the ground rules of the deposition process for today?

A. No, I think I'm okay. Thank you.

Q. All right. I'm going to mark Exhibit 1, which is going to be the Notice of the Deposition.

(Plaintiff's Exhibit No. 1 marked.)

BY MR. RISPOLI:

Q. All right. Let me enlarge this a little bit for you. But are you able to read this document? Is it large enough, sorry, Mr. Evans, for you to be able to read?

A. Yes, it is.

Q. All right. This is the notice of your deposition in the capacity as corporate representative pursuant to Civil Rule of Procedure 30(b)(6). I'm just slowly scrolling down. Do you see where, on page 2, you

are the designated representative?

A. Yes, I can see that.

Q. Have you seen this document prior to today?

A. Yes, I have.

Q. Did you have a chance to review this document so that you were aware of the numbered topics we see starting here at one going through nine?

A. Yes.

Q. Now, I did receive some objections from your counsel on these topics, but subject to those -- well, I did receive some objections from the -- your defense counsel regarding these topics, but are you generally prepared to discuss these topics as you sit here today?

A. Subject to the reservations and objections that are being raised, yes.

Q. All right. Do you know about what time period you received this notice? And I'll also let you know that we sent a similar one, if not identical, other than the dates, back in May of 2026.

A. I don't remember exactly the dates, but May 26, probably three months ago, yes.

Q. In other words, this notice was sent July 9th, but it sounds like prior to that time, you had seen the first draft -- or the first notice at some point, potentially around May of 2026?

A. Possibly. There is lots of documents; sorry.

Q. All right. For your preparation as the corporate representative, did you review any materials to prepare for today's deposition?

A. Yes, I did.

Q. And were any of those materials different than the ones you described in your review yesterday?

A. No, it's just the production documents.

Q. In other words, you did not read or -- let me rephrase that. You did not review any additional materials other than what you described in your review of materials yesterday?

A. That's correct.

Q. Did you speak to any employees or former employees at nChain UK Ltd to prepare for your deposition today as its corporate representative?

A. nChain UK Ltd, no.

Q. And that would include any former employees?

A. Correct.

Q. Did you speak to anyone outside of your counsel and -- your counsel in this case to prepare for today's deposition?

A. Yes, as I said yesterday, I spoke to two of the former engineers out in Slovenia.

Q. And as we discussed yesterday, and I want to do

today as well, when I reference nChain, I'm going to be talking about nChain UK Ltd, okay?

A. Understood.

Q. And just to confirm yesterday, I think you said you talked to Urban Bratina and was it Matej Stavanja?

A. Yeah, Matej Stavanja, yes.

Q. Do you know if those two individuals, are they still residing in Slovenia?

A. As far as I'm aware, yes.

Q. In order to speak with them, did you call them on the phone?

A. No, I emailed them.

Q. So when you were having discussions with them, that was via email only?

A. Yes.

Q. And again, to refresh my recollection, what were those email discussions concerning?

A. I asked them if we could talk about the DistroMint project.

Q. Was that -- the email communications, how many emails do you think in total went across between you, Mr. Bratina, and Mr. Stavanja?

A. I emailed to ask if they were able to talk --

Q. If -- sorry, go ahead.

A. I emailed to ask them to talk and Urban

responded to say, yes, they could and we set a time.

Q. So you did have a verbal communications with them?

A. Sorry, yes.

Q. So did you -- so you spoke over the phone or was it by videoconference?

A. It was a Teams call.

Q. Do those two individuals, do you know who they work for, what company they work for today?

A. I believe they're still both working for Equaleyes.

Q. And what is Equaleyes, if you know?

A. It's the company name from old nChain Slovenia.

Q. Do you know who the UBO is -- sorry. Is there any similar beneficial owners that you're aware of between Equaleyes and any of the nChain companies?

A. No, not that I'm aware of.

Q. Okay. Do you know what Equaleyes is as a company?

A. Sorry. What do you mean by --

Q. Do you know what the company Equaleyes does, its business purpose?

A. Yes, it's a software development company.

Q. Do you in your current role at Teranode work with Equaleyes in any capacity?

A. I don't have a current role with Teranode.

Q. When you worked for Teranode, did you have any interaction or responsibility with Equaleyes?

A. Yes.

Q. What was that? What was your interaction with Equaleyes when you were at Teranode?

A. They provide engineering support to Teranode.

Q. Is that support, would that be subject to a service agreement, similar to the ones you described yesterday that nChain would have with various other nChain entities?

A. Similar but more negotiated terms.

Q. Sorry, did you say more negotiated terms?

A. Yes.

Q. For -- in case I didn't ask you yesterday, do you intend to go back to work for Teranode at some point?

A. That question hasn't been answered. I don't know.

Q. Would you -- I guess who are you waiting -- who would you ask that -- who would you expect an answer to that question from?

MR. RUOCCO: Object to form.

THE WITNESS: I would speak to the management at Teranode.

BY MR. RISPOLI:

Q. And who is the management?
A. The CEO at the moment is called Kal Suurkask.
Q. I'm sorry, did you give me --
COURT REPORTER: I'm sorry, I need you to repeat that answer for me, please.
THE WITNESS: Sure. His name is Kal Suurkask, which is K-a-l Suurkask, which I think is S-u-u-k-a-s-k.
BY MR. RISPOLI:
Q. Did you work with Mr. Suurkask when you were at nChain in -- during the years 2021 through 2024?
A. No.
Q. Are there individuals with you at Teranode that you worked with at nChain during your time there from 2021 through 2024?
A. Sorry, once again, I'm not at Teranode.
Q. Sure. When -- I think you said yesterday you worked at Teranode from 2025 through about one and a half months ago, correct?
A. Correct.
Q. During that time that you were at Teranode, were there other individuals that were your fellow employees at Teranode that you had worked with previously at nChain?
A. Yes.

Q. Besides -- do those two -- I'll just refer to them as shared colleagues, those you worked with at nChain and Teranode, shared colleagues. That included Ms. Spiers-King, correct?

A. I don't believe Elena has a role with Teranode at all.

Q. Did that -- would a shared colleague have also been Olga, the attorney we discussed yesterday?

A. Yes.

Q. Who else that you can think of was a shared colleague, would fit that role, sorry, as a shared colleague?

A. As I said yesterday, you have the transfer of the business from nChain UK Ltd across to Teranode Ltd, so majority of the employees from nChain UK Ltd transferred across to Teranode Ltd. Between then and now quite a number of them have left, so listing them all is...

Q. That's a good point. In terms of -- I'll just go with some of the individuals we discussed. Did Stefan Matthews go over to Teranode?

A. No.

Q. Did Andy Moody go to Teranode?

A. No, he didn't.

Q. Did Christen Ager-Hanssen go to Teranode?

A. No, he did not.

Q. Did any of the individuals in the IP department at nChain go over to Teranode?

A. Yes, they did.

Q. In terms of the individuals we discussed yesterday that were in the nChain's IP department, who went over to Teranode, if you know?

A. So in the UK, just Arthur Roberts.

Q. Also for the purposes of this deposition, if I refer to you instead today, Mr. Evans, as nChain instead of yourself, it's because I'm just referring to you in your capacity as the corporate representative, okay?

A. Okay.

Q. Can you describe nChain's corporate -- maybe give me an overview of nChain's corporate structure from October 2022 through the end of 2023.

MR. RUOCCO: I'm sorry, can I just ask for a point of clarification. Are you asking him in his personal capacity?

MR. RISPOLI: Let's start out with personal capacity.

THE WITNESS: By structure, what do you mean? Sorry.

BY MR. RISPOLI:

Q. Sure. If you could tell me your understanding

of the relationship, to start, between nChain and nChain Holding AG.

A. nChain Holding AG holds I think 20 percent of the shares in nChain UK Ltd directly. And nChain Holding AG holds 100 percent of the shares in nChain AG, which holds the remaining 80 percent of the shares in nChain UK Ltd.

Q. In terms of the relationship between nChain and other nChain affiliates, could you first describe those affiliates and, for example, I mean some of the companies we discussed yesterday, like nChain Slovenia and other affiliates that we may have discussed, such as, for example, nChain Licensing, nChain Ventures.

A. Okay. And you're talking for the period?

Q. October 2022 through, I guess technically January 2024. That's going to be the time period I'm concerned with going forward.

A. Sure. Okay. So nChain Ventures I believe was a direct subsidiary of nChain Holding AG. nChain Licensing was a subsidiary of nChain AG, below nChain Licensing, though, is a company formed called Bjorn IP Holdings Ltd.

Below -- eventually during this period, nChain UK Ltd had investment in a company called Block Dojo Ltd. During that period, nChain Slovenia, nChain DOO was wholly-owned by nChain AG, as well as nChain Philippines,

Inc. And I think below nChain UK Ltd was a company called Box View Ltd.

Q. So in -- for any subsidiaries of nChain -- and again, that's shorthand for nChain UK Ltd -- the -- are the -- are you aware of any subsidiaries beyond I think what you just said was Box View?

A. Box View and Block Dojo Ltd. So Box View is 100 percent. Block Dojo was 50 and a bit percent.

Q. Okay. Do you know if that same ownership of Box View and Block Dojo transferred to Teranode?

A. No. No, didn't transfer, as opposed to, no, I don't know.

Q. Would Box View and Block Dojo be an example of those assets that fall in the category we discussed a little bit yesterday that's still remaining with nChain at the current time?

A. Box View I think was liquidated maybe 18 months ago. Block Dojo, no, that was disposed of.

Q. And sorry, did Simon Wood go from nChain to Teranode at the transfer date?

A. Yes, he did.

Q. Do you know if he's still there at Teranode currently?

A. Yes, he is.

Q. Is James Marchant the current CEO of Block Dojo?

A. As far as I'm aware, yes.

Q. As a foundation for some of the topics we're going to get into that were listed in the 30(b)(6) Deposition Notice, I want to ask you some questions in your role as the corporate representative, just about the roles and authorities of some of the directors and officers at nChain.

At -- and again, nChain during the time of October 2022 through January of 2024, who were directors and officers of nChain?

MR. RUOCCO: And I'm just going to verify again, you're asking him in his personal capacity, right?

MR. RISPOLI: As the representative.

MR. RUOCCO: Which topic is this relevant to, then?

MR. RISPOLI: It would be relevant to --

MR. RUOCCO: Let me rephrase. Which topic asked for this information?

MR. RISPOLI: This would be basically foundational information that goes to all the topics.

MR. RUOCCO: No, I mean, I don't think that's appropriate. You can ask him in his personal capacity, but if you wanted a topic on this sort of information, you could have served one.

MR. RISPOLI: Objection noted.

BY MR. RISPOLI:

Q. Do you know in your personal capacity what -- who the directors and officers were at nChain from October 2022 through January of 2024?

A. Yes.

Q. And who was that? Who were they?

A. So Andy Moody, he covered that entire period. Stefan Matthews also I believe covered that entire period. Christen Ager-Hanssen was appointed late in December of 2022 and moved same time as Andy, kind of probably -- depending on the date in October, but.

Q. So you believe it was just Andy Moody, Stefan Matthews and Christen Ager-Hanssen?

A. Yes, in terms of corporate directors of the company, yes.

Q. In -- who had at nChain the authority to enter into contracts on behalf of nChain regarding DistroMint?

A. It would only be the directors of the company holding any authority to bind the company.

Q. What was Mr. Ager-Hanssen's role and -- well, was Mr. Ager-Hanssen's role the CEO of nChain during his tenure at -- during his tenure?

A. He was, yes.

Q. Can you describe the process nChain used to approve making investments in a project like DistroMint?

A. Sorry, the reason for the pause here is a project like DistroMint and investments. The investments that were made were all subject to board resolutions of nChain UK Ltd.

Q. Okay. And can you describe what a board resolution is.

A. Sure, it's either a board meeting where they pass a resolution, so if the directors consider and vote on the matter. So either at a board meeting or by written resolution.

Q. When you described yesterday getting approval for the Restructure Proposal to present it to Mr. Finnerud -- do you remember that testimony?

A. I do, yes.

Q. That approval, was that a board resolution similar to what you just previously described?

A. No, it was not.

Q. So it sounds like there were other ways for nChain to make approvals for certain actions beyond just board resolutions?

MR. RUOCCO: Object to form.

THE WITNESS: Had anything come from the Restructure Proposal, we would have had a board resolution to approve the transaction documents that came out of that.

BY MR. RISPOLI:

Q. Was there any written document describing the procedures of the board resolution process and what would have been necessary -- or what would have -- the categories that would have required board resolutions?

MR. RUOCCO: Object to form.

THE WITNESS: Yes, I believe.

BY MR. RISPOLI:

Q. What was the process by which nChain approved equity arrangements in projects like DistroMint?

A. I said there would be a board resolution passed at a point in time that an equity investment was being made.

Q. What document retention policies did nChain maintain for email communications?

A. I don't know how long we retain them for, but it's a number of years, generally.

Q. Was there any document retention policies that nChain had for Teams messages?

A. I don't know of specific.

Q. Have you done anything in preparation for today's deposition to determine if any Teams messages that discussed DistroMint were preserved?

MR. RUOCCO: Objection. Is this the -- are you asking him a 30(b)(6) question here? And if so,

identify the topic that you're talking about, please.

MR. RISPOLI: Sure. This would go under topic No. 3, topic No. 4, topic No. 5, topic No. 6, topic No. 7, 8 or 9.

MR. RUOCCO: And in any of those topics can you identify for me where you're asking about preservation matters? Just identify the text of the topic.

MR. RISPOLI: Counsel, I think -- are you going to be making objections to topics if every single word in the question is not in the topic?

MR. RUOCCO: I'm going to be making objections when you're asking the witness confusing questions about the capacity that he's testifying in and getting into topic areas that are different than the ones you noticed.

Now, if you wanted to ask a question about document preservation, you could have served that topic. Instead, you have served nine topics. Subject to the objections and limitation, the witness is here and prepared to testify.

It would be more helpful going forward if you could identify the topic that you're questioning the witness about and making it clear whether or not you're asking him questions in a 30(b)(6) capacity or

a personal capacity.

BY MR. RISPOLI:

Q. All right. Mr. Evans, topic No. 2 in your -- in the notice to today's deposition concerned communications involving Mr. Ager-Hanssen. What did you do to prepare yourself for this topic?

MR. RUOCCO: Object to form. That's not the topic.

MR. RISPOLI: Sorry, topic No. 3.

THE WITNESS: Sorry, I had quite a big gap there so could you repeat the question again, please.

BY MR. RISPOLI:

Q. Sure. Topic No. 3 to this notice concerned communications involving Mr. Ager-Hanssen. What did you do to prepare for this topic?

A. Reviewed the production documents.

Q. And part of that review, did that include reviewing messages that were sent by Teams?

A. I don't know if there are any Teams messages included in the production documents.

Q. Well, what I'm asking is a little bit different. Did you bother to undertake any effort to search archived Teams messages in order to prepare for topic 3 today?

A. Beyond production documents, no.

Q. Did you, to prepare for any of the topics today,

look through archived Teams messages?
A. No.
Q. Did you even consider in your preparation for any of the topics today inquiring into how to look through archived Teams messages?
A. No, I don't believe so.
Q. Do you even know personally if nChain still has access to archived Teams messages?
A. I don't know specifically, no.
Q. Did you ever personally communicate with any member of any fellow colleague at nChain via Teams?
A. Yes.
Q. Did you ever communicate with Mr. Ager-Hanssen via Teams?
A. Yes.
Q. Did you ever communicate with Mr. Moody via Teams?
A. I believe so, yes.
Q. Did you ever communicate with Mr. Matthews via Teams?
A. I don't believe so, no.
Q. Do you know Christine Leong?
A. Yes.
Q. Was she the chief information officer at nChain during the relevant time period?

A. Yes, she was.

Q. Does she work at Teranode now, if you know?

A. No, she does not.

Q. Did you ever ask the IT staff that we discussed yesterday that was involved in the production process here to see if they had access to Teams messages?

A. I don't recall specifically asking that, no.

Q. Do you think if you did specifically ask about how to search Teams messages, the IT staff would have stated one way or the other if that was possible?

MR. RUOCCO: Object to form.

THE WITNESS: I'm sure they would have answered the question.

BY MR. RISPOLI:

Q. All right. Let's -- I'm going to focus here on the -- on topic No. 1, which is personal jurisdiction and contacts with Georgia and the United States.

And you have been designated to testify on this topic regarding -- I'm just quoting from the objections and reservations by nChain. You have been designated to testify, quote, regarding non-privileged factual information concerning nChain UK's business contacts with the state of Georgia in connection with the parties' underlying dispute, i.e. the DistroMint project, if any such information exists.

And you are prepared to discuss that topic today?

A. Yes, subject to those reservations and objections.

Q. At the time that -- by February '21, 2023, nChain was aware that Mr. Finnerud lived in the U.S. state of Georgia?

A. I believe so, yes.

Q. And at that time period, nChain was aware that Sound Alive was a Georgia company?

A. Yes.

Q. And around that time period, nChain was aware that DistroMint LLC was a Georgia company?

A. At that point in time I'm not sure because details arrived around about that time, so whether or not it was 21 February.

Q. Regarding DistroMint LLC, within 30 to 60 days, as a range, the company would have been aware that that LLC was a Georgia company?

A. Yes.

Q. And nChain was aware that when it was making payments to Sound Alive regarding the DistroMint project, that it was wiring money to a Georgia-based bank?

A. Yes.

Q. Who in nChain would have been responsible for

making sure money was -- making sure the money from nChain was wired to Sound Alive's Georgia financial institution?

A. Ultimately, the finance team.

Q. Was there a particular person on the finance team, you know, that was designated with making sure wires were sent properly?

A. I don't believe they had kind of a wires person.

Q. Who was the person that was approving wire transfers to be sent from nChain to Sound Alive's bank account?

A. Andy Moody.

Q. Do you know if nChain was using the Swift system to send those wire transfers?

A. It would seem likely the payments I believe came from either Lloyds Bank or Sutton, and Swift would be the most likely payment route, but without having a document in front of me, I wouldn't say absolutely.

Q. Was there any discussion at nChain to send those payments potentially better, faster, quicker with XRP?

A. I don't believe so.

Q. The primary way that employees at nChain would communicate with Mr. Finnerud was by either email or the Teams application?

A. I'm not aware of Teams communications.

Q. Well, wasn't the Teams application used for the videoconferences between nChain employees and Mr. Finnerud?

A. I'm sorry, yes. For calls, yes. Sorry, I thought you were talking written communication.

Q. In terms -- it sounds like, at least from nChain's perspective, the two primary methods of communicating with Mr. Finnerud regarding the DistroMint project would have either been, one, email communications or, two, videoconferencing through Microsoft Teams?

A. Yes, I think that's correct.

Q. What was -- again, we're going to -- let me rephrase. Did anybody from -- any representatives from nChain travel to Georgia to meet with Mr. Finnerud?

A. No.

Q. Have you heard of the London Blockchain Conference in 2023?

A. I have, yes.

Q. Did you personally attend that conference?

A. Very briefly.

Q. Were you aware that Mr. Finnerud attended that conference as well?

A. Yes, I was.

Q. Asking from the corporate representative perspective, did nChain invite Mr. Finnerud to the 2023

London Blockchain Conference?

A. I believe so. It's operated by a different entity, but we probably would have invited him.

Q. What was the operational entity?

A. Called London Blockchain Conference Ltd.

Q. Was that affiliated with the nChain universe of companies, you know, either as a subsidiary or holding company?

A. No.

Q. Was nChain a sponsor at that event?

A. I believe we were, yes.

Q. Do you know who at the company invited Mr. Finnerud to attend that?

A. No, I don't.

Q. Did nChain pay the expenses that Mr. Finnerud incurred in traveling to that event, The London Blockchain Conference?

A. Yes, I believe we did.

Q. The website that was being used to develop DistroMint, was -- was that DistroMint.com?

A. It was Dev.DistroMint.com, yes.

Q. But Dev.DistroMint.com would have fallen under the domain of DistroMint.com?

A. Yes.

Q. And that was -- nChain was aware that that was a

domain owned by Mr. Finnerud?

A. I believe he had stated that, yes.

Q. And let me rephrase that. That was a domain that nChain was aware of was owned by Mr. Finnerud through either Sound Alive or DistroMint LLC?

MR. RUOCCO: Object to form.

THE WITNESS: I don't know either way, sorry, whether or not it could be in his personal capacity as well.

BY MR. RISPOLI:

Q. It sounds like nChain was aware of, at minimum, that that was a domain name acquired through the efforts of Mr. Finnerud?

A. I believe so, yes.

Q. The -- nChain was aware that Mr. Finnerud was the one undertaking the hosting responsibilities for the DistroMint development website, correct?

MR. RUOCCO: Object to form.

THE WITNESS: He had opened up the account which was where the website was hosted.

BY MR. RISPOLI:

Q. Was nChain aware that -- during this time that Mr. Finnerud was a music producer?

A. I believe so, yes.

Q. Was nChain aware that some of the artists

that -- well, was nChain aware that as part of the services Mr. Finnerud was providing in relation to the DistroMint project included trying to bring musicians to use the DistroMint platform?

MR. RUOCCO: Object to form.

THE WITNESS: It would seem likely, yes, this was where his expertise lied.

BY MR. RISPOLI:

Q. What did nChain do, if anything, to make itself aware of the -- any of the specific musicians that Mr. Finnerud was trying to get commitments to use the DistroMint platform?

A. I'm not aware of any steps that we took.

Q. We have been going for almost an hour. Let's go off the record.

THE VIDEOGRAPHER: We're now off the record. The time is 8 a.m. Eastern Time.

(Break.)

THE VIDEOGRAPHER: We're now on the record. The time is 8:16 a.m. Eastern Time.

BY MR. RISPOLI:

Q. All right. Mr. Evans, moving on, I'm going to ask you some more questions regarding topic 1 on the notice, again regarding personal jurisdiction related questions.

I'm going to mark as Exhibit 2 what should be mainly a set of emails regarding Teams messages to set up meetings with Eric regarding DistroMint.

I tried to combine it on the break. It looks like it may be out of order somewhere, but just going to have to ask you to bear with me on it.

(Plaintiff's Exhibit No. 2 marked.)

BY MR. RISPOLI:

Q. All right. I'm showing you what has been marked as Exhibit 2. Is this large enough for you to be able to read it?

A. If you can you make it slightly larger, that would be great, but I can push.

Q. Is that all right?

A. Perfect. Thank you.

MR. RISPOLI: All right. And just for counsel, this document is an assortment of Teams meetings confirmations through email. All of them are Bates labeled in the top right corner.

MR. RUOCCO: I would note some of them don't appear to be Bates labeled. Just flagging that. The second one, for example, and the third.

MR. RISPOLI: Which page are you talking about?

MR. RUOCCO: Page -- just going to the second page of the PDF, I didn't see a Bates stamp on my

copy, same with the 3rd page, 4th page, 5th page, and the stamping does pick up again after that.

MR. RISPOLI: Interesting.

MR. RUOCCO: I mean, I don't want to go through all -- yeah, I don't know if you want to go and cross-reference the Bates numbers or...

MR. RISPOLI: Let me -- I'll just continue using this one as is. I don't know if that could have been an issue combining -- when I was combining all the files. I'll identify it, though, by other ways if it's not Bates labeled.

MR. RUOCCO: Are you able to make a representation that you did download these documents from the nChain production?

MR. RISPOLI: Yes, although some of these are from our production as well. So there should have been some NCH and SA Bates labeling.

MR. RUOCCO: Okay.

MR. RISPOLI: But it's from those two sources. They have all been produced.

BY MR. RISPOLI:

Q. All right. Mr. Evans, I'm going to potentially go a little bit out of order here because, again, despite my best efforts, it seems like this file wasn't combined in the exact chronological order that I had tried to do

it at the beginning. Maybe we can just work on -- work on it this way.

All right. We're looking at the first page of this exhibit. And as a general matter, nChain would use the Teams application to have videoconferences either amongst employees or with other third parties?

A. That's correct, yes.

Q. And with regard to DistroMint, the DistroMint project and Mr. Finnerud, nChain would use the Teams videoconferencing application to conduct its meetings with Mr. Finnerud as it regarded the DistroMint project?

A. Yes, it would.

Q. We're looking at page 1 of Exhibit 1 -- sorry, of Exhibit 2. The first page is Bates labeled NCH30. And this is from David Habot. And he worked at nChain during the relevant time; is that fair?

A. I think it was nChain Slovenia.

Q. Regarding nChain Slovenia, that company had a service agreement with nChain that allowed it to work on behalf of nChain; is that accurate?

A. Yes, that's correct.

Q. Who at nChain had the primary responsibility for ensuring that these intercompany service agreements were put in place?

A. The legal team or the finance team would ask for

them.

Q. But just personally, did you have any role in creating any of these intercompany service agreements?

A. Yes, to the extent they didn't exist when I arrived.

Q. As a -- as the corporate representative, just as a general matter going forward, if we're talking about any individuals that may have been working for an nChain entity not the UK Ltd one, would that have been -- any other nChain entity, would that entity have had a service agreement with nChain UK Ltd?

MR. RUOCCO: Object to form.

THE WITNESS: Yes, they should have.

BY MR. RISPOLI:

Q. So when we look at Mr. Habot's email address, it is just nChain.com, correct?

A. Correct.

Q. And all of the individuals here beyond -- outside of Mr. Finnerud's SoundAliveNow email, all have emails with the domain @nChain.com, correct?

A. Yes, that's correct.

Q. Did nChain do anything to distinguish, from an email perspective, whether employees worked at nChain versus another nChain affiliate, like nChain Slovenia?

A. The email signoff may have done, but I need to

check one to see.
Q. Sorry, did you say --
A. Meaning -- sorry, the person's -- person's signature may have specified.
Q. But for the email address, no matter which nChain affiliate that person was employed by, it was the same @nChain.com email, correct?
A. Generally, yes. There were some specifics, but generally, yes.
Q. Do you know what some of those specifics were that may have made it different than @nChain.com?
A. So I think the holding company had different email addresses there. I'm not sure if nChain Licensing or not, but the holding company is the one I'm thinking of.
Q. Just for the holding company, do you know what the email address was?
A. I don't remember expressly, no, sorry.
Q. Going back to page 1 of Exhibit 2, all of the individuals with nChain.com emails that we see on this page would have either been employed by nChain or, in this situation with DistroMint, working on behalf of nChain through a service agreement?
A. Yes.
Q. And in this particular email, Mr. Habot, what

was his role again?
A. He was project manager.
Q. And just as the -- well, that will make it confusing. What was Roman Puhek's role at nChain?
A. So he was currently head of nChain Slovenia.
Q. And what was Urban Bratina's role?
A. He was also project manager.
Q. Matej Trampus, what was his role?
A. He was a senior engineer.
Q. What was Tina Krnjic's role?
A. Also an engineer.
Q. Damir Rekic, what was his role?
A. Engineer.
Q. Nejc Habulin, what was this person's role?
A. Engineer.
Q. And Matevz Baskovc, what was his role?
A. Also engineer.
Q. Based on page 1 of Exhibit 2, nChain had set up weekly meetings regarding the DistroMint project with Mr. Finnerud?
A. Yes, that's what this is showing.
Q. Music Artists Fan Connection, was that in reference to the DistroMint project?
A. Yes, it was.
Q. If I scroll down to page 2, this would be --

let's make sure you can see it. This would be similar to page 1, where it's another discussion of a videoconference meeting to be had among nChain representatives with Mr. Finnerud?

A. Yes.

Q. The reference to the Music Artists NFT marketplace, is that in reference to the DistroMint project?

A. I believe it is, yes.

Q. If we go to page 3, this is just another --

A. Sorry, just one thing to note back on that previous one. Can you scroll back up?

Q. Sure.

A. Just seeing the date on that one, where it was sent apparently the 1st of September for a meeting on the 1st of November, I'm not sure if that meeting would have gone ahead.

Q. Oh, for 11/1/2023?

A. Yeah, if -- sorry, if that's -- sorry, if that's September versus January, if it's January, then no issues.

Q. And by that, I think what you're referencing is that in our deposition yesterday, I guess is it your understanding that the dates -- the format of the dates when it originates from nChain is day of the month first,

then the month and then the year?

A. I'm not sure, sorry, to be honest. Looking at these dates, it's not -- it's not super clear, but -- sorry.

Q. In any event, I guess you're aware of the English custom of listing dates by the format of the date in writing by day of the month, then the month, then the year?

A. Correct, yes.

Q. And you're aware that the American custom is to list the month first and then the day of the month and then the year?

A. I am aware, yes.

Q. Just for the rest of this exhibit, it sounds like, by your statement, you -- you're acknowledging the fact that there could be the two different formats for the dates here depending on where the appointment was originating from?

A. Yeah, I don't know whether it's the origination or whether it's the recipient, sorry. Looking at what's in front of me, I can't tell either way.

Q. But as -- I guess in terms of preparing for this deposition, did you do anything to verify whether the meetings that were scheduled in these -- that we see in Exhibit 2, whether they occurred or not?

A. No, I did not.

Q. Do you have any reason to doubt that any of the meetings listed here involving nChain employees and Mr. Finnerud, whether they occurred or not?

A. Beyond the end of September, the engineering team out in Slovenia, I don't believe had any meetings with Eric. There were several meetings that James and myself had with Eric, but that's where I noticed with the first meeting -- first or second, sorry, that's where it looked out of place.

Q. But as a general matter, from December of 2022 through September of 2023, it would be nChain's position that the meetings scheduled in that time on Teams did in fact occur?

A. Unless there is something expressly obvious, they were scheduled.

Q. Going down to page 5 of Exhibit 2, this is another example of a Teams appointment from nChain to Eric?

A. It is.

Q. And the reference to these meetings would be in furtherance of the development of the DistroMint project?

A. It would seem to be the case. This one says, "Sound Alive catchup," but they wouldn't have other reasons to be speaking with Eric.

Q. Generally, to shorthand going through another 60 pages of documents, when we see this type of document that has a Teams meeting link, date and time, is this generally how nChain would go about scheduling videoconference meetings with Eric?

A. I believe so, yes.

Q. Just as a -- for you personally, you would at times schedule meetings with Eric over Teams in the same manner as what we have discussed so far in Exhibit 2?

A. Okay. The -- you send an invite via Outlook, schedule it as a Teams meeting. That's what I believe we are looking at here.

Q. And you personally had done -- undertaken the same process to communicate with Eric via Teams as well?

A. Yes, I had.

Q. Let me go to page 10 of Exhibit 2. For example, here we're on page 10 of the exhibit. This is from you to Eric?

A. It is, yes.

Q. And we see "Sent." Since it's from you, this is an example of the English custom of date formatting where the day of the month is listed first and then the month?

A. Yes.

Q. And so you would have -- well, let me ask you as a corporate representative, this is a meeting that

Mr. Evans would have scheduled in the legal department for a meeting with Mr. Finnerud regarding the DistroMint project?

A. Yes, what was known as the DistroMint project at the time. Not sure what -- yes, when that name arrived. But yes, in relation to the DistroMint project.

Q. At some point, at least as far as nChain is concerned, if the name DistroMint wasn't used or known at the very beginning of discussions with Mr. Finnerud, it did become known as the DistroMint project throughout the course of the interactions between nChain and Mr. Finnerud?

A. Yes, later on, yes.

Q. And here in this document, the -- scratch that. I'll stop presenting this. All right. Let me go to ask you some questions on topic 2 regarding payments made by nChain. What did you do to prepare for this topic, Mr. Evans?

A. I looked at the production documents.

Q. And that included looking at -- in those documents, that included reviewing invoices that were submitted by Mr. Finnerud on behalf of Sound Alive Enterprise?

A. Yes, it did.

Q. Let me see if I can mark this. It looks like I

do have these Bates labeled all the way through, so I am going to upload Exhibit 3.

(Plaintiff's Exhibit No. 3 marked.)

MR. RUOCCO: While we're waiting for that, Debbie, the realtime seems to have disconnected, at least on my end. Just wanted to flag that. I don't want to interrupt the questioning, but if we can reconnect it, that would be great.

COURT REPORTER: Yeah, neither did I want to interrupt, but I noticed that. So give me just one second and I can reconnect that.

MR. RUOCCO: Thank you.

MR. RISPOLI: Debbie, let me know and I'll get started again.

COURT REPORTER: You should be back on.

MR. RUOCCO: I saw the test come through, yeah.

BY MR. RISPOLI:

Q. All right. Mr. Evans, I have put up in front of you what I have marked as Exhibit 3. These are all invoices from Sound Alive. And in this situation, I might be calling out the Bates label, which is at the bottom of the page.

These should be all -- I believe beginning with SA -- that plaintiffs labeled. Did you see these invoices as part of your preparation for topic 2?

A. Yes, I did.

Q. So nChain would have received these invoices from Mr. Finnerud in connection with the services he was providing for the DistroMint project?

A. Yes, we would.

Q. And nChain would have reviewed these invoices before submitting a request for payment to Mr. Finnerud?

MR. RUOCCO: Object to form.

THE WITNESS: Sorry, your question confused me. We would have reviewed the invoice before --

BY MR. RISPOLI:

Q. Yeah, let me --

A. -- payment to pay to Mr. Finnerud?

Q. Let me just ask a better question. Can you describe the process for this invoice to be paid once it's been submitted to nChain?

A. Thank you. Yes, so it would have been submitted probably by the Stampli application, or via email in the earlier days. It would need to have been approved, initially I think Christen Ager-Hanssen, but then Andy Moody going forward approved the -- approved the invoices and instructed payment.

Q. So based on what you said, these invoices would have had to have been approved by one of the directors and officers of the company, in this case, either

Mr. Ager-Hanssen or Andy Moody?

A. I think initially, Christen gave confirmation to pay. Andy formally would have approved as part of the finance process and instructed payment to it.

Q. And in that example, once Mr. Moody -- it sounds like he would also give the instruction that the invoice could be paid?

A. Yes, to the member of the finance team who is going to pay it.

Q. Who would -- do you know who would serve -- who could be that person that's the member of the finance team that would actually send the payment?

A. During that period, there were probably a couple, but predominantly it would be Simon Wood.

COURT REPORTER: Can you repeat that name, Mr. Evans. I didn't get the name.

THE WITNESS: Simon Wood.

BY MR. RISPOLI:

Q. In order to ensure that payment would get to the Georgia-based bank that we see at the bottom of page 1, what would Mr. Wood have to do?

A. He would have to put payment instruction to whichever bank we were using to make the payment.

Q. So Mr. Wood would have been aware that payments were going to a Georgia bank for the benefit of Sound

Alive?

A. If the address details were included in the instruction, that would have been apparent.

Q. Would Mr. Wood have seen the invoice in the form that we see it on page 1?

A. Yes.

Q. And anyone handling this invoice at nChain would have also seen that, as we see up here in the top left corner, that Sound Alive Enterprise was a company based in Roswell, Georgia?

A. They would have seen that address for it. I think we sort of touched on yesterday whether or not -- whether or not that's its registered office or location might not have been obvious -- isn't obvious.

Q. And if we scroll down to the terms at the bottom of the page, it says, "Total Payments: $150,000 Divided into 12 Payments of $12,500," correct?

A. That's what it says, yes.

Q. And so even beginning here with a due date of January 12, 2023, nChain was aware at this point that it was going to be making monthly payments to Sound Alive going forward?

MR. RUOCCO: Object to form.

THE WITNESS: If subsequent invoices were issued.

BY MR. RISPOLI:

Q. Well, would nChain have known at this point that there was an agreement between nChain and Mr. Finnerud that he would be receiving monthly payments of $12,500?

A. As I think we covered yesterday, I don't think there was a separate agreement.

Q. Well, I'm not asking for a -- using a term in the sense of a written agreement. But would -- nChain admits that it paid Mr. Finnerud through Sound Alive on a monthly basis in 2023, right?

A. We settled a number of these invoices, yes.

Q. And they were generally being paid on a monthly basis, correct?

A. Correct.

Q. My question that I was trying to get at was, at this date in Exhibit 1, was nChain aware that it was entering into an arrangement with Sound Alive that it would be paying these monthly amounts going forward?

A. The invoice states 12 payments. And as I said, depending on whether the invoice is ultimately issued, depending if there was other issues, it's a -- it's a leap to take that from just the base of an invoice.

Q. Well, I'm not asking just on the invoice alone. I'm asking at this point, in January of 2023, nChain was aware that it was going to be making future payments to

Mr. Finnerud through Sound Alive on a frequent basis going forward?

A. I said if he kept on issuing invoices and kept on providing services.

Q. For the item listed here in the payment December 12, 2022, consulting and business development services, what were the -- what was nature of those consulting business and development services Mr. Finnerud was providing?

A. He was providing the development team for the development of the DistroMint platform.

Q. Was a board resolution required to authorize payments to Mr. Finnerud?

A. No, not of this size.

Q. If we go to page 2 of Exhibit 3, this is another invoice but for a different date, correct?

A. It is, yes.

Q. This is for the same amount of money, $12,500, with a same description of work, consulting and business development services?

A. It is, yes.

Q. And again, we see that in the notes section, the bank that Mr. Finnerud is requesting to receive payment from nChain is a Georgia-based bank?

A. Yes, it is.

Q. And again, all this information on the invoice would have been approved by Mr. Ager-Hanssen; is that accurate?

MR. RUOCCO: Object to form.

THE WITNESS: Either Mr. Ager-Hanssen or Mr. Moody.

BY MR. RISPOLI:

Q. So just as a general matter for all these invoices going forward, they would have been approved by either Mr. Ager-Hanssen or Mr. Moody?

A. It would be generally Mr. Moody, as it would be a finance matter, but he also, because this was a Christen relationship, I believe was the commercial owner, so he would need to confirm -- confirm the -- confirm the invoice.

Q. And it sounds like whether it was Mr. Ager-Hanssen or Mr. Moody, the invoice ultimately would have also been seen and acted on by Mr. Wood?

A. If he was the person processing the payment, yes.

Q. I guess to maybe be more clear, the invoice would have been approved by one of nChain's directors and officers and then implemented -- or payment initiated by an nChain member of the finance team?

A. Yes -- well, Andy as CFO was approving the --

approving the payment out of the invoice.

Q. But that process that we have described so far for these first two invoices would have been the same for all of the subsequent invoices that Mr. Finnerud submitted?

A. Whether or not they came -- when they come in via the Stampli system, I'm not sure whether Christen would have seen them.

Q. What is the Stampli system?

A. Sorry, it's the system that we used for invoice processing.

Q. Can you describe how that would have worked in the context of the invoices we see in Exhibit 2 -- or in Exhibit 3?

A. Sure. So Eric would have sent in an invoice to the -- I think it's nChain@mystampli email address, which then gets processed by the finance team.

Q. Is there anything happening on nChain's side to determine what the specific consulting and business development services were that Mr. Finnerud was providing?

A. Sorry, I'm not quite sure of the question.

Q. Sure. The -- was there any type of -- at this point in early 2023 -- any type of written requirement that nChain gave Eric as to what he particularly needed

to do to earn the monthly consultancy fee?
A. No.
Q. Did nChain have any belief at any point in time that Eric was not performing the consulting and business development services that it was paying him for?
A. So he would have been directly attending -- sorry, the meetings with developers.
Q. Well, my question was, was there at any point in time that nChain ever felt Eric was not providing the services that he was billing for?
A. I don't believe issues were raised.
Q. Just scrolling down through the invoice a little more, we get to page -- Exhibit 3. We get to page 5. And you see this invoice does not have the reference to the consulting and business development services?
A. Okay.
Q. Is this -- would this be an example of more a expense report as opposed to a service fee that's being submitted by Eric?
A. Looks like an expense recharge, yes.
Q. Is this an expense related to the London Blockchain Conference trip that we talked about earlier?
A. May 30th sounds about the right date, yes.
Q. So nChain was aware that it was paying for Mr. Finnerud to come from Atlanta, Georgia to London to

attend the conference on nChain's behalf?

MR. RUOCCO: Object to form.

THE WITNESS: We can see that from the invoice, yes.

BY MR. RISPOLI:

Q. What was the reason that nChain wanted Eric to -- was willing to pay for Eric to attend the -- this conference in London?

A. As we covered yesterday, the idea of DistroMint platform was an attractive -- attractive use case for the BSV.

So it was having him come to London to talk about that and also to participate in just general ecosystem conversations. I believe he presented. He was part of one of the panel discussions at the conference.

Q. So the -- this particular trip would also have been in furtherance of the development of the DistroMint project between nChain and Eric?

A. When you say development, different from development of the -- of the code. I think it's more of a business, business style meeting.

Q. Yeah, I guess it would be more accurate to say it was for -- it would fit into the box of business development of the DistroMint project; fair?

A. Yes.

Q. And that would include, you know, an element of Eric helping to market the DistroMint project at this event; true?

A. True.

Q. If I go to page 6, this is just another invoice for the consulting and business development services but for April of 2023, correct?

A. Correct.

Q. And again, other than the date, this would be processed in accordance with the methods we have already -- you have already described?

A. Yes.

Q. If we go to page 7, this is a similar invoice but for May 2023 consulting services, right?

A. Correct.

Q. No. 8 -- sorry, page 8, this looks more like an expense report as opposed to an invoice for the -- for services provided, correct?

A. Correct.

Q. What is the press campaign referenced here?

A. I do not know.

Q. Do you know at nChain who would know?

A. No, I'm not sure what details there would have been around that.

Q. If this was -- the amounts listed here were paid

to Mr. Finnerud, that would have gone through the same approval process that you have described earlier?

A. It would have done, yes.

Q. Do you know what the credit line is in reference to?

A. No, I do not.

Q. Do you know what the Google Fi company phones is in reference to?

A. No, I do not.

Q. Do you know what the utilities is in reference to?

A. No, I do not.

Q. Do you know what the web services are in reference to?

A. Not specifically, but it sounds like potentially web services just based on the name, but otherwise, no.

Q. Do you know what the travel is in reference to?

A. Whether that's separate from London blockchain travel, I'm not sure.

Q. If the press campaign was related to a press campaign that Eric had engaged in, who would be the person at nChain that would have had the most knowledge about, like, that press related matter?

MR. RUOCCO: Object to form.

THE WITNESS: It would ultimately depend whether

Eric involved them in that campaign.

BY MR. RISPOLI:

Q. Going to page 9 of this exhibit, again this is a similar consulting and business development services invoice that we have, other than the date, discussed earlier with other invoices?

A. It appears to be, yes.

Q. When we get to page 10, we've got -- this would look like an expense report as opposed to a fee for services; fair?

A. Yes.

Q. It sounds like you personally don't know exactly what is entailed in the web services charge?

A. That's correct.

Q. For Twitter organizations, do you know what nChain was reimbursing Eric for?

A. Other than what's stated there, no.

Q. And for utilities, do you know what that's in reference to?

A. Beyond that, no.

Q. If we go to page 11, this looks like another expense report?

A. It does, yes.

Q. And here, nChain was reimbursing Eric for trademark registration of the name "DistroMint"?

A. That appears to be the case, yes.

Q. If the utilities expenses that we've discussed -- or that we have seen in the expense report -- are related to utility related costs at Eric's home in Georgia, would you -- would nChain have any reason to dispute that?

MR. RUOCCO: Object to form.

THE WITNESS: It's not clear what the utilities relate to there.

BY MR. RISPOLI:

Q. Was -- would anything have been undertaken, any actions undertaken by nChain to determine what is entailed in the utilities charge?

A. There may well have been a question back to ask what it was.

Q. But regardless of whether any particular nChain employee asked any specific questions, this expense report still would have went through the approval process from -- that we have already discussed when we first started talking about the invoices in this exhibit?

A. Yes, it should.

Q. If we go to page 12, again we see another consulting and business service fee for July of 2023, correct?

A. Correct.

Q. Page 13 is another expense report that was submitted by Eric, correct?

A. Correct.

Q. Here in this invoice, nChain was reimbursing Eric for travel that he had undertaken in relation to the DistroMint project?

MR. RUOCCO: Object to form.

THE WITNESS: There is a travel line on there, yes.

BY MR. RISPOLI:

Q. Well, all of these invoices from nChain's understanding are related to Eric's work in regard to the DistroMint project, correct?

MR. RUOCCO: Object to form.

THE WITNESS: Correct, yes.

BY MR. RISPOLI:

Q. If we go to page 14, this is another fee invoice for consulting services, correct?

A. Correct.

Q. And we have page 15, another invoice for September 2023 consulting services?

A. Correct.

Q. And nChain -- when we're going through all these invoices, the services fee and the expense reports, these all were in fact paid by nChain to Eric?

A. There were payments made. Whether or not there is any of the invoices in here that weren't paid, I'm not aware of -- aware of that. We would need to check into the details of the payments that were included in production.

Q. I mean, is it your general understanding that all of these submitted invoices were eventually paid by nChain?

A. Yes, it is.

Q. If we go to page 16, this is referenced as a final 2023 consulting fee?

A. It is, yes.

Q. Is this around the time period -- we see the date of October 26 -- that we discussed yesterday where some invoices had backed up payment-wise from nChain?

A. It would have been around that period, yes.

Q. Page 17 is for December consulting services, correct?

A. Correct, whether or not there is a duplication between that and the previous one that said it was final.

Q. And then we've got an invoice for January 2024 consulting services, correct?

A. Yes.

Q. It sounds like from nChain's perspective, when we get to December of 2023, January of 2024, that would

have been the only beginning time frame when nChain may not have paid invoices submitted by Eric?

MR. RUOCCO: Object to form.

THE WITNESS: Yeah, during 2023, we paid the invoices.

BY MR. RISPOLI:

Q. Why -- it sounds like -- let me rephrase. Payments to Eric relating to the DistroMint project would have ceased in 2024?

A. I'm sorry, I'm not sure what the question is there.

Q. Sure. Did payments to Eric in relation to the DistroMint project cease by 2024?

A. I believe so, yes.

Q. And why did the payments stop?

A. At that point the relationship was broadly ended, that the -- the amounts that we were prepared to -- prepared to pay -- well, we had reached the end of that -- that level of -- yeah, what we were prepared to pay under the -- yeah. Sorry.

Q. What from nChain's end would be the accounting records that would characterize those payments?

A. They would have gone through as expenses.

Q. I guess we have seen in Exhibit 3, those were invoices that nChain was receiving from Eric; fair?

A. Correct.

Q. What would the record of payment look like on nChain's end when those invoices were paid?

A. Sorry, I'm not sure what beyond expenses you are looking for there.

Q. Sure. How would that be reflected in nChain's accounting that these invoices were paid to Eric?

A. Be an expense through P&L.

Q. All right. I want to move to --

MR. RISPOLI: Well, Jared, I want to move to topic 7. Might take 15, 20 minutes. Do you want to -- does anybody want to take a break now or go through this topic?

MR. RUOCCO: If you don't mind, I would like to take a break now.

MR. RISPOLI: Sure, let's go off the record.

THE VIDEOGRAPHER: We're now off the record. The time is 9:19 a.m. Eastern Time.

(Break.)

THE VIDEOGRAPHER: We're now on the record. The time is 9:31 a.m. Eastern Time.

BY MR. RISPOLI:

Q. All right. Back on the record. I wanted to move to topic No. 7, which is public disclosures, marketing and statements. Mr. Evans, what did you do to

prepare for this topic?

A. Looked at the production documents.

Q. Did you talk to anybody on the marketing team that was on the marketing team at nChain at the time?

A. No, I did not.

Q. Was there a marketing team at nChain during this time period?

A. Yes.

Q. Who were the members of the marketing team?

A. So Anna Hogarth, Tian Tian. I think Emma Camilleri was in there as well.

Q. Was -- did nChain utilize its marketing team to market the DistroMint project during the relevant time period?

A. Marketing I'm not sure is the right word, but there was a story that was written.

Q. The story that was written, what are you referring to?

A. It was a web article I think entitled "Fulfilling Our Promise" or something along those lines.

Q. I'm going to share my screen. Can you see this? It should have X, formally Twitter, in front of you right now. Can you see it?

A. Yes, I can see that, yes.

Q. And I'm on the nChain handle @nChainglobal; do

you see that?

A. Yes, I can.

Q. Was this the primary -- I'm going to use Twitter because I believe it was still Twitter in 2023. But was this the primary Twitter account for nChain?

A. I think it was, yes.

Q. Do you know if there were, you know, other handles like nChain UK, nChain AG?

A. I don't believe so.

Q. If these posts are in reverse chronological order, we see the last post being September 18, 2024; do you see that?

A. I can see that.

Q. Why did nChain stop posting around this time in September of 2024?

A. I don't know specifically. Sorry.

Q. But by December 31, 2024, that is when there was a -- and correct me if you want to use a better term -- an asset transfer from nChain to Teranode?

A. A business transfer as opposed to an asset transfer, that's correct.

Q. And sorry, could you just give me a quick overview of what was entailed in this business transfer.

MR. RUOCCO: I just want to clarify. This is in his personal capacity?

MR. RISPOLI: Yeah, let's have this one as personal.

THE WITNESS: So that's a transfer of business undertaking which was the transfer of personnel and a few small sort of assets with them, as opposed to a wholesale transfer of the assets of nChain.

BY MR. RISPOLI:

Q. I'm going to scroll down on the nChain handle. You know what; let me stop. Go up to this post from May 22, 2024. This is in regards to the London blockchain, correct?

A. That's what it shows, yes.

Q. And this would have been the same conference that we were discussing that Eric attended, although he went to the 2023 conference?

A. Yes, it would have been.

Q. Do you know if you -- did you attend the 2024 conference?

A. I think I did, yes. I think so, yeah.

Q. The reference here to Alessio Pagani, was he a research director at nChain?

A. I believe so, yes.

Q. Would this have been for -- you know, it would have been for nChain, not another nChain entity?

A. Yes, Alessio is based in UK.

Q. Was he at nChain in 2023?

A. I don't know specifically.

Q. This is a picture of -- from this May 20, 2024, post, a picture of Christine Leong, the chief information officer?

A. It is, yes.

Q. She was the chief information officer in 2023 as well?

A. She was, yes.

Q. Would she have had a role with regard to the DistroMint project, to your personal knowledge?

A. Yes.

Q. What was that -- what would that role have been?

A. As chief information officer, she would have been overseeing, in big picture terms, the work of the developers in nChain Slovenia, as well as elsewhere in the group.

Q. Did Ms. Leong move to Teradon -- Teranode, to your understanding?

A. I'm not one hundred percent sure of timing.

Q. Did she ever work at Teranode, to your understanding?

A. I'm not sure when she left -- left nChain -- left -- well, if she ever joined Teranode.

Q. I keep saying that. I was mispronouncing the

company. It's Teranode, right?

A. I won't hold it against you.

Q. Okay. I think I was combining it with a movie company, but I can't remember the movie as I sit here today.

All right. Let me scroll down to what I'm actually looking for. I guess while I'm trying to find it, do you know who at nChain was responsible for doing the Twitter posts in 2023?

A. No, sorry, I don't know which member of the team would have done that.

Q. Do you have an idea of which members could have been the potential person for posting on Twitter under the nChain global handle?

A. It likely would have been controlled by the marketing team.

Q. Here, for example, we see a repost by nChain of Mr. Ager-Hanssen, correct, for September 13, 2023?

A. Yes.

Q. All right. I got to what I'm looking for. I'm going to click on this post from September 8, 2023. Did you review this post in preparation for your deposition?

A. There was a post that was included in the production.

Q. Was it a Twitter post?

A. I believe so, yes.

Q. On the screen share right now we see this post from nChain September 8th 2023, and it's concerning DistroMint, correct?

A. Correct.

Q. NChain in the post describes DistroMint as a game changer in music, correct?

A. Right at the top, yes.

Q. And then the post asks, What is DistroMint? and then answers the question by describing it as -- that DistroMint is a blockchain-powered music platform that combines major music distribution with NFT minting technology to offer significant benefits for both artists and fans. NFTs, or Non-Fungible Tokens, are digital assets that are unique and cannot be replicated.

I read that correctly --

A. Yes.

Q. Sorry, did I read that correctly?

A. Yes.

Q. Is that, from nChain's perspective, an accurate description of the DistroMint project at that time?

A. It's describing the technology underlying the platform. Obviously, the platform never -- never went live.

Q. If we go to the third full paragraph it states,

"At nChain, we're so proud to have worked on the DistroMint platform that is set to democratize music distribution. From Spotify to Apple Music, artists can now reach wider audiences and generate revenue like never before."

Did I read that accurately?

A. Yes, you did.

Q. So this is a public statement that -- this post, you -- nChain would agree is a public statement that the company made regarding its work on the DistroMint project?

A. Yes.

Q. I'm going to -- I think i might be on Exhibit 4. I'm just going to take a screen shot of this and mark it as Exhibit 4.

(Plaintiff's Exhibit No. 4 marked.)

BY MR. RISPOLI:

Q. Let me do one thing before I formally mark it real quick going back. You can still see my screen, correct?

A. Yes.

Q. It says, "Read more about this project and stay tuned for the official launch.!" And then there is a website link to the nChain.com domain, correct?

A. Yes.

Q. If I click on that link, though, there is no article, correct?
A. Correct.
Q. Was there an article -- a live article at the time in September 2023?
A. I didn't go to the X page personally.
Q. Would you agree that it was the -- likely the "Fulfilling Our Promises" article that we briefly mentioned earlier?
A. I think that's reasonable.
Q. Do you know -- if we look at my screen right now, the home page for nChain really just has one page -- well, the main page is a Contact Us page?
A. It is, yes.
Q. Was this website changed in connection with the business transfer in December of 2024?
A. I don't know express timing.
Q. I have stopped the share, but I am marking this as Exhibit 4. Can you see this?
A. I can, yes.
Q. This is just the screen shot that I took of the X page for nChain that we had just been previously discussing?
A. It appears to be.
(Plaintiff's Exhibit No. 5 marked.)

BY MR. RISPOLI:
Q. I'll mark as Exhibit 5 -- can you see Exhibit 5, this article entitled "Fulfilling Our Promise: empowering DistroMint to disrupt the music industry"?
A. Yes, I can.
Q. Sounds like you reviewed this article in preparation for your deposition?
A. That's correct.
Q. Is this an article that nChain published on its website at the time listed here of August 17, 2023?
A. I believe so, yes.
Q. Where it's written by Team nChain, who were the members of that team?
A. I would read that as the marketing team. I don't know specifically.
Q. If we go down to the heading "DistroMint Customer Story," the reference here to DistroMint would have been the project that nChain was working on with Eric?
A. Yes, it would.
Q. And nChain here refers in this public statement as being partners in innovation?
A. It says that, yes.
Q. And this -- what would have been the approval process at nChain for this to be published on the nChain

website?

A. I don't know expressly.

Q. Let me read the first sentence. "At nChain, we're more than just pioneers of the Web3 revolution - we're partners in innovation. That's why DistroMint, an upcoming disruptor in the music industry, chose to leverage our deep blockchain expertise and vast ecosystem to build its platform."

Does that accurately reflect nChain's role in designing, building and developing the DistroMint platform?

A. Leveraging our deep blockchain expertise and vast ecosystem, I believe, yes, that's what it's describing there.

Q. We've collaborated to offer more than just technology; we've provided the tools and expertise to deliver a seamless integration of Web3 functionality while ensuring a smooth user experience."

Second sentence states, "Discover how our partnership with DistroMint is setting new standards in the development of blockchain applications and use cases to create a fair and more inclusive society for all."

Did I read that second sentence correctly?

A. You did, yes.

Q. Does this article accurately reflect nChain's

belief that it was in a partnership with DistroMint?

MR. RUOCCO: Object to form.

THE WITNESS: No, I'm seeing partnership there, as it says lowercase "p," as kind of the general use of the word of working together. It also uses collaborated earlier in the sentence. I'm sure they're looking for the synonyms.

BY MR. RISPOLI:

Q. What is -- what was nChain describing when it was using the term "partnership" with DistroMint in this public statement?

A. It would be saying they would be working together. The "with DistroMint" is the confusing part of that.

Q. And why is it confusing?

A. Because we were working with Eric and Sound Alive, so it's kind of DistroMint project.

Q. Do you know if nChain ever made any public statements that corrected any of the information in Exhibit 5?

A. Not that I'm aware of, no.

Q. Do you know if nChain made any later public statements that retracted any of the information stated in Exhibit 5?

A. Not that I'm aware of, no.

Q. If we go to Project Overview it states that "DistroMint is a revolutionary new blockchain music platform that aims to democratize artist discovery and music distribution."

Is that -- well, let me continue. "The platform is the brainchild of leading record producer E. Smitty, who relied on nChain for our blockchain expertise, development and IP services needed to support his vision."

Does that accurately reflect nChain's role in the involvement -- its involvement in the DistroMint platform?

A. It's talking once again about our blockchain expertise and development. IP services I take is referring to the work that was done with Eric and helping him convert his provisional patent application to a full patent application.

Q. And as stated in the second sentence in this section, that was nChain's area of expertise in blockchain with regard to IP were areas that Eric was relying on nChain for in connection with the development of the DistroMint platform?

A. That's what it says, yes.

Q. But did that accurately reflect nChain's understanding that two areas Eric was relying on the

company for were their blockchain expertise and their ability to develop and secure intellectual property rights?

A. I think on the IP side, yes, we ran through yesterday, yes, we have experience and the connections to make that happen.

Q. The reference in the second paragraph to our 200-plus staff technology team drew on previous experience in designing and building Web3 music platforms to deliver DistroMint, does that mean that nChain had the 200-plus staff at its disposal to assist with the development of DistroMint?

MR. RUOCCO: Object to form.

THE WITNESS: No, that's talking about the entire -- I think the entire technology team across all of the nChain companies.

BY MR. RISPOLI:

Q. When you say "all the nChain companies," that would include, for example, nChain Slovenia?

A. Yes.

Q. So nChain's position is, although we are publicly announcing that our 200-plus staff technology team was involved in DistroMint, in actuality, it was only kind of the developers we have been talking about yesterday and today?

MR. RUOCCO: Object to the form.

THE WITNESS: I don't think it expressly says that all 200-plus members of staff were involved in the project.

BY MR. RISPOLI:

Q. Well, it references the -- it references 200-plus -- the 200-plus staff technology team to deliver DistroMint, correct?

A. Through our own previous experience in designing and building Web3 music platforms to deliver DistroMint. It doesn't tell you how many members of staff actually worked on that. I'm seeing that as actually a bit of advertising for the size of our technology team.

Q. The next sentence, we were able -- "We were also able to draw on the expertise of our wider ecosystem partners, AssetLayer and HandCash, to provide minting and authentication services that support the success of DistroMint's NFT and token-based platform."

Does that accurately reflect activities that nChain engaged in in the development of the DistroMint project?

A. Yes, we worked with AssetLayer and HandCash.

Q. What does nChain mean by referring to AssetLayer and HandCash as ecosystem partners?

A. Meaning that they are working exclusively or

predominantly in the BSV ecosystem.

Q. "What is DistroMint?" And then do you see the graphic here below starting on the second page?

A. I do, yes, but I can't read any of that text.

Q. Do you know if this was -- do you see the reference to -- or can you make out -- well, I'll just enlarge it. Are you able to read the text in this graphic now?

A. I can read the headline. I can sort of read the smaller text.

Q. Is this an excerpt of a PowerPoint presentation related to DistroMint?

A. I'm not sure.

Q. Do you remember reviewing any PowerPoint presentations in relation to DistroMint when you were reviewing your materials in the course of this litigation?

A. I do and I did. And the thing which is giving me slight pause is just that "Explore" and "For Artists," but that does look like the PowerPoint presentations that were included.

Q. All right. Again, we're talking about the section, "What Is DistroMint?" You don't need to read this out loud, but just read the -- this paragraph to yourself and let me know when you finish, please.

A. Can you make it slightly larger, please.

Q. Yes.

A. Thank you.

Q. Is that good or do you need me to make it larger?

A. That's good, thank you. (Witness reads.) Okay, I'm good.

Q. Does that paragraph accurately describe nChain's understanding of what the DistroMint platform was aiming to become as a final product?

A. Okay. So on the music distribution side, music platform distribution and discovery, so distribution, I believe that -- the platform had the ability to -- for artists to upload songs, then they could be downloaded as part of a distribution exercise.

That was not, I believe, in any way automated. Generate revenue from multiple sources. So that would mean -- yeah, from -- trading and also potentially if there is distribution income -- minting and meeting trading -- yes, that's describing the NFT functionality that was included in there and describing the attractive use case.

Q. When we go to the "Our Approach" section, it's -- the first sentence states, "As part of the project, we fused together both Web2 and Web3 solutions

to help balance DistroMint's cost, security, and scalability requirements."

Does that describe some of the work that nChain had done in relation to the DistroMint project?

A. I believe so, yes. I'm just thinking of the security elements in that scalability -- I'm not entirely sure what that would be focusing. I think trying to minimize the cost in there.

Q. Well, does this generally describe activities that nChain undertook in its development of the DistroMint platform?

A. I think that's describing, yes, a development of the platform, yes.

Q. And then the last section, or the last -- or the next sentence, paragraph, describes -- or states, We're proud of our partnership with DistroMint -- sorry.

"We're proud of how our partnership with DistroMint is creating the opportunity for fairer and more efficient business models in the music industry, realizing the vision of E. Smitty and the potential of Web3 technology." Do you see where I read that?

A. I can see that, yes.

Q. And again, we've got a second time in that article that nChain is describing its relationship with Eric as a partnership; fair?

A. Yes. And it described its relationship with AssetLayer and HandCash as ecosystem partners.

Q. And then there is a quote attributed to Eric in this box below?

A. It appears to be, yes.

Q. And in that quote Eric states, "nChain helped me realise my goals with their extensive expertise in real blockchain use cases..."

A. That's what it says.

Q. The section "What's next for DistroMint and nChain?" states, "After the successful and efficient build of the platform by nChain, DistroMint is now focused on launch and user acquisitions with plans to work with nChain to add additional features such as streaming service and BSV payments in the future." Did you see that?

A. Yes, I can see that.

Q. All right. So is -- so in this sentence, nChain is representing that there has been a successful and efficient build of the platform?

A. Yes.

Q. And there is the public statement that, from nChain's perspective, DistroMint had plans to continue to work with nChain on additional features of the platform?

A. With plans to work, okay.

Q. Is that accurate?

A. It's being stated there, but obviously as we know, there was no company that was set up to operate DistroMint at this point in time so this -- sorry, July, August.

At that point we were still -- Eric and I were discussing which jurisdiction would be the safe home for DistroMint, so this is getting ahead of itself.

Q. During those discussions, Eric was stating that he believed DistroMint was ready to be launched; is that fair?

A. From a technological perspective, I think he would be saying that. I'm not sure whether or not we had all of the accounts that we would need because, ultimately, that would need to be in the name of the company. And as we didn't have the company, we couldn't have the final account.

So technologically wise, I think everybody was happy that it was in fit shape once you plug it into the correct accounts.

Q. I think based on what we were talking about yesterday, there was a company, DistroMint LLC in Georgia, but nChain was worried about having the platform operate through a U.S.-based entity given regulatory concerns; is that fair?

A. We were concerned, yes.

Q. And then the very last line on Exhibit 5 looks like it has a link provided to places anybody reading this statement could go to to learn more information about DistroMint?

A. Okay.

Q. Is that what that appears to be?

A. That's what it appears to be, yes.

Q. I want to move on to -- or ask some questions regarding topic 9 regarding valuation and damages. What did you do to prepare for this topic?

A. Once again, just looked at the production documents.

Q. Is there any specific documents that you recall you reviewed that related to how to value the DistroMint project?

A. No.

Q. In terms of valuing DistroMint, would it be necessary for nChain to determine what its ownership rights were in the platform in order to come up with its percentage of the valuation of the project?

MR. RUOCCO: Object to form.

THE WITNESS: Sorry, you have confused me here because -- okay, sorry, can you repeat the question.

BY MR. RISPOLI:

Q. Yeah, I'll ask it a different way. What steps did nChain take to put a value on the DistroMint project?

A. I don't believe we took any steps to put a value on the DistroMint project.

Q. Would -- were there other similar projects that -- during this time period that nChain was working on that it would do valuation assessments on?

A. Depends on your definition of similar project. That's what's giving me pause there.

Q. Sure. Were there other projects that nChain was working on with other third parties not employed by nChain or its affiliates, kind of in the Web3 space as described by nChain, regarding DistroMint?

A. Once again, definition of project, that's it.

Q. Sure. Let's go to a more specific one. [redacted]

A. Yes.

Q. Would that be fair to use the terminology "project" that nChain was kind of in its portfolio at this time?

A. That was classed as one of the 20, slash, 10 licensing-for-equity transactions.

Q. But that was a -- I think we called that a twenty-ten yesterday, right?

A. Yes.

Q. And the twenty-ten model was the preferred model that nChain would use in working on these kind of outside projects?

A. That was ultimately an investment transaction, where we took a investment in -- in that company.

Q. In that company, for example, was there -- was it a situation where nChain was doing any development work on the project, you know, similar to the way it had a team assigned for the DistroMint project?

A. That one, no, I don't believe so because that company already had its own in-house developers.

Q. Were there any other projects that nChain was working on during the same time period as DistroMint where it also was utilizing its engineering and development team to benefit the project?

A. Yes.

Q. And in those other projects in that situation, where the team was working on it, would the company do any valuation assessments of the project?

A. It's a broad question. It depends ultimately on the -- depends ultimately on the project in question.

Q. What would be some of the parameters as to when nChain would engage in any type of valuation analysis for a project?

A. You keep on describing as projects -- the investment transactions --

Q. Before you answer that, you think "investment" would be a better term than "project" for what we're describing?

MR. RUOCCO: Object to the form of the question.

THE WITNESS: So if we're looking around for instances where valuation work was undertaken, there was one instance where after the event, after the transaction, there was a document created which explained the -- explained the valuation to a degree.

BY MR. RISPOLI:

Q. Would part of, you know, this assessment on valuation for an investment necessarily entail what nChain's ownership rights were with respect to the project/investment?

A. I guess investment, you would ultimately need a multiplier in there if you are valuing a -- valuing a company or holding an investment in your -- in your books. You need a multiplier of what you've got versus the value of the company.

Q. And sorry, can you define what you mean by multiplier?

A. So if I got a 20 percent stake in a company -- well -- sorry, just had a glitch there. I seem to be

catching up. Sorry, was there a question?

Q. Yeah. Can you define what you mean by multiplier?

A. Okay. Sorry, yes. Where you've got a 20 percent stake in the company, so meaning that is the multiplier. So if I've got 20 percent and I'm valuing a company or putting a number against the value of that company, then ultimately if that's -- yeah, you need to have that for your books, that otherwise you're going to have it impaired and be unable to justify that valuation.

Q. I'm going to mark these as Exhibit 6.

MR. RISPOLI: Just so the court reporter knows, they're going to come through as three separate files but they'll be marked Exhibit 6 page 1, Exhibit 6 page 2 and page 3.

(Plaintiff's Exhibit No. 6 marked.)

BY MR. RISPOLI:

Q. All right. I'm going to present what's been marked a Exhibit 6 page 1. If you can see, it's NCH4336 up in the top right. Is this document large enough for you to read?

A. Barely, if I squint, but keep going.

Q. Let me make that bigger, then. That's too big. All right. This is -- maybe it's just too big. All right. The heading of this document is "Closed Deals" as

of February 27, 2023; do you see that?
A. I can see that, yes.
Q. What type of -- could you explain what this type of document was at nChain, Closed Deals?
A. I'm not sure where this is exactly extracted from. It looks like reporting to the -- reporting to the board.
Q. Is this something that you personally would have been involved with on the finance side of your work at the company?
A. I don't recall reviewing them.
Q. For -- you see at the bottom, this -- there is a footer that says, "REVENUE PLANNING"?
A. Uh-huh, yes.
Q. Was revenue planning something that the company undertook to determine the value of its stakes in investments?
A. No, this revenue planning is talking about revenue as opposed to balance sheet.
Q. In this document, do you see the name of the company DistroMint?
A. I can see that, yes.
Q. And nChain had listed the type of transaction DistroMint was as a Partnership 50/50?
A. That's what listed. Obviously, drafting.

Q. What does drafting mean?

A. Meaning nothing's been completed.

Q. What were the stages for deal status, the, you know, potential stages to put in?

A. I don't know if there are more than what is showing there as closed, pending and drafting.

Q. What was the difference between drafting and pending?

A. Pending could refer to where a transaction has been documented and signed and then is waiting for necessary shareholder approvals.

Q. So for the DistroMint project, as we see in Exhibit 6 page 1, nChain's belief as of this date, February 27, 2023, was that it was, in terms of deal status, in the process of drafting a 50/50 partnership in the DistroMint project in which it would hold 50 percent of the equity?

A. You've got a very broad description. So type of transaction, Equity Held/Other. As we know, this was never finalized.

Q. Well, the -- just going from the document, we have the company -- nChain listed the company as DistroMint, correct?

A. Yes.

Q. It believed that the deal status used the term

"Drafting" to define the deal status of DistroMint as of February 27, 2023, correct?

A. Correct.

Q. And the type of transaction nChain believed the DistroMint company to be was a 50/50 partnership?

MR. RUOCCO: Object to form.

THE WITNESS: Once again, it's describing -- describing like that. Knowing that it hadn't been -- there was no documents -- documents closed. And ultimately, we know that DistroMint wasn't -- wasn't the company so it's not got any of the actual details there.

BY MR. RISPOLI:

Q. And then under the Equity Held/Other column, the number for DistroMint is 50 percent, correct?

A. That's what it shows, yes.

Q. Okay. If we -- do you know what nChain -- some examples of what nChain is referring to with the slash "Other" term?

A. Yes, I can guess.

Q. What do you think it means?

A. So if you look further down the column, you've got License for Equity, 20 percent. That's not relating to equity. Sorry, it's -- ultimately -- revenue royalty is not equity. Facilitated Sales, that's talking

about -- these are talking about revenue items or the percentage -- percentage of facilitated sales, for example, would be talking about if we assisted with a sales transaction for the underlying company, we would expect to receive 40 percent of the -- I think the gross revenue is the typical -- typical multiplier there. Similar for fundraising fees.

Q. The value column over here in the parentheses CHF, what is CHF?

A. That's referring to Swiss Franc.

Q. Was that the currency that nChain typically used to assess value?

A. As a group we've got -- yeah, Swiss Franc was the reporting currency.

Q. And I'm going to present Exhibit 6 page 2. And I will enlarge this. Does this page just look like a -- have the same similar information we just described in page 1?

A. It looks to be, other than just the flipping of the column order.

Q. We also see in the header still -- this header states, "Closed Deals" as of 27 February and has the nChain logo in the header?

A. Yes.

Q. We still have DistroMint listed as -- currently

under Drafting, correct?
A. Correct.
Q. And Type of Transaction is listed as Partnership 50/50, correct?
A. Correct.
Q. And Equity Held/Other for DistroMint is listed as 50 percent, correct?
A. That's what's shown.
Q. And then page 3, this looks to be the -- an identical graphic that we just looked at in page 2?
A. Yes. I mentioned those are both drafts for the first document.
Q. Sorry, page 2 and 3 look like drafts of page 1?
A. That would be my pick.
Q. Let me ask some questions regarding topic 6, which was the topic for DistroMint develop -- development, technology, and operations.
Anything that you have done to prepare for this topic outside of, you know, what you have already discussed as reviewing production documents in this litigation?
A. Sorry, is this the technical topic, so whether or not the conversation with the engineers that we mentioned before would fall into this.
Q. With regard to the phone call, was it just a

phone call with Mr. Bratina or did you also -- were you able to have a phone call with -- was it Matevz?

A. Yes, a Teams call with both.

Q. So it was a Teams call, not a phone call, sorry?

A. Correct.

Q. So it was by video -- was it by video?

A. Yes.

Q. And what were the specifics you discussed with those two individuals?

A. I asked them to give me an overview of the -- of the project, where it had got to in terms of its final development state.

Q. And what is nChain's understanding of the overview of the DistroMint project?

A. Sorry, I'm not sure I understand the question.

Q. Sure. What was -- what is nChain's understanding of what the ultimate end state of DistroMint was?

A. Can I ask you to clarify again. If you -- I want to give you the right answer, but I want to make sure I'm giving the right answer to the question.

Q. Sure. How -- when nChain ceased work on the DistroMint project, what was the end state of the project at that time of cessation?

A. Okay. So the MVP had I think been built, so the

Minimum Viable Products. And then various bits and pieces had been added on, more to do with I think sort of the checking of music when it was uploaded -- uploaded to the platform.

So before kind of the integration with AssetLayer and HandCash in principle was done but we were still waiting for final -- final accounts once the company had been determined.

But at a technical level, they knew how to make that work. They had that running at kind of a development stage. So that covered the NFT minting, sort of the broad administration of the platform.

I believe there was Stripe, very similar -- the connection would ultimately be required for the final company, but I think kind of at the technical level, they had Stripe in there as a payment solution provider.

Q. So it sounds like from nChain's perspective, the site itself had been completed?

A. From a technological perspective, the functionality was there. As I said, the accounts weren't going to be -- weren't the final accounts that were required because they would ultimately be the accounts for the company that would ultimately operate the platform.

Q. When you say "accounts," are you referring to

bank accounts or something else?

A. Meaning the accounts. So wallets with HandCash and then, yes, the -- I suppose the API with AssetLayer, thinking that through.

Q. When you're referencing wallets, would that have been a designated wallet for DistroMint?

A. Yes, the platform operator would have needed its own wallet with HandCash.

Q. Because the goal was that users would also have their own wallets with HandCash that, you know, would be interacting with the platform operator wallet as the platform was being used in its intended way?

A. Yes, I believe that's correct, yes.

Q. Was a -- had the DistroMint site been beta tested by the end point of this relevant time period?

A. When you say beta tested --

Q. Sure. Have you ever heard that term before?

A. It's not one I'm particularly familiar with, no.

Q. Sure. Had the DistroMint site undergone testing by nChain personnel, you know, to ensure that it was functional?

A. Yes, it was during the course of the project, any issues that were raised were dealt with. That's a degree of testing. It had also gone through -- it's not nChain personnel, but had gone through penetration

testing --

Q. Can you just define what penetration testing is?

A. So this is looking for security -- security issues. So trying to see if you can break into operation of the platform.

Q. And the penetration testing had been completed?

A. Correct, yes.

Q. Had the administrative panel for the site been completed?

A. As far as I know, the administration -- administrative position -- I don't know expressly whether or not when you say administrative panel --

Q. Was Stripe integration completed?

A. Once again, you've got the -- ultimately the wrong account there, but they knew how to integrate Stripe.

Q. Well, what do you mean when you say "wrong account"?

A. Once again, I said the platform company didn't exist, so the Stripe account would be in the name of the platform company.

Q. Was there a -- whether nChain believed it was the correct account or not, was there a Stripe account connected to the platform?

A. They had gone through that process early. I'm

not sure whether it was a live account or not --

Q. Is it nChain's understanding that the Stripe account was linked to the Georgia DistroMint LLC?

A. I think they used DistroMint LLC, yes.

Q. And is that what you meant by wrong account, meaning nChain's preference was to have a different as-yet created company be the account for the Stripe connection?

A. That ultimately the platform operating company wouldn't be DistroMint LLC.

Q. Was DistroMint -- was there a HandCash wallet actually connected to DistroMint?

A. I believe that was in process. I'm not sure whether it had been completed or not. I know there was issues ultimately with that. So I believe that was in process, if not completed at that point.

Q. The -- had Eric already uploaded by that point any artist's collections to the site?

A. I believe he had provided imagery, yes.

Q. So some NFTs had already been minted at this point?

A. I'm not sure if they ever minted NFTs.

Q. What was your understanding of what I meant by artist's collections then having been uploaded? In other words, those were not NFTs?

A. So that would be -- my understanding, that's reference to the image as opposed to then taking that image and minting an NFT connected to it.

Q. The -- by the end of the relevant time period, nChain had engaged its design personnel to -- sorry. By the end of this relevant time period, nChain had utilized its personnel to design the DistroMint platform?

A. Yes, well, the nChain Slovenia team was driving that. But yes -- sorry, you instructed before that you treat them as the same, so yes.

Q. Yeah. And just again for clarification, nChain Slovenia was operating for -- was allowed to work on nChain projects or investments based on the services agreement that we described?

A. Correct, yes.

Q. So by the end of the relevant time period, nChain had also had its development team do all of the coding necessary to create the platform?

A. Yes, that was the -- yes.

Q. By the end of the time period, nChain had utilized its personnel to set up the platform with the necessary integration into the BSV network?

A. By the necessary integration to the BSV network, that would be via either HandCash or AssetLayer.

Q. But those actions had been completed by the end

of the relevant time period?

MR. RUOCCO: Object to form.

THE WITNESS: I'm not sure how far the HandCash wallet had got to. Once again, with AssetLayer, I don't know if they were ultimately ready -- kind of subject to ultimately determining the platform company.

BY MR. RISPOLI:

Q. The AssetLayer team involved in the DistroMint project, where were they located?

A. They're in the United States.

Q. Where in the United States?

A. I can't remember exactly where. Sorry.

Q. Do you think it may have been Pennsylvania?

A. Could well be. It rings a bell. But if we've got paperwork, it would confirm it.

Q. Was nChain paying the members of AssetLayer for the work they were doing in relation to the DistroMint project?

A. Not that I'm aware of, no.

Q. Do you know how -- does nChain know how members of the AssetLayer team were getting paid for their services?

MR. RUOCCO: Object to the form.

THE WITNESS: So AssetLayer, not expressly, no.

BY MR. RISPOLI:

Q. Did nChain have an investment in AssetLayer?

A. We did, yes.

Q. Was that -- do you know the amount of the investment nChain made in AssetLayer?

A. Yes, I do.

Q. What was that amount?

A. So in cash terms?

Q. Yeah, let's use U.S. dollars.

A. So I believe there was a -- a loan that was made of I think 600,000 U.S. dollars. Then there was a license-for-equity transaction, which wasn't cash, where we subscribed for and they purchased a license from us I think for $2.4 million, I believe is the number there.

Q. Were there written agreements between nChain and AssetLayer that would have discussed the terms you just described in detail?

A. Yes.

Q. Do you think the work that AssetLayer was doing in relation to the DistroMint project was covered under the arrangement between the -- the investment arrangement between AssetLayer and nChain?

A. I don't know what you mean covered by.

Q. Sure. I mean, if you don't believe that, you know, anybody was getting paid at AssetLayer to, you

know, do the work integrating the AssetLayer toolkit to DistroMint, is it probably because they were compensated through the structure of the investment between nChain and AssetLayer?

MR. RUOCCO: Object to form.

THE WITNESS: No, that's not correct.

BY MR. RISPOLI:

Q. Okay. I guess what I'm trying to figure out is, what was the consideration that AssetLayer was receiving for doing the work related to DistroMint if Eric wasn't paying anybody at AssetLayer?

A. When you say doing the work, ultimately it would be integration of a user of their tool that they would then own fees off that.

So DistroMint would -- sorry, DistroMint. The platform would ultimately be a customer of AssetLayer. And development work on the AssetLayer side, we were just using their tool. I don't believe there was any express work done on their side, or development work on their side.

Q. Well, would there have to be communication with the AssetLayer team in order to integrate their tool into the development site for the DistroMint platform?

A. Yes, to understand how it operates, what the requirements were, yes.

Q. Do you know who the individuals were at AssetLayer that would have been involved in the DistroMint project?

A. Based on what I have seen in the production, I can't remember the second chap's name, but Jack Laskey.

Q. Do you know if anybody at nChain actually went to Slovenia to oversee any of the work being done on the DistroMint project?

A. Sorry, you mean from nChain UK travel to Slovenia?

Q. Correct.

A. I'm not aware of it, no.

Q. Do you know if Stefan Matthews visited the Slovenia offices to review the progress on the DistroMint project?

A. Not that I'm aware of. He may have visited Slovenia, but -- not that I'm aware of, no, sorry.

Q. In terms of the NFT minting, were there ever any testaments done by anyone from nChain with regard to DistroMint project?

A. Most definitely, yes.

Q. The investment in AssetLayer, was that through nChain or nChain Ventures?

A. That was nChain UK.

Q. I think from yesterday, and just to confirm

today, the AWS deployment for DistroMint was handled by Eric?

A. Correct, yes.

Q. For the source code for the DistroMint project that's in the GitHub repository, who controls access to that?

A. Ultimately, it would be nChain.

Q. Well, currently, would that be nChain or Teranode?

A. As far as I'm aware, it's nChain.

Q. Let's go off the record.

THE VIDEOGRAPHER: Any objection to going off the record?

MR. RUOCCO: No.

THE VIDEOGRAPHER: We're now off the record. The time is 10:52 Eastern Time.

(Break.)

THE VIDEOGRAPHER: We're now on the record. The time is 11:31 Eastern Time.

BY MR. RISPOLI:

Q. All right. Back from our break. I just wanted to follow up on something we were talking about before the break. Regarding the source code for DistroMint on the GitHub repository, Eric does not have access to that source code, correct?

A. That's correct.

Q. And the DistroMint platform that was created in part with nChain resources can't be used the way it was designed without that source code?

A. Okay, so there is a few assumptions in there. At a technical level, obviously we have covered the point that there isn't a platform company that we were happy with.

I think once you've got an image of that source code containerized and put onto AWS, then it's there and potentially operational. But future changes to the operation of that platform -- so if you need to update for any -- any security risk or anything like that, you would need to go back to the -- back to the source code.

Q. And did nChain ever offer Eric to purchase the source code or access to it?

A. Well, that's not quite Eric but -- the Restructure Proposal includes the idea of an assignment transfer of that -- that source code to a company that he would -- he would have been incorporated on.

Q. Well, I understand that there was -- the Restructure Proposal was prevented -- presented to Eric, but outside of the terms of that agreement, nChain never made any kind of one-off offers for Eric to, you know, license or purchase the source code for DistroMint; fair?

A. I think that's right, yes.

Q. All right. I'm going to move on to spend some time on topic 3, communications involving or with Christen Ager-Hanssen.

It sounds like, Mr. Evans, the only thing you would have done to prepare for this topic is to review the emails involving Mr. Ager-Hanssen?

A. That's correct, the production documents, yes.

Q. If there weren't emails involving Mr. Ager-Hanssen, any other preparation you would have done is -- would have just been included in that review of the production?

A. The production documents.

Q. I'll mark this as -- I think we're on Exhibit 7.

(Plaintiff's Exhibit No. 7 marked.)

BY MR. RISPOLI:

Q. Is this large enough or do I need to enlarge it?

A. That's okay. Thank you.

Q. All right. When we see generally in these exhibits, or in any of the production documents, Christen Ager-Hanssen's name and the CAH@nChain.com domain email address, that's coming -- that's involving Mr. Ager-Hanssen?

A. Yes. I'm sorry, yes.

Q. And sometimes Mr. Ager-Hanssen would use the

domain -- his email address, CAH@CustosGroup.com?

A. Correct, yes.

Q. Did nChain ever discourage him from conducting nChain business using the Custos Group email?

A. You're going to get into privileged conversations at this point.

Q. So it sounds like there were discussions. The subject matter of those discussions was regarding the use of CustosGroup.com email address, but the specifics of those discussions you would say are privileged?

MR. RUOCCO: And, Dale, if you think this is invading into a privileged area, you can answer the question yes or no.

THE WITNESS: Yes.

BY MR. RISPOLI:

Q. But for the purposes of these documents, nChain is aware that the email address CAHCustosGroup.com was also for Mr. Ager-Hanssen?

A. Yes.

Q. And when we're talking about these emails generally that were part of the production that you reviewed, these are emails that were engaged in the normal, ordinary scope and course of the business at nChain?

MR. RUOCCO: Object to the form.

THE WITNESS: I don't -- I'm sorry, I don't recall seeing emails that wouldn't fall within that, so yes.

BY MR. RISPOLI:

Q. All right. Exhibit 7, beginning on NCH235 -- one moment while I organize my papers. If we scroll down to the second page -- bottom of the first, second page of this exhibit, this was an email that originally started with Eric to the CEO regarding the anticipated relationship between Eric and nChain for the DistroMint project?

A. I think anticipated relationship, this is describing the steps that were going to be taken ultimately of what would be -- yeah, that's -- it was forward looking. This was looking at the future agreement that would need to be entered into between the parties.

Q. Okay. We see in the email here that Eric wrote, "I agree to the terms of 50/50 partnership of DistroMint LLC," with reference to the DistroMint domain, a DistroMint handle, and the partnership was with nChain and then there is the address, physical address of nChain in the United Kingdom?

A. Yes, that's there.

Q. And the CEO responded, Thanks -- well, Mr. Ager-

Hanssen was the CEO at the time?

A. He was, yes.

Q. And he responded to Eric's email regarding the terms of the 50/50 partnership of DistroMint with the words, "Thanks" and a prayer emoji?

A. He replied to that email.

Q. But he stated, "Thanks" and had a hands touching emoji after that, correct?

A. Yes, immediately before the words, "I will arrange an agreement as soon as possible."

Q. But after the word "possible," he indicated that nChain would pay an invoice tomorrow morning?

A. Yes.

Q. And what was -- does that indicate that Eric had already been doing work for nChain if he was going to be getting paid the next morning?

A. Yes, that the invoices had been issued.

Q. So does that indicate to nChain that there were discussions with Mr. Ager-Hanssen and Eric prior to this date, February 21, 2023, considering that Eric was already sending invoices?

A. Yes. Sorry, yes.

Q. And we saw in earlier financial documents from nChain that the reference to DistroMint in Exhibit 6 used the same language, 50/50 partnership, when it came to a

description of the relationship between DistroMint and nChain?

MR. RUOCCO: Object to form.

THE WITNESS: It's in that document obviously next to the word "Drafting," which is consistent with the idea of "I'll arrange an agreement."

BY MR. RISPOLI:

Q. And it's nChain's position that from February of 21, 2023, until December of 2023, there was no formal agreement between Eric and nChain regarding legal status of the DistroMint project?

A. That's correct, yes.

Q. But during that same time period, from February to December of 2023, nChain paid Eric for business development and consultancy fees?

A. Correct.

Q. And during that same time period, nChain also had its employees or affiliates through its other nChain companies, like nChain Slovenia, undertake work in furtherance of developing the DistroMint project?

A. Correct. I see both of those as part of the efforts undertaken in pursuant of a future agreement, the risk during that period.

Q. Is it nChain's position that the attempt to get what it believed was the first written agreement

regarding the nChain-Eric-DistroMint project the Restructure Proposal in December of 2023?

A. That the documents would have resulted from that would have been the first documents between us.

Q. And in this Exhibit 7, Andy Moody would have been aware of this email discussion from Eric and Mr. Ager-Hanssen regarding the described 50/50 partnership?

A. It was forwarded on there, so yes.

Q. And Simon Wood would have also been aware of the communications at the bottom of this page between Mr. Ager-Hanssen and Eric regarding the description of the 50/50 partnership?

A. Correct, yes. I'm sorry, just to -- when I said forwarded on to, I think Andy was actually -- if he was in the chain before or not.

Q. Yes, he was cc'd --

A. Cc'd so forwarded on, sorry.

Q. But Simon Wood would have also been aware of the DistroMint partnership agreement that we see in the subject as contained in Eric's email?

MR. RUOCCO: Object to the form.

THE WITNESS: The email was forwarded on to him, clearly.

BY MR. RISPOLI:

Q. Was forwarded on to, I'm sorry, Simon, you said?

A. To Simon, yes.

Q. And copied on that forwarding -- or, sorry, copied on Simon's email to Eric was also Stefan Matthews?

A. He's there, yes.

Q. But at this point in time, is Stefan Matthews also -- was he working at nChain or was he just working at nChain Holdings, based on his email address?

A. So he was chairman of the board. He's a director of nChain UK.

Q. Okay. I'll mark this as Exhibit 8.

(Plaintiff's Exhibit No. 8 marked.)

BY MR. RISPOLI:

Q. This is Bates labeled NCH1095, beginning. And this is another communication from Mr. Ager-Hanssen to Eric?

A. It is, yes.

Q. Okay. And in this email -- and if you need time to read it, that's fine -- but Eric is describing some of the activities he did at the London blockchain event in 2023?

A. Can you make it slightly larger, please.

Q. Sure.

A. Thank you. (Witness reads.) Okay.

Q. Would this be -- could this be characterized as

items that -- or activities that Eric was alerting Mr. Ager-Hanssen to regarding some of the things he wanted to do to further develop the DistroMint platform?

A. Yes. Okay, starting from the "presently."

Q. Sorry, starting from what?

A. The word "presently" in the middle of the -- third of the way down that paragraph.

Q. Obviously, the reference to reuniting with his twin sister doesn't have anything to do with nChain or DistroMint, right?

A. I assume not. No, it doesn't. Sorry. I assume not. It doesn't.

Q. And Eric had told Mr. Ager-Hanssen that he valued him and his contribution as to the, what he described as the partnership regarding the DistroMint platform -- sorry, the DistroMint project?

A. Potentially, okay. So there is a lot in that -- in that paragraph. He's using the term "partnership," but he's also talking about the activities he's undertaken at the London blockchain event, which is just a bit broader than the DistroMint development.

Q. nChain doesn't have any evidence -- let me rephrase. nChain doesn't have any communications from Mr. Ager-Hanssen to Eric dissuading Eric from his belief that he was in a partnership with nChain regarding

DistroMint?

A. You are I think overlooking the fact that in the previous -- the previous email exchange he was, "Thanks, I will arrange an agreement as soon as possible." I think that's pretty suggestive of the fact that an agreement was required before anything could be finalized.

Q. You don't have -- nChain doesn't have any evidence of Mr. Ager-Hanssen sending any type of additional agreement to Eric after that February 21, 2023, email, correct?

A. That's correct, yes.

Q. Does nChain have any evidence of any communications from Mr. Ager-Hanssen directing anybody else at the company to create a -- any type of further agreement with Eric regarding the DistroMint project?

MR. RUOCCO: And, Dale, I'll caution you, you know, to the extent this is calling on attorney-client communications, the company had legal services provided to the company, I'll object on the basis of privilege.

You can answer that question yes or no, if you are able to without divulging any privileged information.

THE WITNESS: No.

BY MR. RISPOLI:

Q. I'm sorry, let me ask it a different way. Does nChain have any non-privileged communications from Mr. Ager-Hanssen where he is directing anyone to provide any additional agreements to Eric regarding the DistroMint project?

A. Not that I'm aware of. And I'm not taking that initial email where he says, "I'll arrange an agreement" as an instruction.

Q. How would nChain define the relationship that it had with Eric regarding the DistroMint project from -- during the relevant time period of August -- sorry, October of 2022 through December of 2023?

A. So each of us were undertaking steps which would ultimately result in a final agreement between us. We were -- sorry. Actually, do I need to go further than that?

Q. Sure, if you feel like you need to explain it further.

A. I don't think so. I think that's pretty broad enough.

Q. nChain was, we discussed, paying Eric for work he was doing in relation to the development of DistroMint, correct?

A. Correct, yes.

Q. And nChain was paying -- well, nChain was utilizing its employees and others through service agreements and affiliate entities to do work on the development of DistroMint, correct?

A. Yes, correct.

Q. And nChain would agree that the goal of Eric's work on DistroMint and its own employees' work on DistroMint was to ultimately end up in a usable platform for the purposes of revenue generation?

A. If ultimately we could come to an agreement between the parties, if we reach at risk, absence any agreement the steps that we had taken, that would ultimately result in a platform company able to operate the platform the way that the parties were comfortable.

And -- well, in addition to being a use case that attracted nChain for growth of the -- the adoption of the BSV blockchain and working with other ecosystem partners, ultimately, yes, it would be -- if all of those came through, then you're getting to a workable position, yes.

Q. All right. I'm going to switch back over to topic 1 regarding personal jurisdiction real quick so I don't forget about this email.

(Plaintiff's Exhibit No. 9 marked.)

BY MR. RISPOLI:

Q. This is -- Exhibit 9 is Bates labeled NCH258, and it essentially starts on -- it's at the bottom of page 1. This is an email from Eric to Mr. Bratina, correct?
A. Yes.
Q. And in this email, Eric is informing Mr. Bratina of the company details of DistroMint LLC?
A. Yes, he is.
Q. And as set forth by Eric, DistroMint LLC was a company with a business address in Roswell, Georgia?
A. Yes.
Q. Okay. The LLC members were listed as Eric and his wife, Destiny Perry?
A. That's what's shown in the email, yes.
Q. And the phone number was a -- well, as -- a U.S. federal tax ID identification number was also listed?
A. It was, yes.
Q. And Mr. Bratina replied to that indicating that he was appreciative of receiving that information?
A. He did.
Q. So nChain would have had, at least as of this date, been aware of the fact that DistroMint LLC existed as a Georgia company?
A. Yes.
Q. I'll mark Exhibit 10.

(Plaintiff's Exhibit No. 10 marked.)

BY MR. RISPOLI:

Q. And this is Bates -- beginning Bates labeled NCH4503. I'm going to scroll down to the second page. This is an email from Christine Leong. Do you see where it says it's from her at the top of the page?

A. I see that, yes.

Q. And this is an email she's sending to Christen and Stefan?

A. Yes.

Q. And I can't remember if you -- Stefan at this point, in March of 2023, what was his role at nChain?

A. Chairman of the board, director in nChain UK, he was director of various other companies, but the interesting ones here.

Q. Ms. Leong refers at the bottom of her email to the Smitty project. Is that nChain's understanding that that was another reference to the DistroMint project?

A. Yes.

Q. And Ms. Leong states that the initial work has been done and provides a link for Christen and Stefan to check out?

A. She does, yes.

Q. And she's describing the development site for the platform as -- uses the sentence "Looks very cool!"?

A. She does, yes.

Q. And then Mr. Ager-Hanssen sends a response email to Ms. Leong cc'ing his nChain address, "Thanks for the update"?

A. Yes, that's there.

Q. And then the second sentence is, "Yes, it is very cool and we own 50 percent of the project," correct?

A. That's what's there. It's obviously against the earlier emails where he recognized an agreement was in work between us and Eric.

Q. Sure. But that was -- the email that you just referenced was in February of 2023, correct?

A. Correct.

Q. Now we have a later email, about a month later, in March of 28th of 2023, correct?

A. Yes.

Q. And the CEO is telling the chief information officer in response to her reference to the DistroMint project that nChain owns 50 percent of that project, correct?

A. That's what he's saying, but it's an incorrect statement. It's overlooking the fact that no agreement was in place and overlooking the fact that obviously we owned all of the copyright in the code that had been written.

Q. Sure. There is -- there is obviously no mention in this email from the CEO about the -- any issues with the copyright of the source code, correct?

A. Correct.

Q. And there is no mention in this email of the need for any further agreement with Eric regarding the DistroMint project?

A. That's correct.

Q. The only thing that the CEO is responding -- is telling his CIO is that he appreciates receiving the update, that the DistroMint project is very cool, and that nChain owns 50 percent of DistroMint; fair?

A. I think I have already given a response on that. He's saying we own 50 percent of the project, says -- which is not technically correct.

Q. The email from Mr. Ager-Hanssen is also copied to Luka Topolovec. Who is he?

A. Luka was based out in Slovenia. Probably the easiest way to describe him would be Romans number two, the development team.

Q. And who is Thomas Moretti?

A. Thomas was a -- I think he was in the product team, so he would have been Christine's number two.

Q. If we scroll up, we see that Stefan Matthews, who is the executive chairman of the nChain group, and on

the email -- cc'd on the email -- let me rephrase that.

Mr. Ager-Hanssen cc'd the executive chairman Stefan Matthews on the email in his response to Ms. Leong where he stated nChain owned 50 percent of DistroMint?

A. Yes, Stefan Matthews was in copy there.

Q. And then Stefan Matthews forwarded the email of Eric -- sorry, the email of Mr. Ager-Hanssen stating that nChain owns 50 percent of the project to Stephanie Tower?

A. Yes, he did.

Q. And who is Ms. Tower?

A. Stephanie Tower is based out -- nChain Philippines. If you scroll down the message --

Q. Sorry, what's that?

A. Could you scroll down to the bottom. Sorry, actually, I'll leave you to drive. Sorry.

Q. The email from -- well, you don't see, at least in this exhibit, any communications from anybody at nChain trying to correct the CEO in any way that the company believed it did not own 50 percent of DistroMint, correct?

A. That's correct.

Q. And you're not aware of any -- or nChain is not aware of any non-privileged communications to Mr. Ager-Hanssen at any point correcting him that nChain did not own 50 percent of the DistroMint?

A. That is correct.

Q. Nobody at nChain ever instructed Mr. Ager-Hanssen to communicate to Eric that nChain was not a 50 percent owner of the DistroMint project prior to the creation of the Restructure Proposal?

MR. RUOCCO: Dale, again, caution you -- I'm going to object on the basis of privilege to the extent it calls for any information reflecting attorney-client communications or legal services provided to nChain. Do not include any of that in your answer.

THE WITNESS: Thanks, Jared. And at the risk of potentially asking you to repeat that instruction, Fred, could you repeat the question, please.

BY MR. RISPOLI:

Q. Yeah. nChain's not aware of, prior to the creation of the Restructure Proposal -- let me rephrase that.

Prior to the creation of the Restructure Proposal, no one at nChain instructed Mr. Ager-Hanssen to communicate to Eric that nChain did not believe it owned 50 percent of the project?

MR. RUOCCO: Same objection.

THE WITNESS: I'm struggling with a double negative here. There wasn't -- maybe I answer it

just with sentence rather than yes or no. There wasn't -- there wasn't an email back saying no.

BY MR. RISPOLI:

Q. And I'm sorry, I don't think I heard you. There wasn't an email back -- what did you say?

A. Saying -- saying no. And sorry, the reason rather than yes or no because I'm struggling with what I'll be saying no to.

Q. I'm going to mark Exhibit 11.

(Plaintiff's Exhibit No. 11 marked.)

BY MR. RISPOLI:

Q. And this is Bates labeled NCH1920. And this is an email from Roman Puhek to Mr. Ager-Hanssen from December 12, 2022, correct?

A. Yes.

Q. And this is a communication between Mr. Puhek to Mr. Ager-Hanssen informing him that he spoke with Eric, that he explained the concept of DistroMint?

A. He says he explained his idea. I imagine that's describing -- yeah --

Q. Describing the DistroMint concept?

A. Broadly. It's not clear, but you would expect something like that.

Q. Well, does -- is nChain aware of any other communications or relationships it had with Eric outside

of the DistroMint project?

A. No.

Q. And so at least this email would indicate to nChain that by at least December of 2022, there was knowledge on behalf of the company about the DistroMint idea that Eric had?

A. It's reading a lot into it, as in what the idea is. He'll send the documentation he has.

Q. And I think you didn't speak with Roman in order to prepare for this deposition today, did you?

A. No, I did not.

Q. Do you know where he works currently?

A. He's involved in Equaleyes. I'm not sure whether he's still working there.

Q. I'm going to mark another exhibit.

(Plaintiff's Exhibit No. 12 marked.)

BY MR. RISPOLI:

Q. This will be Exhibit 12. This document begins with Bates label 2674. And this was a -- nChain would agree that this is a email that Mr. Ager-Hanssen forwarded to Andy Mooney -- Any Moody?

A. Yes.

Q. And it references a forwarded message between Eric and the development team that was working with him on the development of the DistroMint platform?

A. Yes.

Q. And Eric sent that email to Mr. Ager-Hanssen as well?

A. Yes, he's on copies, yes, on the To line, yes.

Q. And the substance of this email is Eric describing to Urban and his team some of his thoughts on the development of the DistroMint site?

A. Yes, I think that's fair.

Q. In terms of how the team was structured, was Eric leading the development team in Slovenia or was it more of a collaborative agreement?

A. So he would describe what he is looking to achieve. They would be then figuring out how technically that would -- that would work and I think in terms of the look and feel of the -- of the website. You can see here he's providing more detailed input there.

Q. Well, I guess what I meant is, if, you know, there were two technical options to achieve something and Eric wanted to go with option one and Urban suggested option two, who is the one that could make the decision in that situation?

MR. RUOCCO: Object to form.

THE WITNESS: Ultimately, I don't know whether we ran into -- into that sort of situation. I think there would have been technical issues that arose

during the course of the development.

I think it's the Slovenia development team that had the technical background in explaining why a particular route was necessary and just confirming that to Eric so that he knew.

BY MR. RISPOLI:

Q. When it came to the development, does nChain have a position on whether its developers led the team or whether Eric led that team?

A. I'm going to ask you to explain what you mean by lead. Sorry.

Q. Sure. I mean, in terms of nChain itself, I mean, would you -- would nChain agree that the CEO would be the leader of the company?

A. Yes, for certain that is yes.

Q. So just if we take that down to the development team level -- well, let me I guess rephrase. Excluding Eric, of all the developers in Slovenia that were working on the DistroMint project, would Urban have been considered the lead developer?

A. No, Urban was the project manager. He I think is probably the least technical of the lot there, but that's probably taking a lot away from Urban.

Q. As the manager, he had the supervisory authority over the other team members?

A. I'm not sure that's really correct. He's a project manager so his job is to chivvy along other people, making sure that timetables are being met, making sure various tasks are being picked up. I think the developers would have had their own technical boss. I don't think he was --

Q. Let me ask it in another way. Did Eric have the authority to direct the team members in Slovenia as to what to do and how to do it with regard to the platform development?

A. I don't believe we ever ran into that. They were building on the basis of the description that was given to them, figuring out the best way to do that.

I don't think there was a position where Eric was asked whether or not he could or wanted to override a view because they would have to justify and explain the position and, with all due respect to Eric, I don't think he necessarily wants to go against what they were explaining.

Q. It sounds like there weren't any -- there wasn't any documentation, for example, that explained who had what roles on the development team for the DistroMint project?

MR. RUOCCO: Object to form.

THE WITNESS: There were descriptions of who was

doing what on the -- on the project.

BY MR. RISPOLI:

Q. Where would those descriptions have been located? You know, would it have been in emails or something else?

A. I think in Confluence, so in the SharePoint.

Q. So like would this have been like a Word document?

A. No, I said I think Confluence.

Q. Oh, I thought you were using it as a literal term and I was confused. What is Confluence?

A. It's a project management tool, my understanding.

Q. Do you know, do you still have access to Confluence as you sit here today if you wanted to go back and try to find what was in Confluence regarding DistroMint?

A. Yes.

Q. Let me mark Exhibit 13.

(Plaintiff's Exhibit No. 13 marked.)

BY MR. RISPOLI:

Q. This is Exhibit 13, begins with Bates labeled NCH4420. What -- and you can see this includes an email -- this is an email from Christine Leong to Mr. Ager-Hanssen, among other people at nChain, correct?

A. Correct.

Q. Who is Leandro Nunes?

A. He was a promotional director.

Q. Who was Eileen Brown?

A. I believe Eileen was in the marketing team.

Q. And who is Ed Bates?

A. Ed Bates and Brian Baker were in project management in the UK.

Q. David Brookes, he was at this time the general counsel for nChain, correct?

A. Correct, yes.

Q. But this document that we're looking at here isn't legal communications or -- sorry, doesn't represent any legal advice to the company, correct?

A. It's an email from Christine. I haven't seen the contents of it yet, but it's an email from Christine.

Q. Was that something -- well, let me ask this: The subject Technology project delivery & requests weekly status," with a date of -- this would have been March 10, 2023, correct?

A. Yes.

Q. What were the -- could you describe what these project delivery and requests weekly status and reports concerned?

A. Well, based on the text in the email, it's an

update on various projects across the organization.

Q. Was this something that the -- Mr. Brookes would regularly -- information he would be included on?

A. I'm not sure. So we've got one email here.

Q. I guess if I ask it a different way, why would the general counsel be copied on weekly status reports regarding projects?

A. I don't know specifically.

Q. If I scroll down this document, we see on the second page, NCH4421, the reference to DistroMint; do you see that?

A. I see that, yes.

Q. What does it mean by the category under Type, Specific Ops?

A. I think that's reference to Slovenia, that I think Roman might have had the title of special ops.

Q. What was special ops?

A. I think this is referring effectively to -- well, I don't know the differentiation, sorry.

Q. Is special ops, was that a name created just for the DistroMint project?

A. No.

Q. Under the column of Stage, at this point DistroMint was being represented as still in the build/test phase?

A. Yes.

Q. I'm going to mark Exhibit 14.

(Plaintiff's Exhibit No. 14 marked.)

BY MR. RISPOLI:

Q. and for this question, just so I can stay within all my documents, I am skipping back to, let's see, topic 7 regarding marketing. And this begins on Bates label NCH5243. Do you see this email from nChain marketing to Mr. Ager-Hanssen?

A. Yes.

Q. Was this -- and this is labeled -- or sorry, the subject is Internal Marketing Newsletter No. 3?

A. It is, yes.

Q. Just personally, was this something, you know, that as someone with an nChain email address, you would be getting these emails as well from nChain Marketing regarding the internal marketing newsletter?

A. Yes, I think so.

Q. So this is something that was a -- like an nChain-wide email that marketing would send out?

A. Right.

Q. And we see here the -- do you see the cover for the marketing newsletter?

A. I do.

Q. I'm going to scroll down to page 8, which is

NCH5250. Do you see the Updates section?

A. I do, yes.

Q. It says, "DistroMint platform successfully added an a AI recognition toolkit to prevent minting of forbidden content and enabled music distribution that allows artists to deploy their music to record labels." Did I read that correctly?

A. You did, yes.

Q. Does it look like the words "DistroMint platform" were a hyperlink?

A. It looks that way, yes.

Q. Do you know what that hyperlink would have taken the reader to?

A. Sorry, no.

Q. But the update regarding the DistroMint platform is the marketing team letting everybody at nChain that receives the marking newsletter that the work its been doing on the DistroMint platform included, for example, adding an AI recognition toolkit?

A. Yes.

Q. This marketing newsletter is also letting everybody at nChain know that the team has enabled the DistroMint platform to have music distribution allowed artists to deploy their music to record labels?

A. That's what it's saying.

Q. But these are -- these statements that nChain was -- the marketing team was broadcasting it to all other nChain people that received the newsletter?

A. Yes.

Q. All right. I'm going to mark Exhibit 15. And I'm going to go back to topic 3, communications regarding Mr. Ager-Hanssen.

(Plaintiff's Exhibit No. 15 marked.)

BY MR. RISPOLI:

Q. This will be Exhibit 15. All right. Exhibit 15 begins on Bates label NCH5975. And this is a email from Eric to you and Mr. Ager-Hanssen, correct?

A. Correct.

Q. And this would have been September of 2023?

A. Correct, yes.

Q. In the email Eric is sending to you and Christen, he's referencing that he made contact with Derek Sivers, who was associated with Discoid, Tunecore and CDbaby; is that accurate?

A. That's what he's saying.

Q. And then's he asking later on, "I would like some advice on how to respond," giving you a sample response to review, correct?

A. Correct.

Q. Do you remember this email with Eric?

A. I do, yes.
Q. And do you remember how you responded to him?
A. I don't believe I did.
Q. Okay. If you look at the sample text that he provided, he refers to Christen as his "business partner," correct?
A. He does, yes.
Q. And then he refers to you as "our legal," correct?
A. He does, yes.
Q. And then provides a link to the development site for DistroMint?
A. Correct.
Q. So again, at least at this point with this email in September of 2023, nChain was aware that Eric was reaching out to individuals in part to promote the -- or reaching out to other third parties to promote the DistroMint platform?
A. Correct, yes.
Q. Did you ever do anything to, you know, clarify or dissuade Eric from referring to you as his legal person?
A. No, I did not.
Q. Do you know what he meant when he was referring to you as "our legal"?

A. No.

Q. Okay. Did you personally do anything to dissuade Eric from referring to Christen as his business partner with respect to DistroMint?

A. No, I did not.

Q. Do you remember anyone at nChain organization doing anything to dissuade him from referring to Christen as his business partner in the context of DistroMint?

A. Not that I'm aware of, no.

Q. Again, in this email to you and Christen, the last line from Eric is that, quote, I value our partnership and I appreciate everything you do for me, end quote. Do you see where I read that?

A. I do, yes.

Q. Did you ever respond to him, you know, telling him, hey, just so you know, when you say partnership, that's only a very loose definition of the term and doesn't carry any legal meaning whatsoever?

MR. RUOCCO: Object to form.

THE WITNESS: No, I did not.

BY MR. RISPOLI:

Q. Did you ever do anything to have any further discussions with Eric about using the term "partnership" to describe how he felt about you, Christen, or nChain?

A. Not that I recall, no.

Q. All right. I don't think I put this one up. Let me double-check. I'm going to mark -- I'm just trying to get through some of these emails with Christen before we go on our break.

(Plaintiff's Exhibit No. 16 marked.)

BY MR. RISPOLI:

Q. I'm marking this as Exhibit 16, which begins with NCH 5975 -- sorry, NCH1957. This is a -- at the bottom of this page is an email from Eric to Mr. Ager-Hanssen regarding an invoice from December 12, 2022, through January 12, 2023?

A. Yes.

Q. And in that email, Eric is giving Mr. Ager-Hanssen both the name of his Georgia bank and the address and routing and account numbers?

A. Yes, he is.

Q. So at this point, at least in January 5 of 2023, nChain was aware that in working with Eric, they were working with a Georgia resident with a Georgia bank account?

A. Sorry, based on that, that's showing the bank details in Georgia, sorry, with a Georgia resident part.

Q. Sure. At minimum with this email, this company was aware it was at least working with Eric, who was going to be receiving payment for services at a Georgia

bank; fair?

A. Yes. Yup, that's fair.

Q. And Mr. Ager-Hanssen forwarded this email to Andy Moody, right?

A. He did, yes.

Q. I'll mark -- where are we -- Exhibit 17, and we can take a break after this one.

(Plaintiff's Exhibit No. 17 marked.)

BY MR. RISPOLI:

Q. All right. This is Exhibit 17, Bates labeled NCH5979. And this is -- does this look to you to be another email similar to what we discussed in a previous exhibit about the status reports for project delivery?

A. Similar, yes.

Q. Okay. And Mr. Ager-Hanssen is included in this email, a recipient of the email, correct?

A. He is, yes.

Q. And I'm sorry, who is Brian Baker again?

A. He headed at this point the project management team in the UK.

Q. And in this email from Brian, even he, in sending it out to Mr. Ager-Hanssen, used both Christen's nChain.com email address and his CustosGroup.com email address, correct?

A. Apparently so, yes.

Q. But is it apparently so or is it actually so based on looking at this email?

A. It's actually so.

Q. If we scroll down to -- I want to say this is page 2, Bates labeled NCH5980, we see under Special Ops, DistroMint; do you see that?

A. I see that.

Q. And so at that stage, it was ready for, at least based on this email, implementation and release?

A. So this is talking about the technical readiness of the code. Obviously, it doesn't talk to the legal issues remaining outstanding that needed to be solved.

Q. At minimum, then, from a technical aspect, the site was -- or the project was ready to be released publicly?

A. Once we got past the legal issues, which would have resulted in changing to the -- changing the various accounts involved, but this is talking about technical readiness.

Q. Let me ask it this way. Well, first, the stage was that it was at the technical stage of implementation and release, correct?

A. Once again, subject to the various changes, but yes.

Q. And the green status bar indicated that it --

that stage was complete from a technical standpoint?

A. I don't think it would demonstrate that it was complete. It's just demonstrating that there are no issues.

Q. Okay. Now, what do you think that the -- what is nChain's position as to what the green status bar would mean under the status column?

A. It's is a -- it's a RAG status, so red, amber, green.

Q. Sorry, what was that?

A. It would be a RAG status, so red, amber or green. So red, needing attention. Amber, sort of issues to solve. Green, no issues to solve. But this is on a technical front.

Q. So let me give the company a hypothetical. If at this point in September 22nd, 2023, there was a DistroMint entity incorporated in British Virgin Islands and the Restructure Proposal was agreed to by Eric, then there would have been no impediments to a full launch of the DistroMint project?

MR. RUOCCO: Object to the form.

THE WITNESS: Assuming no other issues came out. I think that's saying that on a technical level, that site would have been operational.

BY MR. RISPOLI:

Q. But from an overall complete level, it was technically ready to go and had the platform been incorporated by that point in BVI and the Restructure Proposal agreed to, it would have been ready to be released into the public?

MR. RUOCCO: Object to form.

THE WITNESS: Yeah, by linking this to the Restructure Proposal, then that requires completion of all documentation process involved with that as well, which obviously involve negotiation agreement of those documents.

BY MR. RISPOLI:

Q. Well, sure. But if the terms were agreed to in the Restructure Proposal by this point, September of 2023, would the follow-up documentation set forth the Restructure Proposal, you know, in a contract being executed and the platform being incorporated into BVI, there was nothing that would have prevented, from a technical standpoint, the platform to go into public operation?

MR. RUOCCO: Object to the form.

THE WITNESS: I think it's saying here there is a -- technology are indicating that there is nothing more that they need on the technology front.

So if you look at the status column there where

it's in green, so these don't skip past the proposal -- use that as example. So I think that the fourth one down, "proposal awaiting feedback from client" has got a green status. That's indicating there is nothing required to be done by the technology team.

BY MR. RISPOLI:

Q. Does, for DistroMint, the fact that its blank in the fourth column, indicate also there is nothing to be done by the technology team?

A. Brian's not raising issues that are outstanding.

MR. RISPOLI: Let's go off the record.

THE VIDEOGRAPHER: We're now off the record. The time 12:50 p.m. Eastern Time.

(Break.)

THE VIDEOGRAPHER: We're now on the record. The time is 1:00 p.m. Eastern Time.

BY MR. RISPOLI:

Q. I'm going to mark Exhibit 18.

(Plaintiff's Exhibit No. 18 marked.)

BY MR. RISPOLI:

Q. And this so you know, Mr. Evans, addresses the topics regarding 1, 3 -- 1, 2 and 3, kind of all together. If I go down, this starts at Bates label NCH1989. If I go to, let's see, all the way to the

bottom, I think we have already discussed -- maybe this was the wrong exhibit.

Maybe I already marked this one, but we're going to have it marked here as well. At the top of this email, do you see -- this was from Mr. Ager-Hanssen to Simon Wood with Andy Moody copied?

A. Yes, I see that.

Q. And the fact that it's coming from Mr. Ager-Hanssen's Custos Group email, I mean -- well, you see how this email is from Mr. Ager-Hanssen's Custos Group email address?

A. I can, yes.

Q. So nChain agreed that its directors and officers and other employees, like Mr. Wood and Mr. Moody, were aware that they might receive communications from Mr. Ager-Hanssen regarding nChain matters from the Custos Group email address?

A. Yes, I think that's fair.

Q. The reference here to mystampli, is that the payment system that you had described earlier?

A. Correct, it's the invoice management system.

Q. What I wanted to ask you a question about was do you see the reference here to the payment report?

A. I do.

Q. I'm going to stop presenting this and mark these

next two exhibits as page 1 and 2 of Exhibit 19.

(Plaintiff's Exhibit No. 19 marked.)

BY MR. RISPOLI:

Q. All right. Here's page 1 of Exhibit 19. Would this be an example of the -- of what the Payment Detail Report was that was referenced in the email we just discussed in Exhibit 18?

A. Yes, I imagine so.

Q. So the information from the -- that was provided by Eric regarding his bank, Renasant, would have been inputted into -- I guess is it inputted into Stampli and then Stampli translate all the information into the Payment Detail Report; is that accurate?

A. No, I don't think Stampli is that sophisticated. It's just the -- it's just the invoice management system. The payment -- payment instructions to the bank would have been completely separate.

Q. When it goes -- when we're seeing here the debit account, the reference to nChain Ltd, is that nChain UK Ltd?

A. That's correct. That was the company's old name.

Q. And the beneficiary in this case likely we saw with the invoices submitted by Eric would have been Sound Alive Enterprise LLC?

A. Correct.

Q. This account number, is this a bank account number or an internal account number for nChain?

A. I don't know. Sorry. It looks like it's a beneficiary account number.

Q. As in the bank account number for Sound Alive Enterprise LLC, who is the -- as it relates to the beneficiary bank?

A. I believe so. I'm not seeing elsewhere where there is an account number that would otherwise fit that bill.

Q. And this matches the USD amount of $12,500 for the monthly consulting services that Eric would invoice?

A. Yes, it's 12,500.

Q. Okay. The audit information here, do you know the purpose for the involvement of Mr. Grosvenor on -- as it relates to this payment?

A. So Harry Grosvenor was a member of the finance team. I think what that's auditing is showing who was involved in putting together the payment instruction to the bank.

Q. So he -- was Harry also on -- well, I think I just misread this. What's the username? What does that mean?

A. nChain HG I'm thinking is nChain Harry

Grosvenor, because you can see further down nChain SW would be nChain Simon Wood.

Q. And does this mean that the approval was required by both Harry and Simon?

A. No, that's showing that the payment instruction was entered by Harry and then you've got the approval there from Simon.

Q. Okay, I see. Entered by Harry, approved by Simon. The approval process is going according to the way you described in your earlier testimony today?

A. So this is, I imagine, bank approval process. So the bank account will have various people who have entered as able to approve -- approve payments.

Q. And Simon Wood was one of those people that was able to approve payments?

A. Yes.

Q. And I'm just going to present page 2 of Exhibit 19. Do you have any -- this is NCH1985. Do you have any understanding as to why there is an additional five approvals for Simon Wood?

A. It appears there were issues with the payment based on the fact of the number of approval attempts there.

Q. Okay.

A. 5:38 is strange.

Q. But would -- when we see these Payment Detail Reports in Exhibit 19 for other payments in response to Eric's invoices submitted, you would expect it to go by this process that we see described here in the report in Exhibit 19? Maybe barring why there was six approvals for Simon would be the only difference.

A. Depending on who entered the payment instruction to the bank, whether that was Harry or whether Simon or whether somebody else in the team did it.

Q. But generally, nChain would answer the same way for the structure of how the Payment Detail Report is created?

A. Sorry, I don't understand the question.

Q. Sure. For all of these Payment Detail Reports that may have been produced, the process that we went through here in Exhibit 19 would generally be the same for every single payment that was going out to Eric in relation to the invoices submitted?

A. I would expect so when you're using Lloyds Bank, yes.

Q. All right. I want to move on to topic No. 8, which was labeled intellectual property patents and assignments.

Again, your preparation for this topic was the same you have described for the other topics in terms of

the document review process that you undertook?

A. That's correct, yes.

Q. As a general matter, was there a nChain affiliate called nChain Patents Pool?

A. No, that's not describing an entity.

Q. Have you ever heard that term used before, "nChain Patents Pool"?

A. Yes, I think that's -- yes.

Q. How would you describe what your understanding is of that term, "nChain Patents Pool"?

A. There was a previous transaction where we had looked at the idea of patent pooling with a third-party provider. I imagine that's what the nChain Patents Pool is referring to.

Q. During the relevant time period, did nChain have a patent portfolio that consisted of thousands of patents?

A. NChain Licensing AG had, yes, a large number of patents.

Q. Was there an agreement between nChain Licensing AG and nChain similar to the Service Agreement for use of the patents in the nChain Licensing AG portfolio?

A. Not that I'm aware of, no.

Q. Did nChain have access to be able to utilize the patents held by nChain Licensing AG?

A. That would have all depended on an agreement-by-agreement basis.

Q. It sounds like you're aware that there was the option for nChain to license patents in the portfolio of nChain Licensing AG?

A. nChain licensing AG would enter into licenses, yes.

Q. With nChain?

A. In various agreements.

Q. I guess personally, your involvement at nChain, did you have any interaction with utilizing patent licenses?

A. Yes.

Q. Can you just maybe give me a general description of your involvement with patent licensing while you were at nChain.

A. So the primary example during the period in question was the, once again, the twenty-ten deals, the license-for-equity deals, where nChain Licensing would varietate license over a portion of its patent portfolio to the investee company in return for a license fee or a license commitment fee and ongoing royalties.

Q. Was nChain aware that a General Power of Attorney was executed by Eric to the law firm Page, White & Farrer, LLP?

A. Yes, I think we were in copy on that, yes.

Q. Was that the recommendation of nChain to Mr. Finnerud to execute that General Power of Attorney?

MR. RUOCCO: Object to the form.

THE WITNESS: I don't know whether there was any recommendation involved. Obviously, this was -- we put Eric in touch with Page White. Page White then provided Eric with their terms of business and a power of attorney, which would allow them to act on his behalf.

BY MR. RISPOLI:

Q. And any services that any attorneys at Page White provided regarding services for Eric would have been billed to and paid for by nChain?

A. That's correct, under that agreement, yes.

Q. During the, you know, the relevant time we have been talking about, what were the law firms that nChain engaged in for intellectual property legal services?

A. Obviously, Page White. We saw the name Murgitroyd as well. The -- I don't remember the name of the firm that was ultimately used by Page White for filing in the U.S., but nChain Licensing has patents in a number of jurisdictions.

So it has quite a number of law firms that act for it because you need attorneys filing for you in the

various jurisdictions.

Q. Was there -- as part of this involvement of third-party intellectual property law firms with Eric and DistroMint, was nChain Licensing AG involved at all?

A. No.

Q. Did a credit agreement exist between nChain and nChain Licensing AG?

A. You mean -- sorry, what do you mean by credit agreement?

Q. Was there an agreement between the two organizations where patents could be used as collateral?

A. Remind myself of the position there. I don't believe so, no. For nChain UK, no.

Q. Do you -- do you have any knowledge personally if nChain Licensing AG had a credit agreement, any type of credit agreements in place where it used -- it could use -- draw on credit using patents as collateral?

A. Yes.

Q. As part of your -- your personal job responsibilities kind of that we discussed yesterday, would any of that involve, you know, work done that might impact or be related to patents owned by nChain Licensing AG?

A. Yes.

Q. Would there have been an attorney-client

engagement agreement with Page White and Eric and nChain?

A. I'm not sure if there was a tri-part agreement. Obviously, the agreement with power of attorney -- I think power attorney referred to taking instruction from nChain and obviously invoicing nChain. I don't recall us being party to the -- part of the terms of business.

(Plaintiff's Exhibit No. 20 marked.)

BY MR. RISPOLI:

Q. I'm going to present Exhibit 20. And I apologize this is not the Bates labeled version, although I will represent that this exists in production between the parties as a Bates label.

Does this look like the General Power of Attorney document that Eric executed for Page White & Farrer that we were discussing?

A. Yes, it does.

Q. If we go down to page 2 under Other Matters, it states that the firm is referred to as PWF, that Eric authorizes PWF to take instructions from nChain Ltd and nChain Licensing AG relating to all matters in relation to patent applications and patents owned by Eric. Did I read that correct?

A. You did, yes.

Q. So -- and nChain Ltd ultimately became nChain UK Ltd, correct?

A. Yes. They're using the old name.

Q. And so is there -- would this be a document that would be given to nChain to store in its filing system, for example, in SharePoint?

A. I'm not sure ultimately where it would be -- where it would be stored.

Q. But would there be a mechanism for nChain to ensure that a -- you know, when it started working with Eric regarding his provisional patents that a power of attorney was executed for an outside legal firm?

A. This was a document that was produced by Page White.

Q. Well, what I'm wondering is, in this document there were -- there is a reference that Page White is allowed to take instructions directly from nChain, correct?

A. Correct, yes.

Q. And in the matter regarding DistroMint, nChain did have discussions with attorneys at Page White regarding the prosecution of Eric's provisional patents, correct?

A. Correct, yes.

Q. So is this something that -- is the power of attorney something that would have been provided by Page White to nChain?

A. They could well have sent us a copy because we're ultimately footing the bill.

Q. And the very first line of this power of attorney indicates that Eric's residence is in Lawrenceville, Georgia, correct?

A. Correct, yes.

Q. Just as a general matter, when nChain is undertaking this project with Eric, would there have been like a type of cheat sheet, whether in Word or Confluence, that, you know, listed Eric's name, you know, his identifying information, like his street address, that sort of thing?

MR. RUOCCO: Object to form.

THE WITNESS: There could well be documents that include information that was available to the company.

BY MR. RISPOLI:

Q. Would that be something that might just be like a Word file stored or do you know if there is a place in the Confluence project management software that would have that type of information?

A. I don't know whether -- the format of it in particular, no, sorry.

Q. Just from your own personal experience, did you use the Confluence system?

A. No. Sorry, just to clarify, no, I don't believe I ever put anything on it. I would have viewed various pages.

Q. Did nChain utilize the staff it had in its IP department to assist in prosecuting the provisional patents that were related to the DistroMint project?

A. In the sense that they took the provisional patents application and then reviewed the technical work that had been done by nChain Slovenia and then fed that to the external patent attorneys who ultimately draft the patent application, the full patent application.

Q. Who at nChain monitored the progress of the patent application for Eric in this case?

A. So we would have received feedback from Page White as the -- as the patent application was reviewed.

Q. For any of the filing fees -- well, was this patent being pursued in U.S. Patent and Trademark Office?

A. I believe so, yes.

Q. Do you know if it was being pursued any -- under any other jurisdictions?

A. I'm not sure whether there was P -- I'm sorry, the international -- was it Patent Corporation Treaty Company, PCT. I'm not sure if there was further international filing or not.

(Plaintiff's Exhibit No. 21 marked.)

BY MR. RISPOLI:

Q. All right. I'm going to mark as Exhibit 21, this begins Bates labeled NCH5529. And is this an email from Arthur Roberts to attorneys and staff at the law firm Murgitroyd?

A. It is, yes.

Q. And this would be July 10, 2023?

A. Yes.

Q. And you were cc'd on this email, correct?

A. I was, yes.

Q. Do you remember reviewing the attachments listed here in this document?

A. At the time, not particularly.

Q. If I, let's see, scroll down. I don't know if you need to read this all the way, but as a general matter -- or as a general question, would nChain agree that this email is discussing steps that Arthur Roberts is communicating to the lawyers at Murgitroyd regarding the prosecution of Eric's provisional patents?

A. Yes, he's seeing if they can do the work.

Q. Was there ever an attorney-client engagement entered into between nChain and Eric regarding his provisional patents?

A. Not that I'm aware of, no.

Q. Would nChain have any -- undertaken any steps to

alert Eric of the potential conflicts of interest that could arise between Eric and nChain regarding the work nChain was directing on -- regarding the patent prosecution?

MR. RUOCCO: Object to form.

THE WITNESS: Sorry, you're going to have to explain the conflict there.

BY MR. RISPOLI:

Q. Sure. Have you ever heard of the term "conflict of interest"?

A. I have, yes.

Q. At this point in time, would you have been aware of the conflict of interest professional rules governing attorneys licensed to practice in the UK?

A. Very broadly as part of the solicitor's regulation, but keep going.

Q. I mean, are you aware that -- well, does nChain agree that in a situation with -- well, let me back up a little bit more.

At this point in July of 2023, what was nChain's position on who owned the provisional patents originally filed by Eric?

A. It was Eric's.

Q. Was there any intention at this point, you know, in July of 2023, that Eric would transfer any of these

patents over to the DistroMint project?

A. I don't believe so because a transfer wouldn't have ultimately been required.

Q. What was nChain expecting to receive in consideration for the resources they were deploying to assist Eric in prosecuting this patent?

A. This falls into the same -- the same bucket of actions which we were undertaking in pursuit of a future agreement.

Q. In terms of utilizing third-party IP counsel, was there any particular grading system that nChain used in selecting outside intellectual property counsel?

A. Not that I'm -- not that I'm aware of, no.

Q. Was there any analysis that nChain engaged in to determine the quality of the patent counsel that it would select for assistance as outside counsel?

A. We would have chosen counsel that we were comfortable with, had a lot of experience in prosecution of patents on our own behalf of nChain Licensing. So would have had plenty of time to figure out the firms that we -- the firms that we liked.

Q. I mean, would it be a fair characterization to say that in selecting outside IP counsel, nChain wanted to use the best in class?

A. I'm not -- it's -- I don't know whether best in

class, what that actually ultimately -- ultimately means here. We've got ongoing relationships with firms that we are happy with. I'm sure we would change firms if we're not happy.

Q. So any of the outside counsel that were utilized with respect to Eric's patent prosecution would have been only those firms that nChain was still happy with at the time; is that fair?

A. The firms that we were happy to do the work for our own patents as well.

Q. All right. I'm going to move to -- hopefully this is my last set of questions regarding topic 5, the Restructure Proposal. All right. I'm going to put up Exhibit -- where are we -- 22.

(Plaintiff's Exhibit No. 22 marked.)

BY MR. RISPOLI:

Q. Let me see if I can find the right one. All right, I found it. Sorry, before -- one more question on topic 8 related to intellectual property. Let me introduce this as Exhibit 22, which begins with Bates labeled 6724.

Now, if I scroll down to the bottom of this page -- sorry, if I go up to page 2, this is Bates labeled NCH6725. This is from Thomas Mahon to Arthur Roberts, who was in the IP department at nChain, correct?

A. That's correct, yes.

Q. What's the patents@nChain.com email address?

A. That would most likely be a group -- group email address.

Q. So, for example, that might include Arthur Roberts?

A. Correct, yes.

Q. And this email from Mr. Mahon at Page White to Arthur Roberts is a discussion regarding the DistroMint patent application?

A. Yes.

Q. Okay. And it's discussing Mr. Mahon's review of the application and interaction was the USPTO's examiner?

A. If it's the USPTO, but it's talking about a discussion with the examiner.

Q. I guess can you tell if this is based on the terminology used for the application number, if this is the USPTO or a different jurisdiction's patent office?

A. So the EPO, I think that's talking about the European Patent Office.

Q. Oh, down here, "that has been issued by the EPO?"

A. Yeah.

Q. So would this information that Mr. Mahon was providing to nChain have been communicated by nChain to

Eric?

A. Yes.

Q. Okay. If we scroll up, you see here that we have two sections that are redacted for privilege?

A. I see that.

Q. Okay. And these are all -- the subject is the same subject as Mr. Mahon's, the subject he used in his email to Arthur and the nChain patents group?

A. The subject line of the email -- if you scroll back up --

Q. Sure.

A. So yeah, the same line.

Q. And nChain would agree that in this situation with Mr. Mahon, Eric was a client of Page White, correct?

A. Yes.

Q. Does the basis for the privilege redaction here have anything to do with the legal advice that was being provided by Mr. Mahon?

MR. RUOCCO: Dale, I'm going to caution you again as it relates to an attorney-client communication, legal services provided to the company, don't answer. There is a privilege log description for this document and privilege log ID 409 in our privilege log.

BY MR. RISPOLI:

Q. Just for the record, Mr. Evans, you're going to follow the instruction not to answer the question?

A. Yes, I am.

Q. All right. Let me move to -- back to topic 5, which was regarding the restructure agreement. I'm going to introduce Exhibit 23.

(Plaintiff's Exhibit No. 23 marked.)

BY MR. RISPOLI:

Q. This starts at NCH7250. And do you see -- I'm going to go to the original email at the bottom on page 4, which is an email from you to Eric cc'ing James Marchant regarding the Restructure Proposal, correct?

A. Yes, from me to Eric and copying James, yes.

Q. And the Restructure Proposal was attached to this email?

A. It was, yes.

Q. And the reference to the Restructure Proposal being signed off meant that nChain had reviewed the Restructure Proposal and authorized the terms contained in it to be presented to Eric?

A. That is correct, yes.

Q. Does that mean that if Eric was happy with those terms in the Restructure Proposal, nChain would have -- the next step would have been to draw up documents reflecting the terms of the Restructure Proposal for the

parties to sign?

A. Yes, that would be my expectation.

Q. If I scroll up to this email from Eric to you, do you remember the discussions you had with Eric where -- this email, where he was asking whether his payments were going to be withheld until he agreed to the terms in the Restructure Proposal?

A. I remember this email, yes.

Q. Okay. Regarding this -- sorry, regarding this email from you to Eric December 14, 2023, do you believe that you had this conversation with Eric at 5:30 p.m. UK time?

A. Probably at that time, yes. I don't think it moved.

Q. This email the following day in the same chain as the communications you and Mr. Marchant were having with Eric, do you see in this email that Olga Fernandez is now included?

A. I can see that, yes.

Q. Just trying to clear up maybe some testimony from yesterday. So did Olga Fernandez work at nChain at this time period?

A. She was back in as head of legal providing legal services. Yes, head of legal to the company.

Q. Did she come back to work -- so would she have

been an employee at nChain at this point?

A. I'm not sure about her employment status, sorry.

Q. Being head of legal with an nChain email address, if she wasn't an employee, what other way would she have been categorized?

A. She was either a contractor or -- yeah, contractor or services agreement elsewhere.

Q. Just as a general matter for contractors if they were working under a contract with nChain, would they typically get nChain email addresses?

A. Yes, I believe so, yes.

Q. Do you know if Olga was also working -- [redacted]

A. I think she was at this time, yes.

Q. [redacted]

A. Yes, it is.

Q. I know that this is redacted for privilege and attorney-client privileges claimed, but without getting into the substance, the topic of the discussion was related to the Restructure Proposal?

MR. RUOCCO: Dale, you can answer that yes or no without revealing any privileged information.

THE WITNESS: Yes.

BY MR. RISPOLI:

Q. Do you remember when your last contact with Eric was?

A. I believe it was the 18th of December.

Q. Do you remember what the substance of that communication was about?

A. Yes, I do.

Q. What was it about?

A. So I called on the 18th to confirm that we were paying the outstanding invoices that -- the invoices that were outstanding at that time and to apologize for my inability on the call on the 14th to confirm at that time that we would be paying those invoices.

So, yeah, on the 14th you saw the email from him where he asked the question whether or not the execution of the Restructure Proposal was tied to payment of his invoices.

When I called him to understand of the -- his reading of that -- that document, I didn't realize that I didn't have necessary approval at that time to pay the invoices separately from the restructure, that I hadn't sought approval for those as separate -- as separate items, therefore couldn't tell him on that call that the invoices would be paid.

That's when I got approval for payment of the invoices and that was the subject of the call on the 18th, to say that they had been paid and to apologize for -- apologize for that -- the authorization I put myself in on the 14th.

Q. Was there any discussion regarding the status of the DistroMint project?

A. On the 18th or the 14th, sorry?

Q. Let's start with the 18th.

A. Not that I recall expressly.

Q. Do you remember if there was any conversations about the status of the DistroMint project on the December 14th meeting?

A. No. This was focusing on the Restructure Proposal and -- on both calls. So the call on the 14th, when I was trying to understand Eric's position and how the -- the misunderstanding had arisen as to linking of the payments to the Restructure Proposal, that he wouldn't be drawn on issues that he had with the overall structure because originally he had seemed excited about the idea when it had been described to him in more general terms.

But then on the 14th, he wouldn't be drawing on it for specific items, though did raise concerns about debts being involved in structure.

(Plaintiff's Exhibit No. 24 marked.)

BY MR. RISPOLI:

Q. I'm going to mark Exhibit 24. I think this should be my last exhibit. This beginning NCH1868 is the embodiment of the Restructure Proposal that we have discussed today when we're using the term "Restructure Proposal?"

A. Yes, I believe it is.

Q. What was nChain -- I'll enlarge this a little bit.

A. Thank you.

Q. All right. What was nChain's understanding as to exactly what was being restructured under this proposal?

A. So the left-hand column was demonstrating or trying to describe the position that the parties were in at this point of time in December.

You see it kinds of fits, describing a number of the events that have occurred during the year, a number of events that would occur kind of further down the -- down the track.

So it's describing the steps that we have taken, the steps that would be required in the -- in the future. And then on the right-hand side -- sorry, I have almost lost track of the question.

Q. Yeah, just to remind you, what was -- the question was, what did nChain consider was exactly being proposed to be restructured?

A. Thank you. Apologies. Okay, so it was saying, these are the steps we have taken so far during the course of the year.

We need -- the Restructure Proposal would need to put the proposed project company, which would be owned by Eric, into a position where it would be able to ultimately operate.

So this is describing before and after. So the top paragraph, it's talking about the -- basically the platform assets. So you can see there it's talking about the assignments to the platform company of the interest that nChain has in the platform assets, which really is the -- I think at that point it's talking about the copyrights in the code.

The bit which is pretty inaccurate here is that's not really -- I think at this point probably wouldn't call that 50 percent of the platform assets, given that up until that point that's almost all there is for the platform.

And then talking about if you're putting a platform company, the new platform company into position where it can operate, then to the extent that Eric had

interest in platform assets, so here thinking about the brand name, trademarks, that sort of thing, he would be transferring those -- transferring those across into the -- into the entity.

Sorry, I skipped the part that nChain would be issuing convertible debt in exchange for its transfer of the source code.

Q. And what is meant by convertible debt?

A. So that would be debt that upon certain events would convert into equity of the -- well, normally it's the company that's -- that's issued that debt.

Q. So with the Restructure Proposal that we see here in Exhibit 24, again in terms of receiving authorization by nChain to present it to Eric, who provided that authorization?

A. So on the commercial side, James Marchant and Stefan Matthews.

Q. And nChain in the Restructure Proposal had represented the existence of an oral agreement between Eric and Mr. Ager-Hanssen on behalf of nChain?

A. As we went through yesterday, that's an overstatement of the -- overstatement of the position.

Q. Did you raise with Stefan or James when you were seeking authorization to present this proposal that you drafted that you believe the first line was an

overstatement?

A. No, I did not.

Q. And nChain authorized the statement in the proposal that the agreement referenced in the first sentence was recorded in an email from Eric to Mr. Ager-Hanssen in February 21, 2023?

A. As we have run through that email, is the one that also contains the statement that an agreement would need to follow.

Q. Sure. But the way the sentence is written, it's just referring that the agreement -- well, when we see in the second sentence the term "The Agreement," is it nChain's position that that's referencing to the oral agreement referenced in the preceding sentence?

A. It is linking back to that, which is essentially the agreement to agree being the agreement that you need a further agreement, as referred to in that 21st February email.

Q. And nChain recognized that what's described as the oral agreement and what's described as the recorded agreement regards the development and ownership of the DistroMint platform?

A. Yes, that's what it says.

Q. And the arrangements in this sentence, that was meant by nChain to refer to the oral agreement, the

recorded agreement, and the monthly -- and the, sorry, consultancy services provided by Eric?

A. Arrangements varied. I think it's to be used as a very broad term there.

Q. The purpose was to use the term "arrangements" in a broad definition; is that fair?

A. Yes, describing this as development-for-equity structure. So that would involve all of -- all of the steps ultimately described on the left-hand side below where you can see it come to fruition.

Q. Okay. So one of the things included under the term the arrangements here would include the statements under the Current Position column?

A. Yes, I think that's fair.

Q. And nChain's position was that, taking in all the arrangements and the current position column, a development-for-equity structure had been created?

A. In the sense that we've got all of the steps that need to -- need to be undertaken described on the left-hand side that would ultimately result in the issuance of shares in a company that would need to be formed and need to be agreed, that's -- yeah, that's what's being described as the development-for-equity structure.

Q. Would it be fair to characterize that nChain's

position, at least at this point in time with respect to DistroMint, was that there was a development-for-equity structure between nChain and Eric that wasn't fully finalized?

A. As you see on the left-hand side, there is a number of things that haven't happened, including agreement and formation of the platform company. That's a pretty fundamental step in the process there. So there is an awful lot of items that needed to be agreed between the parties.

Q. I guess what I'm trying to -- maybe if I ask it a different way. Was nChain's belief that a -- steps had been taken to create a development-for-equity structure but the structure was not finished?

A. Each of us had been taking steps which would ultimately put us in a position where we could contribute to the platform company once it was decided.

Q. Did nChain ever communicate to Eric the need for a written agreement regarding the legal structure of the DistroMint entity before the Restructure Proposal was presented?

A. The conversation that I had had with him back in July was looking at what that company looked like. Conversations in June had flagged the issues that we would need to be thinking there and run through the

summary in August. We ran through the various jurisdictions that -- that had been considered.

Q. Just regarding the use of the term "convertible debt," what exactly -- how would that play out -- or what did nChain envision that convertible debt structure playing out in implementation?

A. Could you scroll down to the description of the convertible debt below, please, so I don't talk in theory. I can give you a go, but make sure I can talk to the actual words.

Q. Is this, this bottom right box what you need or do you need me to go down further?

A. I need you to go down to the section entitled Convertible Debt.

Q. We'll start out on page 2. This is the bottom right box that you're looking at under the heading Convertible Debt?

A. That's the one, yes.

Q. Well, let's go section by section. So what did nChain mean with Section A?

A. Okay. So the first thing is this is debt financed to the project company, which is described as one hundred percent owned by Eric.

Section A, so the facility limit is saying that that's the -- the size of the overall facility is

considered fully drawn at day one.

And then so at the $675,000 U.S. Which is consistent with the figures provided on the -- I think on the left-hand side, potentially slightly rounded down.

So as described by the development on the consultancy service fees and the patent cost. So then saying if the project company wanted to borrow more, then that would have to be agreed from time to time. The -- do you want to keep going?

Q. Yeah, let's stop after each section so I can ask you some questions, okay?

A. Okay.

Q. So the point of subsection A, then, would be that all of -- if this term was agreed to by Eric, all of the resources put in by the team at nChain, including nChain Slovenia, was valued by nChain at $675,000 and would immediately be considered debt that the project company would take on at its creation?

A. Yes, that's right.

Q. So another way of saying that is, once the project company was created, nChain would charge the company for all the work it had already completed?

MR. RUOCCO: Object to form.

THE WITNESS: Yes, I think, as it was described in the cover email, the idea would be to reset the

clock as if the project company had been in place from day one.

Obviously, wouldn't be in a position to pay the development time and all the work that had been put in by the nChain Slovenia team and the cost that we had incurred by paying the consultancy service fees to Eric or the cost of the patent assistance that we had incurred during the year.

So yes, that can be treated as a debt owed by the company but on convertible terms.

BY MR. RISPOLI:

Q. What does that mean, convertible terms?

A. So that's what you get into the description below in (b).

Q. Before we get there, what sources did nChain rely on to come up with the $675,000 figure?

MR. RUOCCO: Dale, similar to yesterday, I caution you if you can't answer the question without revealing the substance of legal advice or legal services provided to nChain, don't answer it. But if you can, go ahead.

THE WITNESS: So the 675, so the consulting services fees, that's I believe we put at 150,000. I'm not sure whether it included the expenses that included in there, which that's right or wrong.

The patent costs were based on the -- the invoices that we paid there. And the development time, as we talked yesterday, is based on hours recorded by the development team.

BY MR. RISPOLI:

Q. What was the source used to determine the development time?

MR. RUOCCO: Dale, same instruction I just gave you.

THE WITNESS: Yup, I'm going to follow that.

BY MR. RISPOLI:

Q. So just to be clear, for the sources used to determine what the development time was, nChain can't identify any non-privileged sources that would address that line item?

A. The preparation of this document, yeah.

Q. All right. Let's see. It goes to -- let's do (b)(i), if you could explain what nChain meant by the information proposed in section (b)(i).

A. Okay. So following paragraph A, you've got a loan which is drawn at $675,000. So this is -- so paragraph 1 is talking about a qualified financing. So that's talking about where the project company raises financing from a third-party source on genuine terms and definition of qualified financing would normally require

that to be of a certain size to make sure that it's -- of a believable valuation that's being applied by that third party. So it's a genuine fundraising.

And then the conversion of the 675 would occur at a 20 percent discount to the -- the price implied by that qualified financing. So qualified financing, the shares would have been issued in the company on the basis of whatever value the incoming financier agreed with the project company.

This is saying we would -- converted a discount to -- to that price per share, or the lower of that, or the valuation cap of $10 million.

Q. And the determination of the agreed valuation cap of $10 million US was an arbitrary number selected by nChain?

A. That's correct, yes.

Q. There's no -- nChain can't point to any non-privileged sources that it used to determine the valuation cap of $10 million?

A. That is correct.

Q. Can you tell me how this would work in practice if this -- these terms are agreed to and Eric wanted to convert the entire $675,000 number to -- wanted to, you know, convert the debt, the entire debt?

MR. RUOCCO: Object to form.

THE WITNESS: There is not an optional conversion of the companies option included in this. What paragraph 1 is talking about there is if the company has raised financing from third-party sources, at that point we say, okay, we can see the price that they're raising, they're prepared to invest in the company.

At that point our debt would convert depending on whichever was the lower of the 20 percent discount to the price that that third party had come in at or the agreed valuation cap.

So there isn't a free option for the company just to say, I would like to convert at this -- at this point in time and this value.

It had to be driven by a third party -- third party qualified financing.

BY MR. RISPOLI:

Q. The subsection 2 on the next page, NCH1870, is that -- can you explain what nChain was meaning to convey in that section?

A. Yes. So, okay, if you hit maturity date and haven't an automatic conversion in paragraph 1, then at that point nChain would have the option to decide to say actually, yes, we are prepared to convert that debt into shares and the project company at the lower of the $10

million number or fair market value, fair market value would need to be determined at that point in time or require payment in cash.

So if conversion hadn't occurred, we have the various options available to us, either repay us in cash or we're prepared to convert at the fair market value at the agreed valuation cap.

Q. And as you mentioned, nChain -- if these terms were agreed upon, nChain would have created a more detailed document further defining these terms; is that fair?

A. Yes, absolutely.

Q. For example, the future agreement would actually have a maturity date listed, correct?

A. Correct, yes.

Q. The percentage of interest for the loan or for the debt held, there would be an interest percentage designated?

A. It would. So if you scroll further down, you'll see there is kind of the initial inputs there were suggested.

Q. So under subsection C, the interest rate would start out at zero to June of 2024, and then set to 7 percent going forward?

A. That's correct.

Q. And the maturity date would be 12 months from the date the restructure agreement was signed?

A. Yes, you would expect to sign all of these kind of effective the same date.

Q. Just in general, how would nChain have gone about determining the fair market value of the company had it been required to do so under subsection two?

A. Ultimately -- okay, it really would depend on the situation of the company at the time. And most likely, the language that would have been used there would be a fair impact value agreed between the parties, which is not a great position because that's ultimately an agreement to agree buried in your document.

But given the -- given rights in there, it's an option to -- to include in the -- include it in the documentation.

Q. Would it be fair to generally characterize this Restructure Proposal as another example of an agreement to agree?

A. Well, by the time you've got the -- sorry, the agreement -- sorry, the Restructure Proposal or were you picking on the debt there?

Q. No, just the Restructure Proposal in general, would it be fair to characterize it as an example of another agreement to agree?

A. There were plenty of terms that would still need to be -- still need to be finalized in the detail. So yes, that's I think in the covering on the 14th it said, if you are happy, we will move to documentation. That's where all of this detail would have come through.

Q. Were there any particular companies or services that nChain utilized with other projects or investments to engage in fair market value assessments?

A. Not that I'm aware of, no.

Q. Could you explain what was meant to be conveyed by nChain in subsection 3?

A. Okay, so this is -- this is talking about effectively liquidation and monetization event at the project company.

So if Eric is the owner of that company at that point in, assuming he's still one hundred percent because there was no controls around that, if he sold the company or its assets, so sale of the company or its assets, business sale or a liquidation of the company, then at that point in time, that calculation is to effectively give us the option to say whether it would be -- we would want the 675,000 or it goes through a calculation to see what would have happened had a conversion event occurred.

So take the 675, convert into shares in the project company, see what gets spit out by that

calculation of the lower of the agreed market value cap and the fair market value, but also knowing at that point in time that you have just sold the company or its assets or it's being liquidated so you've got that number.

So that's a much easier one. You've got a cashout you can point to there that gets you the numbers.

Q. Regarding these sections below the table Expenses, what was considered to be included in the term "Expenses" in relation to each party?

A. So if -- if there were expenses involved in drawing up the transaction documents or in execution of it, then they would be for the -- for each of the parties to meet.

Q. So the reference to transactions was any of the anticipated agreements that would flow from the basic structure of this -- of the restructure proposal?

A. Yes, if there were going to be costs associated with -- costs associated with execution of that, then that's saying each party bears its own cost.

Q. But if we go down to legal effect, nChain had recognized again that was a proposal and, even if agreed to by nChain and Eric, was neither legally binding nor bearing any legally enforceable, rights?

A. Yes, until you -- until you actually got the documents that -- that would flow from this, then yes,

that's what it's saying.

Q. The section on governing law, this was -- I guess was this the first time that nChain had ever presented information to any intention to Eric that it would seek to have any issues arising out of the DistroMint project governed under English law?

A. Yes. We hadn't had previous detailed documentation provided. I think that the only previous time there would have been reference to England and Wales, if you remember back in, I think it was -- it was in July that we got the structure chart that I talked Eric through.

There was reference in there to a UK company. It's a bit of a stretch, but I think this was the first time we had a detailed document put in front of him.

Q. I can't remember, did you actually spend time discussing Exhibit 24 with Eric?

A. So the Restructure Proposal? We had -- sorry, no, I think is the short answer there.

Q. All right. Just going back up to page 1, I just want to focus on the information under the Current Position column.

Under the heading of Shared Ownership of the Platform, nChain's current position was that nChain and Eric were 50/50 owners of the DistroMint platform?

MR. RUOCCO: Object to form.

THE WITNESS: As I said yesterday, this is ultimately overstating it, kind of linking it to the right-hand side, that's really talking about the platform assets.

As I said earlier, you've got the code that we've got in there the platform assets and then describing the various pieces that Eric had on his side. So the -- the provisional patent, then the -- I suppose the brand, the brand trademark pieces.

BY MR. RISPOLI:

Q. When you were drafting this document but before it was approved in the manner we have already discussed, did you believe you were overstating this first sentence as you were drafting it?

A. I was trying to describe briefly as possible the position and then to say on right-hand side it gives you the -- more of the kind of detail of what that was trying to achieve or what it was trying to describe.

Q. I'm just trying to find out in -- as the corporate representative of nChain, the position of nChain with regard to this first sentence, you know -- well, I guess I can't do that. That I'm highlighting right here, nChain's position is that this is an overstatement; is that fair?

A. It's not -- it's not an accurate or super accurate statement given that if you look at the DistroMint platform at that point, saying 50/50 doesn't reflect the fact that you would probably see the value of the source code is probably greater than the provisional patent at that point in time.

The value of the brand trademarks, once again, until you have started operating, you're not going to be putting numbers against that. So that's why I say it's not particularly accurate in that -- that statement.

Q. So when you -- and I understand now that that's nChain's position. When you personally wrote this, did you also feel it was an inaccurate statement?

A. I would say it's trying to describe the position in a way that then made sense on the right-hand side. So, no, I wasn't trying to mislead or anything like that.

Q. I guess, looking back, as you sit here today, do you think there was a better way you could have written that first sentence?

A. If you're trying to do a two-page document to describe 11 months worth of interaction, sure, I'm sure there would be better ways of writing it.

Q. Why didn't you decide to put any language in here, especially up at the top of the recitals, to the extent the email of February 21, '23 is not an agreement

and reference the need for a further agreement in writing that never happened?

MR. RUOCCO: I just caution you, Dale, you know, on the basis of privilege in your response, don't divulge any legal services or legal advice provided to nChain. If you can otherwise answer, go ahead.

THE WITNESS: Yeah, I think we're getting into the question of the thought process there.

BY MR. RISPOLI:

Q. Well, I'm just asking right now your own thought process. Because I think from my understanding, you had drafted this -- did you have draft this Restructure Proposal on your own?

A. I did, yes.

Q. So you had drafted it before you spoke to anybody in the company about it; is that fair?

A. Yes.

Q. So I'm just saying, at that point, when you were drafting it yourself before you talked to anybody else at the company, why did you decide not to include any language regarding, you know, the belief that the February 21, 2023, email was not an agreement and reference the fact that the email spoke of the need for a further agreement?

MR. RUOCCO: Same caution I just gave you.

THE WITNESS: Yeah, I think ultimately the email speaks -- speaks for itself in terms of the need for -- need for a future agreement. This is setting the overall -- the overall picture.

BY MR. RISPOLI:

Q. The -- back to nChain's positions. The statement, "The platform was developed by an nChain development team under the guidance of E. Smitty," does that accurately reflect nChain's position at the time?

A. Yes, I think it does.

Q. The platform is based around E. Smitty's provisional U.S. patent application in respect of blockchain integration and digital music distribution, application No. 63/389,715, dated 15 July '2022. Does that accurately represent nChain's position on the relevance of the provisional U.S. patent to the platform?

A. Yes. The patent described the business method, which was then ultimately incorporated into the -- into the platform.

Q. The next sentence, "E. Smitty has been actively developing and promoting the DistroMint brand in social media and with his music contacts," that's what nChain believed to be true at the time?

A. Yes, that's correct.

Q. And when there is a reference that the platform

offers an attractive use case for the reasons related to BSV integration along with Eric's experience and customer and brand relationships in the music industry, that accurately reflects nChain's belief at the time?

A. Yes, that's right.

Q. Going down to row two -- I guess when we see reference to DistroMint platform, that's referred to as "the platform," correct?

A. Correct, yes.

Q. And the platform was in existence at the time of this Restructure Proposal; fair?

A. The technology had been written, but the platform company ultimately needs to be put in place so kind of it was in sort of a -- the code was there; let's say that.

Q. Right, but the platform and the project company are two separate things in this proposal, correct?

A. Correct.

Q. So the platform, you know, already existed at the time of this Restructure Proposal from a technologically feasible standpoint; fair?

A. Yes, the code had been written, yes.

Q. And as we saw with emails on the status reports, it had completed the stage of being ready for implementation from a technological standpoint?

A. Yes, that was saying that there was no issues that the technology team needed to raise.

Q. So at the time of this proposal, nChain would agree that Eric was already leading promotional activities alongside nChain marketing teams?

A. Yes, I think that had started, yes.

Q. But the -- there were no actual licenses created at this point in time for the use of either the intellectual property or the DistroMint brand?

A. That's correct.

Q. But the fee for consultancy services was already being issued and paid at the time of this Restructure Proposal?

A. That's correct, yes.

Q. And then if we go to row three, the -- as of the time of this Restructure Proposal, the -- nChain had already provided software and development services to develop the DistroMint platform, correct?

A. Correct.

Q. The time recorded, where it says time recorded at nChain internal rates is CUSD 514,000, what does that mean?

A. Exactly what it says.

Q. Well, does that mean that when we go over to row six under the right column, is that, the 514,000, a

reference to development time?

A. Yes, the 514 and fed into the 675.

Q. Are there any non-privileged sources that nChain can identify that it used to determine that number, 514,000?

A. No.

Q. You reference in subsection 2, fund payment of the $150,000 fees to E. Smitty for his consultancy services. That was already occurring at the time of this Restructure Proposal?

A. It was, yes.

Q. And the subsection 3, to undertake a normal suite of add-ons at the 2010 rates, including patent licensing, strategic sales agency, bridge financing and fundraising assistance, that had not occurred as of the date of this proposal, correct?

A. That's correct. That would ultimately be signed up with the platform company.

Q. If we go to row four, the heading is "Formation & Investment in Project Company was delayed." The reference that the project company was not incorporated, does that basically mean that nChain was aware that DistroMint LLC was incorporated and existed, but just for all of the reasons we have discussed, did not want the Georgia DistroMint LLC to be the entity in which the

DistroMint platform was contained in?

A. So, yes, all the issues that had been discussed with Eric during the last three, four months which meant that we had then got down to BVI as being the potential safe home for the platform, for the project company.

Q. The next line, "Initial expectation" starting there basically is nChain's position that it was aware that initially there was a Georgia entity, DistroMint LLC, that was planned to be the legal entity that would operate the platform?

A. That was the entity that was formed by Eric, yes.

Q. But the -- for various regulatory reasons, including the reference to enforcement action by the U.S. Securities and Exchange Commission, nChain had advised throughout the relevant time period that the platform should not operate from any company that was incorporated under the jurisdiction in the United States?

A. I think we had said that we wouldn't invest in that company if it was -- sorry, that we wouldn't invest in the project company if it was a U.S. company. So rather than talking about advice, we talked to Erik about the issues that arose from having the project company as a U.S. entity and therefore looking at jurisdictions a viable project company could be formed.

Q. This last sentence, "nChain and E. Smitty were each expected to own 50 percent of the shares in project company," what did nChain mean by that?

A. As described above, in exchange for each of the various inputs that we provided, we would be issued shares in that project company. So here it's suggesting that it was going to be the BVI company.

Q. So is it nChain's position that, at least at the beginning of the relationship between nChain and Eric regarding DistroMint, that the initial expectation was Eric and nChain would own 50 percent of the shares in the company in which DistroMint, the platform, was operated out of?

A. Had we finalized all of the above steps and agreed in an investment document, then ultimately I think that's where you get to if you go through all of the steps above that and if we finally agreed kind of where the platform -- sorry, the project company would be, then against the various inputs that we were each providing, there would be issuance of shares.

Q. But it's -- the reference is, with regard to expectations, is that at the outset, the initial expectation is that whatever company was operating the DistroMint platform, it would be -- the shares would be divided equally between Eric and nChain?

A. Okay, so the left-hand side is showing the position we got to as of the 14th of December. So it was all subject to kind of the final agreement.

Q. And under Convertible Debt, as of the time the Restructure Proposal was provided, there had been no debt issued either to Eric, DistroMint LLC, or Sound Alive?

A. That's correct, none of those entities had borrowed from nChain.

Q. Ultimately, overall, all the -- would nChain agree that all of the meetings that its employees or the development team and an nChain affiliate had with Eric was in furtherance of the development of the DistroMint project?

A. I believe so. Just trying to think of other meetings that could have occurred. I think that's the steps that we were each taking were in relation to the DistroMint project.

Q. When it came to the DistroMint project, does nChain agree that it assembled the infrastructure for the platform?

A. When you say assembled the infrastructure, so there was liaison with AssetLayer. On that front, yes. Liaison with HandCash. But ultimately, I think it was Eric who was -- I think it was Eric setting up the HandCash wallets. I don't know who was liaisoning with

Stripe. AWS, as you said, that was -- that was Eric who opened that account.

Q. The design and coding was assembled by the nChain side of the equation, though; fair?

A. Sorry, if that's -- yes.

Q. Was HandCash suggested to Eric as the wallet provider to use for the project?

A. I believe it was, yes.

Q. Okay. I mean, would nChain have agreed to use a different wallet provider other than HandCash if Eric had suggested one?

A. I think it would have depended on the functionality that was provided by that wallet provider.

Q. Just from all the wallet providers that you're aware of -- or sorry, all the projects or investments that you're aware of that utilized digital asset wallets, were any in use besides HandCash?

A. So there is the Rock wallet is the name. But other than that, those are the two that I'm aware of. Yeah, those are the two that I'm aware of.

Q. Regarding the DistroMint project, did nChain oversee the recurring delivery reporting?

A. Obviously, I think we created the ongoing reporting of the status.

Q. And from time to time, nChain would make public

announcements regarding its self-described partnership in creating the DistroMint project?

MR. RUOCCO: Object to form.

THE WITNESS: So we have seen the two items that we talked about. There is the Twitter and then there is the -- the web page which uses those terms we discussed.

BY MR. RISPOLI:

Q. But those were public announcements that nChain authorized its marketing team to make, correct?

A. The marketing team made those statements, yes.

Q. And then nChain also funded promotion of the DistroMint project?

A. When you say promotion --

Q. Sure. Would it -- we saw in the invoices that Eric submitted there were line items for press campaigns, Twitter related charges. Those were all items that nChain ultimately paid Eric for to carry out?

MR. RUOCCO: Object to form.

THE WITNESS: If those invoices were settled.

MR. RISPOLI: All right. No further questions from me.

EXAMINATION

BY MR. RUOCCO:

Q. Okay. Mr. Evans, first, good evening, good

afternoon. I know you have been sitting there for a while and so I'm going to try to make this as brief as possible.

Yesterday opposing counsel asked you some questions about whether you are certified to practice law in the UK; do you remember that?

A. Yes, I do.

Q. In the UK, are you required to have a certification to provide legal services to a business entity like nChain?

A. No, you're not.

Q. In the UK, are you required to have a certification to work in the legal department at a business entity like nChain?

A. No, you're not.

Q. Did you work in the legal department at nChain in 2023 and 2024?

A. Yes, I did.

Q. I'm going to pull up -- and excuse me if I do this wrongly. I guess just the regular share. Pull up what was marked by opposing counsel as Exhibit 3 today. Can you see this?

A. I can, yes.

Q. And I'm going to scroll down to an invoice here. This is Bates numbered SA0001832. It's a document that

purports to be an invoice from Sound Alive Enterprise LLC listing some expenses here. Do you see all this?

A. I see that, yes.

Q. Do you remember today opposing counsel asking you some questions in your capacity as a 30(b)(6) witness for nChain about whether Mr. Finnerud submitted these expenses to nChain for reimbursement?

A. Yes, I remember.

Q. Have you ever seen any receipts for backup for any of the expenses identified here on this invoice?

A. No.

Q. Have you ever seen any receipts or backup for any expenses that Mr. Finnerud submitted to nChain for reimbursement?

A. Not that I can recall, no.

Q. Okay. Thank you. No further questions at this time.

FURTHER EXAMINATION

BY MR. RISPOLI:

Q. Just a quick follow-up to the question on the invoice, Mr. Evans. If that invoice was paid by nChain, that would have required approval from Simon Wood?

A. It would be Andy Moody and then Simon would have been acting or somebody in the finance team.

Q. That invoice in order to be paid would have

required approval to -- by someone in the finance team to have the payment sent?

A. Correct, yes.

Q. Did you -- did nChain have any information that anybody in the finance team was approving any of the invoices submitted by Eric in bad faith?

A. No.

Q. Did nChain have any evidence that Simon Wood or Andy Moody were approving payment for invoices without a reasonable basis to do so?

A. Well, I haven't seen -- haven't seen the invoices attached to the invoice, if there was any.

Q. I'm sorry, what do you mean by the --

A. So if you're looking for -- sorry, talking over you -- looking for a reasonable basis, I think you normally expect that if you are claiming expenses, that there would be invoices demonstrating those expenses.

Q. Sure. But would that be something that if the finance team at nChain had any reason to believe they were being overcharged in an invoice, the expectation would be that they would do some more investigation before authorizing payment?

A. You would expect them to, yes.

Q. Did nChain have any reason to believe that anyone in the finance team was fraudulently approving the

payment of invoices?

A. No.

Q. Was there any type of policy and procedure at nChain for how the finance team was expected to go through the invoice approval process?

A. Not that I'm aware of.

Q. No further questions from me.

MR. RUOCCO: Nothing further. Thank you.

THE VIDEOGRAPHER: I'll go ahead and get your orders on the record here. Mr. Rispoli, I have you for the standard video. Would you like to purchase anything additional for this proceeding, like a synced video?

MR. RISPOLI: I'll do sync. And you might as well make yesterday sync, too.

THE VIDEOGRAPHER: And your transcript order, just the regular transcript? Was there anything else?

MR. RISPOLI: Yeah, I would ask -- well, I don't know, Debbie, do you have any communication with the court reporter we had yesterday?

COURT REPORTER: I can. I can find out.

MR. RISPOLI: I have her email from the rough. I would like an Etran. But is there any way to get the -- to rush the certified copy of the transcript

today to have by Monday?

COURT REPORTER: Sure, of course.

MR. RISPOLI: All right, that's my order. Thank you.

MR. RUOCCO: And for nChain, same order on the same schedule for the transcript and also synced video, please.

COURT REPORTER: You got it. I'll let you take us off and then I'll talk to Mr. Rispoli.

MR. RISPOLI: For the record, Jared, do you want Mr. Evans, is he going to read and sign for both days?

MR. RUOCCO: I believe so, yeah.

THE VIDEOGRAPHER: This concludes the deposition of Dale Colin Evans for Eric Finnerud, et al v. nChain UK Ltd. We're now off the record. The time is 2:59 p.m. Eastern Time.

* * *

# E R R A T A P A G E

I, DALE COLIN EVANS, the witness herein, have read the transcript of my testimony and the same is true and correct to the best of my knowledge.

______ There are no corrections.

______ Any corrections/additions are listed below.

PAGE/LINE SHOULD READ REASON

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________________________

________________________________

DALE COLIN EVANS

Sworn to and subscribed before me
this ___________ day of ___________ 2026

________________________________________

Notary Public
My commission expires___________________

DISCLOSURE

STATE OF GEORGIA:

COBB COUNTY:

DEPOSITION OF: DALE COLIN EVANS

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter acting as an agent of STENO, who was contacted by the offices of Hodl Law Cali, APC, to provide court reporting services for this deposition. I will not be taking this deposition under any contract that is prohibited by O.C.G.A. 15-14-37 (a) and (b).

STENO has no contract to provide reporting services with any party to the case, and counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. STENO will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

_____________________, CCR# B-2007 DATE: 07-31-26
Debbie C. Hennings

CERTIFICATE

STATE OF GEORGIA:

COBB COUNTY:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 198 represent a true and correct transcript of the evidence given upon said hearing.

The witness did reserve the right to read and sign the transcript.

This, the 31st day of July 2026.

DEBBIE C. HENNINGS, CCR-B-2007
My commission expires the
1st day of April 2027